UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

RENEGADE CAPITAL GP LLC d/b/a RIVERROCK FUNDS LLC, a Delaware limited liability company,

Plaintiff,

v.

ABACUS LIFE INC. n/k/a ABACUS GLOBAL MANAGEMENT INC., a Delaware corporation,

Defendant.

Case Number: 6:25-cv-00424-CEM-NWH

Orlando, Florida
April 15, 2026
2:00 PM - 3:25 PM

TRANSCRIPT OF MOTIONS HEARING
RE: [47] DEFENDANT'S FIRST SHORT FORM MOTION TO COMPEL PLAINTIFF'S PRODUCTION OF DOCUMENTS AND FURTHER RESPONSES TO INTERROGATORIES AND [48] DEFENDANT'S SECOND SHORT FORM MOTION TO COMPEL PLAINTIFF'S PRODUCTION OF DOCUMENTS
BEFORE THE HONORABLE NATHAN W. HILL
UNITED STATES MAGISTRATE JUDGE

Proceedings recorded by real-time mechanical stenography. Transcript produced by computer-aided transcription.

Stenographically reported before:
Heather Suarez, RDR, CRR, FCRR, FPR-C, CA CSR #14538
(407) 801-8921 | heather@stenosuarez.com
StenoSuarez LLC, PO Box 3574, Orlando, Florida 32802

# A P P E A R A N C E S

For the Plaintiff:

Jennifer Junger, Esquire
A. Sheila Oretsky, Esquire
GREENBERG TRAURIG PA
333 Southeast 2nd Avenue
Suite 4400
Miami, Florida 33131
Junger: (305) 579-0560
jungerj@gtlaw.com
Oretsky: (305) 579-0535
sheila.oretsky@gtlaw.com

For the Defendant:

Kathleen S. Messinger, Esquire
QUINN EMANUEL URQUHART & SULLIVAN LLP
865 South Figueroa Street
Tenth Floor
Los Angeles, California 90017
(213) 443-3737
kathleenmessinger@quinnemanuel.com

Alex Zuckerman, Esquire
QUINN EMANUEL URQUHART & SULLIVAN LLP
295 5th Avenue
Ninth Floor
New York, New York 10016
(212) 849-7234
alexzuckerman@quinnemanuel.com

**P R O C E E D I N G S**

(Proceedings commenced at 2:00 PM.)

**COURTROOM DEPUTY**: Case Number 6:25-cv-424, Renegade Capital GP LLC v. Abacus Life Inc.

Counsel, please state your appearances for the record beginning with the plaintiff.

**MS. ORETSKY**: Good afternoon, Your Honor. Sheila Oretsky and Jennifer Junger from Greenberg Traurig on behalf of the plaintiff, Renegade Capital GP LLC. My colleague will be taking the lead on this hearing today.

**THE COURT**: Good afternoon.

**MR. ZUCKERMAN**: Your Honor, Alex Zuckerman for defendant Abacus Life Inc., and my colleague Kathleen Messinger will be taking the lead on this hearing.

**THE COURT**: Good afternoon.

All right. It takes me a second to get logged in here.

All right. So we're here today on two motions, both motions to compel filed by the defendant in this case, the first one at Docket Entry Number 47. Plaintiff's response to that is at Docket Entry Number 56. And the second motion to compel is at Docket Entry Number 48 with plaintiff response at Docket Entry Number 57. I have obviously reviewed the motions and responses.

I also note the parties filed a notice on the 13th,

two days ago, indicating that they had -- that the parties have resolved a substantial part of the pending motions. So I think, from reviewing the notice, that we're down to really a handful of requests: RFPs 3, 5, 6, 7, 33, and 34, and Rogs 9 and 10. Obviously, the parties can correct me if I'm wrong.

My preference here is to deal with this either request by request, issue by issue. I defer to the parties on how best to organize this, but I find it useful to just deal with an issue once and then, you know, defendant -- defendants can start -- it's your motion; so you can start. I'll hear from the plaintiffs on that issue, and then we'll go issue by issue or request by request, whatever you think the best way to proceed is.

So, Ms. Messinger.

**MS. MESSINGER**: Yeah. I think we're fine going issue by issue.

**THE COURT**: Okay. So if you want to stand at the podium and just make sure you speak into the microphone.

**MS. MESSINGER**: Sure.

So this case, as we understand it, or as it's been pled in plaintiff's complaint, is about a data room that their former CEO, Anthony Annino, created to facilitate a transaction or a potential transaction with our client, Abacus.

As plaintiffs allege in their complaint, this data room was uploaded with what they contend is some of their most

confidential information, and they list a few in their complaint itself.

We learned about five days ago that plaintiffs did not preserve Anthony Annino's documents before he left. So we don't, quite frankly, know what's in that data room. We don't know if that data room -- documents in that data room were used to create the valuation that plaintiff contends was confidential that we have also since learned was created by Anthony Annino and sent to Jay Jackson, Abacus's CEO, through his personal Gmail -- his personal Gmail that plaintiffs did not preserve.

And so that's really the first issue is the liability. It goes to confidentiality, confidentiality that they contended, as pled in several paragraphs in the complaint -- an entire section that's titled "Data Room" that they contend that we, Abacus, took information out of that data room and then created a valuation model which we then allegedly posted for 36 hours. So we've been litigating this case under that -- under that theory -- under their theory that they pled.

So we believe, because it's all over plaintiff's complaint, that the data room is highly relevant, who accessed the data room is highly relevant, because if, for example, Anthony Annino was sharing that data room with other people, other interested parties before or after the Abacus deal fell through, that tends to negate whether that information in the

data room was, in fact, confidential.

We also need to understand how he created that model, how he created that valuation. Plaintiffs plead in their complaint that Abacus created it, and they have since, in the last several days, admitted that Abacus did not create that valuation. RiverRock did. Anthony Annino did. And when we've asked how he created that model, if there are documents sufficient to re-create that model, they can't tell us.

So we need to understand how that model was created, whether it came from the data room, whether it was shared, and so that's -- that goes to RFP 3, but I think it really just extends through all of the liability issue.

**THE COURT**: Well, let me ask you a couple questions. When you say "data room," you're referring to, like, an FTP transfer site like a Dropbox or something like that?

**MS. MESSINGER**: So we understand that Anthony Annino created a G drive, like a -- and shared files that way.

**THE COURT**: So --

**MS. MESSINGER**: So it's sort of like --

**THE COURT**: -- a cloud-based drive that he uploaded documents into that then your client could access for purposes of exchange of information?

**MS. MESSINGER**: Correct. Yes, Your Honor.

**THE COURT**: And then there was a log-in, I imagine. He sent them log-ins, and each person or a few folks from your

client had log-in information to this?

**MS. MESSINGER**: So in order to access it, Anthony Annino had to send each individual a link is how we understand it. So it's not like if, for example, Mr. Jackson, Abacus's CEO, could take it and then send it internally to other Abacus individuals. We understand that individuals -- each individual needed access from Mr. Annino.

**THE COURT**: Okay. So like a personal link?

**MS. MESSINGER**: Yes.

**THE COURT**: And then you would click on the link, create a username, password, log in and be able to access the documents?

**MS. MESSINGER**: That's our understanding, yes.

**THE COURT**: Okay.

**MS. MESSINGER**: Or if you already had, like, a Gmail account, as long as you had the link that was personally shared to your, like, Gmail, then you would be able to access it. But for all intents and purposes, Your Honor's understanding is correct.

**THE COURT**: All right. And then I take it that that was the primary device that you use to facility the exchange of confidential information but not the only. I hear there's some dispute that there might have been an exchange of confidential information through email or otherwise, but I assume the data room was the primarily means.

**MS. MESSINGER**: Well, that was our understanding based on how plaintiffs pled their complaint -- was that all the confidential information that was exchanged, that the data room was the primarily repository for that.

**THE COURT**: Okay. And then the other question I have is you mentioned the creation of a valuation that got -- I take it from the -- I have read the complaint, and I read through at least part of the confidentiality agreement the parties have. I just want to make sure I understand exactly what the theory of the case is and kind of where the parties are at so I can make an informed decision here.

But tell me what you mean by this valuation that was created, and kind of walk me through, at least from your perspective -- and I'll give plaintiffs a chance, obviously, to give me their perspective -- what this case looks like.

So it sounds to me like there was a data room, there was an exchange of information like in every one of these sort of buyout situations, and some information gets leaked somehow on a public website. It gets to be public for -- I think you say in the complaint it was, like, 36 hours it was published, and then it gets leaked.

And so it sounds to me like you're trying to figure out what got leaked; right? And that's why you want this information from the data room? Because I see from these requests it's a broad request: everything relating to the data

room. So kind of walk me through your theory of what exactly you want and what the purpose of it is. And then you can also kind of explain to me what you mean by -- or what, from your perspective, was the information that was leaked.

**MS. MESSINGER**: Sure. So I think I'll take it in two parts. So in terms of the valuation itself, plaintiffs pled that we took information from this confidential data room and created a valuation model to assess sort of -- you know, the process of buying the business, buying RiverRock; right?

And so that -- because that's how they pled it, that's how I understood why that data room would be relevant. But since then, because they have now said that that's -- that the valuation came from Anthony Annino's Gmail, personal Gmail, and not necessarily from the data room, we still need to understand how Anthony Annino created the valuation model and why that's sort of -- how that fits into the broader case.

They contend -- and we still are trying to understand the contours of what confidential information they're saying that our client posted, but as we now understand it, there are two slides that were posted in a multislide deck, a multislide Abacus board deck. Two slides.

One slide is essentially a copy and paste of a valuation model that Anthony Annino sent our client. Another slide has a host of information, including things like assets under management, sort of the number of investors they would be

able to tap into. I think it was, like, 160 or something rather. So there are sort of two slides that are at issue. Abacus, you know, allegedly, again, per plaintiff's complaint, uploaded that deck for 36 hours and then pulled it down immediately.

So the data room is important in all of this because, again, as they've pled, that information came from -- the valuation came from the data room or at minimum the information used to create that valuation came from the data room, and so we're entitled to test exactly how that valuation model was put together, whether Anthony Annino shared that information with other people that were under an NDA, for example, or who accessed it, because, again, that goes towards whether or not it's confidential in the first place.

The confidentiality agreement at issue has two very clear kind of ways in which things were deemed confidential. One is that they are stamped confidential, which they have not pled, and the second one is that it's sort of a what would a reasonable business deem confidential.

Well, if Anthony Annino was doing things on the side, whether he was either bluffing in terms of valuation such that the valuation isn't actually what they claim it is, is highly probative of the value of the company itself. But also, again, whether he went and shared things, whether he shared that same exact data room with other individuals that weren't under a

confidentiality agreement or what have you goes towards whether or not information in that data room itself is confidential.

**THE COURT**: Okay. Thank you. So we'll take this issue by issue, then. So I'll hear from the plaintiffs on this particular data room issue, and then we can move on to the next one after that. Okay?

**MS. MESSINGER**: Okay.

**THE COURT**: So, Ms. Junger, is it?

**MS. JUNGER**: Junger.

**THE COURT**: Junger.

**MS. JUNGER**: It is technically Junger, but we have taken the German out of it.

**THE COURT**: Okay.

**MS. JUNGER**: Good afternoon, Your Honor. This case is as clear a liability case as any case that I've ever seen.

We know that RiverRock and Abacus were in negotiations for a potential acquisition of RiverRock to Abacus. We know that RiverRock and Abacus entered into a confidentiality agreement -- very broad confidentiality agreement, which made the terms and contents of this agreement confidential, and the terms specifically discuss the consideration of the discussions between the parties regarding a potential business transaction between the parties.

So the very fact that there was a potential acquisition was confidential. And no one at RiverRock, aside

from Mr. Annino and the principal, knew that this acquisition was happening. So it was very important that that be kept a secret.

In addition to the acquisition itself, the confidentiality agreement broadly protects "all data and information of or related to such party that is marked or would logically be considered as being of a confidential, proprietary, or secret nature." Not going to read you the whole thing. But it goes on for a long time, and it specifically includes finances, data, financing structures, and analyses.

So a data room was created, as is common in business acquisitions. A data room was created whereby Anthony Annino uploaded documents which were purportedly received by Jay Jackson, Abacus's CEO.

Emails went back and forth where Jay Jackson said things along the lines of "Looking good. We want to move forward with this transaction. Things are doing great." However, what the defendant has represented to you, that they need to know what was in the data room, is not true.

There is no dispute in our mind that what was put into the data room is indeed confidential. However, we have come to learn in discovery that what was put into the data room is not what was breached. So Your Honor had asked defendant during her remarks -- I'm quoting -- not quoting you perfectly,

but you said something along the lines of "So you're trying to figure out what was -- what was posted?" We know and we've always known what was posted.

If I may approach, I can show you.

**THE COURT**: Sure.

**MS. JUNGER**: It's these two pages.

So this is a board deck that was presented to Abacus's board --

**THE COURT**: So before I miss anything, is this something that is confidential?

**MS. JUNGER**: Yes. So it lists in the banner "acquisition of RiverRock funds." That in and of itself, if publicly posted, was a breach of the confidentiality agreement. But beyond --

**THE COURT**: But for purposes of this hearing today, this is a confidential document?

**MS. JUNGER**: Oh, yes. Yes.

**THE COURT**: So it's something that you would want -- if you want me to look at it, I'll admit it as an exhibit. We can keep it as confidential, but it needs to be on the record if you want me to look at it.

**MS. JUNGER**: So when we have uploaded it previously, we've had it redacted or under seal. We would still not want it in the public record.

**THE COURT**: So is it already on the docket

somewhere -- this particular document?

**MS. JUNGER**: In our response to the short form motion, we included a snippet which redacted all the numbers, but I don't believe that we attached it to our complaint because of the confidentiality issues.

**THE COURT**: Okay. So then this document is actually on the record in its full form under seal?

**MS. JUNGER**: I don't believe so, no.

**THE COURT**: Okay. So, I mean, I'm happy to admit the entire thing and keep it under seal --

**MS. JUNGER**: Sure.

**THE COURT**: -- just for purposes of the record if there's no objection from the defendants on that.

**MS. MESSINGER**: No objection, Your Honor.

**THE COURT**: Do you have any objection?

**MS. MESSINGER**: No objection.

**THE COURT**: So I'll mark this as Exhibit 1.

(Plaintiff's Exhibit Number 1 was admitted into evidence under seal.)

**THE COURT**: And we'll just keep it under seal.

**MS. JUNGER**: Thank you.

So this was two pages in a board deck that was presented to Abacus's board, and after the board meeting, it was posted to Abacus's investor website, which is a fact that Abacus admitted. So when I started my remarks, I said this is

a clear liability case. Abacus swore and signed interrogatories that, yes, they did post this to their investor website. There is no dispute in this case that this was posted to their investor website.

And while defendants may say, you know, it was only on for a mere 36 hours and immediately taken down, 36 hours is not a small window of time, especially when a reporter was able to see this information, post it -- or prepared an article about it, and published it in *The Deal* publication, which is a highly circulated publication, including one that every single employee of RiverRock receives.

So everyone at RiverRock gets their automatic emails from The Deal, and all of a sudden they see, "Oh, my gosh, our company is about to be acquired, and let me, like, look at this valuation model. It shows that all of our jobs are going to be eliminated. They're reducing our entire payroll when they acquire us." No one at the company knew this information, and it caused complete panic and chaos.

We've interviewed RiverRock's general counsel who confirmed to me that even she as general counsel of the company had no idea -- I'm sorry. Former. Former. A big element of this case is that there is no one left. So all of the employees have quit. Former general counsel. She had no idea that this was happening, that these acquisition talks were happening. She was completely shocked to have seen it pop up

in her email. And not only did it go to everyone at RiverRock, it went to anyone that receives *The Deal* out in the public forum, posted forever.

So this is now creating issues with our own employees who are looking for other jobs because they know that their -- the company is going to be sold. This is creating issues with our investors who have fear now that they don't know who the leadership will be. Caused mass, mass panic.

So the insinuation that Abacus doesn't know what confidential information was posted is completely false. It's all right here.

Now, where the data room issue gets -- gets brought up is that, yes, we had a data room. Information was in the data room. It was prepared by Anthony Annino, who no longer works at our company, on his Gmail. I can only insinuate that he did it on his Gmail because it was a secret, and if he was saving things to the company's server, people would find out. I don't know that information, but that's -- that's my best guess.

Anthony Annino has left, and the former GC, before she left, reached out to him on numerous occasions to send us everything that he discussed with Jay Jackson via Gmail. He sent us some things. We have some of the documents in the data room, but we don't know with full certainty that he sent us everything. We have sent him a litigation hold, and we have

told opposing counsel that if they'd like to get the information from Mr. Annino, they can, but he is not part of our company anymore.

So when they make the statement that RiverRock did not preserve, that's not true. RiverRock had no authority to preserve Anthony Annino's personal Gmail account. That's not under RiverRock's possession, custody, or control; and they're more than welcome to subpoena him and get it from him.

But what's in the data room is not -- or what's in the data room is confidential because it discusses our funds and our business. But this is what was posted, and we know that this was circulated -- "this," being the valuation chart, was circulated via email from Anthony Annino.

May I approach again?

**THE COURT**: You can hand it to Ms. Reyes here in the front.

**MS. JUNGER**: This was circulated via email from Anthony Annino to Jay Jackson. And you'll see the chart attached to it is the chart that was lifted and pulled into the board deck, which then made its way onto the website, which then made its way into *The Deal* article, which was then sent to anyone that reads *The Deal*.

So they're trying to take a simple liability case and, you know, make it hurt for us through discovery by forcing us to piece together a data room which was never under our

control and which is not relevant to proving the breach. We proved the breach by showing that they posted acquisition of RiverRock funds on their website. We proved the breach by showing this valuation chart, which includes highly sensitive confidential information about our projections, our management fees, our rent, our payroll, our accounting.

All of this is highly sensitive information, and this did not come from the data room. This came from that email. So there's no reason to have us figure out technically who accessed, who didn't. And that's not even something that I could do because, like defendant stated, it was on Anthony Annino's personal G drive.

So we don't think that that request is proportional or narrowly tailored to meet the needs of this case when we are specifically telling them, "This is what was confidential. This is what was posted. That is how you breached." Of course, you know, we'll have plenty of time to fight over damages, but the liability of posting this was admitted both in the sworn interrogatories and on the Form 8K that Abacus had to file as a publicly traded company admitting to the world that they should not have posted the board deck.

**THE COURT**: I'm just scrolling through the complaint here.

Okay. So then your position is that the entire breach that you're alleging -- it constitutes really just these

two board deck pages?

**MS. JUNGER**: Correct. Because the rest of the board decks has nothing to do with us. That's their other --

**THE COURT**: Right.

**MS. JUNGER**: -- business.

**THE COURT**: Page 29 is --

**MS. JUNGER**: 29. It's unfortunately listed, 29, twice.

**THE COURT**: So it's 29 and 29.

**MS. JUNGER**: Yeah.

**THE COURT**: All right. And I've just read through your complaint, because that's obviously what governs, and you do mention the data room, but it looks like that's just background; right?

**MS. JUNGER**: Yeah. Exactly. It's background. It's part of the precipice and history of these parties, but it's not where this breach stems from.

**THE COURT**: And then you have alleged breaches, and it does look like -- I read that section beginning on page 10 of the complaint, which is filed under seal at Docket Entry Number 11.

**MS. JUNGER**: Yeah.

**THE COURT**: And it does reference, as far as I could tell, just the board deck. Two full pages of the board deck. Although you do use the words "confidential information" here

and there, I think you do -- the complaint at least does -- does some work at limiting it to just these two things.

**MS. JUNGER**: Yeah. And I also want to point out, because I forgot to mention before, Abacus has, on many meet and confers, stressed how, you know, they have a right to see who else had information in the board deck, and I think that that is a red herring for two reasons:

First, like I said, what was in the data room is not what's at issue. It's what was in that valuation.

But, second, the confidentiality agreement has an explicit carve-out for -- I'll just read it. "For the avoidance of doubt, confidential private placement memoranda and relating documents or information provided on a confidential basis to prospective purchasers of interest in any pooled investment vehicle managed by the receiving party or its affiliates shall not be considered in the public domain for purposes of this section."

So we often -- "we" being RiverRock, often had to send confidential information to potential investors to invest into the funds, and that was specifically carved out by this agreement, and they've made no good faith showing that they have any reason to believe anyone other than a potential investor or purchaser received this information.

So to allege that, you know, they have the right to challenge that someone else may have seen it, that's just a

fishing expedition. We are entitled to share this information with our investors. That's how our business operated.

**THE COURT**: So that's -- I think that's the rub here -- right? -- because there is a -- and you might have to -- because there's a very long confidentiality section in here; right?

**MS. JUNGER**: Yes.

**THE COURT**: But it does look like there's a lot of things that are just confidential. You can either mark it or it just is because of the agreement. But Subsection B of that section talks about that, you know, it's not confidential if it was in the public domain or if it's otherwise disclosed; right?

And it seems to me like what they're trying to get at is if this information was within that subsection -- right? -- if it was otherwise disclosed or something like that, then it might not constitute confidential information; and if it was included on the data room and the data room was available to other people, maybe that exception would apply and it's no longer confidential. Right? That's what I understand them to be arguing.

And I'll -- Ms. Messinger, I'll give you a chance to say it yourself, but that seems to be the relevance here. Right? They want to -- even if this is the only confidential material, they do have a right to investigate whether or not it actually falls within the confidentiality provisions of the

agreement, part of which would be was it -- could it have possibly have been disclosed subject to invoke this -- this thing.

But you might have to read back to me the exception that you just read before --

**MS. JUNGER**: Sure.

**THE COURT**: -- on how it kind of plays with Subsection B here.

**MS. JUNGER**: Sure. Sure. So I have a few responses to that first.

**THE COURT**: Sure.

**MS. JUNGER**: Fully appreciate what you're saying, Your Honor, but whether or not the information in the data room was confidential is not relevant to the dispute because the email that I passed up to Your Honor clearly shows that the board deck 29, 29 -- two pages -- did not come from the data room. It came from an email.

**THE COURT**: Well, how do you know that?

**MS. JUNGER**: Because he attaches the email, and he says, "I prepared this" -- he doesn't say, "I prepared," but "Put this together. Here it is. Here's the valuation."

**THE COURT**: Well, that's true, but let's just say, for example, that if this -- because where did he get this spreadsheet from? Because if you're -- if the parties are exchanging information of valuation models, this is something

they would exchange. So he might have sent it in the email; it might have also been in the data room. You don't know that. You can't tell me for sure today that this wasn't in the data room, can you?

**MS. JUNGER:** No, I cannot. I cannot tell you that it wasn't in the data room and/or that the information in the data room could have put it together -- could have, you know, been consolidated to put that together. But what we do know is that the confidentiality agreement has an exception such that us sharing information with our investors is not considered putting a document in the public domain.

**THE COURT:** So cite to me that part of the agreement again just so I can read it.

**MS. JUNGER:** Sure. It's on page 2.

**THE COURT:** Okay.

**MS. JUNGER:** In B. And it is, like, the last four lines, five lines of B.

**THE COURT:** All right. So "For avoidance of doubt, confidential" -- well, I won't read it into the record since it's confidential --

**MS. JUNGER:** Yeah.

**THE COURT:** -- information anyway. But let me just read it.

So there's a lot of -- like, it's a complicated agreement. So generally the way I read it is that there are

some exceptions for things that make it into the public domain one way or the other. And then there's, like, an exception to that exception that allows you specifically for specific types of documents. So "confidential private placement memoranda and relating documents or information provided on a confidential basis" -- so that's the information -- "to prospective purchasers of interest in any pooled investment vehicle managed by the receiving party or its affiliates." So I don't know what that means. But that's a specific thing. So in order for that to apply, all of those things have to be true.

And sitting here today, I can't say -- I mean -- I mean, maybe you can tell me, but what they want to do is -- is that -- does that apply or not? Like, if this was in the data room -- right? -- or if this was provided to other parties, whether or not those other parties fall within that exception to the exception -- because if they don't, this isn't confidential; right? If it was produced to parties that don't fall within that exception to the exception, then it's not confidential.

**MS. JUNGER:** Well, what I can tell you for sure is that the announcement of a potential acquisition was confidential. So if, you know, we go to trial on this case and prevail on liability, that the fact that there was an acquisition -- a potential acquisition between RiverRock and Abacus and it was posted on the website -- that is

confidential, and that is all we need to prove our case on liability.

**THE COURT**: Well, it may be all you need, but you've alleged more than that. You've alleged that they breached -- because this is a separate breach than that, isn't it, the announcement that *The Deal* -- just the announcement of the existence of the deal is a breach. The production of confidential information is a separate and independent breach, isn't it?

**MS. JUNGER**: We have only one count in the complaint. It's just a breach of the confidentiality agreement, and we -- the fact that there was an acquisition is confidential information. So I'm not viewing those as two separate counts or two separate claims. They breached the confidentiality agreement because they announced our sale to the world.

And that's pretty clear in paragraphs 72 and 73 of the complaint. Specifically, we say, "The confidentiality agreement puts Abacus on notice that it is responsible for and liable to the disclosing party for any breach. The confidential information posted on Abacus's website should have never been publicly released. Sharing that information on the Internet was not necessary to valuate the potential transaction. It was not authorized to be disseminated by RiverRock, and it was spread far beyond those who had a need-to-know basis."

So the fact that there was a sale was -- a potential sale was the breach. And disclosing, you know, financial information is in support of that breach, but they're not separate counts. Either way --

**THE COURT**: Well, they could be separate ways to prove the breach; right? So you could do it either way, and they're independent of each other.

**MS. JUNGER**: Sure.

**THE COURT**: So when you say the announcement -- the announcement of a deal, you're still just talking about this; right?

**MS. JUNGER**: Correct.

**THE COURT**: So this in general -- the fact that they announced the deal at all is a breach?

**MS. JUNGER**: Correct.

**THE COURT**: But each one of these individual pieces of information, if it's confidential, is a separate beach of the agreement. I'm not saying you have a separate count --

**MS. JUNGER**: Also correct.

**THE COURT**: -- but you don't need -- you can prove a breach with any one of these things; right?

**MS. JUNGER**: Can my colleague say something?

**THE COURT**: Sure.

**MS. ORETSKY**: Can I just say one thing?

**THE COURT**: Yes.

**MS. ORETSKY**: I'm sorry. It's very hard for me to sit back and not say anything.

**THE COURT**: It's a complicated case. That's fine.

**MS. ORETSKY**: So, Your Honor, I do a lot of these cases, and there's usually a trigger when you're coming in and saying, "Well, this document actually isn't confidential." You can't just, in every single breach of an NDA, turn around and say, "As a defense, it doesn't just rise -- pop out of nowhere and say, 'By the way, the document wasn't confidential.'" Usually there's some trigger. "Well, we saw that so-and-so posted it somewhere. We saw that you produced it to so-and-so." There is no trigger that exists in this case.

**THE COURT**: But how are they supposed to get that without discovery?

**MS. ORETSKY**: Well, if you were to look at -- I'm, unfortunately, too familiar with the case law, but when you look at the case law on these breaches -- right? -- it's not a fishing expedition into "Well, did you share it with Joe Schmo down the street or your neighbor?" It's more of a "Well, I know for a fact that somebody else posted it on a public domain. Okay? So you have -- there was access to -- you know, multiperson access to some website or there was -- you know, you disseminated this outside of your company." There's usually some trigger that -- that requires that kind of discovery.

But if -- if -- what they're arguing here today is "We have no indication whatsoever that this was shared with any third party, but yet we want to go on a fishing expedition and ask you to go to every single member of your company, go -- go -- anywhere. Look in every single corner that you can to find out if you took one of these numbers on this highly confidential document and shared it with somebody." And to me that's a complete and utter fishing expedition.

This is a clear liability case that's being completely blown up into something -- like, the discovery is not proportional at all because they are admitting we did something wrong. They put it in their 8K. They answered in their interrogatories. This shouldn't be a "We'll consent to liability. Let's fight over damages." But somehow we're here on multiple discovery motions on a really -- you know, I don't think this is a hugely complicated case. It's actually really one of my most straightforward breach of NDA cases that I've actually seen. There's no -- there's no trigger here. There's no indication that any of this information was ever shared with any third party.

I just wanted to put that on the record.

**THE COURT**: That's fine.

**MS. JUNGER**: And following up on Ms. Oretsky, the case that Abacus cites, that *Thrillest* [sic] case -- specifically in that case, the party claiming confidentiality

had themselves posted in a public forum the information that they allege to have been confidential. There's no claim of that here. That's clearly them putting something into the public domain. That's not what happened here.

And ultimately, you know, circling back to the beginning argument, this is all information that needs to be obtained from Anthony Annino. There is nothing that we can do to access his Gmail.

**THE COURT**: Well, let me ask you one more question because --

**MS. JUNGER**: Of course.

**THE COURT**: -- ultimately the factor I have to discuss -- that I have to apply here is, you know, is it relevant and proportional to the needs of the case. So tell me what is the value in this case? How do you see it? I mean, that's a relevant factor; right? What's the value of this case, in your mind?

**MS. JUNGER**: Sure. So it's a multimillion-dollar claim. We're alleging that we -- you know, we were seriously damaged by the breach. We lost half of our workforce within three months of the breach. It was a very -- you know, 12-person, pretty small company. So when employees find out that they're going to be terminated, they leave.

And our expert disclosures are not due for a few weeks, but our expert will set forth an opinion regarding lost

profits on the funds, which, had they been able to take off and get the investments that they needed to have taken off, what those funds would have produced in lost profits. And our expert will speak to the valuation of the company from before the breach and after the breach.

So it is several, several million dollars.

**THE COURT**: We'll be talking about the valuation question, I think, next, but as I understand it from some of the disputes, there were other potential deals kind of -- or there was other negotiations that was going on around this time. Is that right?

**MS. JUNGER**: Yeah. We spoke with multiple people -- multiple entities on being acquired. Obviously, there was -- there was kind of two -- two things going on. There is "We're reaching out to investors to invest money into the funds" and "We're discussing acquisitions of the full funds with other entities." And the potential acquisitions took place after the Abacus deal fell through.

**THE COURT**: Okay. Well, let me hear from Ms. Messinger.

**MS. JUNGER**: Sure.

**MS. MESSINGER**: So I think I heard my good friends on the other side here talk about a trigger, and I'm glad she raised that because it's not a fishing expedition. In December -- December 5, 2023, which is Exhibit H to their

complaint, Anthony Annino emails Jay Jackson and specifically raises the prospects of litigation. So in December of 2023, RiverRock was under an obligation to preserve his documents, but they didn't then and didn't, apparently, until 2025.

At that time, when they were considering litigation, they could have and they should have collected Anthony Annino documents and personal Gmail account. And why that matters? We also heard recently, in the last couple days, from counsel that Anthony Annino was using his personal Gmail against company policy. So we don't know who he was talking to, what information he was sharing, and that's information that we're entitled to know, entitled to test.

**THE COURT**: Well, if we're talking about his Gmail, they said they don't have access to it. If there's a -- if there's a preservation issue -- I don't know that we're here on that particular problem today. Right?

**MS. MESSINGER**: You're right, Your Honor.

**THE COURT**: So they don't have the Gmail; so we're really just talking about the data.

**MS. MESSINGER**: Sort of, Your Honor.

And you're right. That issue is not before the Court, and we are certainly pursuing or considering sanctions for failure to preserve.

The data room and his Gmail are intertwined because he shared, from our understanding, the data room through his

Gmail. So that kind of gets at this whole, like, do you have -- I mean, we, quite frankly, don't know if they have the complete data room. But, regardless, the information that they now say that is at issue, the two slides -- one of them is the valuation that was sent via Gmail from Anthony Annino to Jay Jackson, but the other slide --

**THE COURT**: When you say "the valuation," you mean the spreadsheet?

**MS. MESSINGER**: Yeah. That's the valuation. When we've been talking about valuation, that's what we're referring to. But the other page includes things like 160 million in assets under management, seven-year close-end fund structure, 2024 estimated net revenue of 1.5, access to 100-plus new investors.

They're contending that this information is also their confidential information. That's not on the deck. So if -- we're entitled to test whether that was in the data room and whether that was being actively shared by Anthony Annino or others at RiverRock with other individuals such that it would cast doubt on whether or not it is, in fact, confidential. So that's on the Annino -- I'll call that the Annino preservation issue.

And then in the other -- in terms of the confidentiality agreement -- or I should take a step back. Counsel today has sort of rewritten their complaint as if

they're only focused on the fact of the acquisition being disclosed is the breach. The main breach at issue.

Paragraph 30 of their complaint reads -- one second -- "Abacus included the confidential information from the data room in the slides of the board deck." Paragraph 49, "The most detrimental piece of confidential information posted on Abacus's website and recirculated was regarding RiverRock's payroll." That comes from Anthony Annino's valuation model that he circulated to Jay.

So the fact of the acquisition they're now saying is sort of the sole breach -- or they seem to be relying on that as the sole breach, and they had an opportunity to plead it that way, but the fact of the matter is is the operative complaint says the data room. The information came from the data room. The issue is the data room.

**THE COURT**: So then what specifically -- I mean, walk me through what information you want. I mean, I'm looking at Request Number 3, and there's a couple of things: the platform and web address; the documents that were added, including what date and time; security measurements that were in place; and logs or evidence for who accessed the documents and the data, including the date and time from when they were reviewed. But it has a catchall for "related to."

So is there anything other than that that you anticipate, you know, that they have?

**MS. MESSINGER**: Yeah. So we principally want the documents that were in the data room to test and see whether any of that information made its way into the valuation that Anthony Annino created but also, again, who it was shared with, who accessed it, how they accessed it, whether it was password protected. That is sort of the scope of what we're looking for. So nothing -- nothing else on the "related to" language that you mentioned.

**THE COURT**: Ms. Junger, let me just ask you one more question.

**MS. JUNGER**: Of course.

**THE COURT**: Is this the same data room that you use for every deal, or do you have a different data room?

**MS. JUNGER**: It's not because it was on Mr. Annino's personal G drive; so that's not the same data room that we would use for other things.

I do want to clarify one point just in case there was any misunderstanding, and if there was, I don't know how it got there. But we did ask Annino in 2023. The former GC asked him many, many, many times before he left to give us everything that he had, and he did send us some stuff. He did. So she was able to piece together what she could of the data room, but she can't -- and she's a former GC for them at this point, but she can't beyond any shadow of a doubt say this is the complete universe of documents because we never got that confirmation

from him.

So to suggest that there's a spoliation issue when we did do everything we could to preserve something outside of our systems is completely false. That's not --

**THE COURT**: We're not here on that issue now.

**MS. JUNGER**: Of course.

**THE COURT**: But it does feel like the answer is we don't have a lot of this stuff anyway.

**MS. JUNGER**: We don't have a lot of this stuff anyway. And it's, frankly, been surprising to us when we've conferred with Abacus because they're claiming they don't have it either, but we know that -- we know that the data room was shared with Mr. Jackson and, presumptively, he downloaded the documents because he was also emailing our client saying, "Looks great. I want to close in a month. We're so excited about this deal."

I don't presume he would be so excited about a deal without having reviewed the documents, but they're claiming they don't have them. We have what we were able to piece together, but we cannot swear to you that we know everything that's on Mr. Annino's computer, and he hasn't been subpoenaed. So if they want that information from him, that's who they need to get it from.

And, again, we don't believe the data room is relevant knowing that everything came from that -- that email.

**THE COURT**: Well -- so hearing from both sides -- thank you for the argument. These things are always hard for me because I don't know your case as good as you do. I don't know what this is going to turn into. I don't know what's going to be relevant or not or what's going to be admissible or not, but from what I can tell as pled and based on my review of the agreement -- I can't say that the information they're asking for in RFP Number 3 is -- is so irrelevant as to be outside the scope of discovery considering that there's a variety of different things that are alleged that could potentially be breaches.

There's an exception for -- it might not be a breach under the agreement if the information was shared or otherwise published outside of someone that doesn't fall within that subsection. I don't know if that happened or not; but, regardless, it sounds like you don't have a lot of that information anyway, in which case it's not a -- it's not an extraordinarily big lift in that it's not hugely disproportional to the needs of the case. Even if it's minorly relevant, it doesn't sound like you have a whole lot of this information anyway.

And so I'm going to overrule the objections for -- for RFP Number 3 and order you to produce the documents -- whatever you've got in your possession, custody, and control -- in response to those requests, specifically the ones laid out

in, you know, Sub 1, 2, 3, and 4. I don't like the use of the word "relating to" in this situation. So it's set out in those specific subcategories.

If there's other specific information you need, you can set out new RFPs that specify exactly what type of data, because I can see it being a very odd thing, because I don't know how this stuff is created, what type of -- and I don't think even you know really. When you say "relating to," that could be a whole lot of stuff. So I'll order you to produce the things that are specifically cataloged in the Subs 1 through 4 RFP number.

**MS. MESSINGER**: At the expense of the wrong -- prior counsel, those are not our RFPs that we drafted, Your Honor. So noted on the "related."

**THE COURT**: Okay. So that takes care of RFP Number 3, I think.

Now -- and you'll have to -- I suppose we can walk down to 5 next, if that's the next one that's in dispute.

**MS. MESSINGER**: Yes. Just a moment, please.

**THE COURT**: I'll also take this -- we'll mark it as Exhibit 2, the email with the attachment, and I'll file that confidential. We'll have it as a Court's exhibit, and we'll keep it confidential.

**MS. JUNGER**: Sure. Thank you.

(Plaintiff's Exhibit Number 2 was admitted into evidence

under seal.)

**THE COURT**: All right. Wherever you want to go next, Ms. Messinger.

**MS. MESSINGER**: Yes, Your Honor. So as we -- Requests 5, 6, and 7 are all sort of requests that relate to the model that Anthony Annino created and the financial information that he considered in creating that model, and so the requests kind of go to that. So it's a little bit of the same argument for Request 3, which is to say that anything that he used or any of the financial statements that they can cobble together to re-create that model are kind of what the Requests 5, 6, and 7 are getting at.

And we understand from counsel that they don't know, apparently, how that model was put together, but financial statements that tend to support the valuation model that was shared or re-creating it would be responsive to these requests.

**THE COURT**: This seems to go to a different issue than the previous one. The previous one, the issue you're looking at is is it -- was it a breach or not. Could it have been, you know, subject to such -- this is slightly different because this -- because I don't know how the underlying -- the documents underlying this evaluation necessarily go to -- maybe you can tell me I'm wrong. Maybe it goes to this breach issue. It seems to me like it's more directly relevant to the damages model here. Right?

**MS. MESSINGER**: Yeah. You're right, Your Honor. It certainly does that. So these documents at -- again, as they relate to the Annino model, Rog 3 that RiverRock answered specifically states that they're using that 10 million figure that Anthony Annino arrived at in the valuation model in conjunction with some other things to say that they arrived at a 15-plus-million-dollar damages figure.

So that valuation model and however he created it -- the financials that went into it -- they are, per Rog 3, going to be relying on that in their damages theory. So --

**THE COURT**: What, if any, have you gotten? Because I see in the response to Request Number 5 that subject to foregoing objections, they said they're going to produce. So it's unclear what's been withheld. Do you have any sense of whether anything responsive has been produced at all?

**MS. MESSINGER**: So they definitely -- they produced some financial statements, it appears, last night. But the problem there is, again, that they won't commit one way or another about whether those financial statements support the valuation model, which form the basis of their answer to Rog 3.

**THE COURT**: Let me talk to Ms. Junger, because I have a feeling the answer is they might not know the answer to all of that if this is from a guy who's no longer there. So maybe I'll hear from her, and we'll see where this goes.

**MS. MESSINGER**: Sure.

**THE COURT**: I understand your argument, though.

**MS. MESSINGER**: And sorry. Just to clarify, we are -- the financial statements are relevant generally because they're saying that they were damaged based on this valuation number. So we're seeking financial statements generally to test their theory there. So just in case that wasn't clear --

**THE COURT**: No. I understand that. Thank you.

And this seems to be, in some way, probably the most relevant statement -- right? -- because it's the valuation at the point at which the damage occurred.

**MS. JUNGER**: Give me one quick second.

**THE COURT**: Sure.

**MS. JUNGER**: So I think that -- just taking this because it's an email, and I just want to be able to read it correctly. I was surprised that we couldn't reach an agreement on this specific request, because I did email the other side and say, "We will agree to produce here; however, I stand by our objection that all documents and communications related to essentially any financial term provided to Abacus is overbroad and difficult to ascertain. We are not trying to hide anything, but I need to understand exactly what you are looking for so I can pull it. Please provide a list of the type of documents that you need, and we will search for and produce them."

So I'm not saying that we won't produce here. We're

not being obstructionist. And, in fact, we have produced every single financial statement that we are aware of that would support this. But I am not Anthony Annino, and I can't get into his head to predict everything that he may or may not have relied on.

And I will quote Your Honor himself that "related to" requests are very challenging because their definition of what might relate to something may be different than my definition of what might relate to something. And I don't know what we can do other than we gave them the financials that we have, and we're asking them, "Tell us what you need, and we'll produce it."

I agree with your statement this is about the damages. It's not about the breach. And we're not relying on that $10 million valuation. It's a fact in the case for sure, you know, whether we came up with that number, and "we" being Annino, who is a former employee, so not quite a "we" anymore, but whether Mr. Annino came up with that number or whether Annino and Mr. Jackson spoke over the phone and discussed it together or whether Jackson -- Mr. Jackson just saw the number and said, "Hey, let me just post it."

Either way, they committed to that number and posted it in a public forum, which was disseminated. But we're not using that as the basis for our damages. We have an expert that is independently providing a valuation. So it's not

relevant because we're not relying on it. I can't give them what I don't know what they're looking for, and I've invited them to "Tell me what you're looking for, and we'll give it to you."

**THE COURT**: I mean, this seems like one of these problems where it's how deep do you go down the accounting rabbit hole to -- to prove up these things, because I do think it's relevant for their purposes. Whether or not you rely on it, it's a -- it's a valuation that's -- that was purportedly created by Mr. Annino who is -- what was his position at the time?

**MS. JUNGER**: CEO.

**THE COURT**: So a valuation, at least in some measure, created by him right at the time these breaches occurred. And so, you know, it's relevant for them because you could go in there and you could say, "Oh, well, he didn't know what he was doing. Those numbers are crap." Well, this number might be good for them. So they have the right to investigate what might have supported these, to see if the financials at the time would have supported these numbers.

Now, what information that specifically is, I mean, I don't know. I guess it depends on the number. But I do think they're entitled to look into some of the data that underlies this, but -- I mean, I imagine you have an expert, like an accountant or something you're going to use?

**MS. MESSINGER**: Yes, Your Honor.

**THE COURT**: Okay. So what I would do is get your accountant to say what do you need. What do you need to prove up these numbers in terms of data? And then go back with that.

**MS. JUNGER**: Sure.

**THE COURT**: Because it doesn't need to be everything. I mean, you know.

**MS. JUNGER**: Yeah. I think -- sorry to interrupt, but I think there's, you know, a reasonable scope. They're not entitled to a completely unfettered, you know, access to all of our financial records since the beginning of time. And of course if they give us a list, we reserve the right to object to some things on that list, but I'm telling them, "We're happy to search for things. I just don't know what you want." And we've conferred on this for more time than I'd like to admit. So that's -- that's our -- that's our position.

**THE COURT**: Yeah. This is one of these -- thank you.

This is one of these where there's a big gray area, and it's nobody kind of knows where to -- where to land.

So, Ms. Messinger, what is your proposal? So what exactly -- because, I mean, what do you want, I guess, in terms of background of data for this?

**MS. MESSINGER**: Sure. Absolutely. So, again, I heard counsel talk about working with her own experts to create a valuation, so presumably whatever that expert is asking for

would be highly relevant for our purposes.

But I also just want to point out that in one of our meet and confer letters, we did, in fact, say that this -- we were looking for information like documents that would be sent to a CPA, essentially; right? How does your CPA audit your financials?

And so I think we are willing to certainly take it back, but I think a lot of this, again, is on -- they know how their valuations work, and to the extent they keep saying that they -- you know, Anthony Annino's no longer at the company, they certainly had an opportunity to ask him, since this model has been an issue since 2023, how he created that model.

**THE COURT**: Well, but you can ask him too; right? Just depose him, because he's not there anymore. So you have -- there's two ways to do this. You can ask him how he came to this valuation, because I imagine this is a combination of things. It's a combination of real numbers, presumably, real data, and then there's some guesswork involved. If he's the CEO, "Well, here's what I think it's going to be worth." Probably both of those things.

So you're not going to get the Annino subjective stuff from them right now because he's not there anymore. So really what you're asking for here is if there's any data that supports these numbers at that time, what is it? And, like you said, if it's something a CPA would rely on to get this, then I

think you're entitled it. What that might be specifically, I mean, I can't say here today. That's an expert thing. That's something for a CPA to discuss.

But it seems to me like you-all can probably solve this one. You just need to figure out what the data is, because it sounds to me -- and tell me if I'm wrong, Ms. Junger. But Mr. Annino's not there. When did he leave?

**MS. JUNGER**: He left, I believe, in January of '24, and the breach was November of '23, so pretty shortly -- so pretty shortly thereafter.

**THE COURT**: Okay. So it sounds to me like this really is just a question of figuring out what financial information that exists that you have and that's within a reasonable scope, you know, what a CPA would use to test the numbers on this forum. Right?

**MS. JUNGER**: And we have sent them profit and loss statements, financials. Every single thing our expert has reviewed, they have. They have a lot of our financial information at this point. So I'm just asking them, you know, "What more do you want?" with the understanding that we don't believe that they're entitled to a full audit of our finances.

**THE COURT**: Yeah. I tend to agree with that statement.

So, Ms. Messinger, what alternates -- so setting aside the Mr. Annino issue and what you already have, do you

have some sense as to what else specifically you want from them in terms of the financial information?

**MS. MESSINGER**: I was wanting to look at what they produced last night. I apologize. I didn't have a chance to look through that set yet, so definitely willing to circle back there. But, again, just to make the record clear, it is just highly concerning -- the fact that they were considering litigation in November, December of '23 prior to Mr. Annino leaving -- that they -- despite pleading in their complaint a basis, you know, for the data room and for the valuation model -- that they didn't interview him and they didn't investigate the allegations in their claims. And so, you know, it's sort of a -- they're in a better position than -- and they were in a better position to know what went into that model than we are.

We don't know --

**THE COURT**: I don't disagree with you, but that ship has sailed.

**MS. MESSINGER**: We don't know what we don't know, and that's totally, perfectly fine. Like you said, that issue is not before the Court currently, but I did just want to raise the concern with the fact that a complaint was filed and written without apparently having a conversation with someone that's mentioned six times throughout their complaint, six times throughout discovery responses, their CEO. So --

**THE COURT**: I get your concern, but that's not in front of me right now.

**MS. MESSINGER**: Absolutely, Your Honor.

**THE COURT**: So for now let's go back to the drawing board. Look at what you got last night. I mean, I think you -- you-all seem to resolve most of this stuff, so I think you can reach some -- I mean, the experts are going to rely on specific types of information; and, you know, just make sure you have equal access to that information in terms of the data supporting these financials. I don't think that you'll have a problem reaching that. So if you do, you can always come back, but I'm sure you don't want to have to fly back here again. So --

**MS. MESSINGER**: I don't know. I love Orlando.

**THE COURT**: Well, just going to -- it's nice right now, but the further we go into the summer, the less hospitable it's going to be.

**MS. JUNGER**: Just for the record, can I respond to one thing?

**THE COURT**: Sure.

**MS. JUNGER**: I know that it's not before you today, but since the allegations are being thrown out there, we have never said that we did not interview Annino. We've spoken with him at length prior to his departure. Obviously, this was a very important and serious issue for our company, but we

couldn't have known what they were going to ask us for three years later.

But to suggest that we didn't, you know, do what we could to preserve is completely --

**THE COURT**: Look. You're not waiving anything by not saying it here today. It's not an issue that's in front of me. I understand that you're going to have some differences on this going forward, but -- and I appreciate your desire -- every lawyer's desire to correct the record, but it's not going to be -- what you say here today doesn't matter for this issue. That'll come up whenever it comes up, if it comes up.

So I think that solves Number 5 and, I mean, maybe in part Number 6.

**MS. MESSINGER**: Yes. I would -- I would think that --

**THE COURT**: And 7.

**MS. MESSINGER**: Yeah. So subject to, you know, our reservation of rights to revisit that based on what they produce and what they -- any follow-ups we have on that specific issue.

**THE COURT**: Okay. So, I mean, I guess technically speaking, I'll overrule the objections for 5, 6, and 7. But as stated on the record, I think the parties can come to some agreement as to what underlying financial information you need to -- support for these things, and that should be based on a

conferral with your expert.

All right. So does that cover 5, 6, and 7?

**MS. MESSINGER**: It does, Your Honor.

**THE COURT**: Okay. So the next is 33 and 34, and this is similar types of information but for other types of deals; right?

**MS. MESSINGER**: Yes, Your Honor. So we understand that post breach RiverRock was in conversation with several potential acquirers or different business ventures. In fact, in December 2025, this year [sic], they, in fact, did -- were acquired by a company called Kosmos. I know she's not here today. Those were subject of different requests for production after, we learned, but the point stands that they were, in fact, in conversation with other companies after the fact.

And so we're seeking not just the sort of financials that they were potentially exchanging or the valuations that were exchanged. We're certainly seeking that, but we also are seeking communications underlying those deals. Right? So to the extent there are different deal structures, we think that would be relevant to their damages.

And in addition -- and this is where it kind of leads with the liability. To the extent information was shared, again, without an NDA or in the prospect of an acquisition, we would want to know that -- you know, the information that they shared with Abacus. If that information was shared with other

potential acquirers, we would like to know that as well.

**THE COURT**: So -- all right. Well, let me hear from Ms. Junger on this, then. Thank you.

**MS. JUNGER**: So Abacus's counsel made the point that the valuations that we potentially shared with other acquirers would be relevant, and I just want to point out that clearly the valuations shared with other acquirers would be completely different because the entire dynamic of our company shifted once the breach happened. Like I said, we lost half of our workforce. It created a very stressful work situation where employees knew "We're looking to be acquired. My job is not safe here." So they left.

And then how can we -- "we" being RiverRock -- think about hiring new people when everyone knows we're trying to sell? So who's going to take a job knowing, like, if any of these deals close, you're gone? It was always very temporary.

So RiverRock was put in a very difficult situation, and their financials were harmed significantly. So any valuation that was sent to another company would be very different.

But, sure, I understand how that could be relevant to showing our damages because we're trying to show that we were damaged because of the breach, of course. And this is another situation where I tried to work with Abacus to just narrow the scope because their requests are very broad and essentially ask

for any conceivable document, communication that relates in any way to any number of sales that -- many of which didn't go forward.

So I said, you know, we'll provide you with any financials that were sent to the potential acquirers. We'll provide you with documents that talk about purchase price. But the burden of producing all communications, especially when -- I understand that we now have in litigation a confidentiality agreement in place, not to be confused with the confidentiality agreement at issue. But we're under NDAs with all of those potential purchasers. So for us to produce every single conceivable document related to those potential conditions is overbroad and not proportional when we're more than willing to produce the financials because we understand that that relates to our damages.

**THE COURT**: Okay. So, I mean, I agree with you in part. So I think that the real question here is the "all communications" question. That's really where the rubber meets the road on this dispute; right?

The confidentiality of other agreements, I don't -- I don't think that matters for us here -- right? -- because, yeah, you're under other obligations. But usually those are, you know -- I'm not subject to that, and this case isn't subject to that.

So then it really just comes down to what

communications are they entitled to. I think there is a potential relevance there, like they had for the data room thing. You know, did they -- at least with respect to the -- the data documents you're claiming were -- were the source of the breach here. If they were shared there, I suppose, potentially, that could be relevant, but I guess the question is did you-all have some sort of discussion about search terms for these things?

**MS. JUNGER**: Well, I had asked -- listen. We've had, like, multiple meet and confers over a long period of time, and I can't, you know, with certainty say that something was or wasn't discussed.

But as of last week, I proposed to them, "Hey, we're willing to give you the financials that were given to our other potential acquirers and anything related to the price term; but, you know, can we talk about any other way we can narrow this, especially the communication?"

And at that point they didn't agree to that. But I'd be, you know, more than -- more than willing to negotiate those terms and to see what's out there on that.

**THE COURT**: Well, tell me this: What is the date that the breach allegedly happened here?

**MS. JUNGER**: November 14, 2023, was the date of the board meeting, and I believe that the board deck was posted the following day.

**THE COURT**: Okay. So November of 2023.

And do you have a sense as to how many of these other negotiations or deals happened between the relevant period that you have here -- January of '23 to January of '25?

**MS. JUNGER**: Sure. Don't quote me on it, but I know of at least four. I would venture to guess probably four to six.

**THE COURT**: Okay. And do you have a sense as to how many -- when we say "all communications," what does that look like? Do you have a data number? Do you have a number of emails? Have you pulled that data yet?

**MS. JUNGER**: I don't know that off the top of my head, no.

**THE COURT**: So it sounds like we're really not at a point for me to rule on this at all yet because you don't know what -- you don't even know what the universe of that potential material is. I do think there could be potential arguable relevance there. I can't say that it's disproportional now because I just don't know. You don't even know how much it is; right?

**MS. JUNGER**: Sure. But it's more than just the burden and the proportionality. It's that there's nothing other than price that Company A was willing to purchase us for post breach that would be relevant to this liability and damages case. So --

**THE COURT**: Well, from your perspective, yeah, that's always what the -- you know, the opponent statement. You know, their position is, like it is for the data room, that -- you know, who is the information shared with? Now, again, maybe it might not matter post -- right? -- post breach if they shared it -- if they shared this stuff after. Maybe that doesn't matter.

**MS. JUNGER**: So we were under NDAs, obviously, with every single person that potentially acquired us. Everyone had an NDA. So the same level of confidentiality would be applied to the documents shared with Abacus as would be with the future potential acquirers -- is, I guess, what we'll call them for the purpose of this discussion. And I do see how the financial terms in that regard are relevant.

But "all documents and communications" is still feeling very overbroad, and I understand that -- you know, your point that the confidentiality agreements don't bind the Court in this litigation. But if we're going to share, you know, back and forth negotiations and details that are not relevant to price, you know, if they're talking about any, you know, other number of things that might be discussed in a transaction -- and deals fall through for a number of reasons. You know, there's -- it's just -- I don't know specifically what they're looking for, but to give them everything is pretty overbroad.

And if we could have, you know, some search terms for what they want and an agreement to narrow it, I think that would be a much more manageable and digestible outcome.

**THE COURT**: Okay. I agree with you on that. It sounds to me, at least looking at this, that all communications relating to all these is a little overbroad.

So let me hear from Ms. Messinger, then. See if you can tell me some way to kind of narrow this.

**MS. MESSINGER**: Yeah. So, Your Honor, we actually did propose some search terms back in the day, and they were struck on relevance grounds, not on burden grounds. So certainly, as is pretty typical and par for the course for discovery, we are more than willing to engage in search terms and a negotiation but --

**THE COURT**: What search terms do you propose? Do you have those in front of you right now?

**MS. MESSINGER**: So at the time we had proposed "Obra" because that's the one that was publicly disclosed. And I don't have the particulars, but Obra itself was a search term. From what we understand, it was a pretty short window deal time. So to the extent, again, they come back with a hit report and it's something outrageous, we'll whittle it as necessary and as we do generally speaking. But without that information, their objections at the time during the meet and confers have largely been on relevance grounds. So happy to,

again, continue to confer with our colleagues over here on the burden piece. But -- so --

**THE COURT**: Yeah. Let's do that. I don't know that I'm in a position to rule on this right now because we don't know -- because, like, if you're going to take all of their communications for January '23 to January '25 and then just search for the names of the deals, I don't think that gets us there, because all communications for all of these deals doesn't strike me as narrowly tailored enough under the circumstances because there's all kinds of, I'm sure, communications that happen in a deal like this that are not going to be relevant to the case.

But I can concede with some things at least in theory, and I'm sure you-all can too. So I think maybe this next step for you is to try to whittle down the universe of documents that relate to these other potential purchases and then try to figure out what types of communications here are -- are relevant to you. You know, is it -- you know, I mean, I can't imagine every single back and forth over every single price is relevant. Right? That's outside of the bounds, I think.

But then the question is, you know, is there some other reason, like this breach thing. Is there some other search term that might get you something that might be relevant for determining whether this is or isn't confidential? I don't

know the answer to that. But I think the parties can go back to the drawing board probably on these and see if you can come to some more narrow -- more narrow way to deal with these communications, because I don't think that the time period they're asking for here is completely out of bounds.

So why don't you go back and see if you can figure something out in terms of search terms and everything else. So I'm going to -- I'll defer any ruling on 33 and 34. I'll let you go back to the drawing board.

**MS. JUNGER**: Sure. Can I just make one more comment that I inadvertently left out of my argument?

**THE COURT**: Sure. Yeah.

**MS. JUNGER**: So Your Honor made the point yourself, and we obviously agree with it, that anything after the breach -- there's no longer relevance to whether or not it was adequately protected because it was already breached and put in the public forum. So we would argue that there's no relevance there.

And we would also argue that ultimately the only acquisition that is relevant is the one that closed, the one that we ultimately had a purchase price for that went forward and sold. Everything else was negotiations that didn't come to fruition. So that's not dispositive of what, you know, a value would be because the value is once the sale closes. That is what the value is.

So, again, we think that, you know, these requests are kind of an overbroad fishing expedition to learn more about things that are not related or at issue in the case.

**THE COURT**: I mean, I tend to agree with your -- with the proposition that -- as it relates to whether this stuff had been released into the public. After the breach it doesn't really -- that argument is kind of out the window. I do think that's probably true. Anything before that, maybe that's more relevant. Right?

In terms of prepurchase negotiations, I mean, you're right. The value of the business is what somebody else is willing to pay for it, and before they've paid for it, it's not irrelevant; it's less relevant. And right now this is a two-prong thing. It has to be relevance and proportionality.

And I'm not sure what the proportionality prong of this is because you don't know how many documents are in the dataset. So you got to pull the dataset first, and you have to tell me how burdensome it would be, because maybe it's not that burdensome, in which case if it's got some minor relevance, it's not that burdensome, go ahead and produce it.

So we don't know yet. So why don't you go back to the drawing board and figure that out with respect to that group of documents. Again, I don't think every single communication, every single back-and-forth is necessary here, but if we're not talking about a huge amount of documents --

you know, maybe you have a confidentiality argument for some of that stuff. I don't know. We just don't know yet. We don't have -- we don't have the dataset yet.

So go back and do the -- go back and do that work. See if you can negotiate some search terms to get some decent -- you know, some sort of middle ground here on this. So I'm going to defer ruling technically on 33, 34. You-all can go back to the drawing board and see if you can resolve that through -- you know, pull the data, run some search terms, and see if you can narrow it.

**MS. MESSINGER**: Understood, Your Honor. And just to clarify, just so we understand the sort of mandate when we leave the courtroom today, counsel did offer a few pieces of information that we're seeking; but, as we've discussed, we are seeking communications that aren't just "Here's the final purchase price," because I think, you know, as they allege in their complaint, they say that the breach harmed their business and dropped in value.

But at the same time, if we posted that deck and suddenly everyone's like, "Oh, RiverRock's interested in being acquired or different deal terms" and actually drove business -- excuse me -- that tends to negate the fact that they were damaged; right?

**THE COURT**: Well, I could conceive all kinds of situations; right? Maybe the value went down initially because

of this, and then it went down in another two years for some other reason. So valuations for three years might be relevant, but there may be something else in those three years that caused that, and so maybe there were some negotiations in between that might be relevant. I don't know. But for purposes of discovery, I'm not going to say it's wholly irrelevant at this stage. But, again, I'm not ruling on this stuff yet because we don't know what the proportionality prong of this is.

**MS. MESSINGER**: Understood.

**THE COURT**: So those are just my musings with the information that I have. And I see the parties have been pretty good at working this stuff out. I think you can reach a reasonable middle ground on this stuff, because I think that the key here is you need enough to have your expert do a -- do his own valuation; right? And it's not limited just to the actual ultimate purchase price, because if there were other offers, that could be relevant -- I imagine you're going to have an expert that could say, "Yeah, I could look at those other negotiations, and I think that factors into my damage log," you know, and so that's relevant enough to be produced. But that doesn't mean you get, you know, hundreds of thousands of every single communication back and forth with everybody everywhere.

So I'm not sure if that's helpful or not, but for

purposes of today, I'll defer on those two. The parties can go back to the drawing board and see if you can come to some search terms that narrow that and get you what you need without -- without giving you everything.

So, actually, maybe what I'll do is just, with respect to those two, deny the motion without prejudice and let you go back and go back to the drawing board. I don't want to leave motions sitting around open. It's not good for my statistics. So I'll deny without prejudice and let you go back to the drawing board. If you want to reraise any of these issues, you can do it, at least for 33 and 34, because I'm not going to -- I'll just deny it without prejudice.

**MS. MESSINGER**: Certainly understood there.

I think just one little -- because, again, it seems like we're talking a little bit more about the burden piece now, and I just want to make sure that it's clear that we're not going to run into any sort of relevance issues when we seek communications and propose search terms. So to the extent the denial without prejudice is sort of subject to that, if we could make a note, that would be extremely helpful in the negotiation process.

**THE COURT**: Well, the best I'm going to do is what I've said to you here today.

**MS. MESSINGER**: Understood, Your Honor. I appreciate it.

**THE COURT**: Which is I can conceive of something -- not all. I don't think all is relevant here. It can't possibly be, because I'm sure -- I don't know how many -- I don't even know how many employees were in this company. I don't know how many people were involved in these communications. So there's no way I can whittle this down in a meaningful way today. But certainly not all communications.

There's got to be some, I imagine, depending on situations before the date of the transaction -- bless you -- then I can see some relevance maybe potentially for the same reason that you're looking into the data room, which is who -- who might have this information been disclosed to. Maybe. I'm not willing to let you go forever down that rabbit hole, but I could see some relevance there.

And then also for the valuation, I mean, it's certainly more than just the ultimate purchase price. You get some information for proposed deals before that. As to how deep you go into those communications, you know, I mean, just both of you be reasonable about it and see what the numbers you get at.

**MS. MESSINGER**: Understood. Thank you, Your Honor.

**THE COURT**: Thanks.

All right. So the last two we have are the two interrogatories, 9 and 10. Is that right? Or have -- have what I've done today -- because I -- I'm not quite sure what

the argument is here because they were -- answered the interrogatories, and I understood that your motion was to get additional information.

**MS. MESSINGER**: Yes, Your Honor. One moment.

**THE COURT**: Sure.

**MS. MESSINGER**: I understand that before the hearing started counsel proposed amending their rog responses. So I think subject to those amended responses, we can -- that's not an issue currently.

**THE COURT**: Okay. Ms. Junger, is that right?

**MS. JUNGER**: That's correct. That's correct.

**THE COURT**: All right. So then -- I think we're done today.

Anything else, Ms. Messinger, from you-all today?

**MS. MESSINGER**: Nothing from our side, Your Honor.

**THE COURT**: Ms. Junger, nothing?

**MS. JUNGER**: Nothing from our side.

**THE COURT**: So what I'm going to do is I'll follow this up with just a brief order, and just going to go back through what I think I said today just to make sure that you-all are in agreement that this is what I said.

For RFP Number 3, I'm going to overrule the objections except as to the "related to," obviously. So -- so you'll produce documents in response to RFP 3 at least under the four specific prongs, nothing related to, just those four

enumerated items.

And then as to 5, 6, and 7, we discussed the information underlying that data a CPA would need. So I'm going to grant it to the extent that they're ordered to produce information underlying the financial data.

**MS. ORETSKY**: To clarify, Your Honor, you're using "CPA," like a damages expert; right?

**THE COURT**: Damages expert. Yes. And I think that's right.

**MS. JUNGER**: And to clarify -- I know you just said this, but I was looking for it so I could look along with you. You are sustaining our objection to "related to" the data room but --

**THE COURT**: Stand up when you --

**MS. JUNGER**: Sorry. Sorry.

You're sustaining our objection with "related to" the data room but overruling our objection and ordering us to produce to the extent it's in our possession, custody, and control, one, the platform web address that was used for the data room; two, all documents that were added to the data room and what time and date they were added; three, the security measures that were in place; and, four, any logs of who accessed.

**THE COURT**: Yeah. Those four things that are enumerated, yes.

**MS. JUNGER**: To the extent that we have them.

**THE COURT**: Correct.

**MS. JUNGER**: I don't presume you're asking us to go out and --

**THE COURT**: Of course not.

**MS. JUNGER**: Thank you.

**THE COURT**: And then, yeah, 5, 6, and 7, I think the ruling is -- I think I'm largely overruling the objections and ordering you to produce information that underlies the data, as we've discussed here today. So most of my order -- it's going to be a short order. The reason I have these hearings is so I don't have to write a long order. Right?

And so it's going to say for the reasons stated at the hearing, you know, the objections as to 5, 6, and 7 are overruled. Defendant is ordered to produce, you know, financial information underlying the record -- right? -- underlying the data. I mean, we discussed this before, I think, as it relates to the damages experts -- right? -- to come to some sort of middle ground on what damage -- on what actual financial data you need for these things; right?

**MS. JUNGER**: Sure. So just so that I understand, because I don't want to be back -- as much as I love our, you know, jousts, I don't want to be back in the same position.

If we leave it as open-ended as, you know, all documents underlying the financial information, that is pretty

much exactly their request again. So I had thought that we had left it with -- you know, we proposed to them, "Let us know what you don't have and what you want, and then based on those specific document titles, we will get back to you." If it's just generally, you know, what underlies the information that was presented to Abacus, that again leaves us in a position where we're like, "Well, what do you want?"

**THE COURT**: Yeah. I mean, I think we discussed this -- right? -- because it was your CEO that made these decisions. So what we're talking about is do you have financial information for purposes of a damages expert that underlies this data.

**MS. JUNGER**: Yeah.

**THE COURT**: That's what we're talking about.

**MS. JUNGER**: And we believe we gave that to them.

**THE COURT**: Okay.

**MS. JUNGER**: So what I'm asking is if they're going to come back and say, "You haven't," instead of just, like, standing on their requests, which is pretty open-ended, if they could give us, "We want X-, Y-, Z-titled documents," so that I know what I'm searching for.

**THE COURT**: Yeah. So at least in general categories. So if you have the damages expert that says, "Hey, we need -- you know, we need your payroll logs for this date," or "We need your employee numbers" or whatever, that's kind of the idea

here; right?

So it's not everything everywhere. Just have a damage expert say, "Here's the data we need," or "Here's the information we need to support this financial data"; right? So I think that covers 5, 6, and 7.

And then 33 and 34, we discussed -- I'm going to deny the motion without prejudice as to those, and then the parties can go and discuss ways to deal with that specific information with some search terms. Okay?

All right. So is there anything else I can take care of today, then, or any further clarification you need me to provide?

Oh, and then for the interrogatories, it sounds like those are mooted. So I'll just deny the motion as moot for those.

All right. So all that's set. Anything else, then, that I can take up, Ms. Junger, for the plaintiff?

**MS. JUNGER**: No, Your Honor. Thank you.

**THE COURT**: Ms. Messinger for the defendant, anything else?

**MS. MESSINGER**: No, Your Honor. Thank you.

**THE COURT**: All right. Well, thank you-all. Thank you for flying down to Orlando today. You've got some pretty good weather, so may as well use it while you can. Thank you.

Oh, and I'll mark this as Exhibits 1 and 2. We'll

put it -- we'll put -- we'll keep this as confidential and put it under seal.

**MS. JUNGER**: Thank you.

(Proceedings concluded at 3:25 PM.)

**CERTIFICATE OF REPORTER**

I, HEATHER SUAREZ, RDR, CRR, FCRR, FPR-C, CA CSR, DO HEREBY CERTIFY that the foregoing is a correct transcript of the record of proceedings in the above-titled matter.

DATED this 20th day of April 2026.

Heather Suarez
Registered Diplomate Reporter
Certified Realtime Reporter
Federal Certified Realtime Reporter
Florida Professional Reporter-Certified #790
California Certified Shorthand Reporter #14538