UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

RENEGADE CAPITAL GP, LLC d/b/a RIVERROCK FUNDS LLC, a Delaware limited liability company,

CASE NO.: 6:25-cv-00424

Plaintiff,

v.

ABACUS LIFE, INC. n/k/a ABACUS GLOBAL MANAGEMENT, INC., a Delaware Corporation,

Defendant,

______________________________________ /

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Plaintiff Renegade Capital GP, LLC d/b/a RiverRock Funds LLC ("RiverRock" or "Plaintiff"), files its Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment and states:

## PRELIMINARY STATEMENT

Defendant Abacus Life, Inc. n/k/a Abacus Global Management, Inc. ("Abacus" or "Defendant") asks this Court to do exactly what Federal Rule of Civil Procedure 56 forbids: weigh disputed evidence, choose which expert is superior in the battle of two damages experts, and decide contested causation issues on paper.

RiverRock's damages expert, William E. Harris, ASA, CFA ("Harris"), calculated $13,645,968 in lost profits from two funds (Fund VIII and Longevity) that were materially impacted due to Abacus' breach of the Confidentiality Agreement entered between Abacus and RiverRock on September 5, 2023 ("Confidentiality Agreement"). Harris calculated these lost profits using RiverRock's own historical fund performance—its 2009-to-2023 track record—as the yardstick.[1] Abacus's own expert, Dr. Matthew Farber ("Farber") admits that he "did not do an independent evaluation" and offered no affirmative damages number, yet he nevertheless agrees that Harris "uses the yardstick method by looking at RiverRock's historical funds," concedes those are "generally the steps we follow," and admits that he "followed [Harris'] methodology at a high level."[2]

Harris and Farber's disagreements over damages, including which historical funds best benchmark the capital raise, the treatment of fixed salaries which were lost

[1] The Economic Damages Report of William E. Harris, ASA, CFA ("Harris Rep."), attached hereto as **Exhibit "A",** at pgs 4, 8; Deposition Transcript of William E. Harris, ASA, CFA, taken on July 14, 2026 ("Harris Depo."), attached hereto as **Exhibit "B,"** at p. 158:10-22.

[2] Deposition Transcript of Dr. Matthew Farber, PhD, taken on August 21, 2026 ("Farber Depo."), attached hereto as **Exhibit "C,"** at p. 13:4-11, 15:1-5, 65:15-69:1.

only due to the actions of Abacus, and the projection period are disputes of material fact and ultimately would speak to the credibility of the expert at trial. When two qualified experts reach conflicting conclusions on damages, the conflict "present[s] the classic battle of the experts and it [is] up to [the trier of fact] to evaluate what weight and credibility each expert opinion deserves." *Dunlap v. Clear Blue Specialty Ins. Co.,* No. 2:23-CV-775-KCD, 2025 WL 1545293, at *2 (M.D. Fla. May 30, 2025) (A court "cannot weigh the credibility of either [expert's] conclusion" on summary judgment.").

Abacus also insists RiverRock's lost profits are too "speculative" because RiverRock "did not have profits" and its two newest funds had not yet raised their targeted capital. A business can recover lost profits regardless of whether there is a successful track record so long as that party proves that "1) the defendant's action caused the damage and 2) there is some standard by which the amount of damages may be adequately determined." *W.W. Gay Mech. Contractor, Inc. v. Wharfside Two, Ltd.*, 545 So. 2d 1348, 1351 (Fla. 1989). Lost profits are measured by the *incremental* revenue RiverRock was prevented from earning minus the incremental cost of earning it—not by the profitability of the enterprise as a whole.[3] And under Florida law, "once

---

[3] In *Measuring Business Interruption Losses and Other Commercial Damages*, Patrick A. Gaughan states: "The true economic losses of a firm are its *lost incremental revenues minus the incremental costs associated with these revenues*. The margin associated with these lost incremental revenues is usually less than or equal to the *gross margin* but is greater than or equal to the net *margin*. In effect, the lost incremental revenues minus the associated incremental costs becomes the definition of net profits appropriate to commercial damages litigation." *See* Patrick A. Gaughan, "Measuring Business Interruption Losses and Other Commercial Damages", Second Edition, (John Wiley & Sons, Inc., Hoboken, NJ, 2009): 201; *See* Robert L. Dunn, *Recovery of Damages for Lost Profits*, 6th ed., (Westport,

causation is proven with reasonable certainty, uncertainty as to the precise amount of the lost profits will not defeat recovery so long as there is a reasonable yardstick by which to estimate the damages." *Nebula Glass Int'l, Inc. v. Reichhold, Inc.,* 454 F.3d 1203, 1217 (11th Cir. 2006). RiverRock is not a new business with no track record. Harris measured the loss against RiverRock's own historic results.[4]

Abacus also argues RiverRock cannot prove causation because Harris "assumed" it. Whether causation is established is proven through the fact witnesses. *Simmons v. USI Ins. Servs., LLC*, No. 8:23-CV-201-TPB-AAS, 2025 WL 959161, at *4 (M.D. Fla. Mar. 31, 2025), *appeal dismissed*, No. 25-11493, 2025 WL 3252333 (11th Cir. Nov. 21, 2025); *Bryan v. Galley Maid Marine Prods., Inc.,* 287 So. 3d 1281, 1288 (Fla. 4th DCA 2020) (Under Florida law, "[p]roximate cause, as well as breach and damages, are typically factual questions for a jury."). Four former RiverRock employees who have no financial stake or interest in the outcome of this litigation, including its former CEO, have sworn under oath that the disclosure triggered the employee exodus, froze fundraising, and forced the sale of a damaged business. Abacus has not made—and on this record cannot make—the conclusive showing that would remove that question from the trier of fact.

## RIVERROCK'S RESPONSE TO THE FACTS SET FORTH IN ABACUS' PRELIMINARY STATEMENT AND BACKGROUND

CT: Lawpress, 2005), vol. 1, 469-477; and William A. Cerillo, *Proving Business Damages* (Santa Ana, CA: James publishing, 1989), 1-18-1-19.

[4] Harris Rep., Ex. A, at p. 10; Harris Depo, Ex. B, at p. 83:9-21.

RiverRock was founded in or around 2007 as a specialized asset manager focused on life settlements.[5] By 2023, RiverRock had raised and managed approximately $268 million in life-settlement assets across eight investment vehicles.[6] This undisputed fact directly contradicts Abacus' unsubstantiated claim that "RiverRock struggled to raise funds, to deploy capital, and to manage its investments." *See* MSJ at p. 6. In 2023, RiverRock employed approximately twelve people, including personnel responsible for underwriting, fund operations, compliance, investor relations, and fundraising.[7]

In late 2023, Abacus, through its CEO, Jay Jackson ("Jackson") and RiverRock, through its former CEO Anthony Annino ("Annino"), began discussing the potential acquisition of RiverRock by Abacus ("Potential Acquisition").[8] Before RiverRock provided Abacus with confidential business information for its evaluation of the transaction, the Parties agreed to enter into the Confidentiality Agreement.[9] After the execution of the Agreement, RiverRock shared Confidential Information[10]

---

[5] Deposition Transcript of Jay Jackson, taken on July 24, 2026 ("Jackson Depo."), attached hereto as **Exhibit "D,"** at Ex. 30; Deposition Transcript of Anthony Annino, taken on July 29, 2026 ("Annino Depo."), attached hereto as **Exhibit "E,"** at 71:3-9; Declaration of Hugh Tawney in Support of Plaintiff's Motion for Partial Summary Judgment as to Liability, executed on September 1, 2026, ("Tawney Dec."), attached hereto as **Exhibit "F,"** ¶ 3.

[6] Harris Rep., Ex. A, at p. 9, N. 5; Annino Depo., Ex. E, at Ex. 1; Tawney Dec., Ex. F, ¶¶ 3, 5.

[7] Annino Depo., Ex. E, at 27:15-22, 177:21-23; Tawney Dec., Ex. F, ¶ 4; Declaration of Amy Springs, Esq. in Support of Plaintiff's Motion for Partial Summary Judgment as to Liability, executed on September 1, 2026 ("Springs Dec."), attached hereto as **Exhibit "G,"** at ¶ 11.

[8] Jackson Depo., Ex. D, at 118:15-22, 183:14-21; Annino Depo., Ex. E, at 18:20-25, 42:20-43:15, 164:6-14.

[9] Jackson Depo., Ex. D, at 85:6-11, 88:1-2, 88:23-89:13; Annino Depo., Ex. E, at 165:19-166:8.

[10] Confidential Information has the same meaning as given in the Confidentiality Agreement. *See* Jackson Depo., Ex. D, at 96:18-98:1, Ex. 3 § 1(a).

with Abacus.[11] On October 14, 2023, Annino emailed Jackson a document: "Renegade Model_Abacus" (the "Financial Model").[12] The information in the Financial Model as well as the Potential Acquisition itself was treated as strictly confidential.[13]

Abacus prepared an internal Board Deck to present to its Board of Directors containing two pages concerning RiverRock.[14] The two pages in the Board Deck related to RiverRock contained RiverRock's Confidential Information.[15] The first page included that RiverRock and Abacus were in discussions for an acquisition with the banner "ABL Wealth Advisors – ***Acquisition of RiverRock Funds***," the number of RiverRock investors; the acquisition price and structure; RiverRock's historical financial performance and estimated 2024 net revenue; and the confidential post-transaction plans for RiverRock employees, including that Abacus planned to "Reduce

---

[11] Jackson Depo., Ex. D, at 107:6-108:15; Annino Depo., Ex. E, at 160:17-161:13.

[12] Jackson Depo., Ex. D, at 165:18-167:24, Ex. 8; Annino Depo., Ex. E, at 95:11-96:11, Ex. 10.

[13] Jackson Depo., Ex. D, at Ex. 3; Annino Depo., Ex. E, at 150:12-151:19, 191:4-12, 192:3-15; Tawney Dec., Ex F, ¶ 8; Springs Dec., Ex. G, ¶ 4. In its MSJ, Abacus asserts that "On October 31, 2023, Annino sent a materially identical model to Obra Capital." MSJ at p. 10. Yet, Abacus fails to cite the portion of that transcript where Annino confirms that RiverRock had also entered an NDA with Obra prior to sending confidential information. *See* Annino Depo., Ex. E, at p. 109:8-14.

[14] Jackson Depo., Ex.D, at 165:18-167:24, 189:23-25, 192:8-204:20, Ex. 11 (the Board Deck); Tawney Dec.,Ex. F, ¶¶ 7, 8, 10; Springs Dec., Ex. G, ¶ 3; Defendant's Responses and Objections to Plaintiff's First Requests for Admissions, served on July 14, 2025 ("Abacus RFA"), attached hereto as **Exhibit "H,"** at Nos. 7, 9, 12, 13; Defendant's Responses and Objections to Plaintiff's First Set of Interrogatories, served on July 14, 2025 ("Abacus Rog"), attached hereto as **Exhibit "I,"** at No. 6; Defendant's Amended Answer and Affirmative Defenses to Plaintiff's Amended Complaint [D.E. 85], filed on July 9, 2026 ("Am. Ans."), attached hereto as **Exhibit "J,"** ¶¶ 30-31.

[15] Jackson Depo., Ex. D, at 261:15-265:7, Ex. 11, Ex. 19; Annino Depo., Ex E, at 150:15-151:18, 176:9-177:23, 188:18-192:15, Tawney Dec., Ex. F, ¶¶ 7, 8, 10; Springs Dec., Ex. G, ¶ 3; Abacus RFA, Ex. H, at Nos. 7, 9, 12, 13; Abacus Rog., Ex. I, at No. 6; Deposition Transcript of Jeff Smith, taken on June 24, 2026 ("Smith Depo."), attached hereto as **Exhibit "K,"** at 148:16-154:11.

Gross Costs to 755k in 2024 due to labor and infrastructure redundancies."[16] The second page of the Board Deck had the same banner, and also included the Financial Model of RiverRock previously provided by Annino.[17] The Financial Model included RiverRock's management fees, acquisition fees, carried interest, payroll, commissions, Expense Reimbursements, P-card, Accounting and tax information, tech software costs, insurance, miscellaneous expenses, net income loss, SSW contributions, potential synergies with Abacus, pro-forma cash flow, and a valuation number of $10,029,963. It also stated that RiverRock's payroll would be reduced from $2,842,718 in 2023 to $500,000 in 2024.[18]

On November 14, 2023, at 10:26 am EST, Abacus caused the Board Deck, including the two pages containing RiverRock's Confidential Information, to be posted to its public-facing investor website located at https://ir.abacusgm.com under the Presentations subtab, and the Board Deck remained posted and publicly accessible until November 15, 2023 at 3:30 pm.[19] The link to the Board Deck received 32 clicks while publicly available.[20] Abacus admits that on December 5, 2023, a reporter, Donna Horowitz published an article in The Deal titled "Abacus Accidentally Posts

---

[16] Jackson Depo., Ex. D, at 72:16-21, 197:2-199:12, Ex. 11, Ex. 30; Annino Depo, Ex. E, at 151:2-18; Tawney Dec., Ex. F, ¶ 7; Springs Dec., Ex. G, ¶ 3.

[17] Jackson Depo., Ex. D, at 197:24-199:5, Ex. 11; Tawney Dec., Ex. F, ¶ 7; Springs Dec., Ex. G, ¶ 3.

[18] Jackson Depo., Ex. D, at 197:24-199:5, Ex. 11; Annino Depo., Ex. E, at 96:17-23; Tawney Dec., Ex. F, ¶ 7; Springs Dec., Ex. G, ¶ 3; Abacus RFA, Ex. H, at No. 10.

[19] Jackson Depo., Ex. D, at 237:16-239:22, 240:20-243:12; Abacus RFA, Ex. H, at Nos. 9, 11-13; Abacus Rog, Ex. I, at Nos. 6, 8; Smith Depo., Ex. K, at 102:5-103:7.

[20] Abacus RFA, Ex. H, at No. 9; Abacus Rog, Ex. I, at No. 8; Smith Depo., Ex. K, at 159:1-3.

Document on Potential RiverRock Deal."[21] The article further published RiverRock's Confidential Information to the public.[22]

Annino testified that the public disclosure of RiverRock's Confidential Information, including the existence of the Potential Acquisition, was devastating to RiverRock.[23] Before Abacus publicly posted the Board Deck, RiverRock's employees did not know about the Potential Acquisition.[24] Even RiverRock's general counsel, Amy Springs ("Springs") did not know about the Potential Acquisition.[25] Annino described the "turmoil" that unfolded after the breach.[26] He described RiverRock as being in "a state of confusion, significant confusion . . . at least initially amongst the staff and then . . . amongst the investor base as well," and when asked "would it be fair to say that after the disclosure, RiverRock employees began leaving?" He responded "yes."[27] Springs and Tawney also describe how the disclosure "impaired RiverRock's ability to continue operating" and affected RiverRock's ability to raise capital.[28]

---

[21] Jackson Depo., Ex. D, at 325:20-23, Ex. 30; Abacus RFA, Ex. H, at No. 14; Smith Depo., Ex. K, at 165:4-167:4, Ex. 18.

[22] Jackson Depo., Ex. D, at 325:20-23, Ex. 30; Springs Dec., Ex. G, ¶¶ 6, 9; Declaration of Denny Mathew in Support of Plaintiff's Motion for Partial Summary Judgment as to Liability, executed on September 1, 2026 ("Mathew Dec."), attached hereto as **Exhibit "L,"** at ¶ 9.

[23] Annino Depo., Ex. E, at 154:3-155:23, 172:21-174:1; *see also* Tawney Dec., Ex. F, ¶¶ 14, 16, 18, 20; Springs Dec., Ex. G, ¶¶ 10, 14.

[24] Annino Depo., Ex. E, at 174:3-177:21; Tawney Dec., Ex. F, ¶ 9; Springs Dec., Ex. G, ¶ 5; Mathew Dec., Ex. L, ¶¶ 4, 8.

[25] Annino Depo., Ex. E, at 177:2-8; Springs Dec., Ex. G, ¶ 5.

[26] Annino Depo, Ex. E, at 154:5-155:23, 203:6-13, 211:25-212:15; Tawney Dec., Ex. F, ¶ 14; Springs Dec., Ex. G, ¶ 10.

[27] Annino Depo, Ex. E, at 154:5-155:23, 203:6-13, 211:25-212:15.

[28] Tawney Dec., Ex. F, ¶¶ 14, 16, 18, 20; Springs Dec., Ex. G, ¶¶ 10-14.

RiverRock had half of the company resign in the aftermath of the breach.[29] RiverRock could not replace its workforce because the entire industry now knew about a potential sale.[30] The life settlements industry was small to begin with, and any qualified candidate was now on notice that RiverRock would likely be acquired.[31] Mathew and Springs testified that they enjoyed their positions and had no plans to leave RiverRock before the disclosure. Mathew explained that the uncertainty causing his resignation arose directly from the disclosure, and Springs testified that she would have continued working at RiverRock but for the disclosure.[32]

In addition to employees resigning, the disclosure affected RiverRock's ability to continue fundraising.[33] At the time of the Board Deck's posting, RiverRock was actively raising capital for Fund VIII and the Longevity Fund, and Tawney, RiverRock's Director of Sales, was spearheading those efforts and was actively communicating with existing and prospective investors about potential investments.[34] Both Annino and Tawney testified that they believed RiverRock could have raised the

---

[29] Annino Depo., Ex. E, at 154:3-25; Tawney Dec., Ex. F, ¶ 14; Springs Dec., Ex. G, ¶ 10; Mathew Dec., Ex. L, ¶ 13-14; Plaintiff's Second Amended Responses and Objections to Defendant's First Set of Interrogatories, served on May 5, 2026 ("RR Rog."), attached hereto as **Exhibit "M,"** at No 5. ((1) Denny Mathew ("Mathew"), former Chief Underwriting Officer, (2) Michelle Siler Garza, former Controller, (3) Michelle Eisenlohr, former Closing Analyst/Paralegal, (4) Valerie Coffey ("Coffey"), former Chief Operating Officer, (5) Springs, former General Counsel/Chief Compliance Officer, (6) Hugh Tawney ("Tawney"), former Director, (6) Jill Naponic, former Director, and (7) Meg Yetter, former Vice President/Corporate)).

[30] Tawney, Dec., Ex. F, ¶ 15; Springs Dec., Ex. G, ¶ 11.

[31] Annino Dec., Ex. E ¶¶ 3-9; Tawney, Dec., Ex. F, ¶ 15; Springs Dec., Ex. G, ¶ 11.

[32] Mathew Dec., Ex. L, ¶¶ 3, 14; Springs Dec., Ex. G, ¶¶ 2, 15.

[33] Annino Depo., Ex. E, at 155:1-6, 172:21-174:1, Ex. 22; Tawney Dec., Ex. F ¶¶ 16-17; Springs Dec., Ex. G, ¶¶ 12-14.

[34] Annino Depo., Ex. E, at 54:16-25, Ex. 3, Ex. 4, Ex. 28; Tawney Dec., Ex. F, ¶¶ 5-6.

capital needed for Funds VIII and Longevity to be profitable.[35] Nevertheless, Abacus argues that "RiverRock never met its fundraising targets." MSJ at p. 6. However, that RiverRock did not fully meet its fundraising targets historically has been fully accounted for in the Harris Report as Harris assumes RiverRock would raise only [redacted] percent of the amounts targeted.[36] Falling short of a target does not mean the capital raised was unprofitable on an incremental basis. The capital RiverRock did raise generated total gross fees of [redacted] in 2022 and [redacted] in 2023.[37] The damages calculation applies the same contractual fee terms to the capital RiverRock was prevented from raising.

Following the disclosure, RiverRock suspended its fundraising activities.[38] Springs directed Tawney and RiverRock to cease fundraising because the disclosure and its aftermath had materially changed the information RiverRock could provide to

---

[35] Annino Depo., Ex. E at p. 30:3-12; Tawny Decl., Ex. F, at ¶ 6.

[36] Harris Rep., Ex. A, at p. 9. Harris presumption of a [redacted]% capital raise is based on the average ratio for Funds IV, V, and VI, with Funds I-III excluded given the material growth of the company and the passage of time since fundraising was completed for those funds and also excluding Fund VII as it was materially impacted by the global pandemic COVID-19. Funds I through III were not excluded because they were "poor." They were excluded for the reasons stated at Page 9 of the Harris Report. Omitting an early period that is not representative of the current business is an accepted procedure. The Defendant's own expert reached the same conclusion. *See* Expert Report of Dr. Matthew Farber dated July 2, 2026 ("Farber Rep."), attached hereto as **Exhibit "N"**, at ¶¶ 16, 97-98 (the Farber Report refers to these funds as "inaugural funds," and Paragraphs 97 and 98 identify Funds VI and VII as the most comparable to Longevity and Fund VIII). An expert who sets aside the inaugural funds and selects the two most recent funds as the best comparables cannot fault the Harris Report for drawing the same line. Additionally, even if Harris had considered Fund VII for its benchmarks, it would have changed the average fundraising yardstick from [redacted]%, which is within five percentage points.

[37] Trugman_003706 and Trugman_003708 as referenced and relied upon in the Harris Report are attached hereto as **Composite Exhibit "O"**.

[38] Annino Depo., Ex. E, 155:1-6, 172:21-174:1, Ex. 22; Tawney Dec., Ex. F, ¶¶ 16-18; Springs Dec., Ex. G, ¶¶ 12-14.

existing and prospective investors.[39] RiverRock could no longer accurately identify the personnel who would manage the funds, whether RiverRock would continue operating independently, or what its future management and ownership structure would be.[40] According to Springs, RiverRock could not responsibly solicit millions of dollars from investors while those material questions remained unresolved.[41]

Despite the undisputed record evidence setting forth damages, Abacus moves for summary judgment to argue that RiverRock's should not be awarded damages at all because (1) the damages are speculative and (2) RiverRock has not established causation. Both points invite the Court to consider genuine issues of material fact and fail as a matter of law.

Abacus argues that RiverRock mismanaged the capital that it raised (MSJ at p. 7), but that is an issue of fact, including Harris' selection of which funds to rely on. Contrary to Abacus' assertion that "By 2023, RiverRock was insolvent in all but name" (MSJ at p. 8), RiverRock was making pre-breach fundraising progress. Before the breach, RiverRock's Director of fundraising, Tawney, was building an investor pipeline for Fund VIII and the Longevity Fund and had already secured two anchor investors for the Longevity Fund raising approximately [redacted].[42] The MSJ also states that Fund VIII did not have any investor interest. However, the Farber Report states that as of September 2023, the initial close was scheduled for the fourth quarter

---

39 Tawney Dec., Ex. F, ¶¶ 16-18; Springs Dec., Ex. G, ¶¶ 12-13.
40 Tawney Dec., Ex. F, ¶¶ 16-18; Springs Dec., Ex. G, ¶¶ 12-13.
41 Tawney Dec., Ex. F, ¶¶ 16-18; Springs Dec., Ex. G, ¶¶ 12-13.
42 Tawney Decl., Ex. F, at ¶¶ 5-6.

of 2023.[43] A fund does not call capital before its first close, so the absence of called capital between October 2022 and November 2023 reflects the stage of the fund, not the absence of investors. The Farber Report also states that RiverRock had closed on [redacted] in Fund VIII commitments as of May 2023.[44] The MSJ's statement that "there were no investors interested in Fund VIII" cannot be reconciled with the Defendant's own expert report.

Abacus argues that RiverRock has not substantiated the "assumed time" that it uses to estimate its fundraising. MSJ at p. 6. This is also contradicted by the Harris Report.[45] Funds VIII and Longevity were still early in their operation and if they had followed the same path as Funds VI and VII, the forecasted capital raises would have been reasonably achievable. For larger funds, the fundraising timeline is longer. The capital contribution timelines for Fund VI and Fund VII (the two largest funds) are summarized as follows[46]:

[redacted]

[43] Farber Rep., Ex. N, at ¶ 31.

[44] Farber Rep., Ex. N, at ¶ 33.

[45] Harris Rep., Ex. A, at N. 5 ("As of October 31, 2023, immediately prior to the information leakage, the Longevity Fund had raised approximately [redacted], representing [redacted] percent of the assumed but-for raise of $1[redacted]. RRIF VI, which had the same [redacted] million target capital raise as the Longevity Fund and is the most structurally comparable historical fund, had raised [redacted] percent of its ultimate capital at the same stage of its lifecycle. The close correspondence between these two figures supports the reasonableness of the assumed but-for capital raise.").

[46] The data in the chart is summarized from Trugman_000289, which is referenced and relied upon in the Harris Rep and is attached hereto as **Exhibit "P"**.

[redacted]

As indicated above, over [redacted] of the capital contributed to Fund VI arrived after 19 months of operation. Approximately half of the capital contributed to

Fund VII arrived after 19 months of operation, and the largest single contribution did not occur until the 37th month. These are the two funds that the Defendant's own expert deemed most comparable to Longevity and Fund VIII.[47] The capital raise levels assumed in the Harris Report remained reasonably achievable for both Longevity and Fund VIII at the time of the breach.[48]

The MSJ faults Harris for "rel[ying] solely on Funds IV-VI to assess RiverRock's damages", but all the funds were considered in the analysis. While Harris' fundraising percentage is drawn from Funds IV through VI, the net asset value curves are built from Funds II through VII, and the management fee structures and fundraising timelines draw on the full fund history.[49] To fault Harris's fundraising percentage, the MSJ falsely describes Funds IV, V, and VI as RiverRock's "three most successful funds." Fund VII (excluded from Harris's fundraising-ratio average) raised more capital than Fund IV or Fund V, and Fund V's ratio of [redacted] percent was the lowest of any fund used in the average.[50] The MSJ observes that two of the three funds in the average targeted [redacted], suggesting that performance against small targets says little about a $200 million raise. However, the MSJ fails to mention that RiverRock's largest fund (Fund VI) was also its most successful raise ([redacted]).[51] The

---

47 Farber Rep., Ex. N, at ¶¶ 94-102.

48 Abacus also refers to Annino's testimony that RiverRock was struggling to fundraise in September 2023, but fails to cite to his complete testimony which confirms he believes RiverRock "could have raised it" by pitching that the current team was materially different than the original lower performing funds. *See* Annino Depo., Ex. E, at p. 30:3-12, 31:21-33:3.

49 Harris Rep., Ex. A, at pgs. 7-21.

50 Harris Rep., Ex. A, at p. 9.

51 Harris Rep., Ex. A, at p. 9.

target raise for Fund VI was $200 million, the same amount as Longevity and Fund VIII.[52] Against that target, RiverRock raised [redacted], the best result of the three funds.[53] RiverRock performed best against the largest target. Averaging in the two smaller funds lowered the assumption from [redacted] percent. The Harris Report therefore assumed RiverRock would perform worse against a $200 million target than it did the only time it tried.[54] History shows that despite lower than anticipated investment returns, RiverRock was still successfully raising money.[55]

## LEGAL STANDARD

Summary judgment is proper only when the movant shows "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must "view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party." *Stewart v. Happy Herman's Cheshire Bridge*, 117 F.3d 1278, 1285 (11th Cir. 1997). "If there is a conflict between the parties' allegations or evidence, the nonmoving party's evidence is presumed to be true, and all reasonable inferences must be drawn

---

52 Harris Rep., Ex. A, at p. 9.

53 Harris Rep., Ex. A, at p. 9.

54 The MSJ observation that RiverRock raised $264 million over an 11-year period is misleading. Of that $264 million, $212 million (more than 80 percent) was related to the two most recent funds. This indicates that the fundraising amounts were increasing in comparison to prior years. The damages model assumes roughly 18% more than the last two funds combined, for a business whose funds had grown from $1.4 million to $154.5 million. RiverRock had also already launched two funds approximately one year apart. Fund V received its first capital in January 2015 and Fund VI in January 2016, and together they raised $178 million. *See* Harris Rep., Ex. A, at ¶ 9.

55 For example, Fund VII held its final close in May 2022, and its capital contributions continued through May 2023 under the fund's drawdown structure. The largest single capital call in the fund's history, [redacted], was funded on May 30, 2023. This was after a March 2023 performance summary, that was cited in the Farber Report (Figure 12) was in circulation. Investors honored the largest call in the fund's history with those results known.

in [that] party's favor." *VFS Leasing Co. v. Markel Am. Ins. Co.*, 624 F. Supp. 3d 1284, 1287 (M.D. Fla. 2022). A genuine dispute as to a *single* material fact is sufficient to require denial. *Chambliss v. Brevard Cty. Sheriff's Office*, 2024 U.S. App. LEXIS 13630, at *9 (11th Cir. June 5, 2024) (summary judgment proper only if "no genuine dispute as to *any* material fact") (emphasis added).

## ARGUMENT

### I. Genuine Disputes of Material Fact Preclude Summary Judgment.[56]

a. RiverRock's Damages are Not Speculative

Abacus's central premise—that RiverRock's damages are "speculative" as a matter of law—misstates the governing standard. Under Florida law, lost profits "cannot be speculative and must be proved with reasonable certainty," but the Eleventh Circuit, applying Florida law, has squarely held that "the uncertainty which defeats recovery in such cases is the cause of the damage rather than the amount." *Reichhold, Inc.*, 454 F.3d at 1214. The certainty rule "applies in both contract and tort actions," and "[t]he amount of damages must be established with reasonable, not absolute, certainty …. It is sufficient if a reasonable basis for computation of damages is afforded, even though the result will only be approximate." *id*. at 1212. Thus, "once causation is proven with reasonable certainty, uncertainty as to the precise amount of

[56] Contrary to Abacus MSJ, RiverRock does not assert an independent damage theory regarding the departure of its employees. Rather, the departure of its employees caused by the breach added to RiverRock's inability to fundraise after the breach. RiverRock could not meaningfully fundraise without its work force nor could RiverRock replace the employees given the public disclosure of a Potential Acquisition. Further, the Harris Report does not assert a damages theory based on the price terms negotiated between Abacus and RiverRock during negotiations for the Potential Acquisition.

the lost profits will not defeat recovery so long as there is a reasonable yardstick by which to estimate the damages." *id*. at 1217.

Florida recognizes the yardstick method, and an established plaintiff's own comparable operations are its strongest benchmark. "A business can recover lost prospective profits regardless of whether it is established or has any "track record."" *Reichhold, Inc.,* 454 F.3d at 1214.[57] For example, in *Katz Deli of Aventura, Inc. v. Waterways Plaza, LLC*, 183 So. 3d 374, 382 (Fla. 3d DCA 2013), the Court considered *Katz'* sales from other locations to make up for the very short tenure in the location at issue prior to the breach. *Id*. The Court held the plaintiff's "history of sales from these locations, along with the sales projections and unrebutted expert testimony calculating likely prospective profits, provided a sufficient yardstick by which to measure" its prospective profits. *Id*. Harris did exactly that. He testified he "was looking at more of [RiverRock's] own performance," using RiverRock's "good sample size of 2009 to 2023 track record" and "the company's own historic funds to use as a yardstick for the future."[58] Referring to these damages as speculative is therefore incorrect[59] and the

---

[57] Based on RiverRock's track record, Harris did not assume RiverRock would hit its targets. He assumed it would raise only 62.87% of its goal.

[58] Harris Depo., Ex. B, at p. 80:21-25.

[59] Farber Depo, Ex. C, at Ex. 4. The contemporaneous documentation also contradicts the characterization of the fee projections as speculation. On October 14, 2023, one month before the breach, Mr. Annino transmitted the RiverRock valuation model to Abacus's CEO, writing that the 12.5 percent discount rate "seems reasonable given the surety of management fees and servicing synergies." Abacus's CEO forwarded the model to Abacus board members the same day, writing: "This is kind of a no brainer. Acquisition cost of 5M and we make 2X that in fees. Instant revenue . . . ." Both parties regarded RiverRock's management fee revenue, at the time, as the certain component of the business, not speculation as the MSJ now contends.

new-business authorities cited by Abacus do not accurately reflect the yardstick of an established Manager like RiverRock.[60]

Further, contrary to the MSJ, the yardstick method does not require identifying each hypothetical investor. Florida law holds that lost profits "may be proven …without testimony regarding each customer's purchasing decisions," and an expert's "detailed calculations and methodology" projecting historical performance forward "provided an adequate yardstick for the jury to award lost profit damages," even where they "involved estimating a number of variables that cannot be predicted with certainty." *Reichhold, Inc.*, 454 F.3d at 1215, 1218.

Finally, Abacus contends RiverRock "provided no basis for its projected damages over the next ten years." However, the projection period is drawn from the funds' actual terms. The model does not assume the capital arrives in a single year; it is deployed over the multi-year net-asset-value curves derived from RiverRock's prior funds. The Eleventh Circuit approved precisely this approach in *Reichhold, Inc.*, where the expert projected six years of lost profits by "extrapolating forward the company's established historical growth rate for the same product", and the court held those

---

[60] Abacus' reliance on *Stensby v. Effjohn Oy Ab*, 806 So.2d 542 (Fla. 3d DCA 2001) and *Brevard County Fair Ass'n, Inc. v. Cocao Expo, Inc.*, 832 So.2d 147 (Fla. 5th DCA 2002) do not resolve the sufficiency of RiverRock's evidence. RiverRock offers historical fundraising results, actual fund NAV data, applicable fee terms, an expense analysis, and testimony concerning fundraising opportunities underway before the disclosure. The Court must evaluate that evidence in determining whether RiverRock has supplied a reasonable basis for its projections. Historical losses remain relevant to that inquiry, but do not dispense with examination of the particular revenue and expenses underlying Harris's calculation.

"detailed calculations and methodology provided an adequate yardstick for the jury to award lost profit damages." *id*. at 1216, 1218.

b. RiverRock's Enterprise-level Profitability is Not a Prerequisite to Recover Lost Profits

Abacus's motion returns repeatedly to a single theme: RiverRock was a struggling manager that, in its own words, "did not have profits," so it cannot recover lost profits at all. That premise is not the law. The Florida Supreme Court holds that "A business can recover lost prospective profits regardless of whether it is established or has any "track record." *Wharfside Two, Ltd.*, 545 So. 2d at 1351. The business need only establish causation and "some standard by which the amount of damages may be adequately determined." *id*. A profitable operating history appears nowhere in that test. Harris's calculation addresses the incremental profits associated with management and acquisition fees from the Longevity Fund and Fund VIII. He applies RiverRock's fee terms to projected fund assets, deducts expenses he identifies as attributable to generating that revenue, and discounts future losses to present value. Enterprise profitability is unnecessary because lost profits measure the incremental profit on the revenue the breach took away, not the plaintiff's consolidated bottom line. Here, the lost management fees would have flowed to RiverRock's fee-receiving entity, which was profitable on a standalone basis, earned using infrastructure RiverRock already had. Whether the consolidated enterprise turned a profit is beside the point. At a minimum, whether RiverRock's documented and growing fee revenue supports an award of lost profits is a jury question, not a matter for summary judgment.

c. The Salary Dispute is a Question of Fact

Abacus argues that Harris improperly held salaries constant and that the post-breach payroll reduction should offset damages. Abacus's theory asks the Court to credit it with cost savings its own alleged breach caused[61]—the payroll fell only because the disclosure drove out the employees, and those same departures cut off the revenue the salaries supported. Nevertheless, whether the projected profits and their amount are reasonably certain "is a question of fact to be determined by the finder of fact." *See Katz Deli of Aventura*, 183 So.3d at 383.[62]

d. The Record Supports a Causal Link[63]

Abacus's causation argument rests on the contention that Harris "assumed" causation rather than independently analyzing it. That criticism conflates Harris's role in quantifying damages with RiverRock's obligation to prove the facts supporting causation. A damages expert may calculate losses assuming liability and causation,

---

[61] A wrongdoer cannot profit from its breach. *See Jaffe v. Snow*, 610 So. 2d 482, 487 (Fla. 5th DCA 1992).

[62] Abacus' reliance on *Sostchin v. Doll Enterprises, Inc.*, 847 So.2d 1123 (Fla. 3d DCA 2003) is misplaced. *Sostchin* involved a claim for the lost profits of an *entire business* over the remaining term of a lease. In calculating those profits, the plaintiff's expert did not deduct the compensation paid to the company's owner as an expense. As a result, the expert overstated the business's projected net profits. Here, the damages measure is the net incremental profits associated with specific lost fee revenue and deducts the incremental costs that would have been incurred to generate that revenue. The executives' salaries were fixed compensation and would not have increased because of the additional fundraising activity. Therefore, RiverRock's salaries were not incremental costs of generating the lost fees. The subsequent reduction in payroll resulted from the executives' departure following the alleged breach; it was not a cost RiverRock would have avoided by successfully generating the lost fee revenue.

[63] The MSJ states that the damages attribute "100%" of the harm to Abacus "rather than to RiverRock's own long-running failures." This mischaracterizes the testimony and the damages assumptions. Within the damages model, the risks related to RiverRock's fundraising challenges are accounted for by assuming the company would have raised only [redacted] percent of its targets.

provided the factual predicates for those assumptions are supported by other evidence. *Polypack, Inc. v. Nestle USA, Inc.,* No. 8:23-CV-318-SPF, 2025 WL 748261, at *5 (M.D. Fla. Mar. 7, 2025). *Simmons* illustrates this distinction. There, the damages expert calculated expected profits using historical results and assumed customer-retention rates, without independently determining whether the defendants' breaches caused the losses. *Simmons*, 2025 WL 959161, at *4 The court approved that division of responsibility, explaining that liability and causation were for the jury to determine from the witnesses' testimony and counsel's arguments. *id*. Here, RiverRock supplies the factual foundation through the testimony of Mathew, Springs, Tawney, and Annino concerning the disclosure, employee departures, disruption of operations, and suspension of fundraising. Harris's reliance on that factual scenario therefore does not establish an absence of evidence sufficient to warrant summary judgment. Nevertheless, causation "should be considered a triable issue that will preclude summary judgment until it is conclusively shown. . . that no causal relationship exists." *Visingardi v. Tirone,* 193 So. 2d 601, 605 (Fla. 1966). Abacus's narrative—that RiverRock was already failing—is contradicted by testimony that RiverRock was making pre-disclosure fundraising progress and still had business options.

## <u>CONCLUSION</u>

For the foregoing reasons, RiverRock respectfully requests the Court deny Abacus' Motion for Summary Judgment.

Dated: September 30, 2026. Respectfully submitted,

**GREENBERG TRAURIG, P.A.**
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0535

By: */s/ Jennifer Junger*
A. Sheila Oretsky, Esq.
*Lead Counsel*
Florida Bar No. 31365
sheila.oretsky@gtlaw.com
raquel.acuna@gtlaw.com
flservice@gtlaw.com
JENNIFER JUNGER
Florida Bar No. 125853
jungerj@gtlaw.com
fernandezfe@gtlaw.com
*Attorneys for Plaintiff Renegade Capital GP, LLC d/b/a RiverRock Funds, LLC*

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on this 30th day of September, 2026, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

By: */s/ Jennifer Junger*
Jennifer Junger, Esq.