UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO. 6:25-cv-00424

RENEGADE CAPITAL GP, LLC
d/b/a RIVERROCK FUNDS LLC, a
Delaware limited liability
company,

Plaintiff,

v.

ABACUS LIFE, INC., n/k/a
ABACUS GLOBAL MANAGEMENT, INC.,
a Delaware Corporation,

Defendant.

- - - - - - - - - - - - - - - - - - x

Zoom
July 24, 2026
10:00 a.m. - 6:28 p.m.

REMOTE VIDEOTAPED DEPOSITION OF
JAY JACKSON OF ABACUS LIFE, INC., n/k/a ABACUS
GLOBAL MANAGEMENT, INC.

Taken before JAN L. BRONIS, Registered Professional Reporter and Notary Public for the State of Florida at Large, pursuant to Notice of Taking Deposition filed in the above cause.

APPEARANCES (Via Zoom)


GREENBERG TRAURIG, P.A.
333 Southeast 2nd Avenue, Suite 4400
Miami, Florida 33131
BY: A. SHEILA ORETSKY, ESQ.
JENNIFER JUNGER, ESQ.
On behalf of the Plaintiff
Tele: (305) 579-0535
E-Mail: Sheila.oretsky@gtlaw.com

QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
BY: ALEX ZUCKERMAN, ESQ.
KATHLEEN S. MESSINGER McCARTY, ESQ.
On behalf of the Defendant
Tele: (213) 443-3000
E-Mail: Kathleenmessinger@quinnemanuel.com


ALSO PRESENT (Via Zoom)

Mallory Johnson, Videographer

Lucas Siegel (Off camera)



8108294d-b0ea-4811-8f29-be81af2a5e5f

# I N D E X


| Examinations | Page |
|---|---|
| JAY JACKSON OF ABACUS LIFE, INC., n/k/a ABACUS GLOBAL MANAGEMENT, INC. | 7 |
| DIRECT EXAMINATION BY MS. ORETSKY | 7 |


# E X H I B I T S


| No. | Page |
|---|---|
| Plaintiff's Exhibit 1 - Abacus 0002278 | 20 |
| Plaintiff's Exhibit 2 - Abacus 0000903 - 0000905 | 47 |
| Plaintiff's Exhibit 3 - Confidentiality Agreement | 87 |
| Plaintiff's Exhibit 4 - Abacus 0001093 | 107 |
| Plaintiff's Exhibit 5 - Abacus 0001101 | 122 |
| Plaintiff's Exhibit 6 - AA000808 | 129 |
| Plaintiff's Exhibit 7 - Renegade 000859-000862 | 153 |
| Plaintiff's Exhibit 8 - Abacus 0000794 - 000797 | 165 |
| Plaintiff's Exhibit 9 - Renegade 000891 - 000892 | 182 |
| Plaintiff's Exhibit 10 - Abacus 000257 - 000295 | 189 |
| Plaintiff's Exhibit 11 - Board Deck | 193 |


(The exhibits continue on Page 4.)

EXHIBITS - CONTINUED

Plaintiff's Exhibit 12 - November 9, 2023 Minutes of the Meeting 200

Plaintiff's Exhibit 13 - Abacus 000804 215

Plaintiff's Exhibit 14 - AA 000812 - 000818 221

Plaintiff's Exhibit 15 - E-Mail dated November 14, 2023 Smith to Young Abacus 0001110 240

Plaintiff's Exhibit 16 - Interrogatories 247

Plaintiff's Exhibit 17 - Abacus 0001630 259

Plaintiff's Exhibit 18 - Abacus 001472 - 001473 259

Plaintiff's Exhibit 19 - Abacus 0000456 261

Plaintiff's Exhibit 20 - Mathew 000001 270

Plaintiff's Exhibit 21 - Text Messages Abacus 0003889 - 0003890 273

Plaintiff's Exhibit 22 - Abacus 0003897 - 0003902 288

Plaintiff's Exhibit 23 - Text Messages Abacus 0003901 300

Plaintiff's Exhibit 24 - AA 000819 302

Plaintiff's Exhibit 25 - Abacus 0000013 308

Plaintiff's Exhibit 26 - Renegade 000001 - 000006 310

Plaintiff's Exhibit 27 - Abacus 0000203 - 0000209 (Tab 2) 312

Plaintiff's Exhibit 28 - Abacus 0000081 - 0000082 (Tab 4) 318

(The exhibits continue on Page 5.)



8108294d-b0ea-4811-8f29-be81af2a5e5f

EXHIBITS - CONTINUED


Plaintiff's Exhibit 29 - Text Messages Abacus 0003926 322

Plaintiff's Exhibit 30 - The Deal article Renegade 000007 325

Plaintiff's Exhibit 31 - Abacus 0004126 - 0004127 337


(The exhibits will be e-mailed separate from the transcript.)

THE VIDEOGRAPHER: We're now on the videotape record. The time now is 10 o'clock a.m. Today is Friday, July 24th, 2026.

Will counsel please introduce yourselves for the record, then the court reporter will swear in the witness.

MS. ORETSKY: Good morning. Sheila Oretsky and Jennifer Junger from Greenberg Traurig on behalf of the Plaintiff, Renegade Capital GP, doing business as RiverRock Funds.

MR. ZUCKERMAN: Alex Zuckerman from Quinn Emanuel on behalf of Abacus Global Management. I'm joined also by Kathleen Messinger.

MS. ORETSKY: Good morning, Mr. Jackson. Oh, you're going to swear him in first.

THE COURT REPORTER: Thank you.

MS. ORETSKY: Yeah.

THE COURT REPORTER: Mr. Jackson, if you could raise your right hand to be sworn, please, sir.

Do you solemnly swear that the testimony which you are about to give will be the truth, the whole truth, nothing but the truth, so help you God?

THE WITNESS: I do.

THE COURT REPORTER: Thank you. You can put your hand down.

Thereupon--

JAY JACKSON OF ABACUS LIFE, INC., n/k/a ABACUS GLOBAL MANAGEMENT, INC.

was called as a witness by the Plaintiff, and having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. ORETSKY:

**Q. Good morning, Mr. Jackson. Thank you so much for being here with us today.**

**Just as a preliminary matter, where are you physically located right now?**

A. Orlando, Florida.

**Q. Okay. And are you at the Abacus offices?**

A. Correct.

**Q. And what's the address?**

A. 333 Douglas Avenue, Orlando, Florida.

**Q. Are you in a conference room?**

A. I'm actually in my office.

**Q. Is there anybody else in the office with you?**

A. Alex Zuckerman.

**Q. Okay. Are there any screens in that room that you're using --**



8108294d-b0ea-4811-8f29-be81af2a5e5f

A. No.

**Q. -- at the moment?**

A. No.

**Q. Okay. Is there anybody else in the room with you?**

A. Well, wait. Can I -- I mean, I'm using the screen I'm looking at you on. There's no additional screens, though.

**Q. Okay.**

A. Yeah.

**Q. All right. Let's begin. So, Mr. Jackson, could you tell me a little bit about why Abacus didn't acquire RiverRock?**

MR. ZUCKERMAN: Objection to the form.

MS. ORETSKY: What was wrong with the form of my question?

MR. ZUCKERMAN: Just vague.

MS. ORETSKY: What was vague about why didn't Abacus acquire RiverRock?

MR. ZUCKERMAN: We can -- he can answer.

BY MS. ORETSKY:

**Q. Please answer the question.**

A. Abacus went through and looked at many opportunities, including RiverRock, and, ultimately, there was some specific language that



8108294d-b0ea-4811-8f29-be81af2a5e5f

we couldn't agree that was worth moving forward on around indemnification, and so we chose not to move forward.

**Q. Okay. So if I understand your testimony correctly, you -- and when I say, "you," I'm referring to Abacus -- you -- you decided not to acquire RiverRock because of some language in the LOI?**

A. That would -- there was language in the LOI related to indemnification. That was a red flag for us that they kept removing. And we couldn't, you know, ultimately, come to an agreement as a reason to move forward.

**Q. Okay. Is there any other reason other than this indemnification language that Abacus decided not to move forward with the potential acquisition of RiverRock?**

A. Not that I can really think of. That was -- that was a big issue for us. It was a red flag. And so that was predominately the reason why we chose not to move forward with RiverRock.

**Q. Did you have any discussions with anybody on the RiverRock side about this red flag language that you're testifying to today?**

A. Those discussions would have been via

e-mail with Tony Annino when they removed that language, and Tony removed that language.

**Q. Okay. So your testimony is that the language that caused you to not want to go forward with the potential acquisition of RiverRock was eventually removed by Tony Annino?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I can't say who, specifically, removed it, but that was language that was important. It would be important in any type of potential opportunity. And this was something that was in very early stage. And so, from our perspective, if -- if there was a red flag related to, in this case, indemnification, what else might be out there wasn't worth moving forward.

BY MS. ORETSKY:

**Q. What was in the very early stage?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: This process.

BY MS. ORETSKY:

**Q. Which process are you referring to?**

A. These discussions with RiverRock.

**Q. About their acquisition?**



8108294d-b0ea-4811-8f29-be81af2a5e5f

A. They were just discussions. It wasn't an acquisition.

**Q. They were discussions about a potential acquisition. Am I right?**

A. No.

**Q. Okay. What were they about, Mr. Jackson?**

A. They were just a discussion about an opportunity to potentially work with RiverRock. More importantly, to work with Tony Annino. Tony Annino had approached us to potentially come and work here. He had, you know, presented himself as somebody who, you know, could lead businesses like RiverRock.

**Q. So the discussions were about his potential employment at Abacus?**

A. Yeah.

**Q. Okay.**

A. That was part of them, yeah.

**Q. All right. So I assume there's going to be a bunch of written communications about his potential employment at Abacus?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: So those discussions were predominantly led by his case study that he had sent us in relationship to his current



8108294d-b0ea-4811-8f29-be81af2a5e5f

position.

BY MS. ORETSKY:

**Q. Okay. When did Mr. Annino send you this case study about his current position?**

A. Yeah, I don't -- I don't know the exact date, but he put together a case study and some ideas around how he would manage RiverRock.

**Q. So are you saying that Mr. Annino wanted to work for Abacus after a potential acquisition of RiverRock?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I don't know. It was -- it was a hypothetical, so I don't know. We -- you know, we get inquiries all the time.

BY MS. ORETSKY:

**Q. Okay. So is it your testimony today that Abacus was not in discussions with RiverRock about a potential acquisition?**

A. It's my testimony that we were discussing an opportunity very early stage, but we were not at the stage of acquisition. We were at the -- we were at the stage -- the stage of discovery.

**Q. Okay. Have you led other acquisitions, Mr. Jackson?**

A. Could you --

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: -- be a little more clear on what you mean by that?

BY MS. ORETSKY:

**Q. Sure. Have you led other acquisitions for Abacus in your role as CEO?**

A. I think that we've only had, you know, a -- one or two of those, and we have a broad team that we work with on that. And I do have experience and we've seen a number of opportunities in both early stage and late stage.

**Q. Okay. What do you -- when you say, "early stage," what do you -- how do you define "early stage"?**

A. Just discussions.

**Q. How do you define "late stage"?**

A. A potential later stage would mean that you've gone to an actual purchase and sale agreement. That's where you actually do due diligence, you understand and know the company better, and that's how you're going to actually determine whether that acquisition is or is not going to occur.

**Q. Okay. So other than this indemnification language that you have referenced today, there is**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**no other reason that Abacus decided not to move forward with the potential acquisition of RiverRock. Am I right?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: There are many reasons why a deal may or may not happen. That was a primary red flag for us, was the indemnification.

BY MS. ORETSKY:

**Q. Okay. Did you discuss the indemnification red flag with anybody at RiverRock?**

A. I don't have to discuss it with them. They received that document and they changed it.

**Q. I'm not saying you have -- I'm not -- I'm not telling you you have to -- I'm just asking a question.**

A. Yeah.

**Q. So, yes or no, did you discuss it with them? Yes or no?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I need a definition of "discuss." Written or verbal? Because I interpret "discuss" could mean written.

BY MS. ORETSKY:

**Q. In any format, was RiverRock alerted to**

**the fact that Abacus had an issue with the indemnification language that you're --**

A. Yes.

**Q. -- testifying to today?**

A. Yes.

**Q. Let me finish the -- hold on. Let me finish the question.**

**In any form of communication, was RiverRock alerted to the fact that Abacus had an issue with the indemnification language that you're testifying to today?**

A. Yes. It was in the response.

**Q. In what response?**

A. It was in the nonbonding, nonlegal LOI, which they read and then changed.

**Q. No, I think you're misunderstanding my question. I'm not asking about anything that RiverRock did. I'm asking about what Abacus did. You're testifying -- I believe I understand your testimony is that RiverRock made some redline revisions to a draft LOI. Is that correct?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: Yes.

BY MS. ORETSKY:

**Q. Okay. And those redlines were made to a**

**-- an indemnification clause; is that correct?**
A. Yes.
**Q. Okay. And those --**
A. More than once.
**Q. Okay. And those were then sent to Abacus; is that right?**
MR. ZUCKERMAN: Objection to the form.
THE WITNESS: Who sent those to Abacus? Just so that I'm clear. "They" is a little broad. Meaning, who sent --
BY MS. ORETSKY:
**Q. Anybody --**
A. -- those changes to Abacus, is what I'm trying to get at.
**Q. All right. Let me -- I'm the only one who can answer questions, so if you don't understand my question, just say, "I don't understand your question."**
A. Okay.
**Q. But --**
A. I guess I don't understand the question. Sorry.
**Q. -- somebody from RiverRock sent you those redline revisions to the indemnification clause; is that right?**

A. Tony Annino did.
**Q. Okay. In response, did Abacus say, we have a problem with these redline revisions to the indemnification clause? That's my question.**
MR. ZUCKERMAN: Objection to the form.
THE WITNESS: We responded by putting the revisions back in.
BY MS. ORETSKY:
**Q. Did anybody have a discussion, verbal or written, with RiverRock that there was a problem with the revisions to the indemnification clause --**
A. Yes, we changed the LOI.
**Q. Let me just finish the question.**
MR. ZUCKERMAN: Let her -- let her finish her question.
BY MS. ORETSKY:
**Q. -- that you are saying today was the primary red flag for why Abacus did not move forward with the RiverRock acquisition?**
A. I would say, yes, because I interpret that question to mean communication is in adoption of that -- of changing the redline back in that document. So they sent it to us redlined, we sent it back, removed it, they redlined it again. That is a form of communication.

**Q. So you're saying Abacus' redlines to the -- to RiverRock's redlines was the form of communication that this was a primary red flag for Abacus with respect to the potential acquisition of RiverRock.**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: Yes.

BY MS. ORETSKY:

**Q. Okay. Is there any other communication with RiverRock about the redlines to the indemnification clause that they sent to Abacus other than Abacus' redlines in response?**

A. I don't know which communication you might -- might not be referencing. There were communications that Tony and I had had over multitude of months.

**Q. Did you ever tell Tony -- and for the record, we're talking about Tony Annino; is that right?**

A. Yes. If he goes by Anthony or Tony, I'm assuming we're talking about the same person.

**Q. Okay. Did you have any communications with Mr. Annino specifically about the indemnification clause?**

A. I don't -- I don't remember. I don't

recall.

**Q. Did you ever tell RiverRock why Abacus decided not to proceed with the potential acquisition of RiverRock?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I don't -- I don't recall. I -- I know that there was a letter sent at the end, but outside of that, I don't recall.

BY MS. ORETSKY:

**Q. Okay. So what -- what letter are you referencing?**

A. I think there was an e-mail sent in December.

**Q. And who sent that e-mail?**

A. I believe it came from me.

**Q. And did you mention the indemnification clause in that e-mail?**

A. I don't -- I don't remember. I don't recall.

**Q. If it was a -- the primary red flag as to why Abacus was not going to proceed with the RiverRock acquisition, would you expect to have mentioned the indemnification clause in that e-mail?**

MR. ZUCKERMAN: Objection to the form.



8108294d-b0ea-4811-8f29-be81af2a5e5f

THE WITNESS: No.

BY MS. ORETSKY:

**Q. Why not?**

A. If we're not moving forward, we're not moving forward. Those specifics would be, you know, my option, my decision. I don't have to then tell people why we chose not move forward. I don't owe them that.

**Q. But you just testified that you did send an e-mail discussing why Abacus wasn't moving forward with the potential acquisition of RiverRock.**

A. No, what you asked was, was that if I mentioned the indemnification. And what I said was, was that the e-mail we sent was just that we're not moving forward without -- we didn't include specifics on any of these.

MS. ORETSKY: Okay. Let's go ahead and pull up Tab 5. And we're going to mark this as Exhibit 1 to the deposition.

(Thereupon a document was marked Plaintiff's Exhibit 1 in the proceeding.)

BY MS. ORETSKY:

**Q. Is this the e-mail that you were referring to just now, Mr. Jackson?**



8108294d-b0ea-4811-8f29-be81af2a5e5f

MR. ZUCKERMAN: You can read the whole --
THE WITNESS: Yeah, let me read it.
Yes, that's the e-mail I'm referencing.
BY MS. ORETSKY:
**Q. Okay. So do you recall sending this e-mail on December 15th, 2023, to Anthony J. Annino and copying Chris Romaine, and the subject line is, "Response to LOI request"?**
A. Yes.
**Q. Okay. And let's look at the e-mail. You say, "Tony, As promised, I am now in a position to respond to your latest proposal with respect to the proposed sale of your company. Unfortunately, there is not sufficient support among the various stakeholders here at Abacus to move forward with a transaction. While we have a positive view of your business and your leadership, the main countervailing factors include price, other strategic alternatives and allocation of existing and future capital."**
**Do you see that, sir?**
A. I see it.
**Q. Okay. Does it say anything about an indemnification clause in your e-mail?**
A. Not specifically, nor does it specifically



8108294d-b0ea-4811-8f29-be81af2a5e5f

reference a number of other things that might or might not be weighed into that decision. As I said, this was a broad response. This was just a factor of being polite in business.

**Q. Okay. So the word "indemnification" does not appear in this e-mail.**

A. But it --

**Q. Let's -- let's -- let's talk about -- let's talk about the factors that you do identify. You said, "price." What was the issue with the price?**

A. In reference to the price -- and by the way, we're referencing what I say here is include, but not limited to; right? Like, there are a number of reasons that you would look at something that doesn't --

**Q. Mr. Jackson, if you could just answer my questions, I think it would -- the depo will go a lot faster.**

A. Well, it --

**Q. This is not an -- this is not an opportunity --**

A. We're -- we're on the clock, and I --

MR. ZUCKERMAN: Don't -- don't play with her.

THE WITNESS: Yeah. I --
BY MS. ORETSKY:
**Q. Just answer my question. What were you referring to with respect to price?**
A. I am answering your question. And what I'm saying is, is that there are a multitude of factors that go into any particular --
**Q. I'm not asking about that, Mr. Jackson. I'm just asking: What were you referring to when you referenced "price"?**
A. All I was suggesting was, was that, based at the price of this deal, Tony Annino set the price of this. He represented that the value of this business was X, and then Tony Annino ultimately ended up changing what that value might or might not be. So we had no idea what the actual price of this business is.
**Q. So your testimony is that the reason that you reference price in this e-mail as a reason why Abacus did not want to move forward with the acquisition of RiverRock is that you weren't sure what the price should be.**
MR. ZUCKERMAN: Objection to the form.
THE WITNESS: We had -- did not have enough information to determine what the price



8108294d-b0ea-4811-8f29-be81af2a5e5f

of this business was. Again, it was very early stage. We had done almost no due diligence at all. We had no idea. And the terms of the price were being set by Tony Annino, and so that would be a factor, is that we don't know what the price is of this business because we have no way to value the business.

BY MS. ORETSKY:

**Q. Okay. Let's move on to, "other strategic alternatives." What were you referring to there?**

A. Just in general business practice. There are strategic alternatives and strategic opportunities that we look at every day.

**Q. Was there any specific strategic alternative that you were looking at at around -- on around December 15th, 2023?**

A. As I said, we look at strategic alternatives in and outside this asset on a daily basis.

**Q. Understood. And specifically on December 15th, 2023, what other strategic alternatives were you looking at?**

A. That would be -- you know, I -- I don't know specifically on that day. I can just share

with you that we look at opportunities every day.

**Q. Okay. So your testimony that is -- is that you have no recollection of what other strategic alternatives you would have been looking at in December of 2023.**

A. No, that's not my testimony.

**Q. Okay. What is -- what -- what -- let me ask the question again. What other strategic alternatives was Abacus looking at in December of 2023?**

A. We look at strategic alternatives every day.

**Q. That is not what I'm asking, Mr. Jackson. Do you -- what other strategic alternatives was Abacus looking at on December 15th, 2023?**

MR. ZUCKERMAN: Sheila, you don't need to raise your voice.

MS. ORETSKY: I'm not raising my voice. He's just evading my questions. And I just want you to answer my question so we can move on to the next one.

THE WITNESS: I'm not evading at all your question. I'm answering it, that strategic alternatives in our business come up all the time. And so --

BY MS. ORETSKY:

**Q. I didn't ask that, sir. What -- in December -- on December 15th, 2023, or in -- let me -- strike that.**

**In December of 2023, what other strategic alternatives was Abacus looking at?**

A. It could have been buying policies, it could have been -- you know, there's a variety of things that we look at every single day. Our -- our deck was available to the public. You can see other opportunities that we were considering, and those would be -- like, we'd lay this out. We're a public company. You can see every quarter the things that were ideas we have --

**Q. Mr. Jackson --**

A. -- opportunities that we're considering --

**Q. -- do you recall -- Mr. Jackson --**

MR. ZUCKERMAN: Don't interrupt the witness, please.

BY MS. ORETSKY:

**Q. -- do you recall what opportunities -- it's just a yes-or-no question -- that -- strategic alternatives that Abacus was looking at in December of 2023? Yes or no?**

MR. ZUCKERMAN: Objection to the form.



8108294d-b0ea-4811-8f29-be81af2a5e5f

THE WITNESS: There were several specific opportunities, of which I don't recall each individual opportunity, but we always have strategic opportunities in front of us.

BY MS. ORETSKY:

**Q. Do you recall any of the strategic alternatives that Abacus was looking at in December of 2023?**

A. I think, broadly, again, we're always looking at strategic opportunities.

**Q. Is the answer yes or no?**

MR. ZUCKERMAN: Objection to the form.

BY MS. ORETSKY:

**Q. Do you recall? Yes or no?**

A. We're always looking at strategic -- we're always looking at strategic opportunities.

**Q. That is not -- I'm not asking that question.**

A. That's my answer.

MR. ZUCKERMAN: Wait, wait, wait. Don't talk over her.

MS. ORETSKY: Okay. Listen, if he's not going to answer the questions, I'm going to call the Court and just have somebody babysit the -- the deposition. Because it's just a

yes-or-no question. He's giving me answers that I'm not asking for.

BY MS. ORETSKY:

**Q. I'm just asking: Do you recall, yes or no --**

A. Do I recall what?

**Q. -- what strategic alternate -- what strategic alternatives, in December of 2023, was Abacus looking at? Do you recall?**

A. I don't recall the number of strategic opportunities that we were looking at at the time.

**Q. I wasn't asking the number. I'm asking: Do you recall any of the strategic alternatives that Abacus was looking at in December of 2023?**

A. I don't recall them off the top of my head.

**Q. Okay. Thank you. And then you reference the, "allocation of existing and future capital." What are you referring to there?**

A. That would be how we allocate our current capital and future capital.

**Q. Okay. What did that have to do with the potential acquisition of RiverRock?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: Allocation of capital and

capital needs are dependent on different areas of the company. So how we would allocate that capital in the future.

BY MS. ORETSKY:

**Q. Okay. And you say in your e-mail, "there is not sufficient support among the various stakeholders." Who are you referring to as the various stakeholders?**

A. So stakeholders in our business as a public company would be represented by our board.

**Q. Are there seven members of the Abacus board?**

A. Yes.

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: There are --

MS. ORETSKY: What was --

THE WITNESS: There are --

MS. ORETSKY: Hold on.

THE WITNESS: There are seven members of the Abacus board.

MS. ORETSKY: What was wrong with the form of my question, Alex?

MR. ZUCKERMAN: It was vague as to time.

MS. ORETSKY: Okay.

BY MS. ORETSKY:



8108294d-b0ea-4811-8f29-be81af2a5e5f

**Q. In December of 2023, how many board members did Abacus have?**

A. Seven.

**Q. How many board members does Abacus currently have?**

A. Seven.

**Q. Does Abacus' board contain the same members now that it did back in December of 2023?**

A. Yes.

**Q. Okay. What are the names of those board members?**

A. Sure. It's also public. Tom Corbett, Beth Schulte, Karla Radka, Michiel van Katwijk, Adam Gusky, Sean McNealy, and myself, Jay Jackson.

**Q. When was the decision made that Abacus was not going to proceed with the potential acquisition of RiverRock?**

MR. ZUCKERMAN: Objection to the form.

MS. ORETSKY: You can remove -- you can take down the exhibit.

THE WITNESS: We -- probably before this -- well, before this e-mail went out. I don't know if I have an exact date or time for you, but it was in and around when we received a return redline of the -- of the document, of

the LOI. So it would have been early December, I think. And when the indemnification kept -- language kept getting removed is when, internally, we felt like it wasn't a discussion that we wanted to continue, or that we felt like was going to have an opportunity.

BY MS. ORETSKY:

**Q. Okay. So just so the record is clear, your testimony is that when you received the redlines to the indemnification clause from Mr. Annino on behalf of RiverRock is when Abacus decided that it was not going to proceed with the potential acquisition of RiverRock.**

A. Yeah, we were chatting about it, but that's when discussions started to think that we -- we shouldn't -- shouldn't move forward without that.

**Q. Okay. So if I show you an e-mail where that LOI was transmitted to you with the redlined revisions, it would be that -- on around that date that you decided not to proceed.**

A. Yeah, I mean, so I think "around" is the -- a better -- like, that's -- and not having -- please show me the e-mail. I -- I -- I don't know



8108294d-b0ea-4811-8f29-be81af2a5e5f

the date, so that would be helpful for me.

**Q. Okay. And who -- who were you having these discussions with about not proceeding with -- with RiverRock?**

A. So we have a executive team here that would include Bill McCauley, our CFO, and Chris Romaine at the time, our general counsel.

**Q. Okay. So Mr. Romaine and Mr. McCauley and yourself were the three individuals that ultimately decided not to proceed with the RiverRock transaction?**

A. I mean, we had circulated a couple of the discussions, you know, further just within -- you know, I think Sean McNealy, we -- we -- we just chatted with him a little bit. And -- but, yeah, primarily, we would be the ones that looked at that and thought, you know, there wasn't opportunity to move forward.

**Q. Okay. So it was three of you at Abacus that made this ultimate decision not to move forward with the RiverRock acquisition.**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: Well, three executive -- three executives and the chairman of the board.



8108294d-b0ea-4811-8f29-be81af2a5e5f

BY MS. ORETSKY:

**Q. Okay. And just for the record, who's the chairman of the board?**

A. I am. Jay Jackson.

**Q. Okay. And the three executives are the CFO, Mr. McCauley?**

A. Uh-huh.

**Q. Is that right? Okay. The general counsel, Mr. Romaine?**

A. (Witness nods head.)

**Q. And who's the third?**

A. Myself. I'm also the CEO.

**Q. Okay. And did you make that decision -- well, those discussions that you -- that you had amongst each other about the decision not to acquire RiverRock, were those discussions had in written communications?**

A. This wasn't about a discussion to acquire RiverRock. This was a discussion to not continue our discussions in a nonbinding LOI. Huge difference.

**Q. Okay. However you want to frame it, Mr. Jackson, but this is -- I'm going to ask my questions and you're going to have to just answer them. That's just the way this goes.**

A. I -- I --

**Q. The question was --**

A. I believe I did.

**Q. My -- my question was: The -- were -- did you have written communications with the -- with Mr. McCauley, Mr. Romaine, and -- yeah, with Mr. McCauley, Mr. Romaine about not acquiring RiverRock?**

A. I don't recall written communications. We would have a verbal discussion.

**Q. Okay. So it's your testimony that there were no written communications about -- about the decision not to acquire RiverRock.**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: Again, this was a discussion about not moving forward, not about -- not about acquisition.

THE COURT REPORTER: Not about -- I'm sorry?

THE WITNESS: We had a discussion about not continuing discussions.

BY MS. ORETSKY:

**Q. Okay.**

A. Language is important, and --

**Q. Okay. Mr. Jackson, the discussion that**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**you had with Mr. McCauley and Mr. Romaine about not continuing discussions, was that discussion in writing?**

A. No, not that I recall. I believe it was verbal.

**Q. Okay. And where did you have that discussion?**

A. I believe it was in our office.

**Q. Okay. Whose office were you in?**

A. I don't specifically recall which office it would have been in. We -- we all worked in the same office at the time, so it could have been in Bill's, it could have been in Chris'. I don't recall the exact office location.

**Q. So the three of you were physically together having a conversation about RiverRock.**

MR. ZUCKERMAN: Objection.

THE WITNESS: We were physically in the same office because we worked in the same office, so, yes.

BY MS. ORETSKY:

**Q. Okay. And when was this conversation? When did it take place?**

A. I -- I don't know the exact date and time, as I've said before. It would have happened



8108294d-b0ea-4811-8f29-be81af2a5e5f

sometime, you know, between receiving the last redline and then sending that letter.

**Q. Okay. So sometime between receiving the redline from RiverRock and December 15th, 2023.**

A. It -- that's -- that's correct. I think it would have happened somewhere in there.

**Q. Okay. And how long did the discussion take place for?**

A. I don't know.

**Q. Was it an hour?**

A. Again, I don't know.

**Q. Did it take half the day?**

A. I -- I don't know.

**Q. Was it your whole -- the whole workday devoted to having this conversation?**

A. No.

**Q. Okay. So it was less than -- less than a -- than the work -- than an eight-hour workday.**

A. I think that's fair. I mean, it -- yeah, I think that's fair. I -- I don't know how long the discussion took place.

**Q. Well, was it, like, five minutes?**

A. I -- I don't know. I -- I agreed that it took less than eight hours.

**Q. Okay. But you can't tell me if it took**

**more than five minutes.**

A. I -- I -- like I said, I don't know.

**Q. And what was discussed during that discussion, specifically?**

A. Specifically, I -- I don't remember every aspect of the conversation. We have thousands of conversations a day. But specific to that, I -- I believe that we talked about their -- you know, we weren't going to move forward with our discussions.

Specifically, you know, we were talking about the indemnification language and we didn't have any other data or information, and so it didn't make sense to continue to move forward.

**Q. So the discussion surrounded the indemnification language, and you referenced data that you didn't have.**

A. Correct.

**Q. What data were you missing, Mr. Jackson?**

A. At that point, we didn't have, and I haven't seen any -- because it was so early stage, we hadn't done any due diligence, there weren't any financials, there was nothing referencing the GP. We didn't have any data. And so, for us, it didn't make sense to continue to move forward. That's what I was referencing in the data. There wasn't

-- we were relying solely on what Tony Annino was saying to us, and so we decided that we shouldn't go forward.

**Q. Okay. So your testimony, if I understand you correctly, is that -- and I'm going to make a representation to you that the LOI with this indemnification revision was on December 5th -- was sent to you on December 5th, 2015.**

A. Okay.

**Q. So your testimony is -- and I want to be very clear on this -- is that between December 5th, 20 -- I'm sorry. I was saying 20 -- I think I gave you the wrong date. December 5th, 2023, and December 15th, 2023, Abacus had no data with respect to RiverRock.**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: What -- what I said was, was that we didn't have the appropriate data to move forward, like financials and other information. All we had was what we were being told by Tony Annino.

BY MS. ORETSKY:

**Q. Okay. At any point in time, did you tell Mr. Annino that you did not have the data that you needed for purposes of evaluating the RiverRock**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**transaction?**

A. Tony and I had had phone conversations where we had discussed that, and so he knew we didn't have appropriate data to make that decision, and he knew that we were relying on the information that he was giving us to determine what might or might not be of -- of interest in this discussion.

**Q. Okay. You would agree with me that you exchanged text messages with Mr. Annino; is that right?**

A. Yes.

**Q. And you would agree with me that you also exchanged e-mails with Mr. Annino.**

A. On his Gmail, primarily.

**Q. I didn't ask where. I asked a very specific question, which was --**

A. Okay.

**Q. -- you would agree with me that you exchanged e-mails with Mr. Annino.**

A. I did exchange e-mails with Mr. Annino directly.

**Q. Okay. And -- and you would agree with me that in none of those written communications you relayed any sort of concern about an indemnification clause, other than the redline**

**revisions that you are now testifying your team made to that clause.**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I -- I don't agree with you. We had had a number of phone conversations where I had brought up --

BY MS. ORETSKY:

**Q. I don't --**

A. Sorry.

**Q. I'm sorry. Mr. Jackson -- I'm --**

A. Okay.

MS. ORETSKY: Can you just repeat the question, Jan, so that he can answer?

BY MS. ORETSKY:

**Q. I didn't ask anything about phone conversations. I was asking specifically about text messages --**

A. Oh.

**Q. -- and e-mails.**

A. Sorry. I was -- I thought we were referencing communications. I wasn't trying to be -- be -- I -- I'm trying to answer the questions.

**Q. Okay. Let me -- let me -- let me ask the question again.**

**You would agree with me that in none of the**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**text messages that you had with Mr. Annino, or any of the e-mail communications that you had with Mr. Annino, that you specifically mentioned anything about revisions to an indemnification clause.**

A. I --

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I referenced performance -- performance matrices in an e-mail that I -- that I recall. Performance matrices of the company that the company would have to perform, which is related to indemnification.

And so directly answering your question, did I use the word "indemnification" in an e-mail or text, I did not.

BY MS. ORETSKY:

**Q. Okay. Did you ever mention any revisions to an indemnification clause in writing to Mr. Annino?**

A. Yes, in the LOI.

**Q. Did you make those revisions to the LOI?**

MR. ZUCKERMAN: And I'll -- I'll just caution the witness not to divulge any --

THE COURT REPORTER: I can't hear you.

MS. ORETSKY: I'm sorry. I couldn't hear -- I couldn't hear you.

MR. ZUCKERMAN: I'm just reminding the witness about attorney/client privilege to the extent this question is calling for it.

BY MS. ORETSKY:

**Q. Did you -- yeah, you can answer the question. Did you make any revision -- were you the one who made the revisions to the LOI?**

A. You would have to speak to our attorneys.

**Q. I'm not -- I'm not asking about what your attorneys did or didn't do. I'm asking if you made any revisions to the LOI.**

A. I'm not a lawyer.

**Q. And you're not a lawyer. Are you a lawyer?**

A. I'm not a lawyer.

**Q. Okay. Did you make revisions to the LOI?**

A. I don't think I understand the question, and here -- can I share why I don't think I understand it as not being an attorney? Would you be okay if I shared why I don't understand that question?

**Q. Sure. Go ahead.**

A. Is that when I work with our attorneys, I provide feedback to them. And so when I hear you ask the question, does it mean that I physically



8108294d-b0ea-4811-8f29-be81af2a5e5f

went in and wrote something or did I provide feedback, that's where I'm confused. Right? Because I'm interpreting your question as I provided feedback to our counsel, and I would not have written on a document. That's all. I -- I -- I don't -- I'm not trying to split hairs. I'm just confused. I want to make sure, because I don't understand attorney/client privilege in that sense.

**Q. Okay. Did you type any words in the LOI yourself?**

A. No.

**Q. Okay. And you would agree with me that in none of the communications that you had with Mr. Annino, whether via text or whether via e-mail, did you mention anything about not having the data that Abacus needed for purposes of evaluating the RiverRock transaction.**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I would have to go back and look. I believe in -- in -- just so that I'm clear on this question, you're only asking about written, not verbal.

BY MS. ORETSKY:

**Q. Yes.**

A. In -- in written form, I believe in those

e-mails that I was suggesting that we -- that these -- this discussion doesn't work if we don't meet the performance -- if they don't meet the performance matrices. And the reason we put that in there was because we didn't have any information -- we didn't have the information to be able to support what he was suggesting the company was priced (inaudible.)

THE COURT REPORTER: What was the last word?

THE WITNESS: Priced at.

THE COURT REPORTER: Thank you.

BY MS. ORETSKY:

**Q. Okay. Was there a data room created for purposes of this transaction?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: Anthony had put together something on his Gmail.

BY MS. ORETSKY:

**Q. Okay. Let me ask the question again.**

**Was there a data room created for purposes of this transaction?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I don't know. I haven't seen it. Do you have it?



8108294d-b0ea-4811-8f29-be81af2a5e5f

BY MS. ORETSKY:

**Q. Sir, I'm the only one asking questions here today.**

A. I'm just asking the -- I think it's fair.

MR. ZUCKERMAN: She -- she asks the questions.

THE WITNESS: Okay.

BY MS. ORETSKY:

**Q. Okay. So your testimony is that you don't know whether a data room was created for purposes of the RiverRock transaction.**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: Anthony Annino created a shared Google drive on his personal Google drive. I don't know if by definition that was a data room or not. I never accessed it.

BY MS. ORETSKY:

**Q. Okay. What -- why -- why did Mr. -- what is your understanding of why Mr. Annino created this Google drive?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I can't speak for Tony Annino.

BY MS. ORETSKY:

**Q. I'm not asking you to. I'm asking what**

**your understanding of why he created the Google drive is.**

A. I don't know. I don't know. It -- there -- he was building a idea around -- Tony Annino wanted to come and work for Abacus, and so he was putting together information so that he could, you know, I assume, move to the next step in his career.

**Q. Okay. So your testimony is that he just willingly decided to create some Google drive for purposes of advancing his career?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: Yeah, I think he was trying to advance where he was going to be next. You would have to ask him his motivation behind that. I don't know. I -- I never accessed the drive.

BY MS. ORETSKY:

**Q. Okay. So I haven't asked you whether you accessed it or not, but thank you for that information.**

A. Sure.

**Q. Is it -- is there any other reason that Mr. Annino would have created this Google drive other than attempting to further his career?**



8108294d-b0ea-4811-8f29-be81af2a5e5f

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: Again, I -- I -- I don't know. You -- I think it's a good question for Tony.

BY MS. ORETSKY:

**Q. Okay. So you're not -- as you sit here today, you're not aware of any other reason why he would have created this Google drive.**

A. No.

MR. ZUCKERMAN: Sheila, I think you're muted.

MS. ORETSKY: Okay. Let's pull up Tab 6. We're going to mark this as Exhibit 2 to your deposition, Mr. Jackson. And for the record, this is Abacus 0000903 through 0000905.

If you could scroll all the way down.

(Thereupon a document was marked Plaintiff's Exhibit 2 in the proceeding.)

BY MS. ORETSKY:

**Q. Okay. So do you see this e-mail on September 13th, 2023, from Mr. Annino to yourself, and the subject is, "RiverRock/Abacus"?**

**He says, "Jay, Good connecting last week. I'm in the process of putting the data room together and should have something by --" "-- have you**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**something by early next week."**

**Do you see that?**

A. Yes.

**Q. Okay. And do you see your response directly above that where you say, "Sounds good. Thank you!"**

A. Yes.

**Q. Okay. Did you ask him why he was sending you a data room?**

A. No.

**Q. So, I mean, it sounds here like you understood why a data room was being sent to you. Am I misunderstanding these e-mails?**

A. I -- I think I'm just accepting that he's saying he's putting a data room together.

**Q. Okay. Is it your testimony that as of September 13th, 2023, Mr. Annino was putting together a data room for purposes of advancing his career?**

A. Based on a conversation, not via written, yes, he was putting together a data room for advancing his career, which included his future of potentially running RiverRock.

**Q. Okay. So tell me -- tell me a little bit about what your understanding was about his future**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**with RiverRock.**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: And could you repeat the question?

BY MS. ORETSKY:

**Q. Yeah. What was your understanding about what Mr. Annino's future with RiverRock was?**

A. He had indicated to me via phone that he was interested in, you know, broadly, moving on in his career into different things, maybe going back into different types of finance, and so, you know, he thought that this could be a potential opportunity, but that -- it was very vague.

**Q. Okay. I'm a little unclear about what the potential opportunity was.**

A. I am too.

**Q. So your testimony is that you were unclear as to what Mr. Annino was attempting to accomplish when he sent you this e-mail on September 13th, 2023.**

A. As I've said, it was very early-stage discussions, so there wasn't a clear path with anything. It was more discussions, and that's the way that I viewed it.

**Q. All right. Let's scroll up.**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**On October 2nd, 2023, Mr. Annino sends you an e-mail. And it says, "Jay, I just sent you access to the data room - please confirm you received it.**

**"There's a ton of stuff out there (and clearly I need a lesson on navigating our network), but this should be a good start.**

**"Please let me know when you've reviewed and would like to discuss."**

**Did you receive that e-mail, Mr. Annino?**

A. I'm sorry. Did I receive it --

MR. ZUCKERMAN: Objection to the form.

BY MS. ORETSKY:

**Q. Did you receive that e-mail, Mr. -- Mr. Jackson?**

A. Thanks. I believe I did, yes. That's what I see, so --

**Q. Okay. And you responded; is that right?**

A. If we could scroll up a little, that would be great.

**Q. You see your response?**

A. Yes.

**Q. "Great. Thank you. We can sort thru it. Want to jump on a call next week? How does your schedule look?"**

**Why did you want to jump on a call with Mr.**

**Annino next week?**
MR. ZUCKERMAN: Objection to the form.
THE WITNESS: I -- I don't necessarily recall. We -- we talked a lot on the phone. But my guess would be that it was, you know, to discuss what he was sending me.
BY MS. ORETSKY:
**Q. Okay. And did you sort through it like you said you were going to do in your October 2nd e-mail?**
A. No.
**Q. Okay.**
MS. ORETSKY: Let's scroll up.
BY MS. ORETSKY:
**Q. He responds that he's flexible, let me know what works best on your end. And then you respond with a date and time. Do you see that, sir?**
A. I do see it.
**Q. Okay. And did you actually speak on October 10th at 11 a.m.?**
A. I -- I don't recall.
**Q. Okay. Well, let's look at the next e-mail. On October 14th, Mr. Annino sends you an e-mail, and he says, "I just uploaded the servicing**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**agreements to the portal - you'll see that the termination provisions are simple with 60 days notice (so no issue)."**

**What servicing agreements was he updating to the portal?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I didn't open the portal, so I don't know.

BY MS. ORETSKY:

**Q. Well, this was after a phone call that you had with him; is that right?**

A. I --

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: Again, I -- I can't confirm that we had the phone call, because I don't recall it off the top of my head.

BY MS. ORETSKY:

**Q. Okay. The way he writes this e-mail, he's referring services agreements as if you knew what he was talking about.**

A. In our industry, there are typically servicers who service portfolios of the assets. So they have -- RiverRock has a portfolio of assets, so it's natural to assume they would have a servicer.

**Q. Okay. Why was he uploading the service agreements to the portal?**

A. I'm not sure. You would have to ask him. But it would be typical of a servicer. You would want to show that you have a servicer of these assets. So that would be pretty basic, standard, public information.

**Q. Okay. Was this also to further his career?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I don't know.

BY MS. ORETSKY:

**Q. Okay. So it's still your position that there was no discussion about a potential acquisition of RiverRock during this time?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: This discussion was about Tony Annino coming to work with us and how -- and how he might and/or does manage RiverRock. What his ideas were.

BY MS. ORETSKY:

**Q. Okay. So let me ask the question again.**

**Is it still your position that these discussions are not about a potential acquisition of RiverRock?**



8108294d-b0ea-4811-8f29-be81af2a5e5f

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: It would not have been about an acquisition, because that would have been far too advanced conversation at this stage.

BY MS. ORETSKY:

**Q. Okay. So -- so the answer is -- that is, your -- your testimony is that these -- these communications are not about a potential acquisition of RiverRock.**

A. No.

**Q. Okay. And then he says, "I'm working on the DCF and should have that up by the end of the weekend."**

**What is a DCF?**

A. You would have to ask Anthony.

**Q. What is your understanding of what a DCF is?**

A. You know, DCF, like -- again, I don't know. It's -- it's not -- I don't think it's fair for me to interpret what he thinks a DCF is. If you're looking for financial terms, typically, DCF might stand for discounted cash flow.

**Q. Okay. So I'm not asking you what he meant or what he intended to say. I'm asking you, as the reader and the recipient of this e-mail, what was**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**your understanding of what DCF stood for.**

A. For me, when I look at a DCF, I would have thought discounted cash flow and this is his -- because we -- we had had conversations around what and how he thought RiverRock would be managed going forward, and this was his case study. This was his data and information.

**Q. Why --**

A. That's how I would interpret it. I don't know if it's right.

**Q. Why was he talking to you about RiverRock if he just wanted to come and work for Abacus?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: Yeah, I think that's because that's where he currently was. That's where his track record was.

BY MS. ORETSKY:

**Q. Okay. So is it your testimony that he's just trying to prove his performance by sharing all this information with you?**

A. I'm -- I'm not sure. Right? Like, you would -- again, I think it's a good question for Tony.

**Q. Okay. Let's -- let's move up. Let's -- let's look at your own language.**



8108294d-b0ea-4811-8f29-be81af2a5e5f

A. Uh-huh.

**Q. On October 15th, you respond, less than an hour later, "Great - thank you. We received SEC S1 filing back with no comments so we are wall crossing now."**

**What did you mean when you say -- when you said that?**

A. He and I had had some conversations independent on -- because Tony had represented himself as someone who knew and understood the bond market, and so this was in reference to a bond filing that we had submitted to the SEC and received no comments on.

**Q. Why were you telling him about this bond filing?**

A. It was just about, broadly, because, as I said, he had experience in the bond market.

**Q. There's no other reason why you were telling him about the bond filing.**

A. It -- look, like -- we were talking about, when you do a bond filing, that enhances your capital structure as a business. I was excited about it. And Anthony knew and understood -- at least based on what he had shared with us, based on his prior -- prior experience with bond markets,

and so it was a totally separate conversation.

**Q. So it's your testimony as you sit here today that the bond filing that you're referencing here in your October 14th, 2023, e-mail is completely irrelevant to a potential acquisition of RiverRock.**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: That's correct.

BY MS. ORETSKY:

**Q. Okay. Then you say, "We expect to have it completed by end of month."**

**Do you see that?**

A. I do.

**Q. Why are you giving him the timeline for when the bond filing would be complete?**

A. That's just when it's going to be complete. There wasn't -- again, this is a conversation amongst what I deemed to be someone who is -- understood the bond market and I was pretty excited about it.

**Q. Okay. And then you say, "Assuming all goes well, board approval etc.," What board approval did you need? What are you referring to here?**

A. Any board approval we would have on both



8108294d-b0ea-4811-8f29-be81af2a5e5f

our capital, which would be our bond filing, and any other opportunity that we might consider at Abacus would require board approval at actual execution of documents.

**Q. Okay. So here you say, "Assuming all goes well board approval etc will be in a good position to close before year end."**

**What are you referring to?**

A. I'm just saying that, you know, we could be in a good position to be in a capital -- that we'll be in a -- a strong capital position as a -- as a company.

**Q. Okay.**

A. So, you know, close the bond. It could be close discussions, opportunities. Like, it just meant that we felt like we would be in a good cash and capital position at the company.

**Q. Okay. So this, "close before year end," it's your testimony that it had nothing to do with the potential acquisition of RiverRock.**

A. That's correct, because we were never acquiring RiverRock. We weren't -- this is way early. This -- we were never going down that road. This was an early discovery conversation.

**Q. All right. Let's move up to the next**

**e-mail. And Anthony seems to have been just as excited as you were about this --**

A. Uh-huh.

**Q. -- bond filing, because he writes, "Great news." And then he says, "Few points worth noting," and there's a bunch of bullet points there. Do you see that?**

A. I do.

**Q. What's he talking about there?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I can't interpret everything that he's talking about. These are his words, not mine.

BY MS. ORETSKY:

**Q. Well, what did you understand them to mean?**

A. I understand that Tony was sharing with us his résumé. This was his case study and what he would -- he would do in this type of opportunity, in this type of situation. And so he put together this with some bullet points on what he thought needed or would take place in this hypothetical of his current company, which was RiverRock.

**Q. Okay. So this is nothing more than just a case study from Mr. Annino.**



8108294d-b0ea-4811-8f29-be81af2a5e5f

A. That's the only way I can interpret it. I have no way of verifying this information.

**Q. Well, you're having a communication with the CEO of another company; is that right, Mr. Jackson?**

A. I can confirm that I believe, yes, he was a CEO of another company.

**Q. And that company, RiverRock, was in the same industry as Abacus; is that right?**

A. That's correct.

**Q. Okay. Let's move on to your next e-mail. And here you say, "This is kind of a no brainer."**

A. Uh-huh.

**Q. What are you referring to?**

A. The case study.

**Q. What's the -- what -- what was the no brainer?**

A. The case study and potentially hiring Tony.

**Q. What -- then you say, "Acquisition cost of 5M and we make 2X that in fees."**

**What does that have to do with hiring Tony?**

A. Well, it was what Tony was suggesting that could be produced. So this would be a performance of what Tony thinks he could do.

**Q. What does acquisition of the cost of $5 million, what is that referring to?**

A. I'm referring -- I'm referring to Tony's case study where Tony had said to me that the $5 million would be, you know, effectively, the acquisition cost of that business, and then this is how he would manage and work through those fees.

**Q. The acquisition cost of what business?**

A. Well, from Tony's case study, Tony is basing this on, I believe, the current company that he's with. You would have to ask him. But as I understood it, this was Tony's résumé. This is him showing what he could bring to the table.

**Q. I'm not asking about Tony's résumé, Mr. Jackson. I'm asking about what you forwarded internally --**

A. Uh-huh.

**Q. -- that you called a no brainer, and you specifically wrote, "Acquisition cost of 5M and we make 2X that in fees." So you believed the acquisition would generate immediate fee income, and you're referring to RiverRock; are you not, Mr. Jackson?**

A. Could you --

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: -- break that question down? That was like three questions in one. So if you want -- what was the first question?

BY MS. ORETSKY:

**Q. You are referring to RiverRock when you say, "Acquisition cost of 5M and we make 2X that in fees;" are you not, Mr. Jackson?**

A. I am not. Anthony may be, but this was his analysis. This was his case study. So I have nothing to base this on other than his analysis. I'm affirming that Tony has put together a case study, and these are the -- this is what he's suggesting in his case study.

**Q. Do you understand that you're under oath today, Mr. Jackson?**

A. Yes.

**Q. Okay. So you're here and you're testifying truthfully to the things that you wrote in these e-mails; is that right?**

A. Yes.

**Q. Okay. And -- and I'm going to ask you this again. What, "Acquisition cost of 5M," are you referring to? Are you referring to the acquisition of RiverRock?**

A. That's two questions. So the first

question --

**Q. Are you referring -- are you referring to the acquisition of RiverRock in this e-mail?**

A. I am referring to his case study, period.

**Q. Are you referring to the acquisition of RiverRock; yes or no?**

A. I am referring to his case study.

**Q. That is not what I asked you. If the answer is no, just say no. Are you referring --**

A. The --

**Q. -- to the acquisition of RiverRock?**

A. I would have --

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I would have to go back and look at his case study. So --

MS. ORETSKY: Scroll down.

THE WITNESS: -- show me his --

MS. ORETSKY: Let's scroll down.

THE WITNESS: Show me the case study.

MS. ORETSKY: Let's scroll down to the case study that he keeps referring to.

THE WITNESS: Well, do you have the attachment?

BY MS. ORETSKY:

**Q. We've scrolled down. Please -- please**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**review it.**

MR. ZUCKERMAN: But I think -- Sheila, I think he's asking for the attachment.

MS. ORETSKY: You didn't produce it with an attachment, Alex.

MR. ZUCKERMAN: It is produced as an attachment in some other document.

MS. ORETSKY: Not in this e-mail chain. Not Abacus 0000903 through 905.

MR. ZUCKERMAN: Okay. We've been on for about 73 minutes. Do you think now would be a good time for a break?

MS. ORETSKY: I have a question -- I do have a --

MR. ZUCKERMAN: Okay. Yes.

MS. ORETSKY: -- question pending. So --

MR. ZUCKERMAN: Ask the question.

MS. ORETSKY: -- let me finish this exhibit, the question about this -- these exhibits, and then we can take a break.

BY MS. ORETSKY:

**Q. All right. Let's go back to the question that I just asked you, Mr. Jackson. Now that you've reviewed what you have been referring to as a case study, let's go back --**

A. There was nothing in this e-mail that says RiverRock.

**Q. Is it your testimony that Mr. Annino is not writing you in this e-mail chain about -- about RiverRock? Is that your testimony, sir?**

A. He -- he submitted to me a case study. He submitted to us what he thought that he could do in a hypothetical. We have zero way of verifying any of this.

**Q. That's not what I'm asking you, Mr. Jackson.**

A. And I --

**Q. I need you to answer my question. So please --**

A. So here's what I understood the question --

**Q. No, no. Stop.**

MR. ZUCKERMAN: Let her -- let her finish her question.

BY MS. ORETSKY:

**Q. You need to answer the questions that I ask you. This is not your opportunity -- you can do this at trial. You can talk -- I will let you speak as much as you want, because the more you speak, the better it is for me, sir. So -- but I**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**need to get facts today. Okay? And I'm having a hard time doing that because there's some, like, alternative universe that apparently you're on and I'm on a different one. And so we need to try to figure out why we're on two different planets right now.**

MR. ZUCKERMAN: Sheila, that's not a question. You --

BY MS. ORETSKY:

**Q. And so let's -- let me ask you this.**

MS. ORETSKY: Go back up, please.

BY MS. ORETSKY:

**Q. Right here when you say, "Acquisition cost of 5M," are you referring to the acquisition of RiverRock? It's either yes or no.**

A. I am referring to the acquisition listed in his case study.

**Q. That is not what I asked you, sir.**

A. If his case study is --

**Q. You're being evasive --**

A. -- referencing RiverRock --

**Q. -- and I'm going -- I am going to terminate this depo and ask the Court to compel you to answer my questions if you do not comply with the way this --**



8108294d-b0ea-4811-8f29-be81af2a5e5f

A. I'm trying to answer them.

MR. ZUCKERMAN: Wait, wait, wait.
Don't --

THE WITNESS: I'm -- I'm -- I'm doing the best I can to answer your questions, Sheila.

BY MS. ORETSKY:

**Q. No, you're not.**

A. Like, I --

**Q. It's a yes or no. And my name is not Sheila. Okay? Mr. Jackson.**

A. I'm sorry. Ms. Oretsky.

**Q. "Acquisition cost of 5M."**

A. Uh-huh.

**Q. Are you referring to RiverRock; yes or no?**

A. In this e-mail --

**Q. It's a yes-or-no question, sir.**

MR. ZUCKERMAN: You're not letting him answer.

THE WITNESS: In -- in this e-mail --

BY MS. ORETSKY:

**Q. Sir, you can -- say "yes" or say "no" --**

MR. ZUCKERMAN: Now (inaudible) three times.

BY MS. ORETSKY:

**Q. -- and then you can explain if you'd like,**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**but you have to answer the question. Yes or no?**

A. His case study I believe was referencing RiverRock.

**Q. Oh, my -- that is not what I asked you.**

MS. ORETSKY: Alex, you have got to tell your client that he's gotta answer the questions. I'm telling you, this is -- this is not the way a depo goes.

MR. ZUCKERMAN: He just said that he thinks the case study is referencing RiverRock.

MS. ORETSKY: And that is not what I asked.

THE WITNESS: Okay.

BY MS. ORETSKY:

**Q. You've gotta answer my questions.**

A. I -- I -- I believe I'm answering --

**Q. When you --**

A. -- them --

**Q. When you wrote --**

A. -- to the best of my ability.

**Q. -- "Acquisition cost of 5M," were you referring to RiverRock? Yes or no?**

A. Tony was referring to RiverRock.

**Q. He -- Tony did not write those words, sir;**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**you did.**

A. He wrote --

MR. ZUCKERMAN: You're shouting at the witness right now.

THE WITNESS: He wrote the --

MS. ORETSKY: I am not yelling --

THE WITNESS: He wrote the --

MS. ORETSKY: -- at the witness.

THE WITNESS: -- case study. He wrote the case study.

BY MS. ORETSKY:

**Q. Mr. Jackson, when you wrote -- when you wrote, "Acquisition cost of 5M," were you referring to RiverRock? Yes or no?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: Yes.

BY MS. ORETSKY:

**Q. Thank you. And you wrote --**

A. Now --

**Q. -- "and we make 2X that in fees." Right? So did you believe that the acquisition of RiverRock would generate immediate fee income for Abacus?**

A. No, I had no idea, because this was a hypothetical. It was a case study.

**Q. Okay. And then you write, "Instant revenue - I would bring all servicing in house and remove all of their labor costs day one."**

**Whose labor costs are you referring to, sir?**

A. I'm literally referencing a hypothetical.

**Q. That's not what I asked you, sir.**

A. And so this is a --

**Q. I did not ask --**

A. -- case study.

**Q. -- you that question.**

A. So in the case study --

MR. ZUCKERMAN: Wait. Let her finish her question.

THE WITNESS: Okay. I'm sorry.

That would refer to the case study, and the case study was referencing RiverRock.

BY MS. ORETSKY:

**Q. When you say, "I would bring all servicing in house and remove all of their labor costs day one," whose labor costs? You say, "their labor costs." Whose -- I don't -- I don't want to hear about a case study. I want one -- a one-word answer.**

MR. ZUCKERMAN: That's (indecipherable).

BY MS. ORETSKY:



8108294d-b0ea-4811-8f29-be81af2a5e5f

**Q. I want a one-word answer. Were you referring to --**

MR. ZUCKERMAN: That's not -- not appropriate to tell the --

BY MS. ORETSKY:

**Q. Were you referring to RiverRock's -- were you referring to RiverRock's labor costs? Yes or no?**

A. I don't know what their labor costs are.

**Q. Oh, my God.**

A. I don't know. This is not -- I have no idea.

MR. ZUCKERMAN: I -- Sheila, I think it would be a good time for a break. It's been well over an hour.

MS. ORETSKY: No. This -- this is --

MR. ZUCKERMAN: It's been well over an hour.

MS. ORETSKY: You've got -- so -- you've got -- I've got an exhibit pending and I've got questions that I need to ask.

MR. ZUCKERMAN: Okay.

MS. ORETSKY: I want to finish the questions to this exhibit and then we can take a break.

MR. ZUCKERMAN: Okay.

MS. ORETSKY: But I need you to tell your client, please, I'm asking you to please tell your client to answer the questions. This is going to -- I mean, this record does not look good.

MR. ZUCKERMAN: I agree. I think we disagree about why it doesn't look good, but I think he's answering the questions.

MS. ORETSKY: You think he -- okay. So it's -- you think he's answering the questions, Alex? Really?

MR. ZUCKERMAN: Just ask the rest of your questions on this exhibit.

BY MS. ORETSKY:

**Q. Whose -- were you -- okay. Let me ask again for the 15th time.**

**"I would bring all servicing in house and remove all of their labor costs day one." Are you referring to RiverRock's labor costs? Yes or no?**

A. Yes.

**Q. Okay. And then you write, "This wouldn't happen until post baby bond assuming we have excess capital."**

**What wouldn't happen until post baby bond?**

**What are you referring to?**

A. We wouldn't be able to proceed in any type of additional opportunities post -- with post baby bond.

**Q. You mean without post baby bond.**

A. Yeah. Right. We would have to be post our baby bond, which, as we've discussed, would provide excess capital, the balance sheet.

**Q. Okay. And you're referring to the potential acquisition of RiverRock; is that right?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: It just -- it was never a potential acquisition. This was a discussion. And I'm not trying, Sheila, to be evasive. I'm just -- I'm sorry. If you --

BY MS. ORETSKY:

**Q. Please stop calling me "Sheila."**

A. I -- I apologize. I -- I'm not trying to be in any way, you know, disrespectful to you. I -- I certainly apologize. I'm just referencing that the language you're using, it's -- I feel like it's okay for me to say that this wasn't a potential acquisition. I think it's okay to say that we were in discovery. We were just literally exploring whether this was an opportunity or not,



8108294d-b0ea-4811-8f29-be81af2a5e5f

and --

**Q. Then you can say "no" when I ask the question. You can say "yes" or "no." But the --**

A. Okay.

**Q. -- question -- you have to answer the question.**

A. Okay.

**Q. And the question is that when you say, "This wouldn't happen until post baby bond," are you referring to the potential acquisition of RiverRock?**

MR. ZUCKERMAN: Objection to form.

THE WITNESS: No.

BY MS. ORETSKY:

**Q. Okay. And then you say, "So many things we could do with 160M in policies and cash."**

**What are you referring to?**

A. I'm referring to policies and cash in portfolios. And according to this case study that Anthony was referencing, it was, you know, plus or minus 160 million policies in cash. That's -- that's all we were talking about, is that broadly there's opportunity there.

**Q. Okay. Please, if -- if you could just answer the question.**

**The $160 million in policies and cash, you're --**

A. Uh-huh.

**Q. -- referring to RiverRock's portfolio; yes or no?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: It -- it's hard, because I don't have the exact number. It's just an estimate.

BY MS. ORETSKY:

**Q. I didn't ask about an estimate, sir. I'm reading your own e-mail with your own words, and I'm asking: What are you --**

A. Yes.

**Q. -- referring to?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I was just referencing, yes, the $160 million that RiverRock Funds had.

BY MS. ORETSKY:

**Q. Thank you.**

**Okay. And let's go up. This is from Sean McNealy in response --**

A. Uh-huh.

**Q. -- to your e-mail. And who -- who's Sean McNealy?**



8108294d-b0ea-4811-8f29-be81af2a5e5f

A. Sean is an employee of Abacus and is also a board member.

**Q. Okay. And you also copied -- or he also copies Scott Kirby. And who is Scott Kirby?**

A. An employee of Abacus.

**Q. What is his role?**

A. He works in our origination channel.

**Q. Does he have a title?**

A. Currently, it's -- I believe it's co-founder.

**Q. Co-founder of Abacus?**

A. Yeah.

**Q. And what was his title --**

A. No, well, it was Advanced Settlements, but it's a different -- different name.

**Q. Okay. And what was his title on October 14th, 2023?**

A. I believe his title was co-founder, dash, co-president.

**Q. Okay. And then also copied is Samantha Butcher. Who is Samantha Butcher?**

A. Samantha Butcher -- at this time, her title, or currently?

**Q. Okay. Well, the question was: Who is she?**

A. Yeah. So -- okay. Samantha Butcher leads our origination channel, acquisition of policies.

**Q. And what is her current title at Abacus?**

A. Current title is president of Abacus Life Solutions.

**Q. And what was her title on October 14th, 2023?**

A. I believe it was the same.

**Q. Okay. So this hypothetical case study that you've been referring to throughout your testimony on this e-mail chain, you actually forwarded it to senior executives at Abacus; is that right?**

A. Yes.

**Q. Okay. And -- and you called this hypothetical case study a no brainer; is that correct?**

A. I said it was kind of.

**Q. You said it was kind of a no brainer; right?**

A. That's what I said.

**Q. Right. And in response, you've got Mr. McNealy saying, "I like it." Right?**

A. Uh-huh.

**Q. And he said, "We leverage and add DTC**

**cases."**

**What is your understanding of what "DTC" stands for?**

A. I understand that to mean direct to consumer.

**Q. And then he asks, "Did the --" and I think he meant "he" "-- send details on the fund holdings? Cash flow?"**

**Do you see those questions being posed to you, Mr. Jackson?**

A. I do see those questions.

**Q. Okay. Why was he asking for all of those -- for all of that information? What was your understanding of why he was asking for all that information?**

A. My understanding was that he was curious and was curious what else information.

**Q. He was curious about the potential acquisition of RiverRock?**

A. I think he was just curious about what information did we have in relationship to what this was.

**Q. And then let's go up. And here you say, "We have everything in the doc room."**

**Do you see that, sir?**



8108294d-b0ea-4811-8f29-be81af2a5e5f

A. I do see that.

**Q. Is the doc room the Google drive that you testified to earlier?**

A. Yes.

**Q. Okay. How did you know what was contained in what you refer to as "the doc room"?**

A. I was referencing what Tony Annino had told me.

**Q. But your e-mail doesn't say Tony told me that we have everything in the doc room; is that right?**

A. Yeah, I -- I understand, but that was my answer is I was referencing -- when I typed this, I was going off of what Tony had told me.

**Q. Okay. So you represented to your colleagues that everything was in the doc room; is that right?**

A. That's correct.

**Q. All right. And then you say, "Coventry originated most of the paper."**

**And how did you know that, sir?**

A. That's what Tony had told me.

**Q. Okay. And then you say, "Between RR --" And does "RR" refer to RiverRock?**

A. Yes.



8108294d-b0ea-4811-8f29-be81af2a5e5f

**Q. "-- and Jose --" Who was Jose?**
A. Jose Garcia was the CEO of -- or is the CEO of a fund group.
**Q. The CEO of -- of one of Abacus' fund groups?**
A. Carlyle Investments. Not at the point of this e-mail.
**Q. Okay. Who was he at the point of this e-mail?**
A. He was just a fund buyer. A policy buyer.
**Q. Okay. And it says, "Between RR and Jose this will have an impact on their DTC buying."**
**What are you referring to?**
A. We had sold policies to both RiverRock and Jose's fund.
**Q. Okay. So what impact would it have had on their DTC buying?**
A. It just means that we have more buyers.
**Q. And then you say, "Also, could offer investors transfer into interval fund."**
**What are you referring to there?**
A. Tony Annino had said to me that there was a group of investors that he had contacts with and that investors that he thought that might be interested in other Abacus products as he was



8108294d-b0ea-4811-8f29-be81af2a5e5f

talking about potentially coming to work with us.
**Q. And then you write, "This would give instant assets --"**
**Whose assets are you referring to there?**
MR. ZUCKERMAN: Objection to the form.
THE WITNESS: Yeah, I'm referencing the assets in the case study. I know you don't like that answer, but I'm just referencing the assets in -- in general. And so, in this case, it would be RiverRock.
BY MS. ORETSKY:
**Q. Okay. So when you say, "instant assets," you were referring to RiverRock's assets.**
A. Assets under management; RiverRock or Jose.
**Q. "This would give instant assets and qualify us for large platforms."**
**Can you explain that to me?**
A. Yeah, I -- I think we were referencing some potential growth that we might see in our investment products.
**Q. So you're referring to Abacus' own fund management business.**
A. Correct.
**Q. So in this e-mail, you're analyzing how**

**the RiverRock acquisition would affect Coventry's direct to consumer origination business?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: No.

BY MS. ORETSKY:

**Q. Okay. How -- I'm sorry. How it would affect your direct to consumer origination business.**

A. I am referencing it could have an impact on direct to consumer buying.

**Q. Abacus' direct to consumer buying.**

A. Correct.

**Q. All right. Before you circulated this e-mail, you had actually signed a Confidentiality Agreement with RiverRock; is that right?**

A. I apologize. I don't know the dates between this e-mail and -- and when that document. If you could show me the date on that document, then I'm happy to affirm it.

**Q. Okay. Well, let me ask you this. When you -- when you circulated this information to your colleagues, were they aware that a Confidentiality Agreement existed?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: Yeah, I'm not sure.



8108294d-b0ea-4811-8f29-be81af2a5e5f

MR. ZUCKERMAN: Well, can -- can we take a break if you're moving on to the agreement? It's been 90 minutes now.

MS. ORETSKY: Yeah, I'm not moving on. I'm just finalizing the last couple of questions about this e-mail.

MR. ZUCKERMAN: Keep going.

BY MS. ORETSKY:

**Q. So you're not aware whether they were aware of whether a Confidentiality Agreement had actually been executed.**

A. I don't recall.

**Q. Did you personally inform them that a Confidentiality Agreement had been executed?**

A. I don't recall.

**Q. Did you put them on notice of the fact that anything that you were discussing with respect to this hypothetical case study could be confidential?**

A. I don't recall.

**Q. Do you know what your colleagues did with any of the information that you circulated to them about the hype -- and I'm just using your words -- the hypothetical case study?**

A. I don't -- I don't know.

MR. ZUCKERMAN: Okay. Sheila, the document's down. We're going to take the break now. It's been quite a while.

MS. ORETSKY: Okay. We'll take a break.

MR. ZUCKERMAN: And we're -- before we go off the record, I want to designate this as a highly confidential transcript. Now we can go off the record.

MS. ORETSKY: Okay.

THE VIDEOGRAPHER: Off the record at 11:34.

(Thereupon a brief recess was taken, after which the following proceedings were had:)

THE VIDEOGRAPHER: We're back on the record at 11:48.

BY MS. ORETSKY:

**Q. Did you talk to anybody during the break, Mr. Jackson?**

A. Just my attorney.

**Q. And what did you discuss with your attorney?**

A. We chatted about the length of the break. I have a -- there's a -- he asked where the Disney fireworks might actually go up. That was about it.

**Q. So you didn't discuss your testimony at**

**all.**

A. No.

MS. ORETSKY: Let's go to Tab 9. Well, don't pull it up yet.

BY MS. ORETSKY:

**Q. Did Abacus enter into a Confidentiality Agreement with RiverRock?**

A. Yes.

**Q. Why did Abacus enter into a Confidentiality Agreement with RiverRock?**

A. So that we could begin discussions.

**Q. So you could begin discussions about what, sir?**

A. About a potential opportunity to work with each other, and -- so --

**Q. Okay. And how would you describe this potential opportunity to work with each other?**

A. RiverRock had reached out. Luke Siegel originally reached out, I think it was in the summer of '23 shortly after we went public, and he had indicated to me that he was selling a different business than RiverRock, his life settlement brokerage business, and asked if I was interested in that business. I indicated at the time I didn't think we would be. He also mentioned that



8108294d-b0ea-4811-8f29-be81af2a5e5f

RiverRock might be -- or he -- they might be looking to sell RiverRock or might be on the market.

And then a few months or so had passed, forgive me for not knowing the exact dates, and Tony Annino reached out to me to have a phone call conversation to talk about what some of the opportunities were in the market. And Tony and I had a conversation, which included he just suggesting that he might be leaving RiverRock or that RiverRock may or may not be, you know, potentially selling to GP. And I think we had another phone call that he reached out and asked if I might be interested in learning more about RiverRock, and so we -- I engaged -- or Abacus engaged our law firm at the time for this, which was Locke Lord, now Troutman, and they had engaged in the process of an NDA.

**Q. So you would agree with me that you entered -- and when I say, "you," again I'm talking about Abacus, because you're here as the corporate representative of Abacus Life -- that you entered into a [redacted] of RiverRock.**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I agree that we entered into an NDA with RiverRock.

BY MS. ORETSKY:

**Q. Okay. What did you think [redacted] was, sir?**

A. To learn more about our businesses. Acquisition, I just think is too far advanced at [redacted] stage. It may sound nuanced, but it's not the language that I would use, that's all.

**Q. Would you use the word "transaction"?**

A. I would use the word "opportunity to discover."

**Q. Okay. So you wouldn't use the word "transaction."**

A. No.

**Q. Okay. Well, let's take a look at the [redacted]**

A. Okay.

MS. ORETSKY: We're going to mark this as Exhibit 3.

(Thereupon a document was marked Plaintiff's Exhibit 3 in the proceeding.)

BY MS. ORETSKY:

**Q. Do you recall signing this [redacted], sir?**



8108294d-b0ea-4811-8f29-be81af2a5e5f

A. I -- I do recall that I signed a [redacted]. I -- if you wouldn't mind scrolling through it, I want to affirm that's my signature on it, that this is a correct agreement.

MR. ZUCKERMAN: Can I show him a copy of this if I have one in the room just so he can -- so he doesn't have to ask you to scroll?

THE WITNESS: She -- she did it.

MS. ORETSKY: I assume you don't have any writings or notes or highlights or anything on the document?

MR. ZUCKERMAN: No. He can hold it up for the camera for you to confirm that too.

MS. ORETSKY: No, I -- I'll take your representation for it, Alex.

MR. ZUCKERMAN: Here. I have a clean copy. Here. (Hands document.)

THE WITNESS: Okay.

BY MS. ORETSKY:

**Q. All right. So --**

A. That is my -- that is my signature, yes.

**Q. Okay. And you signed it on September -- well, let's say -- yes. Well, the -- the agreement was effective on September 5th, 2023? Is that**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**right?**

A. That's what the document says.

**Q. Okay. And you signed it as the CEO of Abacus Life, Inc.?**

A. Yes.

**Q. And it was countersigned by Mr. Annino as the CEO of RiverRock?**

A. Yes.

**Q. Okay. So we've got the CEO of RiverRock and the CEO of Abacus entering into this [redacted] am I right?**

A. Those would be the two parties in the agreement; correct.

**Q. Okay. And if you -- did you read this agreement before you signed it?**

A. Our attorney had worked on this agreement and, yes, I -- I believe that I -- I read it. I -- I'm not an attorney, so forgive me for not under -- you know, completely understanding every legal term, but I did -- I did read it.

**Q. Okay.**

A. Excuse me.

**Q. And -- and you understood that you were binding Abacus and its agents to keep RiverRock's information confidential; is that right?**



8108294d-b0ea-4811-8f29-be81af2a5e5f

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I was signing this Confidentiality Agreement as a signature on this Confidentiality Agreement. So if the word "binding" is the appropriate word, then -- then I would say yes.

BY MS. ORETSKY:

**Q. Okay. Let me -- let me ask the question again, and hopefully you'll just answer it.**

**Did you understand that by signing this [redacted] on behalf of Abacus, you were binding Abacus to keep RiverRock's information confidential?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: As I understand this agreement, [redacted] I would say, you know, that based on this, as I understand it, then -- then, yes.

BY MS. ORETSKY:

**Q. Okay. So your answer is yes.**

**And when you signed it, you personally understood what Abacus was and was not permitted to do with RiverRock's information?**

MR. ZUCKERMAN: Objection to the form to



8108294d-b0ea-4811-8f29-be81af2a5e5f

the extent this is calling (indecipherable) --

THE COURT REPORTER: I'm sorry. I couldn't hear you.

MR. ZUCKERMAN: Objection to the form to the extent this is calling for an attorney interpretation of the contract. Sorry. I meant -- sorry. I meant to caution the witness not to divulge attorney interpretation. Object. Making an objection on privilege.

BY MS. ORETSKY:

**Q. You can answer the question, sir.**

A. Okay. Could you ask it again? Sorry.

**Q. When you signed this agreement on behalf of Abacus, you personally understood what Abacus was and was not permitted to do with RiverRock's information?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I think "personally" is the hard word there. I'm not an attorney, so I'm not there to interpret the document. But the answer would be, yes, I -- I understood what a Confidentiality Agreement encompasses.

BY MS. ORETSKY:

**Q. Okay. And do you see -- let's just look**

**at the second paragraph. It says, [redacted]**

A. Uh-huh.

**Q. What [redacted] is this Confidentiality Agreement referring to?**

A. It's -- it's unknown. I don't know. It's unknown at this stage.

**Q. But you understood that the parties were contemplating a business transaction; is that right?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I did not understand at that time.

BY MS. ORETSKY:

**Q. You signed this agreement, sir; didn't you?**

A. Yes.

**Q. And you signed it on behalf of Abacus?**

A. Yes.

**Q. Okay. And you're telling me you didn't understand that there was a [redacted] -- and I'm just using the words from the agreement that you signed.**

A. Uh-huh.

**Q. Your testimony is that you did not understand that [redacted] between Abacus and RiverRock; is that right?**

A. There had not been a defined business transaction.

**Q. That's not what I asked you, sir. Not what I asked you.**

A. Okay. What did you ask? Because I'm -- I'm trying to answer it correctly.

**Q. It's -- is your testimony that at the time you signed this Confidentiality Agreement on behalf of Abacus, you did not understand that there [redacted] between Abacus and RiverRock?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: Correct. There was not a potential business transaction discussed at this point.

BY MS. ORETSKY:

**Q. Okay. So the words on this agreement mean nothing.**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I don't know.

BY MS. ORETSKY:

**Q. Okay. All right. And did you understand -- and I'm looking at Section 2(a) -- that** [redacted] **Did you understand that, sir?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I didn't write the document, so, you know, the evaluation of "the," I would have probably not had the word "the" in there, but it is what it is, so --

You know, we signed a -- I signed this Confidentiality Agreement, so I would have to affirm that that was there. If I understood or not, I don't -- I don't think I understood that there was a business -- a -- a -- an actual business transaction or that this transaction had been named at that point, because it hadn't.

BY MS. ORETSKY:

**Q. What do you mean --**

A. I'm not --

**Q. -- that the -- that the -- that the**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**transaction had not been named? What does that mean?**

A. We -- we were in very early stages of a conversation. It was a hypothetical. It was an opportunity. There was not a definitive potential transaction. And the word "the" indicates to me like there is a transaction, that's all.

**Q. But you specifically said that it had -- that the transaction had not been named. What does that mean?**

A. Oh, just meaning that we hadn't discussed -- named, meaning we hadn't discussed an actual business transaction at this point.

**Q. Okay. So you -- you didn't mean that you hadn't given the transaction a name. That's not what you were referring to?**

A. That's correct.

**Q. Okay. Did RiverRock ever direct Abacus to use or disclose any of its information for any purpose other than evaluating [redacted] that's referenced in this agreement?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I'm just thinking as best I can back to any communication that -- that I would have had. Not that I recall.

BY MS. ORETSKY:

**Q. And if you look at Section 4 of the Confidentiality Agreement, it says,** [redacted]

**Do you see that, sir?**

A. I see it.

**Q. Okay. So** [redacted]**; is that correct?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: Correct; that's what the document says.

BY MS. ORETSKY:

**Q. And do you see, back to Paragraph 1, where the definition of** [redacted] **is stated? Do you see that? 1(a)?**

A. I see 1(a); correct.

**Q. Okay. And it says right there that,** [redacted]

**Do you see that, sir?**

A. I do see that.

**Q.** [redacted]

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: Yes.

BY MS. ORETSKY:

**Q. Okay. And if you look at subsection 1(a)(iii) --**

MS. ORETSKY: So you'll have to go down. Yeah, go down. Yeah.

BY MS. ORETSKY:

**Q. Did you understand -- and when I say, "you," again I mean Abacus -- that if a document was confidential, it was confidential irrespective of the form of the communication?**

A. I see that.

**Q. So did you understand that** [redacted]**?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I -- I understand. And, yes, irrespective of the form of communication, that's what was in the

document.

BY MS. ORETSKY:

**Q. Okay. So we've spent a lot of time in this litigation about whether a particular document was located in the data room or sent just via e-mail. Do you know what I'm referring to when I say that?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: No. Could you repeat the question or explain a little more?

BY MS. ORETSKY:

**Q. Well, I will -- I'll happily show you the document, but it was a valuation that was transmitted to you via e-mail by Mr. Annino. Do you recall that?**

A. I recall that we -- I believe we discussed this earlier in an e-mail, and so I -- I do recall the case study that he had sent us.

**Q. Okay. I'm talking about something else. I'll show you the document and we'll come back to this question.**

A. Okay.

**Q. Is there any provision in this agreement that permitted Abacus to post RiverRock's confidential information on its website?**



8108294d-b0ea-4811-8f29-be81af2a5e5f

MR. ZUCKERMAN: Objection to the form.
THE WITNESS: I don't know.
BY MS. ORETSKY:
**Q. Do you dispute that Abacus posted RiverRock's confidential information on its website?**
MR. ZUCKERMAN: Objection to the form.
THE WITNESS: Yes.
BY MS. ORETSKY:
**Q. Okay. Why do you dispute that?**
A. The communication or the information that was posted on our investor relations website was inclusive of a document that was received from Tony Annino which was a -- was not part of this communication. It was not marked confidential. It was his personal case study, hypothetical assessment.
**Q. Okay. Let's break that down a little bit. What information are you referring to?**
MR. ZUCKERMAN: Objection to the form.
THE WITNESS: I believe it's the information you're asking me about, which was a case study model that he had e-mailed to me that you showed me earlier today.
BY MS. ORETSKY:

**Q. Okay. So I have not shown you that model today.**

A. I'm sorry. I -- the -- the e-mail that the model would have been attached to.

**Q. Okay. So you're referring to the model that was posted on your investor website; is that right?**

A. I'm referring to that specific -- yes, that slide, that model, that case study that Tony had sent us.

**Q. Okay. And so one of the things that you mentioned in your testimony is that the document wasn't marked confidential; right?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: Correct.

BY MS. ORETSKY:

**Q. Does that matter, sir?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: It -- it wasn't a document that was an official RiverRock document. This was a case study that Tony Annino had built because he was looking for a potential position with Abacus. He was looking for what he was going to do next. We had zero way of verifying or knowing if any of that



8108294d-b0ea-4811-8f29-be81af2a5e5f

information was -- was accurate or not. It wasn't based on actual data, as we understood it, as I understood it.

BY MS. ORETSKY:

**Q. Okay. That's not what I asked you.**

A. Okay.

**Q. I asked --**

A. I may have misunderstood the question.

**Q. The question was: You had earlier testified that the document, this model that you are referring to, was not confidential because it was not marked as confidential.**

A. It was not a --

MR. ZUCKERMAN: Is that a question?

BY MS. ORETSKY:

**Q. I'm -- I -- I'm not done.**

A. Okay.

**Q. And I asked you: Does that matter?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I -- I'm not an attorney, so I -- I don't really know how much that matters or not. The document that I'm referencing was a case study, a hypothetical, not based on actual data that was his résumé that he built.

BY MS. ORETSKY:



8108294d-b0ea-4811-8f29-be81af2a5e5f

**Q. Why did you think it was important to tell me that it was not marked confidential?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I -- I think I misunderstood either the question or what it was referencing.

BY MS. ORETSKY:

**Q. Okay. This case study that you keep referring to --**

A. Uh-huh.

**Q. -- your testimony is that those numbers on that model were prepared as part of this case study? Am I right?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I don't know the source of the numbers.

BY MS. ORETSKY:

**Q. So I didn't ask you the source, although you have multiple times just told me under oath that it wasn't RiverRock's numbers; it was some case -- I mean, I'm a little confused myself. Some case study that Mr. Annino was putting together. What -- what was the purpose of Mr. Annino sharing this model with you?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I can't speak specifically to Mr. Annino's motivation. I can only speak to that he was interested in coming to work with Abacus, and this was an example of what he might be able to do in his management and management of not just businesses, but potentially what he might or might not do with RiverRock.

BY MS. ORETSKY:

**Q. Why did you present it to your board?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: We have a section or a -- a period that we talk about at our board meeting of what we call opportunities or strategies, and we shared that with the board. There were multiple opportunities that we discussed in that board deck.

BY MS. ORETSKY:

**Q. So your -- if this was just a résumé-builder for Mr. Annino, why would that be shared with the board?**

A. Yeah, it was a hypothetical that was being presented to us. We had -- and we discussed this at the board, that we have no information to verify this. And Tony Annino was asking us to move



8108294d-b0ea-4811-8f29-be81af2a5e5f

forward with a potential LOI, and he was setting the price for that.

**Q. What was the hypothetical, sir? Define the hypothetical for me.**

A. Okay. The case study would be the hypothetical.

**Q. What was the case study, sir?**

MR. ZUCKERMAN: Do you need to see the document?

THE WITNESS: Yeah, could you show me the document, please? The attachment?

BY MS. ORETSKY:

**Q. No, I'm not asking about the e-mail. I'm asking: What is your understanding of --**

A. I see.

**Q. You've been using the word -- you have used that word hundreds of times. You've used that term, "case study" --**

A. Uh-huh.

**Q. -- hundreds of times. When you're referring to it, what is your understanding of what the case study is?**

A. It's the attachment that Tony Annino sent me.

**Q. Okay. And what -- what -- what is that?**

**Just off the top of your head, what is it?**
A. It's a -- it's a case study related to a business and how he would manage that business. And that's it.
**Q. What business? How he would manage what business?**
A. So he was at RiverRock, and this is how he would manage RiverRock.
**Q. So it's about the potential acquisition of RiverRock.**
MR. ZUCKERMAN: Objection to the form.
THE WITNESS: No.
BY MS. ORETSKY:
**Q. Why would Abacus care about how Mr. Annino managed RiverRock?**
A. Any time you interview someone that you might bring onboard, you want to know what their track record is, what they've done, and this was an example of that.
**Q. Then why were you signing** [redacted]**?**
A. That took place in September to explore what an opportunity might be with RiverRock. And that ultimately amounted to discussions that ultimately didn't move forward in any way on a



8108294d-b0ea-4811-8f29-be81af2a5e5f

nonbinding agreement.

**Q. Okay. So let me just make sure my timeline is very clear.**

A. Okay.

**Q. In September when you** [redacted] **has nothing to do with the discussions you later had with Mr. Annino.**

A. You mean -- are you referencing all discussions with Tony Annino, or some discussions with Tony Annino?

**Q. I'm referencing the discussions you had with Mr. Annino about RiverRock.**

A. Okay. So in discussions with Tony Annino specifically about RiverRock. So then was your question is that -- is it going back to this agreement?

**Q. Yes, that's my question.**

A. Okay. In my communications with Tony, the answer is, yes, we were -- I was presented an opportunity, potentially, to look at RiverRock as they were, potentially, shopping their business to several potential market participants.

**Q. Okay.**

MS. ORETSKY: Okay. Let's pull up -- well, actually, back up for a minute.



8108294d-b0ea-4811-8f29-be81af2a5e5f

We're going to pull up what we're going to mark as Exhibit 4. Tab 11.

(Thereupon a document was marked Plaintiff's Exhibit 4 in the proceeding.)

BY MS. ORETSKY:

**Q. Okay. This is Abacus 0001093. This is an e-mail from Mr. Annino to yourself. It's dated October 2nd, 2023.**

**Is this the Google drive that you were referring to earlier in your testimony, Mr. Jackson, that Mr. Annino shared with you?**

A. This is the Google drive that Mr. Annino had sent an invite to join; correct.

**Q. And if I refer to it as a data room, will you understand what I'm referring to?**

A. Yes.

**Q. Okay. Do you remember receiving the invitation to the data room, sir?**

A. I don't recall, but it's -- it's here in the e-mail, so --

**Q. You don't have any reason to dispute that you received an invitation to the Google drive; right?**

A. I don't.

**Q. All right. And this was sent to you just**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**approximately three-and-a-half weeks or so after you signed the confidentiality agreement with RiverRock?**

A. Yes. And is it signed or effective date? Because I don't want to get caught up in the --

**Q. Right. All right. I'll rephrase. You're right. It was -- it was sent to you about three-and-a-half weeks after the effective date of the Confidentiality Agreement; is that right?**

A. That's what the dates say, yeah, approximately.

**Q. Okay.**

A. Yeah.

**Q. And is your e-mail jay@abacuslife.com?**

A. Yes.

**Q. Okay. Is that the e-mail that you still use today?**

A. No.

**Q. What e-mail do you use today?**

A. Jay@abacusgm.com. But it's a forward, so anything that goes to Abacus Life would also go to abacusgm.

**Q. When did you start using the e-mail jay@abacusgm.com?**

A. We did a -- filed for a name change --

forgive me for not knowing the exact date, but it was, I believe, at the beginning of this year.

**Q. Did you use any other e-mail addresses in late 2023 and -- and in 2024 other than jay@abacuslife.com?**

A. Could you be more clear? Like, I have a personal e-mail for my wife and I. But meaning just for RiverRock and business communications, is that --

**Q. Yeah, I mean with respect to your business communications.**

A. Yes, that's the only e-mail.

**Q. Okay.**

A. That -- yeah. It would have all fed to a single source.

**Q. Okay. So there's no dispute that as of October 2nd, 2023, you received access to the data room.**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I'm not disputing that I received this e-mail. I never accessed the data room. So I don't know if I was granted access or not; that's all I'm saying.

BY MS. ORETSKY:

**Q. But you did share the data room with other**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**people; right?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: Yes, I did.

BY MS. ORETSKY:

**Q. And, in fact, you represented to others that you could access the data room in those communications; isn't that right?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I don't -- I don't recall that communication.

BY MS. ORETSKY:

**Q. And the only purpose for which RiverRock provided access to this data room was -- and I'm asking your understanding; okay? I'm not asking you to -- to -- to be clairvoyant or I'm not asking you what RiverRock was doing or not doing.**

**Your understanding of why they shared access to this data room with you was for purposes of evaluating a potential transaction with RiverRock; is that right?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I appreciate you're not asking me to be clairvoyant, because I don't know what their intent was. And I didn't access the data room, so I don't know what was

inside to suggest that intent. So my understanding was that Anthony was sharing information so that we could continue conversations.

BY MS. ORETSKY:

**Q. Okay. Well, let's look -- let's look at what -- look at the file. Look what it's called.**

A. Uh-huh.

**Q. What's it called?**

A. He -- he named it Abacus RiverRock.

**Q. Okay. But he didn't name it Annino RiverRock; right?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: No.

BY MS. ORETSKY:

**Q. Or I'm sorry. I mean, Abacus Annino. He didn't name it Abacus Annino; right?**

A. Because that -- no, that's not what this e-mail says.

**Q. Yeah. It says, "Abacus_RiverRock."**

A. Uh-huh.

**Q. All right. Do you -- do you -- when you're hiring an employee, do you normally present them to your board of directors?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: If it's an executive, yes.

BY MS. ORETSKY:

**Q. Were you planning on hiring Mr. Annino as an executive?**

A. Potentially.

**Q. Okay. And he was going to work for Abacus? That was going to be the employer?**

A. Abacus would have been the employer.

**Q. Okay. Did you give him any comp structure? Did you share any of that information with him?**

A. No. It was, like I said, very early stage, so we -- we hadn't discussed that. He had just shared his intent with us.

**Q. So he was using RiverRock's financials to try and gain employment at Abacus? That's your testimony today?**

A. I don't know what he was using, because I can't verify any of those numbers. We've never seen them.

**Q. But you -- but you actually represented those numbers as your own; is that right?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I -- I don't think I understand that question. Sorry.

BY MS. ORETSKY:

**Q. Okay. We'll -- we'll get to that in a minute.**

A. Okay.

**Q. Okay. Do you get your lawyers involved when you're looking at potentially hiring an executive?**

MR. ZUCKERMAN: Objection to the form, and just caution the witness not to divulge privileged information.

THE WITNESS: We have a legal team that would review any potential person who comes here, including background checks, referrals. We have asked employees to, you know, demonstrate their skill sets in the form of case studies and -- and other things.

BY MS. ORETSKY:

**Q. Okay. So that legal team, is that inhouse or -- or outside counsel that does that?**

A. It -- honestly, it can depend on -- on the individual.

**Q. Okay. So in the case of Mr. Annino, did he ever send you a résumé?**

A. We had his LinkedIn profile, and he did not send a résumé. He had just spoken about his

abilities to me on the phone.

**Q. Okay. What position was he applying for?**

A. It was undefined at that time.

**Q. Did you conduct an interview?**

A. A lot of our phone conversations were more casual, and it was more opportunistic in what he could or might be interested in doing going forward. He had interest in, you know, remaining in the asset class.

**Q. Okay. So, again, my question. Did you ever perform an interview with Mr. Annino?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I think I just would better want to understand your definition of an interview, which might be different than mine, that's all.

BY MS. ORETSKY:

**Q. I think a job interview is pretty standard. I'm not sure what's vague about that. Someone comes in, you sit them down, you ask them about their experience, you --**

A. Yeah.

**Q. -- have them meet with other colleagues to see if they'd be a good fit. Did you ever perform an interview with Mr. Annino?**

A. On that definition, Mr. Annino and I had several conversations that would fit that definition.

**Q. Okay. So you did. Your answer -- your -- so if we ask Mr. Annino next week was -- did Mr. Jackson interview you for a position for -- at Abacus, he's going to say yes.**

A. I don't know what he'll say. He -- he might have a different definition of what an interview is than you or I. So I don't -- I don't know.

**Q. Okay. I don't think -- I don't think the judge is going to have a different definition of what an interview is. And I'm not sure that the judge is going to understand that you don't understand what the word "interview" means, but we'll get there.**

MR. ZUCKERMAN: Objection to the form.

BY MS. ORETSKY:

**Q. And did you run a background check on Mr. Annino?**

A. No. This is, like I said, very early stage conversations.

**Q. Okay. Okay. So he didn't send you a résumé; is that right?**

A. That's correct.
**Q. And no background check was performed; is that right?**
MR. ZUCKERMAN: Objection to the form.
THE WITNESS: It would have been too early stage. He did send us a case study.
BY MS. ORETSKY:
**Q. No, I asked you: No background check was performed; right?**
A. That's correct.
**Q. And --**
A. That would have been early stage.
**Q. Okay. And you didn't have any comp discussions with Mr. Annino.**
MR. ZUCKERMAN: Objection to the form.
BY MS. ORETSKY:
**Q. Is that right?**
A. I don't recall any direct compensation. He had talked about what he had made in his prior positions.
**Q. No, I'm asking about: You didn't have any comp discussions about what he would make at Abacus should he have joined Abacus as an employee; is that right?**
A. No, that would --

MR. ZUCKERMAN: Objection to the form.
THE WITNESS: That was early.
BY MS. ORETSKY:
**Q. Okay. But all of this was because Mr. Annino was seeking a job at Abacus. All of these communications that we've looked at --**
MR. ZUCKERMAN: Objection to the form.
BY MS. ORETSKY:
**Q. -- were solely for the purpose of Mr. Annino seeking employment at Abacus; is that right?**
A. No.
**Q. Okay. What am I wrong about?**
A. I think that Mr. Annino was adding his potential employment to these conversations as an opportunity. And Mr. Annino was having conversations with other companies, as he had shared with me.
**Q. Okay. So his potential employment was an add-on to what?**
A. Any potential opportunities that he may be working on.
**Q. What potential opportunities that he may be working on?**
A. I -- I don't know.
**Q. You mean the potential acquisition of**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**RiverRock.**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I think that, you know, those were opportunities he was working on, but you can ask him if there are others.

BY MS. ORETSKY:

**Q. I mean, you were working with him on that; weren't you?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: We were having conversations about -- and discovery and -- about this, about RiverRock, about Tony personally and professionally.

BY MS. ORETSKY:

**Q. Okay. So you were having discussions about the potential acquisition of RiverRock.**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: That would be in the form of an LOI.

BY MS. ORETSKY:

**Q. So is your answer yes?**

A. Yes.

**Q. Okay. And let's see. Let's take a look at what we're going to mark as --**

MS. ORETSKY: Are we at Exhibit 5 now?



8108294d-b0ea-4811-8f29-be81af2a5e5f

MS. JUNGER: Yes.

THE COURT REPORTER: Yes.

MS. ORETSKY: Exhibit 5. We're going to pull that up in one minute.

BY MS. ORETSKY:

**Q. You actually retained counsel, sir; didn't you; with respect to the potential acquisition of RiverRock?**

A. I don't recall. We did retain counsel for the [redacted], but I -- I don't recall having counsel outside of that. I don't believe we had gone that far.

**Q. So your testimony is, as you're sitting here today as the corporate representative of Abacus --**

A. Uh-huh.

**Q. -- that you don't remember whether you retained lawyers with respect to the potential acquisition of RiverRock. That's your testimony.**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: We weren't in -- we weren't at a stage of acquisition of RiverRock. We were talking about a discussion in reference to what might happen via an LOI. There was no purchase and sale agreement, there was no



8108294d-b0ea-4811-8f29-be81af2a5e5f

acquisition. You would do that later in the stage, and you would also do due diligence later. Like, at that stage, we were not engaging a third-party law firm to determine if there's even an indication of interest.

BY MS. ORETSKY:

**Q. When you use the word "LOI," are you referring to a letter of intent?**

A. I'm referring to a letter of intent.

**Q. Okay. And why do parties, in your experience, enter into an LOI?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: We didn't enter into an LOI.

BY MS. ORETSKY:

**Q. I didn't ask you if you entered into an LOI. My question was --**

A. Oh, I'm sorry. Apologies.

**Q. -- why do parties enter --**

A. Uh-huh.

**Q. -- into an LOI?**

A. I don't know. I'm not an attorney.

**Q. You have no understanding of why a party would enter into an LOI. None whatsoever.**

MR. ZUCKERMAN: Objection to the -- objection to the form.

THE WITNESS: At that stage, you know, when you're entering into an LOI, it has a lot of pieces. To me, entering is defined by you're executing an LOI, which is still not binding --
BY MS. ORETSKY:
**Q. I'm not asking for that, sir.**
A. I'm -- I'm --
**Q. I'm asking you: Why do -- I'm not talking about this case. As the CEO of a public company --**
A. Uh-huh.
**Q. -- what is your understanding of why Abacus would ever enter into an LOI? I'm not talking about this particular transaction. Why would -- why would Abacus ever enter into an LOI?**
A. To move toward --
MR. ZUCKERMAN: Objection to the form.
THE WITNESS: To move towards due diligence, discovery, and determine whether there is a fit with that company.
BY MS. ORETSKY:
**Q. Okay. At what stage, okay, would you generally retain counsel?**
MR. ZUCKERMAN: Objection to the form.
THE WITNESS: Generally, it would be prior



8108294d-b0ea-4811-8f29-be81af2a5e5f

to executing an LOI.

BY MS. ORETSKY:

**Q. Okay. And it's your testimony, as you sit here today, that you did not retain counsel for --**

A. It's my testimony -- it's my testimony I don't recall retaining counsel for the LOI.

**Q. Okay. All right. You don't remember.**

A. I'm just -- we were using Chris Romaine, our inhouse counsel, to work -- to work through that process, so I don't -- I don't recall using any third-party attorneys at that time. I just -- I just don't recall.

**Q. All right. Let me refresh your recollection, sir.**

A. Okay.

MS. ORETSKY: We're going to pull up what we're marking as Exhibit 5, and it's Tab 13.

(Thereupon a document was marked Plaintiff's Exhibit 5 in the proceeding.)

BY MS. ORETSKY:

A. This is part of a longer e-mail chain, but it was produced like this and then we'll show you the longer chain.

MS. ORETSKY: Let's move down.

MS. JUNGER: To the bottom?



8108294d-b0ea-4811-8f29-be81af2a5e5f

MS. ORETSKY: Yeah.
BY MS. ORETSKY:
**Q. There's an e-mail from Mr. Annino replying to an earlier e-mail from you. And he says, "Jay, That's great news. Thanks for the update. Look forward to receiving the term sheet."**
MS. ORETSKY: Let's go up.
BY MS. ORETSKY:
**Q. And Jay Jackson, which is yourself --**
A. Uh-huh.
**Q. -- responds, and you copy in Daniel Harrist. Who's Daniel Harrist, Mr. Jackson?**
A. He's an attorney with Latham Watkins. Latham + Watkins.
**Q. He's not an employment lawyer; is he?**
MR. ZUCKERMAN: Objection to the form.
THE WITNESS: I -- I can't speak to everything he does at Latham. I -- I don't know.
BY MS. ORETSKY:
**Q. What kind of lawyer do you think he is?**
MR. ZUCKERMAN: Objection to the form.
THE WITNESS: I don't know. He -- he's an attorney with Latham Watkins. Latham Watkins is a firm that we have -- had used in the past



8108294d-b0ea-4811-8f29-be81af2a5e5f

for a variety of different things.

BY MS. ORETSKY:

**Q. Okay. What did you use Mr. Harrist for?**

MR. ZUCKERMAN: And I'll just -- don't divulge privileged information.

THE WITNESS: Yeah, we -- we had engaged Mr. Harrist for a variety of different -- different things that would be privileged.

BY MS. ORETSKY:

**Q. I'm not asking about communications with him. I'm asking: What kind of representation did Mr. Harrist provide for Abacus?**

A. Mr. Harrist had worked on things like Confidentiality Agreements, I believe. And we were a fairly new public company, so he had provided us feedback, as a new public company, working with the SEC.

**Q. Anything else?**

A. Not that I recall.

**Q. Did he ever help you with an employment agreement for any potential employee?**

A. I'm not sure. He -- you know, Chris Harrist -- or, excuse me, Chris Romaine would have engaged with Mr. -- Mr. Harrist more often than me.

**Q. Okay. And Chris is not on this e-mail;**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**right?**

A. It doesn't look like it, no.

**Q. No. And -- and look -- let's look at what you say. You say, "Hi Tony. Can you please provide doc room access to Dan Harrist with Latham?"**

A. Uh-huh.

**Q. Do you see that?**

A. Yeah.

**Q. Okay. And -- and then you write, "He is going to be our attorney and will start working on a term sheet."**

A. Sure.

**Q. Does this refresh your recollection as to whether you retained counsel?**

A. Sure. It looks like we did use at least Dan Harrist to offer some initial feedback on a term sheet.

**Q. Okay. And the term sheet, is that the same thing as an LOI, or is that different?**

A. Yeah, I would interpret that to mean a very similar thing to a LOI.

**Q. Okay. And then you say, "He is attached to this e-mail and here is his contact information." And you share his e-mail address; is**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**that right?**

A. Yes, that's correct.

**Q. Okay. So you're asking Mr. Annino to send access to the data room to Mr. Harrist; is that correct?**

A. Yes.

**Q. Why were you asking Mr. Annino to do that?**

A. Because Dan could go through and potentially review the doc room.

**Q. Why would he do that?**

A. He's our attorney.

**Q. Why did you ask your attorney to go in and review the data room that was sent to you by Mr. Annino?**

MR. ZUCKERMAN: I'll just caution the witness not to divulge privileged information.

THE WITNESS: That would be a privileged conversation between Dan and I.

BY MS. ORETSKY:

**Q. No, it wouldn't, because what he tells you would be privileged, but why --**

A. Okay. Well --

**Q. -- you asked him to do something is not privileged.**

MR. ZUCKERMAN: Communications he has with

his lawyer in either direction is privileged.

MS. ORETSKY: I'm not asking for the communications. I -- if they're rendering legal advice, that is absolutely privileged.

THE WITNESS: Okay.

MS. ORETSKY: But I'm ask asking him: Why did he ask his lawyer to review the data room? That is not a privileged question.

THE WITNESS: He -- he gave me legal advice related to reviewing the doc room.

BY MS. ORETSKY:

**Q. Okay. Why -- why -- why were you seeking legal advice with respect to the review of what -- of the contents of that data room?**

MR. ZUCKERMAN: Again, this is privileged.

THE WITNESS: Legal advice is useful and he could provide us some background and feedback on what the doc room consisted of or didn't consist of.

BY MS. ORETSKY:

**Q. For what purpose, sir?**

A. So that he could help us and provide us some advice as to whether this is the type of business that we should consider moving forward with.

**Q. You're talking about RiverRock's business; right?**

A. Yeah.

**Q. Okay.**

MR. ZUCKERMAN: Sheila, it's been about an hour, I think. Do you --

MS. ORETSKY: I don't think it's been an hour.

MR. ZUCKERMAN: I had us going back on at 11:43. Since you're moving to a new document, it might be a good time to take a break.

MS. ORETSKY: Okay. Do you want to take a lunch break now since it's 12:45?

MR. ZUCKERMAN: Yeah. Could we take 45?

MS. ORETSKY: We can.

MR. ZUCKERMAN: Okay. Let's go off the record.

MS. ORETSKY: Okay. Thanks.

THE VIDEOGRAPHER: We're off the record at 12:44.

(Thereupon a lunch recess was taken, after which the following proceedings were had:)

THE VIDEOGRAPHER: We're back on the record at 1:34.

MS. ORETSKY: Okay. We're going to pull

up what we're going to mark as Exhibit 6. Tab 14.

(Thereupon a document was marked Plaintiff's Exhibit 6 in the proceeding.)

BY MS. ORETSKY:

**Q. Before I ask you about these e-mails, Mr. Jackson, is it your testimony that the potential acquisition of RiverRock was an add-on to Mr. Annino's employment with Abacus, or the other way around?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: Sorry. I got twisted there. Could you repeat that?

BY MS. ORETSKY:

**Q. Yeah. Is it your testimony that the potential acquisition of RiverRock was an add-on to Annino's potential employment at Abacus, or was it the other way around?**

A. Yeah, it was a potential add-on to Mr. Annino's employment at Abacus.

**Q. Okay. So the primary --**

A. Meaning that I would have -- sorry. Go ahead.

**Q. Go ahead. Go ahead. No, go ahead.**

A. No, no, no, no. Please. No. I didn't



8108294d-b0ea-4811-8f29-be81af2a5e5f

mean to interrupt. Go ahead.

**Q. So the primary purpose of all these communications was Mr. Annino's employment at Abacus.**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I think it was partly indicative, like, we included his compensation -- the potential, even, compensation in the LOI, it was noted that there was an equity position for Mr. Annino as -- as part of that, so --

I don't know if that's the answer that you're looking for, but that was definitely part of the discussion.

BY MS. ORETSKY:

**Q. No, that's not the -- that's not the question I asked.**

A. Okay.

**Q. Did you review any documents while we were on the break?**

A. No.

**Q. Okay. So no one showed you any documents.**

A. No.

**Q. All right. Did you discuss his potential equity compensation with anybody during the break?**

**And remember you're under oath.**

A. No.

**Q. Did you have any communications with anybody during the break?**

A. Briefly with my attorney Alex on non-case-related things.

**Q. Okay. So you --**

A. Such as --

**Q. -- just remember this -- this -- this equity compensation portion just -- it just came to you.**

A. Well, you -- you asked about the contingency of Abacus and his employment, that's all. And I just brought up that he had equity in this. That's what brought that comment, was based on your question.

**Q. Okay. Because, before, I asked you about any compensation structure, and you said, no, that was not part of any of the discussions. Do you recall that?**

A. I do recall that, and your question was different in that you were talking about Mr. Annino coming to work for Abacus and being tied to this deal, and that's what brought the response of, well, he was going to be receiving equity.

**Q. Okay. I'm not sure that answers my question, but let's move on. That's besides the point.**

A. Okay.

**Q. So the primary purpose --**

**This is the question I wanted answered. Nothing else.**

**The primary purpose of the communications that we've reviewed thus far was Mr. Annino's potential employment at Abacus. Is that your testimony?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: The result of the conversations. I wouldn't say it was primary. I -- I said that this was about a broader opportunity, and that broader opportunity included the employment of Mr. Annino.

BY MS. ORETSKY:

**Q. No, you said the transaction with RiverRock was an add-on to the employment opportunity that Mr. Annino had with Abacus. That was your testimony.**

A. Right. So it's twofold; right? There's multiple things to take into consideration.

**Q. All right. Let me ask the question again. Again, it's a yes-or-no question.**



8108294d-b0ea-4811-8f29-be81af2a5e5f

A. Uh-huh.

**Q. I think you're trying to confuse the issue, and I just want a yes-or-no answer. It will just make this move really fast.**

**The primary purpose of the communications that we have reviewed thus far today, is it your testimony that the primary purpose of them was for the employment of -- the potential employment of Mr. Annino at Abacus?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I didn't --

BY MS. ORETSKY:

**Q. Yes or no? That's it.**

A. I didn't testify it was the primary purpose. I said RiverRock --

**Q. But I'm asking you --**

A. -- was an add-on.

**Q. I'm asking you --**

A. Yeah.

**Q. -- was the primary purpose of these communications the potential employment of Mr. Annino at Abacus? That's a question.**

MR. ZUCKERMAN: Objection to --

THE WITNESS: Yes.

BY MS. ORETSKY:

**Q. Okay. Thank you.**

**Did you know that Mr. Annino had a employment agreement with my client?**

A. We hadn't gotten that far yet.

**Q. Okay. So you were allowing this chief executive officer of RiverRock to share confidential information with you without asking --**

MR. ZUCKERMAN: Objection to the form.

BY MS. ORETSKY:

**Q. -- whether he had an employment agreement that contained a confidentiality clause? Was that -- is that your position?**

A. It was -- it was --

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: It was very early stage conversation, as I said, and he -- he did not indicate to us about employment agreements, so he had not shared that with us.

BY MS. ORETSKY:

**Q. Did you ask him whether he had an employment agreement before he uploaded thousands of pages of documents into a data room that belonged to my client, RiverRock?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: Yeah, I don't -- I don't



8108294d-b0ea-4811-8f29-be81af2a5e5f

recall.

BY MS. ORETSKY:

**Q. You don't recall whether you asked him.**

A. I don't. I don't recall.

**Q. Okay. So your -- your testimony is that you're recruiting the chief executive officer of another company that's a direct competitor of yours, and you're not asking whether they have -- that person has an employment agreement --**

A. It was --

**Q. -- with their employer. Is that your -- is that your testimony?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I wasn't recruiting. He -- he came to us.

BY MS. ORETSKY:

**Q. Okay. So you were engaging with, for quite a bit of time, and in a bunch of different communications as we've seen, the chief executive officer of another company that's in the same industry as Abacus, and you don't -- you don't think to ask, "Sir, do you have an employment agreement?"**

A. That would be a question --

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: That would be a question we would ask later down the road and not one that we asked then.

BY MS. ORETSKY:

**Q. And are you now aware that he did have an employment agreement with RiverRock?**

A. I've never seen one.

**Q. You've never seen one. Okay. Did you -- were you aware that he had a noncompete with RiverRock?**

A. No.

**Q. Okay. Did you know -- did you think that RiverRock was aware of the communications that you were having with Mr. Annino?**

A. I don't know.

**Q. Did you ask Mr. Annino whether RiverRock was aware of the communications that you were having with him?**

A. No.

**Q. Okay. So it's your testimony that Mr. Annino could have just been trying to sell RiverRock from right underneath them?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I don't know. I can't speculate.



8108294d-b0ea-4811-8f29-be81af2a5e5f

BY MS. ORETSKY:

**Q. Okay. All right. Let's go back to these communications that are primarily for the purpose, according to you, of hiring Mr. Annino at Abacus.**

**So your inhouse -- your general counsel, on November 9th -- and we're looking at AA000808. Let's go down to the first e-mail. Your general counsel, Mr. -- Mr. Romaine, sends an e-mail to Mr. Annino and he copies yourself and Seth Miller, as well as your outside counsel, Dan Harrist. Do you see that?**

A. I see that.

**Q. And the subject line is, "Project Water."**

A. Okay.

**Q. What is Project Water?**

A. I didn't name that, so I'm assuming that's what Chris was titling a project.

**Q. Okay. Again, I didn't ask that question. I didn't ask whether you named it or not or who titled it. Let's go back to my questions.**

**What is your understanding of what Project Water is?**

A. At this point, I don't know. I didn't name it. So Project Water would have -- you know, we name a lot of things. And in this case, Project



8108294d-b0ea-4811-8f29-be81af2a5e5f

Water could have been the communications. But it's -- it's very early stage, so I don't know.

**Q. So when you received this e-mail on November 9th, 2023, and it said, "Project Water," what popped into your head?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I don't know. It -- it was -- I -- the subject line was not important. It was just Chris asking for access to the data room.

BY MS. ORETSKY:

**Q. Okay. So Chris is asking for access to the data room which contains documents related to Project Water, which you didn't know what it was --**

A. Uh-huh.

**Q. -- and this is all because he's -- he's -- because Abacus is considering hiring Mr. Annino.**

MR. ZUCKERMAN: And, Sheila, again, I have a blank copy of this e-mail. I'm just going to hand it to Mr. Jackson so --

MS. ORETSKY: That's fine. That's fine. Not a problem.

THE WITNESS: Could you repeat the question, please?

BY MS. ORETSKY:



8108294d-b0ea-4811-8f29-be81af2a5e5f

**Q. He is -- okay. When you received this e-mail, what -- what was your understanding as to why Mr. Romaine was asking for access to the data room?**

A. So that he could review the documents in the data room.

**Q. So he can decide whether to hire Mr. Annino or not?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I don't know.

BY MS. ORETSKY:

**Q. You don't know. You have no idea why the lawyer that you retained or why your general counsel would be asking for access to a data room that contained RiverRock documents. You have no idea.**

A. I don't know what was in the doc -- what was in the doc room.

**Q. I'm not asking what you -- whether you knew what was in the doc room that you represented to them contained everything. I'm not asking that.**

**I'm asking you: What was your understanding as to why they wanted access to it?**

A. Tony Annino said the doc room contained everything. And all I'm saying is, is --

**Q. No, sir. You said that the doc room contained everything. We looked --**

A. Can you go --

**Q. -- at an e-mail where you said it. So go ahead --**

MR. ZUCKERMAN: Sheila, don't --

BY MS. ORETSKY:

**Q. -- tell me -- tell me --**

MR. ZUCKERMAN: Don't argue with the witness. Just ask him questions.

BY MS. ORETSKY:

**Q. What was your understanding as to why they were asking for access to the data room?**

A. I answered it. So they could review the data room.

**Q. Why? What was your understanding as to why they wanted to review the data room?**

A. So that they could review the data room. That's my answer.

**Q. You don't know why they wanted access to the data room.**

A. I just told you why. They wanted to review the data room.

**Q. For what purpose, sir?**

A. To see what was potentially in it.



8108294d-b0ea-4811-8f29-be81af2a5e5f

**Q. For what reason?**

MR. ZUCKERMAN: Objection to the form. And to the extent this is calling for attorney -- or attorney mental impressions, this is all privileged. You can answer the question to the extent you're not giving your attorney's impressions.

THE WITNESS: They were reviewing the document room to see what was inside the document room and what had been provided.

BY MS. ORETSKY:

**Q. For what reason, sir?**

A. It -- it would be to see what was provided. That's the reason. We don't know yet. There's -- you would look at a data room to see what data was potentially there, and that's what they were doing. It's stage one. They're gaining access to the data room. So I -- why? It is because they want to look what's in the data room. And --

**Q. Stage one of what, sir?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: As -- as I've said, it was an early stage discussion. So a data room would be something that you would look at very

early stage.

BY MS. ORETSKY:

**Q. Early stage of what, sir?**

A. I don't know. You can ask the question 50 times and it's the same answer. It's -- it's I don't know, but there wasn't anything to go yet. It was early stage in a conversation.

**Q. In a conversation about what?**

A. In a conversation that RiverRock had reached out and -- to not just us, but to several parties suggesting that their business was -- that they were interested in potentially selling their business.

**Q. Okay. So this was stage one of evaluating whether or not Abacus wanted to acquire RiverRock's business; is that correct?**

A. No.

MR. ZUCKERMAN: Objection to the form.

BY MS. ORETSKY:

**Q. Okay. All right. Does Abacus create project names for new hires?**

A. Yes.

**Q. Really. Can you give me an example of one?**

A. I cannot. That would be privileged



8108294d-b0ea-4811-8f29-be81af2a5e5f

information between us and our -- and our attorney, but we had used this in hires in the past.

**Q. Okay. So your testimony today is that when you hire an employee, you call them project something or another. That's -- that's your testimony.**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: It can be.

BY MS. ORETSKY:

**Q. Is that in connection --**

A. It depends on --

**Q. -- with an acquisition, or is it just -- just the hiring of the employee?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: In connection in discussions with any, whether it's an acquisition or whether it's an employee, it -- it could have a project name. There's also project names in acquisitions of life insurance contracts.

BY MS. ORETSKY:

**Q. What does Project Water mean? You're the corporate representative of Abacus and you are -- you have -- you were to appear here with information as to the questions I'm going to ask, and we're going to go through your notice.**



8108294d-b0ea-4811-8f29-be81af2a5e5f

A. Okay.

**Q. What does Project Water mean?**

A. I don't know.

**Q. Okay. So you -- you -- you did not prepare yourself to answer that question for purposes of this deposition; is that correct?**

A. Yes, that's your interpretation. I don't know what Project Water is.

**Q. No, that's not my interpretation. I'm asking you --**

**Do you know what a corporate representative means, sir?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: Yes, I -- I read that before we did this deposition.

BY MS. ORETSKY:

**Q. Okay. Were you -- are you aware that you are to educate yourself on --**

A. I am.

**Q. -- the exhibits and on the communications and on the terms and of all of the things that were listed in that notice of deposition for purposes of today's deposition? Are you aware that --**

MR. ZUCKERMAN: Objection on --

BY MS. ORETSKY:



8108294d-b0ea-4811-8f29-be81af2a5e5f

**Q. -- you had that obligation?**
MR. ZUCKERMAN: Objection on the form.
Misstates Abacus' response and objections to that notice.
THE WITNESS: I -- I did the best I could.
BY MS. ORETSKY:
**Q. Did you prepare to answer the question, "What is Project Water?"**
A. I did prepare, and I don't know what it -- I did depo prep. I don't know specifically what Project Water means.
**Q. Who would know what Project Water means, sir? Who can I ask?**
MR. ZUCKERMAN: Is -- Sheila, what -- what topic is this?
BY MS. ORETSKY:
**Q. Who can I ask, Mr. Jackson?**
MR. ZUCKERMAN: Objection to the form.
THE WITNESS: You could probably ask our former general counsel, Chris Romaine.
BY MS. ORETSKY:
**Q. Okay. And where is Mr. Romaine now?**
A. He is -- I don't know. He doesn't work for Abacus, so I don't know specifically where he is.



8108294d-b0ea-4811-8f29-be81af2a5e5f

**Q. When did he leave Abacus?**
A. Approximately ten months ago.
**Q. And you don't know where he's currently working?**
A. No.
**Q. Why did Mr. Romaine leave Abacus?**
A. I -- he left for personal reasons.
**Q. Do you know where Mr. Romaine lives?**
A. No.
**Q. Have you ever known where Mr. Romaine lives?**
A. Ever? When he was here, I -- in Orlando at one point. I don't know if he's still here in Orlando or not.
**Q. Do you have his cellphone number?**
A. I do not, not that I recall, but I could check for you.
**Q. You never communicated with him by cellphone?**
A. Not recently.
**Q. How about when he worked at Abacus?**
A. Occasionally, but it was rare.
**Q. So would you have his cellphone number saved in your cellphone?**
A. Potentially. I haven't -- I haven't

looked at it for some time. I -- I do a lot of cleansing of my cellphone, so if someone's not there anymore, I don't have a need for it.

**Q. Do you have your cellphone with you, sir?**

A. Yep.

**Q. Can you check to see if his e-mail is saved -- his phone number, his contact information is saved?**

MR. ZUCKERMAN: We're -- we're -- Sheila, we're not allowing that.

MS. ORETSKY: Why not?

MR. ZUCKERMAN: Because this is a deposition for oral examination. This is not a deposition where you get to examine objects like Mr. --

MS. ORETSKY: I'm not examining. I'm just asking him for the cellphone number of the person he told me to talk to about --

MR. ZUCKERMAN: Right.

MS. ORETSKY: -- what Project Water means because he's unable to tell me that --

MR. ZUCKERMAN: Again, Sheila, what topic in the 30(b)(6) notice says he has to know what Project Water is? Because I don't see Project Water in the notice.



8108294d-b0ea-4811-8f29-be81af2a5e5f

MS. ORETSKY: It doesn't have to say those words. It says all the exhibits that were -- it -- that were produced. This is an exhibit that was produced by you all.

MR. ZUCKERMAN: We've reasonably prepared him on the topics that you noticed, none of which use the words "Project Water." So I think that you're manufacturing an issue.

MS. ORETSKY: I'm -- Alex, the entire acquisition was called Project Water. You know that and I know that, and you've got the CEO sitting here as the corporate rep telling me he doesn't know what that is. Do I really need to file a motion on this, or -- or is somebody going to tell me what Project Water is? That's it. What is Project Water?

MR. ZUCKERMAN: What -- this is asked and answered. I'll also note that you can't contact Mr. Romaine. We are representing him, as was indicated in our (indecipherable) --

THE COURT REPORTER: I'm sorry. Your -- your --

MS. ORETSKY: Okay.

THE COURT REPORTER: -- your objection just cut out.



8108294d-b0ea-4811-8f29-be81af2a5e5f

MR. ZUCKERMAN: I'm saying she can't reach out to Chris Romaine by cellphone because he's represented --

MS. ORETSKY: Okay. So you're --

MR. ZUCKERMAN: -- in connection with this matter.

MS. ORETSKY: So Quinn Emanuel is representing Mr. Romaine?

MR. ZUCKERMAN: I believe it says that in the initial disclosures, yes.

MS. ORETSKY: Okay. Okay. So I will work with you on getting him deposed so that we can understand what Project Water means.

BY MS. ORETSKY:

**Q. All right. Let's look at the response from Daniel Harrist where he says, "Hi Tony - happy Friday! Following up on the note below, please let us know if you need anything further to add me and Seth to the data room."**

**And then he says, "If you have a structure chart and the entity org documents handy and can send my way, that would also be helpful in the interim."**

**Do you know why your lawyer was asking for a structure chart or an entity org?**



8108294d-b0ea-4811-8f29-be81af2a5e5f

MR. ZUCKERMAN: Objection to the form.
THE WITNESS: Yeah, I believe he was working on what entity he might send an -- an LOI to.
BY MS. ORETSKY:
**Q. An LOI for what?**
A. The LOI is a nonbinding agreement --
**Q. I'm not asking you what an LOI is. I'm asking --**
A. Oh, okay.
**Q. -- you: An LOI for what?**
A. An LOI to further discussions with -- and learn more about RiverRock.
**Q. Okay. Now, let's look at his November 10th e-mail.**
MS. ORETSKY: If you could scroll up, please.
BY MS. ORETSKY:
**Q. It's from Mr. Harrist to Anthony and it also copies you again and your general counsel and Seth. And it says, "Tony - apologies --" "-- apologies for the quick follow up. Can you help me confirm which entity would be the target of the contemplated transaction?"**
**Do you see that, sir?**

A. Yes.

**Q. And it says, "Is it RiverRock Asset Management, LLC, or somewhere further down the chain?"**

**Do you see that?**

A. Yes.

**Q. Okay. So he's referring to this as a transaction; is he not, sir?**

A. He is.

**Q. Yes. And the Confidentiality Agreement also referred to it as a transaction; right?**

A. He's referring to it as a contemplated transaction, not a transaction. I think there's a big difference.

**Q. Okay. And the Confidentiality Agreement also referred to it as a potential transaction; is that right?**

A. Potential. It did.

**Q. Yeah. Okay. Was there any agreement signed with respect to this potential employment with Mr. Annino?**

A. No. We -- we hadn't gotten that far.

**Q. Okay. And then let's move on to --**

**Do you know that -- whether Mr. Harrist or -- or anybody at Latham or your inhouse counsel ever**

**asked for any additional documents after reviewing the data room?**

A. I believe Bill McCauley, our CFO, said there were no financials in the document room. And he was -- said he couldn't contemplate a price on the transaction without financials.

**Q. Did anybody ask for the financials?**

A. I don't know what the followup was for that.

**Q. Weren't you running point on this?**

A. No.

MR. ZUCKERMAN: Objection to the form.

BY MS. ORETSKY:

**Q. You weren't?**

A. No.

**Q. Who was?**

A. It was -- it wasn't assigned to an individual point. We had -- and as I'd highlighted before, we had multiple people working on this. There's not always a single person at a company our size that works on the deal.

**Q. Okay. So now -- now, this deal, who was actually -- who was the person that communicated the most with respect to this deal?**

A. With who?



8108294d-b0ea-4811-8f29-be81af2a5e5f

**Q. With RiverRock.**

MR. ZUCKERMAN: Objection --

THE WITNESS: Who are you defining as RiverRock? I just want some clarity.

BY MS. ORETSKY:

**Q. The Plaintiff in this action, the target entities that were listed on the confidentiality or the LOI --**

A. Uh-huh.

**Q. -- and Mr. Annino. That's who I am defining as RiverRock.**

A. So the communications with Mr. Annino were generally taken place by me.

**Q. Okay. But you were not running point. That's your testimony.**

A. No.

**Q. Okay.**

MS. ORETSKY: All right. Let's take a look at what we're going to mark as Exhibit 7. Tab 15.

(Thereupon a document was marked Plaintiff's Exhibit 7 in the proceeding.)

BY MS. ORETSKY:

**Q. Okay. So we see again -- this is now Renegade 000859 through 000862. I think we see**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**again the e-mail that we looked at earlier today that was sent on October 15th, which you referred to as the case study? Is that right, Mr. Jackson? This right here? This is what you've been referring to as the case study?**

MR. ZUCKERMAN: Is this the top of the document?

MS. ORETSKY: You can go all the way up.

BY MS. ORETSKY:

**Q. Is this -- is this -- this e-mail on October 14th, is this the case study that you've been referring to?**

A. The attachment was.

**Q. Okay. So the e-mail itself is not the case study. Whatever --**

A. Correct.

**Q. I'm not sure what that --**

A. Yeah, I mean, correct. That just has his talking points in that e-mail. And then the case study I'm referencing was the attachment.

**Q. Okay. Let's look at this case study.**

MR. ZUCKERMAN: This is -- Sheila, sorry. Can you go back to the e-mail so I can check that I have a hard copy of this for him?

MS. JUNGER: (Scrolling.)



8108294d-b0ea-4811-8f29-be81af2a5e5f

MR. ZUCKERMAN: Okay.

BY MS. ORETSKY:

**Q. What is your understanding of what this document is, sir?**

A. My understanding is, is that that was Tony's assessment and hypothetical of the business.

**Q. Why was that your understanding, sir?**

A. We didn't have any of this data.

**Q. Are you saying Mr. Annino made this information up?**

A. You would have to ask Mr. Annino. I have no idea. I have no idea how to verify it, how to review it. He sent this in a PDF. And so it's not -- we had no way to determine whether this was actual RiverRock data or not.

**Q. Did you ask?**

A. He -- he had indicated that this was his hypothetical and that this was his case study on what he would do, potentially, with RiverRock. I have no way of knowing if the numbers were accurate or not.

And my response was, well, we would have to confirm any of this even exists in some sort of due diligence, and we never got to due diligence.

**Q. Okay. So you're telling me that he told**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**you that the numbers that appear under the columns 2022 --**

A. Uh-huh.

**Q. -- under that column, he told you that was all hypothetical.**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: Yes.

BY MS. ORETSKY:

**Q. Okay. So he told you -- so this is -- is this -- is this a projection, or is this a -- what is this to you?**

MR. ZUCKERMAN: Objection to the form.

BY MS. ORETSKY:

**Q. It's called a "Valuation Model"; right?**

MR. ZUCKERMAN: Objection.

BY MS. ORETSKY:

**Q. What is this to you?**

A. This is his assessment, his ideas, his case study.

**Q. What is it based on? Did he tell you what it was based on?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: He didn't specifically state what it was based on.

BY MS. ORETSKY:



8108294d-b0ea-4811-8f29-be81af2a5e5f

**Q. Did you -- did you ask him?**
A. No.
**Q. Why not?**
A. Because he had already said that this was a case study and what he would do. I didn't have any other information. There wasn't anything to ask. Again, this was very early stage. He was trying to support his thesis.
**Q. What was his thesis, sir?**
A. Well, I think you could scroll down and see what I think he was suggesting.
**Q. Okay. What was he suggesting, sir?**
A. I think he was suggesting that these were some of the things that he would potentially integrate into RiverRock if he was going to remain in place or remain there.
**Q. He was going to remain at RiverRock?**
A. If he was going to remain there.
**Q. Why would he be sharing this with you?**
A. I think he's trying to show value.
**Q. Okay. Was this his -- was this --**
A. He wanted Abacus stock. You know, so this was his way of potentially showing value.
**Q. Okay. And who prepared this model?**
A. I don't know. As I understand it, it was

sent to me from Anthony Annino. I assume he prepared this, but I have no way of verification.

**Q. Did you talk to him about it before he prepared it?**

A. Not -- not specifically outside of general terms.

**Q. Okay. So none of the information that's provided in this model was discussed with Mr. Annino in advance of him sending it to you. Is that your testimony?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: Not that I recall. There could be a piece of information here that we discussed. I just don't -- we -- we spent a number of times on the phone discussing what it is he wanted to do, where he was going. He had indicated to me that he was seeking additional employment, that his opportunity was going to be leaving Abacus and he was speaking to multiple firms. So I -- he -- you know, any specifics here related to this data, I don't recall us talking about specifically.

BY MS. ORETSKY:

**Q. Okay. Did Abacus adopt the information contained within this Valuation Model?**



8108294d-b0ea-4811-8f29-be81af2a5e5f

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: Yeah, adopt in what way? I don't think I understand the question.

BY MS. ORETSKY:

**Q. Did you present this information to your board?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: The answer is, yes, we presented this to our board in the form of it was presented to me as this is a case study involving a CEO that is looking for additional opportunities, and he thinks that he can extract value.

BY MS. ORETSKY:

**Q. I mean, you later actually sent an LOI based on this Valuation Model; is that not right?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: No.

BY MS. ORETSKY:

**Q. You did not. Okay.**

A. No, that's not what I said. It wasn't based on this valuation model.

**Q. Okay. But you did later send an LOI to RiverRock after receiving --**

A. We did.



8108294d-b0ea-4811-8f29-be81af2a5e5f

**Q. -- after receiving this Valuation Model.**

A. We did send an LOI to RiverRock based on an assumption that Tony Annino had told us was what the company was potentially selling for.

**Q. Okay. So when you wrote, this is a no brainer, that e-mail that we had looked at earlier, were you referring to this Valuation Model?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I was referring to Tony and this Valuation Model that he had put together.

BY MS. ORETSKY:

**Q. Okay. And is it your testimony that you had no idea what these numbers actually meant before you presented it to your board of directors?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I had no idea if they were accurate, if they were actual data. We had no idea at all whether this was just -- and where the numbers came from.

BY MS. ORETSKY:

**Q. But you presented it to your board.**

A. We show our board ideas frequently. Every board meeting. And that's the way that we had presented this.

**Q. Okay. So tell me exactly how this was**

**presented to the board.**

A. This was a potential discussion, a potential opportunity that we were in very early stage with, and that's how it was presented to the board.

**Q. Okay. So if I'm -- if I'm clear on all of this, what we've seen so far in the e-mails is that you've referred to the acquisition as, "kind of a no brainer." You discussed integrating the business in your e-mails. You talk about eliminating millions of dollars of costs. You've discussed moving investors into an interval fund. We saw that e-mail. You talked about closing before the -- before year -- year end. And these are all e-mails that we looked at after you saw this Valuation Model, and your testimony is that you have no idea where the financial assumptions came from; is that correct?**

MR. ZUCKERMAN: Objection to form.

THE WITNESS: All of the points you highlighted were things that Tony Annino had said to me and I repeated them. And so I would not have had any of the information behind this model.

BY MS. ORETSKY:



8108294d-b0ea-4811-8f29-be81af2a5e5f

**Q. Okay. All right. And you didn't say anywhere in writing to anybody, we have to -- "this is unreliable;" right? I didn't --**

A. Right.

**Q. I didn't see any communications like that, and I'm asking: Do any exist?**

A. I don't recall. There were verbal conversations, but I don't recall any written communications around that.

**Q. And did you write back to Mr. Annino and say, "these numbers make absolutely no sense," at any point in time?**

A. I don't recall.

**Q. Okay.**

A. Well, if -- if I may. Ma'am, if I may, just I want these -- I do think that we did -- there were -- there was correspondence related to the LOI later that did highlight and say that the numbers that they were presenting didn't -- just didn't add up in general, but I didn't specifically reference this model.

**Q. Okay. All right. And you would agree -- you can read this model; right?**

A. I -- I don't necessarily understand the question, what you're referencing.

**Q. I mean, when you're looking at this model, do you understand what it says?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I can physically read, yes, but understanding the dynamic that the model might represent or his case study, I -- I can't speak to that, because I didn't write it. I didn't have the underlying data, I didn't have any of the underlying information.

So there's a difference between looking and reading something versus understanding it. And I would not have understood the data behind the model.

BY MS. ORETSKY:

**Q. So I'm not asking about the data behind the model. I'm asking about: Do you understand the model?**

A. And my answer --

MR. ZUCKERMAN: Objection --

THE WITNESS: -- is no.

BY MS. ORETSKY:

**Q. Okay. All right. So you don't understand the model. So if I asked you whether the spreadsheet reflects the business plan as you were discussing in the e-mails that we reviewed already,**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**would you be able to even answer that question?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I would say -- I would say, no, because I was relying on Tony Annino, not this -- not this model. This wasn't -- this was a hypothetical.

BY MS. ORETSKY:

**Q. Okay. So when you used the words, "it was kind of a no brainer," did you not understand what the model reflected at that time when you were describing it as a no brainer?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I believe what I was referencing when I said, "kind of a no brainer," I was kind of -- I was referencing the very basics of what Tony had alluded to me, which was, hypothetically, he felt like that, you know, this -- this business could be potentially higher than what a potential purchase might look like, but that's what he had said to me. So when I was using the term "no brainer," I was referencing what I was being told by Tony.

MS. ORETSKY: Okay. Let's just -- let's just quickly -- I just want to pull up quickly



8108294d-b0ea-4811-8f29-be81af2a5e5f

for him -- and I want to go back to this too. Did we mark -- what exhibit was, "This is kind of a no brainer"?

MS. JUNGER: 16 has it, but --

MS. ORETSKY: Oh, let me -- you know what, I'm going to pull up a new exhibit. Because of the way these were produced, there's not always an attachment to the e-mail. So we'll mark this as a new exhibit. We're on exhibit -- what exhibit are we on?

MS. JUNGER: 8.

THE COURT REPORTER: 8.

MS. ORETSKY: Okay. So we're at Tab 16, Exhibit 8.

(Thereupon a document was marked Plaintiff's Exhibit 8 in the proceeding.)

BY MS. ORETSKY:

**Q. All right. So you see here, this is the, "This is kind of a no brainer," e-mail that we had reviewed.**

A. Correct.

**Q. And you see that the, "Renegade_Model_Abacus.pdf," is attached to the e-mail that you forward to top-level executives at --**

A. Yes.
**Q. -- at Abacus?**
A. Right.
**Q. Okay.**
MS. ORETSKY: And then can -- can you go back up, please?
MR. ZUCKERMAN: Again, we have this.
MS. ORETSKY: Okay.
MR. ZUCKERMAN: We have the same one.
MS. ORETSKY: All right.
BY MS. ORETSKY:
**Q. And you see again where it says, "Acquisition cost of 5M and we make 2X that in fees. Instant revenue."**
**I mean, you're -- you're -- this is all reflected on the model; isn't it?**
MR. ZUCKERMAN: Objection to the form.
THE WITNESS: I am -- I am repeating what Tony and I had discussed.
BY MS. ORETSKY:
**Q. Okay. So you're saying that all the words that you write in this e-mail --**
A. Uh-huh.
**Q. -- attach -- and where you're attaching the model and you're forwarding to these top-level**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**executives at your company, these words all came from a discussion with Mr. Annino and not an analysis of the model that was sent to you.**

A. Those words in that e-mail would be a combination of both, but I wouldn't call it an analysis. It was just -- and all the model showed was that what Tony was sharing with us. Tony was trying to sell us on -- on this, and this is what he was trying to present himself. And as I mentioned, you know, RiverRock was an add-on to what he was trying to sell.

So when I sent this e-mail and I had the model, I was going off of the information that Tony had provided, not on any foundational actual analysis that we would have done later on down the road. Again, this is all very early stage. This was a nonbinding LOI that, effectively, didn't have any value whatsoever. We didn't go to purchase docs and then say, oh, things have changed. That's not what happened.

This is a reason for us to think about, well, if Tony, as the CEO, is saying this, then maybe we should think about what this looks like. Continue our discussions.

**Q. Okay. You can't deny that you sound very**

**excited about the deal yourself; can you?**
MR. ZUCKERMAN: Objection to the form.
THE WITNESS: I think that you can look at e-mails in lots of ways. I wouldn't interpret this as excitement. I would interpret this as opportunity.
MS. ORETSKY: All right. Let's scroll all the way down to the model.
BY MS. ORETSKY:
**Q. There's a line at the very bottom of the model, and it says -- it's entitled, "Potential Synergies." Do you see that?**
A. Well, if you can zoom in.
MS. ORETSKY: Can you highlight that?
MR. ZUCKERMAN: Got it.
THE WITNESS: Oh. Oh, I -- sorry. Got it. I see it now. Thank you.
BY MS. ORETSKY:
**Q. What does that mean to you?**
A. Synergies can mean a lot of things. Synergies, in our industry, might mean opportunities to buy and sell policies. It could mean synergies related to management. It means shared resources.
**Q. What did it mean with respect to the**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**RiverRock transaction?**
A. I don't know, because I didn't put in "Potential Synergies." Anthony put in "Potential Synergies." So this is his estimate, and I have no idea what he put in behind the numbers and what he was referencing as synergies.
**Q. But you talked about potential synergies in your e-mails; did you not?**
A. From --
MR. ZUCKERMAN: Objection to the form.
THE WITNESS: From his conversations. This is what Anthony is suggesting are potential synergies. Synergies are --
BY MS. ORETSKY:
**Q. You don't say that -- you don't say that in any of your e-mails. You don't say, "Mr. Annino said," "Anthony said." You're -- you're the one writing those e-mails --**
A. Okay.
**Q. -- and there's no reference whatsoever to something being told to you. Is that right?**
MR. ZUCKERMAN: Objection to the form.
THE WITNESS: It was being told to me, or how else would I even be able to type the e-mail?

BY MS. ORETSKY:

**Q. I don't know. You could read the model.**

A. I -- I can't -- I can't read anyone's mind. And --

**Q. You're the CEO of --**

A. -- it would have been --

**Q. -- a public company. This is your business.**

A. Uh-huh.

**Q. And you're telling me you can't read this model, yet you're saying in e-mails, without referencing Mr. Annino whatsoever, you're talking about bringing servicing inhouse, you're talking about cross-selling RiverRock investors into Abacus' interval fund, you're talking about improving DTC origination, you're talking about using the $160 million policy portfolio more efficiently, but you're telling me you don't know what potential synergies mean, and you're telling me that those are things that Mr. Annino told you. So I'm a little confused.**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I'm sorry you're confused.

MR. ZUCKERMAN: Wait. Did -- did you ask a question?



8108294d-b0ea-4811-8f29-be81af2a5e5f

BY MS. ORETSKY:

**Q. My -- yeah. My question is: Do you know what potential synergies mean?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I explained to you what potential synergies mean. I don't know what potential synergies are related to RiverRock.

BY MS. ORETSKY:

**Q. Okay.**

A. I did not come up with those. That was Tony Annino put in "Potential Synergies."

Synergies are something that is calculated once you actually have the financials and do actual diligence. There is no diligence at this point. There's nothing being done. There are no financials, there is no data. This is a case study, and he is trying to sell us in any way he can to try to move forward and potentially come and work with Abacus.

**Q. So it's your position that when you're having all of these communications with the executives of Abacus, you had -- you did not understand the model, and you had done no due diligence. That's -- that's your testimony.**

A. Everyone would know we did no diligence at



8108294d-b0ea-4811-8f29-be81af2a5e5f

that point. And -- and all of the communications, we're talking about a handful. Like this --

**Q. My question is: When you were having these communications --**

A. Okay. So --

**Q. -- where you say you had, you know --**

A. -- approximately a handful of communications.

MR. ZUCKERMAN: Wait. Let her -- let her finish her question.

THE WITNESS: Sure. Sorry.

BY MS. ORETSKY:

**Q. Where you say, "Instant revenue - I would bring all servicing in house and remove all their labor costs day one," when you say, "This is kind of a no brainer," when you're -- when you're having these communications where you say -- when you talk about the $160 million in assets, all of those communications were had without any due diligence and without understanding the model. Is that right?**

A. If you'll scroll down, you'll see that these are Tony's words, not mine. He specifically --

**Q. No. No. Hold on.**



8108294d-b0ea-4811-8f29-be81af2a5e5f

A. -- talks about --

**Q. Hold on. Don't --**

MR. ZUCKERMAN: Wait.

THE WITNESS: -- there is significant --

MR. ZUCKERMAN: No.

MS. ORETSKY: This is the --

THE WITNESS: -- opportunity --

MR. ZUCKERMAN: He's answering your question with the document you're examining him about.

MS. ORETSKY: I -- I understand. He's telling me where to scroll on the document, and I'm looking at his words.

THE WITNESS: No.

BY MS. ORETSKY:

**Q. Don't -- so I don't want to scroll to where you're telling me to scroll. I'm looking at your words --**

A. Okay.

MR. ZUCKERMAN: Okay. So you don't -- you don't want to --

BY MS. ORETSKY:

**Q. -- Mr. Jackson, CEO, Abacus Life --**

MR. ZUCKERMAN: -- let the witness look at the exhibit that you're asking him about.

BY MS. ORETSKY:

**Q. These are your words, sir; are they not?**

A. Oh, my God.

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: So --

BY MS. ORETSKY:

**Q. Did you write -- did you write in an e-mail, "This is kind of a no brainer"? Did you write those words?**

A. I did type those words based upon information I had received from Tony. And if you look at the prior e-mail, you'll see how he conveys some of these things. He was selling us. And it was early stage. He even says, "There is a significant opportunity to convert all or a portion of the assets into more permanent capital." So he's the one referencing the 160 million and the investors and the interval fund. That's all I'm pointing out to you, is that this was information that was provided to me. I repeated it.

**Q. Okay. So you see where you write, "So many things we could do with 160M in policies and cash." Do you see that?**

A. As he highlights below.

**Q. No, no, no, no, no.**

A. It is.

**Q. Right on your screen. I don't know what highlights. What highlights are you referring to?**

A. The, "Few points worth noting."

**Q. I'm talking about your e-mail, sir.**

MR. ZUCKERMAN: Just, Sheila, to be clear, this is Abacus_000794; right? That's the document we're looking at?

MS. ORETSKY: No. I don't know. Jen, what is it?

MR. ZUCKERMAN: Yes. He is looking at a -- at a hard copy version of this document. He's just reading the whole document that you're asking him about.

MS. ORETSKY: No, I understand. I'm asking him about his e-mail up top. And he keeps telling me -- he keeps referring me to another e-mail below it, and I'm asking about what he wrote. Where he wrote --

THE WITNESS: I can -- all right. What -- what's the question?

BY MS. ORETSKY:

**Q. The question is: You wrote, "So many things we could do with 160M in policies and cash." Yes or no; did you write that?**

A. Yes.

**Q. Okay. And you even wrote, "Bill we could even add leverage."**

A. There was already -- I -- I -- if -- if there wasn't already leverage on there, which we don't know or not. So I wrote that, yes, but I didn't have all the data. This is, again, very early stage. You can -- you know, people write e-mails about SpaceX, that they might be excited on opportunities. It doesn't mean that they understand -- doesn't mean they have all the data.

**Q. Okay. But there's nothing in this e-mail that says, "by the way, we don't have all the data. This is kind of a no brainer, but we don't have all the data."**

MR. ZUCKERMAN: Objection -- objection to form.

BY MS. ORETSKY:

**Q. It doesn't say that.**

A. I think it exactly says that in the -- in what Anthony sent to us, is that we don't have this.

**Q. I'm not talking about what Anthony sent to you.**

A. Well, it's an e-mail saying --

**Q. I'm talking about the e-mail that you forwarded. And where does it say that, "we don't have this"? Where did Anthony say to you, "We don't have this"?**

MR. ZUCKERMAN: Objection to the form.

BY MS. ORETSKY:

**Q. Where does he say that?**

A. It's -- it's just saying that -- you know, it's estimating necessary expenses. Like, these are his estimates; right?

**Q. Where does he say, "We don't have this," like you just testified to?**

A. It's -- it's simply saying because it's a forecasted model. This isn't an actual -- these -- none of these are actual revenue. This didn't come from Abacus. This came from Anthony. This was his model, not anyone else's. And that model was attached. His model was attached, not mine. His assumptions, his case study. This is him. That's what was attached.

**Q. Okay. And you see that where he says, bullet point, our servicing fees are somewhere between 300 to 600,000 annually. That's not a forecast.**

A. It's a giant range. So you're going to



8108294d-b0ea-4811-8f29-be81af2a5e5f

say -- it's a 2X range. That's definitely an estimate. It's a guess. It says, "somewhere."

**Q. Right. But you didn't write in your e-mail, "that's a giant range." And when you forwarded this to the executives, and this is all a forecast, this is all a guess, you didn't write any of that. You said, "This is --" "This is a no brainer."**

A. He wrote the word, "my guess" --

MR. ZUCKERMAN: Objection -- objection -- wait. Sheila, that wasn't even a question. What was the question there?

BY MS. ORETSKY:

**Q. It was a question. You didn't write it; did you?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I didn't have to, because he did. It literally says, "my guess," on the line underneath it.

BY MS. ORETSKY:

**Q. Okay. He says, "My guess is there are significant additional synergies."**

A. It's -- it's a guess.

MR. ZUCKERMAN: Again -- wait. That's not a question; is it? Is there a question?



8108294d-b0ea-4811-8f29-be81af2a5e5f

BY MS. ORETSKY:

**Q. That's what he says, Mr. Jackson.**

**MR. ZUCKERMAN: Oh.**

BY MR. ORETSKY:

**Q. But I guess we can try to twist what the words on paper say as well.**

A. You've done an --

MR. ZUCKERMAN: Objection to the --

MS. ORETSKY: All right. Let's move on.

MR. ZUCKERMAN: Just, again, wait till she asks the question.

THE WITNESS: Okay.

MR. ZUCKERMAN: (Indecipherable.)

MS. ORETSKY: All right. Let's move to exhibit --

MR. ZUCKERMAN: Sheila, we're -- we're almost at an hour. If you're transitioning --

MS. ORETSKY: Well, I'm not taking another break. We're not taking 17 breaks. We just came back from lunch. Okay?

MR. ZUCKERMAN: We came back from lunch at 1:33.

MS. ORETSKY: We're not taking --

MR. ZUCKERMAN: It's now 2:30.

MS. ORETSKY: We didn't take a break every

hour when you took my expert's depo. We did not do that.

MR. ZUCKERMAN: Jay, would you like to take a break?

MS. ORETSKY: I mean, this is absurd. You're trying to run him into the 6 p.m. time that you didn't tell us about, which is --

And by the way, for the record, Mr. Jackson, why do you have a 6 p.m. hard stop today?

THE WITNESS: Am I answering that?

MR. ZUCKERMAN: You're allowed to answer, but you should really spend your time asking questions about the case.

MS. ORETSKY: No, I -- I -- no, I'm building my record. Why do you have a 6 p.m. hard stop today?

THE WITNESS: I have three young children that I want to see.

MS. ORETSKY: Okay. Well, I have two young children as well, and that is not a legitimate business purpose to stop a deposition today.

THE WITNESS: Well, then you should be more focused on your family, because it's

important to me.

MR. ZUCKERMAN: We don't need to fight about this on the record. If you're -- you're refusing to take a break, so let's keep going.

MS. ORETSKY: I'm not concluding this deposition at 6 p.m. We're going to go for seven hours. So we'll take a break, but we're going past 6 p.m.

MR. ZUCKERMAN: Okay. We're going to take a break. It's been an hour. Give me a five-minute break, and going off the record.

THE VIDEOGRAPHER: We're off the record at 2:32.

(Thereupon a brief recess was taken, after which the following proceedings were had:)

THE VIDEOGRAPHER: We're back on the record at 2:42.

MS. ORETSKY: Jan, what was my last question before we went off the record?

THE COURT REPORTER: You were going on to the next exhibit.

MS. ORETSKY: All right. Let's go ahead and pull up what we're going to mark as Exhibit 9, and it's Tab 18.



8108294d-b0ea-4811-8f29-be81af2a5e5f

(Thereupon a document was marked Plaintiff's Exhibit 9 in the proceeding.)

BY MS. ORETSKY:

**Q. Okay. So this is Renegade 000891 through 892. Mr. Jackson, have you seen this e-mail before?**

A. I -- I believe so, yeah.

**Q. Okay. And did you write this e-mail on November 5th, 2023, to Anthony Annino with the subject line, "Next Steps"?**

A. Yes.

**Q. Okay. Let's read it. It says, "We had a successful bond raise --"**

**What bond raise are you referring to there?**

A. We -- I think we addressed it earlier, the S1 SEC filing bond raise, so that would be that bond raise.

**Q. Okay. That's how I --**

A. Yeah.

**Q. -- understood it.**

**All right. And it says, "and we are ready to move forward with a term sheet."**

A. Uh-huh.

**Q. What are you referring to there?**

A. Yeah, I believe the potential LOI.



8108294d-b0ea-4811-8f29-be81af2a5e5f

**Q. Okay. So -- so this is -- this indicated that Abacus had moved past preliminary interest; is that right?**

A. No. An LOI is still very preliminary. That's the very beginning.

**Q. All right. Let's keep reading then.**

**Then you say, "I am presenting to the Board on Thursday but I have already spoken with the key members and we are moving forward with the acquisition."**

A. Uh-huh.

**Q. Do you see that?**

A. I do see it.

**Q. Okay. So you would agree with me that you told Mr. Annino on November 5th, 2023, that Abacus was moving forward with the acquisition of RiverRock.**

A. Yeah, I -- I would say that that was a misstatement in that e-mail, and I own that. It was we were moving forward with the LOI. I should not have typed "acquisition."

**Q. Okay. So your testimony is that this statement was a misstatement in this e-mail.**

A. Correct. It should have said, "LOI," not "acquisition."



8108294d-b0ea-4811-8f29-be81af2a5e5f

**Q. All right. And then you say, "I think I am going to use Latham as our attorney on this one."**

**Do you see that?**

A. Correct.

**Q. All right. And skipping forward, you say, "I am hoping to have a term sheet to you shortly after the board meeting on Thursday afternoon. We would still be a before year end target close."**

**Do you see that?**

A. That's correct.

**Q. Okay. Remember the e-mail I showed you earlier where you said you wanted a target close before the end of the year, and you said you weren't sure what you were referring to in that e-mail?**

A. Yeah.

MR. ZUCKERMAN: Objection to form.

THE WITNESS: It's -- it's a target; right? And so whether that's a target close for this or a target close for other opportunities.

BY MS. ORETSKY:

**Q. No, but you're talking about the RiverRock --**



8108294d-b0ea-4811-8f29-be81af2a5e5f

A. It's just a target.

**Q. Hold on. But you're talking about the RiverRock acquisition in this e-mail; are you not?**

A. As I stated, it was a -- it was an LOI. And so it's early stage and it's a target. So, yes, I am referring to RiverRock in this e-mail.

**Q. Okay. But as you stated in writing, it was an acquisition and not an LOI.**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: And, yes, I made that mistake. It should have said, "LOI," not "acquisition."

BY MS. ORETSKY:

**Q. Okay. And who were the key members that you were referring to in this e-mail?**

A. Predominantly myself, and then he -- looking at the board, I had spoken to Chris, I had spoken to Bill, and Bill was our board secretary. And we hadn't made a formal presentation to the board, so we had just kind of circulated it with a few of the, kind of, key members that would then -- we would talk to about the board about this opportunity.

**Q. So it was just yourself and -- can you just say Chris' full name for me?**

A. Chris Romaine and Bill McCauley.

**Q. Okay.**

A. And Chris was the board's counsel.

**Q. Right. So you had spoken to Mr. Romaine and Mr. McCauley --**

A. Right.

**Q. -- about the acquisition.**

A. Right.

**Q. And those were the key members that you're referring to in this November 5th, 2023, e-mail.**

A. Correct.

**Q. All right. And the LOI was for the acquisition of RiverRock that you're now claiming you should have written instead of "acquisition."**

MR. ZUCKERMAN: Objection --

THE WITNESS: Yes.

MR. ZUCKERMAN: -- to the form.

THE WITNESS: Sorry. I think I misheard your statement there. We -- because, yes, the -- the LOI was an intent, not the acquisition of. And that's why I said that there was a misstatement there.

BY MS. ORETSKY:

**Q. Okay. And when did you speak to Mr. Romaine and Mr. McCauley?**



8108294d-b0ea-4811-8f29-be81af2a5e5f

A. I think I had spoken to them -- you know, we had several conversations throughout the day, but I believe I spoke to them either earlier that day or maybe the prior day. This was around our board meeting and earnings call, so we would have had a number of conversations.

**Q. Okay. And what was discussed about the acquisition during those conversations?**

A. The LOI. We would have discussed that this is a potential opportunity and should we consider drafting an -- an LOI to see if there's a potential opportunity.

**Q. So you did not discuss with them that you were moving forward with the acquisition.**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: Correct.

BY MS. ORETSKY:

**Q. All right. So at this point in time, you had had access to the data room since -- I believe it was October 2nd; is that right?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: Okay.

BY MS. ORETSKY:

**Q. And the documents in that data room had been reviewed; is that right?**



8108294d-b0ea-4811-8f29-be81af2a5e5f

MR. ZUCKERMAN: Objection to the form.
THE WITNESS: Not by me.
BY MS. ORETSKY:
**Q. Okay. Who had they been reviewed by?**
A. I believe that Bill McCauley looked at those documents, or some of those documents, and I -- and I believe that Chris Romaine had looked at those documents. I'm not certain when and what dates that would have happened.
**Q. Okay. And when you had these discussions on November 5th about the acquisition with Mr. Romaine and Mr. McCauley, did they object to the acquisition moving forward?**
A. Again, it was not a conversation about an acquisition.
**Q. Okay. So contrary to what the e-mail says on that date --**
**Let me rephrase the question.**
A. Okay.
**Q. Did they object to you sending an LOI to RiverRock?**
A. No, they didn't. It was not a legally-binding document.
**Q. I didn't ask if it was legally binding. I asked you --**



8108294d-b0ea-4811-8f29-be81af2a5e5f

A. Sorry.

**Q. -- if they objected --**

A. But that's why they didn't object.

**Q. Okay.**

MR. ZUCKERMAN: Objection to the form.

BY MS. ORETSKY:

**Q. All right. That's -- why would you send an LOI -- why did you all agree to send an LOI to RiverRock?**

A. It was to learn more about the business. We were being told by Tony Annino and being represented that he felt like this business could be an opportunity, and we were going to potentially explore that.

**Q. Okay. Let's pull up -- well, let me -- let me -- actually, let's -- let's look at the -- the response here. Well, you're not on the e-mail, so let's -- let's move on to Exhibit 10. This is Tab 19.**

**(Thereupon a document was marked Plaintiff's Exhibit 10 in the proceeding.)**

BY MS. ORETSKY:

**Q. Okay. So there was a board meeting scheduled for November 9th, 2023?**

A. I believe that's correct.



8108294d-b0ea-4811-8f29-be81af2a5e5f

**Q. How often does the board meet throughout a year?**

A. We will meet four times per year.

MR. ZUCKERMAN: Sorry. Sheila, can you read out the Bates' number here?

MS. ORETSKY: Sure. It's Abacus 000257 through 295.

MR. ZUCKERMAN: Thank you.

BY MS. ORETSKY:

**Q. Okay. So this was your final board meeting for 2023?**

A. Yes, that was the final time we got together. The Q4 board meeting, even though it was for 2023, wouldn't technically take place until the audits were final, which I think was late March of '24.

**Q. Okay.**

A. But that would be on 2023, if that makes sense.

**Q. Right. No, that makes sense. So --**

A. Okay.

**Q. -- the -- do you know if there was a board meeting called after the board deck was posted to your investor website?**

A. No.

MR. ZUCKERMAN: Objection to the form.

BY MS. ORETSKY:

**Q. Was there some sort of meeting via e-mail or a telephone conference or anything of that nature after that occurred?**

A. I -- I don't think we called a special meeting. I don't recall doing a special meeting. I think we had had a couple of individual phone conversations with -- with the board members, and that was it.

**Q. Okay. Which board members had you spoken to about the posting of the board deck on the investor website?**

A. I would have to go back and look. I don't know off the top of my head. I know that I -- I had spoken to a couple of them about it.

**Q. You have no recollection of who you spoke to as you sit here today?**

A. Not -- not exactly. Meaning that, you know, I may have spoken to three board members versus four, and I don't want to name names without having time to research that and see exactly what board members I would have spoken to to answer your question.

**Q. Well, I'm not asking for an exhaustive**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**list. I'm just asking for the ones that you can remember as you sit here today.**

A. I see. I believe I remember speaking to Sean McNealy, specifically. And I don't recall at what time I spoke to the other board members.

**Q. Okay. And we'll circle back to that in a minute.**

**So do you recall sending the board deck with the RiverRock Valuation Model in it to the board prior to the November 9th meeting?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: So I -- I do remember sending the board presentation deck to the board. That board presentation deck is -- forgive me for not knowing the exact number of pages, but it's probably 50, 60 pages. So specifically the content related to Anthony Annino's case study, I believe that was included as a discussion point.

BY MS. ORETSKY:

**Q. Okay. And who would have included that in the board deck?**

A. I think at that time it would have been myself or Bill, and I -- I believe I put that in as a discussion point.

**Q. Okay. So here's the e-mail where you're transmitting it to the entire board.**

A. Okay.

**Q. And it says, "Hi All, Please see attached the following for the board meeting this Thursday. Board Presentation Deck with Agenda," and then, "3Q 10Q."**

A. Uh-huh.

**Q. And you attach a copy of the board deck. And I'll represent to you that the acquisition of RiverRock appears on 0000278 through 000279.**

A. Uh-huh.

**Q. Just for purposes of a cleaner record, I'm going to mark the actual board deck separately as a separate exhibit. So we're going to mark that --**

A. Okay.

**Q. -- as Exhibit 11.**

MS. ORETSKY: Pull up Tab 20.

(Thereupon a document was marked Plaintiff's Exhibit 11 in the proceeding.)

MS. ORETSKY: If you can pull up -- scroll down to the second page, 0000258.

MR. ZUCKERMAN: What number is that?

MS. ORETSKY: It's Abacus 000258.

MS. ZUCKERMAN: Okay.



8108294d-b0ea-4811-8f29-be81af2a5e5f

MS. JUNGER: And this is Exhibit 11; correct?

MS. ORETSKY: Well, I'm sorry. I'm looking at -- there's two Bate labels on here. I'm not sure why.

MS. JUNGER: Yeah, that's how Abacus produced it. But I'm asking, Exhibit 10 is the e-mail transmitting to the board, and Exhibit 11 is just the board --

MS. ORETSKY: You need to be on Tab 20.

MS. JUNGER: I am on Tab 20.

MS. ORETSKY: Okay.

MS. JUNGER: But for the exhibit list, this is a new exhibit.

MS. ORETSKY: Yes. All right. But I need you to scroll down to 0 -- this looks different than what I'm seeing on paper.

MS. JUNGER: What's your Bates number?

MS. ORETSKY: Abacus 0000260 and 258. I don't -- there's two different Bate labels assigned to this for some odd reason.

MS. JUNGER: 258 is right here.

MS. ORETSKY: Tab 20.

BY MS. ORETSKY:

**Q. All right. Is this the -- is this your**

**entire board reflected here on --**

MS. ORETSKY: And, Alex, can you tell me what Bate-label number you wish for me to use? I don't know why there are two Bate labels.

MR. ZUCKERMAN: Yeah. Sorry. You know, Sheila, we actually have a different version of the e-mail you were showing us in the background. We are using 0003093 and its attachment, and it only has one set of Bates numbers on it. So the version that we have printed out for this purpose is not what you're looking at and we don't have a color version. So, I mean --

MS. ORETSKY: Okay. Well, we'll just continue to use this. I just -- just tell me which number do you want me to use so that the record's clear for both of our purposes.

MR. ZUCKERMAN: I think it makes sense for you to use the one that's on the same line as "Confidential." So use the 260 or --

MS. ORETSKY: Okay. All right. We will use the one that's on the same line as "Confidential."

BY MS. ORETSKY:

**Q. So is this -- so I'm looking at Abacus**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**000260. What -- is this -- is this your board of directors, sir?**

A. Yes.

**Q. Okay.**

MS. ORETSKY: All right. Let's -- let's go to Abacus 000278.

BY MS. ORETSKY:

**Q. And this is the Valuation Model that was sent to you by Mr. Annino; is that right?**

A. That was the -- wait. You call it Valuation Model, I call it something different, but, yes, that's correct.

**Q. Okay. I'm not calling it anything.**

A. Yeah.

**Q. I'm just referring to the title that's on paper in the -- on the words that are --**

A. Yeah, I understand.

**Q. -- on the paper.**

MR. ZUCKERMAN: Well, wait.

BY MS. ORETSKY:

**Q. Okay.**

A. I understand.

**Q. Do you -- so do you see that it says, "Valuation Model," on the piece of paper that's before you?**



8108294d-b0ea-4811-8f29-be81af2a5e5f

A. Understood. Yes, I see that.

**Q. Okay. And you understood that you took a piece of paper that says, "Valuation Model," on it, and you stuck it in the board deck that you were going to present to your board; is that right?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I didn't -- I didn't stick it in the board deck. It was -- I placed this in a slide that -- for discussion purposes.

BY MS. ORETSKY:

**Q. Okay. And you didn't change the title of the document; right?**

A. I did not.

**Q. You called it, "Valuation Model," just like it appeared when Mr. Annino sent it to you; is that right?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: Yes.

BY MS. ORETSKY:

**Q. All right. And --**

A. I --

**Q. And --**

A. Go ahead.

**Q. And hold on a second, now. And let's look at 0000258, which is right above the Valuation**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**Model.**

MS. JUNGER: 278.

BY MS. ORETSKY:

**Q. I'm sorry. 278. We're -- no, 277. 277. Yeah. Who created that slide?**

A. I did.

**Q. Okay. So did you add the RiverRock logo into the slide?**

A. Yes.

**Q. All right. Where did you find the RiverRock logo?**

A. I don't recall.

**Q. But you took the time to locate it and insert it into a slide; is that right?**

A. I did insert it in the slide.

**Q. And you took the time to locate it.**

A. Okay.

**Q. Yes?**

A. Yes. I did it on the prior slide too.

**Q. Okay. And you actually also titled this slide; did you not?**

A. I did.

**Q. And you titled it, "ABL Wealth Advisors - Acquisition of RiverRock Funds."**

A. Yes.

**Q. Okay. So the words, "Acquisition of RiverRock Funds, those were your words, sir; is that right?**

A. Those were my words, but that was not the RiverRock GP, just so that we're clear.

**Q. Okay. Explain what you mean.**

A. There's a difference between a general partner and just the underlying funds. The funds could be policy sales, they could be a lot of things. I just -- this was more broad than just saying we're going to buy RiverRock. This was a -- this was a talking point.

**Q. This was the acquisition of something related to RiverRock; is that right?**

A. It -- I -- I -- as I said, I titled this, "Acquisition." I should have titled it, "LOI."

**Q. Okay. So -- so now you've misspoken again, is your testimony.**

A. It is my testimony. I -- I have testified that I should not have used the word "acquisition." We should have used the word "LOI."

**Q. Okay. So you misspoke when you were communicating with Mr. Annino; is that right?**

A. Specifically around a single word, yes.

**Q. And then you misspoke when you were**

**speaking internally as well.**

A. I misspoke in how I have the slide labeled, but not in how we spoke about it.

**Q. Okay. So how did you speak about it at the board meeting, specifically?**

A. This was an idea, a concept around a potential LOI.

**Q. And that's how it was spoken about --**

A. Yes.

**Q. -- at the meeting? Okay. And who took -- who took the minutes of that board meeting?**

A. It would have been our -- Chris Romaine at the time.

**Q. Okay. Let's -- let's jump to what we're going to mark as Exhibit 11.**

MS. JUNGER: It's going to be 12.

MS. ORETSKY: Oh, I'm sorry. I misspoke. Exhibit 12.

THE COURT REPORTER: It's 12.

MS. ORETSKY: Yep. Tab 22.

(Thereupon a document was marked Plaintiff's Exhibit 12 in the proceeding.)

BY MS. ORETSKY:

**Q. Is -- is this a true and correct copy of the minutes of the board meeting that was held on**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**November 9th, 2023?**

A. I believe so, yes.

**Q. Let's take a look at Page 3 under Business Interview -- Overview. And let's look at Paragraph 3. Sorry, it's Paragraph 4.**

**It says, [redacted] He also discussed the potential acquisition of RiverRock Funds."**

**Do you see that, Mr. Jackson?**

A. Yes.

**Q. Okay. Is it still your testimony that you only discussed an LOI at the board --**

A. Yeah, I --

**Q. -- meetings held on November 9th, 2023?**

A. That is. And I think that in these notes what probably occurred was, was just the potential acquisition. And maybe Chris is fine. We would have to ask Chris why he wrote, "potential acquisition," versus, "LOI," but it's my testimony that I spoke about a letter of intent, not an acquisition.

**Q. Okay. So your testimony is that Mr. Romaine did not accurately reflect what you**

**represented at the board meeting on November 9th, 2023, in the board minutes.**

A. I think in that word, I think that that's accurate, or it was too broad.

**Q. It would be a strange coincidence that he used the word "acquisition" --**

A. Uh-huh.

**Q. -- wouldn't it?**

A. Not necessarily. It was mislabeled on the slide, so I don't think that's a strange coincidence. You know, but we discussed -- it's my testimony that we discussed an LOI. And because we weren't far enough along to have substantial data to support an acquisition, we would have never been able to do that. We didn't even have an LOI issued at the time.

**Q. So let me -- I just want to be really clear, because I think I need to speak to Mr. Romaine too, who's a licensed attorney. What exactly is your -- is your testimony today as to what you said at the board meeting on November 9th, 2023?**

A. I believe I just said it, is that we discussed a potential LOI of the RiverRock Funds.

**Q. Okay. So your testimony is that you never**

**used the word "acquisition" at that board meeting.**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: My -- my testimony is, is that we discussed an LOI.

BY MS. ORETSKY:

**Q. Is it your testimony that you never used the word "acquisition" --**

A. I don't know.

**Q. -- at that board meeting?**

A. I don't know if I ever said that word at that board meeting. It could reply -- there was another deal in this same deck. So, you know, we could have been -- that word could have been used in other scenarios, so I don't know.

**Q. Okay. Is it your testimony that you did not use the word "acquisition" at that board meeting when you were discussing RiverRock?**

A. That's my testimony; correct.

**Q. Okay. Why was Jeff Smith at this meeting?**

A. I'm not sure where you see Jeff Smith in attendance. I apologize.

**Q. Why don't you take a look at the first page.**

A. I see it now. Thank you. At some of the board meetings, we would have Jeff potentially



8108294d-b0ea-4811-8f29-be81af2a5e5f

present on marketing initiatives.

**Q. What was he presenting on at this meeting?**

A. We'd have to go through the deck, but I believe he was just giving an update on -- on advertising and marketing.

**Q. Do you see that anywhere in the board minutes?**

A. I don't know. I see a slide on it. Where it says, "Marketing & Advertising."

**Q. Who prepared that slide?**

A. I believe it would have been Jeff, but I don't -- I don't know for sure.

**Q. Okay. Before you circulated the board deck to your board, did you inform them of the Confidentiality Agreement that Abacus had signed with RiverRock?**

A. I don't believe I had informed them specifically before I sent the board deck to the board of that Confidentiality Agreement with RiverRock.

**Q. After you signed the Confidentiality Agreement with RiverRock, did you inform anybody at Abacus about the Confidentiality Agreement?**

A. Well, Chris Romaine, Bill McCauley would have known. And I -- I don't remember the exact

communications with everyone at that time related
to that specific agreement.
**Q. Okay. What was the point of the LOI that you were discussing at the board meeting?**
MR. ZUCKERMAN: Objection.
THE WITNESS: We were discussing opportunities and really just different opportunities and an industry update of things that were potentially happening in -- in the industry. And I informed the board that, you know, RiverRock was interested, at least they had said they were interested based upon what Tony had said, in potentially selling their business. And across the industry, there were others that -- that knew this as well and that there were potentially other interested parties, and so we just discussed more at a high level, industrywide, things that were happening in the industry.
BY MS. ORETSKY:
**Q. Let's pull up --**
**So you didn't have, like, any sort of disclaimer on the slide that included the Valuation Model that that was confidential information; is that right?**



8108294d-b0ea-4811-8f29-be81af2a5e5f

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I did not put that disclaimer because I didn't believe it to be confidential. It was information provided by Tony Annino on a case study that didn't have what we believed were actual data.

BY MS. ORETSKY:

**Q. Okay. Is it your position in this case that** [redacted]

MR. ZUCKERMAN: Objection to the form. Again, our objection's on the 30(b)(6) notice. It's not (indecipherable) --

MS. ORETSKY: You can answer the question.

THE COURT REPORTER: Can you just repeat the end of your objection for me?

MR. ZUCKERMAN: Yeah. Our objections -- our written objections to this 30(b)(6) notice stated he's not testifying as to (indecipherable) --

THE COURT REPORTER: As to the -- you keep trailing out.

MR. ZUCKERMAN: As to legal conclusions.

THE COURT REPORTER: Thank you.

MS. ORETSKY: You can object to the form



8108294d-b0ea-4811-8f29-be81af2a5e5f

of the question, but that doesn't mean I don't get to ask and he doesn't have to answer. So unless you --

MR. ZUCKERMAN: I'm just putting my objection on the record --

MS. ORETSKY: Yeah, understood.

MR. ZUCKERMAN: -- about the scope of the 30(b)(6) testimony.

MS. ORETSKY: Understood.

BY MS. ORETSKY:

**Q. What -- is it your -- is it your position in this case that you did not** [redacted]

A. I don't know.

**Q. You don't know whether you breached it or not?**

A. I -- I don't know the agreement. I'm not an attorney in that sense, and so I -- I don't know if -- I can't make that judgment.

**Q. How can you abide by an agreement that you don't know?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: As I said, I'm not an attorney.

BY MS. ORETSKY:

**Q. You understand that that's not a defense to not abiding by your obligation; right?**

MR. ZUCKERMAN: Again -- again, same objection regarding legal conclusions.

THE WITNESS: My answer remains the same.

BY MS. ORETSKY:

**Q. Did any of the board members ask you questions about the Valuation Model that was contained in the board deck?**

A. Not that I recall.

**Q. Why did you include the Valuation Model in the board deck?**

A. It was included because it was a -- as I said, we were talking about industry-related activity, and this was sent from someone in the industry as a case study and the way that he saw this particular business. So it was -- it was very -- it was designed to be informational.

**Q. For purposes of acquiring RiverRock.**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: No. For, potentially, purposes of -- of submitting an LOI.

BY MS. ORETSKY:

**Q. Why would you submit an LOI if you weren't intending to potentially acquire RiverRock? That's**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**the part I'm misunderstanding.**

A. This happens every day. You don't -- you don't know if you're going to acquire a business. You're doing discovery to determine whether that is a business that you have interest in or not, and that's what an LOI is.

**Q. Okay. So you -- so is it your testimony that you were using RiverRock for information-gathering purposes so you could actually explore other deals in the market?**

MR. ZUCKERMAN: Objection to the form.

BY MS. ORETSKY:

**Q. Is that --**

A. No.

**Q. -- your testimony?**

A. No.

**Q. You said it happens every day. Isn't that what happens every day?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: No. We were -- we were exploring a discussion with RiverRock, and Tony had come to us and said that they were potentially for sale, and he told us what price that might look like, and gave us all of, you know, his data and assumption, and he

said that he wanted to come and work with Abacus, so that's what we were basing it on.

Information is -- you know, whether that was, you know, information that was used for this terms or others, it was industry information. And, frankly, we weren't the only group that this information was going out to.

BY MS. ORETSKY:

**Q. What information?**

A. Just that RiverRock was potentially for sale. It was widely known throughout the industry. They -- I think they were having multiple conversations with multiple companies, so that's what we had heard.

**Q. Okay. Let's just go back to Tab 20.**

MS. ORETSKY: Or what was this? Exhibit 11?

MS. JUNGER: Yes.

MS. ORETSKY: For a minute.

MS. JUNGER: You want to pull it up?

MS. ORETSKY: Yeah. Bate label?

MS. JUNGER: (Inaudible.)

MS. ORETSKY: Yes.

MS. JUNGER: It is 287, top number. Page



8108294d-b0ea-4811-8f29-be81af2a5e5f

30.

MS. ORETSKY: Pull it up. All right. So we're just going to go back to that exhibit really quickly.

Well, wait. Just hold it for one second.

BY MS. ORETSKY:

**Q. The other slides that were prepared on this board deck, who prepared the other slides?**

A. It depends on the division. So, you know, could you reference a specific slide you would like to know about, or --

**Q. Yeah. So before --**

MS. ORETSKY: Let's not scroll anymore.

BY MS. ORETSKY:

**Q. So there was a slide on Q4 Initiatives and Outlook. Who would have prepared that slide?**

MR. ZUCKERMAN: Which slide number is that?

THE WITNESS: Yeah.

BY MS. ORETSKY:

**Q. I'll get to that -- I'll get to it in a minute. I'm just -- in general, I'm asking generally, when you do the initiatives for the next quarter -- or for the quarter, who prepares those slides?**



8108294d-b0ea-4811-8f29-be81af2a5e5f

A. Gosh, it -- it just -- I'm not trying to -- I'm trying to tell you that it -- it can depend on what our target Q4 initiatives are. So it might be myself, it might be Bill. At the time, it could have been Chris. It could have been -- you know, so if you don't mind, if you would be willing to show me the slide, I think that might help provide some clarity for --

MS. ORETSKY: Let's scroll down to the slide.

BY MS. ORETSKY:

**Q. Who prepared this slide?**

MR. ZUCKERMAN: This is 30?

MS. ORETSKY: Page 30.

THE WITNESS: Yeah, this particular slide, I -- I prepared.

BY MS. ORETSKY:

**Q. And did you speak -- misspeak again when you wrote, "Complete acquisition of RiverRock," as part of your Q4 initiatives and outlook?**

A. I think he's -- when I'm looking at it here now, we're -- remember, we're -- we're talking about Q4 and we're forecasting the future here. It was put out as, hey, if we decide to move forward, these are some of the things that we would like to



8108294d-b0ea-4811-8f29-be81af2a5e5f

pursue in Q4. And so the, "Complete acquisition of RiverRock," that was all like, hey, we hope that happens. [redacted]

**Q. I'm not asking about the rest of this stuff. I'm asking about --**

A. But all --

**Q. -- "Complete acquisition of RiverRock."**

A. None of these things happened, and that's what I'm trying to tell you, is that none of these things occurred.

**Q. I'm not asking about whether they occurred or not. That's why we're sitting here today --**

A. So that's why it's all a --

**Q. -- because they didn't occur.**

A. -- hypothetical.

MR. ZUCKERMAN: Wait. Let her finish --

THE WITNESS: I'm so sorry. Yeah.

BY MS. ORETSKY:

**Q. Let me --**

A. I --

**Q. This is not --**

A. Yeah, yeah, yeah. I get it.

**Q. We're not having a conversation. I'm asking questions, you're answering. It's not a**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**conversation.**

A. Okay. I get it.

**Q. So -- so this -- did you misspeak when you wrote, "Complete acquisition of RiverRock"? Was that another mistake?**

A. This --

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: This was a goal. This wasn't a -- an -- an actual timeline and model. None -- all of these were goals.

BY MS. ORETSKY:

**Q. I'm not asking that. I'm asking --**

A. But that's --

**Q. -- did you misspeak --**

A. It's -- well --

**Q. -- when you wrote --**

**Mr. Jackson, just answer the question. Did you misspeak when you wrote, "Complete acquisition of RiverRock"? That's it. Yes or no?**

A. Yes.

**Q. Okay. That should have said, "Complete submission of LOI," or something? Is that what it should have said?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I don't know what it should

have said.

BY MS. ORETSKY:

**Q. Okay. All right. Let's move on to -- all right.**

**So this board meeting was a big deal for purposes of the next steps with RiverRock; is that right?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: No.

BY MS. ORETSKY:

**Q. Okay. Let's go back to the written words on paper at the time that this was all happening. We're going to pull up Exhibit 13.**

**(Thereupon a document was marked Plaintiff's Exhibit 13 in the proceeding.)**

BY MS. ORETSKY:

**Q. And your -- your board meeting was, what, from 9:00 till 12 that day on November 9th?**

A. I don't recall, but I -- I think that sounds about what the time frame was.

**Q. Okay. So let's take a look at Abacus 000804, Tab 23.**

A. I don't have that up. I'm sorry.

**Q. We're going to pull it up right now.**

**All right. And there's an e-mail from Mr.**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**Annino to you in the morning of the board meeting. Do you see that?**

A. I do see it.

**Q. And he says -- there's nobody else copied on the this e-mail; right? It's just Mr. Jackson?**

A. Yes, that's correct.

**Q. All right. And he says, "Jay. Hope it goes well today and keep me posted."**

**You see that?**

A. I do see that.

**Q. Okay. Let's move up.**

A. Wait.

**Q. No. No wait.**

A. He's expecting another term sheet by the end of the week. Like, this is --

**Q. Sir, this is my depo. I ask the questions --**

A. Okay.

**Q. -- and you answer. I didn't ask you a question about that.**

**Okay. The response comes in at 1:59. So this is shortly after the -- the meeting ended; is that right?**

A. I -- I can't say shortly or not. I don't know exactly when the meeting ended, but it would



8108294d-b0ea-4811-8f29-be81af2a5e5f

have been after the meeting ended.
**Q. It's the same day; right?**
A. Same day.
**Q. And it's at 1:59 p.m.; is that right?**
A. Correct.
**Q. And the meeting occurred before 1:59 p.m.; right?**
A. That's correct.
**Q. And it was about a couple hours? A few hours?**
A. That's my guess. I think it was a few hours.
**Q. Yep. All right. And you wrote back, "Understood - went well."**
**What went well, Mr. Jackson?**
A. Just, in general, our board meeting.
**Q. Why are you telling Mr. Annino that the board meeting went well?**
A. It's cordial.
**Q. Just -- just because it's cordial? No other reason?**
A. Yeah.
**Q. All right. Then you write, "We are in process of term sheet."**
**What does that mean?**

A. Exactly what it says, that we're in process of an LOI.

**Q. Okay. For purposes of acquiring RiverRock; right?**

A. An LOI is not a document that means --

**Q. I'm not asking --**

A. -- we're going to acquire something. It -- it -- I'm sorry. You can ask that, but I'm going to give you the answer. I'm going to tell you the truth. Like, it's -- it's a -- literally, a discussion. It's an LOI. It is not an acquisition document.

**Q. But you're not a lawyer, Mr. Jackson; are you.**

A. I don't have to be to know that there's not a purchase and sale agreement. There is a big difference between an LOI and a purchase agreement. Just like there's a big difference when you make an offer on a house and you actually buy it.

**Q. And then you write, "Should have it ready by Friday but might be Monday."**

**Why are you giving him a timeline?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: Just being courteous.

BY MS. ORETSKY:



8108294d-b0ea-4811-8f29-be81af2a5e5f

**Q. Okay. All right. Let's -- so that -- that -- those communications took place on the day of the board meeting. Would you have taken the time and spent the money and hired the lawyers on an LOI if there was no board interest in actually acquiring RiverRock?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: Sometimes you invest capital to discover what you don't want to invest in. And so you engage the people around you so that they can provide you sound advice and feedback.

BY MS. ORETSKY:

**Q. At this point in time, Abacus wanted to acquire RiverRock; is that not right?**

A. That's not correct.

**Q. Okay. At what point in time did Abacus want to acquire RiverRock?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: There was not a point in time where we moved forward to acquire RiverRock.

BY MS. ORETSKY:

**Q. That's not what I asked you.**

A. There was -- there was not a point in



8108294d-b0ea-4811-8f29-be81af2a5e5f

time.

**Q. So your testimony today is, at no point in time Abacus had any interest in acquiring RiverRock.**

A. Not at that stage.

**Q. At what stage did Abacus have an interest in acquiring RiverRock?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: We -- we never got to a stage that we could potentially be interested in acquiring RiverRock.

BY MS. ORETSKY:

**Q. Okay. So, again --**

A. We never had the information.

**Q. -- it is your testimony that at no point in time Abacus was interested in acquiring RiverRock.**

A. I think that's a challenging statement to answer, because interest, I would say no. Just so to --

**Q. Okay. Thank you.**

A. -- try to provide you a simple answer, but there's --

**Q. Thank you. I appreciate that.**

A. -- much more complex than that.

**Q. Okay. Thank you.**
**Let's take a look at what we're going to mark as Exhibit --**
**MS. JUNGER: 14.**
BY MS. ORETSKY:
**Q. -- 14 to the deposition.**
MS. JUNGER: It's Tab 10.
(Thereupon a document was marked Plaintiff's Exhibit 14 in the proceeding)
BY MS. ORETSKY:
**Q. All right. Have you seen this e-mail before, Mr. Jackson, from yourself to Mr. Annino? And you copy a ton of people on this e-mail. And you use the word, "Project Water."**
**Do you see that, sir?**
A. I do see that.
**Q. Okay. Is it still your testimony that you don't know what Project Water means?**
A. I don't remember. You're asking me something from two years ago, and we have a lot of projects. And so here you have an e-mail that says, "Project Water," so we're referencing the letter of intent. Great.
**Q. Okay. So you don't remember what Project Water means, but you do remember the exact words**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**you used at the board meeting on November 9th, 2023? I'm just trying to understand.**

MR. ZUCKERMAN: That's -- objection.

THE WITNESS: No.

MR. ZUCKERMAN: Mischaracterizes what he just said.

THE WITNESS: I -- I just said that we have a lot of project names and I didn't know what Project Water meant in the question that you were referencing earlier today. This is referencing a letter of intent and calling it "Project Water."

BY MS. ORETSKY:

**Q. Okay. So you do realize that we're taking a deposition today in a lawsuit that Renegade Capital, doing business as RiverRock, filed against Abacus; right?**

A. Yes.

**Q. Okay. And you understand that the purpose of today's deposition is to ask you questions about that deal that fell through. Is that right?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I would say that the deal didn't -- there was no deal. It didn't fall through. That's -- you're asking me questions



8108294d-b0ea-4811-8f29-be81af2a5e5f

about a matter that never occurred.

BY MS. ORETSKY:

**Q. Okay. I'm asking you questions for purposes of gathering facts so I can prove my case at trial. Do you understand that?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I don't understand your intent. It's not -- I -- I don't know what your intent is.

BY MS. ORETSKY:

**Q. Do you understand what the purpose of a deposition is, Mr. Jackson?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: Yes.

BY MS. ORETSKY:

**Q. Okay. So, earlier, when I asked you about Project Water, and you said you had no idea what that term meant --**

A. I don't think that's what I said.

**Q. What did you say?**

A. I just think I said I don't remember what Project Water was. We have a lot of projects that are named. Here, you got an e-mail that says, "Letter of Intent - Project Water." Great. Thanks for refreshing my memory.

**Q. Does this refresh your memory, Mr. Jackson?**
MR. ZUCKERMAN: Objection to the form.
THE WITNESS: Yes.
BY MS. ORETSKY:
**Q. Okay. What is Project Water, Mr. Jackson?**
A. It's this letter of intent.
**Q. The letter of intent for what?**
A. It's a letter of intent as Tony and I had discussed, which would include a -- a nonbinding discussion in relationship to RiverRock.
**Q. Who prepared the letter of intent?**
A. I believe that was done with Chris and -- and I believe he solicited help or assistance from -- from Latham.
**Q. Okay. Did you help as well with respect to the drafting of the letter of intent?**
A. In respect to drafting, I'm not an attorney. I would have provided some high-level feedback, but that's -- that's all I recall.
**Q. What about the numbers that appear in the letter of intent?**
A. Yeah, that's the -- some of the feedback I would have provided would have been information that was provided to me by Tony Annino in



8108294d-b0ea-4811-8f29-be81af2a5e5f

relationship to what numbers would go in there.

**Q. Okay. So you -- you provided the numbers that were inputted into the LOI.**

A. No. Tony did.

**Q. This LOI came from Abacus; is that right?**

A. It did.

MR. ZUCKERMAN: Objection to the form.

BY MS. ORETSKY:

**Q. All right. So this is the -- this is a letter agreement that was proposed by Abacus and sent by Abacus to RiverRock; is that right?**

A. It was sent to Tony at his Gmail.

**Q. I didn't ask where you sent it.**

A. Okay. But it wasn't sent to RiverRock.

**Q. I didn't ask --**

A. It was sent to Tony at his Gmail.

**Q. Mr. Jackson, you do understand that Mr. Annino is the CEO of RiverRock when you're communicating --**

A. Okay.

**Q. -- with him; right?**

A. He's -- he's the CEO of RiverRock, but didn't use his RiverRock e-mail.

**Q. I didn't ask you about --**

A. So this was going to --



8108294d-b0ea-4811-8f29-be81af2a5e5f

**Q. -- what e-mail he used.**

A. -- to his personal e-mail.

**Q. Mr. Jackson, I didn't ask you --**

A. I -- I don't --

**Q. -- about what e-mail --**

A. -- know. I don't know.

MR. ZUCKERMAN: Let her ask the question.

THE WITNESS: I'm sorry. I -- I -- I just -- I don't know.

BY MS. ORETSKY:

**Q. You proposed this letter agreement that you're referring to as an LOI; is that right?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I proposed? What do you mean? If you wouldn't mind being some more clear. I -- what did I propose?

BY MS. ORETSKY:

**Q. These -- this letter agreement, this LOI, was drafted by Abacus; yes or no?**

A. It was drafted by, as far as I know, our -- our -- Chris, our general counsel, and he had assistance with attorneys.

**Q. Okay. It was drafted on behalf of Abacus; is that right?**

A. Yes. It was, I think --



8108294d-b0ea-4811-8f29-be81af2a5e5f

**Q. Just yes or no?**

A. Well, no, because it's Abacus -- I just want to have it right. Abacus Wealth Advisors, I believe.

**Q. I'm sorry?**

A. I think it was drafted on behalf of Abacus Wealth Advisors. Just being -- being clear.

**Q. Okay. And it was sent to RiverRock; is that correct?**

A. It was sent to Anthony Annino. I -- you'd have to ask him if he sent it to RiverRock. I'm not -- I'm not -- I'm just saying where it was sent. I want to be clear where this was sent.

**Q. You sent it -- if somebody sends something to you, Mr. Jackson, is there a distinction between you and Abacus if somebody's sending something to you that's related to the business of Abacus? I'm trying to understand this.**

A. Yeah, I --

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I mean, if somebody sends something to my personal e-mail address --

BY MS. ORETSKY:

**Q. I'm not asking about his personal e-mail address.**



8108294d-b0ea-4811-8f29-be81af2a5e5f

A. Well, that's what I feel like you're asking.

**Q. Mr. Jackson, is Mr. Annino a party to this letter agreement? Yes or no?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: Mr. Annino -- I'll have to look at the agreement, if his name is on it.

BY MS. ORETSKY:

**Q. Take a look. Why don't you scroll down.**

A. Okay. Doesn't have his name on it.

**Q. Okay. All right. The numbers that were inputted, transaction structure, consideration, there's a purchase price. Do you see that?**

A. Yes.

**Q. Who directed your lawyers to put that number in that box?**

A. I did.

**Q. Okay. All right. And you see your e-mail. It says, "Attached is the letter of intent as discussed."**

**And this is only two days after the board meeting.**

**"Happy to jump on a call this weekend or Monday to discuss if you are available.**

**"All the best, Jay."**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**What was the rush?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: There wasn't a rush. It was just he -- there was no rush at all. It was just being cordial on timing. I was just offering some times that I was available. There was no rush.

BY MS. ORETSKY:

**Q. Well, you offered to speak to them over a weekend; did you not?**

A. I did. I -- I work most weekends.

**Q. Okay. And this was high priority, then, if you were willing to spend your weekend working on this potential acquisition; is that right?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: No.

BY MS. ORETSKY:

**Q. I'm wrong?**

A. You're wrong.

**Q. Okay. So you usually spend your time on things that are unimportant over the weekend when you -- when -- when you have three kids, small children at home?**

A. I --

MR. ZUCKERMAN: Objection to the form.



8108294d-b0ea-4811-8f29-be81af2a5e5f

THE WITNESS: I do work on -- on the weekend on a number of items, particularly on ones that may not have as much importance because I can't get to them during -- during the week.

BY MS. ORETSKY:

**Q. All right. And who is -- just so the record is clear. I know we've talked about Bill McCauley, we've talked about Chris Romaine, we've talked about Daniel Harrist. Who is Ryan Maierson?**

A. He is an attorney at Latham Watkins.

**Q. Okay. And -- and who is Seth Miller?**

A. Seth was our former chief revenue officer.

**Q. And what is this e-mail address that he's using, lmagrp.com?**

A. It was a e-mail of Longevity Market Assets Group.

**Q. That's Abacus?**

A. That would be an affiliate of Abacus; that's correct.

**Q. So it's not Abacus; it's an affiliate company of Abacus'?**

A. Yeah, it's all a hundred percent owned by Abacus, or Abacus -- Abacus Life at -- at the time, this was Abacus Life.



8108294d-b0ea-4811-8f29-be81af2a5e5f

**Q. Okay. Can you point me to the red flag indemnification language that you testified to earlier today in this initial draft of the LOI that you submitted to RiverRock?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: You want to scroll down?

BY MS. ORETSKY:

**Q. Sure.**

A. It's under the section called, "Survival; Tax True-Up; Indemnification." That third -- - well, I guess, second, technical paragraph, third line, "In connection with closing of the Transaction --"

**Q. Okay. What, specifically, about that paragraph?**

A. What do you mean?

**Q. What was the primary red flag?**

A. They removed it.

**Q. What did they remove?**

A. Most of that language. They put caps on claims and then they reduced the escrow account significantly. Means that they're expecting, potentially, that they may have some litigation or other issues outstanding.

**Q. Okay. So this -- this draft was sent to**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**them on November 11th, and that would be three days -- well, let me -- let me not characterize this. It was sent to them before the board deck was posted on the investor website; right?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I don't know off the top of my head. I'm not trying to -- you know, the actual dates here, I think -- I -- I -- I believe what you've said is correct. I think this -- what was the date of this, if you don't mind showing me again?

BY MS. ORETSKY:

**Q. This e-mail was sent on November 11th, two days after the board meeting.**

A. Correct.

**Q. And I will represent to you that the unauthorized posting took place on November 14th.**

A. Okay.

**Q. So this was sent -- this was submitted before the board deck was posted on your investor website; is that right?**

A. Yes.

**Q. Okay. All right. And -- well, let's take a look at Paragraph 7. "Confidentiality." Do you see that?**



8108294d-b0ea-4811-8f29-be81af2a5e5f

A. I do.

**Q. Okay. And Abacus drafted this confidentiality clause. And it states, "The Parties agree that the existence of this Letter Agreement, its contents and any information provided by either Party in connection with this Letter Agreement shall be deemed 'Confidential Information.'"**

**Do you see that?**

A. I see it.

**Q. Okay. Do you recall ever meeting with Mr. Annino in New York City?**

A. I do.

**Q. Do you know when that was?**

A. I believe it was --

MR. ZUCKERMAN: Sheila, you're -- you're muted.

MS. ORETSKY: Yeah, I meant to do that.

MR. ZUCKERMAN: Oh, sorry. Sorry for interrupting.

MS. ORETSKY: That's okay.

THE WITNESS: I believe it was the 16th in the morning. I believe we had -- we had met for -- we were -- met for a quick breakfast.

BY MS. ORETSKY:



8108294d-b0ea-4811-8f29-be81af2a5e5f

**Q. And what did you discuss at that meeting?**

A. Lots of pleasantries. I was in town for a different set of meetings. He was curious what that was related to the public company. He shared with me that he had learned that Reid -- Reid Buerger from Coventry had learned of the transaction, and, yeah, I -- it -- it was a challenge. Because it wasn't that Coventry learned of the transaction, which, in my premise, I believe that they already knew of, it was they knew now Abacus was involved. He didn't specify why they knew. And that he said that these kinds of things are -- you know, generally get out and that they've probably been out for a while. It was a very comfortable conversation that we had.

**Q. Okay. We're going to go back to what you just said, but let's talk about the posting of the board deck.**

A. Yeah.

**Q. How did that happen?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I wasn't part of that specific thing that happened. Just that the IR firm had loaded the incorrect deck on the IR website. The investor relations website.



8108294d-b0ea-4811-8f29-be81af2a5e5f

BY MS. ORETSKY:

**Q. Who was the IR firm?**

A. It's a firm called ICR. I, indigo, C, cat, R, Richard.

**Q. And how long have you been -- has Abacus been using ICR?**

A. We no longer use them. At that point when that had occurred, it was a fairly new relationship. Just -- we'd only been public, you know, for five months or four months, so it was not a long-term relationship at that point.

**Q. And how long after the incident occurred on November 14 did you continue to use ICR for?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I don't recall the exact date. It was approximately a year or a year-and-a-half. I -- I could get that for you. I -- I don't know it off the top of my head.

BY MS. ORETSKY:

**Q. Why don't you use ICR anymore?**

A. We expanded to a different firm to replace them, and it was related to outreach, where we wanted a firm that had a more proactive approach to investor relations.



8108294d-b0ea-4811-8f29-be81af2a5e5f

**Q. Okay. Let's go back to the posting on November 14th. What is your understanding of what occurred on that day?**

MR. ZUCKERMAN: Sheila, this is in his individual capacity; right? Because we had designated Jeff on Topic 11.

MS. ORETSKY: Yeah.

THE COURT REPORTER: I'm sorry. You have to repeat your objection because I couldn't catch all of it.

MR. ZUCKERMAN: This is -- you're asking in Mr. Jackson's individual capacity, because Jeff Smith was the witness designated on Topic 11; correct?

MS. ORETSKY: Yes. Well --

MR. ZUCKERMAN: Okay.

MS. ORETSKY: Well, yes. Yes, I am. Although, just for the record to be clear, I don't think Mr. Smith knew answers to those questions. So somebody at Abacus has to know the answer to these questions.

MR. ZUCKERMAN: To the extent that Abacus knows all the answers, they have to know.

MS. ORETSKY: No, they have to educate themselves if there's a corporate rep that's

--

MR. ZUCKERMAN: On information in Abacus' possession.

MS. ORETSKY: And in their agent's possession, and in their custody and in their control, they are obligated under the law to educate themselves.

So I'm going to ask Mr. Jackson the question. We asked Mr. Smith the question. His depo transcript was primarily, "I don't know. I don't remember. I don't know." So we're going to ask Mr. Jackson the question, because this entire case is about the posting of the board deck. So somebody has to know.

BY MS. ORETSKY:

**Q. So, Mr. Jackson, what is your understanding of what happened on November 14th with the posting of the board deck on the investor website?**

A. Sure. I understand that there were two decks; a board deck and what we would call a shareholder deck. And I don't have all the details outside of, as I understand, ICR wanted to post our deck to the -- the shareholder deck. And we're still working through -- it's -- I know it's been

some time, on who's to assign blame and fault here.

As I understand it -- this is just as I understand it -- both decks would have been sent to ICR, and ICR would have then chosen a deck to, in fact, post. But, you know, Jeff would have been the one in contact with ICR. I was not in town. I was traveling. In fact, I was in New York at the time, as I testified to meeting Tony a few days later.

So I -- beyond that, that's how I understand it.

**Q. Okay. So it's your testimony that there had been -- there were two decks prepared --**

A. Uh-huh.

**Q. -- is that right?**

A. There generally is a shareholder deck and a board deck. And so I -- I don't -- I did not -- I was not part of that transaction, I was not part of that loading, so I don't have that information.

**Q. All right. Is it your testimony that there was a public deck prepared at the time the board deck was submitted to ICR?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I don't know, and here's why, is that, generally, those two things



8108294d-b0ea-4811-8f29-be81af2a5e5f

happen at separate times. Meaning that you do your board deck, and a public deck would have been created at some point thereafter. And so whichever deck was -- you know, Jeff had and then went to ICR with is what got posted, which was, in this case, our board deck.

To me, the process was less important than Pages 6, 7, and 8 in that deck. That's what -- that's why we had to file the disclosures. That was the forward earnings that we had put. We put our entire whiteboard and business plan in that conversation with the board because we had '24 and '26 forecasted earnings in that deck, and that was the problem. That's why we filed -- had to immediately file an S -- sorry, an 8-K, and that's why we had to disclose the deck. It had forecasted guidance and earnings in it.

BY MS. ORETSKY:

**Q. Okay. So if I understand you correctly, Mr. Smith sent ICR the board deck.**

A. That's as I understand it.

**Q. Okay. And he didn't send ICR any other deck; is that right?**

A. Not that I'm aware of.



8108294d-b0ea-4811-8f29-be81af2a5e5f

**Q. Okay.**

MR. ZUCKERMAN: Sheila, we've been going for about 75 minutes. Do you think we could take a break soon, or now?

MS. ORETSKY: Yeah. Let me just finish this line of questioning and then we can take the break.

MS. JUNGER: Do you want me to show that?

MS. ORETSKY: Yeah. Let's just take a quick -- what are we marking it as? Exhibit --

MS. JUNGER: 15. Yeah. This was Exhibit 9 to Jeff Smith's depo.

MS. ORETSKY: All right. This is exhibit -- what we're going to mark as Exhibit 15.

THE WITNESS: Yeah.

(Thereupon a document was marked Plaintiff's Exhibit 15 in the proceeding.)

BY MS. ORETSKY:

**Q. And this is an e-mail from Mr. Smith to Marissa Young at ICR.**

A. Yeah.

**Q. And he actually refers to a "board deck."**

A. "Board deck."

**Q. Do you see that?**



8108294d-b0ea-4811-8f29-be81af2a5e5f

A. I do, yeah.
**Q. Okay. So there was no shareholder deck --**
A. Right.
**Q. -- that was attached to this e-mail; right?**
A. Correct. So --
**Q. Why -- why did Mr. Smith send the board deck to Marissa Young at ICR?**
MR. ZUCKERMAN: Objection to the form.
THE WITNESS: I don't -- I don't have a great response inside his head; right? I know that I was upset, and that Marissa Young, in my opinion, also made a mistake. She should have known that it's a board deck.
I was -- again, the reason I was so upset is because you can't, as a public company, put out forward guidance without an 8-K. And beyond that, we had just shared our entire business plan, specifically on Slide 6, of all of our -- all of our verticals. This was our whiteboard. That's why we were both focused on this board meeting. And that was the reason for my focus and concern and why we put the -- had to immediately get a disclosure on the deck.



8108294d-b0ea-4811-8f29-be81af2a5e5f

BY MS. ORETSKY:

**Q. Okay. So I'm not asking about your disclosure. I haven't asked --**

A. Okay.

**Q. -- about what you were upset about or what -- Slide 6, 7, or 8. I haven't asked anything about that.**

A. Okay. I was --

**Q. I've only asked about this board deck being transmitted --**

A. Got it.

**Q. -- to ICR and --**

A. Sorry.

**Q. And --**

A. I -- I was just trying to be forthright.

MR. ZUCKERMAN: Just let her ask the question.

BY MS. ORETSKY:

**Q. And to be clear, the board deck was, in fact, posted on the investor website; is that right?**

A. Yes.

**Q. And what is that website?**

A. I believe -- because the website has changed. I believe at the time it was



8108294d-b0ea-4811-8f29-be81af2a5e5f

AbacusLife.com, and then there was a backslash, and I believe it said, "investors," I believe. I don't know the exact nomenclature of the website, but it would have been accessible through AbacusLife.com, and then you would have had to click to the investor website.

**Q. What about IR.AbacusGM.com? What is that?**

A. That's our current investor website. That's now hosted by a different group. But I think, again, Abacus GM, we went through that name change in January and rebranding, and so that's why I'm referencing Abacus Life in 2023, not Abacus GM.

**Q. Okay. Did you have -- did you personally have a conversation with Mr. Smith about the publishing of the board deck on the investor website?**

A. I -- I did call him after I had seen that it was posted. I also spoke to several other Abacus employees.

**Q. When did you see that it had been posted?**

A. Gosh. I believe it was the afternoon of -- I -- I -- and, again, I -- I would have to go back and check, but I believe it was the afternoon, or maybe it was the morning of the 15 -- midday on the 15th, somewhere in there. I think it was --



8108294d-b0ea-4811-8f29-be81af2a5e5f

yeah.

**Q. So you did not see it on the day it was posted on the 14th.**

A. No.

**Q. And you're a hundred percent sure about that.**

A. That's what I remember. I -- I -- I remember seeing it, I believe, the next day, but that's -- that's what I remember now. I could go back and look, but that's what I believe. Because this was, I think, 1:30, maybe?

**Q. What was at 1:30?**

A. This -- this e-mail here was at 1:30. Am I looking at that right? No, that's -- sorry. That's 2:30.

**Q. Okay. Who told you about it? Who told you that it was posted on the investor website?**

A. I -- anyone told me. I was checking because I was in town in New York for investor meetings, and I was going into a meeting with an investment banker that we were working with, Piper Sandler, and that's when I noticed. Because I was on my laptop, and I would many times pull down our deck from the laptop from the website to show to our bankers and maybe go through a conversation.

So that's when I noticed it was -- that Slides 6, 7, and 8 were on there.

**Q. Okay. So nobody alerted you from the company, from Abacus, that this had been posted on the investor website.**

A. Not that I recall.

**Q. All right. Once you saw it on the investor website, what did you do next?**

MR. ZUCKERMAN: Sheila, do you think, seeing you're moving on, we could actually take a break now? It's been quite a while. I know there's a question pending, but --

MS. ORETSKY: Yeah, let me just finish the question. He can answer this and then we'll take a break.

MR. ZUCKERMAN: Okay.

MS. ORETSKY: It would be nice if we could take breaks, like, once a topic is closed.

MR. ZUCKERMAN: Seemed like you were moving on to reaction. Like, the last time I asked for a break, we were on the posting part, and now you're moving to reaction. That's why I asked to go.

MS. ORETSKY: No, the topic -- the whole topic is the posting of it, and I've got

several questions about it.

BY MS. ORETSKY:

**Q. So what did -- what -- what did you do next?**

A. I contacted Jeff and told him that the board deck had been posted and that he needed to take the deck down and get in contact with ICR to take the deck down.

**Q. Okay. How did you contact him?**

A. I believe I called him on my cell.

**Q. And did you -- how long was that conversation for?**

A. Not very long. Just, effectively, what we just spoke about. I was going meeting to meeting. I had a full day of meetings that day in New York.

**Q. Did you discuss it with anybody else?**

A. Meaning that day, or that moment, or ever?

**Q. That day.**

A. Okay. That day -- and -- and forgive me, I don't -- I can't remember if it was that day or the next day that I reached out to Bill and Chris specifically about Slides 6, 7, and 8, because it was -- the concern was we'd given forward guidance, and this is an -- an SEC concern, and I believe at that point, you know, they were -- you know, we



8108294d-b0ea-4811-8f29-be81af2a5e5f

needed to get in contact with our law firm to discuss what our options were.

**Q. Okay.**

MS. ORETSKY: All right. Let's -- we can take the break now.

THE WITNESS: Okay. Thank you.

THE VIDEOGRAPHER: We're off the record at 4:04.

(Thereupon a brief recess was taken, after which the following proceedings were had:)

THE VIDEOGRAPHER: We're back on the record at 4:19.

BY MS. ORETSKY:

**Q. Okay. So before we went on break, we were talking about the posting of the board deck onto the investor website. I do want to show you your Interrogatory responses.**

MS. ORETSKY: Tab 25. We'll mark these as Exhibit 16 to the deposition.

THE WITNESS: Okay.

(Thereupon a document was marked Plaintiff's Exhibit 16 in the proceeding.)

BY MS. ORETSKY:

**Q. And I'm going to take you to Interrogatory Number 6. We asked you about the circumstances**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**under which the board deck was published to the website.**

A. Yeah.

**Q. And the website that was provided in this Interrogatory answer was IR.AbacusGM.com.**

A. Right.

**Q. Is that incorrect, or is that correct?**

A. Yeah, on that date -- and I'm sorry. Could you scroll up to the website again just to make sure I'm looking at the right -- oh, there it is. I see it. Yeah, that's our current investor website that I -- I believe the prior information on the AbacusLife.com, because it was IR.AbacusLife.com, I believe that that is a forward to that one today. So I don't -- I don't know website registration law here. Just that I -- as I understand it, everything that would have happened from the time that we were public would be on, you know, AbacusGM.com, which is what it is today, and AbacusLife.com would have been wrapped into and/or forwarded to that website. So I don't know if that's technically defined as one and the same, but that's -- you know, all the data is there.

**Q. Okay. Let me just ask the question --**

A. Okay.



8108294d-b0ea-4811-8f29-be81af2a5e5f

**Q. -- one more time. I just want a simple answer.**

**The website that the board deck was posted on, was it IR.AbacusGM.com?**

A. No, because we -- we weren't known as Abacus GM at that time.

**Q. Okay.**

A. The website would have been AbacusLife.com -- IR.AbacusLife.com.

**Q. Thank you. Do you know how long the board deck remained on that website?**

A. Off the top of my head, I don't -- I don't have the exact hours, but, you know, I think it would have been, you know, less than 24, but I -- I don't have that exact information here in front of me.

**Q. Do you know why Mr. Smith sent the board deck to ICR?**

A. I don't have a definitive response exactly why he did, with the premise that he was, as part of marketing, would have sent our deck to be posted post board meeting as -- as a practice. We had only had -- that was our second board meeting as a public company, so that practice was fairly new.

**Q. He would have sent the board deck to be**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**posted as a matter of practice?**

A. Sorry. I -- I said that incorrectly. He would have sent -- well, he would have sent the investor deck or shareholder deck to the IR website.

**Q. But that -- there was not one prepared at the time; was there.**

A. Not yet, no.

**Q. Okay. So then -- so why did he send the board deck?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I think that -- and -- and I think we've said this in our statement here, is that, you know, he -- he made a mistake.

BY MS. ORETSKY:

**Q. Did anybody tell him to send the board deck?**

A. Not that I'm aware of.

**Q. Was there any other reason why Abacus would have wanted the board deck posted on its investor website?**

A. No. As I've stated, we had forward-looking statements specifically around our forecasted earnings, our potential forecasted earnings within that deck, including our business



8108294d-b0ea-4811-8f29-be81af2a5e5f

plan.

**Q. I understand that that's your testimony right now --**

A. Okay.

**Q. -- but my question is: Was there any discussion with anybody that you -- that you've heard of or that you're aware of where there was some reason that they wanted Mr. Smith to send this board deck to ICR to be posted on the investor website?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: It would have been seen as not the board deck, but to post a deck post earnings, but I -- I don't know if ICR or anybody had said, Jeff, we -- you know, we need to post this. I'm not aware of any instructions that were provided to him directly.

BY MS. ORETSKY:

**Q. No, I mean, in fact, the instruction was from Mr. Smith to ICR to post the board deck --**

A. Yeah.

**Q. -- right?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: Again --

BY MS. ORETSKY:

**Q. Is that right?**

A. -- based upon that e-mail, that would be correct.

**Q. Okay. So your testimony is, as you sit here today, you were not aware of any reason whatsoever why Abacus would have wanted the -- and I know what you're testifying to today, and I'm not -- I'm not saying you were involved or not involved. I'm just saying: As you sit here today, you are not aware of any reason why Abacus would have wanted to have that board deck posted to its investor website.**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: Correct.

BY MS. ORETSKY:

**Q. So you have not learned anything post -- post the posting of the board deck that would give us some context as to why it was posted on the investor website.**

A. Just that it's normal practice for a company to post a deck, not the board deck.

**Q. Okay. And do you know how many people viewed the board deck on the -- on the investor website?**

A. I -- I don't have that exact number. Jeff would have had that information as -- as he was trying to solicit that information. So I don't have the exact number. I -- I understood that I think there were eight that had downloaded it. Seven were Abacus people.

**Q. How did he know that?**

A. I believe he could see the IP addresses for the download, but you would have to ask Jeff. And maybe you did. I don't know.

**Q. Did you ask him at the time to actually investigate who clicked the board deck?**

A. I did.

**Q. Why did you ask him to do that?**

A. I just wanted to know who had viewed it, specifically because we had forecasted guidance and earnings, and we wanted to see, you know, what the potential impact was of having our guidance out.

**Q. And how would -- how would the information as to who actually viewed it be helpful to you?**

A. I think that it would just help in getting an idea of the scope of who had seen these earnings and potentially downloaded the deck.

**Q. Do you know -- are you familiar with a company named Notified?**



8108294d-b0ea-4811-8f29-be81af2a5e5f

A. Notified. Apologies. Not off the top of my head.

**Q. Okay. So Mr. Smith was at the board meeting on November 9th; right?**

A. He was in attendance on November 9.

**Q. And he took the board -- that board deck that was presented at that board meeting and he sent it to ICR to be posted; is that right?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: He sent it to ICR, yes.

BY MS. ORETSKY:

**Q. And did he ever give you an explanation as to why he would do that after he sat through a November 9th board meeting that clearly contained confidential information belonging to everybody?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: The only issue I have with your question was on the "everybody." Is that there are parts of the board deck that are confidential and parts that aren't that -- that would have been in the investor deck either way. So that's -- that's all I'm suggesting. And that Jeff was just, I think, simply acting on the idea that a basic protocol post board meeting for a public



8108294d-b0ea-4811-8f29-be81af2a5e5f

company is -- is to post a deck.

BY MS. ORETSKY:

**Q. So he just didn't know better; is that -- is that --**

MR. ZUCKERMAN: Objection --

BY MS. ORETSKY:

**Q. Is that what I understand you're saying?**

A. That -- that could be a -- a reason is that he, potentially, didn't have -- I don't think he did anything with bad intentions here. I think, you know, maybe he didn't know better or maybe he was uncertain. But, yeah, I think he was doing his best to follow what a public company would typically do, which was put your deck up a few -- you know, a reasonable time after your board meeting.

**Q. What was Mr. Smith's role at the time that he sent the board deck to ICR?**

A. Yeah, he was our vice president of marketing.

**Q. And what's his role now?**

A. Chief marketing officer.

**Q. So he's been promoted since he posted the board deck on the investor website?**

A. Our company's grown 3X. He's -- he's been

a significant part of that growth.

**Q. Did Abacus have any controls in November of 2023 to keep board materials off the public internet?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: We had our general counsel, Chris Romaine, that would have potentially weighed in on a control basis. In addition to that, we were using a third party for our postings and public relations firm that we had trusted to help us manage and better understand public relations and -- and -- investor relations, sorry, investor relations and, specifically, our website that was a third party, ICR.

BY MS. ORETSKY:

**Q. So the PR firm that you were testifying to, are you referring to ICR, or is that somebody else?**

A. Sorry. Yeah, there was no PR firm. I incorrectly said PR. I corrected it to ICR -- or, excuse me, IR, which was ICR; that's correct.

**Q. All right. So did Jeff speak at all to Chris before he told ICR to post this board deck?**

A. I don't know. I don't -- I -- I don't



8108294d-b0ea-4811-8f29-be81af2a5e5f

have any recollection whether he spoke to Chris or not. Again, I was out of the office, so I wasn't privy to communications at the time when that occurred.

**Q. Okay. But if I understood your testimony, the -- the three controls that you had in place were Chris, Mr. Smith himself as the VP of marketing, and ICR.**

A. I think that's fair.

**Q. Okay.**

A. Yeah.

**Q. And -- and everyone failed to identify that this board deck should not have been posted on the investor website.**

A. That's correct.

**Q. Okay. Let's take a look at an e-mail on -- it was sent on November 15th. It's Tab 26. It's Abacus 0001630. And you're not on this e-mail, but it's from Mr. Smith on the 15th to Marissa Young, and the subject line is, "Board Deck." And it says, "Hey 911 here."**

A. Got it.

**Q. Do you see that? Yeah.**

A. I do.

**Q. Does 91 -- I'm sorry?**



8108294d-b0ea-4811-8f29-be81af2a5e5f

A. I see it.

**Q. Yeah. And "911" indicates there's some sort of an emergency; right?**

A. Yes.

**Q. Okay. And he says, "Let's get that 3Q board deck pulled ASAP."**

**And would it be fair to assume that this was after the conversation that you had with him?**

A. Yes.

**Q. And he says, "Sorry about that it's not ready to go up yet, Replace it with the 2Q deck we already had up."**

**Do you know why he was telling her to replace it with the 2Q deck?**

A. You know, I -- it's speculation, but I believe that he was putting in the 2Q deck as a replacement for the board deck and to -- to have information that was still going to be on the IR website.

**Q. Okay. All right. Let's take a look at paragraph -- sorry, what we're going to mark as exhibit --**

MS. JUNGER: You didn't mark that last one.

MS. ORETSKY: Oh. The last one is going

to be marked as Exhibit 17.

(Thereupon a document was marked Plaintiff's Exhibit 17 in the proceeding.)

MS. ORETSKY: And we'll mark the next one as Exhibit 18. 27. Tab 27.

(Thereupon a document was marked Plaintiff's Exhibit 18 in the proceeding.)

BY MS. ORETSKY:

**Q. And this is Abacus 001472 through 1473. And you are on these e-mails.**

A. Okay.

**Q. Okay? And this was an e-mail sent on November 17th. So three days post posting of the board deck.**

A. Okay.

**Q. And it's from you to -- I'm sorry. It's from Jeff Smith to Marissa Young and it copies you. And it says, "Public deck for IR site." And the subject line is, "Public Deck for Site." And he says, "I promise it's the right one this time."**

A. Yeah.

**Q. And that was sent at 4:38. And at 4:49, you sent back, how I read to be, a panicked, "Wait not yet!!!!", response.**

**Do you see that?**



8108294d-b0ea-4811-8f29-be81af2a5e5f

A. I do see that.

**Q. Okay. With three -- one, two, three, four exclamation --**

A. Four.

**Q. -- points.**

A. Yeah. I -- I'm -- I'm typically heavy on the punctuation, so --

**Q. And you say, "I will send."**

A. Correct.

**Q. Why did you want to send it yourself?**

A. It was just to ensure that we had the right -- right deck, and I wanted to do a -- an -- like, you know, a last review of -- of that deck.

**Q. Okay. All right. And was that, in fact, actually posted to the investor website?**

A. I believe so, yes.

**Q. Okay.**

A. With the -- and I -- I would want to see it to verify, but I believe that deck had the disclosures on it on the front page.

**Q. The -- you mean the 8 -- 8-K that you filed?**

A. A -- well, there was an 8-K filed, and then there was a disclosure on the front page of that deck which was reiterating what the 8-K said,

which was specifically around the fact we had posted guidance in Slide 7 and 8.

**Q. Okay. So let's take a look at what we're going to mark as --**

MS. JUNGER: Exhibit 19.

MS. ORETSKY: Wait one second. Yeah, Exhibit 19. And this is an e-mail. It's -- we're going to do Tab 30.

MS. JUNGER: You want me to pull it up now?

MS. ORETSKY: Yeah.

(Thereupon a document was marked Plaintiff's Exhibit 19 in the proceeding.)

BY MS. ORETSKY:

**Q. This is an e-mail from you to a bunch of people at Abacus.**

A. Yeah.

**Q. This is two days after the posting of the board deck on November 16th. And the subject line is, "Coventry knows about RR deal."**

A. Yeah.

**Q. So -- so you are referring to it as the RiverRock deal; is that right?**

A. "RR" would stand for RiverRock in this e-mail. And if you'll allow me, I'd like to



8108294d-b0ea-4811-8f29-be81af2a5e5f

explain the context, if that's okay.

**Q. No, I'm not asking about the e-mail. I'm just asking specifically --**

A. Oh, I see.

**Q. -- about the subject line.**

A. I see.

**Q. And -- and you are referring to it as the RR deal; is that right?**

A. I am referring that to the RR deal --

**Q. Okay.**

A. -- in that -- in that e-mail; that's correct.

**Q. All right. And you say here, "Somehow Coventry knows we are working on a deal with RR and Reid is flying out to see RR Friday."**

A. Uh-huh.

**Q. All right. Who's Reid?**

A. Reid Buerger is the CEO of Coventry.

**Q. Okay. And how did you find out that he was flying out to see RiverRock on Friday?**

A. Tony Annino had told me at breakfast that morning.

**Q. Okay. So this was the same day that you had breakfast with Mr. Annino in New York City?**

A. Correct.

**Q. All right. And then you write, "Super frustrating."**

A. Right.

**Q. All right. And -- and -- and you say, somehow, they know. So you --**

A. Correct.

**Q. At this point, you don't know how they knew; is that right?**

A. Correct. I was referencing this in this moment because I was so focused on what Anthony had said, my assumption was, was that Coventry learned that Abacus was involved in this deal, not necessarily that Coventry knows there's a deal, that Coventry knows Abacus is involved in conversations with RiverRock, and I was expressing my frustration about that, and that I was reminding some of the individuals who may have industry conversations with a lot of our people as we source policies that, you know, we're not -- you know, we shouldn't be discussing information related to, really, anything.

And my assumption here was that Coventry potentially learned of this -- that Abacus was involved from an industry participant.

**Q. Okay. So let's just look at the words**

**that you wrote on November 16th.**

A. Okay.

**Q. You say, "Super frustrating." Right?**

A. Uh-huh.

**Q. "I am hopeful that no one said anything to anyone even by accident."**

A. Right.

**Q. "This is non public information --"**

A. Right.

**Q. "-- and will impact our potential deal."**

A. Okay.

**Q. So you're referencing the deal with RiverRock when you say that; is that right?**

A. It's -- I'm referencing a potential deal, like a potential opportunity. That's -- it's -- and Coventry is an organization that would potentially cause us harm and impact in other areas of our business.

**Q. Okay. And then you say --**

A. And that's why I'm frustrated.

**Q. Yeah. Yeah, but you're talking about the RiverRock deal in this e-mail.**

MR. ZUCKERMAN: Objection to the form.

BY MS. ORETSKY:

**Q. Right?**



8108294d-b0ea-4811-8f29-be81af2a5e5f

A. I'm -- I'm actually referencing both more broadly, and any conversations that they have when I'm referencing things like, you know, meetings in the hallways or -- or -- or those kinds of things.

**Q. Okay. But the subject line is, "Coventry knows about the RiverRock deal." That's --**

A. That's correct.

**Q. All right.**

A. Yeah, yeah. That's --

**Q. And then you say --**

A. That's correct.

**Q. -- "Always remember, anything we say or materials used in the board meeting --"**

A. Uh-huh.

**Q. "-- or in the hallways is non public and we cannot tell anyone including our family."**

**Do you see that?**

A. I -- of course I see that.

**Q. Yeah. And this whole case is about this, specifically; isn't it.**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: No, it's not.

BY MS. ORETSKY:

**Q. No?**

A. This --



8108294d-b0ea-4811-8f29-be81af2a5e5f

**Q. My case --**

A. This -- because the focus of the materials used in the board meeting was our forward earnings and guidance. This wasn't about, you know, RiverRock. I say, "Always remember."

**Q. Mr. Jackson, I'm asking you about this e-mail. Please, I just need to move forward with the depo, so I just need to --**

A. I'm sure you do, but I have to be allowed to answer what I'm saying.

**Q. I'm asking you about this e-mail.**

A. Okay. And --

**Q. You're going off about your forward earnings and -- and all these things that I -- I'm asking --**

A. But that's what the materials in the board meeting references.

**Q. That's not what the subject line of this e-mail says. It doesn't say, "don't talk about my forward earnings." That's not what's in this e-mail.**

MR. ZUCKERMAN: Just wait for the question.

THE WITNESS: Okay. Is there a question, Sheila?



8108294d-b0ea-4811-8f29-be81af2a5e5f

MS. ORETSKY: Yeah.

THE WITNESS: Sorry. Is there a question?

BY MS. ORETSKY:

**Q. Yes, Mr. Jackson. The question is: This e-mail is referring --**

A. Uh-huh.

**Q. -- to nonpublic information that has been shared with Coventry and it having impacted the RiverRock -- RiverRock deal. Yes or no?**

A. No. Because this e-mail is referencing something else in a conversation I had with Tony. And my question was, to this group, was that did you share anything. And the response was from, I think, Matt replied no.

I -- I was under the assumption to ensure that someone didn't talk to someone else in the -- in the market.

**Q. Did you know that Coventry learned about this because of you posting it onto your investor website?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: No. That's not what I was told. I was told by Tony Annino at breakfast that Coventry had -- had learned of this opportunity and that knew we were involved

through the industry. We did not talk, and, quite frankly, I wasn't focused at all on the board deck posting because I didn't deem that as confidential information, that piece of it. The only confidential information that was the most important to me was Slide 6, 7, and 9 -- or 6, 7, and 8.

BY MS. ORETSKY:

**Q. Okay. Have you ever heard of an individual named Joshua Funt?**

A. I -- Joshua -- have I heard of him?

**Q. Yes.**

A. Or do I know him? I've heard of him. I believe he's an employee at Coventry.

**Q. Okay. Are you aware that he sent --**

**Well, let me ask you this. Do you know an individual named Denny Mathew?**

A. I don't know Denny. The only time Denny's name was brought up was from Tony Annino when Tony was talking about individuals that he felt like he -- that were going to potentially depart RiverRock anyways. So that was the only time I had -- I maybe met Denny once at a conference, and then Tony had brought him up.

**Q. Okay.**



8108294d-b0ea-4811-8f29-be81af2a5e5f

MS. ORETSKY: Can you pull up Tab 31?
MS. JUNGER: Yeah, I can. One second.
BY MS. ORETSKY:
**Q. Have you ever seen this e-mail before, Mr. Jackson?**
A. I don't think so.
**Q. Okay.**
A. I don't -- I don't recall seeing this.
**Q. All right. Well, this is an e-mail from Mr. Funt to Mr. Denny Mathew, and it was sent on the day that you posted -- by, "you," I mean Abacus -- posted the board deck on its investor website, November 14th, 2023, and it was sent at 6:07 p.m.**
**If you scroll up, you'll see that the attachments to the e-mail are reflected in the forward, and it is the Board Deck 3Q Final, 11/9/23. Do you see that?**
A. I see that.
**Q. Is this the first time that you're learning that somebody at Coventry had viewed the board deck on the day that it was posted?**
MR. ZUCKERMAN: Objection to the form.
THE WITNESS: I -- I think I had -- I had heard that Coventry was potentially involved,



8108294d-b0ea-4811-8f29-be81af2a5e5f

but it's the first time that I have seen or processed this e-mail.

MS. ORETSKY: Okay.

THE COURT REPORTER: Sheila, are you marking that?

MS. ORETSKY: Yeah.

MS. JUNGER: Exhibit 20.

MS. ORETSKY: It's going to be marked as Exhibit 20.

(Thereupon a document was marked Plaintiff's Exhibit 20 in the proceeding.)

BY MS. ORETSKY:

**Q. Okay. Do you know if there's any other way that Mr. Funt could have gotten that board deck other than viewing it on your website?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I can't -- I can't speculate. I don't know.

BY MS. ORETSKY:

**Q. Are you -- do you think that it was anybody on your team that may have sent it to him?**

A. Again, I can't -- I can't speculate that, but it -- I can tell you that the e-mail we were talking about before was, you know, directed at our team, and so I -- I don't -- I -- I don't know. I

can't -- I can't say somebody did or didn't send something. How Josh, specifically, acquired that deck, I don't know.

**Q. Okay. So you haven't heard anything about somebody sending it to him, is what you're saying.**

A. I -- I -- I have not heard specifically that an individual at our company or if someone else may have -- may have sent it to him. I don't know.

**Q. Okay. Do you know that Mr. Mathew quit RiverRock shortly after receiving that board deck from Mr. Funt?**

A. I don't know. What was -- can you help me better understand "shortly"? Like, when did Mr. Mathew resign?

**Q. I have -- I have to answer the questions here.**

A. Okay. Sorry. I -- I just -- I -- because I just don't -- I don't know. I don't know, shortly, what that means.

**Q. Well, did you know that Mr. Mathew resigned?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: Did I know that he resigned at the time that -- like, when did Mr. Mathew



8108294d-b0ea-4811-8f29-be81af2a5e5f

resign?

BY MS. ORETSKY:

**Q. I'm not asking about a time frame. Did you know that --**

A. Oh.

**Q. -- Mr. Mathew resigned?**

A. Only through public forums through the industry, they had said that Mr. Mathew resigned. Tony Annino had told me Mr. Mathew was already resigning.

**Q. He told you --**

A. Early in our conversations.

**Q. On November 16th; right?**

A. No. He had said that -- when he was talking to me about -- gosh, it would have been before then when we were talking about his case study, he had -- he had talked about that, hey, you know, there -- there are others that are going to potentially leave RiverRock, including Denny.

So I -- I don't know when, how, what Denny's situation was in relationship to resignation, but Tony Annino had told me in advance of that that there were others that were unhappy and that were going to be leaving RiverRock.

**Q. Okay. So was that in writing?**

A. No, we had talked about this on the phone.

**Q. So that part of the case study was just verbal.**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: We spoke often on the phone, Tony and I did.

BY MS. ORETSKY:

**Q. Let's take a look at what we're going to mark as Exhibit 21. Tab 44.**

**(Thereupon a document was marked Plaintiff's Exhibit 21 in the proceeding.)**

BY MS. ORETSKY:

**Q. Okay. And this was -- so we got dumped a bunch of text messages last night for the first time. And just for the record, yeah, at 11 p.m. We reserve the right, obviously, to continue this depo when we have had an opportunity to review these text messages.**

**But I wanted to ask you: When was the first time --**

MR. ZUCKERMAN: Sheila, we gave you the chance to move this deposition to a time when you could review the text messages. You chose to start today. Just I want to get that on the record.



8108294d-b0ea-4811-8f29-be81af2a5e5f

MS. ORETSKY: We gave you the chance to produce the text messages and comply with your discovery obligations --

MR. ZUCKERMAN: And we did.

MS. ORETSKY: -- when discovery was first served.

MR. ZUCKERMAN: You have them right now.

MS. ORETSKY: And now, years later, we're sitting here getting text messages on the eve of the depo. That's not our fault. That's a creation of your own making.

MR. ZUCKERMAN: It's the eve of the depo because you wanted to take it today. Just don't --

MS. ORETSKY: Well, this has been noticed for a long time, and your discovery -- the discovery requests have been outstanding for a long time. You chose to dump them on us last night, so don't -- don't turn this on us.

BY MS. ORETSKY:

**Q. Mr. Jackson, when was the first time that somebody asked you to look for text messages on your phone?**

A. I don't -- I don't know.

**Q. You don't know?**



8108294d-b0ea-4811-8f29-be81af2a5e5f

A. No, well, we -- I don't. I don't have an actual record of -- of what these were and what these weren't. We had a -- a prior law firm initially engaged here, so I couldn't tell you --

**Q. I'm not asking the prior firm. I'm asking, any firm, any lawyer, anybody.**

A. Uh-huh.

**Q. Who asked -- when -- when did they ask you to look for text messages on your phone? That's what I'm asking.**

MR. ZUCKERMAN: And I'll just ask you to not divulge attorney/client communications.

THE WITNESS: Yeah. I don't -- I don't know. It -- it would be a conversation I would have had with our attorneys, and those are attorney/client conversations.

BY MS. ORETSKY:

**Q. No. No, no, no, no. When somebody asked you to look for text messages on your phone --**

A. Uh-huh.

**Q. -- is not attorney/client communication. When was --**

MR. ZUCKERMAN: You can --

BY MS. ORETSKY:

**Q. When was the first time that somebody**

**asked you to look for text messages on your phone?**

A. I don't know.

**Q. Was it last week?**

A. I don't know.

**Q. Was it two weeks ago?**

A. I don't know.

**Q. How do you not know when somebody asked you to review text messages on your phone?**

A. I don't know.

**Q. We're going to move to compel an answer to that response.**

**Let me ask you this: Did you hand your phone over to anybody to retrieve text messages from your phone?**

A. Ever? We -- we --

**Q. With respect to this case, Mr. Jackson.**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: Okay. Well, yeah, I -- I'll continue with my same answer; right? I don't -- I don't know. Like, we -- we had -- we keep these things, and I don't know when, how those requests would actually happen and when, but --

BY MS. ORETSKY:

**Q. Mr. Jackson, how many cellphones do you**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**have?**

A. Just one.

**Q. And you use it for both business and personal reasons?**

A. I can, yeah, I do.

**Q. Do you? Not can you. Do you use it for both personal and business purposes?**

A. I do.

**Q. Okay. When -- was there ever a time when your cellphone was no longer in your possession for a period of time?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: It's an odd question. I've lost my cellphone several times.

BY MS. ORETSKY:

**Q. You know what I mean, Mr. Jackson. Did you hand your phone over to somebody to retrieve text messages for purposes of complying with your discovery obligations in this case?**

A. In this case. Again, I don't recall the date when that happened. Sorry.

**Q. Was it last week?**

A. I don't --

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I don't recall when that



8108294d-b0ea-4811-8f29-be81af2a5e5f

happened. I'm not -- I just don't recall when that happened. Sorry.

BY MS. ORETSKY:

**Q. You don't remember if last week you handed your telephone to somebody else for purposes of retrieving text messages from your telephone. That's your testimony.**

A. That is my testimony.

**Q. Do you have memory issues, Mr. Jackson?**

MR. ZUCKERMAN: Sheila, again, this is about the sixth time you've raised your voice. It's not called for.

MS. ORETSKY: I'm not raising my voice. I'm trying to understand your client's testimony throughout the entire day that makes no sense whatsoever.

BY MS. ORETSKY:

**Q. Do you have memory issues?**

A. Not that I'm aware of.

**Q. Are you on any medication that impairs your memory?**

A. No.

**Q. Do you know if anybody else at Abacus was asked to search for text messages or to surrender their phone for purposes of searching for text**

**messages?**

A. I don't know.

**Q. Who would know the answer to that question?**

A. Our attorneys.

**Q. Who was the point person at Abacus for purposes of responding to discovery requests?**

A. We have a number of attorneys. I would have to get back to you on who was in charge of that.

**Q. So you don't know the answer to that as you sit here today.**

A. Correct. I -- I don't. It -- we have a number of attorneys who work with us.

**Q. All right. Let's take a look at Tab 44.**

MS. JUNGER: That was what we're on; right?

MS. ORETSKY: Yep.

BY MS. ORETSKY:

**Q. All right. These are text messages with Mr. Annino --**

A. Okay.

**Q. -- that were produced last night, and the date is November 16th, 2023. Do you see that?**

A. I see, yeah, Thursday, 16th November 2023.



8108294d-b0ea-4811-8f29-be81af2a5e5f

I see that.

**Q. And you're sending an e-mail on the 16th -- or you're sending a text message. And you say, "Great. I don't know him." I don't know who you're referring to. "We had a good meeting tonight. And will catch you up in the morning."**

**What are you referring to?**

MR. ZUCKERMAN: Objection to form.

THE WITNESS: Are you referencing the person, or are you referencing, "good meeting tonight"?

BY MS. ORETSKY:

**Q. The good meeting.**

A. I was in town doing investor meetings.

**Q. And you were going to catch Mr. Annino up in the morning about your investor meetings?**

A. Just we were -- it was a general term. We were going to catch up in the morning. And will catch up in the morning. Like, he and I just catch up. Not specific to investor meetings. We're just catching up.

**Q. Again, the words on -- that you wrote matter, Mr. Jackson, and you wrote --**

A. Sure.

**Q. -- "And will catch you up in the morning."**

**After --**

A. Yes.

**Q. -- you tell him about, "a good meeting tonight." What are you referring to?**

MR. ZUCKERMAN: Objection to the form.

BY MS. ORETSKY:

**Q. Not, I'm going to catch up, we're going to catch up in the morning, but I'm going to catch you up in the morning. What --**

A. No, it's --

**Q. -- does that mean?**

MR. ZUCKERMAN: Objection to the form.

MS. JUNGER: I'm, literally, just saying to him I'm going to catch him up in the morning. We had -- we had a good meeting tonight. We had met with -- we had done investor meetings all day and had a dinner meeting that night, and then I'll catch you up in the morning. That's a separate -- there's a period, and then that's a separate statement.

BY MS. ORETSKY:

**Q. Catch him up on what?**

A. Just catch up. Right? Like, you -- you know, you catch up with somebody. How are you?

Great. I'm doing fine. How is your family?

**Q. Okay. All right. Let's move down. All right. So you have breakfast with him, and then you send a text message saying, "Great seeing you today. Appreciate your feedback."**

A. Correct.

**Q. What feedback was -- was he giving you?**

A. He was chatting with -- I -- over breakfast, the feedback was on, if I recall, was more on he has experience in markets, and he was sharing some of his experience with investment bankers and other people potentially on Wall Street.

**Q. And then you say, "Just finished our coverage meetings."**

**What are coverage meetings?**

A. Coverage meetings would be research analysts. These are people who cover our stock.

**Q. You said, "Went well."**

A. Uh-huh.

**Q. "Regardless of how the RR piece goes --"**

A. Okay.

**Q. Is "RR" RiverRock?**

A. Yes.

**Q. "-- I want you to know that I would still**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**like you to be an advisor for us. Would love to do the RR deal but if it goes to someone else I still want to work with you."**

**Do you see that?**

A. Yeah.

**Q. Okay. So -- so he's not selling himself to you in these text messages. You're telling him, I'd love for you to work with us. Did I --**

A. No, but --

**Q. -- read that correctly?**

A. No. He is saying that he wanted to be an advisor and work for us, and I'm saying, regardless of what happens, this -- you know, RiverRock is an add-on or not, I'd still love -- love for you to be a part of what we're doing. I -- that was just a continuation of this potential employment conversation.

**Q. Is there any communication that you've produced in this lawsuit where Mr. Annino says, "I really want to work for Abacus"?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I believe we spoke about that verbally, and then here I'm affirming it.

BY MS. ORETSKY:

**Q. Okay. And you also say, "Would love to do**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**the RR deal;" right?**
A. I -- I do say that, yeah.
**Q. Yeah. So as of November 16th, 2023, you really wanted to do the -- the RiverRock acquisition.**
MR. ZUCKERMAN: Objection to the form.
THE WITNESS: But it could also go to someone else. It wasn't that important. It could -- we could do it or it could go to somebody else. The premise of this was that I still want to work with you.
BY MS. ORETSKY:
**Q. You say, I would love to do the PR deal.**
A. I also say that it could go to someone else.
**Q. I mean, the RR deal.**
A. I also say --
**Q. But --**
A. -- it could go to someone else.
**Q. That's not what you say, sir. You said, "but if it goes to someone else."**
A. Yeah, it --
**Q. "But if it goes to someone else."**
A. I -- I think that, you know, we're splitting hairs here. The intent of what I'm



8108294d-b0ea-4811-8f29-be81af2a5e5f

saying is, if it goes to somebody else, I don't care. I still want to work with you. It's just not that important to us.

**Q. Is that what you say in the text message, that the RR deal --**

A. It is. It's because I said it's --

**Q. -- is not important to us?**

A. Sorry.

**Q. Do you say the words, "the RR deal is not important to us," sir? Do you write that in your text message?**

A. I -- I say the word, it's okay if it goes to someone else.

**Q. No, you do not.**

A. That's what I say. Yes, I --

**Q. But -- but you -- read to me what you say there. Read to me --**

A. "But if it goes to someone else I still want to work with you." Meaning, it's not that big of a deal. This isn't an issue. We don't care.

**Q. Where do you say -- where did you read it's okay if it goes to someone else? You just testified that your text message said it's okay if it goes to someone else.**

A. Okay.

**Q. Where did you read that?**
A. "But if it goes to someone else I still want to work with you."
**Q. Okay.**
A. That's says to me what I'm saying is, is that I don't care.
**Q. All right.**
A. Doesn't matter. I still wanted --
**Q. That's what you're --**
A. -- to work with you. Sorry.
**Q. -- saying today, sir. That's what you're saying today.**
A. No, that's what I said.
MR. ZUCKERMAN: Objection to the form.
THE WITNESS: Sorry.
BY MS. ORETSKY:
**Q. What was the name -- what's Jose's last name that works for you at Abacus?**
MR. ZUCKERMAN: Objection to the form.
THE WITNESS: His name is Jose Garcia.
BY MS. ORETSKY:
**Q. Okay. And what was his role at Abacus?**
A. He was -- he is the CEO of Carlyle Funds based out of Luxembourg. So that's -- it's an affiliate.

**Q. Okay. And was he aware of the potential deal with RiverRock?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: No, not that I'm aware of. I don't -- I don't think so. Now, he may have known it through the market or through, kind of, other industry participants who were also looking at this deal. As we know, there's -- there were several participants looking at this deal who might have told him that, you know, there was an opportunity with RiverRock, but -- so I -- I can't confirm that.

BY MS. ORETSKY:

**Q. At some point in time, did you believe that Jose was the individual that told Reid from Coventry about the RiverRock deal?**

A. I wasn't sure. I was speculating. I -- you know, whether it was Jose or someone else, it was industry conversations that Jose had and he was engaged with a lot of people in the industry.

**Q. But you did communicate to somebody that you thought it may have been Jose that told Reid; right?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: Yes, I believe I -- I can't



8108294d-b0ea-4811-8f29-be81af2a5e5f

remember who I communicated that to. It sounds like you have that communication, and if you want to pull it up, I'm happy to acknowledge it.

BY MS. ORETSKY:

**Q. All right. Let's take a look at -- yeah, Tab 46 -- what we're going to mark as Exhibit 22.**

**(Thereupon a document was marked Plaintiff's Exhibit 22 in the proceeding.)**

BY MS. ORETSKY:

**Q. So this is a text message between yourself and Mr. Annino on November 17th that was produced last night. It's -- and I'm using the -- there's two Bate labels on it again, but we'll use the top one per Alex's directive. It's Abacus 0003897 through 3902.**

**And Tony sends to you a screenshot of a text message that he was on with Lucas Siegel and Gabe Siegel, and he says, "Abacus posted your financials on their website on accident which is how the leak happened. They took it down."**

**Do you see that?**

A. I see that.

**Q. Okay. And he writes, "Just fyi."**

**And he said, "Caught some noise today but all**

**good. Let's get it done."**

**Do you see those text messages?**

A. Yeah, if you could scroll up, though. I'm trying to get a context.

MR. ZUCKERMAN: Sheila, can he read through this document?

THE WITNESS: I just want to read the one in front that you just showed me.

BY MS. ORETSKY:

**Q. The top one? Sure. It was --**

A. Sure.

**Q. -- an image that was being -- that was --**

A. Yeah.

**Q. -- screenshot, sent to you as a, "Just fyi."**

A. Got it. So it references that Coventry -- using our NDA for Coventry, which I thought was very interesting, but, okay.

MR. ZUCKERMAN: But can -- can he read through the whole thing before you ask him more questions? Because we don't have this one.

BY MS. ORETSKY:

**Q. Sure. There's not much left. Go ahead.**

A. Okay. Oh, you went the wrong way.



8108294d-b0ea-4811-8f29-be81af2a5e5f

**Q. No. We're scrolling down.**
A. I know. You're just too fast.
**Q. It was just the image, and then, "Just fyi."**
A. I see. Okay.
**Q. All right. So you write, "Holy shit."**
**You see that?**
A. Yeah.
**Q. Did you write that?**
A. I did. Apologies if that's offensive.
**Q. Doesn't offend me.**
A. Okay.
**Q. What warranted a, "Holy shit"?**
A. It was the -- I think the -- the image is what I was referencing there. And then I talk about, "Let me look into this." And Tony was saying to me, we caught some noise, but -- but it's all good. Like, this isn't an issue.
**Q. I think it just dropped off the screen. Give me one minute here.**
A. Okay.
**Q. All right. And you write -- okay. "Let me look into this."**
A. Uh-huh.
**Q. You had already -- you had already looked**

**into this; hadn't you?**

A. What I had looked into was, and been focused on, was the SEC part of the forward and guided earnings. I hadn't paid much of any attention to the remainder part of the deck, because the Slide 6, 7, and 8 were the ones that were the most important, and that's where -- when he sent this to me is why I said, "Holy shit." I -- I hadn't even put any weight or thought into the other pieces of this.

And I was then also, you know, reassured when Tony said, "all good." And he goes, again, "it's all good."

**Q. All right. Let me -- let me finish my questioning.**

A. Okay.

**Q. You say: They may have posted the board deck and not the public deck.**

A. Okay.

**Q. And what is -- and you write, "F me." What does "F me" mean?**

A. Do you want me to say that out loud? I don't want to offend.

**Q. Yeah. I just want to make sure I'm -- I'm understanding what it stands for.**



8108294d-b0ea-4811-8f29-be81af2a5e5f

A. I read "F me" as fuck me, and I'm referencing, again, 6, 7, and 8 of our board deck where I've got to deal with the SEC and file an 8-K.

**Q. But you're feigning --**

A. That's what I was saying.

**Q. -- ignorance about something -- you're feigning ignorance about something that you already knew --**

A. No, I was --

MR. ZUCKERMAN: Objection to the form.

BY MS. ORETSKY:

**Q. -- that you had already addressed --**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I was only focused on what was important in that deck. And that's why -- I -- I'm not feigning that at all. And, again, Tony says very clearly it's -- it's all good.

BY MS. ORETSKY:

**Q. "They must have posted the board deck and not the public deck."**

A. Okay. I -- I -- I said I had been on the road, and I think I've given you testimony to this.

**Q. This was three days after this was posted**

**on your investor website; right?**

A. I believe so. What was the date on this again?

**Q. November 17th.**

A. Yeah. So I was -- as I said, I was -- I was traveling, had not been back into the office. And it wouldn't have been three days for me. It would have just been a few days, and I was on the road. And I chatted with Tony already for breakfast also.

And so I was focused on, again, what was really important in this deck, which was our guidance that had been put out and our business plan. That's what mattered. And so, therefore, yes, I was frustrated. I was upset that our competitor, or people who weren't supposed to have that information, had it, and then I had to go back and file an 8-K with the SEC and -- and put a disclosure on it. And so Tony states it's all good.

**Q. And you say, "I am so sorry."**

A. Yeah, I -- I -- I was -- I was sorry that happened. It's just in general. You know, I -- I -- I didn't want to go through that. I had just dropped a couple of curse words that I'm not

entirely proud of.

**Q. That's -- okay. Let's -- why were you apologizing to Mr. Annino?**

A. Just, you know, look, I -- I am -- I am so sorry that he said he had taken some noise, but it's all good, and I was apologizing for that noise. And then he said it's all good.

**Q. Now, where does he say, I got some noise --**

A. I think it was up a little prior he talked about --

**Q. Okay.**

A. -- he caught some noise.

**Q. All right. So you say -- so you're saying, "I am so sorry," because he caught some noise, not because of the deck being -- being posted? Is that your testimony?**

A. Correct.

**Q. Okay. And -- and then you say, at 2:47, so about an hour -- almost an hour after the first text messages were exchanged, you say, "I appreciate it. I just confirmed. They accidentally posted our board deck instead of our public deck."**

**I mean, that's just a lie; isn't it, Mr.**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**Jackson.**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: That is absolutely not a lie. Remember, I was traveling. I had not been able to actually affirm while on the road. And so now I was back in the office and I was -- I was able to affirm what had happened.

BY MS. ORETSKY:

**Q. We just looked at the exhibits on November 15th --**

A. Uh-huh.

**Q. -- where you're telling Mr. Smith to take this down. You're the one in charge of the public deck. You're telling everybody --**

A. Yes.

**Q. -- to wait. And you're instructing ICR to post the public deck. How are you saying that this is not a lie, the text message that you sent?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: It -- it's two different conversations. One, I'm speaking to an internal personnel, and then, three, I'm speaking to somebody in the public. And so, you know, I had to wait until we spoke to our



8108294d-b0ea-4811-8f29-be81af2a5e5f

attorneys before we could affirm publicly.

So there's two different -- two different reasons for that conversation.

BY MS. ORETSKY:

**Q. I'm asking you, when you said, "I just confirmed. They accidentally posted our board deck instead of our public deck." You were lying when you wrote that.**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: No, I wasn't.

BY MS. ORETSKY:

**Q. Look at November 15th. We showed you this as exhibit --**

MS. ORETSKY: What was this exhibit?

MS. JUNGER: This was 17.

BY MS. ORETSKY:

**Q. "Presentation is removed."**

MR. ZUCKERMAN: Objection to the --

BY MS. ORETSKY:

**Q. "Waiting response to see if they can view who has clicked on it."**

MS. ORETSKY: Okay. No. Go back to the one where he's talking about --

MS. JUNGER: Sure. The 911 here.

BY MS. ORETSKY:



8108294d-b0ea-4811-8f29-be81af2a5e5f

**Q. The 911; right. These are all -- these are -- we just looked at these e-mails on November 15th. Do you see these e-mails?**

A. I do.

MR. ZUCKERMAN: These e-mails he's not on?

MS. ORETSKY: Doesn't matter. He knew all about them. I just asked him about them. And he directed Mr. Smith. It doesn't matter. My --

Point up -- point the one up about the --

THE WITNESS: I think it does matter.

BY MS. ORETSKY:

**Q. Mr. Jackson, you lied in a text message, that I just confirmed.**

MR. ZUCKERMAN: Sheila, what --

BY MS. ORETSKY:

**Q. I just -- I just confirmed.**

MR. ZUCKERMAN: Just -- just what is the lie? I -- I'm genuinely lost.

Also, objection to the form while we're here. It hasn't been more than an hour, but I wonder --

BY MS. ORETSKY:

**Q. Do you see this? "Wait not yet!!!! I will send." November -- that was on the day after**

**the public deck.**

MR. ZUCKERMAN: Objection to the form.

MS. ORETSKY: All right. Take it down.

BY MS. ORETSKY:

**Q. All right. And then you say, "I am really embarrassed and again truly apologize."**

**What are you embarrassed about?**

A. I'm embarrassed that our business plan got published with forward, forecasted earnings. That's what I was embarrassed about.

**Q. And why are you apologizing to Mr. Annino about that?**

A. Yeah, he -- because he had caught noise.

**Q. About your forecast?**

A. I -- I don't know what he caught noise about. You would have to ask him. But he's saying that he caught noise, and then he says it's all good. And so, from his perspective, he's saying it's all good. This isn't a problem.

**Q. Okay. So -- so you apologize twice and you say, "Holy shit," and your testimony is that in those text messages with the CEO of RiverRock, all you're talking about is those three slides that had to do with Abacus. That's your testimony.**

A. That's my testimony, and he says it's all



8108294d-b0ea-4811-8f29-be81af2a5e5f

good.

**Q. Okay. Thank you.**

MR. ZUCKERMAN: Sheila, could we take a break? It's been over an hour now.

MS. ORETSKY: Sure. Sure.

MR. ZUCKERMAN: Okay. We'll take -- this will be our last break, because I think -- what's the latest you can be here?

MS. ORETSKY: I'm sorry?

THE WITNESS: I mean --

MR. ZUCKERMAN: I'm sorry.

THE WITNESS: -- maybe 6:15.

MR. ZUCKERMAN: We'll go off the record now. And we'll make this a quick break. We'll come back at 5:30 if (inaudible) --

THE VIDEOGRAPHER: We're off the record at 5:23.

(Thereupon a brief recess was taken, after which the following proceedings were had:)

THE VIDEOGRAPHER: We're back on the record at 5:33.

MS. ORETSKY: All right. Can you pull up Tab 47?

I just spoke on mute for -- sorry about that. This is another text message, and we're



8108294d-b0ea-4811-8f29-be81af2a5e5f

going to mark this as Exhibit 23. It's between you and Scott Kirby on November 17th, 2023.

(Thereupon a document was marked Plaintiff's Exhibit 23 in the proceeding.)

BY MS. ORETSKY:

**Q. Do you recognize these text messages, sir?**

A. I believe so, yeah.

**Q. And just for the record, who is Scott Kirby?**

A. Scott Kirby is one of the co-founders and president of our -- in our origination channel.

**Q. Okay.**

THE COURT REPORTER: Origination what?

THE WITNESS: We originate policies, resource them from financial advisors.

BY MS. ORETSKY:

**Q. All right. He sends you a text message and he says, "So, Reid has a complete copy of our 3Q Board Presentation?"**

**Do you see that?**

A. I do see that.

**Q. And this is Reid at Coventry?**

A. That's Reid at Coventry; correct.

**Q. All right. And your response is, "Yes. I**

**am in a kids performance will debrief everyone later."**

**Then you write, "Big problems were RiverRock but I spoke to them and we are ok."**

**What did you mean by, "Big problems were RiverRock"?**

A. That Reid Buerger now knows that we're potentially involved in an opportunity with RiverRock.

**Q. Why is that a big problem?**

A. Well, Reid Buerger now knows our business plan, our financials, and has all of our company really pertinent information. And, specifically, it wasn't that Reid didn't know that RiverRock was potentially for sale; it's just that he knows we're -- we're -- we're involved. And having a competitor, you know, know that you're involved in things can create a problem down the road.

**Q. Okay. You don't say the big problems were your own financials, though; right? In this text message?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: In -- in that message, and it's a very brief text message, I'm -- I'm referencing that these are big problems and



8108294d-b0ea-4811-8f29-be81af2a5e5f

that he knows that we're involved with
RiverRock.

BY MS. ORETSKY:

**Q. Okay. You're -- you're actually stating, "Big problems were RiverRock;" right?**

A. Because he knows that we're involved with RiverRock.

**Q. Okay.**

A. But I spoke to them, and as we affirmed, Tony was okay. He say's, I'm -- I think he said, I'm good with it.

MS. ORETSKY: All right. Let's go to what we're going to mark as exhibit --

MS. JUNGER: 24.

MS. ORETSKY: Yeah, Tab 21. So this is Exhibit 24.

(Thereupon a document was marked Plaintiff's Exhibit 24 in the proceeding.)

BY MS. ORETSKY:

**Q. This is an e-mail from you on November 20th, 2023, to Mr. Annino, and you are copying your general counsel. And the subject line is, "Abacus Counter Draft Proposal." And in there, you identify a number of bullet points.**

**Do you see that?**

A. I don't think I caught it all. Could I see the whole exhibit?

**Q. Sure.**

A. Thanks.

MS. ORETSKY: Scroll up. There's a -- it's a whole e-mail chain.

THE WITNESS: You can scroll down. I'm just getting caught up on the whole exhibit, if you don't mind. Sorry.

BY MS. ORETSKY:

**Q. Did you review this e-mail as part of your deposition preparation?**

A. I -- I -- we looked at every possible e-mail. I -- I -- I am not able to memorize every single exhibit and e-mail, but I was familiar and I just wanted to affirm what this exhibit was. There were exhibits that had very similar e-mails on them, and so I was just trying to make sure that I was referencing in my mind the right -- the right information.

**Q. Okay. Are you ready?**

A. I believe so, yeah.

**Q. All right. So you see the --**

MS. ORETSKY: Scroll down to -- yeah, there we go.

BY MS. ORETSKY:

**Q. At the bottom, the very last bullet point, you write, "This gets this deal up to 6.5M assuming the performance assumptions are correct."**

**Do you see that?**

A. I do.

**Q. And then you write, "I want to be aligned with you and get this done."**

**Do you see that?**

A. I do.

**Q. Okay. And you're talking about the RiverRock acquisition; is that right?**

A. I'm talking about I want to be aligned with Tony, and the performance assumptions are what he can deliver. That's why he's getting equity in this deal. That's what I'm talking about.

**Q. Are you talking about getting the deal done with RiverRock?**

A. Well, with Tony.

**Q. Are you -- just answer my question. Are you talking about getting the deal --**

A. Sorry. I thought I was.

**Q. -- done with RiverRock?**

A. Well, is Tony RiverRock?

**Q. Are you talking about getting the deal**

**done with RiverRock? It's either yes or no.**
A. Okay.
MR. ZUCKERMAN: Objection to the form.
THE WITNESS: I -- I apologize. I'm not trying to frustrate you, but I believe earlier you said Tony was RiverRock, and I had said Tony. So I assumed that that was the right answer.
BY MS. ORETSKY:
**Q. Sir, is this about Project Water?**
MR. ZUCKERMAN: Objection to the form.
THE WITNESS: I -- I don't see Project Water on here, on this specific e-mail.
BY MS. ORETSKY:
**Q. Was the LOI about a deal with RiverRock; yes or no?**
MR. ZUCKERMAN: Objection to the form.
THE WITNESS: It was not about a deal. It was about an LOI is a nonbinding discussion.
BY MS. ORETSKY:
**Q. Sir, you were using the word "deal" --**
A. And so that would involve us and RiverRock. I'm just --
**Q. You were using the word "deal" --**
A. -- saying, you asked me about an LOI, and

I shared it.

**Q. You used -- you used the word "deal" --**

THE COURT REPORTER: I'm sorry. One at a time, please.

MR. ZUCKERMAN: Yes.

BY MS. ORETSKY:

**Q. You used the word "deal" multiple times in --**

A. Uh-huh.

**Q. -- communications that we reviewed.**

A. That might be considered shorthand in -- in this specific example, you asked me is the LOI. You didn't ask me about a deal.

**Q. Okay. All right. Let's move on.**

A. Okay.

**Q. Mr. Annino says to you, "I'm fine with structuring the transaction as you propose."**

**What transaction did you understand that he was referring to?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I think he's -- we were talking about the LOI.

BY MS. ORETSKY:

**Q. Okay. And then there was some discussion, and on November 21st, Mr. Annino sends you an**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**e-mail and copies Mr. Romaine, and he also copies Joel Shaw. Who is Joel Shaw?**

A. I -- I -- I would have to look that up. I don't know off the top of my head.

**Q. Did you know what -- who is Bernstein, Shur, Sawyer & Nelson, P.A.?**

A. Gosh, I -- I honestly don't know off the top of my head.

**Q. And then he writes, "Jay. Per our discussion, please amend the term sheet to reflect the following."**

**There's a number of bullet points. Do you see that?**

A. I see the e-mail and I see the bullet points.

**Q. Okay. And he says, "Let's push to get this done by year-end if possible. Once we get an executed term sheet, I'll move quickly with necessary consents/approvals on my end."**

**You see that?**

A. I do see this is his reply --

**Q. Okay. So as of --**

A. -- to the -- to the LOI.

**Q. So as of November 21, 2023, you are still negotiating the terms of a definitive agreement**

**with RiverRock.**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: We were still talking about the LOI and we had not come to any conclusion yet.

MS. ORETSKY: Okay. All right. Let's go to Tab 24. We're going to mark this as Exhibit --

THE COURT REPORTER: 25.

MS. ORETSKY: -- 25.

(Thereupon a document was marked Plaintiff's Exhibit 25 in the proceeding.)

BY MS. ORETSKY:

**Q. Okay. And we are backtracking a little bit here. And this is an e-mail from Mr. Annino to you. And this was before the e-mails that we just reviewed. And he said, "Great connecting in NYC - talk about a stroke of luck."**

**And he's got a couple of bullet points in that e-mail which he characterizes as a proposal.**

**And you write back, "Thank you Tony. Let me work on over the weekend. I like the alignment just need to work on the model related to net income and cost of capital associated with the cash outlay."**



8108294d-b0ea-4811-8f29-be81af2a5e5f

A. Uh-huh.
**Q. What model were you working on?**
A. We didn't have a model yet. We didn't have the financial information, so there was no model yet. That's what I said, you need to work -- we need to work on a model. We don't have one.
**Q. Okay. So -- so who was supposed to work on this model?**
A. At that point, it was early stage. This is about an LOI. So, you know, an LOI doesn't mean anything. An LOI is just simply a conversation around what --
**Q. Okay. I've heard about the LOI. I'm not -- I haven't asked anything about the LOI.**
A. Oh, okay.
**Q. I was just asking --**
MR. ZUCKERMAN: Don't interrupt. He's giving you his answer.
MS. ORETSKY: He's not answering my questions. He's wasting my depo time.
BY MS. ORETSKY:
**Q. Just answer my question, sir.**
A. I --
**Q. And then you --**
A. Go ahead.



8108294d-b0ea-4811-8f29-be81af2a5e5f

**Q. -- sent that e-mail that we just reviewed with all of the bullet points, okay, in response to this e-mail from Mr. Annino.**

MS. ORETSKY: Let's go to -- okay. Yeah, pull up 33, please. And this is Exhibit 26.

(Thereupon a document was marked Plaintiff's Exhibit 26 in the proceeding.)

BY MS. ORETSKY:

**Q. And you say, "Hi Tony." This on November 24th, 2023. "Attached is the updated LOI based on our last conversation. Please let me know if you have any feedback or if you want me to send an executable version."**

**Do you see that?**

A. Yes.

**Q. Okay. Did you send that e-mail?**

A. Yes.

**Q. All right. And the -- the numbers in the transaction structure, those numbers changed; is that right? In the LOI?**

MR. ZUCKERMAN: Objection to the form.

BY MS. ORETSKY:

**Q. And I'm -- I'm asking you with respect to the first LOI that we reviewed earlier in the deposition.**



8108294d-b0ea-4811-8f29-be81af2a5e5f

A. Could you pull up the first one for me just so that I can see side by side?

**Q. It doesn't matter. They speak for themselves, so we'll move on.**

A. Okay. Okay. Great. Thank you.

**Q. If I characterize this as the second LOI, would you understand what I'm referring to?**

MR. ZUCKERMAN: Objection to the form. Are you representing that it's the second LOI?

MS. ORETSKY: I'm going to -- yes.

BY MS. ORETSKY:

**Q. I'm going to represent that this was the second LOI that was sent to my client from Abacus. Do you have any reason to dispute that?**

A. I -- I can't think of a reason to dispute at this time. I don't know. So I -- if there would have been one, I don't have all the e-mails up side by side in front of me, but based upon what I see, I would -- I would assume this is the second LOI. I just -- I'm sorry. I -- I -- without them having chronologically in order, it makes it hard to a hundred percent confirm this was the second LOI.

**Q. Do you know how many LOI's were sent to RiverRock?**



8108294d-b0ea-4811-8f29-be81af2a5e5f

A. Again, not off the top of my head. I know that we had exchanged redlines, and I don't know if you're defining a redline as a new LOI or -- and so, you know, there was -- there was a couple of exchanges.

**Q. Were there more than three?**

A. Again, are you defining the redlines as separate LOI's?

**Q. I am.**

A. Okay. Then I believe we had more than three, including the redline exchanges.

**Q. Okay.**

MS. ORETSKY: Okay. We're going to pull up -- we're going to -- we're going to pull up Tab 2. This is going to be marked as Exhibit 26? 27.

THE COURT REPORTER: 27.

MS. ORETSKY: 27.

(Thereupon a document was marked Plaintiff's Exhibit 27 in the proceeding.)

BY MS. ORETSKY:

**Q. Okay. And then this is an e-mail from Mr. Annino to you, Chris Romaine, and Mr. McCauley, and it was sent on December 5th, 2023.**

**Do you see that, Mr. Jackson?**



8108294d-b0ea-4811-8f29-be81af2a5e5f

A. I do.

**Q. Okay. And he's responding to the e-mail that we just previously reviewed on November 24th, 2023, where you said, "Attached is the updated LOI based on our last conversation. Please let me know if you have any feedback or if you want me to send an executable version."**

**And you respond -- or he responds and says, "please find our latest turn of the LOI."**

**Do you see that?**

A. I do see that.

**Q. And he said, "We should be close. Please let me know if a call would be helpful."**

A. Okay.

**Q. Is this -- let's scroll down to the LOI.**

A. I apologize. Was there an e-mail above that that I responded to? I just want to make sure I see the whole exhibit.

**Q. You can look at the whole exhibit. There's --**

A. Okay.

**Q. That's it. It was just those two e-mails.**

A. Okay. Sorry.

**Q. Is this the -- is this the LOI that you say was the primary red flag for why Abacus didn't**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**close the deal?**

A. Again, this isn't about closing a deal. This is about an LOI --

**Q. Is this --**

A. -- to -- this was a redline located -- if you scroll down -- that they had made a number of changes to.

**Q. Which change was the primary red flag that you testified to earlier?**

A. Yeah, so if you keep scrolling down, I'll show you. It's the -- predominantly, the indemnification language.

**Q. Is that what we're looking at, "Survival; Tax Tru-Up; Indemnification"?**

A. Correct. They -- they removed that language and altered it significantly.

**Q. Okay. So they removed the $1 million in escrow, and they --**

A. Yes.

**Q. -- made some --**

A. Well --

**Q. -- revisions to --**

A. And all the language for it. Not just the million dollars, but all of the protections around what any of this might apply to.

**Q. Okay. So this was, to you, to Mr. Jackson, the primary red flag as to why you ceased exploring the acquisition of RiverRock; is that right?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: This was -- this was absolutely the primary red flag that we -- you know, they're going to remove all indemnification, there's no alignment, it -- everything else in this document is -- doesn't -- doesn't matter. Because they're -- they're not standing behind, potentially, even their business.

And so, for us, without this, we -- we decided that, you know, we would have to put this language back in, which is what I believe we did in response to this.

BY MS. ORETSKY:

**Q. Okay. So your testimony is that you actually put the language back in and sent another LOI to RiverRock.**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: That depends. There was -- there was a couple of these that they had done this to. So, you know, I would have to go



8108294d-b0ea-4811-8f29-be81af2a5e5f

back and look whether it was this version or whether it was a prior version, but we had put this -- they had taken it out before and we had put it back in and then they took it out again. That's -- that's what I recall.

BY MS. ORETSKY:

**Q. Okay. So we don't have any other LOI's other than the ones that we've shown you in our possession.**

MR. ZUCKERMAN: But that's --

BY MS. ORETSKY:

**Q. And that's a representation --**

MR. ZUCKERMAN: Objection to the form.

BY MS. ORETSKY:

**Q. -- that I'm just going to make to you.**

MR. ZUCKERMAN: That is a misrepresentation of the discovery in this case, but please go on with your questioning.

BY MS. ORETSKY:

**Q. And I actually don't have any record of a response, like of a later LOI. So I have no record of anything where you say indemnification -- the indemnification revisions were a problem. I don't have any record of that.**

**So can you tell me who you -- I think we**

**discussed this earlier -- who you relayed that information to at RiverRock?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: I don't have to. I'm under no obligation to tell RiverRock what our decision process is. We had sent them a document, they deleted it and materially changed it, and we no longer responded. That's -- the obligation then was, okay, we then start to look at other opportunities for us. Like, it's -- it's why continue to waste time. And I'm under no obligation to tell them --

BY MS. ORETSKY:

**Q. Okay. I didn't ask you whether you had an obligation, sir. I just asked: Who did you tell that --**

A. I --

MR. ZUCKERMAN: Objection to the form.

BY MS. ORETSKY:

**Q. -- that language was objectionable?**

A. In -- in the LOI. So whoever received that LOI would know this language is objectionable --

**Q. Okay. So you're telling me --**

A. -- because they removed it.

**Q. -- there was a subsequent LOI where you -- you rejected these redline revisions. Is that what you're telling me?**

A. That's what --

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: That's what I believe. But even more so, it doesn't matter. Even if this was the one, they changed the language. I don't have to move forward. They didn't agree to this very important indemnification language, and we don't have to talk anymore. That's that. Like, there's no -- we don't have to continue dialogue related to this.

MS. ORETSKY: Let me just show you what we're going to mark -- mark as Exhibit 28. Tab what?

MS. JUNGER: 4.

(Thereupon a document was marked Plaintiff's Exhibit 28 in the proceeding.)

BY MS. ORETSKY:

**Q. All right. So this is a complete e-mail chain, and this is Abacus 00081 through 82.**

**And so Mr. Annino sends you the latest turn of the LOI. You respond and you say, "Received - we**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**will review."**

**This was the following day that you responded.**

**December 7th, Mr. Annino follows up with you. He says, "Just checking-in. Please let me know if we should prepare an execution version."**

**And you respond on December 7th and say, "Tony, We've reached out to our board for feedback, which we do not expect until late next week at the earliest. Apologies for the delay."**

**Do you see that?**

A. But this is -- I see it, but that's not my response.

**Q. I'm sorry. Mr. Romaine wrote that.**

A. Okay.

**Q. Yeah. So nobody in this e-mail chain mentioned anything about the revisions to the indemnification clause; is that right?**

A. We don't have to. They've -- they've --

**Q. I didn't ask you --**

A. -- already made the changes.

**Q. -- if you had to, sir. I just asked you --**

A. All right.

**Q. -- did anybody mention them?**

A. No. Why would we?

**Q. Okay. So you've spent now months negotiating --**

A. Uh-huh.

**Q. -- the RiverRock deal, and at this point in time, you decide not to give any explanation as to why you are ceasing the communications. Because you basically started ghosting them, from what we can tell from the timeline.**

A. I --

MR. ZUCKERMAN: Objection to the form.

BY MS. ORETSKY:

**Q. And --**

A. Which --

**Q. -- nowhere do you actually say, we're not going to agree to this indemnification language and give them an opportunity to say, okay, we'll leave it as it is.**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: What is --

BY MS. ORETSKY:

**Q. And this is all --**

A. -- ghosting?

**Q. And this is all post your unauthorized --**

A. Is -- is ghosting --

**Q. -- posting --**

A. -- a legal term I should know about?

**Q. Can you stop interrupting my question?**

A. Sorry.

**Q. So -- so, Mr. Jackson, the revisions that my client made to the LOI that was submitted to you on December 5th, that was post your breach of the Confidentiality Agreement; is that right?**

A. On that date, that would be -- that would be post of us posting the board deck. I don't agree that we breached the Confidentiality Agreement.

**Q. Okay. And we have no record of any communication from Abacus that there were any issues with the revisions to the indemnification clause. This is actually the first time I'm hearing about it.**

**So -- so I'm -- I'm just asking: Was that ever relayed to anybody? I know you don't have to. I know that's what you're going to say. I'm just asking: Did you relay it to anybody at RiverRock?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: We -- we don't have to, and we -- we did not. We did not accept this as a potential change and moved on.

BY MS. ORETSKY:



8108294d-b0ea-4811-8f29-be81af2a5e5f

**Q. Okay. All right. When did you decide that you weren't going to do the deal?**

A. You know, first of all, you mean stop discussing the LOI, to be clear. And when we saw this indemnification language, we kind of felt like that was part of the final straw. We had chatted about it, and we just moved on, and there wasn't any need to continue to communicate.

**Q. So was that on December 5th?**

A. Gosh, I don't know the exact date, but -- when we had received this. I don't know what time we had received that, so it might have been shortly thereafter.

**Q. Okay.**

MS. ORETSKY: Well, let's pull this up. This is going to be marked as Exhibit 29.

(Thereupon a document was marked Plaintiff's Exhibit 29 in the proceeding.)

BY MS. ORETSKY:

**Q. And this is text messages that you're exchanging with Mr. Annino on December 8th. So three days after --**

A. Okay.

**Q. -- you received the LOI with the primary red flag revisions.**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**And Annino says, "I'm under a lot of pressure to get something done. Waiting until the end of next week doesn't really work. Lmk if you can push it."**

**And he's responding to a text where you said, "Unfortunately our timeline needs to include the board and could actually take --" "and could actually be longer. I understand if you need to go in a different direction."**

**So as of --**

A. Okay.

**Q. -- December 8th, am I -- is it my -- is my understanding correct that, as of December 8th, you had not made a decision not to move forward with RiverRock?**

MR. ZUCKERMAN: Objection -- objection to the form.

THE WITNESS: So I would say that that was three days after, and I was acknowledging that, go into a different direction.

BY MS. ORETSKY:

**Q. No, you were saying, "I understand if you need to go in a different direction." You weren't acknowledging --**

A. Okay.



8108294d-b0ea-4811-8f29-be81af2a5e5f

**Q. -- a different direction, sir.**

MR. ZUCKERMAN: Let her -- let her finish. Objection to form.

BY MS. ORETSKY:

**Q. No, so let's -- let's just be clear on what you wrote. "I understand --"**

A. Okay.

**Q. "-- if you need to go in a different direction." And my question was: At this point in time, did you already make the decision that you were not moving forward with the RiverRock transaction?**

A. I'm not sure. We had had some conversations, we were reviewing this. You know, I said shortly after. Shortly could be three days, could be four days, it could be five days. Like, we were contemplating at that. And at that time, I had said, I understand, I acknowledge if you need to move in a different direction. He had multiple offers, he had multiple companies looking at the deal. And this was for an LOI. This wasn't a deal. This was an LOI. This is a matter of whether we continue --

**Q. Okay. Thank you, sir.**

A. -- our conversations on the LOI. That's

it.

**Q. And what day was the article from The Deal published?**

A. I don't know.

MR. ZUCKERMAN: Objection to the form.

BY MS. ORETSKY:

**Q. You don't know?**

A. I don't know off the top of my head. I don't -- I'm not a --

**Q. Did you read the article?**

A. I am aware of that article, and so I don't specifically know the exact day.

**Q. Let's look at it.**

MS. ORETSKY: We're going to mark this as Exhibit 30.

(Thereupon a document was marked Plaintiff's Exhibit 30 Identification in the proceeding.)

BY MS. ORETSKY:

**Q. Okay. So the article that was written by Donna Horowitz, that was published on December 5th; right?**

A. Yes, December 5th.

**Q. All right. So that was the same day where you received the -- the LOI with the primary red**



8108294d-b0ea-4811-8f29-be81af2a5e5f

**flag language that you testified to earlier; right?**

A. Okay.

**Q. Is that right? Do you remember that?**

A. I -- we've talked about it, yes.

**Q. Okay. And this article says nothing about Slide 6, 7, and 8 of your board deck; does it.**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: What it says is that we had to file a disclaimer with the Securities & Exchange Commission, and I had told her that in my interview. You can subpoena her. And that was the first thing I said. And all she wrote was this piece here as a quote.

I was -- I had quoted her initially that our concern, why we filed the disclaimer with the Securities & Exchange Commission was because of Slides 6, 7, and 8. That is not what she put in the article, but that is -- I quoted her directly on the phone that that is why we filed the disclaimer with the Securities & Exchange Commission. I also said it wasn't a financial model and it's not actual data, just as I've said all day. This was a case study.

BY MS. ORETSKY:

**Q. So she misunderstood you --**
A. No, she just didn't quote it --
**Q. -- and wrote this article.**
**Let me just answer the question -- let me just ask the question.**
A. Okay.
**Q. So -- so she either -- she either falsified the quote or misunderstood you when she wrote this article; is that right?**
A. No, she just --
MR. ZUCKERMAN: Objection to the form.
THE WITNESS: She didn't put the entire quote in.
BY MS. ORETSKY:
**Q. Okay. And -- and -- and very similar to when your general counsel was writing the notes about the board minutes, he also just put the wrong words in.**
MR. ZUCKERMAN: Objection to the form.
BY MS. ORETSKY:
**Q. Right?**
A. No. These are two different people. This is a reporter versus -- versus Chris Romaine in two totally different circumstances. So, no, not similar at all.



8108294d-b0ea-4811-8f29-be81af2a5e5f

**Q. But same -- but same thing.**
A. No, it's not the same thing.
MR. ZUCKERMAN: Objection to the form.
BY MS. ORETSKY:
**Q. I mean, obviously, the RiverRock acquisition was newsworthy; right?**
MR. ZUCKERMAN: Objection to the form.
THE WITNESS: I don't know if it was newsworthy. I didn't write the article.
BY MS. ORETSKY:
**Q. Well, did you read the -- the -- this publication as part of your --**
A. No.
**Q. You never read it?**
A. No, did I read the publication, meaning was this, you said, regular way? Is that correct?
**Q. Yeah, regularly. Is this something that you would read on a regular basis, The Deal?**
A. This would not --
MR. ZUCKERMAN: Objection to the form.
THE WITNESS: This would not be a publication that I would read on a regular basis. It's behind a pay wall and required subscriptions and she wasn't somebody that I assigned a great deal of credibility to.

BY MS. ORETSKY:

**Q. Okay. Is it coincidental that you lost interest in the deal the day that this article was posted?**

MR. ZUCKERMAN: Objection to form.

THE WITNESS: There was no correlation between this article and them changing the indemnification language.

BY MS. ORETSKY:

**Q. I'll let you tell the Court that.**

MR. ZUCKERMAN: Sheila, you know about the December 3rd redline; right?

MS. ORETSKY: All right. Let's move on.

THE WITNESS: I guess not.

MS. ORETSKY: All right. Let's just -- I just want to organize myself for the last few questions. If we could just go off the record for two minutes.

MR. ZUCKERMAN: Yeah. We got 13 minutes left.

THE VIDEOGRAPHER: We're off the record at 6:09.

(Thereupon a brief recess was taken, after which the following proceedings were had:)

(Recording in progress.)

MR. ZUCKERMAN: There's 13 minutes --

MS. ORETSKY: Okay.

MR. ZUCKERMAN: You have 13 minutes left on the record.

MS. ORETSKY: So I've been advised that Mr. Jackson needs to leave by 6:30 to catch a flight, so I'm being rushed through this deposition now it the end, but we reserve the right anyway --

MR. ZUCKERMAN: There's 16 minutes until 6:30, then 13 --

MS. ORETSKY: By your count.

MR. ZUCKERMAN: -- minutes left on the record.

MS. ORETSKY: By your count, but --

MR. ZUCKERMAN: It was the videographer's count.

MS. ORETSKY: Let's just move forward.

BY MS. ORETSKY:

**Q. All right. Mr. -- Mr. Jackson, you used to work for RiverRock; didn't you?**

A. Yes. It was, I believe, Service Steel Warehouse at the time was the actual employer, and then it got shifted to RiverRock, and then we used ADP as the employment vehicle.



8108294d-b0ea-4811-8f29-be81af2a5e5f

**Q. Okay. And what were the circumstances under which you left RiverRock?**

A. They were pretty good. I -- I resigned. I was looking for an opportunity to potentially do some work around research, and ultimately ended up moving up to Boston.

**Q. Why did you resign?**

A. I think that the -- this was back in 2015, and I think that, you know, RiverRock was looking at a -- they just brought in a new management staff, a new CEO, and I had had some conversations with -- with Gabe at the time and, you know, felt like it was the right time for me to go -- go out and -- and resign.

**Q. And you and Mr. -- Mr. Gabe Siegel used to be friends; is that right?**

A. Yeah, we were very close.

**Q. Are you still friends?**

A. I have -- I have no ill will towards -- towards Gabe and his family.

**Q. Was there any falling out with respect to that friendship?**

A. No, not -- not specifically.

**Q. Okay. Have you ever been convicted of a crime?**



8108294d-b0ea-4811-8f29-be81af2a5e5f

A. Could you define how you reference a crime? Meaning just if you could explore or just share with me what you define a crime as. Is that misdemeanor? Is that --

**Q. Sir, I'm not -- you're not asking me questions. I'm asking you. You can --**

A. All right. Well, no, I just --

**Q. -- answer it based on how you understand it.** [redacted]

**Q. I didn't ask for the time frame, sir.**

A. Okay.

**Q. Just answer my questions.**

A. Well --

**Q. Have you ever had any issues with your -- with any -- do you hold any professional licenses?**

A. Currently, on licenses, I -- I don't have any current licenses that I -- that I still maintain.

**Q. Which ones did you previously hold?**

A. Previously, I had FINRA licenses, or a Series 7 and Series 6, and I believe it was Series 65.

**Q. Was there ever any complaint or any issue with respect to those licenses?**

A. No, not that I'm aware of.

**Q. Has any other member of the board of directors of Abacus been convicted of a crime, to your knowledge?**

A. Not to my knowledge.

**Q. Is there a messaging service that you use internally at Abacus? Like a -- like Teams, Microsoft Teams, or something of that nature?**

A. We have Zoom. We have Zoom Chat. I'm not active on it, but there's a chat or a service that comes with Zoom.

**Q. Do you know if anybody asked you to search your Zoom Chat function in response to our Request for Production?**

A. Again, I -- I'm not sure. I'm not aware. Again, I'm not an active Zoom Chat user.

**Q. Okay. So you were never asked to check any sort of Zoom Chat function that you may or may not have used.**

MR. ZUCKERMAN: Objection to the form.



8108294d-b0ea-4811-8f29-be81af2a5e5f

THE WITNESS: Not that I recall.
BY MS. ORETSKY:
**Q. In July of 2024, Abacus signed an agreement to buy Carlyle Management; is that right?**
A. I'm sorry. Could you repeat the date again?
**Q. July of 2024?**
A. That -- that sounds about right.
**Q. Okay. And when did --**
A. Well, let me go back. I apologize. I just want to make sure that I answer that correctly. In July of 2024, are you asking if we signed an LOI or a purchase agreement?
**Q. I'm asking: Did you sign an agreement to purchase Carlyle Management?**
A. We signed a purchase agreement in July of 2024.
**Q. Okay. All right. And I skipped over some background questions. I'm just going to go back to them.**
**Can you give me your testimony as to what line of business Abacus is in?**
A. Abacus has four verticals, four lines of business. We have our Abacus Life Solutions division line that is our originator of life

insurance contracts, as well as our acquirer of life insurance contracts. And then we have our asset management division, which would be the division that is responsible for managing investment funds. We have our private wealth division, which is currently just in build-out. We don't have any clients or assets in the wealth division. And then our final division is our Abacus intel division, which is where we maintain our data and our mortality verification businesses.

**Q. Okay. How is your business different than RiverRock's business?**

A. We are in a licensed origination company, meaning we have provider licenses. I don't know if RiverRock has those licenses. At one point when I was there, I believe they did have some provider licenses. I don't know if they maintain them after I had left. Been over a decade. But Abacus is a licensed provider in almost every state, meaning that we would source the policies either from the consumer or from their financial advisor.

That would be a primary differentiator. I can't speak to all of the -- you know, outside of the basics of RiverRock as I knew them where they were just running funds. But they may be doing



8108294d-b0ea-4811-8f29-be81af2a5e5f

other things. I have no idea.

**Q. Okay. And how would have the acquisition of RiverRock fit into the Abacus business model?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: We never got to a point where we were going to do due diligence and start to formulate what that integration and synergies could have looked like. So the only thing that we would have potentially looked at is at, potentially, if -- if they have their -- their current funds, maybe servicing would have been something that I think that we would have taken a look at. But other than that, it's -- it's hard to tell, because we weren't able to actually do full due diligence.

BY MS. ORETSKY:

**Q. So you represented to Donna Horowitz that the information on that deck was inaccurate; right? You used those words. You said it was inaccurate?**

MR. ZUCKERMAN: Objection to the form.

THE WITNESS: So if you could show me. I -- I believe I said it was a -- it was not actual data. Is that what you're referencing?

BY MS. ORETSKY:

**Q. You actually --**



8108294d-b0ea-4811-8f29-be81af2a5e5f

MS. ORETSKY: What tab?
MS. JUNGER: 53?
MS. ORETSKY: No. Go back. Pull it up. Pull it up on the screen. Can you show him where he uses the word?
MS. JUNGER: Inaccurate.
MS. ORETSKY: Okay. We're going to show you what's going to be marked as Exhibit 31.
(Thereupon a document was marked Plaintiff's Exhibit 31 in the proceeding.)
MS. JUNGER: The one starting with December 1st.
MS. ORETSKY: Yeah.
BY MS. ORETSKY:
**Q. So this is an e-mail from you to Donna Horowitz on December 1st, and you copy your inhouse counsel. Do you see that?**
A. I see it, yeah.
**Q. And the subject line is, "Please call about your purchase of RiverRock."**
A. I --
**Q. Yeah. Okay. You say here: As stated in our Form 8-K furnished to the SEC, certain of the information contained therein may be inaccurate and preliminary.**

**And if you go down, you say, "I strongly discourage you from disseminating the Disclaimed Document, as you will be engaging in dissemination of inaccurate information --"**

**Do you see that?**

A. I do see that.

**Q. "-- and potential fraud and market manipulation."**

A. I do see that.

**Q. What did you mean when you said -- when you said that?**

A. That was referencing Slide 6, 7, and 8 specific to the forecasted earnings where those were internal forecasts. And when you say, "fraud and market manipulation," she could be potentially putting out information related to our earnings, which could have an impact on stock price, and that would be market manipulation related to that.

MR. ZUCKERMAN: That's time. That's seven hours. He's not answering any more questions. We're done. We can go off the record now.

MS. ORETSKY: All right. I'm going to adjourn. I'm going to -- I'm going to seek leave to sit him down again based on the document dump that I received in the last

couple of days. So we will -- we'll ask the Court for leave to do that.

MR. ZUCKERMAN: We will oppose that, but --

MS. ORETSKY: That's fine. I'm just stating it on the record.

Well, thank you. Have a safe flight.

THE VIDEOGRAPHER: We're off the record --

THE COURT REPORTER: Wait.

THE VIDEOGRAPHER: -- at 6:28.

THE COURT REPORTER: I need read or waive. Mr. Zuckerman, read or waive?

THE VIDEOGRAPHER: I think they left.

THE COURT REPORTER: Mr. Zuckerman, read or waive?

MS. McCARTY: We're here. What's the question?

THE COURT REPORTER: Read or waive?

MS. McCARTY: Read, as in we're going to -- we want to read it. We have that. And I just want to reiterate again that this whole thing is designated highly -- or designated confidential under the parties stipulated Confidentiality Agreement. That's all.

THE VIDEOGRAPHER: We're off the record at



8108294d-b0ea-4811-8f29-be81af2a5e5f

6:28 p.m.

(Thereupon the taking of the videotaped remote deposition was adjourned.)

JAY JACKSON OF ABACUS LIFE, INC., n/k/a ABACUS GLOBAL MANAGEMENT, INC.

Sworn to and subscribed before me this

day of 2026.



8108294d-b0ea-4811-8f29-be81af2a5e5f

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

I, the undersigned authority, certify that JAY JACKSON OF ABACUS LIFE, INC., n/k/a ABACUS GLOBAL MANAGEMENT, INC., was duly sworn.

WITNESS my hand and official seal this day of July 27, 2026.

JAN L. BRONIS
Notary Public - State of Florida
My Commission expires: 5-16-2027
Commission No. HH 350118

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

I, JAN L. BRONIS, Registered Professional Reporter, certify that I was authorized to and did stenographically report the videotaped remote deposition of JAY JACKSON OF ABACUS LIFE, INC., n/k/a ABACUS GLOBAL MANAGEMENT, INC.; that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DATED this day of July 27, 2026.

JAN L. BRONIS, R.P.R.

CORRECTION SHEET

Re: Renegade Capital GP vs. Abacus Live, Inc.
Deponent: JAY JACKSON OF ABACUS LIFE, INC., n/k/a ABACUS GLOBAL MANAGEMENT, INC.
July 24, 2026

PAGE NO. LINE NO. CORRECTION OR CHANGE

________ ________ ______________________________
________ ________ ______________________________
________ ________ ______________________________
________ ________ ______________________________
________ ________ ______________________________
________ ________ ______________________________
________ ________ ______________________________
________ ________ ______________________________
________ ________ ______________________________
________ ________ ______________________________
________ ________ ______________________________
________ ________ ______________________________
________ ________ ______________________________
________ ________ ______________________________
________ ________ ______________________________
________ ________ ______________________________
________ ________ ______________________________
________ ________ ______________________________
________ ________ ______________________________
________ ________ ______________________________
________ ________ ______________________________
________ ________ ______________________________

______________________________
JAY JACKSON OF ABACUS LIFE, INC., n/k/a ABACUS GLOBAL MANAGEMENT, INC.

Sworn to and subscribed to before me this ______day of ___________, 2026 by _________________________ who produced_________________________ as Identification.

________________________________
Notary Public-State of Florida
My Commission No.
Expires:



8108294d-b0ea-4811-8f29-be81af2a5e5f

CHOICE-UNITED REPORTING SERVICE, INC.
REGISTERED PROFESSIONAL REPORTERS / VIDEOTAPE
DEPOSITIONS COMPUTER TRANSCRIPTION / LITIGATION
VIDEO TELECONFERENCING

Jan L. Bronis Registered Professional Reporter
Ft. Lauderdale (954) 525-2221

July 27, 2026

RE: Renegade Capital GP, LLC
vs. Abacus Life, Inc.

Quinn Emanuel
Attn: Alex Zuckerman, Esq.
Kathleen S. Messinger McCarty, Esq.
E-Mail: Alexzuckerman@quinnemanuel.com
Kathleenmessinger@quinnemanuel.com

Dear Mr. Zuckerman,

With reference to the remote videotaped deposition of JAY JACKSON OF ABACUS LIFE, INC., n/k/a ABACUS GLOBAL MANAGEMENT, INC., taken on July 24, 2026, in connection with the above-captioned case, please be advised that the transcript of the deposition has been completed and is awaiting signature.

Please provide a copy of the transcript to the deponent, or arrange to have the deponent stop by our office at 633 South Andrews Avenue, Suite 202, Fort Lauderdale, Florida, for the purpose of reading and signing the transcript of the deposition. Office hours are from 9:30 a.m. until 4:30 p.m., Monday through Friday.

PLEASE TELEPHONE IN ADVANCE

If this has not been taken care of, however, within the next 20 days or by the time of trial, whichever comes first, we shall conclude that the reading and subscribing of the deposition have been waived without further notice.

Sincerely,

BY: ______________________________
Jan L. Bronis, RPR



8108294d-b0ea-4811-8f29-be81af2a5e5f

**A**

**a.m** 1:16 6:3 51:21 344:19
**AA** 4:4,18
**AA000808** 3:15 137:6
**Abacus** 1:10,11,19,19 3:4,5,9,10,13,14,17 3:20 4:3,7,9,10,11 4:14,15,17,19,21,23 5:9,14 6:12 7:4,4,15 8:12,19,23 9:6,15 11:15,21 12:9,17 13:6 14:1 15:1,9,18 16:5,8,13 17:2,18 18:4,11 19:2,21 20:10 21:15 23:20 25:9,15 26:6,23 27:7 28:9,14 29:11 29:20 30:2,4,15 31:12 32:19 38:14 43:16 46:5 47:15 55:12 58:3 60:9 64:9 69:23 76:1,5 76:11 77:3,4,12 80:25 85:6,9 86:15 86:21,22 89:4,10,24 90:11,12,23 91:15 91:15 92:20 93:4,14 93:15 94:3 95:18 96:9 97:4,15 98:24 99:4 100:23 103:4 105:14 107:6 108:21 111:10,16 111:17 112:7,8,16 115:7 116:22,23 117:5,10 119:15 121:13,15 124:12 129:9,17,20 130:4 131:13,23 132:10 132:20 133:9,22 135:21 137:4 138:17 142:15,20 143:22 145:24 146:1,6,21 157:22 158:19,24 166:2 171:19,22 173:23 177:16 183:2,15 190:6 193:24 194:6 194:19 195:25 196:6 204:15,23 210:2 215:21 219:14,17 220:3,6 220:16 222:17 225:5,10,11 226:19 226:23 227:2,3,6,16 227:17 230:18,19 230:21,24,24,24,25 233:2 234:11 235:5 236:20,22 243:10 243:12,12,19 245:4 249:6 250:19 252:7 252:11 253:6 256:2 257:18 259:9 261:16 263:12,14 263:23 269:12 278:23 279:6 283:20 286:18,22 288:15,19 298:24 302:23 311:13 313:25 318:23 321:13 333:8,12 334:3,22,23,24 335:9,18 336:3 340:7,8 341:7,7 342:9,10 343:3,3,4 343:18,19 344:7,13 344:14
**Abacus'** 18:1,12 30:7 80:4 81:22 82:11 94:5 145:3 170:15 230:22 237:2
**Abacus_000794** 175:7
**Abacus_RiverRock** 111:20
**abacusgm** 108:22
**AbacusGM.com** 248:19
**AbacusLife.com** 243:1,4 248:13,20 249:9
**abide** 207:20
**abiding** 208:2
**abilities** 114:1
**ability** 68:21
**ABL** 198:23 201:8,9 213:3
**able** 44:6 73:2 103:5 164:1 169:24 202:15 295:5,7 303:14 336:15
**above-captioned** 344:14
**absolutely** 127:4 162:11 295:3 315:7
**absurd** 180:5
**accept** 321:23
**accepting** 48:14
**access** 50:2 109:17,23 110:6,13,17,25 125:5 126:4 138:9 138:12 139:3,14,23 140:13,20 141:18 187:19
**accessed** 45:16 46:16 46:20 109:21
**accessible** 243:4
**accident** 264:6 288:20
**accidentally** 294:23 296:6
**accomplish** 49:18
**account** 231:21
**accurate** 101:1 155:20 160:17 202:4
**accurately** 201:25
**acknowledge** 288:4 324:18
**acknowledging** 323:19,24
**acquire** 8:13,19 9:7 33:16,18 34:13 142:15 208:25 209:3 218:7 219:15 219:18,21
**acquired** 271:2
**acquirer** 335:1
**acquiring** 34:7 58:22 208:19 218:3 219:6 220:3,7,11,16
**acquisition** 9:17 10:5 10:25 11:2,4 12:9 12:18,21 13:22 14:2 17:19 18:4 19:4,22 20:11 23:21 28:23 30:16 31:14 32:21 34:17 53:15,24 54:3 54:9 57:5 58:20 60:20 61:1,6,8,19 61:21 62:6,22,24 63:3,5,11 66:13,14 66:16 67:12 68:22 69:13,21 73:10,13 73:23 74:10 77:2 78:19 82:1 86:24 87:7 105:9 117:25 118:16 119:7,19,22 120:1 129:8,16 143:12,16 148:10 161:8 166:13 183:10,16,21,25 185:3,8,12 186:7,13 186:14,20 187:8,14 188:11,13,15 193:10 198:24 199:1,13,16,20 201:10,19,21,23 202:6,14 203:1,7,16 212:19 213:1,8 214:4,18 218:12 229:14 284:5 304:12 315:3 328:6 336:2
**acquisitions** 12:23 13:5 143:19
**acting** 254:24
**action** 153:6 342:19 342:20
**active** 333:15,21
**activity** 208:15
**actual** 13:18 23:16 58:3 94:19 95:13 101:2,24 155:15 160:17 167:14 171:13 177:14,15 193:14 206:6 214:9 232:8 275:2 326:23 330:23 336:23
**Adam** 30:14
**add** 77:25 149:18 162:20 176:3 198:7
**add-on** 117:19 129:8 129:16,19 132:19 133:17 167:10 283:14
**adding** 117:13
**addition** 256:8
**additional** 8:8 73:3 152:1 158:18 159:11 178:22
**address** 7:17 125:25 227:22,25 230:14
**addressed** 182:15 292:13
**addresses** 109:3 253:8
**adjourn** 338:23
**adjourned** 340:3
**adopt** 158:24 159:2
**adoption** 17:21
**ADP** 330:25
**advance** 46:14 94:6 158:9 272:22 344:20
**advanced** 54:4 76:14 87:7
**advancing** 46:11 48:18,22
**advertising** 204:5,9
**advice** 127:4,10,13 127:16,23 219:11
**advised** 330:5 344:15
**advisor** 283:1,12 335:21
**advisors** 198:23 201:9 227:3,7 300:16
**affect** 82:1,7
**affiliate** 230:19,21 286:25
**affirm** 82:19 88:3 94:16 295:5,7 296:1 303:16
**affirmed** 302:9
**affirming** 62:11 283:23
**afternoon** 184:8 243:21,23
**Agenda** 193:6
**agent's** 237:4
**agents** 89:24
**ago** 146:2 221:20 276:5 332:15
**agree** 9:1 39:8,12,18 39:22 40:4,25 43:12 72:7 86:19 87:1 162:22 183:14 189:8 233:4 318:10 320:15 321:10
**agreed** 36:23 96:9 97:4
**agreement** 3:12 9:13 13:19 82:15,23 83:2 83:10,14 85:7,10 86:23 87:17,25 88:2 88:5,24 89:11,13,15 89:16 90:3,4,11,16 90:17 91:14,23 92:7

92:17,24 93:13,22 94:15 95:21 96:3,25 97:3 98:23 106:1,16 108:2,9 119:10,25 124:21 134:3,10,21 135:9,23 136:6 150:7 151:10,15,19 204:15,19,22,23 205:2 206:10 207:13,17,20 218:16,17 225:10 226:11,18 228:4,7 233:5,7 307:25 321:7,11 334:4,13 334:14,16 339:24
**agreements** 52:1,4,19 53:2 124:14 134:17
**ahead** 20:18 42:22 129:23,24,24,24 130:1 140:5 181:22 197:23 289:24 309:25
**alerted** 14:25 15:9 245:3
**Alex** 2:9 6:11 7:23 29:22 64:5 68:5 72:12 88:16 131:5 148:9 195:2 344:9
**Alex's** 288:15
**Alexzuckerman@q...** 344:10
**aligned** 304:7,13
**alignment** 308:22 315:9
**allocate** 28:20 29:2
**allocation** 21:19 28:18,25
**allow** 261:25
**allowed** 180:12 266:9
**allowing** 134:5 147:10
**alluded** 164:16
**altered** 314:16
**alternate** 28:7
**alternative** 24:16 66:3
**alternatives** 21:19 24:11,13,19,23 25:4 25:9,11,14,24 26:6 26:23 27:7 28:8,13
**amend** 307:10
**amounted** 105:24
**analysis** 62:9,10 167:3,6,15
**analysts** 282:18
**analyzing** 81:25
**and/or** 53:19 248:20
**Andrews** 344:17
**Angeles** 2:8
**Annino** 10:1,6 11:9 11:10 12:3,8 17:1 18:18,23 21:6 23:12 23:14 24:5 31:12 38:1,21,24 39:9,13 39:19,20 41:1,3,18 43:14 45:13,19,23 46:4,24 47:21 48:17 49:18 50:1,9 51:1 51:24 53:18 59:25 65:3 79:7 80:22 86:6 89:6 98:14 99:14 100:21 102:22,23 103:20 103:25 104:23 105:14 106:7,9,10 106:12,13 107:7,11 107:12 111:11,16 111:17 112:3 113:22 114:11,25 115:1,5,21 116:14 117:5,10,13,15 123:3 126:3,7,14 130:10 131:22 132:16,20 133:9,22 134:2 136:14,16,21 137:4,9 138:17 139:8,24 151:21 153:10,12 155:9,11 158:1,9 160:3 161:21 162:10 164:4 167:2 169:16 170:12,20 171:11 182:9 183:15 189:11 196:9 197:15 199:23 206:5 216:1 217:17 221:12 224:25 225:18 227:10 228:3,6 233:12 262:21,24 267:23 268:19 272:9,22 279:21 280:15 283:19 288:12 294:3 298:11 302:21 306:16,25 308:15 310:3 312:23 318:24 319:3 322:21 323:1
**Annino's** 49:7 103:2 129:9,17,20 130:3 132:9 192:18
**annually** 177:23
**answer** 8:20,22 16:16 22:17 23:3 25:20 27:11,19,23 33:24 40:13,22 42:5 54:6 63:9 65:13,21 66:24 67:1,5,18 68:1,6,16 70:23 71:1 72:4 74:5,25 79:13 81:8 90:9,21 91:12,22 93:11 106:19 115:4 118:21 130:12 133:3 140:19 141:5 142:5 144:5 145:7 159:8 163:18 164:1 180:12 191:23 206:14 207:2 208:5 214:17 216:19 218:9 220:19,22 236:21 245:14 248:5 249:2 266:10 271:16 276:10,19 279:3,11 304:20 305:8 309:18,22 327:4 332:8,18 334:11
**answered** 132:6 140:14 148:18
**answering** 23:5 25:23 41:12 68:17 72:9,11 173:8 180:11 213:25 309:19 338:20
**answers** 28:1 132:1 236:19,23
**Anthony** 18:20 21:6 44:17 45:13 54:15 56:23 59:1 62:8 74:20 111:2 150:19 158:1 169:3,12,17 176:21,23 177:3,16 182:9 192:17 227:10 263:10
**anybody** 7:21 8:4 9:22 14:11 16:12 17:9 84:17 130:25 131:4 151:25 152:7 162:2 204:22 246:16 250:16 251:6,15 270:21 275:6 276:13 278:23 319:24 321:18,20 333:17
**anymore** 147:3 211:13 235:21 318:12
**anyone's** 170:3
**anyway** 330:9
**anyways** 268:22
**apologies** 120:17 150:21,22 254:1 290:10 319:9
**apologize** 73:18,20 82:16 203:21 298:6 298:20 305:4 313:16 334:10
**apologizing** 294:3,6 298:11
**apparently** 66:3
**appear** 22:6 143:23 156:1 224:21
**APPEARANCES** 2:1
**appeared** 197:15
**appears** 193:11
**apply** 314:25
**applying** 114:2
**appreciate** 110:22 220:24 282:5 294:22
**approach** 235:24
**approached** 11:10
**appropriate** 38:18 39:4 71:4 90:5
**approval** 57:22,23,25 58:3,6 213:3
**approximately** 108:1 108:11 146:2 172:7 235:16
**areas** 29:1 264:17
**argue** 140:9
**arrange** 344:17
**article** 5:11 325:2,10 325:11,20 326:5,18 327:3,9 328:9 329:3 329:7
**ASAP** 258:6
**asked** 20:13 39:15 46:19 63:8 64:23 66:18 68:4,13 70:6 84:23 85:23 86:13 93:8,9 101:5,7,18 113:14 116:8 126:23 130:17 131:12,17 135:3 136:3 148:17 152:1 163:23 188:25 219:24 223:16 237:9 242:3,6,9 245:21,23 247:25 274:22 275:8,18 276:1,7 278:24 297:7 305:25 306:12 309:14 317:16 319:21 333:17,22
**asking** 14:15 15:17 15:18 23:8,9 25:13 27:17 28:2,4,12,12 40:16 42:9,10 43:21 45:2,4,25,25 54:23 54:24 61:14,15 64:3 65:10 72:3 75:13 78:12,14 99:22 103:25 104:13,14 110:14,14,15,23 116:21 121:7,9 124:10,11 126:3,7 127:2,6 133:16,18 134:7 135:8 138:9 138:12 139:3,14,19 139:21,22 140:13 144:10 147:17 149:24 150:8,9 162:6 163:15,16 173:25 175:14,16 175:18 180:13 191:25 192:1 194:7 211:22 213:5,6,12 213:25 214:12,12 218:6 221:19 222:25 223:3 227:24 228:2 236:11 242:2 262:2 262:3 266:6,11,15 272:3 275:5,6,10 296:5 309:16 310:23 321:17,20 332:5,6 334:12,14
**asks** 45:5 78:6 179:11

**aspect** 37:6
**assessment** 99:17 155:6 156:18
**asset** 24:19 114:9 151:2 335:3
**assets** 52:22,23 53:6 81:3,4,7,9,12,13,14 81:16 172:18 174:16 230:16 335:7
**assign** 238:1
**assigned** 152:17 194:21 328:25
**assistance** 224:14 226:22
**associated** 308:24
**assume** 11:19 46:7 52:24 88:10 158:1 258:7 311:19
**assumed** 305:7
**assuming** 18:21 57:21 58:5 72:23 137:16 304:3
**assumption** 160:3 209:25 263:11,22 267:15
**assumptions** 161:17 177:19 304:4,14
**attach** 166:24 193:9
**attached** 100:4 125:23 165:23 177:18,18,20 193:4 228:19 241:4 310:10 313:4
**attaching** 166:24
**attachment** 63:23 64:3,5,7 104:11,23 154:13,20 165:8 195:9
**attachments** 269:16
**attempting** 46:25 49:18
**attendance** 203:21 254:5
**attention** 291:5
**Attn** 344:9
**attorney** 42:19 84:19 84:21 89:16,18 91:5 91:8,20 101:20 120:21 123:13,24 125:11 126:11,12 131:5 141:3,4 143:1 184:2 202:19 207:18,24 224:19 230:11 342:16,18
**attorney's** 141:6
**attorney/client** 42:2 43:8 275:12,16,21
**attorneys** 42:8,10,23 122:11 226:22 275:15 279:5,8,14 296:1
**audits** 190:15
**authority** 341:6
**authorized** 342:7
**available** 26:10 228:24 229:6
**Avenue** 2:3 7:18 344:17
**awaiting** 344:15
**aware** 47:7 82:22 83:9,10 136:5,9,13 136:17 144:17,23 239:25 250:18 251:7,16 252:6,11 268:15 278:19 287:1,4 325:11 333:6,20

**B**

**B** 3:7
**baby** 72:23,25 73:3,5 73:7 74:9
**babysit** 27:24
**back** 17:7,22,24 30:8 43:19 49:10 56:4 63:14 64:22,25 66:11 84:14 95:24 96:18 98:20 106:15 106:25 128:9,23 137:2,20 154:23 162:10 165:1 166:6 179:20,21 181:16 191:14 192:6 210:16 211:3 215:11 217:13 234:16 236:1 243:23 244:10 247:11 259:23 279:9 293:6,17 295:6 296:22 299:15,20 308:21 315:16,20 316:1,4 331:8 334:10,19 337:3
**background** 113:13 115:20 116:2,8 127:17 195:8 334:19
**backslash** 243:1
**backtracking** 308:14
**bad** 255:10
**balance** 73:8
**banker** 244:21
**bankers** 244:25 282:12
**base** 62:10
**based** 23:11 48:20 56:24,24 90:18 101:2,23 131:15 156:20,21,24 159:16,22 160:2 174:10 205:12 252:3 286:24 310:11 311:18 313:5 332:8 338:24
**basic** 53:6 254:24
**basically** 320:7
**basics** 164:16 335:24
**basing** 61:10 210:2
**basis** 24:20 256:8 328:18,23
**Bate** 194:4,20 195:4 210:22 288:14
**Bate-label** 195:3
**Bates** 194:18 195:9
**Bates'** 190:5
**beginning** 109:2 183:5
**behalf** 2:5,10 6:9,12 31:12 90:11 91:14 92:20 93:13 226:23 227:6
**believe** 15:19 19:15 34:3 35:4,8 37:8 43:20,25 50:15 60:6 61:10 68:2,17 69:21 76:9,18 77:8 89:17 98:16 99:21 109:2 119:12 124:14 149:9 150:2 152:3 164:13 182:7,25 187:3,19 188:5,7 189:25 192:3,18,24 201:2 202:23 204:4 204:11,17 206:3 224:13,14 227:4 232:9 233:15,22,23 234:9 242:24,25 243:2,2,21,23 244:8 244:10 246:10,24 248:12,14 253:8 258:16 260:16,19 268:14 283:22 287:14,25 293:2 300:8 303:22 305:5 312:10 315:16 318:7 330:22 333:2 335:16 336:22
**believed** 61:20 206:6
**belonged** 134:23
**belonging** 254:15
**Bernstein** 307:5
**best** 51:16 67:5 68:21 95:23 145:5 228:25 255:13
**Beth** 30:13
**better** 13:21 31:24 65:25 114:13 255:3 255:11 256:11 271:14
**beyond** 238:10 241:18
**big** 9:19 151:14 215:5 218:16,18 285:19 301:3,5,10,19,25 302:5
**Bill** 32:6 152:3 176:2 185:18,18 186:1 188:5 192:24 204:24 212:4 230:8 246:21
**Bill's** 35:13
**binding** 89:24 90:5 90:12 121:5 188:24
**bit** 8:12 32:15 48:24 99:18 135:18 308:15
**blame** 238:1
**blank** 138:19
**board** 3:22 29:10,12 29:20 30:1,4,7,10 32:25 33:3 57:22,22 57:25 58:3,6 76:2 103:10,13,15,17,21 103:24 111:24 159:6,9 160:14,21 160:22,23 161:1,5 183:7 184:8 185:17 185:18,20,22 187:5 189:23 190:1,10,13 190:22,23 191:9,11 191:12,20,23 192:5 192:8,9,13,14,14,22 193:2,5,6,9,14 194:8,9 195:1 196:1 197:4,5,8 200:5,11 200:25 201:14 202:1,2,21 203:1,9 203:11,16,25 204:6 204:13,14,18,19 205:4,10 208:7,9,12 211:8 215:5,17 216:1 217:16,18 219:3,5 222:1 228:21 232:3,14,20 234:18 237:14,18 237:21 238:17,22 239:2,6,13,21 240:23,24 241:7,14 241:22 242:9,19 243:15 246:6 247:15 248:1 249:3 249:10,17,22,23,25 250:10,16,20 251:9 251:13,21 252:12 252:18,22,24 253:12 254:3,6,6,7 254:14,19,25 255:15,18,24 256:3 256:24 257:13,20 258:6,17 259:14 261:19 265:13 266:3,16 268:3 269:12,17,22 270:14 271:11 291:17 292:2,21 294:23 296:6 300:20 319:7 321:9 323:7 326:6 327:17 333:7
**board's** 186:3
**bond** 56:10,11,14,17 56:19,21,25 57:3,15 57:19 58:1,14 59:4 72:23,25 73:4,5,7 74:9 182:13,14,16 182:17
**Boston** 331:6
**bottom** 122:25

168:10 304:2
**box** 228:16
**brainer** 60:12,17 61:18 77:16,19 160:6 161:9 164:9 164:11,15,22 165:3 165:19 172:16 174:8 176:14 178:8
**breach** 206:9 207:12 321:6
**breached** 207:15 321:10
**break** 62:1 64:12,20 71:14,25 83:2 84:3 84:4,17,22 99:18 128:11,13 130:20 130:25 131:4 179:19,25 180:4 181:4,7,10,11 240:4 240:7 245:11,15,21 247:5,14 299:4,7,14
**breakfast** 233:24 262:21,24 267:23 282:3,9 293:10
**breaks** 179:19 245:18
**brief** 84:12 181:14 247:9 299:18 301:24 329:23
**Briefly** 131:5
**bring** 61:13 70:2,18 72:18 105:17 172:14
**bringing** 170:13
**broad** 13:8 16:10 22:3 199:10 202:4
**broader** 132:14,15
**broadly** 27:9 49:9 56:16 74:22 265:2
**brokerage** 85:23
**Bronis** 1:22 341:17 342:6,25 344:4,25
**brought** 40:6 131:14 131:15,24 268:19 268:24 331:10
**Buerger** 234:6 262:18 301:7,11
**build-out** 335:6
**building** 46:4 180:16
**built** 100:21 101:24
**bullet** 59:6,21 177:22 302:24 304:2 307:12,14 308:19
310:2
**bunch** 11:20 59:6 135:18 261:15 273:14
**business** 6:10 21:17 22:4 23:14,17 24:1 24:7,8,12 25:24 29:9 56:22 61:6,8 81:23 82:2,8 85:22 85:23,24 92:3,6,11 92:23 93:3,6,15,19 94:18,19 95:13 105:3,3,5,6 106:21 109:8,10 127:24 128:1 142:11,13,16 155:6 161:10 163:24 164:18 170:8 180:22 189:10,12 201:3 205:14 208:17 209:3,5 222:16 227:17 239:12 241:19 250:25 264:18 277:3,7 293:13 298:8 301:11 315:13 334:22,24 335:11 335:12 336:3
**businesses** 11:12 87:6 103:6 335:10
**Butcher** 76:21,21,22 77:1
**buy** 168:22 199:11 218:19 334:4
**buyer** 80:10,10
**buyers** 80:18
**buying** 26:7 80:12,17 82:10,11

**C**

**C** 235:3
**calculated** 171:12
**California** 2:8
**call** 27:24 50:23,25 52:10,15 86:6,13 103:14 143:4 167:5 187:5 196:10,11 228:23 237:21 243:17 313:13 337:19
**called** 7:6 61:18 77:15 111:7,9
148:10 156:14 190:23 191:6 197:14 231:9 235:3 246:10 278:12
**calling** 42:3 73:17 91:1,5 141:3 196:13 222:11
**camera** 2:22 88:14
**capacity** 236:5,12
**capital** 1:6 6:10 21:20 28:18,21,21,25 29:1 29:3 56:22 58:1,10 58:11,17 72:24 73:8 174:16 219:8 222:16 308:24 343:3 344:7
**caps** 231:20
**care** 105:14 285:2,20 286:6 344:20
**career** 46:8,11,25 48:19,22 49:10 53:9
**Carlyle** 80:6 286:23 334:4,15
**case** 1:3 10:15 11:24 12:4,6 55:6 59:18 59:25 60:15,18 61:4 61:9 62:9,11,13 63:4,7,15,19,21 64:25 65:6 66:17,19 68:2,10 69:9,10,25 70:9,11,15,16,22 74:19 77:9,16 81:7 81:10 83:18,24 98:18 99:16,23 100:9,21 101:23 102:8,12,21,22 104:5,7,18,22 105:2 113:16,22 116:6 121:10 137:25 154:3,5,11,15,19,21 155:18 156:19 157:5 159:10 163:6 171:16 177:19 180:14 192:18 206:5,8 207:12 208:16 223:4 237:13 239:6 265:19 266:1 272:16 273:2 276:16 277:19,20 316:18 326:24 344:14
**cases** 78:1
**cash** 54:22 55:3 58:16 74:16,18,21 75:1 78:8 174:23 175:24 308:24
**casual** 114:6
**cat** 235:4
**catch** 236:10 280:6 280:15,18,19,19,25 281:7,8,8,14,18,23 281:24,25 330:6
**catching** 280:21
**caught** 108:5 288:25 290:17 294:13,15 298:13,15,17 303:1 303:8
**cause** 1:25 264:17
**caused** 10:4
**caution** 41:22 91:7 113:9 126:15
**ceased** 315:2
**ceasing** 320:6
**cell** 246:10
**cellphone** 146:15,19 146:23,24 147:2,4 147:17 149:2 277:10,14
**cellphones** 276:25
**CEO** 13:6 33:12 60:4 60:7 80:2,3,4 89:3,7 89:9,10 121:10 148:12 159:11 167:22 170:5 173:23 225:18,22 262:18 286:23 298:22 331:11
**certain** 188:8 337:23
**certainly** 73:20
**CERTIFICATE** 341:1 342:1
**certify** 341:6 342:7 342:15
**CFO** 32:6 33:6 152:3
**chain** 64:8 65:4 77:11 122:21,23 151:4 303:6 318:23 319:15
**chairman** 32:24 33:3
**challenge** 234:8
**challenging** 220:18
**chance** 273:22 274:1
**change** 108:25
197:11 243:11 314:8 321:24 343:5
**changed** 14:13 15:15 17:12 167:19 242:25 310:19 317:8 318:9
**changes** 16:13 314:7 319:20
**changing** 17:22 23:15 329:7
**channel** 76:7 77:2 300:12
**characterize** 232:2 311:6
**characterizes** 308:20
**charge** 279:9 295:14
**chart** 149:21,25
**chat** 333:14,15,18,21 333:23
**chatted** 32:15 84:22 293:9 322:6
**chatting** 31:15 282:8
**check** 115:20 116:2,8 146:17 147:6 154:23 243:23 333:22
**checking** 244:18
**checking-in** 319:4
**checks** 113:13
**chief** 134:5 135:6,19 230:13 255:22
**children** 180:18,21 229:23
**CHOICE-UNITED** 344:1
**chose** 9:2,21 20:7 273:23 274:18
**chosen** 238:4
**Chris** 21:7 32:6 122:8 124:22,23,25 137:17 138:9,12 145:20 149:2 185:17 186:1,3 188:7 200:12 201:19,20 204:24 212:5 224:13 226:21 230:9 246:21 256:7,24 257:1,7 312:23 327:23
**Chris'** 35:13 185:25
**chronologically**

311:21
**circle** 192:6
**circulated** 32:12 82:13,21 83:22 185:20 204:13
**circumstances** 247:25 327:24 331:1
**City** 233:12 262:24
**claiming** 186:13
**claims** 231:21
**clairvoyant** 110:15 110:23
**clarity** 153:4 212:8
**class** 114:9
**clause** 16:1,24 17:4 17:11 18:11,24 19:17,23 21:24 31:11 39:25 40:2 41:4,17 134:11 233:3 319:17 321:15
**clean** 88:17
**cleaner** 193:13
**cleansing** 147:2
**clear** 13:2 16:9 31:9 38:11 43:21 49:22 106:3 109:6 161:6 175:6 195:17 199:5 202:18 226:16 227:7,13 230:8 236:18 242:19 322:4 324:5
**clearly** 50:4 254:14 292:18
**click** 243:5
**clicked** 253:12 296:21
**client** 68:6 72:3,4 134:3,23 311:13 321:5
**client's** 278:14
**clients** 335:7
**clock** 22:23
**close** 58:7,14,15,18 184:9,13,20,21 313:12 314:1 331:17
**closed** 245:18
**closing** 161:13 231:12 314:2
**co-founder** 76:10,11 76:18
**co-founders** 300:11
**co-president** 76:19
**coincidence** 202:5,11
**coincidental** 329:2
**colleagues** 79:16 82:22 83:21 114:23
**color** 195:12
**column** 156:4
**columns** 156:1
**combination** 167:5
**come** 9:12 11:10 25:24 46:5 55:12 98:20 171:10,18 177:15 209:22 210:1 299:15 308:4
**comes** 113:12 114:20 216:21 333:16 344:21
**comfortable** 234:15
**coming** 53:18 81:1 103:3 131:23
**comment** 131:15
**comments** 56:4,13
**Commission** 326:10 326:16,21 341:19 341:20 343:22
**communicate** 287:21 322:8
**communicated** 146:18 152:23 288:1
**communicating** 199:23 225:19
**communication** 15:8 17:21,25 18:3,9,13 60:3 95:24 97:17,20 97:25 99:11,15 110:10 275:21 283:18 288:2 321:13
**communications** 11:20 18:15,22 33:17 34:5,9,12 39:23 40:21 41:2 43:13 54:8 106:18 109:8,11 110:7 117:6 124:10 126:25 127:3 130:3 131:3 132:8 133:5 133:21 135:19 136:13,17 137:3 138:1 144:20 153:12 162:5,9 171:21 172:1,4,8,17 172:19 205:1 219:2 257:3 275:12 306:10 320:6
**comp** 112:9 116:13 116:22
**companies** 117:16 210:14 324:20
**company** 1:7 13:20 21:13 26:13 29:2,10 41:10,10 44:7 58:12 58:17 59:23 60:4,7 60:8 61:10 121:10 121:20 124:15,16 135:7,20 152:20 160:4 167:1 170:7 230:22 234:4 241:16 245:4 249:24 252:22 253:25 255:1,13 271:7 301:12 335:13
**company's** 255:25
**compel** 66:23 276:10
**compensation** 116:18 130:7,8,25 131:10 131:18
**competitor** 135:7 293:16 301:17
**complaint** 333:4
**complete** 57:15,17 212:19 213:1,8 214:4,18,21 300:19 318:22 342:12
**completed** 57:11 344:15
**completely** 57:5 89:19
**complex** 220:25
**comply** 66:24 274:2
**complying** 277:18
**COMPUTER** 344:2
**concept** 200:6
**concern** 39:24 241:23 246:23,24 326:15
**conclude** 344:21
**concluding** 181:5
**conclusion** 308:4
**conclusions** 206:23 208:4
**conduct** 114:4
**conference** 7:19 191:4 268:23
**confidential** 83:19 84:7 89:25 90:13 96:5,11,19,23 97:5 97:16,16,21,21 98:25 99:5,15 100:13 101:11,12 102:2 134:7 195:20 195:23 205:24 206:4 233:7 254:15 254:20 268:4,5 339:23
**confidentiality** 3:11 82:14,22 83:10,14 85:6,10 86:23 87:17 87:24 88:2 89:11 90:3,4,11,16 91:23 92:7 93:13 94:15 96:3,4,10 108:2,9 119:10 124:14 134:11 151:10,15 153:7 204:15,19,21 204:23 206:9 207:13 232:24 233:3 321:7,10 339:24
**confirm** 50:3 52:14 60:6 88:14 150:23 155:23 287:12 311:22
**confirmed** 294:22 296:6 297:14,17
**confuse** 133:2
**confused** 43:2,7 102:21 170:21,23
**connected** 342:18
**connecting** 47:23 308:17
**connection** 94:4 143:10,15 149:5 231:12 233:6 344:14
**consents/approvals** 307:19
**consider** 58:2 127:24 187:11
**consideration** 92:2 132:23 228:12
**considered** 306:11
**considering** 26:11,16 138:17
**consist** 127:19
**consisted** 127:18
**consumer** 78:5 82:2,7 82:10,11 335:21
**contact** 125:24 147:7 148:19 238:6 246:7 246:9 247:1
**contacted** 246:5
**contacts** 80:23
**contain** 30:7
**contained** 79:5 134:11 139:15,21 139:24 140:2 158:25 208:9 254:14 337:24
**contains** 138:13
**contemplate** 152:5
**contemplated** 150:24 151:12
**contemplating** 92:11 324:17
**content** 192:17
**contents** 96:24 97:4 127:14 233:5
**context** 252:19 262:1 289:4
**contingency** 131:13
**continuation** 283:16
**continue** 3:25 4:25 31:6 33:19 37:13,24 111:3 167:23 195:15 235:13 273:16 276:19 317:11 318:14 322:8 324:23
**CONTINUED** 4:1 5:6
**continuing** 34:21 35:2
**contract** 91:6
**contracts** 143:19 335:1,2
**contrary** 188:16
**control** 237:6 256:8
**controls** 256:2 257:6
**conversation** 35:16 35:22 36:15 37:6 48:20 54:4 57:1,18 58:24 86:7,9 95:4 126:18 134:16 142:7,8,9 188:14 213:24 214:1 234:15 239:12

243:14 244:25 246:12 258:8 267:11 275:14 283:17 296:3 309:11 310:11 313:5
**conversations** 37:7 39:2 40:5,16 55:4 56:8 111:4 114:5 115:2,23 117:14,16 118:10 132:13 162:8 169:11 187:2 187:6,8 191:9 210:14 263:15,18 265:2 272:12 275:16 287:19 295:22 324:14,25 331:11
**convert** 174:15
**conveys** 174:12
**convicted** 331:24 332:10,11 333:8
**copied** 76:3,20 216:4
**copies** 76:4 137:9 150:20 259:17 307:1,1
**copy** 88:6,18 123:11 138:19 154:24 175:12 193:9 200:24 221:13 300:19 337:16 344:16
**copying** 21:7 302:22
**Corbett** 30:12
**cordial** 217:19,20 229:5
**corporate** 86:21 119:14 143:22 144:11 148:12 236:25
**Corporation** 1:11
**correct** 7:16 15:21 16:1 36:5 37:17 57:8 58:21 60:10 77:17 79:18 81:24 82:12 88:4 89:13 93:18 95:17 96:13 96:15,21 100:15 107:13 116:1,10 126:2,5 142:16 144:6 154:16,18 161:18 165:21 183:24 184:5,11 186:11 187:16 189:25 194:2 196:12 200:24 203:18 216:6 217:5 217:8 219:16 227:9 230:20 232:9,15 236:14 241:6 248:7 252:4,15 256:22 257:15 260:9 262:12,25 263:6,9 265:7,11 279:13 282:6 294:18 300:24 304:4 314:15 323:13 328:16
**corrected** 256:21
**CORRECTION** 343:1,5
**correctly** 9:5 38:5 93:11 239:20 283:10 334:12
**correlation** 329:6
**correspondence** 162:17
**cost** 60:20 61:1,6,8,19 62:6,22 66:13 67:12 68:22 69:13 166:13 308:24
**costs** 70:3,4,19,20,21 71:7,9 72:19,20 161:11 172:15
**counsel** 6:4 32:7 33:9 43:4 113:19 119:6,9 119:11 121:23 122:4,6,9 125:15 137:5,8,10 139:14 145:20 150:20 151:25 186:3 226:21 256:6 302:22 327:16 337:17 342:16,18
**count** 330:12,15,17
**Counter** 302:23
**countersigned** 89:6
**countervailing** 21:18
**COUNTY** 341:4 342:4
**couple** 32:12 83:5 191:8,16 217:9 293:25 308:19 312:4 315:24 339:1
**course** 265:18
**court** 1:1 6:5,16,18 7:1 27:24 34:18 41:23 44:9,12 66:23 91:2 119:2 148:21 148:24 165:12 181:20 200:19 206:15,21,24 236:8 270:4 300:14 306:3 308:9 312:17 329:10 339:2,9,11 339:14,18
**courteous** 218:24
**Coventry** 79:19 234:6,8 261:20 262:14,18 263:11 263:13,14,22 264:16 265:5 267:8 267:18,24 268:14 269:21,25 287:16 289:16,17 300:23 300:24
**Coventry's** 82:1
**cover** 282:18
**coverage** 282:15,16 282:17
**create** 46:10 142:20 301:18
**created** 44:14,21 45:10,13,19 46:1,24 47:8 198:5 239:3
**creation** 274:11
**credibility** 328:25
**crime** 331:25 332:2,3 332:10 333:8
**crimes** 332:12
**cross-selling** 170:14
**crossing** 56:5
**curious** 78:16,17,18 78:20 234:3
**current** 11:25 12:4 28:20 59:23 61:10 77:3,4 243:8 248:11 332:23 336:11
**currently** 30:5 55:15 76:9,23 146:3 332:22 335:6
**curse** 293:25
**custody** 237:5
**cut** 148:25

**D**

**D** 3:1
**d/b/a** 1:6
**daily** 24:19
**Dan** 125:5,17 126:8 126:18 137:10
**Daniel** 123:11,12 149:16 230:10
**dash** 76:18
**data** 37:12,15,18,23 37:25 38:14,18,24 39:4 43:15 44:14,21 45:10,16 47:24 48:9 48:12,15,18,21 50:3 55:7 98:5 101:2,24 107:14,18 109:17 109:22,25 110:6,13 110:18,25 126:4,13 127:7,14 134:22 138:10,13 139:3,6 139:14 140:13,15 140:17,18,21,23 141:15,16,18,19,24 149:19 152:2 155:8 155:15 158:21 160:17 163:8,12,15 171:16 176:7,11,13 176:15 187:19,24 202:13 206:6 209:25 248:23 326:23 335:10 336:23
**date** 12:6 30:23 31:21 32:1 35:24 38:13 51:17 82:18 108:4,8 109:1 188:17 232:10 235:16 248:8 277:21 279:24 293:2 321:8 322:10 334:5
**dated** 4:6 107:7 342:21
**dates** 82:16 86:5 108:10 188:9 232:8
**day** 24:14,25 25:1,12 26:9 36:12 37:7 70:3,19 72:19 172:15 187:2,4,4 209:2,17,18 215:18 217:2,3 219:2 236:3 244:2,8 246:15,15 246:17,18,19,20,21 262:23 269:11,22 278:15 281:17 297:25 319:2 325:2 325:12,24 326:23 329:3 340:13 341:11 342:21 343:19
**days** 52:2 228:21 232:1,14 238:8 259:13 261:18 292:25 293:7,8 322:22 323:19 324:15,16,16 339:1 344:21
**DCF** 54:12,14,16,18 54:20,21 55:1,2
**deal** 5:11 14:6 23:12 131:24 152:21,22 152:24 168:1 203:12 215:5 222:21,23,24 261:20,23 262:8,9 262:14 263:12,13 264:10,12,14,22 265:6 267:9 283:2 284:1,13,16 285:5,9 285:20 287:2,8,10 287:16 292:3 304:3 304:16,17,21,25 305:15,18,21,24 306:2,7,13 314:1,2 320:4 322:2 324:21 324:22 325:2 328:18,25 329:3
**deals** 209:10
**Dear** 344:12
**debrief** 301:1
**decade** 335:18
**December** 19:13 21:6 24:17,22 25:5,9,15 26:3,3,5,23 27:7 28:8,14 30:1,8 31:2 36:4 38:7,8,11,13 38:14 312:24 319:3 319:6 321:6 322:9 322:21 323:12,13 325:21,23 329:12 337:12,16
**decide** 139:7 212:24 320:5 322:1
**decided** 9:6,16 14:1 19:3 31:13,22 32:10 38:2 46:10 315:15

**decision** 20:6 22:2 30:15 32:20 33:13 33:15 34:13 39:4 317:6 323:14 324:10
**deck** 3:22 26:10 103:17 190:23 191:12 192:8,13,14 192:22 193:6,9,14 197:4,8 203:12 204:3,14,18 208:9 208:12 211:8 232:3 232:20 234:18,24 237:14,18,21,22,24 237:24 238:4,16,17 238:21,22 239:2,2,4 239:6,8,14,17,21,24 240:23,24 241:2,8 241:14,25 242:9,19 243:15 244:24 246:6,7,8 247:15 248:1 249:3,11,18 249:21,25 250:4,4 250:10,17,20,25 251:9,13,13,21 252:12,18,22,22,24 253:12,23 254:6,19 254:21 255:1,14,18 255:24 256:24 257:13,21 258:6,11 258:14,16,17 259:14,18,19 260:12,13,19,25 261:19 268:3 269:12,17,22 270:14 271:3,11 291:5,18,18 292:2 292:16,21,22 293:12 294:16,23 294:24 295:15,18 296:6,7 298:1 321:9 326:6 336:18
**decks** 237:21 238:3 238:13
**deem** 268:3
**deemed** 57:18 97:21 233:7
**Defendant** 1:12 2:10
**defense** 208:1
**define** 13:13,16 104:3 332:1,3
**defined** 93:6 121:3 248:22
**defining** 153:3,11 312:3,7
**definitely** 130:13 178:1
**definition** 14:21 45:15 96:19 114:14 115:1,3,9,13
**definitive** 95:5 249:19 307:25
**Delaware** 1:7,11
**delay** 319:9
**deleted** 317:7
**deliver** 304:15
**demonstrate** 113:15
**Denny** 268:17,18,23 269:10 272:19
**Denny's** 268:18 272:20
**deny** 167:25
**depart** 268:21
**depend** 113:20 212:2
**dependent** 29:1
**depends** 143:11 211:9 315:23
**depo** 22:18 66:23 68:8 145:10 180:1 216:16 237:10 240:13 266:8 273:17 274:10,12 309:20
**deponent** 343:3 344:17,17
**deposed** 149:12
**deposition** 1:18,25 20:20 27:25 47:14 144:6,15,22,23 147:13,14 180:23 181:6 221:6 222:15 222:20 223:12 247:19 273:22 303:12 310:25 330:8 340:3 342:1,9 344:13,15,19,22
**DEPOSITIONS** 344:2
**describe** 85:16
**describing** 164:11
**designate** 84:6
**designated** 236:6,13 339:22,22
**designed** 208:18
**details** 78:7 237:22
**determine** 13:22 23:25 39:6 120:4 121:19 155:14 209:4
**devoted** 36:15
**dialogue** 318:14
**difference** 33:21 151:14 163:10 199:7 218:17,18
**different** 29:1 49:10 49:11 66:4,5 76:15 76:15 85:21 114:15 115:9,13 124:1,7,8 125:20 131:22 135:18 194:17,20 195:6 196:11 205:7 234:3 235:22 243:9 295:21 296:2,2 323:9,20,23 324:1,8 324:19 327:22,24 335:11
**differentiator** 335:22
**diligence** 13:20 24:3 37:21 120:2 121:19 155:24,24 171:14 171:14,24,25 172:19 336:6,15
**dinner** 281:17
**direct** 3:6 7:8 78:4 82:2,7,10,11 95:18 116:18 135:7
**directed** 94:6 228:15 270:24 297:8
**direction** 127:1 323:9 323:20,23 324:1,9 324:19
**directive** 288:15
**directly** 39:21 41:12 48:5 251:18 326:19
**directors** 111:24 160:14 196:2 333:8
**disagree** 72:8
**Disclaimed** 338:2
**disclaimer** 205:23 206:3 326:9,15,20
**disclose** 95:19 96:11 239:17
**Disclosing** 94:7 96:5
**disclosure** 241:24 242:3 260:24 293:19
**disclosures** 149:10 239:10 260:20
**discounted** 54:22 55:3
**discourage** 338:2
**discover** 87:12 219:9
**discovery** 12:22 58:24 73:24 118:11 121:19 209:4 274:3 274:5,16,17 277:19 279:7 316:17
**discuss** 14:10,12,18 14:22,23 50:8 51:6 84:20,25 130:24 187:13 228:24 234:1 246:16 247:2
**discussed** 37:3 39:3 73:7 93:19 95:12,12 98:16 103:16,23 112:13 158:8,14 161:9,12 166:19 187:7,9 201:6,9,14 202:11,12,24 203:4 205:17 224:10 228:20 317:1
**discussing** 12:19 20:10 83:17 158:15 163:25 203:17 205:4,6 263:20 322:4
**discussion** 11:7 17:9 31:5 33:18,19 34:10 34:15,20,25 35:2,7 36:7,21 37:4,14 39:7 44:2 53:14,17 73:13 119:23 130:14 141:24 161:2 167:2 192:19 192:25 197:9 209:21 218:11 224:11 251:6 305:19 306:24 307:10
**discussions** 9:22,25 10:24 11:1,3,14,23 12:17 13:15 31:16 32:3,13 33:14,16,20 34:21 35:2 37:9 49:22,23 53:24 58:15 85:11,12 92:2 105:24 106:7,9,9,11 106:13 116:14,22 118:15 131:19 143:15 150:12 167:24 188:10
**Disney** 84:23
**dispute** 99:4,10 107:21 109:16 311:14,15
**disputing** 109:20
**disrespectful** 73:19
**disseminating** 338:2
**dissemination** 338:3
**distinction** 227:15
**DISTRICT** 1:1,1
**division** 1:2 211:9 334:25 335:3,4,6,8 335:8,9
**divulge** 41:22 91:8 113:9 124:5 126:16 275:12
**doc** 78:24 79:2,6,10 79:16 125:5 126:9 127:10,18 139:17 139:18,20,24 140:1
**docs** 167:19
**document** 14:13 17:23 20:21 30:25 43:5 47:17 64:7 82:17,18 87:21 88:12,18 89:2 91:21 94:10 96:16 97:15 97:20 98:1,4,13,20 99:13 100:12,19,20 101:10,22 104:9,11 107:3 122:18 128:10 129:3 141:9 141:10 152:4 153:21 154:7 155:4 165:15 173:9,12 175:8,12,13 182:1 188:23 189:20 193:19 197:12 200:21 215:14 218:5,12 221:8 240:17 247:21 259:2,6 261:12 270:10 273:10 288:8 289:6 300:4 302:17 308:11 310:6 312:19 315:10 317:7 318:19 322:17 325:16 337:9 338:3

338:25
**document's** 84:2
**documents** 58:4 130:19,22 134:22 138:13 139:5,15 149:21 152:1 187:24 188:6,6,8
**doing** 6:10 66:2 67:4 110:16,16 114:7 141:17 191:7 209:4 222:16 255:12 280:14 282:1 283:15 335:25
**dollars** 161:11 314:24
**Donna** 325:21 336:17 337:15
**Douglas** 7:18
**download** 253:9
**downloaded** 253:5,23
**draft** 15:21 231:3,25 302:23
**drafted** 226:19,20,23 227:6 233:2
**drafting** 187:11 224:17,18
**drive** 45:14,15,20 46:2,10,17,24 47:8 79:2 107:9,12,22
**dropped** 290:19 293:25
**DTC** 77:25 78:2 80:12,17 170:16
**due** 13:19 24:2 37:21 120:2 121:18 155:23,24 171:23 172:19 336:6,15
**DUI** 332:11,13
**duly** 7:7 341:8
**dump** 274:18 338:25
**dumped** 273:13
**dynamic** 163:5

**E**

**E** 3:1,7
**e-mail** 2:6,11 4:6 10:1 19:12,14,17,24 20:10,15,24 21:3,6 21:10,24 22:6 23:19 29:5 30:22 31:19,25 41:2,8,14 43:14 47:20 49:19 50:2,9 50:13 51:10,24,25 52:18 54:25 57:4 59:1 60:11 63:3 64:8 65:1,4 67:15 67:19 75:12,24 77:11 79:9 80:7,9 81:25 82:14,17 83:6 98:6,14,17 100:3 104:13 107:7,20 108:14,16,19,23 109:3,7,12,21 111:19 122:21 123:3,4 124:25 125:24,25 137:7,8 138:3,19 139:2 140:4 147:6 150:15 154:1,10,14,19,23 160:6 161:13 165:8 165:19,24 166:22 167:4,12 169:25 174:8,12 175:5,16 175:18 176:12,25 177:1 178:4 182:5,8 183:19,23 184:12 184:16 185:3,6,15 186:10 188:16 189:17 191:3 193:1 194:8 195:7 215:25 216:5 221:11,13,21 223:23 225:23 226:1,2,5 227:22,24 228:19 230:14,16 232:13 240:20 241:4 244:13 252:3 257:16,19 259:12 261:7,15,25 262:2 262:11 264:22 266:7,11,19,21 267:5,10 269:4,9,16 270:2,23 280:2 302:20 303:6,11,14 303:15 305:13 307:1,14 308:15,20 310:1,3,16 312:22 313:2,16 318:22 319:15 337:15 344:10
**e-mailed** 5:17 99:23
**e-mails** 39:13,19,20 40:19 44:1 48:13 62:19 129:6 161:7 161:10,15 163:25 168:4 169:8,16,18 170:11 176:9 259:10 297:2,3,5 303:17 308:16 311:17 313:22
**earlier** 79:3 98:17 99:24 101:9 107:10 123:4 154:1 160:6 182:15 184:13 187:3 222:10 223:16 231:3 305:5 310:24 314:9 317:1 326:1
**earliest** 319:9
**early** 10:13,19 12:20 13:11,12,13 24:2 31:1 37:20 48:1 58:23,24 95:3 112:12 115:22 116:5,12 117:2 134:15 138:2 141:24 142:1,3,7 157:7 161:3 167:16 174:14 176:8 185:5 272:12 309:9
**early-stage** 49:21
**earnings** 187:5 239:10,14,18 250:24,25 251:14 253:17,22 266:3,14 266:20 291:4 298:9 338:13,16
**educate** 144:18 236:24 237:7
**effective** 88:25 108:4 108:8
**effectively** 61:5 167:17 246:13
**efficiently** 170:18
**eight** 36:24 253:5
**eight-hour** 36:18
**either** 66:15 102:5 127:1 187:3 233:6 254:22 305:1 327:7 327:7 335:20
**eliminating** 161:11
**else's** 177:17
**Emanuel** 2:7 6:12 149:7 344:9
**embarrassed** 298:6,7 298:8,10
**emergency** 258:3
**employee** 76:1,5 111:23 116:23 124:21 143:4,13,17 268:14 342:16,17
**employees** 113:14 243:19
**employer** 112:7,8 135:11 330:23
**employment** 11:15,21 112:16 117:10,14 117:18 123:15 124:20 129:9,17,20 130:3 131:13 132:10,16,19 133:8 133:8,21 134:2,10 134:17,21 135:9,22 136:6 151:20 158:18 283:16 330:25
**encompasses** 91:23
**ended** 23:15 216:22 216:25 217:1 331:5
**engage** 219:10
**engaged** 86:15,16,17 124:6,24 275:4 287:20
**engaging** 120:4 135:17 338:3
**enhances** 56:21
**ensure** 260:11 267:15
**enter** 85:6,9 120:11 120:13,18,23 121:13,15
**entered** 86:20,22 87:1 120:15
**entering** 89:10 121:2 121:3
**entire** 148:9 193:2 195:1 237:13 239:11 241:18 278:15 327:12
**entirely** 294:1
**entities** 153:7
**entitled** 168:11
**entity** 96:12 149:21 149:25 150:3,23
**equity** 130:9,25 131:10,14,25 304:15
**escrow** 231:21 314:18
**Esq** 2:4,4,9,9 344:9
344:10
**estimate** 75:9,11 169:4 178:2
**estimates** 177:10
**estimating** 177:9
**evading** 25:19,22
**evaluating** 38:25 43:16 95:20 110:19 142:14
**evaluation** 94:5,11
**evasive** 66:20 73:14
**eve** 274:9,12
**eventually** 10:6
**everybody** 254:15,18 295:15
**exact** 12:5 30:23 35:14,24 75:8 86:5 109:1 192:15 204:25 221:25 235:15 243:3 249:13,15 253:1,4 322:10 325:12
**exactly** 160:25 176:20 191:19,22 202:20 216:25 218:1 249:19
**examination** 3:6 7:8 147:13
**Examinations** 3:2
**examine** 147:14
**examining** 147:16 173:9
**example** 103:4 105:19 142:23 306:12
**excess** 72:23 73:8
**exchange** 39:20 326:10,16,21
**exchanged** 39:9,13,19 294:21 312:2
**exchanges** 312:5,11
**exchanging** 322:21
**excited** 56:22 57:20 59:2 168:1 176:9
**excitement** 168:5
**exclamation** 260:3
**excuse** 89:22 124:23 256:22
**executable** 310:13 313:7
**executed** 83:11,14 307:18

**executing** 121:4 122:1
**execution** 58:4 319:5
**executive** 32:5,23 112:1,4 113:7 134:6 135:6,19
**executives** 32:24 33:5 77:12 165:24 167:1 171:22 178:5
**exhaustive** 191:25
**exhibit** 3:9,10,11,13 3:14,15,16,17,19,20 3:22 4:2,3,4,6,8,9 4:10,11,12,13,15,16 4:18,19,20,21,23 5:8,11,14 20:20,22 30:20 47:13,18 64:19 71:20,24 72:14 87:20,22 107:2,4 118:25 119:3 122:17,19 129:1,4 148:3 153:19,22 165:2,6,9 165:9,10,14,16 173:25 179:15 181:21,24 182:2 189:18,21 193:15 193:17,20 194:1,7,9 194:13,14 200:15 200:18,22 210:18 211:3 215:13,15 221:3,9 240:10,12 240:14,15,18 247:19,22 258:22 259:1,3,5,7 261:5,7 261:13 270:7,9,11 273:9,11 288:7,9 296:13,14 300:1,5 302:13,16,18 303:2 303:8,15,16 308:8 308:12 310:5,7 312:16,20 313:18 313:19 318:16,20 322:16,18 325:15 325:17 337:8,10
**exhibits** 3:25 4:1,25 5:6,17 64:20 144:20 148:2 295:10 303:17
**exist** 162:6
**existed** 82:23
**existence** 233:4
**existing** 21:19 28:18
**exists** 155:23
**expanded** 235:22
**expect** 19:22 57:10 319:8
**expecting** 216:14 231:22
**expenses** 177:9
**experience** 13:10 56:17,25 114:21 120:11 282:10,11
**expert's** 180:1
**expires** 341:19 343:23
**explain** 67:25 81:18 98:10 199:6 262:1
**explained** 171:5
**explanation** 254:12 320:5
**explore** 105:22 189:14 209:10 332:2
**exploring** 73:25 209:21 315:3
**expressing** 263:15
**extent** 42:3 91:1,5 141:3,6 236:22
**extract** 159:13

**F**

**F** 291:20,21 292:1
**fact** 15:1,9 83:16 110:5 238:5,7 242:20 251:20 260:14 261:1
**factor** 22:4 24:5
**factors** 21:18 22:9 23:7
**facts** 66:1 223:4
**failed** 257:12
**fair** 36:19,20 45:4 54:19 257:9 258:7
**fairly** 124:15 235:8 249:24
**fall** 222:24
**falling** 331:21
**falsified** 327:8
**familiar** 253:24 303:15
**family** 180:25 265:16 282:1 331:20
**far** 54:4 87:7 119:12 132:9 133:6 134:4 151:22 161:7 202:13 226:20
**fast** 133:4 290:2
**faster** 22:19
**fault** 238:1 274:10
**fed** 109:14
**fee** 61:21 69:22
**feedback** 42:24 43:2 43:4 124:16 125:17 127:18 219:12 224:20,23 282:5,7,9 310:12 313:6 319:7
**feel** 73:21 228:1
**fees** 60:21 61:7,20 62:7 69:20 166:14 177:22
**feigning** 292:5,8,17
**fell** 222:21
**felt** 31:4,6 58:16 164:17 189:12 268:20 322:5 331:12
**fight** 181:2
**Figueroa** 2:8
**figure** 66:5
**file** 111:7 148:14 239:9,16 292:3 293:18 326:9
**filed** 1:25 108:25 222:16 239:15 260:22,23 326:15 326:20
**filing** 56:4,12,15,19 56:21 57:3,15 58:1 59:4 182:16
**final** 190:10,12,15 269:17 322:6 335:8
**finalizing** 83:5
**finance** 49:11
**financial** 54:21 161:17 300:16 309:4 326:22 335:21
**financially** 342:19
**financials** 37:22 38:19 112:15 152:4 152:6,7 171:13,16 288:19 301:12,20
**find** 198:10 262:19 313:9
**fine** 138:21,21 201:19 282:1 306:16 339:5
**finish** 15:6,7 17:13,14 64:18 65:18 70:12 71:23 172:10 213:17 240:5 245:13 291:14 324:2
**finished** 282:14
**FINRA** 333:1
**fireworks** 84:24
**firm** 86:16 120:4 123:25 234:24 235:2,3,22,24 247:1 256:10,17,20 275:3 275:5,6
**firms** 158:20
**first** 6:15 7:7 62:3,25 137:7 203:22 269:20 270:1 273:14,19 274:5,21 275:25 294:20 310:24 311:1 321:15 322:3 326:12 344:21
**fit** 114:24 115:2 121:20 336:3
**five** 36:22 37:1 235:10 324:16
**five-minute** 181:11
**flag** 9:11,19,23 10:14 14:7,11 17:18 18:3 19:20 231:1,17 313:25 314:8 315:2 315:7 322:25 326:1
**flexible** 51:15
**flight** 330:7 339:7
**Floor** 2:8
**Florida** 1:1,24 2:3 7:14,18 341:3,18 342:3 343:22 344:18
**flow** 54:22 55:3 78:8
**flying** 262:15,20
**focus** 241:23 266:2
**focused** 180:25 241:21 263:10 268:2 291:3 292:15 293:11
**follow** 150:22 255:13
**following** 84:13 128:22 149:17 181:15 193:5 247:10 299:19 307:11 319:2 329:24
**follows** 7:7 319:3
**followup** 152:8
**forecast** 177:24 178:6 298:14
**forecasted** 177:14 239:14,18 250:24 250:24 253:16 298:9 338:13
**forecasting** 212:23
**forecasts** 338:14
**forgive** 86:5 89:18 109:1 192:15 246:19
**form** 8:14,15 10:7,20 11:22 12:11 13:1 14:4,20 15:8,22 16:7 17:5,25 18:2,6 19:5,25 23:23 26:25 27:12 28:24 29:14 29:21 30:18 32:22 34:14 38:16 40:3 41:6 43:18,25 44:16 44:23 45:12,21 46:12 47:1 49:2 50:11 51:2 52:6,13 53:10,16 54:1 55:13 57:7 59:10 61:25 63:13 69:15 73:11 74:12 75:6,16 81:5 82:3,24 86:25 90:1 90:14,25 91:4,18 92:13 93:17,24 94:9 95:22 96:14 97:6,17 97:20,22,24 98:8 99:1,7,20 100:14,18 101:19 102:3,14,25 103:11 105:11 109:19 110:2,8,21 111:13,25 112:23 113:8,15 114:12 115:18 116:4,15 117:1,7 118:2,9,17 118:18 119:20 120:12,25 121:17 121:24 123:16,22 129:11 130:5 132:11 133:10 134:8,14,24 135:13 135:25 136:23

138:6 139:9 141:2 141:22 142:18 143:7,14 144:13 145:2,18 150:1 152:12 156:6,12,22 158:11 159:1,7,9,17 160:8,15 161:19 163:3 164:2,12 166:17 168:2 169:10,22 170:22 171:4 174:4 176:17 177:5 178:16 184:18 185:9 186:17 187:15,21 188:1 189:5 191:1 192:11 197:6,17 203:2 206:1,11,25 207:22 208:20 209:11,19 214:7,24 215:8 218:23 219:7 219:19 220:8 222:22 223:6,13 224:3 225:7 226:13 227:20 228:5 229:2 229:15,25 231:5 232:5 234:21 235:14 238:23 241:9 250:11 251:11,24 252:14 254:9,16 256:5 264:23 265:21 267:21 269:23 270:16 271:23 273:4 276:17 277:12,24 280:8 281:5,12 283:21 284:6 286:14,19 287:3,24 292:11,14 295:2,20 296:9 297:20 298:2 301:22 305:3,11,17 306:20 308:2 310:21 311:8 315:5 315:22 316:13 317:3,19 318:6 320:10,18 321:21 323:17 324:3 325:5 326:7 327:11,19 328:3,7,20 329:5 333:25 336:4,20 337:23
**formal** 185:19
**format** 14:25
**former** 145:20 230:13
**formulate** 336:7
**Fort** 344:18
**forthright** 242:15
**forums** 272:7
**forward** 9:1,3,13,16 9:21 10:4,17 14:2 17:19 20:4,5,7,11 20:16 21:15 23:20 31:17 32:18,21 34:16 37:9,13,24 38:3,19 55:6 104:1 105:25 108:20 114:8 123:6 127:24 165:24 171:18 182:22 183:9,16,20 184:6 187:14 188:13 212:24 219:21 239:10 241:17 246:23 248:14 266:3,7,13 266:20 269:17 291:3 298:9 318:10 323:14 324:11 330:18
**forward-looking** 250:23
**forwarded** 61:15 77:12 177:2 178:5 248:21
**forwarding** 166:25
**foundational** 167:14
**four** 190:3 191:21 235:10 260:2,4 324:16 334:23,23
**Fourth** 201:7
**frame** 33:22 215:20 272:3 332:16
**frankly** 210:6 268:2
**fraud** 338:7,14
**frequently** 160:22
**Friday** 6:3 149:17 218:21 262:15,20 344:19
**friends** 331:16,18
**friendship** 331:22
**front** 27:4 249:15 260:20,24 289:8 311:18
**frustrate** 305:5
**frustrated** 264:20 293:15
**frustrating** 263:2 264:3
**frustration** 263:16
**Ft** 344:4
**fuck** 292:1
**full** 185:25 246:15 336:15
**function** 333:18,23
**fund** 78:7 80:3,4,10 80:15,20 81:22 161:12 170:15 174:18 201:8 213:4
**funds** 1:6 6:10 75:18 198:24 199:2,8,8 201:10 202:24 286:23 335:5,25 336:11
**Funt** 268:10 269:10 270:14 271:12
**furnished** 337:23
**further** 32:13 46:25 53:8 149:18 150:12 151:3 342:15 344:22
**future** 21:20 28:18,21 29:3 48:22,25 49:7 201:6 212:23
**fyi** 288:24 289:15 290:4

**G**

**Gabe** 288:18 331:12 331:15,20
**gain** 112:16
**gaining** 141:17
**Garcia** 80:2 286:20
**gathering** 223:4
**general** 24:12 32:7 33:8 81:9 137:5,7 139:13 145:20 150:20 158:5 162:20 199:7 211:22 217:16 226:21 256:6 280:17 293:23 302:22 327:16
**generally** 121:23,25 153:13 211:23 234:13 238:16,25
**generate** 61:21 69:22
**genuinely** 297:19
**getting** 31:3 149:12 253:21 274:9 303:8 304:15,17,21,25
**ghosting** 320:7,22,24
**giant** 177:25 178:4
**give** 6:22 81:2,16 112:9 142:23 181:10 218:9 252:18 254:12 290:20 320:5,16 334:21
**given** 95:15 246:23 292:24
**giving** 28:1 39:6 57:14 141:6 204:4 218:22 282:7 309:18
**Global** 1:11,19 3:5 6:12 7:5 340:8 341:8 342:10 343:4 343:19 344:14
**GM** 243:10,12 249:6
**Gmail** 39:14 44:18 225:12,16
**go** 10:4 20:18 22:18 23:7 38:3 42:22 43:19 63:14 64:22 64:25 66:11 75:21 78:23 84:5,7,24 85:3 97:11,12 108:21 123:7 126:8 126:12 128:16 129:22,24,24,24 130:1 137:2,7,20 140:3,4 142:6 143:25 154:8,23 165:1 166:5 167:18 181:6,22 191:14 196:6 197:23 204:3 210:16 211:3 215:11 225:1 234:16 236:1 243:22 244:9,25 245:23 258:11 284:7,9,14,19 289:24 293:17,24 296:22 299:13 302:12 303:25 308:6 309:25 310:4 315:25 316:18 323:8,20,23 324:8 329:17 331:13,13 334:10,19 337:3 338:1,21
**goal** 214:8
**goals** 214:10
**God** 6:24 71:10 174:3
**goes** 18:20 33:25 57:22 58:5 68:8 108:21 216:8 282:21 283:2 284:21,23 285:1,12 285:18,22,24 286:2 291:12
**going** 6:15 11:19 13:21,23 19:21 20:19 27:23,23 30:16 31:6,13 33:23 33:24 37:9 38:5 46:14 47:13 49:10 51:9 55:5 57:16 58:23 62:21 66:22 66:22 72:5 79:14 83:7 84:2 87:19 100:24 106:15 107:1,1 112:6,7 114:7 115:7,13,15 118:24 119:3 122:16 125:11 128:9,25 129:1 131:25 138:19 143:24,25 148:15 153:19 157:15,17 157:18 158:16,19 165:6 167:13 177:25 181:4,6,8,9 181:11,20,23 184:2 189:13 193:14,15 197:5 199:11 200:15,16 209:3 210:7 211:3 215:13 215:24 218:7,9,9 221:2 225:25 234:16 237:8,12 240:2,15 244:20 246:14 247:24 258:18,21,25 261:4 261:8 266:13 268:21 270:8 272:18,24 273:8 276:10 280:15,18 281:7,7,8,14 288:7 300:1 302:13 308:7

311:10,12 312:13
312:14,14,15 315:8
316:15 318:16
320:15 321:19
322:2,16 325:14
334:19 336:6 337:7
337:8 338:22,23,23
339:19
**good** 6:7,14 7:10 47:3
47:23 48:5 50:6
55:22 58:6,10,16
64:12 71:14 72:6,8
114:24 128:11
280:5,10,13 281:3
281:15 289:1
290:18 291:12,13
292:19 293:20
294:6,7 298:18,19
299:1 302:11 331:3
**Google** 45:14,14,20
46:1,10,24 47:8
79:2 107:9,12,22
**gosh** 212:1 243:21
272:15 307:7
322:10
**gotta** 68:6,16
**gotten** 134:4 151:22
270:14
**GP** 1:6 6:10 37:22
86:12 199:5 343:3
344:7
**granted** 109:22
**great** 50:19,22 56:3
59:4 123:5 221:23
223:24 241:11
280:4 282:1,4
308:17 311:5
328:25
**Greenberg** 2:2 6:8
**group** 80:3,23 210:7
230:17 243:9
267:12
**groups** 80:5
**grown** 255:25
**growth** 81:20 201:8,8
213:3 256:1
**guess** 16:21 51:5
178:2,6,9,18,21,23
179:5 217:11
231:11 329:14
**guidance** 239:18
241:17 246:23
253:16,18 261:2
266:4 293:13
**guided** 291:4
**Gusky** 30:14

**H**

**H** 3:7
**hairs** 43:6 284:25
**half** 36:12
**hallways** 265:4,15
**hand** 6:19 7:2 138:20
276:12 277:17
341:11
**handed** 278:4
**handful** 172:2,7
**Hands** 88:18
**handy** 149:21
**happen** 14:6 72:23,25
74:9 119:24 234:20
239:1 276:22
**happened** 35:25 36:6
167:20 188:9 213:9
234:23 237:17
248:17 277:21
278:1,2 288:21
293:23 295:8
**happening** 205:9,19
215:12
**happens** 209:2,17,18
213:3 283:13
**happily** 98:12
**happy** 82:19 149:16
228:23 288:3
**hard** 66:2 75:7 91:20
154:24 175:12
180:9,17 311:21
336:14
**harm** 264:17
**Harrist** 123:12,12
124:3,7,12,13,23,24
125:5,17 126:4
137:10 149:16
150:19 151:24
230:10
**he'll** 115:8
**head** 28:16 33:10
52:16 105:1 138:5
191:15 232:7
235:19 241:11
249:12 254:2 307:4
307:8 312:1 325:8
**hear** 41:23,24,25
42:24 70:21 91:3
**heard** 210:15 251:7
268:9,11,13 269:25
271:4,6 309:13
**hearing** 321:16
**heavy** 260:6
**held** 200:25 201:16
**help** 6:24 124:20
127:22 150:22
212:7 224:14,16
253:21 256:11
271:13
**helpful** 32:1 149:22
253:20 313:13
**hey** 212:24 213:2
257:21 272:17
**HH** 341:20
**Hi** 125:4 149:16
193:4 310:9
**high** 205:18 229:12
**high-level** 224:19
**higher** 164:19
**highlight** 162:18
168:14
**highlighted** 152:18
161:21
**highlights** 88:11
174:24 175:3,3
**highly** 84:7 339:22
**hire** 139:7 143:4
**hired** 219:4
**hires** 142:21 143:2
**hiring** 60:18,22
111:23 112:3 113:6
137:4 138:17
143:13
**hold** 15:6 29:18 88:13
172:25 173:2 185:2
197:24 211:5
332:21,25
**holdings** 78:8
**Holy** 290:6,13 291:8
298:21
**home** 229:23
**honestly** 113:20
307:7
**hope** 213:2 216:7
**hopeful** 264:5
**hopefully** 90:9
**hoping** 184:7
**Horowitz** 325:21
336:17 337:16
**hosted** 243:9
**hour** 36:10 56:3
71:15,18 128:6,8
179:17 180:1
181:10 294:20,20
297:21 299:4
**hours** 36:24 181:7
217:9,10,12 249:13
338:20 344:19
**house** 70:2,19 72:18
172:14 218:19
**Huge** 33:20
**hundred** 230:23
244:5 311:22
**hundreds** 104:17,20
**hype** 83:23
**hypothetical** 12:13
59:22 65:8 69:25
70:5 77:9,16 83:18
83:24 95:4 99:16
101:23 103:22
104:3,4,6 155:6,18
156:5 164:6 213:16
**hypothetically**
164:17

**I**

**ICR** 235:3,6,13,21
237:23 238:4,4,6,22
239:5,21,23 240:21
241:8 242:12 246:7
249:18 251:9,14,21
254:8,10 255:18
256:15,18,21,22,24
257:8 295:17
**idea** 23:16 24:3 46:4
69:24 71:12 139:12
139:16 155:12,12
160:13,16,18
161:17 169:5 200:6
223:17 253:22
254:24 336:1
**ideas** 12:7 26:14
53:20 156:18
160:22
**Identification** 325:17
343:20
**identify** 22:9 257:12
302:24
**ignorance** 292:7,8
**ill** 331:19
**image** 289:12 290:3
290:14
**immediate** 61:21
69:22
**immediately** 239:16
241:24
**impact** 80:12,16 82:9
253:18 264:10,17
338:17
**impacted** 267:8
**impairs** 278:20
**importance** 230:3
**important** 10:10,11
34:24 102:1 138:8
181:1 239:7 268:6
284:8 285:3,7,10
291:7 292:16
293:12 318:11
**importantly** 11:9
**impressions** 141:4,7
**improving** 170:16
**inaccurate** 336:18,19
337:6,24 338:4
**inaudible** 44:8 67:22
210:23 299:15
**incident** 235:12
**include** 20:17 21:18
22:13 32:6 201:7
208:11 224:10
323:6
**included** 48:22 86:9
130:7 132:16
192:19,21 205:23
208:13
**including** 8:24 113:13
250:25 265:16
272:19 312:11
**inclusive** 99:13
**income** 61:21 69:22
201:8 213:4 308:24
**incorrect** 234:24
248:7
**incorrectly** 250:2
256:21
**indecipherable** 70:24
91:1 148:20 179:13
206:13,20
**indemnification** 9:2
9:10,15 10:15 13:24
14:8,10 15:2,10
16:1,24 17:4,11
18:11,24 19:16,23
20:14 21:24 22:5

31:3,11 37:11,15 38:7 39:25 41:4,11 41:13,17 231:2,10 314:12,14 315:9 316:22,23 318:11 319:17 320:15 321:14 322:5 329:8
**independent** 56:9
**indicate** 134:17
**indicated** 49:8 85:21 85:24 148:20 155:17 158:17 183:1
**indicates** 95:6 258:2
**indication** 120:5
**indicative** 130:7
**indigo** 235:3
**individual** 27:3 113:21 152:18 191:8 236:5,12 268:10,17 271:7 287:15
**individuals** 32:9 263:17 268:20
**industry** 52:21 60:9 135:21 168:21 205:8,10,14,19 208:16 210:5,12 263:17,24 268:1 272:8 287:7,19,20
**industry-related** 208:14
**industrywide** 205:18
**inform** 83:13 204:14 204:22
**information** 23:25 37:12 38:20 39:5 44:5,6 46:6,21 53:7 55:7,20 60:2 78:13 78:15,17,21 82:21 83:22 89:25 90:12 90:24 91:17 94:4 95:19 96:5,11,19 98:25 99:5,11,19,22 101:1 103:24 111:3 112:10 113:10 124:5 125:25 126:16 134:7 143:1 143:24 147:7 155:10 157:6 158:7 158:13,24 159:5 161:23 163:9 167:13 174:11,19 205:24 206:4 210:3 210:4,6,7,10 220:14 224:24 233:5 237:2 238:19 248:12 249:15 253:2,3,19 254:15 258:18 263:20 264:8 267:7 268:4,5 293:17 301:13 303:20 309:4 317:2 336:18 337:24 338:4,16
**Information'** 96:23
**information-gather...** 209:9
**Information.'** 233:8
**informational** 208:18
**informed** 204:17 205:10
**inhouse** 113:18 122:9 137:5 151:25 170:13 337:16
**initial** 125:17 149:10 231:3
**initially** 275:4 326:14
**initiatives** 204:1 211:15,23 212:3,20
**inputted** 225:3 228:12
**inquiries** 12:14
**insert** 198:14,15
**inside** 111:1 141:9 241:11
**instant** 70:1 81:3,12 81:16 166:14 172:13
**instructing** 295:17
**instruction** 251:20
**instructions** 251:17
**insurance** 143:19 335:1,2
**integrate** 157:15
**integrating** 161:9
**integration** 336:7
**intel** 335:9
**intended** 54:24
**intending** 208:25
**intent** 110:24 111:1 112:14 120:8,9 186:20 201:22 221:23 222:11 223:8,9,24 224:7,8 224:9,12,17,22 228:19 284:25
**intentions** 255:10
**interest** 39:7 114:8 120:5 183:2 209:5 219:5 220:3,6,19 329:3
**interested** 49:9 80:25 85:23 86:14 103:3 114:7 142:12 205:11,12,16 220:10,16 342:19
**interesting** 289:18
**interim** 149:23
**internal** 295:23 338:14
**internally** 31:4 61:16 200:1 333:12
**internet** 256:4
**interpret** 14:23 17:20 54:20 55:9 59:11 60:1 91:21 125:21 168:4,5
**interpretation** 91:6,9 144:7,9
**interpreting** 43:3
**Interrogatories** 4:8
**Interrogatory** 247:17 247:24 248:5
**interrupt** 26:18 130:1 309:17
**interrupting** 233:20 321:2
**interval** 80:20 161:12 170:15 174:18
**interview** 105:16 114:4,11,15,18,25 115:6,10,14,16 201:4 326:11
**introduce** 6:4
**invest** 219:8,9
**investigate** 253:12
**investment** 81:21 244:21 282:11 335:5
**Investments** 80:6
**investor** 99:12 100:6 190:24 191:13 232:4,20 234:25 235:25 237:18 242:20 243:6,8,15 244:17,19 245:5,8 247:16 248:11 250:4,21 251:9 252:13,20,24 254:21 255:24 256:13,13 257:14 260:15 267:19 269:12 280:14,16 280:20 281:17 293:1
**investors** 80:20,23,24 161:12 170:14 174:18 243:2
**invitation** 107:18,22
**invite** 107:13
**involve** 305:22
**involved** 113:5 234:11 252:9,10 263:12,14,24 267:25 269:25 301:8,16,17 302:1,6
**involving** 159:11
**IP** 253:8
**IR** 234:24,25 235:2 250:4 256:22 258:18 259:18
**IR.AbacusGM.com** 243:7 248:5 249:4
**IR.AbacusLife.com** 248:14 249:9
**irrelevant** 57:5
**irrespective** 97:16,24
**issue** 9:19 15:1,9 22:10 52:3 133:3 148:8 254:17 285:20 290:18 333:4
**issued** 202:15
**issues** 231:24 278:9 278:18 321:14 332:20
**items** 230:2

**J**

**J** 21:6
**Jackson** 1:19 3:4 6:14 6:18 7:4,10 8:11 11:6 12:24 20:25 22:17 23:8 25:13 26:15,17 30:14 33:4 33:23 34:25 37:18 40:10 47:14 50:14 60:5 61:15,23 62:7 62:15 64:23 65:11 67:10 69:12 78:10 84:18 107:11 115:6 123:9,12 129:7 138:20 145:17 154:3 173:23 179:2 180:9 182:5 201:6 201:11 214:17 216:5 217:15 218:13 221:12 223:12 224:2,6 225:17 226:3 227:15 228:3 237:8 237:12,16 266:6 267:4 269:5 274:21 276:16,25 277:16 278:9 280:23 295:1 297:13 312:25 315:2 321:4 330:6 330:20 340:7 341:7 342:9 343:3,18 344:13
**Jackson's** 236:12
**Jan** 1:22 40:13 181:18 341:17 342:6,25 344:4,25
**January** 243:11
**Jay** 1:19 3:4 7:4 30:14 33:4 47:23 50:2 123:4,9 180:3 216:7 228:25 307:9 340:7 341:7 342:9 343:3,18 344:13
**jay@abacusgm.com** 108:20,24
**jay@abacuslife.com** 108:14 109:5
**Jeff** 203:19,20,25 204:11 236:6,13 238:5 239:4 240:13 246:5 251:15 253:1 253:9 254:23 256:23 259:17
**Jen** 175:9
**Jennifer** 2:4 6:8
**job** 114:18 117:5
**Joel** 307:2,2
**Johnson** 2:20
**join** 107:13
**joined** 6:13 116:23
**Jose** 80:1,1,2,11 81:15 286:20

287:15,18,19,22
**Jose's** 80:15 286:17
**Josh** 271:2
**Joshua** 268:10,11
**judge** 115:13,15
**judgment** 207:19
**July** 1:16 6:3 334:3,7 334:12,16 341:12 342:21 343:4 344:6 344:14
**jump** 50:23,25 200:14 228:23
**Junger** 2:4 6:8 119:1 122:25 154:25 165:4,11 194:1,6,11 194:13,18,22 198:2 200:16 210:19,21 210:23,25 221:4,7 240:8,12 258:23 261:5,9 269:2 270:7 279:16 281:13 296:15,24 302:14 318:18 337:2,6,11

**K**

**Karla** 30:13
**Kathleen** 2:9 6:13 344:10
**Kathleenmessinger...** 2:11 344:11
**Katwijk** 30:13
**keep** 83:7 89:24 90:12 97:4 102:8 181:4 183:6 206:21 216:8 256:3 276:21 314:10
**keeps** 63:21 175:17 175:17
**kept** 9:11 31:3,3
**key** 183:8 185:14,21 186:9
**kids** 229:22 301:1
**kind** 60:12 77:18,19 123:21 124:11 161:8 164:9,14,15 165:2,19 172:15 174:8 176:14 185:20,21 287:6 322:5
**kinds** 234:12 265:4
**Kirby** 76:4,4 300:2 300:10,11
**knew** 39:3,5 52:19 56:10,23 139:20 205:15 234:10,10 234:12 236:19 263:8 267:25 292:9 297:6 335:24
**know** 9:12 11:11,12 12:5,12,13,14 13:7 13:20 18:13 19:7 20:6 24:6,24,25 26:8 30:23 31:25 32:13,14,17 35:24 36:1,9,11,13,20,23 37:2,8,10 44:24 45:10,15 46:3,3,7 46:16 47:3 49:9,11 50:7 51:5,16 52:8 53:11 54:18,19 55:10 58:9,14 61:5 71:9,11 73:19 74:20 79:5,21 81:7 82:16 83:21,25 86:11 89:19 90:17 92:8 93:25 94:11,14 98:6 99:2 101:21 102:15 105:17 109:22 110:24,25 112:18 113:14 114:8 115:8 115:11 117:24 118:3 120:21 121:1 123:19,23 124:22 130:12 134:2 136:12,15,24 137:23,24 138:2,7 138:14 139:10,12 139:17 140:20 141:14 142:4,6 144:3,8,11 145:9,10 145:12,23,24 146:3 146:8,13 147:23 148:11,11,13 149:18,24 151:24 152:8 157:22,25 158:21 164:18 165:5 167:10 169:2 170:2,18 171:2,6,25 172:6 175:2,9 176:6 176:8 177:8 187:1 190:22 191:15,15 191:20 195:4,5 202:11 203:8,10,12 203:14 204:8,12 205:11 207:14,15 207:17,18,21 209:3 209:25 210:3,4 211:9,11 212:5 214:25 216:25 218:15 221:18 222:8 223:8 226:6,6 226:9,20 230:8 232:6,7 233:14 234:13 235:10,18 236:20,23 237:11 237:11,14,25 238:5 238:24 239:4 241:11 243:3 245:12 246:25,25 248:15,19,21,23 249:10,13,14,17 250:14 251:14,15 252:8,23 253:7,10 253:15,17,24 255:3 255:11,11,15 256:25 258:13,15 260:13 263:5,7,19 263:19 265:3 266:4 267:18 268:13,16 268:18 270:13,18 270:24,25 271:3,9 271:10,13,19,19,21 271:24 272:4,18,20 274:24,25 275:14 276:2,4,6,7,9,20,21 277:16 278:23 279:2,3,11 280:4,4 281:25 282:25 283:13 284:24 287:8,11,18 290:2 291:11 293:23 294:4 295:25 298:15 301:14,17 301:17 307:4,5,7 309:10 310:11 311:16,24 312:1,2,4 313:5,13 315:8,15 315:25 317:23 319:4 321:1,18,19 322:3,10,11 324:14 325:4,7,8,12 328:8 329:11 331:9,12 333:17 335:14,17 335:23
**knowing** 86:5 100:25 109:1 155:20 192:15
**knowledge** 333:9,10
**known** 146:10 204:25 210:12 241:14 249:5 287:6
**knows** 236:23 261:20 262:14 263:13,14 265:6 301:7,11,15 302:1,6

**L**

**L** 1:22 341:17 342:6 342:25 344:4,25
**label** 210:22
**labeled** 200:3
**labels** 194:4,20 195:4 288:14
**labor** 70:3,4,19,20,20 71:7,9 72:19,20 172:15
**language** 8:25 9:7,9 9:15,23 10:2,2,4,10 13:25 15:2,10 31:3 34:24 37:11,15 55:25 73:21 87:9 231:2,20 314:12,16 314:23 315:16,20 317:21,23 318:9,12 320:15 322:5 326:1 329:8
**laptop** 244:23,24
**large** 1:24 81:17
**late** 13:11,16 109:4 190:15 319:8
**latest** 21:12 299:8 313:9 318:24
**Latham** 123:13,14,18 123:24,24 125:6 151:25 184:2 224:15 230:11
**Lauderdale** 344:4,18
**law** 86:16 120:4 237:6 247:1 248:16 275:3
**lawsuit** 222:15 283:19
**lawyer** 42:12,13,14 42:15 123:15,21 127:1,7 139:13 149:24 218:13 275:6
**lawyers** 113:5 119:18 219:4 228:15
**lay** 26:12
**lead** 11:12
**leadership** 21:17
**leads** 77:1
**leak** 288:20
**learn** 87:6 150:13 189:10
**learned** 234:5,6,8 252:17 263:11,23 267:18,24
**learning** 86:14 269:21
**leave** 146:1,6 272:19 320:16 330:6 338:24 339:2
**leaving** 86:10 158:19 272:24
**led** 11:24 12:23 13:5
**left** 146:7 289:24 329:20 330:3,13 331:2 335:18 339:13
**legal** 89:19 113:11,18 127:4,9,13,16 206:23 208:4 321:1
**legally** 188:24
**legally-binding** 188:23
**legitimate** 180:22
**length** 84:22
**lesson** 50:5
**let's** 8:11 20:18 21:10 22:8,8,8,9 24:10 47:12 49:25 51:13 51:23 55:24,24,24 55:25 58:25 60:11 63:18,20 64:22,25 66:10 75:21 78:23 85:3 87:16 88:24 91:25 99:18 106:24 111:6,6 118:23,23 122:24 123:7 125:3 128:16 132:2 137:2 137:7,20 149:15 150:14 151:23 153:18 154:21 164:24,24 168:7 179:9,14 181:4,22 182:12 183:6 189:15,16,16,18,18 196:5,5 197:24

200:14,14 201:3,4 205:21 210:16 211:13 212:9 215:3 215:11,21 216:11 219:1 221:2 232:23 234:17 236:1 240:9 247:4 257:16 258:5 258:20 261:3 263:25 273:8 279:15 282:2 288:6 289:1 294:2 302:12 306:14 307:16 308:6 310:4 313:15 322:15 324:5,5 325:13 329:13,15 330:18
**letter** 19:7,10 36:2 120:8,9 201:22 221:23 222:11 223:24 224:7,8,9,12 224:17,22 225:10 226:11,18 228:4,19 233:4,7
**letting** 67:17
**level** 205:18
**leverage** 77:25 176:3 176:5
**liability** 1:7
**licensed** 202:19 335:13,19
**licenses** 332:21,22,23 333:1,5 335:14,15 335:17
**lie** 294:25 295:4,19 297:19
**lied** 297:13
**life** 1:10,19 3:4 7:4 77:4 85:22 86:22 89:4 108:21 143:19 173:23 230:24,25 243:12 334:24,25 335:2 340:7 341:7 342:9 343:3,18 344:7,13
**limited** 1:7 22:14
**line** 21:7 137:13 138:8 168:10 178:19 182:10 195:19,22 231:12 240:6 257:20 259:19 261:19 262:5 265:5 266:18 302:22 334:21,25 337:19 343:5
**lines** 334:23
**LinkedIn** 113:24
**list** 192:1 194:13
**listed** 66:16 144:22 153:7
**Listen** 27:22
**literally** 70:5 73:24 178:18 218:10 281:13
**litigation** 98:4 231:23 344:2
**little** 8:12 13:2 16:9 32:15 48:24 49:14 50:18 98:10 99:18 102:21 170:21 294:10 308:14
**Live** 343:3
**lives** 146:8,11
**LLC** 1:6,6 151:3 344:7
**LLP** 2:7
**lmagrp.com** 230:15
**Lmk** 323:3
**loaded** 234:24
**loading** 238:19
**locate** 198:13,16
**located** 7:13 98:5 314:5
**location** 35:14
**Locke** 86:17
**logo** 198:7,11
**LOI** 9:8,10 15:14,21 17:12 21:8 31:1,20 33:20 38:6 41:19,20 42:7,11,16 43:9 104:1 118:19 119:24 120:7,11,13 120:16,20,23 121:2 121:4,13,15 122:1,6 125:20,22 130:9 150:4,6,7,8,11,12 153:8 159:15,23 160:2 162:18 167:17 182:25 183:4,20,24 185:4,8 185:11 186:12,20 187:9,11 188:20 189:8,8 199:16,21 200:7 201:14,21 202:12,15,24 203:4 205:3 208:22,24 209:6 214:22 218:2 218:5,11,17 219:5 225:3,5 226:12,18 231:3 305:15,19,25 306:12,22 307:23 308:4 309:10,10,11 309:13,14 310:10 310:20,24 311:6,9 311:13,20,23 312:3 313:4,9,15,24 314:3 315:21 316:21 317:22,23 318:2,25 321:5 322:4,24 324:21,22,25 325:25 334:13
**LOI's** 311:24 312:8 316:7
**long** 36:7,20 235:5,12 246:11,13 249:10 274:16,18
**long-term** 235:11
**longer** 122:21,23 235:7 277:10 317:8 323:8
**Longevity** 201:8 213:3 230:16
**look** 21:10 22:15 24:14,18 25:1,11 26:9 43:20 50:24 51:23 55:2,25 56:20 63:15 72:5,8 87:16 91:25 96:2,24 97:9 106:20 111:6,6,7,7 118:23 123:5 125:2 125:3,3 141:15,19 141:25 149:15 150:14 153:19 154:21 164:20 168:3 173:24 174:12 189:16 191:14 197:24 201:3,4 203:22 209:24 215:21 221:2 228:7,9 232:24 244:10 257:16 258:20 261:3 263:25 273:8 274:22 275:9,19 276:1 279:15 288:6 290:16,23 294:4 296:12 307:3 313:19 316:1 317:10 325:13 336:13
**looked** 8:23 32:16 117:6 140:2 147:1 154:1 160:6 161:15 188:5,7 290:25 291:2 295:10 297:2 303:13 336:8,9
**looking** 8:7 24:16,23 25:4,9,15 26:6,23 27:7,10,15,16 28:9 28:11,14 54:21 86:2 94:3 100:22,23 113:6 130:13 137:6 159:11 163:1,10 173:13,17 175:8,11 185:17 194:4 195:12,25 212:21 244:14 248:10 287:8,9 314:13 324:20 331:4,9
**looks** 125:16 167:23 194:16
**Lord** 86:17
**Los** 2:8
**lost** 277:14 297:19 329:2
**lot** 22:19 51:4 98:3 114:5 121:2 137:25 147:1 168:20 199:9 221:20 222:8 223:22 263:18 287:20 323:1
**lots** 168:4 234:2
**loud** 291:22
**love** 283:1,8,14,14,25 284:13
**Lucas** 2:22 288:18
**luck** 308:18
**Luke** 85:18
**lunch** 128:13,21 179:20,21
**Luxembourg** 286:24
**lying** 296:7

**M**

**Ma'am** 162:15
**Maierson** 230:10
**main** 21:17
**maintain** 96:4,9 332:24 335:9,17
**making** 91:9 274:11
**Mallory** 2:20
**manage** 12:7 53:19 61:7 105:3,5,8 256:11
**managed** 55:5 105:15
**management** 1:11,19 3:5 6:12 7:5 81:14 81:23 103:5,6 151:3 168:23 331:10 334:4,15 335:3 340:8 341:8 342:10 343:4,19 344:14
**managing** 335:4
**manipulation** 338:8 338:15,18
**manufacturing** 148:8
**March** 190:15
**Marissa** 240:21 241:8,12 257:20 259:17
**mark** 20:19 47:13 87:19 107:2 118:24 129:1 153:19 165:2 165:9 181:23 193:14,15 200:15 221:2 240:15 247:18 258:21,23 259:4 261:4 273:9 288:7 300:1 302:13 308:7 318:16,16 325:14
**marked** 20:21 47:17 87:21 99:15 100:13 101:12 102:2 107:3 122:18 129:3 153:21 165:15 182:1 189:20 193:19 200:21 215:14 221:8 240:17 247:21 259:1,2,6 261:12 270:8,10 273:10 288:8 300:4 302:17 308:11 310:6 312:15,19 318:19 322:16,17 325:16 337:8,9
**market** 56:11,17 57:19 86:3,8 106:22 209:10 230:16 267:17 287:6 338:7

338:15,18
**marketing** 204:1,5,9 249:21 255:20,22 257:8
**markets** 56:25 282:10
**marking** 122:17 240:10 270:5
**materially** 317:7
**materials** 256:3 265:13 266:2,16
**Mathew** 4:12 268:17 269:10 271:10,15 271:21,25 272:6,8,9
**matrices** 41:8,9 44:4
**Matt** 267:14
**matter** 7:12 100:17 101:18 149:6 223:1 250:1 280:23 286:8 297:6,8,11 311:3 315:11 318:8 324:22
**mattered** 293:14
**matters** 101:21
**McCARTY** 2:9 339:16,19 344:10
**McCauley** 32:6,8 33:6 34:6,7 35:1 152:3 186:1,5,25 188:5,12 204:24 230:9 312:23
**McNealy** 30:14 32:14 75:22,25 77:23 192:4
**mean** 8:6 13:3,17 14:23 17:21 31:23 32:12 36:19 42:25 48:11 56:6 59:16 72:5 73:5 78:4 93:22 94:23 95:2,10 95:14 97:15 102:21 106:8 109:10 111:16 117:25 118:7 125:21 130:1 143:21 144:2 154:18 159:15 163:1 166:15 168:19,20,21,23,25 170:19 171:3,6 176:10,11 180:5 195:13 199:6 207:1 217:25 226:15 227:21 231:16 251:20 260:21 269:11 277:16 281:11 284:16 291:21 294:25 299:10 301:5 309:10 322:3 328:5 338:10
**meaning** 16:10 95:11 95:12 109:7 129:22 191:19 239:1 246:17 285:19 328:15 332:2 335:14,19
**means** 80:18 96:23 115:16 144:12 145:11,12 147:20 149:13 168:23 218:5 221:18,25 231:22 271:20
**meant** 54:23 58:16 78:7 91:7,7 160:13 222:9 223:18 233:18
**medication** 278:20
**meet** 44:2,3 114:23 190:1,3
**meeting** 4:2 103:13 160:23 184:8 187:5 189:23 190:11,13 190:23 191:3,7,7 192:10 193:5 200:5 200:10,11,25 202:1 202:21 203:1,9,11 203:17,19 204:2 205:4 215:5,17 216:1,22,25 217:1,6 217:16,18 219:3 222:1 228:22 232:14 233:11 234:1 238:8 241:22 244:20 246:14,14 249:22,23 254:4,7 254:14,25 255:16 265:13 266:3,17 280:5,10,13 281:3 281:15,18
**meetings** 201:16 203:25 234:3 244:20 246:15 265:3 280:14,16,20 281:17 282:15,16 282:17
**member** 76:2 333:7
**members** 29:11,19 30:2,4,8,11 183:9 185:14,21 186:9 191:9,11,20,23 192:5 208:7
**memorize** 303:14
**memory** 223:25 224:1 278:9,18,21
**mental** 141:4
**mention** 19:16 41:16 43:15 319:24
**mentioned** 19:23 20:14 41:3 85:25 100:12 167:10 319:16
**message** 280:3 282:4 285:4,11,23 288:11 288:18 295:19 297:13 299:25 300:18 301:21,23 301:24
**messages** 4:13,16 5:8 39:9 40:17 41:1 273:14,18,23 274:2 274:9,22 275:9,19 276:1,8,13 277:18 278:6,24 279:1,20 283:7 289:2 294:21 298:22 300:7 322:20
**messaging** 333:11
**Messinger** 2:9 6:13 344:10
**met** 233:23,24 268:23 281:16
**Miami** 2:3
**MIAMI-DADE** 341:4 342:4
**Michiel** 30:13
**Microsoft** 333:13
**midday** 243:24
**MIDDLE** 1:1
**Miller** 137:9 230:12
**million** 61:2,5 74:21 75:1,18 170:17 172:18 174:17 314:17,24
**millions** 161:11
**mind** 88:3 170:4 212:6 226:15 232:11 303:9,19
**mine** 59:13 114:15 172:23 177:18
**minus** 74:21
**minute** 106:25 113:3 119:4 192:7 210:20 211:22 290:20
**minutes** 4:2 36:22 37:1 64:11 83:3 200:11,25 202:2 204:7 240:3 327:17 329:18,19 330:1,3 330:10,13
**Mischaracterizes** 222:5
**misdemeanor** 332:4 332:11,13
**misheard** 186:18
**mislabeled** 202:9
**misrepresentation** 316:17
**missing** 37:18
**misspeak** 212:18 214:3,14,18
**misspoke** 199:22,25 200:2,17
**misspoken** 199:17
**misstatement** 183:19 183:23 186:22
**Misstates** 145:3
**mistake** 185:11 214:5 241:13 250:14
**misunderstanding** 15:16 48:13 209:1
**misunderstood** 101:8 102:4 327:1,8
**model** 99:23 100:1,4 100:5,9 101:10 102:12,24 156:14 157:24 158:8,25 159:16,22 160:1,7 160:10 161:16,24 162:21,23 163:1,5 163:13,16,17,23 164:5,10 166:16,25 167:3,6,13 168:8,11 170:2,11 171:23 172:20 177:14,17 177:17,18 192:9 196:8,11,24 197:3 197:14 198:1 205:24 208:8,11 214:10 308:23 309:2,3,5,6,8 326:22 336:3
**moment** 8:2 246:17 263:10
**Monday** 218:21 228:24 344:19
**money** 219:4
**month** 57:11
**months** 18:16 86:4 146:2 235:10,10 320:1
**morning** 6:7,14 7:10 216:1 233:23 243:24 262:22 280:6,16,18,19,25 281:8,9,15,19
**mortality** 335:10
**motion** 148:14
**motivation** 46:15 103:2
**move** 9:2,13,16,21 14:1 17:18 20:7 21:15 23:20 24:10 25:20 31:17 32:18 32:20 37:9,13,24 38:19 46:7 55:24 58:25 60:11 103:25 105:25 121:16,18 122:24 132:2 133:4 151:23 171:18 179:9,14 182:22 189:18 212:24 215:3 216:11 266:7 273:22 276:10 282:2 306:14 307:18 311:4 318:10 323:14 324:19 329:13 330:18
**moved** 183:2 219:21 321:24 322:7
**moving** 9:1 10:17 20:4,5,10,16 34:16 49:9 83:2,4 127:24 128:10 161:12 183:9,16,20 187:14 188:13 245:10,20 245:22 324:11 331:6
**multiple** 102:19 103:16 132:23

152:19 158:20 210:13,14 306:7 324:19,20
**multitude** 18:16 23:6
**mute** 299:24
**muted** 47:11 233:17

**N**

**N** 3:1
**n/k/a** 1:10,19 3:4 7:4 340:8 341:7 342:10 343:4,19 344:13
**name** 67:9 76:15 95:15 108:25 111:11,17 137:16 137:24,25 143:18 185:25 191:21 228:7,10 243:10 268:19 286:17,18 286:20
**named** 94:20 95:1,9 95:12 111:10 137:19 223:23 253:25 268:10,17
**names** 30:10 142:21 143:18 191:21 222:8
**natural** 52:24
**nature** 191:5 333:13
**navigating** 50:5
**NDA** 86:18 87:2,5,8 105:20 106:5,6 289:17
**necessarily** 51:3 162:24 202:9 263:13
**necessary** 94:5 177:9 307:19
**need** 14:21 25:16 50:5 57:23 65:13,21 66:1,4 71:21 72:2 104:8 147:3 148:14 149:18 181:2 194:10,15 202:18 251:16 266:7,8 308:23 309:5,6 322:8 323:8,23 324:8,18 339:11
**needed** 38:25 43:16 59:22 246:6 247:1
**needs** 29:1 323:6 330:6
**negotiating** 307:25 320:2
**Nelson** 307:6
**net** 308:23
**network** 50:5
**never** 45:16 46:16 58:21,23 73:12 109:21 112:19 136:7,8 146:18 155:24 202:14,25 203:6 220:9,14 223:1 328:14 333:22 336:5
**new** 124:15,16 128:10 142:21 165:6,9 194:14 233:12 235:8 238:7 244:19 246:15 249:24 262:24 312:3 331:10,11
**news** 59:5 123:5
**newsworthy** 328:6,9
**nice** 245:17
**night** 273:14 274:19 279:23 281:18 288:13
**nods** 33:10
**noise** 288:25 290:17 294:5,7,8,13,16 298:13,15,17
**nomenclature** 243:3
**non** 264:8 265:15
**non-case-related** 131:6
**nonbinding** 33:20 106:1 150:7 167:17 224:10 305:19
**nonbonding** 15:14
**noncompete** 136:9
**nonlegal** 15:14
**nonpublic** 267:7
**normal** 252:21
**normally** 111:23
**north** 332:14
**Notary** 1:23 341:18 343:22
**note** 148:18 149:17
**noted** 130:9
**notes** 88:11 201:17 327:16 342:13
**notice** 1:24 52:3 83:16 143:25 144:22 145:4 147:23,25 206:12 206:18 344:22
**noticed** 148:6 244:22 245:1 274:15
**Notified** 253:25 254:1
**noting** 59:6 175:4
**November** 4:2,6 137:6 138:4 150:15 182:9 183:15 186:10 188:11 189:24 192:10 201:1,16 202:1,21 215:18 222:1 232:1 232:13,17 235:13 236:2 237:17 254:4 254:5,14 256:2 257:17 259:13 261:19 264:1 269:13 272:13 279:24,25 284:3 288:12 293:4 295:11 296:12 297:2,25 300:2 302:21 306:25 307:24 310:10 313:3
**nuanced** 87:8
**number** 13:10 22:1 22:15 28:10,12 40:5 75:8 146:15,23 147:7,17 158:15 187:6 190:5 192:15 193:23 194:18 195:3,16 210:25 211:17 228:16 230:2 247:25 253:1 253:4 279:8,14 302:24 307:12 314:6
**numbers** 102:11,16 102:20 112:19,22 155:20 156:1 160:13,19 162:11 162:19 169:5 195:10 224:21 225:1,2 228:11 310:18,19
**NYC** 308:17

**O**

**o'clock** 6:2
**oath** 62:14 102:19 131:1 341:1
**object** 91:9 188:12,20 189:3 206:25
**objected** 189:2
**objection** 8:14 10:7 10:20 11:22 12:11 13:1 14:4,20 15:22 16:7 17:5 18:6 19:5 19:25 23:23 26:25 27:12 28:24 29:14 30:18 32:22 34:14 35:17 38:16 40:3 41:6 43:18 44:16,23 45:12,21 46:12 47:1 49:2 50:11 51:2 52:6,13 53:10,16 54:1 55:13 57:7 59:10 61:25 63:13 69:15 73:11 74:12 75:6,16 81:5 82:3 82:24 86:25 90:1,14 90:25 91:4,9,18 92:13 93:17,24 94:9 95:22 96:14 97:6,22 98:8 99:1,7,20 100:14,18 101:19 102:3,14,25 103:11 105:11 109:19 110:2,8,21 111:13 111:25 112:23 113:8 114:12 115:18 116:4,15 117:1,7 118:2,9,17 119:20 120:12,24 120:25 121:17,24 123:16,22 129:11 130:5 132:11 133:10,23 134:8,14 134:24 135:13,25 136:23 138:6 139:9 141:2,22 142:18 143:7,14 144:13,24 145:2,18 148:24 150:1 152:12 153:2 156:6,12,15,22 158:11 159:1,7,17 160:8,15 161:19 163:3,19 164:2,12 166:17 168:2 169:10,22 170:22 171:4 174:4 176:16 176:16 177:5 178:10,10,16 179:8 184:18 185:9 186:15 187:15,21 188:1 189:5 191:1 192:11 197:6,17 203:2 205:5 206:1 206:11,16 207:5,22 208:4,20 209:11,19 214:7,24 215:8 218:23 219:7,19 220:8 222:3,22 223:6,13 224:3 225:7 226:13 227:20 228:5 229:2 229:15,25 231:5 232:5 234:21 235:14 236:9 238:23 241:9 250:11 251:11,24 252:14 254:9,16 255:5 256:5 264:23 265:21 267:21 269:23 270:16 271:23 273:4 276:17 277:12,24 280:8 281:5,12 283:21 284:6 286:14,19 287:3,24 292:11,14 295:2,20 296:9,18 297:20 298:2 301:22 305:3 305:11,17 306:20 308:2 310:21 311:8 315:5,22 316:13 317:3,19 318:6 320:10,18 321:21 323:16,16 324:3 325:5 326:7 327:11 327:19 328:3,7,20 329:5 333:25 336:4 336:20
**objection's** 206:12
**objectionable** 317:21 317:24
**objections** 145:3 206:17,18
**objects** 147:14
**obligated** 237:6
**obligation** 145:1 208:2 317:5,9,12,16
**obligations** 274:3

277:19
**obviously** 273:16 328:5
**Occasionally** 146:22
**occur** 13:23 213:15
**occurred** 191:5 201:18 213:11,12 217:6 223:1 235:8 235:12 236:3 257:4
**October** 50:1 51:9,21 51:24 56:2 57:4 76:17 77:6 107:8 109:17 154:2,11 187:20
**odd** 194:21 277:13
**offend** 290:11 291:23
**offensive** 290:10
**offer** 80:19 125:17 218:19
**offered** 229:9
**offering** 229:6
**offers** 324:20
**office** 7:20,21 35:8,9 35:10,12,14,19,20 257:2 293:6 295:6 344:17,19
**officer** 134:6 135:6 135:20 230:13 255:22
**offices** 7:15
**official** 100:20 341:11
**oh** 6:15 40:18 68:4 71:10 95:11 120:17 150:10 165:5 167:19 168:16,16 174:3 179:3 200:17 233:19 248:10 258:25 262:4 272:5 289:25 309:15
**ok** 301:4
**okay** 7:15,24 8:4,9 9:4,14 10:3 11:6,17 12:3,16,23 13:12,24 14:10 15:25 16:3,5 16:19 17:2 18:9,22 19:10 20:18 21:5,10 21:23 22:5 24:10 25:2,7 27:22 28:17 28:22 29:5,24 30:10 31:9,19 32:2,8,19 33:2,5,8,13,22 34:11,23,25 35:6,9 35:22 36:3,7,17,25 38:4,9,23 39:8,17 39:22 40:11,23 41:16 42:16,20 43:9 43:12 44:14,20 45:7 45:9,18 46:9,19 47:6,12,20 48:4,8 48:16,24 49:14 50:17 51:8,12,20,23 52:18 53:1,8,13,22 54:6,11,23 55:18,24 57:10,21 58:5,13,18 59:24 60:11 62:17 62:21 64:10,15 66:1 67:10 68:14 70:1,14 71:22 72:1,10,16,22 73:9,22,23 74:4,7 74:15,24 75:21 76:3 76:16,20,24 77:1,9 77:15 78:12 79:5,15 79:23 80:8,11,16 81:12 82:6,20 84:1 84:4,9 85:16 87:4 87:13,16,18 88:19 88:23 89:3,9,14,21 90:8,21 91:13,25 92:22 93:10,22 94:2 95:14,18 96:9,22 97:9 98:3,19,22 99:10,18 100:1,5,11 101:5,6,17 102:8 104:5,25 106:2,4,13 106:18,23,24 107:6 107:17 108:12,16 109:13,16 110:14 111:6,11 112:6,9 113:2,4,5,18,22 114:2,10 115:4,12 115:24,24 116:13 117:4,12,18 118:15 118:23 120:10 121:22,22 122:3,7 122:15 124:3,25 125:10,19,23 126:3 126:22 127:5,12 128:4,12,16,18,25 129:21 130:18,22 131:7,17 132:1,4 134:1,5 135:5,17 136:8,12,20 137:2 137:14,18 138:12 139:1 142:14,20 143:3 144:1,4,17 145:22 148:23 149:4,11,11 150:10 150:14 151:7,15,19 151:23 152:22 153:14,17,24 154:14,21 155:1,25 156:9 157:12,21,24 158:7,24 159:20,23 160:5,12,25 161:6 162:1,14,22 163:22 164:8,24 165:13 166:4,8,21 167:25 169:19 171:9 172:5 173:19,20 174:21 176:2,12 177:21 178:21 179:12,20 180:20 181:9 182:4 182:8,12,18 183:1 183:14,22 184:12 185:7,14 186:2,24 187:7,22 188:4,10 188:16,19 189:4,15 189:23 190:10,17 190:21 191:11 192:6,21 193:1,3,16 193:25 194:12 195:14,21 196:4,13 196:21 197:2,11 198:7,17,20 199:1,6 199:17,22 200:4,10 200:14 201:13,24 202:25 203:15,19 204:13 205:3 206:8 209:7 210:16 214:2 214:21 215:3,11,21 216:11,18,21 218:3 219:1,17 220:13,21 221:1,17,24 222:14 222:19 223:3,16 224:6,16 225:2,14 225:20 226:23 227:8 228:10,11,18 229:12,20 230:12 231:1,14,25 232:18 232:23 233:2,11,21 234:16 236:1,16 238:12 239:20,23 240:1 241:2 242:2,4 242:8 243:13 244:16 245:3,16 246:9,19 247:3,6,14 247:20 248:24,25 249:7 250:9 251:4 252:5,23 254:3 257:5,10,16 258:5 258:20 259:11,12 259:15 260:2,14,17 261:3 262:1,10,19 262:23 263:25 264:2,11,19 265:5 266:12,24 268:9,15 268:25 269:7 270:3 270:13 271:4,10,18 272:25 273:13 276:18 277:9 279:22 282:2,22 283:6,25 285:12,22 285:23,25 286:4,22 287:1 288:24 289:18,25 290:5,12 290:21,22 291:16 291:19 292:23 294:2,12,19 296:22 298:20 299:2,6 300:13 301:19 302:4,8,10 303:21 304:11 305:2 306:14,15,24 307:16,22 308:6,14 309:7,13,15 310:2,4 310:16 311:5,5 312:10,12,13,22 313:2,14,21,23 314:17 315:1,19 316:7 317:9,15,25 319:14 320:1,16 321:12 322:1,14,23 323:11,25 324:7,24 325:20 326:2,5 327:6,15 329:2 330:2 331:1,24 332:17 333:22 334:9,18 335:11 336:2 337:7,22
**onboard** 105:17
**once** 16:4 171:13 245:7,18 268:23 307:17
**one-word** 70:22 71:1
**ones** 32:16 192:1 230:3 291:6 316:8 332:25
**open** 52:7
**opinion** 241:13
**opportunistic** 114:6
**opportunities** 8:24 13:10 24:14 25:1 26:11,16,21 27:2,4 27:10,16 28:11 58:15 73:3 86:8 103:14,16 117:20 117:22 118:4 159:12 168:22 176:10 184:22 205:7,8 317:10
**opportunity** 10:12 11:8 12:20 22:22 27:3 31:7 32:17 49:13,15 58:2 59:19 65:22 73:25 74:23 85:14,17 87:11 95:5 105:23 106:20 117:15 132:15,15 132:20 158:18 161:3 168:6 173:7 174:15 185:23 187:10,12 189:13 264:15 267:25 273:17 287:11 301:8 320:16 331:4
**oppose** 339:3
**option** 20:6
**options** 247:2
**oral** 147:13
**order** 311:21
**Oretsky** 2:4 3:6 6:7,8 6:14,17 7:9 8:15,18 8:21 10:18,22 12:2 12:15 13:4 14:9,24 15:24 16:11 17:8,16 18:8 19:9 20:2,18 20:23 21:4 23:2 24:9 25:18 26:1,20 27:5,13,22 28:3 29:4,16,18,21,24,25 30:19 31:8 33:1 34:22 35:21 38:22 40:7,12,14 41:15,24 42:4 43:23 44:13,19 45:1,8,17,24 46:18 47:5,12,19 49:5 50:12 51:7,13,14 52:9,17 53:12,21 54:5 55:17 57:9 59:14 62:4 63:16,18

63:20,24 64:4,8,13
64:16,18,21 65:20
66:9,11,12 67:6,11
67:20,24 68:5,12,15
69:6,8,11,17 70:17
70:25 71:5,16,19,23
72:2,10,15 73:16
74:14 75:10,19
81:11 82:5 83:4,8
84:4,9,16 85:3,5
87:3,19,23 88:10,15
88:20 90:7,20 91:11
91:24 92:16 93:21
94:1,22 96:1,17
97:8,11,13 98:2,11
99:3,9,25 100:16
101:4,15,25 102:7
102:17 103:9,18
104:12 105:13
106:24 107:5
109:24 110:4,11
111:5,15 112:2
113:1,17 114:17
115:19 116:7,16
117:3,8 118:6,14,20
118:25 119:3,5
120:6,14 121:6,21
122:2,16,20,24
123:1,2,7,8,20
124:2,9 126:19
127:2,6,11,20 128:7
128:12,15,18,25
129:5,14 130:15
132:17 133:12,25
134:9,19 135:2,16
136:4 137:1 138:11
138:21,25 139:11
140:7,11 141:11
142:2,19 143:9,20
144:16,25 145:6,16
145:21 147:11,16
147:20 148:1,9,23
149:4,7,11,14 150:5
150:16,18 152:13
153:5,18,23 154:8,9
155:2 156:8,13,16
156:25 158:23
159:4,14,19 160:11
160:20 161:25
163:14,21 164:7,24
165:5,13,17 166:5,8
166:10,11,20 168:7
168:9,14,18 169:14
170:1 171:1,8
172:12 173:6,11,15
173:22 174:1,6
175:9,15,22 176:18
177:6 178:13,20
179:1,4,9,14,18,23
179:25 180:5,15,20
181:5,18,22 182:3
184:23 185:13
186:23 187:17,23
188:3 189:6,22
190:6,9 191:2
192:20 193:18,21
193:24 194:3,10,12
194:15,19,23,24
195:2,14,21,24
196:5,7,20 197:10
197:19 198:3
200:17,20,23 203:5
205:20 206:7,14,25
207:6,9,10,25 208:6
208:23 209:12
210:9,17,20,22,24
211:2,6,13,14,20
212:9,11,14,17
213:19 214:11
215:2,10,16 218:25
219:13,23 220:12
221:5,10 222:13
223:2,10,15 224:5
225:8 226:10,17
227:23 228:8 229:8
229:17 230:6 231:7
232:12 233:18,21
233:25 235:1,20
236:7,15,17,24
237:4,15 239:19
240:5,9,14,19 242:1
242:18 245:13,17
245:24 246:2 247:4
247:13,18,23
250:15 251:19
252:1,16 254:11
255:2,6 256:16
258:25 259:4,8
261:6,11,14 264:24
265:23 267:1,3
268:8 269:1,3 270:3
270:6,8,12,19 272:2
273:7,12 274:1,5,8
274:15,20 275:17
275:24 276:24
277:15 278:3,13,17
279:18,19 280:12
281:6,22 283:24
284:12 286:16,21
287:13 288:5,10
289:9,23 292:12,20
295:9 296:4,11,14
296:16,19,22,25
297:6,12,16,23
298:3,4 299:5,9,22
300:6,17 302:3,12
302:15,19 303:5,10
303:24 304:1 305:9
305:14,20 306:6,23
308:6,10,13 309:19
309:21 310:4,8,22
311:10,11 312:13
312:18,21 315:18
316:6,11,14,19
317:14,20 318:15
318:21 320:11,20
321:25 322:15,19
323:21 324:4 325:6
325:14,19 326:25
327:14,20 328:4,10
329:1,9,13,15 330:2
330:5,12,15,18,19
334:2 336:16,24
337:1,3,7,13,14
338:22 339:5
**org** 149:21,25
**organization** 264:16
**organize** 329:16
**originally** 85:19
**originate** 300:15
**originated** 79:20
**origination** 76:7 77:2 82:2,7 170:16 300:12,14 335:13
**originator** 334:25
**Orlando** 1:2 7:14,18 146:12,14
**outlay** 308:25
**outlook** 211:16 212:20
**outreach** 235:23
**outside** 19:8 24:19 113:19 119:11 137:10 158:5 237:23 335:23
**outstanding** 231:24
274:17
**Overview** 201:4
**owe** 20:8
**owned** 230:23

**P**

**P.A** 2:2 307:6
**p.m** 1:16 180:6,9,16 181:6,8 217:4,6 269:14 273:15 340:1 344:19
**page** 3:2,8,25 4:25 193:22 201:3 203:23 210:25 212:14 260:20,24 343:5
**pages** 134:22 192:16 192:16 239:8
**paid** 291:4
**panicked** 259:23
**paper** 79:20 179:6 194:17 196:16,18 196:24 197:3 215:12
**paragraph** 92:1 96:18 201:5,5 231:11,15 232:24 258:21
**part** 11:18 96:11 99:14 102:12 122:21 130:10,14 131:19 209:1 212:20 234:22 238:18,18 245:22 249:20 256:1 273:2 283:15 291:3,5 303:11 322:6 328:12
**participant** 263:24
**participants** 106:22 287:7,9
**particular** 23:7 98:4 121:14 208:17 212:15
**particularly** 230:2
**parties** 89:12 92:3,4 92:10 120:10,18 142:11 205:17 233:4 339:23 342:17
**parties'** 342:18
**partly** 130:6
**partner** 199:8
**parts** 254:19,20
**party** 94:7 96:4,6 120:22 228:3 233:6 256:9,15
**passed** 86:4
**path** 49:22
**pay** 328:23
**PDF** 155:13
**pending** 64:16 71:20 245:12
**people** 20:7 110:1 152:19 176:8 219:10 221:13 252:23 253:6 261:16 263:18 282:12,18 287:20 293:16 327:22
**percent** 230:23 244:5 311:22
**perform** 41:11 114:11,24
**performance** 41:7,8,9 44:3,4 55:19 60:24 301:1 304:4,14
**performed** 116:2,9
**period** 63:4 103:13 277:11 281:20
**permanent** 174:16
**permitted** 90:23 91:16 98:24
**person** 18:21 96:12 113:12 135:9 147:18 152:20,23 279:6 280:10
**personal** 45:14 99:16 109:7 146:7 226:2 227:22,24 277:4,7
**personally** 83:13 90:22 91:15,19 118:12 243:13
**personnel** 295:23
**perspective** 10:14 298:18
**pertinent** 301:13
**phone** 39:2 40:5,15 49:8 51:4 52:10,15 86:6,13 114:1,5 147:7 158:15 191:8 273:1,5 274:23 275:9,19 276:1,8,12 276:14 277:17

278:25 326:19
**physically** 7:13 35:15 35:18 42:25 163:4
**piece** 158:13 196:24 197:3 268:4 282:21 326:13
**pieces** 121:3 291:10
**Piper** 244:21
**place** 35:23 36:8,21 59:22 105:22 153:13 157:16 190:14 219:2 232:17 257:6
**placed** 197:8
**Plaintiff** 1:8 2:5 6:9 7:6 153:6
**Plaintiff's** 3:9,10,11 3:13,14,15,16,17,19 3:20,22 4:2,3,4,6,8 4:9,10,11,12,13,15 4:16,18,19,20,21,23 5:8,11,14 20:22 47:18 87:22 107:4 122:19 129:4 153:22 165:16 182:2 189:21 193:20 200:22 215:15 221:9 240:18 247:22 259:3,7 261:13 270:11 273:11 288:9 300:5 302:18 308:12 310:7 312:20 318:20 322:18 325:17 337:10
**plan** 163:24 239:12 241:19 251:1 293:14 298:8 301:12
**planets** 66:5
**planning** 112:3
**plans** 201:7
**platforms** 81:17
**play** 22:24
**pleasantries** 234:2
**please** 6:4,20 8:22 26:19 31:25 50:3,7 63:25,25 65:14 66:11 72:3,3 73:17 74:24 104:11 125:4 129:25 138:24
149:17 150:17 166:6 193:4 266:7 306:4 307:10 310:5 310:11 313:5,9,12 316:18 319:4 337:19 344:15,16 344:20
**plus** 74:20
**point** 37:19 38:23 80:6,8 93:20 94:20 95:13 132:3 137:23 146:13 152:10,18 153:14 162:12 171:14 172:1 177:22 187:18 192:19,25 199:12 205:3 219:14,17,20 219:25 220:2,15 231:1 235:7,11 239:3 246:25 263:7 279:6 287:14 297:10,10 304:2 309:9 320:4 324:9 335:15 336:5
**pointing** 174:19
**points** 59:5,6,21 154:19 161:20 175:4 260:5 302:24 307:12,15 308:19 310:2
**policies** 26:7 74:16,18 74:21 75:1 77:2 80:14 168:22 174:22 175:24 263:19 300:15 335:20
**policy** 80:10 170:17 199:9
**polite** 22:4
**popped** 138:5
**portal** 52:1,5,7 53:2
**portfolio** 52:23 75:4 170:17
**portfolios** 52:22 74:19
**portion** 131:10 174:15
**posed** 78:9
**position** 12:1,4 21:11 53:13,23 58:6,10,11 58:17 100:23 114:2 115:6 130:10
134:12 171:20 206:8 207:11
**positions** 116:20
**positive** 21:16
**possession** 237:3,5 277:10 316:9
**possible** 303:13 307:17
**post** 72:23,25 73:3,3 73:5,6 74:9 98:24 237:23 238:5 249:22 251:13,13 251:16,21 252:17 252:18,22 254:25 255:1 256:24 259:13 295:18 320:23 321:6,9
**posted** 99:4,12 100:6 190:23 216:8 232:4 232:20 239:5 242:20 243:18,20 244:3,17 245:4 246:6 249:3,21 250:1,20 251:9 252:12,19 254:8 255:23 257:13 260:15 261:2 269:11,12,22 288:19 291:17 292:21,25 294:17 294:23 296:6 329:4
**posting** 191:12 232:17 234:17 236:1 237:13,18 245:21,25 247:15 252:18 259:13 261:18 267:19 268:3 320:25 321:9
**postings** 256:10
**potential** 9:16 10:5 10:11 11:3,15,21 12:9,18 13:17 14:2 18:4 19:3 20:11 28:23 30:16 31:14 49:12,15 53:14,24 54:8 57:5 58:20 73:10,13,23 74:10 78:18 81:20 85:14 85:17 86:24 92:3,6 92:23 93:3,15,19 94:6 95:5,20 100:22 104:1 105:9 106:22
110:19 113:12 117:14,18,20,22,25 118:16 119:7,18 124:21 129:7,16,17 129:19 130:8,24 132:9 133:8,21 151:16,18,20 161:2 161:3 164:19 168:11 169:3,3,7,13 170:19 171:3,6,7,11 182:25 187:10,12 200:7 201:10,18,20 202:24 229:14 250:24 253:18 264:10,14,15 283:16 287:1 321:24 338:7
**potentially** 11:8,10 48:23 60:18 81:1 86:12 103:7 106:20 106:21 112:5 113:6 126:9 140:25 141:16 142:12 146:25 155:19 157:14,23 160:4 164:19 171:18 189:13 203:25 205:9,13,16 208:21 208:25 209:23 210:11 220:10 231:23 253:23 255:9 256:7 263:23 264:17 268:21 269:25 272:19 282:12 301:8,15 315:12 331:4 336:9 336:10 338:15
**PR** 256:17,20,21 284:13
**practice** 24:12 249:22 249:24 250:1 252:21
**predominantly** 11:24 185:16 314:11
**predominately** 9:20
**preliminary** 7:12 183:2,4 337:25
**premise** 234:9 249:20 284:10
**prep** 145:10
**preparation** 303:12
**prepare** 144:5 145:7
145:9 319:5
**prepared** 102:12 148:5 157:24 158:2 158:4 204:10 211:7 211:8,16 212:12,16 224:12 238:13,21 250:6
**prepares** 211:24
**present** 2:17 103:10 111:23 159:5 167:9 197:5 204:1
**presentation** 185:19 192:13,14 193:6 296:17 300:20
**presented** 11:11 103:23 106:19 159:9,10 160:14,21 160:24 161:1,4 254:7
**presenting** 162:19 183:7 204:2
**president** 77:4 255:19 300:12
**pressure** 323:1
**pretty** 53:6 57:20 114:18 331:3
**previously** 313:3 332:25 333:1
**price** 21:18 22:10,11 22:12 23:4,10,12,13 23:17,19,22,25 24:4 24:6 104:2 152:5 209:24 228:13 338:17
**priced** 44:8,11
**primarily** 32:16 39:14 137:3 237:10
**primary** 14:7 17:18 18:3 19:20 129:21 130:2 132:5,8,13 133:5,7,14,20 231:17 313:25 314:8 315:2,7 322:24 325:25 335:22
**printed** 195:11
**prior** 56:25,25 116:19 121:25 174:12 187:4 192:10 198:19 248:12 275:3,5 294:10 316:2

**priority** 229:12
**private** 335:5
**privilege** 42:2 43:8 91:10
**privileged** 113:10 124:5,8 126:16,17 126:21,24 127:1,4,8 127:15 141:5 142:25
**privy** 257:3
**proactive** 235:24
**probably** 30:21 94:12 145:19 192:16 201:18 234:14
**problem** 17:3,10 138:22 239:15 298:19 301:10,18 316:23
**problems** 301:3,5,19 301:25 302:5
**proceed** 19:3,21 30:16 31:13,22 32:10 73:2
**proceeding** 20:22 32:3 47:18 87:22 107:4 122:19 129:4 153:22 165:16 182:2 189:21 193:20 200:22 215:15 221:9 240:18 247:22 259:3,7 261:13 270:11 273:11 288:9 300:5 302:18 308:12 310:7 312:20 318:20 322:18 325:18 337:10
**proceedings** 84:13 128:22 181:15 247:10 299:19 329:24
**process** 10:21,23 47:24 86:18 122:10 217:24 218:2 239:7 317:6
**processed** 270:2
**produce** 64:4 274:2
**produced** 60:24 64:6 122:22 148:3,4 165:7 194:7 279:23 283:19 288:12 343:20
**Production** 333:19
**products** 80:25 81:21
**professional** 1:23 332:21 342:6 344:1 344:4
**professionally** 118:13
**profile** 113:24
**progress** 329:25
**project** 137:13,15,17 137:21,24,25 138:4 138:14 142:21 143:4,18,18,21 144:2,8 145:8,11,12 147:20,24,25 148:7 148:10,15,16 149:13 221:14,18 221:22,24 222:8,9 222:12 223:17,22 223:24 224:6 305:10,12
**projection** 156:10
**projects** 221:21 223:22
**promise** 259:20
**promised** 21:11
**promoted** 255:23
**proposal** 21:12 302:23 308:20
**propose** 226:16 306:17
**proposed** 21:13 225:10 226:11,14
**protections** 314:24
**protocol** 254:25
**proud** 294:1
**prove** 55:19 223:4
**provide** 42:24 43:1 73:8 124:12 125:5 127:17,22 212:7 219:11 220:22 344:16
**provided** 43:4 110:13 124:15 141:10,14 158:8 167:14 174:20 206:4 224:19,24,25 225:2 233:6 248:4 251:17
**provider** 335:14,16 335:19
**provision** 98:23
**provisions** 52:2
**public** 1:23 26:10,13 29:10 30:12 53:7 85:20 121:10 124:15,16 170:7 234:4 235:9 238:21 239:2 241:16 248:18 249:24 254:25 255:13 256:3,10,12 259:18 259:19 264:8 265:15 272:7 291:18 292:22 294:24 295:14,18 295:24 296:7 298:1 341:18
**Public-State** 343:22
**publication** 328:12 328:15,22
**publicly** 296:1
**published** 248:1 298:9 325:3,21
**publishing** 243:15
**pull** 20:19 47:12 85:4 106:24 107:1 119:4 122:16 128:25 164:25 165:6 181:23 189:15 193:18,21 205:21 210:21 211:2 215:13,24 244:23 261:9 269:1 288:3 299:22 310:5 311:1 312:13,14 322:15 337:3,4
**pulled** 258:6
**punctuation** 260:7
**purchase** 13:18 119:25 164:20 167:18 218:16,17 228:13 334:13,15 334:16 337:20
**purpose** 87:4 95:20 102:23 110:12 117:9 127:21 130:2 132:5,8 133:5,7,15 133:20 137:3 140:24 180:22 195:11 222:19 223:11 344:18
**purposes** 38:25 43:16 44:15,21 45:10 46:11 48:18 110:18 144:6,22 193:13 195:17 197:9 208:19,22 209:9 215:6 218:3 223:4 277:7,18 278:5,25 279:7
**pursuant** 1:24
**pursue** 213:1
**push** 307:16 323:3
**put** 7:2 12:6 44:4,17 59:20 62:11 83:16 160:10 169:2,3,5 171:11 192:24 206:2 212:24 228:15 231:20 239:11,11 241:16 241:23 255:14 291:9 293:13,18 315:15,20 316:2,4 326:18 327:12,17
**putting** 17:6 46:6 47:24 48:15,17,21 102:22 207:4 258:16 338:16

**Q**

**Q4** 190:13 211:15 212:3,20,23 213:1
**qualify** 81:17
**quarter** 26:13 201:7 211:24,24
**question** 8:16,22 14:16 15:7,17 16:17 16:18,21 17:4,13,15 17:21 23:3,5 25:8 25:20,23 26:22 27:18 28:1 29:22 34:2,4 39:16 40:13 40:24 41:12 42:3,6 42:17,21,25 43:3,21 44:20 47:3 49:4 53:22 55:22 62:1,3 63:1 64:13,16,17,19 64:22 65:13,15,19 66:8 67:16 68:1 70:10,13 74:3,5,6,8 74:25 76:24 90:8 91:12 98:10,21 101:8,9,14 102:5 106:15,17 112:25 114:10 120:16 127:8 130:17 131:16,21 132:2,6 132:24,25 133:22 135:24 136:1 137:18 138:24 141:5 142:4 144:5 145:7 159:3 162:25 164:1 170:25 171:2 172:3,10 173:9 175:21,23 178:11 178:12,14,25,25 179:11 181:19 188:18 191:24 206:14 207:1 214:17 216:20 222:9 226:7 237:9,9 237:12 242:17 245:12,14 248:24 251:5 254:18 266:23,24 267:2,4 267:12 277:13 279:4 304:20 309:22 321:2 324:9 327:4,5 339:17
**questioning** 240:6 291:15 316:18
**questions** 16:16 22:18 25:19 27:23 33:24 40:22 45:2,6 62:2,25 65:21 66:24 67:5 68:7,16 71:21 71:24 72:4,9,12,14 78:9,11 83:6 137:20 140:10 143:24 180:14 208:8 213:25 216:17 222:20,25 223:3 236:20,21 246:1 271:16 289:21 309:20 329:17 332:6,18 334:19 338:20
**quick** 150:22 233:24 240:10 299:14
**quickly** 164:25,25 211:4 307:18
**Quinn** 2:7 6:11 149:7 344:9
**quit** 271:10
**quite** 84:3 135:18 245:11 268:2
**quote** 326:13 327:2,8 327:13

**quoted** 326:14,19

**R**

**R** 235:4
**R.P.R** 342:25
**Radka** 30:13
**raise** 6:19 25:17 182:13,14,16,17
**raised** 278:11
**raising** 25:18 278:13
**range** 177:25 178:1,4
**rare** 146:22
**reach** 149:1
**reached** 85:18,19 86:6,13 142:10 246:21 319:7
**reaction** 245:20,22
**read** 15:15 21:1,2 89:14,17,20 144:14 162:23 163:4 170:2 170:3,10 182:12 190:5 259:23 283:10 285:16,17 285:21 286:1 289:5 289:7,19 292:1 325:10 328:11,14 328:15,18,22 339:11,12,14,18,19 339:20
**reader** 54:25
**reading** 75:12 163:11 175:13 183:6 344:18,22
**ready** 182:21 218:20 258:11 303:21
**realize** 222:14
**really** 9:18 72:12 101:21 133:4 142:23 148:13 180:13 202:17 205:7 211:4 263:21 283:20 284:4 293:12 298:5 301:13 323:3
**reason** 9:13,14,20 14:1 23:18,19 44:4 46:23 47:7 56:18 107:21 141:1,12,14 167:21 194:21 217:21 241:15,23 250:19 251:8 252:6 252:11 255:8 311:14,15
**reasonable** 255:15
**reasonably** 148:5
**reasons** 14:5 22:15 146:7 277:4 296:3
**reassured** 291:11
**rebranding** 243:11
**recall** 19:1,6,8,19 21:5 26:17,21 27:2 27:6,14 28:4,6,9,10 28:13,15 34:9 35:4 35:10,14 41:9 51:4 51:22 52:16 83:12 83:15,20 87:24 88:1 95:25 98:15,16,17 107:19 110:9 116:18 119:9,11 122:6,10,12 124:19 131:20,21 135:1,3,4 146:16 158:12,22 162:7,8,13 191:7 192:4,8 198:12 208:10 215:19 224:20 233:11 235:15 245:6 269:8 277:20,25 278:1 282:9 316:5 334:1
**receive** 50:9,10,13
**received** 14:13 30:24 31:10 50:3 56:3,13 99:13 107:22 109:17,21 138:3 139:1 174:11 317:22 318:25 322:11,12,24 325:25 338:25
**receiving** 36:1,3 96:3 107:17 123:6 131:25 159:24 160:1 271:11
**recess** 84:12 128:21 181:14 247:9 299:18 329:23
**recipient** 54:25
**recognize** 300:7
**recollection** 25:3 122:14 125:14 191:17 257:1
**record** 6:2,5 18:18 31:9 33:2 47:14 55:16 72:5 84:6,8 84:10,15 105:18 128:17,19,24 180:8 180:16 181:3,11,12 181:17,19 193:13 207:5 230:8 236:18 247:7,12 273:15,25 275:2 299:13,16,21 300:9 316:20,21,24 321:12 329:17,21 330:4,14 338:21 339:6,8,25 342:12
**record's** 195:17
**Recording** 329:25
**recruiting** 135:6,14
**red** 9:10,19,23 10:14 14:7,11 17:18 18:3 19:20 231:1,17 313:25 314:8 315:2 315:7 322:25 325:25
**redline** 15:20 16:24 17:3,22 30:25 36:2 36:4 39:25 312:3,11 314:5 318:3 329:12
**redlined** 17:23,24 31:20
**redlines** 15:25 18:1,2 18:10,12 31:11 312:2,7
**reduced** 231:21
**refer** 70:15 79:6,24 107:14
**reference** 22:1,12 23:19 28:17 56:11 119:23 162:21 169:20 211:10 332:1 344:13
**referenced** 13:25 23:10 37:15 41:7 95:21
**references** 266:17 289:16
**referencing** 18:14 19:11 21:3 22:13 37:22,25 40:21 57:3 66:21 68:2,10 70:5 70:16 73:20 74:20 75:17 79:7,13 81:6 81:8,19 82:9 101:22 102:6 106:8,11 154:20 162:25 164:14,15,22 169:6 170:12 174:17 221:22 222:10,11 243:12 263:9 264:12,14 265:1,3 267:10 280:9,10 290:15 292:2 301:25 303:19 336:23 338:12
**referrals** 113:13
**referred** 151:11,16 154:2 161:8
**referring** 9:6 10:23 20:24 23:4,9 24:11 28:19 29:7 52:19 57:23 58:8 60:14 61:2,3,3,22 62:5,23 62:23 63:2,2,4,5,7,9 63:21 64:24 66:14 66:16 67:14 68:23 68:24 69:13 70:4 71:2,6,7 72:20 73:1 73:9 74:10,17,18 75:4,15 77:10 80:13 80:21 81:4,13,22 92:7 95:16 98:6 99:19 100:5,8 101:11 102:9 104:21 107:10,15 120:8,9 151:7,12 154:5,12 160:7,9 175:3,17 182:14,24 184:15 185:6,15 186:10 196:15 226:12 256:18 261:22 262:7,9 267:5 280:5,7 281:4 306:19 311:7
**refers** 240:23
**reflect** 201:25 307:10
**reflected** 164:10 166:16 195:1 269:16
**reflects** 163:24
**refresh** 122:13 125:14 224:1
**refreshing** 223:25
**refusing** 181:4
**regarding** 92:3 208:4
**regardless** 97:19 282:21 283:12
**Registered** 1:22 342:6 344:1,4
**registration** 248:16
**regular** 328:16,18,22
**regularly** 328:17
**Reid** 234:5,5 262:15 262:17,18 287:15 287:22 300:19,23 300:24 301:7,11,14
**reiterate** 339:21
**reiterating** 260:25
**rejected** 318:3
**related** 9:10 10:15 41:11 105:2 127:10 138:13 158:21 162:17 168:23 171:7 192:17 199:14 205:1 227:17 234:4 235:23 263:20 308:23 318:14 338:16,18
**relations** 99:12 234:25 235:25 256:10,12,13,13
**relationship** 11:25 78:21 224:11 225:1 235:9,11 272:21
**relative** 342:16,17
**relay** 321:20
**relayed** 39:24 317:1 321:18
**relying** 38:1 39:5 164:4
**remain** 157:15,16,17 157:18
**remainder** 291:5
**remained** 249:11
**remaining** 114:8
**remains** 208:5
**remember** 18:25 19:18 37:5 107:17 119:17 122:7 131:1 131:9 184:12 192:2 192:3,12 204:25 212:22 221:19,24 221:25 223:21 237:11 244:7,8,9 246:20 265:12 266:5 278:4 288:1 295:4 326:3
**reminding** 42:1 263:16
**remote** 1:18 340:3 342:8 344:13

**remove** 30:19 70:3,19 72:19 172:14 231:19 315:8
**removed** 10:1,2,6,9 17:24 31:4 231:18 296:17 314:15,17 318:1
**removing** 9:11
**rendering** 127:3
**Renegade** 1:6 3:16,19 4:20 5:12 6:9 153:25 182:4 222:15 343:3 344:7
**Renegade_Model_...** 165:23
**rep** 148:12 236:25
**repeat** 40:12 49:3 98:9 129:13 138:23 206:15 236:9 334:5
**repeated** 161:22 174:20
**repeating** 166:18
**rephrase** 108:6 188:18
**replace** 235:22 258:11,13
**replacement** 258:17
**replied** 267:14
**reply** 203:11 307:21
**replying** 123:3
**report** 342:8
**reporter** 1:23 6:5,16 6:18 7:1 34:18 41:23 44:9,12 91:2 119:2 148:21,24 165:12 181:20 200:19 206:15,21 206:24 236:8 270:4 300:14 306:3 308:9 312:17 327:23 339:9,11,14,18 342:7 344:4
**REPORTER'S** 342:1
**REPORTERS** 344:1
**REPORTING** 344:1
**represent** 163:6 193:10 232:16 311:12
**representation** 38:6 88:16 124:11 316:12
**representative** 86:22 119:14 143:22 144:11
**represented** 23:13 29:10 56:9 79:15 110:5 112:21 139:20 149:3 189:12 202:1 336:17
**representing** 148:19 149:8 311:9
**request** 21:8 333:18
**requested** 342:11
**requests** 274:17 276:22 279:7
**require** 58:3
**required** 328:23
**research** 191:22 282:17 331:5
**reserve** 273:16 330:8
**resign** 271:15 272:1 331:7,14
**resignation** 272:21
**resigned** 271:22,24 272:6,8 331:3
**resigning** 272:10
**resource** 300:16
**resources** 168:24
**respect** 18:4 21:12 23:4 38:15 83:17 109:10 119:7,18 127:13 151:20 152:24 168:25 224:16,18 276:16 310:23 331:21 333:5
**respond** 21:12 51:17 56:2 313:8 318:25 319:6
**responded** 17:6 50:17 313:17 317:8 319:2
**responding** 279:7 313:2 323:5
**responds** 51:15 123:11 313:8
**response** 15:12,13 17:2 18:12 21:8 22:3 48:4 50:20 75:22 77:22 131:24 145:3 149:15 155:22 189:17 216:21 241:11 249:19 259:24 267:13 276:11 296:20 300:25 310:2 315:17 316:21 319:12 333:18
**responses** 247:17
**responsible** 335:4
**rest** 72:13 213:5
**result** 132:12
**résum** 59:18 61:12,14 101:24 113:23,25 115:25
**résumé-builder** 103:20
**retain** 119:9 121:23 122:4
**retained** 119:6,18 125:15 139:13
**retaining** 122:6
**retrieve** 276:13 277:17
**retrieving** 278:6
**return** 30:25
**revenue** 70:2 166:14 172:13 177:15 230:13
**review** 64:1 113:12 126:9,13 127:7,13 130:19 139:5 140:14,17,18,23 155:13 260:13 273:17,23 276:8 303:11 319:1 342:10
**reviewed** 50:7 64:24 132:9 133:6 163:25 165:20 187:25 188:4 306:10 308:17 310:1,24 313:3
**reviewing** 127:10 141:8 152:1 324:14
**revision** 38:7 42:6
**revisions** 15:21 16:24 17:3,7,11 31:21 40:1 41:4,16,20 42:7,11,16 314:22 316:23 318:3 319:16 321:4,14 322:25
**Richard** 235:4
**right** 6:19 7:13 8:11 11:4,19 14:3 16:6 16:15,25 18:19 22:14 33:8 39:10 43:2 49:25 50:17 52:11 55:10,21 58:25 60:4,9 62:19 64:22 66:5,13 69:4 69:20 73:6,10 77:13 77:20,22,23 79:11 79:17,19 82:13,15 88:21 89:1,11,25 92:12 93:5 94:2 96:22 97:5 100:7,13 102:13 107:23,25 108:6,6,7,9 110:1,7 110:20 111:12,17 111:22 112:22 115:25 116:3,9,17 116:24 117:10 122:7,13 125:1 126:1 128:2 130:24 132:22,22,24 136:22 137:2 142:20 147:19 149:15 151:11,17 153:18 154:3,4 156:14 159:16 162:1,3,4,22,23 163:22 165:18 166:3,10 168:7 169:21 172:21 175:2,7,20 177:10 178:3 179:9,14 181:22 182:21 183:3,6 184:1,6,20 186:4,6,8,12 187:18 187:20,25 189:7 190:20 194:15,22 194:25 195:21 196:5,9 197:5,12,16 197:20,25 198:10 198:14 199:3,14,23 205:25 208:2 211:2 213:4 215:3,4,7,24 215:25 216:5,7,23 217:2,4,7,13,23 218:4 219:1,15 221:11 222:17,21 225:5,9,11,21 226:12,24 227:3 228:11,18 229:14 230:7 232:4,21,23 236:5 238:15,20 239:24 240:14 241:3,5,11 242:21 244:14 245:7 247:4 248:6,10 251:3,23 252:2 254:4,8 256:23 258:3,20 259:20 260:12,12 260:14 261:23 262:8,13,17 263:1,3 263:4,8 264:3,7,9 264:13,25 265:8 269:9 272:13 273:16 274:7 276:19 279:15,17 279:20 281:24 282:2,3 284:1 286:7 287:23 288:6 290:6 290:22 291:14 293:1 294:14 297:1 298:3,5 299:22 300:18,25 301:20 302:5,12 303:19,19 303:23 304:12 305:7 306:14 308:6 310:18,20 315:4 318:22 319:17,23 321:7 322:1 325:22 325:24 326:1,3 327:9,21 328:6 329:12,13,15 330:9 330:20 331:13,16 332:7 334:4,8,18 336:18 338:22
**RiverRock** 1:6 6:10 8:13,19,24 9:7,17 9:21,23 10:5,24 11:8,13 12:7,10,17 14:3,11,25 15:8,18 15:20 16:23 17:10 17:19 18:5,10 19:2 19:4,22 20:12 23:21 28:23 30:17 31:12 31:14 32:4,10,21 33:16,19 34:8,13 35:16 36:4 38:15,25 43:17 45:11 48:23 49:1,7 52:23 53:15 53:19,25 54:9 55:5 55:11 57:6 58:20,22 59:23 60:8 61:22 62:5,24 63:3,6,11

65:2,5 66:15,21 67:14 68:3,11,23,24 69:14,22 70:16 73:10 74:11 75:18 78:19 79:24 80:14 81:10,14 82:1,15 85:7,10,18,22 86:1 86:2,10,11,15,23,24 87:2 89:7,9 93:4,16 94:8 95:18 100:20 103:8 105:7,8,10,15 105:21,23 106:12 106:14,20 108:3 109:8 110:12,16,19 111:10,12 118:1,12 118:16 119:8,19,22 129:8,16 132:19 133:15 134:6,23 136:6,10,13,16,22 139:15 142:9 150:13 151:2 153:1 153:4,11 155:15,19 157:15,17 159:24 160:2 167:10 169:1 170:14 171:7 183:17 184:25 185:3,6 186:13 188:21 189:9 192:9 193:11 198:7,11,24 199:2,5,11,14 201:10 202:24 203:17 204:16,20 204:22 205:11 208:19,25 209:8,21 210:11 212:19 213:2,8 214:4,19 215:6 218:4 219:6 219:15,18,22 220:4 220:7,11,17 222:16 224:11 225:11,14 225:18,22,23 227:8 227:11 231:4 261:23,24 262:20 263:15 264:13,22 265:6 266:5 267:9,9 268:21 271:11 272:19,24 282:23 283:13 284:4 287:2 287:11,16 298:22 301:3,6,9,14 302:2 302:5,7 304:12,18 304:23,24 305:1,6 305:15,23 308:1 311:25 315:3,21 317:2,5 320:4 321:20 323:15 324:11 328:5 330:21,24 331:2,9 335:15,24 336:3 337:20

**RiverRock's** 18:2 71:6,7 72:20 75:4 81:13 89:24 90:12 90:24 91:16 96:10 98:24 99:5 102:20 112:15 128:1 142:15 335:12

**RiverRock/Abacus** 47:22

**road** 58:23 136:2 167:16 292:24 293:9 295:6 301:18

**role** 13:6 76:6 255:17 255:21 286:22

**Romaine** 21:7 32:7,8 33:9 34:6,7 35:1 122:8 124:23 137:8 139:3 145:20,22 146:6,8,10 148:19 149:2,8 186:1,4,25 188:7,12 200:12 201:25 202:19 204:24 230:9 256:7 307:1 312:23 319:13 327:23

**room** 7:19,24 8:4 44:14,21 45:10,16 47:24 48:9,12,15,18 48:21 50:3 78:24 79:2,6,10,16 88:7 98:5 107:14,18 109:18,22,25 110:6 110:13,18,25 125:5 126:4,9,13 127:7,10 127:14,18 134:22 138:10,13 139:4,6 139:14,18,20,24 140:1,13,15,17,18 140:21,23 141:9,10 141:15,18,19,24 149:19 152:2,4 187:19,24

**RPR** 344:25

**RR** 79:23,24 80:11 261:20,24 262:8,9 262:14,15 282:21 282:23 283:2 284:1 284:16 285:5,9

**run** 115:20 180:6

**running** 48:23 152:10 153:14 335:25

**rush** 229:1,3,4,7

**rushed** 330:7

**Ryan** 230:10

**S**

**S** 2:8,9 3:7 239:16 344:10

**S1** 56:3 182:16

**safe** 339:7

**sale** 13:18 21:13 119:25 209:23 210:12 218:16 301:15

**sales** 199:9

**Samantha** 76:20,21 76:22 77:1

**Sandler** 244:22

**sat** 254:13

**saved** 146:24 147:7,8

**saw** 161:13,15 208:16 245:7 322:4

**Sawyer** 307:6

**say's** 302:10

**saying** 12:8 14:14 17:17 18:1 23:6 38:2,12 48:15 58:9 77:23 109:23 139:25 149:1 155:9 166:21 167:22 170:11 176:25 177:8,13 199:11 227:12 252:9,10 255:7 266:10 271:5 281:13 282:4 283:11,12 285:1 286:5,11,12 290:17 292:6 294:15 295:18 298:16,18 305:25 323:22

**says** 47:23 50:2 51:25 54:11 59:5 65:1 80:11 89:2 92:1 96:3,16,22 111:19 111:20 123:4 147:23 148:2 149:9 149:16,20 150:21 151:2 163:2 166:12 168:11 174:14 176:13,20 177:21 178:2,18,21 179:2 182:12,21 188:16 193:4 196:23 197:3 201:6 204:9 216:4,7 218:1 221:22 223:23 228:19 257:21 258:5,10 259:18,20 266:19 283:19 286:5 288:19 292:18 298:17,25 300:19 306:16 307:16 313:8 319:4 323:1 326:5,8

**scenarios** 203:14

**schedule** 50:24

**scheduled** 189:24

**Schulte** 30:13

**scope** 207:7 253:22

**Scott** 76:4,4 300:2,9 300:11

**screen** 8:7 175:2 290:19 337:4

**screens** 7:24 8:8

**screenshot** 288:17 289:14

**scroll** 47:16 49:25 50:18 51:13 63:16 63:18,20 88:8 150:16 157:10 168:7 172:22 173:12,16,17 193:21 194:16 211:13 212:9 228:9 231:6 248:9 269:15 289:3 303:5,7,24 313:15 314:6

**scrolled** 63:25

**scrolling** 88:3 154:25 290:1 314:10

**seal** 341:11

**Sean** 30:14 32:14 75:21,24 76:1 192:4

**search** 278:24 333:17

**searching** 278:25

**SEC** 56:3,12 124:17 182:16 213:3 246:24 291:3 292:3 293:18 337:23

**second** 92:1 193:22 197:24 211:5 231:11 249:23 261:6 269:2 311:6,9 311:13,19,22 332:13

**secretary** 185:18

**section** 94:3 96:2 103:12 231:9

**Securities** 326:9,16 326:21

**see** 21:21,22 26:10,13 47:20 48:2,4 50:16 50:20 51:17,19 52:1 57:12 59:7 78:9,11 78:25 79:1 81:20 91:25 96:7,8,18,20 96:21 97:1,2,18 104:8,15 114:24 118:23 125:8 137:11,12 140:25 141:9,13,15 147:6 147:24 150:25 151:5 153:24,25 157:11 162:5 165:18,22 166:12 168:12,17 172:22 174:12,21,23 177:21 180:19 183:12,13 184:4,10 187:11 191:22 192:3 193:4 196:23 197:1 201:11 203:20,24 204:6,8 216:2,3,9,10 221:15 221:16 228:13,18 232:25 233:9,10 240:25 243:20 244:2 248:11 253:8 253:17 257:23 258:1 259:25 260:1 260:18 262:4,6,15 262:20 265:17,18 269:15,18,19 279:24,25 280:1 283:4 288:22,23 289:2 290:5,7 296:20 297:3,24 300:21,22 302:25 303:2,23 304:5,9 305:12 307:12,14

307:14,20,21 310:14 311:2,19 312:25 313:10,11 313:18 319:10,11 337:17,18 338:5,6,9
**seeing** 194:17 244:8 245:10 269:8 282:4
**seek** 338:23
**seeking** 117:5,10 127:12 158:17
**seen** 13:10 37:20 44:25 112:20 135:19 136:7,8 161:7 182:5 221:11 243:17 251:12 253:22 269:4 270:1
**sell** 86:2 136:21 167:8 167:11 168:22 171:17
**selling** 85:21 86:12 142:12 160:4 174:13 205:13 283:6
**send** 12:3 20:9 78:7 113:23,25 115:24 116:6 126:3 149:22 150:3 159:23 160:2 189:7,8 239:23 241:7 250:9,16 251:8 260:8,10 271:1 282:4 297:25 310:12,16 313:6
**sending** 21:5 36:2 48:8 51:6 158:9 188:20 192:8,13 227:16 271:5 280:2 280:3
**sends** 50:1 51:24 137:8 227:14,21 288:17 300:18 306:25 318:24
**senior** 77:12
**sense** 37:13,24 43:8 162:11 190:19,20 195:18 207:18 278:16
**sent** 11:25 16:5,8,10 16:23 17:23,23 18:11 19:7,12,14 20:15 38:8 48:12 49:19 50:2 98:5,18 100:10 104:23 107:13,25 108:7 126:13 154:2 155:13 158:1 159:15 167:3,12 176:21,23 196:9 197:15 204:18 208:15 225:11,12 225:13,14,16 227:8 227:10,11,13,13,14 231:25 232:3,13,19 238:3 239:21 249:17,21,25 250:3 250:3 254:8,10 255:18 257:17 259:12,22,23 268:15 269:10,13 270:21 271:8 289:14 291:8 295:19 310:1 311:13,24 312:24 315:20 317:6
**separate** 5:17 57:1 193:15 239:1 281:19,20 312:8
**separately** 193:14
**September** 47:21 48:17 49:19 88:23 88:25 105:22 106:5
**Series** 333:2,2,2
**served** 274:6
**service** 52:22 53:1 330:22 333:11,15 344:1
**servicer** 52:25 53:4,5
**servicers** 52:22
**services** 52:19
**servicing** 51:25 52:4 70:2,18 72:18 170:13 172:14 177:22 336:11
**set** 23:12 24:4 195:9 234:3
**Seth** 137:9 149:19 150:21 230:12,13
**sets** 113:15
**setting** 104:1
**settlement** 85:22
**Settlements** 76:14
**seven** 29:11,19 30:3,6 181:7 253:6 338:19
**share** 24:25 42:18 109:25 112:10 125:25 134:6 267:13 332:3
**shared** 42:20 45:14 56:24 103:15,21 107:11 110:17 112:14 117:17 134:18 168:24 234:4 241:18 267:8 306:1
**shareholder** 237:22 237:24 238:16 241:2 250:4
**sharing** 55:19 59:17 102:23 111:2 157:19 167:7 282:11
**Shaw** 307:2,2
**sheet** 73:8 123:6 125:12,18,19 182:22 184:7 216:14 217:24 307:10,18 343:1
**Sheila** 2:4 6:7 25:16 47:10 64:2 66:7 67:5,10 71:13 73:14 73:17 84:1 128:5 138:18 140:6 145:14 147:9,22 154:22 175:6 178:11 179:16 190:4 195:6 233:16 236:4 240:2 245:9 266:25 270:4 273:21 278:10 289:5 297:15 299:3 329:11
**Sheila.oretsky@gtl...** 2:6
**shifted** 330:24
**shit** 290:6,13 291:8 298:21
**shopping** 106:21
**shorthand** 306:11
**shortly** 85:20 184:7 216:22,24 271:11 271:14,20 322:12 324:15,15
**shouting** 69:3
**show** 31:19,25 53:5 63:17,19 82:18 88:6 98:12,20 104:10 122:22 157:20 160:22 212:7 240:8 244:24 247:16 314:11 318:15 336:21 337:4,7
**showed** 99:24 130:22 167:6 184:12 289:8 296:12
**showing** 61:13 157:23 195:7 232:11
**shown** 100:1 316:8
**Shur** 307:6
**side** 9:23 311:2,2,18 311:18
**Siegel** 2:22 85:18 288:18,19 331:15
**sign** 334:14
**signature** 88:4,22 90:3 344:16
**signed** 82:14 88:1,23 89:3,15 90:22 91:14 92:17,20,25 93:13 94:14,14 106:5 108:2,4 151:20 204:15,21 334:3,13 334:16
**significant** 173:4 174:15 178:22 256:1
**significantly** 231:22 314:16
**signing** 87:24 90:2,10 90:16 105:20 344:18
**similar** 125:22 303:17 327:15,25
**simple** 52:2 220:22 249:1
**simply** 177:13 254:24 309:11
**Sincerely** 344:23
**single** 26:9 109:15 152:20 199:24 303:15
**sir** 6:20 21:21 26:2 45:2 51:18 65:5,25 66:18 67:16,21 68:25 70:4,6 75:11 78:25 79:21 85:13 87:5,25 91:12 92:17 93:8 94:8 96:7 97:1 100:17 104:3,7 107:18 119:6 121:7 122:14 127:21 135:22 140:1,24 141:12,21 142:3 144:12 145:13 147:4 150:25 151:8 155:4,7 157:9,12 174:2 175:5 196:2 199:2 216:16 221:15 284:20 285:10 286:11 300:7 305:10,21 309:22 317:16 319:21 324:1,24 332:5,16
**sit** 47:6 57:2 114:20 122:3 191:18 192:2 252:5,10 279:12 338:24
**site** 259:18,19
**sitting** 119:13 148:12 213:13 274:9
**situation** 59:20 272:21
**sixth** 278:11
**size** 152:21
**skill** 113:15
**skipped** 334:18
**skipping** 184:6
**slide** 100:9 197:9 198:5,8,14,15,19,21 200:2 202:10 204:8 204:10 205:23 211:10,15,16,17 212:7,10,12,15 241:19 242:6 261:2 268:6 291:6 326:6 338:12
**slides** 211:7,8,25 245:1 246:22 298:23 326:17
**small** 229:22
**Smith** 4:6 203:19,20 236:13,19 237:9 239:21 240:20 241:7 243:14 249:17 251:8,21 254:3 257:7,19 259:17 295:13 297:8
**Smith's** 240:13 255:17

**sold** 80:14
**solely** 38:1 117:9
**solemnly** 6:21
**solicit** 253:3
**solicited** 224:14
**Solutions** 77:5 334:24
**somebody** 11:12 16:23 27:24 148:15 227:14,21 236:20 237:14 256:18 269:21 271:1,5 274:22 275:18,25 276:7 277:17 278:5 281:25 284:10 285:1 287:21 295:24 328:24
**somebody's** 227:16
**someone's** 147:2
**soon** 240:4
**sorry** 16:22 34:19 38:12 40:9,10,20 41:24 50:10 67:11 70:14 73:15 82:6 91:2,6,7,13 100:3 111:16 112:25 120:17 129:12,22 148:21 154:22 168:16 170:23 172:11 186:18 189:1 190:4 194:3 195:5 198:4 200:17 201:5 213:18 215:23 218:8 226:8 227:5 233:19,19 236:8 239:16 242:13 244:14 248:8 250:2 256:13 256:20 257:25 258:10,21 259:16 267:2 271:18 277:21 278:2 285:8 286:10,15 293:21 293:22 294:5,15 299:9,11,24 303:9 304:22 306:3 311:20 313:23 319:13 321:3 334:5
**sort** 39:24 50:22 51:8 155:23 191:3 205:22 258:3 333:23
**sound** 87:8 167:25 219:11
**sounds** 48:5,11 215:20 288:2 334:8
**source** 102:15,18 109:15 263:18 335:20
**South** 344:17
**Southeast** 2:3
**SpaceX** 176:9
**speak** 42:8 45:22 51:20 65:24,25 103:1,2 123:17 163:7 186:24 200:4 202:18 212:18 229:9 256:23 311:3 335:23
**speaking** 158:20 192:3 200:1 295:22 295:24
**special** 191:6,7
**specific** 8:25 24:15 27:1 37:7 39:16 100:8 205:2 211:10 234:23 280:20 305:13 306:12 338:13
**specifically** 10:9 18:23 21:25,25 24:21,25 35:10 37:4 37:5,10 40:16 41:3 61:19 95:8 103:1 106:14 145:10,24 156:23 158:5,22 162:20 172:24 192:4,17 199:24 200:5 204:18 231:14 241:19 246:22 250:23 253:16 256:14 261:1 262:3 265:20 271:2,6 301:13 325:12 331:23
**specifics** 20:5,17 158:21
**specify** 234:11
**speculate** 136:25 270:18,22
**speculating** 287:17
**speculation** 258:15
**spend** 180:13 229:13 229:20
**spent** 98:3 158:14 219:4 320:1
**split** 43:6
**splitting** 284:25
**spoke** 187:3 191:17 192:5 200:3 201:22 243:18 246:14 257:1 273:5 283:22 295:25 299:24 301:4 302:9
**spoken** 113:25 183:8 185:17,18 186:4 187:1 191:11,16,20 191:23 200:8
**spreadsheet** 163:24
**staff** 331:11
**stage** 10:13,19 12:20 12:21,22,22 13:11 13:11,13,14,16,17 24:2 37:20 54:4 87:8 92:9 112:13 115:23 116:6,12 119:22 120:2,3 121:1,22 134:15 138:2 141:17,21,24 142:1,3,7,14 157:7 161:4 167:16 174:14 176:8 185:5 220:5,6,10 309:9
**stages** 95:3
**stakeholders** 21:15 29:7,8,9
**stand** 54:22 261:24
**standard** 53:6 114:19
**standing** 315:12
**stands** 78:3 291:25
**start** 50:6 108:23 125:11 273:24 317:10 336:7
**started** 31:16 320:7
**starting** 337:11
**state** 1:24 156:23 335:19 341:3,18 342:3
**stated** 96:20 185:4,7 206:19 250:22 337:22
**statement** 183:23 186:19 220:18 250:13 281:21
**statements** 250:23
**states** 1:1 233:3 293:19
**stating** 302:4 339:6
**Steel** 330:22
**stenographic** 342:13
**stenographically** 342:8
**step** 46:7
**steps** 182:10 215:6
**stick** 197:7
**stipulated** 339:23
**stock** 157:22 282:18 338:17
**stood** 55:1
**stop** 65:17 73:17 180:9,17,22 321:2 322:3 344:17
**strange** 202:5,10
**strategic** 21:19 24:10 24:13,13,15,18,22 25:4,8,11,14,23 26:5,22 27:4,6,10 27:15,16 28:7,8,10 28:13
**strategies** 103:14
**straw** 322:6
**Street** 2:8 282:13
**strict** 96:4,10
**strike** 26:4
**stroke** 308:18
**strong** 58:11
**strongly** 338:1
**structure** 56:22 112:10 131:18 149:20,25 228:12 310:19
**structuring** 306:17
**stuck** 197:4
**studies** 113:16
**study** 11:24 12:4,6 55:6 59:18,25 60:15 60:18 61:4,9 62:9 62:12,13 63:4,7,15 63:19,21 64:25 65:6 66:17,19 68:2,10 69:9,10,25 70:9,11 70:15,16,22 74:19 77:9,16 81:7 83:18 83:24 98:18 99:16 99:23 100:9,21 101:23 102:8,13,22 104:5,7,18,22 105:2 116:6 154:3,5,11,15 154:20,21 155:18 156:19 157:5 159:10 163:6 171:17 177:19 192:18 206:5 208:16 272:17 273:2 326:24
**stuff** 50:4 213:6
**subject** 21:7 47:22 137:13 138:8 182:10 257:20 259:19 261:19 262:5 265:5 266:18 302:22 337:19
**submission** 214:22
**submit** 208:24
**submitted** 56:12 65:6 65:7 231:4 232:19 238:22 321:5
**submitting** 208:22
**subpoena** 326:11
**subscribed** 340:11 343:19
**subscribing** 344:22
**subscriptions** 328:24
**subsection** 96:24 97:9
**subsequent** 318:2
**substantial** 202:13
**successful** 182:13
**sufficient** 21:14 29:6
**suggest** 111:1
**suggesting** 23:11 44:1 44:7 60:23 62:13 86:10 142:11 157:11,12,13 169:12 254:23
**Suite** 2:3 344:17
**SULLIVAN** 2:7
**summer** 85:20
**Super** 263:1 264:3
**support** 21:14 29:6 44:7 157:8 202:14
**supposed** 293:16 309:7
**sure** 13:5 23:21 30:12 42:22 43:7 46:22 53:3 55:21 82:25 106:2 114:19 115:14 124:22 125:13,16 132:1 154:17 172:11 184:15 190:6 194:5 203:20 204:12

231:8 237:20 244:5 248:10 266:9 280:24 287:17 289:10,11,24 291:24 296:24 299:5,5 303:3,18 313:17 324:13 333:20 334:11
**surrender** 278:24
**surrounded** 37:14
**Survival** 231:9 314:13
**swear** 6:6,15,21
**sworn** 6:19 7:7 340:11 341:8 343:19
**synergies** 168:12,20 168:21,23 169:3,4,6 169:7,13,13 170:19 171:3,6,7,11,12 178:22 336:8

**T**

**T** 3:7
**tab** 4:22,23 20:19 47:12 85:3 107:2 122:17 129:1 153:20 165:13 181:24 189:19 193:18 194:10,11 194:23 200:20 210:16 215:22 221:7 247:18 257:17 259:5 261:8 269:1 273:9 279:15 288:7 299:23 302:15 308:7 312:15 318:17 337:1
**table** 61:13
**take** 30:20 35:23 36:8 36:12 59:22 64:20 71:24 83:1 84:2,4 87:16 88:15 118:23 128:11,12,14 132:23 153:18 179:25 180:4 181:4 181:7,9 190:14 201:3 203:22 215:21 221:2 228:9 232:23 240:4,6,9 245:11,15,18 246:7 246:8 247:5,24 257:16 258:20 261:3 273:8 274:13 279:15 288:6 295:13 298:3 299:3 299:6 323:7
**taken** 1:22 84:12 128:21 153:13 181:14 219:3 247:9 294:5 299:18 316:3 329:23 336:13 344:14,20
**talk** 22:8,9 27:21 65:23 84:17 86:7 103:13 147:18 158:3 161:10 172:17 185:22 234:17 266:19 267:16 268:1 290:15 308:18 318:12
**talked** 37:8 51:4 116:19 161:13 169:7 230:8,9,10 272:17 273:1 294:10 326:4
**talking** 18:18,21 37:10 52:20 55:11 56:20 59:9,12 74:22 81:1 86:20 98:19 119:23 121:9,14 128:1 131:22 154:19 158:22 170:12,13,15,16 172:2 175:5 176:23 177:1 184:24 185:2 199:12 208:14 212:22 247:15 264:21 268:20 270:24 272:15,16 296:23 298:23 304:11,13,16,17,21 304:25 306:22 308:3
**talks** 173:1
**target** 150:23 153:6 184:9,13,19,20,21 185:1,5 212:3
**Tax** 231:10 314:14
**team** 13:8 32:5 40:1 113:11,18 270:21 270:25
**Teams** 333:12,13
**technical** 231:11
**technically** 190:14 248:22
**Tele** 2:5,10
**TELECONFEREN...** 344:2
**telephone** 191:4 278:5,6 344:20
**tell** 8:12 18:17 19:2 20:7 36:25 38:23 48:24,24 68:5 71:4 72:2,3 102:1 140:8 140:8 147:21 148:15 156:20 160:25 180:7 195:2 195:15 212:2 213:10 218:9 250:16 265:16 270:23 275:4 281:3 316:25 317:5,12,16 320:8 329:10 336:14
**telling** 14:15 56:14,19 68:7 92:22 148:12 155:25 170:10,18 170:19 173:12,17 175:17 217:17 258:13 283:7 295:13,15 317:25 318:4
**tells** 126:20
**ten** 146:2 332:14
**term** 89:20 104:18 123:6 125:12,18,19 164:21 182:22 184:7 216:14 217:24 223:18 280:17 307:10,18 321:1
**terminate** 66:23
**termination** 52:2
**terms** 24:4 54:21 96:24 97:4 144:21 158:6 210:5 307:25
**testified** 7:7 20:9 79:3 101:10 177:12 199:19 231:2 238:8 285:23 314:9 326:1
**testify** 133:14
**testifying** 9:24 15:4 15:10,19 40:1 62:18 206:19 252:8 256:17
**testimony** 6:21 9:4 10:3 12:16,19 15:20 23:18 25:2,6 31:10 34:11 38:4,10 45:9 46:9 48:16 49:17 54:7 55:18 57:2 58:19 65:3,5 77:11 84:25 93:2,12 100:12 102:11 106:6 107:10 112:17 119:13,19 122:3,5,5 129:7,15 132:10,21 133:7 135:5,12 136:20 143:3,6 153:15 158:10 160:12 161:16 171:24 183:22 199:18,19 201:13,21,24 202:12,20,25 203:3 203:6,15,18 207:8 209:7,15 220:2,15 221:17 238:12,20 251:2 252:5 257:5 278:7,8,15 292:24 294:17 298:21,24 298:25 315:19 334:21
**text** 4:13,16 5:8 39:9 40:17 41:1,14 43:14 273:14,18,23 274:2 274:9,22 275:9,19 276:1,8,13 277:18 278:6,24,25 279:20 280:3 282:4 283:7 285:4,11,23 288:11 288:17 289:2 294:21 295:19 297:13 298:22 299:25 300:7,18 301:20,24 322:20 323:5
**thank** 6:16 7:1,10 28:17 44:12 46:20 48:6 50:22 56:3 69:18 75:20 134:1 168:17 190:8 203:24 206:24 220:21,24 221:1 247:6 249:10 299:2 308:21 311:5 324:24 339:7
**Thanks** 50:15 123:5 128:18 223:24 303:4
**Thereupon--** 7:3
**thesis** 157:8,9
**they'd** 114:24
**thing** 125:20,22 234:23 289:20 326:12 328:1,2 336:9 339:22
**things** 22:1 26:9,14 49:10 62:18 74:15 100:11 113:16 124:1,8,13 131:6 132:23 137:25 144:21 157:14 161:21 167:19 168:20 170:20 174:13,22 175:24 199:10 205:8,18 212:25 213:9,11 229:21 234:12 238:25 265:3,4 266:14 276:21 301:18 336:1
**think** 9:18 13:7 15:16 19:12 22:18 27:9 31:2,16,23 32:14 36:5,19,20 38:12 42:17,18 45:4 46:13 47:3,10 48:14 54:19 55:14,22 64:2,3,11 71:13 72:7,9,10,11 73:23 78:6,20 81:19 85:19,25 86:12 87:4 87:7 91:19 94:17 102:1,4 112:24 114:13,18 115:12 115:12 117:13 118:3 123:21 128:6 128:7 130:6 133:2 135:22 136:12 148:8 151:13 153:25 157:10,11 157:13,20 159:3 162:16 167:21,23 168:3 176:20 182:15 184:1 186:18 187:1 190:15 191:6,8

192:23 195:18
201:17 202:3,3,10
202:18 210:13
212:7,21 215:19
217:11 220:18
223:19,21 226:25
227:6 232:8,9
236:19 240:3
243:10,25 244:11
245:9 249:13
250:12,13 253:5,21
254:23 255:9,10,12
257:9 267:14 269:6
269:24 270:20
284:24 287:5
290:14,19 292:24
294:10 297:11
299:7 302:10 303:1
306:21 311:15
316:25 331:8,9
336:12 339:13
**thinking** 95:23
**thinks** 54:20 60:25
68:10 159:12
**third** 33:11 231:10,11
256:9,15
**third-party** 120:4
122:11
**thought** 32:17 40:20
49:12 55:3,5 59:21
65:7 80:24 287:22
289:17 291:9
304:22
**thousands** 37:6
134:21
**three** 32:9,19,23,24
33:5 35:15 62:2
67:22 180:18
191:20 229:22
232:1 257:6 259:13
260:2,2 292:25
293:7 295:23
298:23 312:6,11
322:22 323:19
324:15
**three-and-a-half**
108:1,8
**Thursday** 183:8
184:8 193:5 279:25
**tied** 131:23
**till** 179:10 215:18
**time** 6:2 12:14 25:25
28:11 29:23 30:23
32:7 35:12,24 38:23
51:17 53:15 64:12
66:2 71:14 72:17
76:22 85:24 86:16
92:15 93:12 98:3
105:16 114:3
122:11 128:11
135:18 147:1
162:12 164:10
180:6,13 187:18
190:12 191:22
192:5,23 198:13,16
200:13 202:16
205:1 212:4 215:12
215:20 219:4,14,17
219:21 220:1,3,16
229:20 230:24
238:1,8,21 242:25
245:20 248:18
249:1,6 250:7
253:11 255:15,17
257:3 259:20
268:18,22 269:20
270:1 271:25 272:3
273:15,20,22
274:16,18,21
275:25 277:9,11
278:11 287:14
306:4 309:20
311:16 317:12
320:5 321:15
322:11 324:10,17
330:23 331:12,13
332:16 338:19
344:21
**timeline** 57:14 106:3
214:9 218:22 320:8
323:6
**times** 67:23 102:19
104:17,20 142:5
158:15 190:3 229:6
239:1 244:23
277:14 306:7
**timing** 229:5
**title** 76:8,13,16,18,23
77:3,4,6 196:15
197:11
**titled** 137:20 198:20
198:23 199:15,16
**titling** 137:17
**today** 6:3 7:11 9:24
12:16 13:25 15:4,11
17:17 45:3 47:7
57:3 62:15 66:1
99:24 100:2 108:17
108:19 112:17
119:14 122:4 133:6
143:3 154:1 180:10
180:17,23 191:18
192:2 202:20
213:13 216:8 220:2
222:10,15 231:3
248:15,19 252:6,8
252:10 273:24
274:13 279:12
282:5 286:11,12
288:25
**today's** 144:23
222:20
**told** 38:21 79:8,9,14
79:22 102:19
140:22 147:18
155:25 156:4,9
160:3 164:23
169:21,23 170:20
183:15 189:11
209:23 244:16,16
244:18 246:5
256:24 262:21
267:23,23 272:9,11
272:22 287:10,15
287:22 326:10
**Tom** 30:12
**ton** 50:4 221:13
**tonight** 280:6,11
281:4,16
**Tony** 10:1,2,6 11:9,9
17:1 18:15,17,18,20
21:11 23:12,14 24:4
38:1,21 39:2 45:22
46:4 47:4 53:18
55:23 56:9 59:17
60:19,22,23,25 61:4
61:9 62:11 68:24,25
79:7,9,14,22 80:22
86:6,8 99:13 100:9
100:21 103:25
104:23 106:9,10,13
106:18 118:12
125:4 139:24
149:16 150:21
160:3,9 161:21
164:4,16,23 166:19
167:7,7,13,22
171:11 174:11
189:11 205:13
206:5 209:22 224:9
224:25 225:4,12,16
238:8 262:21
267:11,23 268:19
268:19,23 272:9,22
273:6 288:17
290:16 291:12
292:18 293:9,19
302:10 304:14,19
304:24 305:6,7
308:21 310:9 319:7
**Tony's** 61:3,9,12,14
155:6 172:23
**top** 28:15 52:16 105:1
154:6 175:16
191:15 210:25
232:6 235:18
249:12 254:1
288:14 289:10
307:4,8 312:1 325:8
**top-level** 165:24
166:25
**topic** 145:15 147:22
236:6,13 245:18,24
245:25
**topics** 148:6
**totally** 57:1 327:24
**town** 234:2 238:6
244:19 280:14
**track** 55:16 105:18
**trailing** 206:22
**transaction** 21:16
32:11 39:1 43:17
44:15,22 45:11
87:10,14 92:3,6,11
93:4,7,15,19 94:6
94:19,20 95:1,6,7,9
95:13,15,21 110:19
121:14 132:18
150:24 151:8,11,13
151:13,16 152:6
169:1 228:12
231:13 234:7,9
238:18 306:17,18
310:19 324:12
**transcript** 5:18 84:7
237:10 342:11,12
344:15,16,18
**TRANSCRIPTION**
344:2
**transfer** 80:20
**transitioning** 179:17
**transmitted** 31:20
98:14 242:10
**transmitting** 193:2
194:8
**Traurig** 2:2 6:9
**traveling** 238:7 293:6
295:4
**trial** 65:23 223:5
344:21
**Troutman** 86:17
**Tru-Up** 314:14
**true** 200:24 342:12
**True-Up** 231:10
**truly** 298:6
**trusted** 256:11
**truth** 6:22,23,23
218:10
**truthfully** 62:18
**try** 66:4 112:16
171:18 179:5
220:22
**trying** 16:14 40:21,22
43:6 46:13 55:19
67:1 73:14,18 93:11
133:2 136:21 157:8
157:20 167:8,9,11
171:17 180:6 212:1
212:2 213:10 222:2
227:18 232:7
242:15 253:3
278:14 289:4
303:18 305:5
**turn** 274:19 313:9
318:24
**twelve** 332:15
**twice** 298:20
**twist** 179:5
**twisted** 129:12
**two** 13:8 62:25 66:5
89:12 180:20 194:4
194:20 195:4
221:20 228:21
232:13 237:20
238:13,25 260:2
261:18 276:5
288:14 295:21
296:2,2 313:22
327:22,23 329:18
**twofold** 132:22

**type** 10:11 43:9 59:19 59:20 73:2 127:23 169:24 174:10
**typed** 79:13 183:21
**types** 49:11
**typical** 53:4
**typically** 52:21 54:21 255:14 260:6

**U**

**Uh-huh** 33:7 56:1 59:3 60:13 61:17 67:13 75:3,23 77:24 92:5 93:1 102:10 104:19 111:8,21 119:16 120:19 121:11 123:10 125:7 133:1 138:15 153:9 156:3 166:23 170:9 182:23 183:11 193:8,12 202:7 238:14 262:16 264:4 265:14 267:6 275:7 275:20 282:20 290:24 295:12 306:9 309:1 320:3
**ultimate** 32:20
**ultimately** 8:25 9:12 23:15 32:9 105:24 105:25 331:5
**unable** 147:21
**unauthorized** 232:17 320:23
**uncertain** 255:12
**unclear** 49:14,17
**undefined** 114:3
**underlying** 163:8,9 199:8
**underneath** 136:22 178:19
**undersigned** 341:6
**understand** 9:4 13:20 15:19 16:16,17,21 38:4 42:17,19,20 43:8 59:15,17 62:14 78:4 79:12 90:10,15 90:18 92:14,23 93:3 93:14 94:2,8 97:14 97:19,23 107:15 112:25 114:14 115:15,16 149:13 157:25 159:3 162:24 163:2,16,22 164:9 171:23 173:11 175:15 176:11 196:17,22 208:1 222:2,19 223:5,7,11 225:17 227:18 237:20,23 238:2,3,10 239:20 239:22 248:17 251:2 255:7 256:12 271:14 278:14 306:18 311:7 323:8 323:22 324:6,18 332:8
**understanding** 45:19 46:1 48:25 49:6 54:16 55:1 78:2,14 78:16 89:19 104:14 104:21 110:14,17 111:2 120:22 121:12 137:21 139:2,22 140:12,16 155:3,5,7 163:5,11 172:20 236:2 237:17 291:25 323:13
**understood** 24:21 48:12 56:10,23 57:19 61:12 65:15 89:23 90:23 91:15 91:22 92:10 94:16 94:17 101:2,3 163:12 182:20 197:1,2 207:6,9 217:14 253:4 257:5
**Unfortunately** 21:13 323:6
**unhappy** 272:23
**unimportant** 229:21
**UNITED** 1:1
**universe** 66:3
**unknown** 92:8,9
**unreliable** 162:3
**update** 123:5 204:4 205:8
**updated** 310:10 313:4
**updating** 52:4
**uploaded** 51:25 134:21
**uploading** 53:1
**upset** 241:12,15 242:5 293:15
**URQUHART** 2:7
**use** 41:13 87:9,10,11 87:13 94:4 95:19 108:17,19 109:3 120:7 124:3 125:16 148:7 184:2 195:3 195:15,16,19,20,22 203:16 221:14 225:23 235:7,13,21 277:3,6 288:14 333:11
**useful** 127:16
**user** 333:21
**uses** 337:5
**usually** 229:20

**V**

**v** 1:9
**vague** 8:17,18 29:23 49:13 114:19
**valuation** 98:13 156:14 158:25 159:16,22 160:1,7 160:10 161:16 192:9 196:8,11,24 197:3,14,25 205:23 208:8,11
**value** 23:13,15 24:7 157:20,23 159:13 167:18
**van** 30:13
**variety** 26:8 124:1,7
**various** 21:14 29:6,8
**vehicle** 330:25
**verbal** 14:22 17:9 34:10 35:5 43:22 162:7 273:3
**verbally** 283:23
**verification** 158:2 335:10
**verify** 103:24 112:19 155:12 260:19
**verifying** 60:2 65:8 100:25
**version** 175:12 195:6 195:10,13 310:13 313:7 316:1,2 319:5
**versus** 163:11 191:21 201:21 327:23,23
**verticals** 241:20
334:23
**vice** 255:19
**VIDEO** 344:2
**Videographer** 2:20 6:1 84:10,14 128:19 128:23 181:12,16 247:7,11 299:16,20 329:21 339:8,10,13 339:25
**videographer's** 330:16
**videotape** 6:2 344:1
**videotaped** 1:18 340:2 342:8 344:13
**view** 21:16 296:20
**viewed** 49:24 252:24 253:15,20 269:21
**viewing** 270:15
**voice** 25:17,18 278:11 278:13
**VP** 257:7
**vs** 343:3 344:7

**W**

**wait** 8:6 27:20,20,20 67:2,2,2 70:12 170:24 172:9 173:3 178:11,24 179:10 196:10,19 211:5 213:17 216:12,13 259:23 261:6 266:22 295:17,25 297:24 339:9
**Waiting** 296:20 323:2
**waive** 339:11,12,15 339:18
**waived** 344:22
**wall** 56:4 282:12 328:23
**want** 10:4 23:20 25:20 33:22 38:10 43:7 50:23,25 53:5 62:3 65:24 70:21,22 71:1,23 84:6 88:3 105:17 108:5 114:14 128:12 133:3 141:19 153:4 162:16 164:25 165:1 173:16,21 180:19 191:21 195:16 202:17 210:21 219:9,18 227:3,13 231:6 240:8 247:16 249:1 260:10,18 261:9 273:24 282:25 283:3,20 284:11 285:2,19 286:3 288:3 289:7 291:22 291:23,24 293:24 304:7,13 310:12 313:6,17 329:16 334:11 339:20,21
**wanted** 12:8 31:5 46:5 55:12 132:6 139:23 140:17,20 140:22 142:15 157:22 158:16 184:13 210:1 219:14 235:24 237:23 250:20 251:8 252:7,12 253:15,17 260:12 273:19 274:13 283:11 284:4 286:8 303:16
**Warehouse** 330:23
**warranted** 290:13
**wasn't** 10:16 11:1 20:10 28:12 31:5 32:17 33:18 37:25 40:21 49:22 57:17 73:22 100:13,19 101:2 102:20 135:14 142:6 152:17 157:6 159:21 164:5 176:5 178:11 214:9 225:14 229:3 234:8 234:22 257:2 266:4 268:2 284:8 287:17 296:10 301:14 322:7 324:21 326:22 328:24
**waste** 317:11
**wasting** 309:20
**Water** 137:13,15,22 137:24 138:1,4,14 143:21 144:2,8 145:8,11,12 147:20 147:24,25 148:7,10 148:15,16 149:13 221:14,18,22,25 222:9,12 223:17,22

223:24 224:6
305:10,13
**Watkins** 123:13,14
123:24,24 230:11
**way** 22:13 24:7 33:25
47:16 49:24 52:18
58:22 60:1,2 65:8
66:25 68:8 73:19
100:24 105:25
129:9,18 149:22
154:8 155:14,20
157:23 158:2 159:2
160:23 165:7 168:8
171:17 176:13
180:8 208:16
254:22 270:14
289:25 328:16
**ways** 168:4
**we'll** 58:11 84:4
98:20 113:2,2
115:17 122:22
165:8 181:7 192:6
195:14 245:14
247:18 259:4
288:14 299:6,13,14
299:15 311:4
320:16 339:1
**we're** 6:1 18:18,21
20:4,4,16,19 22:13
22:23,23 26:12,16
27:9,15,15 47:13
66:5 84:2,5,14
87:19 107:1,1
118:24 119:3
122:16,17 128:19
128:23,25 129:1
137:6 143:25 147:9
147:9,10 153:19
165:9,13 172:2
175:8 179:16,16,19
179:23 181:6,7,9,12
181:16,23 193:15
198:4 199:5,11
200:14 211:3
212:22,22,22,23
213:13,24 215:13
215:24 218:1,7
221:2,22 222:14
234:16 237:12,24
240:15 247:7,11
258:21 261:3,8
263:19 273:8 274:8
276:10 279:16
280:20 281:7
283:15 284:24
288:7 290:1 297:20
299:16,20,25 301:7
301:15,16,16 302:1
302:6,13 308:7
312:13,14,14
314:13 318:16
320:14 325:14
329:21 337:7
338:21 339:8,16,19
339:25
**we've** 13:7,10 63:25
64:10 73:7 89:9
98:3 112:19 117:6
132:9 135:19 148:5
161:7 230:8,9,9
240:2 250:13 316:8
319:7 326:4
**wealth** 198:23 201:9
227:3,7 335:5,7
**website** 98:25 99:6,12
100:6 190:24
191:13 232:4,21
234:25,25 237:19
242:20,23,24 243:3
243:6,8,16 244:17
244:24 245:5,8
247:16 248:2,4,9,12
248:16,21 249:3,8
249:11 250:5,21
251:10 252:13,20
252:25 255:24
256:14 257:14
258:19 260:15
267:20 269:13
270:15 288:20
293:1
**week** 47:23 48:1
50:23 51:1 115:5
216:15 230:5 276:3
277:22 278:4 319:8
323:3
**weekend** 54:13
228:23 229:10,13
229:21 230:2
308:22
**weekends** 229:11
**weeks** 108:1,8 276:5
**weighed** 22:2 256:8
**weight** 291:9
**went** 8:23 30:22 43:1
85:20 181:19
217:14,15,18 239:5
243:10 247:14
282:19 289:25
**weren't** 23:21 37:9
37:21 58:22 118:8
119:21,21 152:10
152:14 184:15
202:13 208:24
210:6 249:5 275:3
293:16 322:2
323:23 336:14
**whatsoever** 120:23
167:18 169:20
170:12 252:7
278:16
**whichever** 239:4
344:21
**whiteboard** 239:11
241:21
**widely** 210:12
**wife** 109:7
**willing** 212:6 229:13
**willingly** 46:10
**wish** 195:3
**witness** 6:6,25 7:6
10:8,21 11:23 12:12
13:2 14:5,21 15:23
16:8 17:6 18:7 19:6
20:1 21:2 23:1,24
25:22 26:19 27:1
28:25 29:15,17,19
30:21 32:23 33:10
34:15,20 35:18
38:17 40:4 41:7,22
42:2 43:19 44:11,17
44:24 45:7,13,22
46:13 47:2 49:3
51:3 52:7,14 53:11
53:17 54:2 55:14
57:8 59:11 62:1
63:14,17,19,22 67:4
67:19 68:14 69:4,5
69:7,8,9,16 70:14
73:12 74:13 75:7,17
81:6 82:4,25 87:1
88:9,19 90:2,15
91:8,19 92:14 93:18
93:25 94:10 95:23
96:15 97:7,23 98:9
99:2,8,21 100:15,19
101:20 102:4,15
103:1,12 104:10
105:12 109:20
110:3,9,22 111:14
112:1,24 113:9,11
114:13 116:5 117:2
118:3,10,18 119:21
120:13 121:1,18,25
123:17,23 124:6
126:16,17 127:5,9
127:16 129:12
130:6 132:12
133:11,24 134:15
134:25 135:14
136:1,24 138:7,23
139:10 140:10
141:8,23 143:8,15
144:14 145:5,19
150:2 153:3 156:7
156:23 158:12
159:2,8,18 160:9,16
161:20 163:4,20
164:3,13 166:18
168:3,16 169:11,23
170:23 171:5
172:11 173:4,7,14
173:24 174:5
175:20 178:17
179:12 180:11,18
180:24 184:19
185:10 186:16,18
187:16,22 188:2
192:12 197:7,18
203:3 205:6 206:2
207:23 208:5,21
209:20 211:19
212:15 213:18
214:8,25 215:9
218:24 219:8,20
220:9 222:4,7,23
223:7,14 224:4
226:8,14 227:21
228:6 229:3,16
230:1 231:6 232:6
233:22 234:22
235:15 236:13
238:24 240:16
241:10 247:6,20
250:12 251:12,25
252:15 254:10,17
256:6 265:22
266:24 267:2,22
269:24 270:17
271:24 273:5
275:13 276:18
277:13,25 280:9
283:22 284:7
286:15,20 287:4,25
289:7 292:15 295:3
295:21 296:10
297:11 299:10,12
300:15 301:23
303:7 305:4,12,18
306:21 308:3 315:6
315:23 317:4 318:7
320:19 321:22
323:18 326:8
327:12 328:8,21
329:6,14 334:1
336:5,21 341:11
**wonder** 297:22
**word** 22:5 41:13
44:10 87:10,11,13
90:5,5 91:20 94:12
95:6 104:16,17
115:16 120:7 178:9
199:20,21,24 202:3
202:6 203:1,7,10,13
203:16 221:14
285:12 305:21,24
306:2,7 337:5
**words** 43:9 59:12
68:25 75:12 83:23
92:24 93:22 148:2,7
164:8 166:21 167:1
167:4 172:23
173:13,18 174:2,9
174:10 179:6
196:16 199:1,2,4
215:11 221:25
263:25 280:22
285:9 293:25
327:18 336:19
**work** 11:8,9,11 12:9
13:9 36:18 42:23
44:2 46:5 53:18
55:12 61:7 81:1
85:14,17 103:3
112:6 122:9,9
131:23 145:23
149:11 171:19
210:1 229:11 230:1
279:14 283:3,8,12
283:20 284:11

285:2,19 286:3,10
308:22,23 309:5,6,7
323:3 330:21 331:5
**workday** 36:14,18
**worked** 35:11,19
89:16 124:13
146:21
**working** 54:11
117:21,23 118:4,7
124:16 125:11
146:4 150:3 152:19
229:13 237:25
244:21 262:14
309:2
**works** 51:16 76:7
152:21 286:18
**worth** 9:1 10:16 59:5
175:4
**wouldn't** 72:22,25
73:2 74:9 87:13
88:2 126:20 132:13
167:5 168:4 190:14
202:8 226:15 293:7
**wrapped** 248:20
**write** 68:25 70:1
72:22 81:2 94:10
125:10 162:10
163:7 166:22 174:7
174:7,9,21 175:25
176:8 178:3,6,14
182:8 217:23
218:20 263:1
285:10 290:6,9,22
291:20 301:3 304:3
304:7 308:21 328:9
**writes** 52:18 59:4
288:24 307:9
**writing** 35:3 41:17
65:4 94:7 162:2
169:18 185:7
272:25 327:16
**writings** 88:11
**written** 11:20 14:22
14:23 17:10 33:17
34:5,9,12 39:23
43:5,22,25 48:20
162:8 186:14
206:18 215:11
325:20
**wrong** 8:15 29:21
38:13 117:12
229:18,19 289:25
327:17
**wrote** 43:1 61:19
62:18 68:20 69:2,5
69:7,9,12,13,18
160:5 175:19,19,23
176:2,6 178:9
201:20 212:19
214:4,16,18 217:13
264:1 280:22,23
296:8 319:13 324:6
326:13 327:3,9

**X**

**x** 1:13 3:1,7 23:14

**Y**

**yeah** 6:17 8:10 11:16
11:18 12:5 14:17
21:2 23:1 31:15,23
32:15 34:6 36:19
42:5 46:13 49:6
55:14 73:6 76:12
77:1 79:12 81:6,19
82:25 83:4 97:12,12
103:22 104:10
108:10,13 109:10
109:14 111:20
114:22 123:1 124:6
125:9,21 128:3,14
129:15,19 133:19
134:25 150:2
151:19 154:18
159:2 171:2 182:7
182:19,25 183:18
184:17 194:6 195:5
196:14,17 198:5
201:15 206:17
207:6 210:22
211:12,19 212:15
213:18,23,23,23
217:22 224:23
227:19 230:23
233:18 234:7,19
236:7 240:5,9,12,16
240:22 241:1 244:1
245:13 248:3,8,11
251:22 255:12,19
256:20 257:11,23
258:2 259:21 260:6
261:6,11,17,21
264:21,21 265:9,9
265:19 267:1 269:2
270:6 273:15
275:13 276:18
277:5 279:25 283:5
284:2,3,22 288:6
289:3,13 290:8
291:24 293:5,22
298:13 300:8
302:15 303:22,24
310:4 314:10
319:15 328:17
329:19 331:17
337:13,18,22
**year** 58:7,18 109:2
161:14,14 184:9,14
190:2,3 235:16
**year-and-a-half**
235:17
**year-end** 307:17
**years** 221:20 274:8
332:15
**yelling** 69:6
**Yep** 147:5 200:20
217:13 279:18
**yes-or-no** 26:22 28:1
67:16 132:25 133:3
**York** 233:12 238:7
244:19 246:15
262:24
**young** 4:6 180:18,21
240:21 241:8,12
257:20 259:17

**Z**

**zero** 65:8 100:24
**zoom** 1:15 2:1,17
168:13 333:14,14
333:16,18,21,23
**Zuckerman** 2:9 6:11
6:11 7:23 8:14,17
8:20 10:7,20 11:22
12:11 13:1 14:4,20
15:22 16:7 17:5,14
18:6 19:5,25 21:1
22:24 23:23 25:16
26:18,25 27:12,20
28:24 29:14,23
30:18 32:22 34:14
35:17 38:16 40:3
41:6,21 42:1 43:18
44:16,23 45:5,12,21
46:12 47:1,10 49:2
50:11 51:2 52:6,13
53:10,16 54:1 55:13
57:7 59:10 61:25
63:13 64:2,6,10,15
64:17 65:18 66:7
67:2,17,22 68:9
69:3,15 70:12,24
71:3,13,17,22 72:1
72:7,13 73:11 74:12
75:6,16 81:5 82:3
82:24 83:1,7 84:1,5
86:25 88:6,13,17
90:1,14,25 91:4,18
92:13 93:17,24 94:9
95:22 96:14 97:6,22
98:8 99:1,7,20
100:14,18 101:14
101:19 102:3,14,25
103:11 104:8
105:11 109:19
110:2,8,21 111:13
111:25 112:23
113:8 114:12
115:18 116:4,15
117:1,7 118:2,9,17
119:20 120:12,24
121:17,24 123:16
123:22 124:4
126:15,25 127:15
128:5,9,14,16
129:11 130:5
132:11 133:10,23
134:8,14,24 135:13
135:25 136:23
138:6,18 139:9
140:6,9 141:2,22
142:18 143:7,14
144:13,24 145:2,14
145:18 147:9,12,19
147:22 148:5,17
149:1,5,9 150:1
152:12 153:2 154:6
154:22 155:1 156:6
156:12,15,22
158:11 159:1,7,17
160:8,15 161:19
163:3,19 164:2,12
166:7,9,17 168:2,15
169:10,22 170:22
170:24 171:4 172:9
173:3,5,8,20,24
174:4 175:6,11
176:16 177:5
178:10,16,24 179:3
179:8,10,13,16,21
179:24 180:3,12
181:2,9 184:18
185:9 186:15,17
187:15,21 188:1
189:5 190:4,8 191:1
192:11 193:23,25
195:5,18 196:19
197:6,17 203:2
205:5 206:1,11,17
206:23 207:4,7,22
208:3,20 209:11,19
211:17 212:13
213:17 214:7,24
215:8 218:23 219:7
219:19 220:8 222:3
222:5,22 223:6,13
224:3 225:7 226:7
226:13 227:20
228:5 229:2,15,25
231:5 232:5 233:16
233:19 234:21
235:14 236:4,11,16
236:22 237:2
238:23 240:2 241:9
242:16 245:9,16,19
250:11 251:11,24
252:14 254:9,16
255:5 256:5 264:23
265:21 266:22
267:21 269:23
270:16 271:23
273:4,21 274:4,7,12
275:11,23 276:17
277:12,24 278:10
280:8 281:5,12
283:21 284:6
286:14,19 287:3,24
289:5,19 292:11,14
295:2,20 296:9,18
297:5,15,18 298:2
299:3,6,11,13
301:22 305:3,11,17
306:5,20 308:2
309:17 310:21
311:8 315:5,22
316:10,13,16 317:3
317:19 318:6
320:10,18 321:21
323:16 324:2 325:5
326:7 327:11,19
328:3,7,20 329:5,11

329:19 330:1,3,10 330:13,16 333:25 336:4,20 338:19 339:3,12,14 344:9 344:12

**0**

**0** 194:16
**000001** 4:12,20
**0000013** 4:19
**000006** 4:20
**000007** 5:12
**0000081** 4:23
**0000082** 4:23
**0000203** 4:21
**0000209** 4:22
**0000258** 193:22 197:25
**0000260** 194:19
**0000278** 193:11
**0000456** 4:11
**0000794** 3:17
**0000903** 3:10 47:15 64:9
**0000905** 3:10 47:15
**0001093** 3:13 107:6
**0001101** 3:14
**0001110** 4:7
**0001630** 4:9 257:18
**0002278** 3:9
**000257** 3:20 190:6
**000258** 193:24
**000260** 196:1
**000278** 196:6
**000279** 193:11
**000295** 3:21
**0003093** 195:8
**0003889** 4:14
**0003890** 4:14
**0003897** 4:15 288:15
**0003901** 4:17
**0003902** 4:15
**0003926** 5:9
**0004126** 5:14
**0004127** 5:15
**000797** 3:18
**000804** 4:3 215:22
**00081** 318:23
**000812** 4:4
**000818** 4:4
**000819** 4:18
**000859** 153:25
**000859-000862** 3:16
**000862** 153:25
**000891** 3:19 182:4
**000892** 3:19
**001472** 4:10 259:9
**001473** 4:10

**1**

**1** 3:9 20:20,22 96:18 314:17
**1(a)** 96:20,21
**1(a)(iii)** 97:10
**1:30** 244:11,12,13
**1:33** 179:22
**1:34** 128:24
**1:59** 216:21 217:4,6
**10** 3:20 6:2 189:18,21 194:7 221:7
**10:00** 1:16
**107** 3:13
**10Q** 193:7
**10th** 2:8 51:21 150:15
**11** 3:22 51:21 107:2 193:17,20 194:1,9 200:15 210:18 236:6,14 273:15
**11/9/23** 269:18
**11:34** 84:11
**11:43** 128:10
**11:48** 84:15
**11th** 232:1,13
**12** 4:2 200:16,18,19 200:22 215:18
**12:44** 128:20
**12:45** 128:13
**122** 3:14
**129** 3:15
**13** 4:3 122:17 215:13 215:15 329:19 330:1,3,11
**13th** 47:21 48:17 49:19
**14** 4:4,6 129:2 221:4 221:6,9 235:13
**1473** 259:9
**14th** 51:24 57:4 76:17 77:6 154:11 232:17 236:2 237:17 244:3 269:13
**15** 4:6 153:20 240:12 240:15,18 243:24
**153** 3:16
**15th** 21:6 24:17,22 25:15 26:3 36:4 38:14 56:2 72:17 154:2 243:25 257:17,19 295:11 296:12 297:3
**16** 4:8 165:4,13 247:19,22 330:10
**160** 74:21 75:1,18 170:17 172:18 174:17
**160M** 74:16 174:22 175:24
**165** 3:17
**16th** 233:22 261:19 264:1 272:13 279:24,25 280:2 284:3
**17** 4:9 179:19 259:1,3 296:15
**17th** 259:13 288:12 293:4 300:2
**18** 4:10 181:24 259:5 259:7
**182** 3:19
**189** 3:20
**19** 4:11 189:19 261:5 261:7,13
**193** 3:22
**1st** 337:12,16

**2**

**2** 3:10 4:22 47:13,18 312:15
**2(a)** 94:3
**2:30** 179:24 244:15
**2:32** 181:13
**2:42** 181:17
**2:47** 294:19
**20** 3:9 4:12 38:12,12 193:18 194:10,11 194:23 210:16 270:7,9,11 344:21
**200** 4:2
**2015** 38:8 331:8
**202** 344:18
**2022** 156:2
**2023** 4:2,6 21:6 24:17 24:22 25:5,10,15 26:3,5,24 27:8 28:8 28:14 30:1,8 36:4 38:13,14 47:21 48:17 49:20 50:1 57:4 76:17 77:7 88:25 107:8 109:4 109:17 138:4 182:9 183:15 186:10 189:24 190:11,14 190:18 201:1,16 202:2,22 222:2 243:12 256:3 269:13 279:24,25 284:3 300:3 302:21 307:24 310:10 312:24 313:4
**2024** 109:4 334:3,7 334:12,17
**2026** 1:16 6:3 340:13 341:12 342:21 343:4,20 344:6,14
**20th** 302:21
**21** 4:13 273:9,11 302:15 307:24
**213** 2:10
**215** 4:3
**21st** 306:25
**22** 4:15 200:20 288:7 288:9
**221** 4:4
**23** 4:16 85:20 215:22 300:1,5
**24** 1:16 4:18 190:16 239:13 249:14 302:14,16,18 308:7 343:4 344:14
**240** 4:6
**247** 4:8
**24th** 6:3 310:10 313:3
**25** 4:19 247:18 308:9 308:10,12
**258** 194:19,22
**259** 4:9,10
**26** 4:20 239:13 257:17 310:5,7 312:16
**260** 195:20
**261** 4:11
**27** 4:21 259:5,5 312:16,17,18,20 341:12 342:21 344:6
**270** 4:12
**273** 4:13
**277** 198:4,4
**278** 198:2,4
**28** 4:23 318:16,20
**287** 210:25
**288** 4:15
**29** 5:8 322:16,18
**295** 190:7
**2nd** 2:3 50:1 51:9 107:8 109:17 187:20
**2Q** 258:11,14,16
**2X** 60:21 61:20 62:6 69:20 166:13 178:1

**3**

**3** 3:11 87:20,22 201:3 201:5
**30** 5:11 211:1 212:13 212:14 261:8 325:15,17
**30(b)(6)** 147:23 206:12,18 207:8
**300** 4:16 177:23
**302** 4:18
**305** 2:5
**308** 4:19
**31** 5:14 269:1 337:8 337:10
**310** 4:20
**312** 4:21
**318** 4:23
**322** 5:8
**325** 5:11
**33** 310:5
**33131** 2:3
**333** 2:3 7:18
**337** 5:14
**350118** 341:20
**3902** 288:16
**3Q** 193:6 258:5 269:17 300:20
**3rd** 329:12
**3X** 255:25

**4**

**4** 3:13,25 4:23 96:2 107:2,4 201:5 318:18
**4:04** 247:8
**4:19** 247:12
**4:30** 344:19
**4:38** 259:22
**4:49** 259:22
**44** 273:9 279:15

**4400** 2:3
**443-3000** 2:10
**45** 128:14
**46** 288:7
**47** 3:10 299:23

**5**

**5** 3:14 4:25 20:19 61:2,5 118:25 119:3 122:17,19
**5-16-2027** 341:19
**5:23** 299:17
**5:30** 299:15
**5:33** 299:21
**50** 142:4 192:16
**525-2221** 344:4
**53** 337:2
**579-0535** 2:5
**5M** 60:21 61:19 62:6 62:22 66:14 67:12 68:22 69:13 166:13
**5th** 38:7,8,11,13 88:25 182:9 183:15 186:10 188:11 312:24 321:6 322:9 325:21,23

**6**

**6** 3:15 47:12 129:1,4 180:6,9,16 181:6,8 239:8 241:19 242:6 245:1 246:22 247:25 268:6,7 291:6 292:2 326:6 326:17 333:2 338:12
**6.5M** 304:3
**6:07** 269:14
**6:09** 329:22
**6:15** 299:12
**6:25-cv-00424** 1:3
**6:28** 1:16 339:10 340:1
**6:30** 330:6,11
**60** 52:2 192:16
**600,000** 177:23
**633** 344:17
**65** 333:3

**7**

**7** 3:4,6,16 153:19,22 232:24 239:8 242:6 245:2 246:22 261:2 268:6,7 291:6 292:2 326:6,17 333:2 338:12
**73** 64:11
**75** 240:3
**7th** 319:3,6

**8**

**8** 3:17 165:11,12,14 165:16 239:8 242:6 245:2 246:22 260:21 261:2 268:7 291:6 292:2 326:6 326:17 338:12
**8-K** 239:16 241:17 260:21,23,25 292:4 293:18 337:23
**82** 318:23
**865** 2:8
**87** 3:11
**892** 182:5
**8th** 322:21 323:12,13

**9**

**9** 3:19 4:2 85:3 181:24 182:2 240:13 254:5 268:6
**9:00** 215:18
**9:30** 344:19
**90** 83:3
**90017** 2:8
**905** 64:9
**91** 257:25
**911** 257:21 258:2 296:24 297:1
**954** 344:4
**9th** 137:6 138:4 189:24 192:10 201:1,16 202:1,21 215:18 222:1 254:4 254:14

**CONFIDENTIAL**

**Plf. Exhibit 1 |** Date: 7/24/2026
Witness: Jay Jackson

Plf. Exhibit 2 | Date: 7/24/2026
Witness: Jay Jackson

**From:** Jay Jackson <jay@abacuslife.com>
**To:** Sean McNealy <sean@abacuslife.com>
**CC:** Scott Kirby <scott@abacuslife.com>, Bill McCauley <bill@abacuslife.com>, Samantha Butcher <sbutcher@lmagrp.com>
**Subject:** RE: RiverRock / Abacus
**Date:** Sat, 14 Oct 2023 16:56:10 +0000

---

We have everything in the doc room. Coventry originated most of the paper. Between RR and Jose this will have an impact on their DTC buying.

Also, could offer investors transfer into interval fund. This would give instant assets and qualify us for large platforms.

---

**From:** Sean McNealy <sean@abacuslife.com>
**Sent:** Saturday, October 14, 2023 12:53 PM
**To:** Jay Jackson <jay@abacuslife.com>
**Cc:** Scott Kirby <scott@abacuslife.com>; Bill McCauley <bill@abacuslife.com>; Samantha Butcher <sbutcher@lmagrp.com>
**Subject:** Re: RiverRock / Abacus

I like it. We leverage and add DTC cases. Did the send details on the fund holdings? Cash flow?

Sean McNealy

[redacted]

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**From:** Jay Jackson <jay@abacuslife.com>
**Sent:** Saturday, October 14, 2023 8:33 AM
**To:** Anthony J Annino <anthony.annino@gmail.com>
**Subject:** RE: RiverRock / Abacus

Great – thank you. We received SEC S1 filing back with no comments so we are wall crossing now. We expect to have it completed by end of month. Assuming all goes well, board approval etc. will be in a good position to close before year end.

**From:** Anthony J Annino <anthony.annino@gmail.com>
**Sent:** Saturday, October 14, 2023 7:53 AM
**To:** Jay Jackson <jay@abacuslife.com>
**Subject:** RE: RiverRock / Abacus

I just uploaded the servicing agreements to the portal – you'll see that the termination provisions are simple with 60 days notice (so no issue).

I'm working on the DCF and should have that up by the end of the weekend.

Anthony J Annino
+1.617.990.6545

**From:** Jay Jackson <jay@abacuslife.com>
**Sent:** Friday, October 6, 2023 12:40 PM
**To:** Anthony Annino <anthony.annino@gmail.com>
**Subject:** RE: RiverRock / Abacus

How does 11am Est on Tuesday the 10th look for you?

**From:** Anthony Annino <anthony.annino@gmail.com>
**Sent:** Friday, October 6, 2023 11:44 AM
**To:** Jay Jackson <jay@abacuslife.com>
**Subject:** Re: RiverRock / Abacus

Jay

I'm flexible - let me know what work best on your end.

Thanks
Tony

On Mon, Oct 2, 2023 at 12:59 PM Jay Jackson <jay@abacuslife.com> wrote:

> Great. Thank you. We can sort thru it. Want to jump on a call next week? How does your schedule look?
>
> ---
>
> **From:** Anthony J Annino <anthony.annino@gmail.com>
> **Sent:** Monday, October 2, 2023 12:56 PM
> **To:** Jay Jackson <jay@abacuslife.com>
> **Subject:** RE: RiverRock / Abacus
>
> Jay
>
> I just sent you access to the data room – please confirm you received it.
>
> There's a ton of stuff out there (and clearly I need a lesson on navigating our network), but this should be a good start.
>
> Please let me know when you've reviewed and would like to discuss.
>
> Tony
>
> Anthony J Annino
> +1.617.990.6545
>
> ---
>
> **From:** Jay Jackson <jay@abacuslife.com>
> **Sent:** Wednesday, September 13, 2023 5:32 PM
> **To:** Anthony Annino <anthony.annino@gmail.com>
> **Subject:** RE: RiverRock / Abacus
>
> Sounds good. Thank you!
>
> ---
>
> **From:** Anthony Annino <anthony.annino@gmail.com>
> **Sent:** Wednesday, September 13, 2023 1:54 PM
> **To:** Jay Jackson <jay@abacuslife.com>
> **Subject:** RiverRock / Abacus
>
> Jay
>
> Good connecting last week.
>
> I'm in the process of putting the data room together and should have you something by early next week.
>
> Tony
>
> --
> Anthony J Annino
> +1.617.990.6545

--
Anthony J Annino
+1.617.990.6545
<Renegade Model_Abacus.pdf>

**CONFIDENTIAL**

**Plf. Exhibit 3 |** Date: 7/24/2026
Witness: Jay Jackson

Plf. Exhibit 4 | Date: 7/24/2026
Witness: Jay Jackson

**From:** "Anthony Annino (via Google Drive)" <drive-shares-dm-noreply@google.com>
**To:** jay@abacuslife.com
**Subject:** Folder shared with you: "Abacus_RiverRock"
**Date:** Mon, 02 Oct 2023 16:54:37 +0000

---

# Anthony Annino shared a folder

Anthony Annino (anthony.annino@gmail.com) added you as a viewer. Verify your email to securely view this shared folder. You will need to verify your email every 7 days. Learn more

Abacus_RiverRock

This email grants access to this item without logging in. Only forward it to people you trust.

Open

Use is subject to the Google Privacy Policy.

Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA
You have received this email because anthony.annino@gmail.com shared a file or folder located in Google Drive with you. Delete visitor session

Google Workspace

Plf. Exhibit 5 | Date: 7/24/2026
Witness: Jay Jackson

**From:** Jay Jackson <jay@abacuslife.com>
**To:** Anthony J Annino <anthony.annino@gmail.com>, "Daniel.Harrist@lw.com" <Daniel.Harrist@lw.com>
**Subject:** RE: Next Steps
**Date:** Mon, 6 Nov 2023 22:44:56 +0000

---

Hi Tony

Can you please provide doc room access to Dan Harris with Latham?

He is going to be our attorney and will start working on a term sheet

He is attached to this email and here is his contact information.

Daniel.harris@lw.com

**Daniel J. Harrist**

**LATHAM & WATKINS LLP**
811 Main Street | Suite 3700 | Houston, TX 77002
D: +1.713.546.7509 | M: +1.303.349.5850

---

**From:** Anthony J Annino <anthony.annino@gmail.com>
**Sent:** Monday, November 6, 2023 12:11 PM
**To:** Jay Jackson <jay@abacuslife.com>
**Subject:** RE: Next Steps

Jay

That's great news – thanks for the update.

Look forward to receiving the term sheet.

Tony

Anthony J Annino
+1.617.990.6545

CONFIDENTIAL

**Plf. Exhibit 6 |** Date: 7/24/2026
Witness: Jay Jackson

CONFIDENTIAL

**Plf. Exhibit 7 |** Date: 7/24/2026
Witness: Jay Jackson

Plf. Exhibit 8 | Date: 7/24/2026
Witness: Jay Jackson

[redacted]

---

[redacted]

[redacted]

[redacted]

---

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

---

**From:** Jay Jackson <jay@abacuslife.com>
**Sent:** Saturday, October 14, 2023 8:33 AM
**To:** Anthony J Annino <anthony.annino@gmail.com>
**Subject:** RE: RiverRock / Abacus


ABACUS_0000794

Great – thank you. We received SEC S1 filing back with no comments so we are wall crossing now. We expect to have it completed by end of month. Assuming all goes well, board approval etc. will be in a good position to close before year end.

---

**From:** Anthony J Annino <anthony.annino@gmail.com>
**Sent:** Saturday, October 14, 2023 7:53 AM
**To:** Jay Jackson <jay@abacuslife.com>
**Subject:** RE: RiverRock / Abacus

I just uploaded the servicing agreements to the portal – you'll see that the termination provisions are simple with 60 days notice (so no issue).

I'm working on the DCF and should have that up by the end of the weekend.

Anthony J Annino
+1.617.990.6545

---

**From:** Jay Jackson <jay@abacuslife.com>
**Sent:** Friday, October 6, 2023 12:40 PM
**To:** Anthony Annino <anthony.annino@gmail.com>
**Subject:** RE: RiverRock / Abacus

How does 11am Est on Tuesday the 10th look for you?

---

**From:** Anthony Annino <anthony.annino@gmail.com>
**Sent:** Friday, October 6, 2023 11:44 AM
**To:** Jay Jackson <jay@abacuslife.com>
**Subject:** Re: RiverRock / Abacus

Jay

I'm flexible - let me know what work best on your end.

Thanks
Tony

On Mon, Oct 2, 2023 at 12:59 PM Jay Jackson <jay@abacuslife.com> wrote:

> Great. Thank you. We can sort thru it. Want to jump on a call next week? How does your schedule look?
>
> ---
>
> **From:** Anthony J Annino <anthony.annino@gmail.com>
> **Sent:** Monday, October 2, 2023 12:56 PM
> **To:** Jay Jackson <jay@abacuslife.com>
> **Subject:** RE: RiverRock / Abacus
>
> Jay
>
> I just sent you access to the data room – please confirm you received it.
>
> There's a ton of stuff out there (and clearly I need a lesson on navigating our network), but this should be a good start.

Please let me know when you've reviewed and would like to discuss.

Tony

Anthony J Annino
+1.617.990.6545

**From:** Jay Jackson <jay@abacuslife.com>
**Sent:** Wednesday, September 13, 2023 5:32 PM
**To:** Anthony Annino <anthony.annino@gmail.com>
**Subject:** RE: RiverRock / Abacus

Sounds good. Thank you!

**From:** Anthony Annino <anthony.annino@gmail.com>
**Sent:** Wednesday, September 13, 2023 1:54 PM
**To:** Jay Jackson <jay@abacuslife.com>
**Subject:** RiverRock / Abacus

Jay

Good connecting last week.

I'm in the process of putting the data room together and should have you something by early next week.

Tony

--
Anthony J Annino
+1.617.990.6545

--
Anthony J Annino
+1.617.990.6545

**CONFIDENTIAL**

# RiverRock's Valuation Model

Plf. Exhibit 9 | Date: 7/24/2026
Witness: Jay Jackson

**From:** Lucas Siegel [lucas@harborlifebrokerage.com]
**Sent:** 11/5/2023 2:37:46 PM
**To:** Anthony Annino [anthony.annino@gmail.com]
**CC:** Gabe Siegel [gsiegel@servicesteel.org]
**Subject:** Re: Next Steps

This sender is trusted.

This is great news

On Sun, Nov 5, 2023 at 2:15 PM Anthony Annino <anthony.annino@gmail.com> wrote:

Anthony J Annino
+1.617.990.6545

Begin forwarded message:

**From:** Jay Jackson <jay@abacuslife.com>
**Date:** November 5, 2023 at 3:06:11 PM EST
**To:** Anthony J Annino <anthony.annino@gmail.com>
**Subject: Next Steps**

Hi Tony,

We had a successful bond raise and we are ready to move forward with a term sheet. I am presenting to the Board on Thursday but I have already spoken with the key members and we are moving forward with the acquisition. I think I am going to use Latham as our attorney on this one. They were fast and efficient on our last deal. That may change to Locke Lord if Latham is swamped. I am hoping to have a term sheet to you shortly after the board meeting on Thursday afternoon. We would still be a before year end target close.

All the best,

Jay

Jay Jackson
President & CEO

800.561.4148 | jay@abacuslife.com | abacuslife.com | 2101 Park Center Drive, Orlando, FL 32835

ABACUS LIFE
KNOW THE VALUE OF YOUR LIFE
NASDAQ | ABL

The information contained in this electronic mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be a client communication and/or work product which may contain proprietary information and as such is privileged and confidential. If the reader of this message is not the intended recipient(s) or an agent responsible for delivering it to the intended recipient(s), you are hereby notified that you have received this message and any attachments hereto in error and that any review, dissemination, distribution, or copying of this message whole or in part is strictly prohibited and may subject you to civil and/or criminal penalties under state or federal law. If you have received this message in error, please notify the sender immediately by email, and delete the original message.

--
All the best,
Lucas Siegel

**Lucas Siegel**
CEO, Chief Executive Officer
lucas@harborlifesettlements.com
800-694-0006
8am-5pm CST

**We put life back into life insurance by helping our customers use their money now, when they need it.**

What is a life settlement and how does it work?

**As seen in Forbes**

**Plf. Exhibit 10** | Date: 7/24/2026
Witness: Jay Jackson

**From:** Jay Jackson <jay@abacuslife.com>
**To:** Karla Radka <karlaradka@gmail.com>, "mbscpamba65@gmail.com" <mbscpamba65@gmail.com>, Michiel Katwijk <michiel.vankatwijk@icloud.com>, Tom Corbett <tomcorbett46@gmail.com>, Adam Gusky <agusky@emslp.com>, Sean McNealy <sean@abacuslife.com>
**CC:** Bill McCauley <bill@abacuslife.com>, Chris Romaine <chris@lmagrp.com>, Matt Ganovsky <matt@abacuslife.com>, Scott Kirby <scott@abacuslife.com>
**Subject:** Board Materials for Meeting on Thursday at AC Hotel 8:00am EST
**Date:** Tue, 7 Nov 2023 15:51:46 +0000
**Attachments:** Board_Deck_-_3Q_Final.pdf; Abacus_Life_Inc._FS_09.30.23_11-7.pdf
**Inline-Images:** image001.png

---

Hi All,

Please see attached the following for the board meeting this Thursday.

- Board Presentation Deck with Agenda
- 3Q 10Q

We will discuss the third quarter at the meeting and vote to approve the 10Q. Please feel free to reach out in advance if you have any questions.

Look forward to seeing you on Thursday.

All the best,

Jay

Jay Jackson
**President & CEO**

800.561.4148 | jay@abacuslife.com | abacuslife.com | 2101 Park Center Drive, Orlando, FL 32835

ABACUS LIFE
KNOW THE VALUE OF YOUR LIFE
NASDAQ | ABL

The information contained in this electronic mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be a client communication and/or work product which may contain proprietary information and as such is privileged and confidential. If the reader of this message is not the intended recipient(s) or an agent responsible for delivering it to the intended recipient(s), you are hereby notified that you have received this message and any attachments hereto in error and that any review, dissemination, distribution, or copying of this message whole or in part is strictly prohibited and may subject you to civil and/or criminal penalties under state or federal law. If you have received this message in error, please notify the sender immediately by email, and delete the original message.

**CONFIDENTIAL**

**Plf. Exhibit 10 |** Date: 7/24/2026
Witness: Jay Jackson

# CONFIDENTIAL

**Plf. Exhibit 11 |** Date: 7/24/2026
Witness: Jay Jackson

CONFIDENTIAL

**Plf. Exhibit 12 |** Date: 7/24/2026
Witness: Jay Jackson

**From:** Anthony Annino <aannino@sealightcap.com>
**To:** Jay Jackson <jay@abacuslife.com>
**Subject:** RE: Board Meeting
**Date:** Thu, 9 Nov 2023 19:07:33 +0000

---

Sounds good – no rush. Thx.

Anthony J Annino
+1.617.990.6545

**From:** Jay Jackson <jay@abacuslife.com>
**Sent:** Thursday, November 9, 2023 1:59 PM
**To:** Anthony Annino <aannino@sealightcap.com>
**Subject:** RE: Board Meeting

Understood – went well. Wee are in process of term sheet. Should have ready by Friday but might be Monday.

**From:** Anthony Annino <aannino@sealightcap.com>
**Sent:** Thursday, November 9, 2023 9:02 AM
**To:** Jay Jackson <jay@abacuslife.com>
**Subject:** Board Meeting

Jay

Hope it goes well today and keep me posted.

Just FYI – I'm expecting another term sheet by the end of the week.

Thanks
Tony

**Anthony J. Annino, CFA**
Managing Partner
SeaLight Capital LLC
One Liberty Lane (East), Suite 124
Hampton, NH 03842

+1.617.990.6545
aannino@sealightcap.com

**CONFIDENTIAL**

**Plf. Exhibit 14 |** Date: 7/24/2026
Witness: Jay Jackson

**CONFIDENTIAL**

**Plf. Exhibit 15 |** Date: 7/24/2026
Witness: Jay Jackson

Plf. Exhibit 16 | Date: 7/24/2026
Witness: Jay Jackson

**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

RENEGADE CAPITAL GP, LLC
d/b/a RIVERROCK FUNDS LLC, a
Delaware Limited Liability company,

Plaintiff,

v.

Case No. 6:25-cv-00424-CEM-UAM

ABACUS LIFE, INC. n/k/a ABACUS
GLOBAL MANAGEMENT, INC.,
a Delaware Corporation,

Defendant.

---

**DEFENDANT'S RESPONSES AND OBJECTIONS TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES**

Defendant Abacus Life, Inc. n/k/a Abacus Global Management, Inc. ("Abacus" or "Defendant"), by and through its undersigned counsel, submits the foregoing Responses and Objections to Plaintiff Renegade Capital GP, LLC d/b/a RiverRock Funds LLC's ("RiverRock" or "Plaintiff") First Set of Interrogatories, pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, and states as follows:

**PRELIMINARY STATEMENT**

These Responses are made solely for the purpose of this action. By responding to these Interrogatories, Defendant does not concede that the information provided is relevant to or reasonably calculated to lead to the discovery of admissible evidence in this or any other action. Defendant instead expressly reserves all objections pertaining to the relevance, competency, materiality, and admissibility of the documents as evidence and

information provided, as well as the right to object to further discovery relating to the subject matter of any information provided.

Defendant's investigation and development of the facts and circumstances related to this action are ongoing. Defendant's objections and responses are made without prejudice to, and are not a waiver of, its right to reply and object to other facts, documents, and requests during the pendency of this case. These Responses are provided based on the information reasonably known to Defendant at the time. Defendant reserves the right to supplement, revise, and/or amend these Responses, and to assert additional objections or privileges.

**OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS**

1. Defendant objects to each Instruction and Definition to the extent they purport to impose any requirement or discovery obligation greater or different from the Federal Rules of Civil Procedure, applicable rules of the Court, or case law.

2. Defendant objects to the definition "Business Records" on the grounds that it assumes facts not established in the record, specifically, the existence of a "potential RiverRock Acquisition."

3. Defendant objects to the definitions of "PowerPoint Presentation" or "Board Deck" on the grounds that it assumes facts not established in the record, specifically, the existence of a "potential RiverRock Acquisition."

4. Defendant objects to the definition of "RiverRock Acquisition" as it assumes facts not established in the record, specifically, the existence of a potential acquisition between RiverRock and Abacus.

## GENERAL OBJECTIONS

1. Defendant objects to each Instruction and Definition to the extent it purports to impose any requirement or discovery obligation greater or different from the Federal Rules of Civil Procedure, applicable rules of the Court, or case law.

2. Defendant objects to each instruction, definition, and interrogatory to the extent that it seeks documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, or any other applicable privilege. Should any disclosure by Defendant occur, it is inadvertent and shall not constitute a waiver of any privilege.

3. Defendant's discovery and investigation of the facts relevant to this case are ongoing and its responses to the Interrogatories are made to the best of its present knowledge, information, and belief. Defendant reserves the right to amend and/or supplement its responses, which are subject to such additional or different information as discovery or further investigation may disclose.

4. In making these objections, Defendant does not in any way waive or intend to waive, but rather preserves and intends to preserve:

a. all rights to object on any ground to the competency, relevancy, materiality, and admissibility of any information or document that may be provided in response to the Interrogatories or the subject matter thereof;

b. all rights to object on any ground to the use of any information or document that may be provided in response to the Requests or the subject matter thereof, in any subsequent proceeding, including the trial of the this or any other action; and

c. all rights to object on any ground to any request for further responses to these or any other discovery requests.

5. Defendant objects to the Interrogatories to the extent that they seek to define terms or characterize the evidence or pleadings in this matter. To the extent that Defendant reference theses terms in their Responses, such adoption is for ease of reference only and is not intended to imply acceptance of any such characterizations.

6. Defendant reserves the right to supplement, modify, amend, or correct all of any of the response and objections asserted below as necessary, including based on any court order that may be entered in this case.

**SPECIFIC RESPONSES AND OBJECTIONS**

1. Identify all individuals who have knowledge, or who Defendant believes have knowledge regarding the preparation of the Board Deck and describe what knowledge that individual(s) possesses.

**RESPONSE:** Defendant objects to this Interrogatory as overbroad and unduly burdensome, insofar as it requests identification of "all individuals" with knowledge regarding the preparation of the entire Board Deck which contained 38 slides of information, 36 of which did not concern or relate to Plaintiff. Subject to and without waiver of the foregoing objection, Defendant states that the following individuals have knowledge regarding the preparation of the two slides pertaining to Plaintiff in the Board Deck:

a. Jay Jackson
Chairman and Chief Executive Officer, Abacus
c/o LashGoldberg

He is likely to have information regarding the contents and preparation of the Board Deck.

b. Jonathan Osbourne
c/o Greenberg Traurig, P.A.
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
(305) 579-0535

He is likely to have knowledge regarding the information provided to Defendant pertaining to RiverRock that was included in the Board Deck.

c. Gabriel Siegel
c/o Greenberg Traurig, P.A.
333 E. 2nd Avenue, Suite 4400
Miami, Florida 33131
(305) 579-0535

He is likely to have knowledge regarding the information provided to Defendant pertaining to RiverRock which was included in the Board Deck.

d. Lucas Siegel
c/o Greenberg Traurig, P.A.
333 E. 2nd Avenue, Suite 4400
Miami, Florida 33131
(305) 579-0535

He is likely to have knowledge regarding the information provided to Defendant pertaining to RiverRock that was included in the Board Deck.

e. Anthony J. Annino
Former CEO, RiverRock
Anthony.annino@gmail.com

He is likely to have knowledge regarding the information provided to Defendant pertaining to RiverRock which was included in the Board Deck.

Defendant further states that its factual investigation is ongoing, and Defendant will supplement this interrogatory response as necessary as additional facts and information become available.

2. Identify all individuals who have knowledge, or who Defendant believes have knowledge regarding the presentation of the Board Deck to the board at the meeting on or around November 9, 2023, and describe what knowledge that individual(s) possesses.

**RESPONSE:** Defendant objects to this Interrogatory as overbroad and unduly burdensome, insofar as it requests identification of "all individuals" with knowledge regarding the presentation of the Board Deck which contained 38 slides of information, 36 of which did not concern or relate to Plaintiff. Subject to and without waiver of the foregoing objection, Defendant states that the following individuals have knowledge regarding the presentation of the two slides pertaining to the Plaintiff in the Board Deck:

a. Jay Jackson
Chairman and Chief Executive Officer, Abacus
c/o LashGoldberg

He is likely to have knowledge regarding the presentation of the Board Deck on or about November 9, 2023.

b. Bill McCauley
Chief Financial Officer, Abacus
c/o LashGoldberg

He is likely to have knowledge regarding the presentation of the Board Deck on or about November 9, 2023.

c. Chris Romaine
Chief Counsel, Abacus
c/o LashGoldberg

He is likely to have knowledge regarding the presentation of the Board Deck on or about November 9, 2023.

d. Adam Gusky
Chief Investment Officer, East Asset Management
Director, Abacus Board of Directors
c/o LashGoldberg

He is likely to have knowledge regarding the presentation of the Board Deck on or about November 9, 2023.

e. Gov. Thomas W. Corbett Jr.
Director, Abacus Board of Directors

He is likely to have knowledge regarding the presentation of the Board Deck on or about November 9, 2023.

f. Michiel van Katwijk
Director, Abacus Board of Directors

He is likely to have knowledge regarding the presentation of the Board Deck on or about November 9, 2023.

g. Beth Schulte, CPA, MBA
Director, Abacus Board of Directors

She is likely to have knowledge regarding the presentation of the Board Deck on or about November 9, 2023.

h. Karla Radka
Director, Abacus Board of Directors

She is likely to have knowledge regarding the presentation of the Board Deck on or about November 9, 2023.

Defendant further states that its factual investigation is ongoing, and Defendant will supplement this Interrogatory response as necessary as additional facts and information become available.

3. Identify all individuals who have knowledge, or who Defendant believes have knowledge regarding negotiations and communication relating to the potential RiverRock Acquisition and describe what knowledge that individual(s) possesses.

**RESPONSE:** Defendant objects to this Interrogatory as overbroad and unduly burdensome, insofar as it requests identification of "all individuals" with knowledge regarding a "potential RiverRock Acquisition," the existence of which is not established in the record. Subject to and without waiver of the foregoing objections, Defendant states that the following individuals have knowledge regarding the communications between Defendant and Plaintiff relating to RiverRock:

a. Jay Jackson
Chairman and Chief Executive Officer, Abacus
c/o LashGoldberg

He is likely to have knowledge regarding communications between Defendant and Plaintiff related to RiverRock.

b. Bill McCauley
Chief Financial Officer, Abacus
c/o LashGoldberg

He is likely to have knowledge regarding communications between Defendant and Plaintiff related to RiverRock.

c. Chris Romaine
Chief Counsel, Abacus
c/o LashGoldberg

He is likely to have knowledge regarding communications between Defendant and Plaintiff related to RiverRock.

Defendant further states that its factual investigation is ongoing, and Defendant will supplement this Interrogatory response as necessary as additional facts and information become available.

4. Identify all individuals who have knowledge, or who Defendant believes have knowledge regarding the upload of the Board Deck onto Abacus's public facing website and describe what knowledge that individual(s) possesses.

**RESPONSE:** Defendant objects to this Interrogatory as overbroad and unduly burdensome, insofar as it requests identification of "all individuals" with knowledge regarding the inadvertent upload of the Board Deck onto Defendant's website. Subject to and without waiver of the foregoing objection, Defendant states that the following individuals have knowledge regarding the inadvertent upload of the Board Deck to Defendant's website:

a. Jay Jackson
Chairman and Chief Executive Officer, Abacus
c/o LashGoldberg

He is likely to have knowledge regarding the inadvertent upload of the Board Deck to Defendant's website.

b. Jeff Smith
Director of Marketing, Abacus
c/o LashGoldberg

He is likely to have knowledge regarding the inadvertent upload of the Board Deck to Defendant's website.

c. Blake Gallimore
Director of Corporate Marketing & Communications, Abacus

c/o LashGoldberg

She is likely to have knowledge regarding the inadvertent upload of the Board Deck to Defendant's website.

d. Marissa Young
Senior Associate, ICR Inc.

She is likely to have knowledge regarding the inadvertent upload of the Board Deck to Defendant's website.

Defendant further states that its factual investigation is ongoing, and Defendant will supplement this Interrogatory response as necessary as additional facts and information become available.

5. Identify all individuals who have knowledge, or who Defendant believes have knowledge regarding the decision to not move forward with the RiverRock Acquisition and describe what knowledge that individual(s) possesses.

**RESPONSE:** Defendant objects to this Interrogatory as overbroad and unduly burdensome, insofar as it requests identification of "all individuals" with knowledge regarding the uploading of the Board Deck onto Defendant's website. Defendant further objects to this Request to the extent it seeks information regarding the "RiverRock Acquisition," on the ground that such Interrogatory presumes facts not established in the record. Subject to and without waiver of the foregoing objections, Defendant states that the following individuals have knowledge regarding discussions between RiverRock and Defendant and Defendant's decision-making process with respect to RiverRock:

a. Jay Jackson
Chairman and Chief Executive Officer, Abacus

c/o LashGoldberg

He is likely to have knowledge regarding discussions between Defendant and Plaintiff and Abacus's decision-making process with respect to RiverRock.

b. Chris Romaine
Chief Counsel, Abacus
c/o LashGoldberg

He is likely to have knowledge regarding discussions between Defendant and Plaintiff and Abacus's decision-making process with respect to RiverRock.

Defendant further states that its factual investigation is ongoing, and Defendant will supplement this Interrogatory response as necessary as additional facts and information become available.

6. Describe in detail the circumstances under which the Board Deck containing RiverRock's Confidential Information was published to Abacus' public website, including the date and time of posting, who authorized or caused the posting, and the reasons for doing so.

**RESPONSE:** Defendant objects to this Interrogatory to the extent is assumes facts not in evidence, including the characterization of any information as "Confidential." Defendant also objects to this Interrogatory to the extent that it seeks identification or a summary of documents that Defendant agrees to produce in discovery, on the grounds that such a request is unduly burdensome and seeks information equally available to Plaintiff. Subject to and without waiver of the foregoing objections, Defendant states that the Board Deck which included two pages referencing Plaintiff out of a total of 38 pages, was inadvertently posted on

Defendant's investor website at https://ir.abacusgm.com under the Presentations subtab during the period from November 14, 2023 at 10:26AM EST to November 15, 2023 at 3:30PM EST. Defendant further states that the Board Deck was inadvertently sent by Jeff Smith to ICR, Inc., who then sent the Board Deck to Notified to be posted on Defendant's investor website.

Defendant further states that its factual investigation is ongoing, and Defendant will supplement this Interrogatory response as necessary as additional facts and information become available.

7. State the exact date and time when the Board Deck was removed from Abacus' website, and identify all individuals involved in or responsible for the removal.

**RESPONSE:** Defendant objects to this Interrogatory as overbroad and unduly burdensome, insofar as it requests identification of "all individuals" involved in or responsible for the removal of the Board Deck from Defendant's website. Subject to and without waiver of the foregoing, Defendant states that the Board Deck which included two pages referencing Plaintiff out of a total of 38 pages, was inadvertently posted on Defendant's investor website at https://ir.abacusgm.com under the Presentations subtab during the period from November 14, 2023 at 10:26AM EST to November 15, 2023 at 3:30PM EST. Jay Jackson immediately directed Jeff Smith who directed ICR, Inc. to remove the Board Deck from Defendant's investor website after the inadvertent posting was discovered.

Defendant further states that its factual investigation is ongoing, and Defendant will supplement this Interrogatory response as necessary as additional facts and information become available.

8. Identify all persons or entities who accessed, viewed, downloaded, or otherwise obtained the Board Deck containing RiverRock's Confidential Information while it was publicly posted to Abacus' website, including all IP addresses, email domains, or identifying information captured.

**RESPONSE:** Defendant objects to this Interrogatory to the extent is assumes facts not in evidence, including the characterization of any information as "Confidential." Defendant also objects to this Interrogatory to the extent that it seeks identification or a summary of documents, if any exist, that Defendant agreed to produce in response to Plaintiff's Request for Production No. 14, on the grounds that such a request is unduly burdensome and seeks information equally available to Plaintiff. Subject to and without waiver of the foregoing, Defendant states that the link to the Board Deck presentation that was inadvertently posted on Defendant's investor website during the period from November 14, 2023 at 10:26AM EST to November 15, 2023 at 3:30PM EST received thirty-two (32) clicks. Defendant is without further knowledge or information to enable it to identify the persons or entities who clicked on the link to the Board Deck. Defendant further states that its factual investigation is ongoing, and Defendant will supplement this Interrogatory response as necessary as additional facts and information become available.

9. Identify all documents and communications relating to Abacus' decision not to proceed with the RiverRock Acquisition, including who made the decision, when it was made, and the reasons given.

**RESPONSE:** Defendant objects to this Interrogatory to the extent that it seeks information regarding a potential "RiverRock Acquisition," on the grounds that it presumes facts not established in the record. Defendant also objects to this Interrogatory to the extent that it seeks identification or a summary of documents that Defendant agreed to produce in discovery, on the grounds that such a request is unduly burdensome and seeks information equally available to Plaintiff. Defendant states that the responsive and non-privileged documents and communications requested in this Interrogatory, if any, will be produced in response to Plaintiff's First Set of Requests for Production to Defendants.

Dated: July 14, 2025

**LASHGOLDBERG**
Lash Goldberg Fineberg LLP
2500 Weston Road, Suite 220
Weston, Florida 33331
Tel: 954-384-2500
Fax: 954-384-2510

By: */s/ Lauren Z. Alexander*
**MARTIN B. GOLDBERG**
Florida Bar No. 827029
mgoldberg@lashgoldberg.com
**LAUREN Z. ALEXANDER**
Florida Bar No. 58044
lalexander@lashgoldberg.com
**ANDREA PICCO**
Florida Bar No. 1011573
apicco@lashgoldberg.com

*Counsel for Defendant*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 14th day of July, 2025, a true and correct copy of the foregoing has been served on all counsel of record.

*/s/ Lauren Z. Alexander*
**LAUREN Z. ALEXANDER**

STATE OF FLORIDA )
) SS.
COUNTY OF Orange )

BEFORE ME, the undersigned authority, personally appeared, Jay Jackson, who, after being first duly sworn, deposes and says that the foregoing answers are true and accurate.

[signature]

SWORN TO AND SUBSCRIBED before me this 14 day of July, 2025.

[signature]
Signature

TRACEY SMID FORD
Notary Public - State of Florida
Commission # HH 307374
My Comm. Expires Aug 31, 2026
Bonded through National Notary Assn.

Tracey Smid Ford
Print Name
NOTARY PUBLIC
State of Florida at Large

My Commission Expires:
8/31/2026

X Personally known to me

______ Produced identification

**CONFIDENTIAL**

**Plf. Exhibit 17 |** Date: 7/24/2026
Witness: Jay Jackson

# CONFIDENTIAL

**Plf. Exhibit 18 |** Date: 7/24/2026
Witness: Jay Jackson

Plf. Exhibit 19 | Date 7/24/2026
Witness: Jay Jackson

**From:** Jay Jackson <jay@abacuslife.com>
**To:** Sean McNealy <sean@abacuslife.com>, Scott Kirby <scott@abacuslife.com>, Matt Ganovsky <matt@abacuslife.com>, Samantha Butcher <sbutcher@abacuslife.com>
**CC:** Jeff Smith <jeff@abacuslife.com>, Bill McCauley <bill@abacuslife.com>, Seth Miller <seth@lmagrp.com>, Chris Romaine <chris@lmagrp.com>
**Subject:** Coventry knows about RR deal
**Date:** Thu, 16 Nov 2023 15:26:39 +0000
**Inline-Images:** image001.png

---

Somehow Coventry knows we are working on a deal with RR and Reid is flying out to see RR Friday. Super frustrating. I am hopeful that no one said anything to anyone even by accident. This is non public information and will impact our potential deal. Always remember, anything we say or materials used in the board meeting or in the hallways is non public and we cannot tell anyone including our family.

Jay Jackson
President & CEO

800.561.4148 | jay@abacuslife.com | abacuslife.com | 2101 Park Center Drive, Orlando, FL 32835

ABACUS LIFE
KNOW THE VALUE OF YOUR LIFE
NASDAQ | ABL

The information contained in this electronic mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be a client communication and/or work product which may contain proprietary information and as such is privileged and confidential. If the reader of this message is not the intended recipient(s) or an agent responsible for delivering it to the intended recipient(s), you are hereby notified that you have received this message and any attachments hereto in error and that any review, dissemination, distribution, or copying of this message whole or in part is strictly prohibited and may subject you to civil and/or criminal penalties under state or federal law. If you have received this message in error, please notify the sender immediately by email, and delete the original message.

CONFIDENTIAL

**Plf. Exhibit 20 |** Date: 7/24/2026
Witness: Jay Jackson

CONFIDENTIAL

**Plf. Exhibit 21 |** Date: 7/24/2026
Witness: Jay Jackson

CONFIDENTIAL

**Plf. Exhibit 22 |** Date: 7/24/2026
Witness: Jay Jackson

**CONFIDENTIAL**

**Plf. Exhibit 23 |** Date: 7/24/2026
Witness: Jay Jackson

**CONFIDENTIAL**

**Plf. Exhibit 24 |** Date: 7/24/2026
Witness: Jay Jackson

Plf. Exhibit 25 | Date: 7/24/2026
Witness: Jay Jackson

**From:** Jay Jackson <jay@abacuslife.com>
**To:** Anthony Annino <aannino@sealightcap.com>
**CC:** Chris Romaine <chris@lmagrp.com>, Bill McCauley <bill@abacuslife.com>, "Joel T. Shaw - Bernstein, Shur, Sawyer & Nelson, P.A. (jshaw@bernsteinshur.com)" <jshaw@bernsteinshur.com>
**Subject:** RE: Project Water
**Date:** Thu, 16 Nov 2023 21:03:44 +0000

---

Thank you Tony. Let me work on over the weekend. I like the alignment just need to work on the model related to net income and cost of capital associated with the cash outlay.

**From:** Anthony Annino <aannino@sealightcap.com>
**Sent:** Thursday, November 16, 2023 3:58 PM
**To:** Jay Jackson <jay@abacuslife.com>
**Cc:** Chris Romaine <chris@lmagrp.com>; Joel T. Shaw - Bernstein, Shur, Sawyer & Nelson, P.A. (jshaw@bernsteinshur.com) <jshaw@bernsteinshur.com>
**Subject:** RE: Project Water

Jay

Great connecting in NYC – talk about a stroke of luck.

As I mentioned, Gabe would like to get to $7.5-8M over a three-year period inclusive of the earnout.

See the following proposal:

- $6M cash purchase at close;
- $2M in RSUs that vest over the first 3-years post close;
- 20% of net income + servicing synergies over the first 3-years post close;
    - Incentivizes you and me to move quickly with the cost savings and servicing synergies while retaining / growing the asset/investor base.

Let me know if this works – if so, I can probably get it done.

Thanks
Tony

Anthony J Annino
+1.617.990.6545

**From:** Jay Jackson <jay@abacuslife.com>
**Sent:** Wednesday, November 15, 2023 7:43 AM
**To:** Anthony Annino <aannino@sealightcap.com>
**Cc:** Chris Romaine <chris@lmagrp.com>; Joel T. Shaw - Bernstein, Shur, Sawyer & Nelson, P.A. (jshaw@bernsteinshur.com) <jshaw@bernsteinshur.com>
**Subject:** Re: Project Water

Sounds good. Thank you Tony

Jay Jackson

CEO
Abacus Life
(407) 988-1084

---

**From:** Anthony Annino <aannino@sealightcap.com>
**Sent:** Wednesday, November 15, 2023 6:37:18 AM
**To:** Jay Jackson <jay@abacuslife.com>
**Cc:** Chris Romaine <chris@lmagrp.com>; Joel T. Shaw - Bernstein, Shur, Sawyer & Nelson, P.A. (jshaw@bernsteinshur.com) <jshaw@bernsteinshur.com>
**Subject:** Project Water

Jay

FYI – I'm en route to NYC this morning but hope to have you a redline later today.

Tony

**Anthony J. Annino, CFA**
Managing Partner
SeaLight Capital LLC
One Liberty Lane (East), Suite 124
Hampton, NH 03842

+1.617.990.6545
aannino@sealightcap.com

**CONFIDENTIAL**

**Plf. Exhibit 26 |** Date: 7/24/2026
Witness: Jay Jackson

Plf. Exhibit 27 | Date: 7/24/2026
Witness: Jay Jackson

**From:** "Anthony J Annino" <anthony.annino@gmail.com>
**To:** "'Jay Jackson'" <jay@abacuslife.com>
**CC:** "'Chris Romaine'" <chris@lmagrp.com>, "'Bill McCauley'" <bill@abacuslife.com>, <jshaw@bernsteinshur.com>
**Subject:** RE: Updated LOI for RR
**Date:** Tue, 5 Dec 2023 16:24:35 -0500
**Attachments:** Project_Water_-_Letter_of_Intent_-_AA.BSSN_12.05.2023.docx
**Inline-Images:** image001.png

---

Jay

Attached please find our latest turn of the LOI.

We should be close. Please let me know if a call would be helpful.

Tony

Anthony J Annino
+1.617.990.6545

---

**From:** Jay Jackson <jay@abacuslife.com>
**Sent:** Friday, November 24, 2023 9:47 AM
**To:** Anthony J Annino <anthony.annino@gmail.com>
**Cc:** Chris Romaine <chris@lmagrp.com>; Bill McCauley <bill@abacuslife.com>; jshaw@bernsteinshur.com
**Subject:** Updated LOI for RR

Hi Tony,

Attached is the updated LOI based on our last conversation. Please let me know if you have any feedback or if you want me to send an executable version.

All the best,

Jay

Jay Jackson
President & CEO

800.561.4148 | jay@abacuslife.com | abacuslife.com | 2101 Park Center Drive, Orlando, FL 32835

ABACUS LIFE
KNOW THE VALUE OF YOUR LIFE
NASDAQ | ABL

The information contained in this electronic mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be a client communication and/or work product which may contain proprietary information and as such is privileged and confidential. If the reader of this message is not the intended recipient(s) or an agent responsible for delivering it to the intended recipient(s), you are hereby notified that you have received this message and any attachments hereto in error and that any review, dissemination, distribution, or copying of this message whole or in part is strictly prohibited and may subject you to civil and/or criminal penalties under state or federal law. If you have received this message in error, please notify the sender immediately by email, and delete the original message.

CONFIDENTIAL
LW AA DRAFT 11/22/202312.2.23

## LETTER AGREEMENT

This letter agreement ("***Letter Agreement***") sets forth certain terms of a Transaction (as defined below) between ABL Wealth Advisors, LLC, a Delaware limited liability company ("***Buyer***"), and Renegade Capital GP, LLC, a Texas limited liability company (d/b/a RiverRock Funds, LLC) (the "***Company***"), with respect to the Company's wholly owned subsidiaries RiverRock Asset Management LLC, a Delaware limited liability company ("***RRAM***"), and RiverRock Trust, LLC, a Delaware limited liability company ("***RiverRock GP***" and, together with RRAM, the "***Subject Entities***"). This Letter Agreement is indicative only (except as expressly provided herein) and does not contain all of the terms and conditions upon which Buyer and the Company would enter into the Transaction. Except as otherwise stated in the following sentence, this Letter Agreement shall not create any obligation on the part of Buyer or the Company, and no agreement shall exist between the parties as a result of this Letter Agreement or any negotiation with respect hereto unless and until the definitive agreements described herein are executed by the parties with respect to the Transaction. Only the matters set forth in Sections 3, 4, 6 and 7 of this Letter Agreement shall constitute binding agreements between Buyer and the Company. Buyer and the Company each reserve the right, in their sole discretion, to elect not to pursue the Transaction at any time or for any reason.

1. **Material Terms.** Set forth below is a term sheet of the material terms and provisions relating to the Transaction Agreement (as defined below) and other ancillary agreements to be entered into in connection with the Transaction.

| | |
|---|---|
| **Parties** | Buyer and the Company (each, a "***Party***" and, collectively, the "***Parties***"). |
| **Transaction Structure; Consideration** | The Parties propose to enter into a transaction agreement (the "***Transaction Agreement***"), pursuant to which Buyer will pay to the Company an aggregate of:<br>• $4.0 million in cash (the "***Cash Consideration***") at closing; and<br>• $1.0 million of shares of common stock ("***Common Stock***") of Abacus Life, Inc., a Delaware corporation and the sole member of Buyer ("***Abacus***"), payable on the closing date and an additional $1.5 million of Common Stock payable on the third anniversary of the closing date, in each case valued based on the average closing price of the Company's common stock [ABL:NASDAQ] for the 15 business days prior to the date of issuance (the "***Stock Consideration***"). The Stock Consideration will be subject to resale restrictions and drag-along rights, but not any vesting or lock-up provisions imposed by the Buyer; and<br>• An unlimited amount of contingent consideration, payable no later than 30 days of the completion of an audit for the Subject Entities for the fiscal year ended 2026, in cash or Abacus common stock, at Buyer's option (the "***Contingent Consideration***" and, together with the Cash Consideration and the Stock Consideration, the "***Purchase Price***"). The amount of Contingent Consideration will equal $250,000 for each 5% of three-year annualized growth achieved by the Subject Entities' business as of December 31, 2026 when compared to its annual revenue for the period ended December 31, 2023. For example, if the annual revenue attributable to the Subject Entities at December 31, 2023 is $1 million and $3,310,125 of total, cumulative revenue is attributed to the Subject Entities for the three-year period ended on December 31, 2026, then the Contingent Consideration would equal $250,000.<br>In the event of a change of control of Abacus or the delisting of Abacus or its Common Stock, a pro-rated(1) the total amount of the Stock Consideration and (2) the Contingent Consideration (based on the three-year measurement period) equal to the greater of (a) the amount due above or (b) $1 million of cash or unrestricted Common Stock shall become due and payable at the closing of such change of |

Commented [AA1]: Limited to volume / float-based restrictions

|US-DOCS\146268128.5||

| | |
|---|---|
| | control transaction~~, subject to prior achievement of applicable performance targets in the case of the Contingent Consideration~~. In exchange for the Purchase Price the Buyer will receive (a) 100% of the outstanding equity interests of RRAM (the "***RRAM Interests***") and (b) 100% of the outstanding equity interests of RiverRock GP (the "***RiverRock GP Interests***" and, together with the RRAM Interests, the "***Subject Interests***") (such transaction, the "***Transaction***"). The Transaction will close concurrent with the execution of the Transaction Agreement and will be structured in a manner that achieves the same tax treatment as an asset sale, or such other structure as the Parties may mutually agree. |
| **Required Approvals** | Execution of the Transaction Agreement and the completion of the transactions contemplated thereby will require approval by Abacus in its capacity as the sole member of Buyer, and the board of directors or equivalent governing body of the Company. No approval by the equity holders of the Company will be required in connection with the execution of the Transaction Agreement and the completion of the transactions contemplated thereby. |
| **Representations and Warranties** | The Transaction Agreement will include customary representations and warranties of each of Buyer and the Company, including in respect of ownership of the Subject Interests, the business of the Subject Entities, sufficiency of assets, affiliate contracts, leases, certain tax matters, employee and benefits matters, litigation and financial statements, among others. |
| **Employee Matters** | Prior to the execution of the Transaction Agreement, the Company will provide to Buyer copies of all employment, severance or similar agreements relevant to the Subject Entities and the Parties will work together to determine which employees of the Subject Entities will continue providing services post-closing. ~~As a condition to the Parties' willingness to enter into the Transaction Agreement, the Company will, at the Company's cost, terminate all employees identified by Buyer prior to the execution of the Transaction Agreement.~~ |
| **Financial Statements** | The Company shall provide to Buyer financial information reasonably requested by Buyer, including unaudited ~~monthly~~ quarterly financial statements through and including the most recent completed month as of the execution of the Transaction Agreement. |
| **Regulatory and Other Approvals** | Each of the Parties shall use its reasonable best efforts to take all actions necessary, proper or advisable, as determined by each of the Parties in its reasonable discretion, to consummate the Transaction, including, among other things, using its reasonable best efforts to obtain all necessary waivers, consents, approvals, permits, orders or authorizations from governmental entities and third parties. |
| **Other Matters** | As a condition to the Parties' willingness to enter into the Transaction Agreement, any existing service agreements ~~and leases~~ of the Subject Entities or their affiliates shall be subject to termination with ~~30~~ 60 days' prior notice, or amended prior to execution of the Transaction Agreement to provide for termination post-closing at Buyer's option and in its sole discretion with ~~30~~ 60 days' prior notice and without any terminal payment. |

| | |
|---|---|
| **Survival; Tax True-Up; Indemnification** | The Company's "fundamental" representations and warranties in the Transaction Agreement will survive closing until the applicable statute of limitations, and all other representations and warranties in the Transaction Agreement will survive the closing for a period of 12 months. ~~and t~~The Company will indemnify, defend and hold harmless Buyer and its affiliates and representatives from and against all losses arising directly or indirectly from, as a result of or in connection with breaches of the representations and warranties or covenants contained in the Transaction Agreement or any ancillary document and other matters that may be identified as part of due diligence. The representation and warranty indemnification obligations will be subject to a true deductible of $15,000 and a cap of $500,000, subject to a customary fraud exception.<br><br>The Transaction Agreement will include a customary tax true-up provision.<br><br>~~In connection with closing of the Transaction, Buyer and the Company shall cause to be deposited in an escrow account $1.0 million of the Cash Consideration, with such amount to be held in escrow for as long as Buyer is entitled to indemnity pursuant to the Transaction Agreement. Such amounts in escrow will be released to Buyer to cover any indemnity claims or the tax-true up, with the balance, if any, to be released to the Company at such time that Buyer is no longer entitled to indemnity or a tax true-up under the Transaction Agreement.~~ |
| **Specific Performance** | Each of the Parties will be entitled to specifically enforce the covenants and other agreements of the other Party contained in the Transaction Agreement and to injunctive relief restraining the other Party from breaching or threatening to breach the Transaction Agreement. |
| **Governing Law; Venue; Waiver of Jury Trial** | The Transaction Agreement will be governed by Delaware law with venue in the Chancery Court of the State of Delaware, which will have exclusive jurisdiction for all matters relating to the Transaction and the other transactions contemplated by the Transaction Agreement. The Parties will waive any right to a jury trial. |

**Commented [JS2]:** Please provide further explanation of the contemplated tax true up.

2. **Due Diligence; Timing.** The execution of definitive agreements related to the Transaction is subject to the completion of confirmatory due diligence reviews by Buyer, including with respect to existing employment agreements and servicing agreements. The Parties expect to complete due diligence, negotiate and execute definitive agreements in an expedited manner, with a target closing date of January 2, 2024.

3. **Exclusivity.** In order for Buyer to complete its confirmatory due diligence and the definitive documentation in an expedited manner, Buyer and the Company hereby agree as follows:

    a. From the date the parties execute this Letter Agreement until the end of the Exclusivity Period, neither Party shall enter into any arrangement or agreement that would prevent it from engaging in Exclusive Discussions or otherwise performing its obligations described in Section 3(b).

    b. During the Exclusivity Period, (i) Company will not, directly or indirectly, through any representative or otherwise, solicit, invite or entertain offers from, negotiate with or in any manner encourage, discuss, accept or consider any proposal of any other person relating to a business combination transaction involving the Subject Entities, in whole or in part, whether directly or indirectly, through purchase, merger, consolidation or otherwise ("***Alternate Transaction***"); provided that any party may refer to its inability hereunder to participate in any such discussion or negotiation and (ii) the Company shall not furnish or cause to be furnished any material non-public information concerning the Company or its assets or businesses or afford access to the assets, properties, books or records of the Company to any person or group of persons (other than to Buyer, its affiliates and their respective representatives) for the purpose of assisting with or facilitating an Alternate Transaction and (iii) each party will use

commercially reasonable efforts to negotiate and execute a final definitive agreement for the Transaction on or before the last date of the Exclusivity Period~~, subject to the completion by Buyer of customary due diligence~~. The Company shall, and shall cause its affiliates and their respective representatives to, immediately terminate any and all negotiations with third parties in respect of an Alternate Transaction. The term "***Exclusive Discussions***" means the conduct of the Parties described in clauses (i) through (iii) of this Section 3(b).

c. The term "***Exclusivity Period***" means the period beginning on the date of this Letter Agreement and ending on the earlier of (i) 5:00 p.m. Eastern Time, on the day that is ~~ninety~~ forty-five (~~90~~45) calendar days from the date of this Letter Agreement or such later date as is agreed in writing by the ~~parties~~ Parties (the "Exclusivity End Date") and (ii) the date, if any, on which Buyer and the Company enter into a Transaction Agreement.

4. **Termination.** This Letter Agreement may be terminated by the mutual written agreement of the Parties at any time. If definitive agreements have not been executed by the Parties on or before the Exclusivity End Date, this Letter Agreement shall terminate in its entirety without any further notice being necessary unless extended in writing by both Parties; provided, however, that such termination shall not impair or otherwise affect the rights or remedies of the Parties under the Confidentiality Agreement described in Section 7 or for any prior breach of the obligations set forth in Sections 3, 4, 6 and 7 of this Letter Agreement.

5. **Representations and Warranties.** Each of the Parties represents and warrants to each other that (a) this Letter Agreement has been validly executed and delivered, (b) the execution of this Letter Agreement and the performance of the transactions contemplated in Section 1 of this Letter Agreement will not violate any contract or other agreement applicable to such Party and (c) the matters set forth in Sections 3, 4, 6 and 7 of this Letter Agreement constitute valid and binding obligations of such Party, enforceable against such Party in accordance with its terms.

6. **Expenses.** If definitive agreements relating to the Transaction are not executed, the fees, costs and expenses incurred in connection with the negotiation, preparation and execution of this Letter Agreement and related transactions shall be paid by the Party incurring such fees, costs and expenses.

7. **Confidentiality.** The Parties agree that the existence of this Letter Agreement, its contents and any information provided by either Party in connection with this Letter Agreement shall be deemed "Confidential Information" as set forth in, and shall be subject to the restrictions of, that certain Confidentiality Agreement, dated on or about ~~August 31~~September 5, 2023, by and between Buyer and the Company, as the same may be further amended or supplemented.

8. **Miscellaneous.** This Letter Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of laws. Venue shall be in the Chancery Court of the State of Delaware, which will have exclusive jurisdiction for all disputes arising out of this Letter Agreement. The Parties agree to waive any right to a jury trial with respect to all disputes arising out of this Letter Agreement. This Agreement may not be modified, changed or discharged, in whole or in part, except by an agreement in writing signed by both parties. For the convenience of the parties, this Letter Agreement may be executed by facsimile signature and in counterparts, each of which shall be deemed to be an original, and both of which taken together, shall constitute one agreement binding on both Parties.

[*Signature page follows.*]

**Agreed to and accepted this**
**______ day of ~~November~~ December 2023**

**RENEGADE CAPITAL GP, LLC**
**(D/B/A RIVERROCK FUNDS, LLC)**

By: [•]

By: ________________________________
Name: [•]
Title: [•]

**ABL WEALTH ADVISORS, LLC**

By: ________________________________
Name: [•]
Title: [•]

[*Signature Page to Letter Agreement*]

**From:** Chris Romaine <chris@lmagrp.com>
**To:** Anthony J Annino <anthony.annino@gmail.com>, Jay Jackson <jay@abacuslife.com>
**CC:** Bill McCauley <bill@abacuslife.com>, "jshaw@bernsteinshur.com" <jshaw@bernsteinshur.com>
**Subject:** RE: Updated LOI for RR
**Date:** Thu, 7 Dec 2023 18:20:43 +0000
**Inline-Images:** image001.png

---

Tony,
We've reached out to our board for feedback, which we do not expect until late next week at the earliest. Apologies for the delay.
Best,
Chris

---

**From:** Anthony J Annino <anthony.annino@gmail.com>
**Sent:** Thursday, December 7, 2023 1:08 PM
**To:** Jay Jackson <jay@abacuslife.com>
**Cc:** Chris Romaine <chris@lmagrp.com>; Bill McCauley <bill@abacuslife.com>; jshaw@bernsteinshur.com
**Subject:** RE: Updated LOI for RR

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe, any questions please forward to IT. Thank You!

Just checking-in.

Please let me know if we should prepare an execution version.

Anthony J Annino
+1.617.990.6545

---

**From:** Jay Jackson <jay@abacuslife.com>
**Sent:** Wednesday, December 6, 2023 8:54 AM
**To:** Anthony J Annino <anthony.annino@gmail.com>
**Cc:** Chris Romaine <chris@lmagrp.com>; Bill McCauley <bill@abacuslife.com>; jshaw@bernsteinshur.com
**Subject:** RE: Updated LOI for RR

Received – we will review.

---

**From:** Anthony J Annino <anthony.annino@gmail.com>
**Sent:** Tuesday, December 5, 2023 4:25 PM
**To:** Jay Jackson <jay@abacuslife.com>
**Cc:** Chris Romaine <chris@lmagrp.com>; Bill McCauley <bill@abacuslife.com>; jshaw@bernsteinshur.com
**Subject:** RE: Updated LOI for RR

Jay

Attached please find our latest turn of the LOI.

We should be close. Please let me know if a call would be helpful.

Tony

Anthony J Annino
+1.617.990.6545

**From:** Jay Jackson <jay@abacuslife.com>
**Sent:** Friday, November 24, 2023 9:47 AM
**To:** Anthony J Annino <anthony.annino@gmail.com>
**Cc:** Chris Romaine <chris@lmagrp.com>; Bill McCauley <bill@abacuslife.com>; jshaw@bernsteinshur.com
**Subject:** Updated LOI for RR

Hi Tony,

Attached is the updated LOI based on our last conversation. Please let me know if you have any feedback or if you want me to send an executable version.

All the best,

Jay

Jay Jackson
**President & CEO**

800.561.4148 | jay@abacuslife.com | abacuslife.com | 2101 Park Center Drive, Orlando, FL 32835

ABACUS LIFE
KNOW THE VALUE OF YOUR LIFE
NASDAQ | ABL

The information contained in this electronic mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be a client communication and/or work product which may contain proprietary information and as such is privileged and confidential. If the reader of this message is not the intended recipient(s) or an agent responsible for delivering it to the intended recipient(s), you are hereby notified that you have received this message and any attachments hereto in error and that any review, dissemination, distribution, or copying of this message whole or in part is strictly prohibited and may subject you to civil and/or criminal penalties under state or federal law. If you have received this message in error, please notify the sender immediately by email, and delete the original message.

**CONFIDENTIAL**

**Plf. Exhibit 29 |** Date: 7/24/2026
Witness: Jay Jackson

# Abacus Accidentally Posts Document on Potential RiverRock Deal




**The firm removes a document that detailed a potential acquisition and subsequently files a disclaimer and CEO Jay Jackson says it only was a financial model.**



**By Donna Horowitz**

December 05, 2023 09:05 AM

Abacus Life Inc. (ABL) published a document on its website about the acquisition of RiverRock Funds LLC, pulled it down and filed a disclaimer with the Securities and Exchange Commission.

The Orlando, Fla.-based life settlement provider posted a third-quarter board presentation dated Nov. 9 giving details about the acquisition of a competitor.

"It just was a financial model and not actual data," Abacus CEO Jay Jackson said, referring to the two pages of information in the middle of the document under the heading: "ABL Wealth Advisors — Acquisition of RiverRock Funds".

Jackson forwarded a link to a Form 8-K filed with the SEC on Nov. 20 that said the company had posted an updated investor deck on its website.

The "important notice to investors" by the company said the "disclaimed document" contained certain information that might be "inaccurate and preliminary."

Abacus didn't say in the filing that it was referring to the RiverRock information, which was obtained by The Life Settlements Report.

Abacus said in its updated filing that the "disclaimed document" entered the public domain about Nov. 14.

It didn't say when it removed the document or discovered its mistake. One industry source said it was up for about a day and a half before being removed.

The investors' note on the updated filing said it advises investors not to rely upon the disclaimed document or any information contained in it when making investment decisions to transact Abacus securities.

"The company notes that the disclaimed document and certain of the information contained therein, may be inaccurate and preliminary, was not intended to be publicly disclosed, and was not reviewed by the Company's auditors," Abacus said. "The company is providing this note to investors and third quarter 2023 investor presentation, which the company believes includes any material information from the disclaimed document, in order to better inform investors about the company."

The proposal about the RiverRock acquisition listed five bullet points describing advantages of such a purchase: $160 million in assets under management via two funds — seven-year closed-end fund structure; $5 million-plus acquisition price — $1.8 million 2023 gross revenue — $4.6 million 2023 gross costs; reduce gross costs to $755,000 in 2024 due to labor and infrastructure redundancies; 2024 estimated net revenue of $1.5 million (including transfer of servicing to Abacus) $1 million without transfer; and access to 100-plus new investors for Abacus funds.

Other costs in the "uses" category that includes payroll and rent totaled $4.7 million this year and dropped to $755,000 next year.

Under the valuation scenario, the net loss was about $2.9 million this year, which became net income of $967,177 in 2024 and ranged from $1 million to $1.8 million in succeeding years through 2031.

It isn't known if Abacus ever made an offer to purchase RiverRock, as Jackson declined comment. Jackson worked as a director of RiverRock from April 2009 to August 2015, according to his LinkedIn profile.

RiverRock chairman and owner Gabe Siegel, CEO Anthony Annino and COO Valerie Coffey didn't respond to calls and emails.

In addition to Siegel and the top two executives, RiverRock has 12 staff members, according to its web page.

RiverRock, which was founded in 2007, focuses on small-face policies ranging from $100,000 to $1 million in face value. The firm said it managed more than $220 million in assets four years ago when it put out a statement about its hiring of Annino. An October 2020 Form D notice for RRIF VII LP, the firm's seventh fund, said it had raised $44.7 million from 33 investors.

TAGS LIFE SETTLEMENTS INSURANCE FLORIDA TEXAS TRANSACTION EXCLUSIVE

COMPANIES MENTIONED

Abacus Life Inc.

PEOPLE MENTIONED

Jay Jackson

**CONFIDENTIAL**

**Plf. Exhibit 31 |** Date: 7/24/2026
Witness: Jay Jackson