**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

RENEGADE CAPITAL GP, LLC d/b/a RIVERROCK FUNDS, LLC, a Delaware limited liability company,

Plaintiff,

v. Case No. 6:25-cv-00424-CEM-NWH

ABACUS LIFE, INC. n/k/a ABACUS GLOBAL MANAGEMENT, INC., a Delaware Corporation,

Defendant.

**DECLARATION OF HUGH TAWNEY IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY**

I, Hugh Tawney, hereby declare as follows:

1. I am over 18 years of age, of sound mind, and otherwise competent to make this declaration in support of Plaintiff's Motion for Partial Summary Judgment as to Liability. This declaration is made under penalty of perjury pursuant to 28 U.S.C. Section 1746 and the evidence set out in the foregoing Declaration is based upon my personal knowledge. I could and would competently testify to the facts stated herein if called upon by the Court to do so.

2. I was employed by Renegade Capital GP, LLC d/b/a RiverRock Funds, LLC ("RiverRock") for almost four years. I was hired on or around May of 2021 as a Director and was principally responsible for raising capital and was also involved, along with Jill Naponic, with maintaining relationships with existing and prospective investors. Before the events described below, I enjoyed working at RiverRock and had no plans to leave the company. I left RiverRock in January 2025.

3. RiverRock was founded in or around 2007 as a specialized asset manager focused on life settlements. RiverRock raised capital from investors, used that capital to acquire portfolios of life-insurance policies, and managed those policies through investment funds. Through my responsibilities at RiverRock, I became familiar with its funds, fundraising history, investor base, and assets under management. By 2023, RiverRock had raised and managed approximately $268 million in life-settlement assets across eight investment vehicles.

4. RiverRock operated with a relatively small but robust team whose members had specialized responsibilities. As previously stated, I was principally responsible for raising capital and maintaining investor relationships along with Jill Naponic. Anthony Annino as Chief Executive Officer, Valerie Coffey as Chief

Operating Officer, and Denny Mathew as Chief Underwriting Officer were involved in acquiring and managing policies. Denny Mathew was also responsible for underwriting and maintained institutional knowledge to strengthen the asset management from an acquisition and portfolio management perspective. Denny Mathew led the team. Amy Springs was responsible for RiverRock's legal and compliance functions.

5. In the fall of 2023, and prior to Abacus' disclosure, I was actively engaging with potential investors and developing a pipeline of investors for RiverRock Institutional Fund VIII ("Fund VIII") and Longevity Fund. Prior to the disclosure, we secured two anchor investors for the Longevity Fund and raised approximately $5 million dollars. I was reaching out to investors, scheduling calls and meetings, preparing and making pitches and had plans to meet our fundraising targets.

6. Prior to Abacus' disclosure described below, we were making significant progress in growing firm assets under management. I believed that our team at RiverRock could have raised the necessary capital for Funds VIII and Longevity to be profitable. That belief was based on my direct involvement in RiverRock's fundraising, my communications with prospective investors, and

RiverRock's prior fundraising results. We had a positive response in the market and therefore, my expectations in September 2023, prior to the disclosure, were that we could raise as much capital for Fund VIII as RiverRock previously raised for Fund VI, which was $154,527,245. We also expected to raise additional funds beyond that for Longevity that would continue to habitually grow.

7. I came to learn that on or around November 14, 2023, Abacus posted a board deck onto its public investor-relations website with two pages related to a potential acquisition of RiverRock. After learning of the posting, I reviewed the portions of the Board Deck relating to RiverRock. The two pages related to RiverRock contained highly sensitive and confidential information, including the fact that RiverRock and Abacus were in discussions for a potential acquisition. Both pages had a banner stating "ABL Wealth Advisors – Acquisition of RiverRock." The Board Deck also stated plans to "Reduce Gross Costs to 755k in 2024 due to labor and infrastructure redundancies." In addition, the Board Deck published RiverRock's confidential financial information, including the proposed acquisition price, gross revenue, estimated 2024 net revenue, fund structure, the number of RiverRock's investors, and a full financial model reflecting among other things, RiverRock's management fees, acquisition fees, carried interest, payroll,

rent, commissions, accounting and tax information, technology services, net income, potential synergies, pro-forma cash flow, and 2024 financial projections. The financial model further disclosed that, if acquired, Abacus anticipated reducing the majority of RiverRock's workforce, reducing its payroll from $2,842,718 in 2023 to $500,000 in 2024.

8. The information disclosed in the Board Deck was materially different from the information RiverRock ordinarily provided when soliciting investments. The documents shared with potential investors typically included information related to the operations of the investment funds themselves—not the management company—and even then, RiverRock did not share this information without a signed non-disclosure or confidentiality agreement. In my experience raising capital for RiverRock, information like what was described above in Paragraph 7 was held strictly confidential.

9. I was unaware that RiverRock and Abacus were in discussions for a potential acquisition. I only became aware after Abacus' disclosure.

10. I was informed about the public disclosure of the Board Deck on Abacus' investor relations website by Jill Naponic. After the conversation, I had serious concerns about the security of my job. The Board Deck made specific

reference to the potential acquisition and that RiverRock's $4.6 million in gross costs for 2023 would be reduced to $755,000 in 2024.

11. Thereafter, on December 5, 2023, an industry reporter, Donna Horowitz, published an article in the Deal titled "Abacus Accidentally Posts Document on Potential RiverRock Deal." I refer to the article to establish the information disseminated within the industry and its effect on RiverRock's fundraising activities.

12. Valerie Coffey had a subscription to the Deal and shared articles with everyone at RiverRock when they became available. RiverRock utilized this subscription as an industry news source. The December 5 article was circulated within RiverRock. By that point, anyone at RiverRock that did not already know, found out.

13. The life-settlement industry is relatively small. During my work raising capital for RiverRock, I repeatedly interacted with many of the same fund managers, brokers, service providers, and other industry participants at conferences and in potential transactions. Reputation and confidence in a fund's management team are important to investors deciding whether to commit capital in this industry.

14. This disclosure and subsequent news article destroyed RiverRock's business. It created major turmoil with the employees, including myself, who all feared that our jobs were not secure. Within one month after the Deal article, RiverRock lost its Chief Underwriting Officer, Denny Mathew. Based on my contemporaneous conversations with RiverRock employees, I understood that almost all key RiverRock employees were looking for new employment at that point. Over the course of the next few months, RiverRock lost approximately half its workforce.

15. The departures impaired RiverRock's ability to continue operating because the employees who left possessed specialized knowledge and experience in the life-settlement industry. RiverRock could not easily replace the employees that it lost because now the entire life settlements industry knew that RiverRock was potentially going to be sold and its workforce would be reduced. The life settlements industry is small to begin with, and any qualified candidate was now on notice that RiverRock would likely be acquired.

16. Beyond the departures, the disclosure essentially froze RiverRock's fundraising efforts. Based on my professional experience, the SEC prohibits making an untrue statement of material fact or omitting a material fact. We also

have a fiduciary responsibility to represent true facts to potential investors so they can make educated investment decisions. As part of my job, I had to be sure of the accuracy and completeness of information RiverRock provided to prospective investors. RiverRock had so much uncertainty at the time that it could not accurately represent its state of affairs to investors both from a regulatory and ethical perspective. RiverRock did not know who would be managing the funds, which employees would be overseeing the funds, whether RiverRock was going to be sold, and who would be left at RiverRock after an investment was made. There were substantial ethical roadblocks with continued fundraising. After the disclosure, RiverRock could not accurately represent to investors who would be managing their funds. I could not in good faith approach investors asking for millions of dollars knowing that RiverRock had lost essential employees. RiverRock had lost and was in the process of losing its key employees and without the team, we could not conduct new business. It was particularly troubling that Denny Mathew left, as with his departure, RiverRock lost a great deal of institutional knowledge. His skillset and background differentiated RiverRock from other players in the industry. We could not replace our workforce—let alone our most key employees—due to the disclosure of a potential sale. I could not

guarantee to any investor that the team they believed would be managing their money would be managing their money.

17. I was working with an Israeli investor for a family office named Eran Eshel, who was interested in investing in the Life Settlement Space. Our discussions began in approximately April 2023. However, the Abacus disclosure jeopardized that opportunity and he did not invest. I also had to pause conversations with Wealth Management Group, where I was targeting a 15-25 million fundraise and Axiom Wealth Management Group, where I was targeting a 25-50 million raise. We could not ethically or from a regulatory perspective continue prospecting these investors or any investors with so much uncertainty. It had been publicly disclosed to the market that we were not a stable group so we could not represent to potential investors that we were. In my professional experience, investors look to the stability and skill set of a management team when allocating to investment managers. When we raise capital we sell the team, but the disclosure caused the key members of the team to leave due to the uncertainty that their job would be secure.

18. Based on my personal observations and experiences at RiverRock contemporaneous with the disclosure, the disclosure was detrimental to

RiverRock. It took away RiverRock's choice to continue operating its business because without the ability to raise capital it could not operate.

19. Because I have a mergers and acquisition background, RiverRock asked me to stay on in a different capacity. I was no longer responsible for fundraising as the company could no longer fundraise, so I assisted RiverRock in its attempts to sell its existing funds after Abacus walked away from the acquisition.

20. By that point, RiverRock was a broken business doing everything it could to mitigate damages by keeping costs down until it could eventually sell.

I declare under penalty of perjury that the foregoing is true and correct. This declaration was executed this __1st__ day of September 2026, in Denver, Colorado.

/s/Hugh P. Tawney
Hugh Tawney