**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

RENEGADE CAPITAL GP, LLC d/b/a RIVERROCK FUNDS, LLC, a Delaware limited liability company,

Plaintiff,

v. Case No. 6:25-cv-00424-CEM-NWH

ABACUS LIFE, INC. n/k/a ABACUS GLOBAL MANAGEMENT, INC., a Delaware Corporation,

Defendant.

**DECLARATION OF AMY SPRINGS, ESQ. IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY**

I, Amy Springs, Esq., hereby declare as follows:

1. I am over 18 years of age, of sound mind, and otherwise competent to make this declaration in support of Plaintiff's Motion for Partial Summary Judgment as to Liability. This declaration is made under penalty of perjury pursuant to 28 U.S.C. Section 1746 and the evidence set out in the foregoing Declaration is based upon my personal knowledge. I could and would competently testify to the facts stated herein if called upon by the Court to do so.

2. I was employed by Renegade Capital GP, LLC d/b/a RiverRock Funds, LLC ("RiverRock") for approximately three years and six months. I was hired on or around January of 2021 as General Counsel and Chief Compliance Officer. In those roles, I was responsible for, among other things, advising RiverRock concerning its legal and regulatory obligations, overseeing its compliance functions, and reviewing information provided to existing and prospective investors. I left RiverRock in July 2024. Prior to Abacus' disclosure, I enjoyed my job and working at RiverRock. I had no plans to leave prior to the disclosure.

3. I came to learn that on or around November 14, 2023, Abacus posted a board deck onto its public investor-relations website with two pages related to a potential acquisition of RiverRock. After learning of the posting, I reviewed the portions of the Board Deck relating to RiverRock. The two pages related to RiverRock contained highly sensitive and confidential information, including the fact that RiverRock and Abacus were in discussions for a potential acquisition. Both pages had a banner stating "ABL Wealth Advisors – Acquisition of RiverRock." The Board Deck also stated plans to "Reduce Gross Costs to 755k in 2024 due to labor and infrastructure redundancies." In addition, the Board Deck

published RiverRock's confidential financial information, including the proposed acquisition price, gross revenue, estimated 2024 net revenue, fund structure, the number of RiverRock's investors, and a full financial model reflecting among other things, RiverRock's management fees, acquisition fees, carried interest, payroll, rent, commissions, accounting and tax information, technology services, net income, potential synergies, pro-forma cash flow, and 2024 financial projections. The financial model further disclosed that, if acquired, Abacus anticipated reducing the majority of RiverRock's workforce, reducing its payroll from $2,842,718 in 2023 to $500,000 in 2024.

4. As RiverRock's General Counsel and Chief Compliance Officer, I was familiar with the information RiverRock made publicly available and the information it provided to existing and prospective investors. None of the confidential information contained in the Board Deck, including RiverRock's financial information, the existence of acquisition discussions, or any of the other details described in paragraph 3 had been shared by RiverRock with the public. This information was highly protected and not in the public forum. If financial information as described in paragraph 3 was ever shared with an investor or third party it was safeguarded with a confidentiality agreement. RiverRock treated this

information as strictly confidential, and its public disclosure by Abacus was entirely unauthorized and unknown to RiverRock until after the fact.

5. I, as General Counsel and Chief Compliance Officer, was unaware that RiverRock and Abacus were in discussions for a potential acquisition. I only became aware of the discussions after Abacus' disclosure.

6. On December 5, 2023, an industry reporter, Donna Horowitz, published an article in the Deal titled "Abacus Accidentally Posts Document on Potential RiverRock Deal." I received an electronic alert containing the article. The article reported the potential acquisition and that RiverRock's $4.6 million in gross costs for 2023 would be reduced to $755,000 in 2024.

7. Valerie Coffey had a subscription to the Deal and shared articles with everyone at RiverRock when they became available. RiverRock utilized this subscription as an industry news source.

8. This is how most of the RiverRock employees, including myself, came to learn that their jobs were no longer secure. The article placed me on notice that my job was most likely not secure.

9. After the article was published, I discussed it with other RiverRock employees. Those discussions made clear to me that employees were concerned

that their jobs were no longer secure because the article reported both the potential acquisition and Abacus's anticipated reduction of RiverRock's expenses and workforce. I was personally shocked and distraught by the news to say the least.

10. This disclosure and subsequent news article destroyed RiverRock's business. It created major turmoil with the employees, including myself, who all feared that our jobs were not secure. Within one month after the Deal article, RiverRock lost its Chief Underwriting Officer, Denny Mathew. Based on my contemporaneous conversations with RiverRock employees, I understood that almost all RiverRock employees were looking for new employment at that point. Over the course of the next few months, RiverRock lost half its workforce.

11. The departures impaired RiverRock's ability to continue operating because the employees who left possessed specialized knowledge and experience in the life-settlement industry. RiverRock could not easily replace the employees that it lost because now the entire life settlements industry knew that RiverRock was potentially going to be sold and its workforce would be reduced. The life settlements industry is small to begin with, and any qualified candidate was now on notice that RiverRock would likely be acquired.

12. The disclosure also affected RiverRock's ability to raise capital. In my role as General Counsel and Chief Compliance Officer, I was responsible for evaluating the accuracy and completeness of information RiverRock provided to prospective investors. Following the disclosure, material questions existed concerning whether RiverRock would be acquired, who would manage its funds, which employees would remain with the company, and who would oversee investors' investments. Because those questions had not been resolved, I concluded that RiverRock could not provide prospective investors with sufficiently definite and accurate information concerning the future management and operation of its funds. Based on my professional experience, I know that.

13. Hugh Tawney was a director at RiverRock responsible for raising capital. Based on that compliance determination, I directed Mr. Tawney to cease fundraising activities.

14. Based on my personal and contemporaneous observations of RiverRock, the disclosure materially disrupted RiverRock's operations. RiverRock lost approximately half of its workforce, ceased fundraising, and did not return to the level of operations it maintained before the disclosure. The disclosure took

away RiverRock's choice to continue operating its business and forced RiverRock to find a buyer willing to purchase a damaged company.

15. I would have continued employment at RiverRock if not for the disclosure but after the disclosure I lacked certainty that I would have long-term continued employment at RiverRock either because it would be sold or because the company had been so damaged after the breach that it could no longer operate. This uncertainty only arose directly from Abacus' disclosure described above.

I declare under penalty of perjury that the foregoing is true and correct.

This declaration was executed this 1st day of September 2026, in Houston, Texas.

*/s/ Amy Springs*
Amy Springs, Esq.