UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO. 6:25-cv-00424

RENEGADE CAPITAL GP, LLC,
d/b/a RIVERROCK FUNDS, LLC, a
Delaware limited liability
company,

Plaintiff,

v.

ABACUS LIFE, INC., n/k/a
ABACUS GLOBAL MANAGEMENT, INC.,
a Delaware Corporation,

Defendant.

\- - - - - - - - - - - - - - - - x

Zoom
June 24, 2026
10:20 a.m. - 3:32 p.m.

VIDEOTAPED REMOTE DEPOSITION OF JEFF SMITH

Taken before JAN L. BRONIS, Registered Professional Reporter and Notary Public for the State of Florida at Large, pursuant to Notice of Taking Deposition filed in the above cause.



e2b6859b-b218-480f-b9dc-547a8e116de3

APPEARANCES (Via Zoom):

GREENBERG TRAURIG, P.A.
333 Southeast 2nd Avenue, Suite 4400
Miami, Florida 33131
BY: JENNIFER JUNGER, ESQ.
On behalf of the Plaintiff
Tele: (305) 579-0535
E-Mail: Jungerj@gtlaw.com

QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
BY: KATHLEEN S. MESSINGER McCARTY, ESQ.
ALEX ZUCKERMAN, ESQ. (Off camera)
On behalf of the Defendant
Tele: (213) 443-3000
E-Mail: Kathleenmessinger@quinnemanuel.com

ALSO PRESENT (Via Zoom):

Mallory Johnson, Videographer



e2b6859b-b218-480f-b9dc-547a8e116de3

# I N D E X


| Examinations | Page |
|---|---|
| JEFF SMITH | 6 |
| DIRECT EXAMINATION BY MS. JUNGER | 6 |


# E X H I B I T S


| No. | Page |
|---|---|
| Plaintiff's Exhibit 1 - Re-Notice of Taking Deposition | 10 |
| Plaintiff's Exhibit 2 - Re-Notice of Taking Deposition 30(b)(6) | 12 |
| Plaintiff's Exhibit 3 - Confidentiality Agreement | 49 |
| Plaintiff's Exhibit 4 - Board Deck | 58 |
| Plaintiff's Exhibit 5 - RiverRock's First RFP | 61 |
| Plaintiff's Exhibit 6 - E-Mail from McDonald to Jackson | 71 |
| Plaintiff's Exhibit 7 - Board Meeting Minutes | 79 |
| Plaintiff's Exhibit 8 - Defendant's Responses and Objections to Plaintiff's First Set of Interrogatories | 101 |
| Plaintiff's Exhibit 9 - E-Mail - 0001110 | 114 |
| Plaintiff's Exhibit 10 - E-Mail from Young to Smith - 11/14/23 | 121 |


(The exhibits continue on Page 4.)



e2b6859b-b218-480f-b9dc-547a8e116de3

EXHIBITS - CONTINUED

Plaintiff's Exhibit 11 - E-Mail - 0001629 124

Plaintiff's Exhibit 12 - E-Mail - 0001634 135

Plaintiff's Exhibit 13 - E-Mail - 0001496 137

Plaintiff's Exhibit 14 - E-Mail - 0001472 139

Plaintiff's Exhibit 15 - E-Mail - 0000100 142

Plaintiff's Exhibit 16 - E-Mail dated 11/16/23 148

Plaintiff's Exhibit 17 - Form 8-K 163

Plaintiff's Exhibit 18 - The Deal Article 165

(The exhibits will be e-mailed with the transcript.)



e2b6859b-b218-480f-b9dc-547a8e116de3

THE VIDEOGRAPHER: We're now on the videotaped record. The time now is 10:20 a.m. Today is Wednesday, June 24th, 2026.

Will counsel please introduce yourselves for the record, then the court reporter will swear in the witness.

MS. JUNGER: Good morning, Mr. Smith. My name is Jennifer Junger, and I represent the Plaintiff in this action, RiverRock.

MS. MESSINGER: Kathy Messinger from Quinn Emanuel on behalf of Abacus Global Management, Inc., and I'm --

THE COURT REPORTER: I'm sorry. I'm sorry. I can't really hear you.

MS. MESSINGER: Okay. Kathy Messinger on behalf of Abacus Global Management, and I'm joined via Zoom by my colleague, Alex Zuckerman.

THE COURT REPORTER: Mr. Smith, if you could raise your right hand to be sworn, please, sir.

Do you solemnly swear that the testimony which you are about to give will be the truth, the whole truth, nothing but the truth, so help you God?



e2b6859b-b218-480f-b9dc-547a8e116de3

THE WITNESS: I do.

THE COURT REPORTER: Thank you. You can put your hand down.

Thereupon--

JEFF SMITH

was called as a witness by the Plaintiff and, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. JUNGER:

**Q. Good morning, Mr. Smith. Can you please state your full name for the record.**

A. Jeffrey Alan Smith.

**Q. And where do you work?**

A. Abacus Global Management.

**Q. What's the address of your workplace?**

A. We just moved. It's 333 Garland in Orlando, Florida.

**Q. And are you -- is that where you are currently right now?**

A. Yes.

**Q. Before I get into more questions, I just want to give some ground rules today. I'm going to be asking you questions, and before you answer the question, please make sure to let me finish. Even if you think you know what I'm going to say, even**



e2b6859b-b218-480f-b9dc-547a8e116de3

**if, you know, you're predicting what's coming next, please just make sure I finish the question so that Ms. Bronis can -- can get my question and then get your response. The court reporter can't take both of us at once.**

**If you need a break, feel free to ask. The only thing that I would ask of you is that, if there's a question pending, you answer the question, and then you ask for a break. If you don't understand a question, please ask me to repeat it. And then your lawyer is probably going to object to some questions throughout the deposition, but unless you're specifically instructed not to answer a question, you can go ahead and answer it.**

**Do those rules make sense to you?**

A. Yes.

**Q. Okay. Have you had your deposition taken before?**

A. No.

**Q. Have you ever been a part of any lawsuit?**

A. No.

**Q. And that's both individually as Jeff Smith and as part of the company, you've never been -- have you ever been involved just helping Abacus**



e2b6859b-b218-480f-b9dc-547a8e116de3

**with other lawsuits?**
A. No.
**Q. Okay. How did you prepare for the deposition today?**
A. Spoke to our legal team yesterday and just reviewed to --
**Q. About how long did you speak to your legal team yesterday?**
A. Three to four hours.
**Q. And you said that you reviewed some documents?**
A. We reviewed the case.
**Q. When you say you reviewed the case, does that mean you reviewed documents that were produced in the case?**
A. Only ones relevant specifically to my aspect of this, yes.
**Q. And was anyone else in attendance at that meeting?**
A. No.
**Q. Did you talk to anyone else about your deposition today? And perhaps anyone internally at Abacus?**
A. No.
**Q. Have you spoken, outside the context of**



e2b6859b-b218-480f-b9dc-547a8e116de3

**this deposition, about this case with anyone at Abacus?**

A. No.

**Q. Do you recall, specifically, any documents that you reviewed?**

A. No.

**Q. Did you speak with anyone at ISR in advance of this deposition?**

A. No.

**Q. Okay. I'm going to pull up what I've marked as Tab 1, and it is the Re-Notice of Deposition. I can share the screen to the extent that's helpful, although I am advised that you will have a printed copy, but I will share it anyway.**

**Okay. Have you seen this document before?**

A. No.

**Q. You said, "no"? Sorry.**

A. I'm just making sure. No.

**Q. Okay.**

A. Not that I recall, at the very least.

**Q. Are you looking at the same document that I'm showing on my screen right now?**

A. I just received it, yes.

**Q. Okay. Yeah, I saw. I saw them pass.**

**Okay. So you've never seen this document, but**

**you are aware that you were noticed for your deposition to be taken today.**

A. Yes.

**Q. Correct?**

A. Yes.

**Q. And you are aware that this deposition is largely, in part, being taken in your personal capacity. So just what Mr. Smith remembers of the events; correct?**

A. Correct.

**Q. Okay.**

MS. JUNGER: I'll mark this as Exhibit 1.

(Thereupon a document was marked Plaintiff's Exhibit 1 in the proceeding.)

BY MS. JUNGER:

**Q. But you are also aware that in addition to testifying in your personal capacity, you're testifying as the corporate representative on one, specific topic; correct?**

A. Correct.

**Q. Do you recall what that topic is?**

A. The uploading of the deck.

THE COURT REPORTER: I'm sorry. The uploading of the --

THE WITNESS: Deck.



e2b6859b-b218-480f-b9dc-547a8e116de3

THE COURT REPORTER: Deck?

BY MS. JUNGER:

**Q. And when you say, "deck," do you mean the board deck that was presented to the Abacus board on or around November 11th, 2023?**

A. Correct.

**Q. Okay. I'm going to show you what I've premarked as Tab 2, and this is the Re-Notice of 30(b)(6) Deposition.**

**Have you seen this document before?**

A. It's currently in front of me, so, yes, and as well as here.

**Q. Sorry. I couldn't hear what you said.**

A. Yes.

**Q. You've seen this document before, but not the first one?**

A. Correct. I -- and, like I said, it's literally in front of me right now, so I have seen this document as of right now.

**Q. Okay. Thank you for the clarification.**

A. Yes.

**Q. I'm going to scroll down to the very end. No. Sorry. One second. This is -- sorry. One quick second. Let me stop sharing and find what I need to find.**



e2b6859b-b218-480f-b9dc-547a8e116de3

A. No problem.
**Q. Okay. Thank you for your patience.**
**Okay. So all the way at the bottom on Page 5, do you see where it says, "Topic 11," the uploading of the slide deck to Abacus' investor website in November 2023?**
A. I do.
**Q. And is that what you were prepared to testify about in your corporate capacity?**
A. It is.
**Q. Okay.**
MS. JUNGER: I'm going to mark that as Exhibit 2.
(Thereupon a document was marked Plaintiff's Exhibit 2 in the proceeding.)
BY MS. JUNGER:
**Q. And do you know what it means to be a corporate representative?**
A. I do.
**Q. Can you tell me what it means?**
A. I don't have the dictionary definition of this term in my head, I'm not a lawyer, but --
**Q. What is your understanding?**
A. My understanding is that I am the representative for Abacus in that matter, not on a



e2b6859b-b218-480f-b9dc-547a8e116de3

personal level.

**Q. And you're aware that means that when you answer, you are answering in a way that speaks for the company; correct?**

A. Correct.

**Q. Okay. And when you discussed earlier the preparation meeting yesterday, was the focus of that preparation Topic 11?**

MS. MESSINGER: Objection, and I'm going to caution the witness not to divulge privileged information.

MS. JUNGER: I can't really hear you.

THE VIDEOGRAPHER: Excuse me, can we go -- can we go off the record really quick? This is the videographer.

MS. JUNGER: Sure.

THE VIDEOGRAPHER: We're off the record at 10:30 a.m.

(Thereupon a brief recess was taken, after which the following proceedings were had:)

THE VIDEOGRAPHER: We're back on the record at 10:35.

BY MS. JUNGER:

**Q. Okay. How did you prepare for Topic 11?**

A. Reviewing the general case.



e2b6859b-b218-480f-b9dc-547a8e116de3

**Q. And who -- what do you mean when you say, "the general case"?**

A. We went over the specifics of the case, what we would be talking about today, and how to -- well, in theory, and then how to have the conversation.

**Q. When you say, "the specifics of the case," can you tell me what that means?**

MS. MESSINGER: Objection.

THE WITNESS: The specifics of the case as -- as they are currently filed.

BY MS. JUNGER:

**Q. And who prepared you for Topic 11?**

A. My attorney, Kat, who you've already met.

**Q. Was it just Ms. Messinger, or was there anyone else present?**

A. Alex Zuckerman was present via Zoom.

**Q. Okay. Is there any reason, as you sit here today, that you would not be able to testify truthfully?**

A. No.

**Q. Are you on any medications that may impact your memory or ability to testify?**

A. No.

**Q. Okay. We're going to start with some of**



e2b6859b-b218-480f-b9dc-547a8e116de3

**your background. Where did you grow up?**

A. Okeechobee, Florida.

[redacted]

**Q. Who do you live with?**

A. My wife and my ten-month-old child.

**Q. Aww, very cute. Where did you attend college?**

A. Two years in college in Okeechobee, Indian River. Two years at the University of Central Florida in Orlando.

**Q. Nice. What degree did you receive?**

A. I have a technical writing degree and an English associate's, if that matters, really.

**Q. And what did you do after graduation?**

A. Started working. First job was at a company called Soft Rock.

**Q. Soft Rock, you said?**

A. Soft Rock; correct. Worked there until the -- the company eventually closed. I'm not really privy to why. I wasn't in that type of position. And Abacus, this is actually my -- my second career job.

**Q. Okay. So I'm going to break that down a**

**little bit.**

A. Okay.

**Q. How long were you at Soft Rock?**

A. I don't recall the exact time frame, but three to four years.

**Q. Okay. And what was your position there?**

A. Copywriter, and then director of marketing.

**Q. Okay. And when Soft Rock went out of business, your immediate next job was Abacus.**

A. Basically. I did -- I did some contract work in between for things like IT and copywriting, but, yes, my next actual career was Abacus.

**Q. And about how much time was between Soft Rock and Abacus?**

A. I -- that's been ten years, so I don't fully recall, but not more than -- not more than several months.

**Q. Okay. So let me backtrack. When did you graduate from college?**

A. 2014.

**Q. Okay. So 2014, you graduate. How soon after that did you start at Soft Rock?**

A. Again, I don't recall the exact dates for something like that. It was 12 years ago.

**Q. I understand. Approximation.**
A. Several -- within several months of graduating.
**Q. Okay. So let's just say 2014. And then you were there about three or four years, so that puts you at approximately 2017, 2018; correct?**
A. Yeah. I mean, I started Abacus in 2016, so it had to have been two years. Like I said, I don't recall these exact dates. Like, these are a decade ago.
**Q. Yeah, understood. We're just, you know, trying to create a timeline. I -- I --**
A. Uh-hum.
**Q. -- get that the dates can be a little off.**
A. Absolutely.
**Q. Okay. So you started Abacus in 2016. What was your initial position at Abacus?**
A. Director of marketing.
**Q. And has that remained your position?**
A. No.
**Q. What is your current position?**
A. Chief marketing officer.
**Q. Okay. When you were director of marketing, what was your role? What was your -- what was your role, if you could explain it to me?**



e2b6859b-b218-480f-b9dc-547a8e116de3

A. Generating value for the company. Creating revenue.

**Q. So as director of marketing, you were responsible for creating revenue?**

A. That's correct.

**Q. How so?**

A. Bringing business to the company and helping to manage the operational flow of that business.

**Q. So what were your day-to-day responsibilities?**

A. Building websites, running ad campaigns on various ad platforms. Nothing -- nothing outside of, like, standard marketing purview, essentially; right? Like, spend -- spending money to generate leads.

**Q. And did those leads come directly to you, or was it the processes that you set up that allowed the leads to come to a different department?**

A. Both.

**Q. How many people were on your team?**

A. Just me when I started.

**Q. And how long were you director of marketing before you were promoted?**

A. That, I really don't recall. I was promoted to managing director, I think, within two years.

**Q. Okay. So you were director, then managing director, and now you're chief, so you were promoted twice in that time period?**

A. No. I said I was director of marketing --

**Q. Okay.**

A. -- managing director, vice president, and now chief.

**Q. Okay. So three promotions from 2016.**

A. To my recollection, yes. I mean, that sounds correct.

**Q. And how did your job responsibilities change from director to managing director?**

A. Mostly the budget and the expectations of volume as our company grew.

**Q. What were those expectations as your company grew?**

A. No hard KPI's on we need to generate X. It was we need to continue company growth, so let's continue growing the number of leads we're generating.

**Q. What is a KPI?**

A. It's a performance number; right? A KPI

is -- you know, a lead is $35 per -- per qualified lead; right? That's a KPI.

**Q. What does it stand for?**

A. To be honest with you, I don't know.

**Q. Okay. So using it in context, can you explain what -- what, exactly, you had to do with a KPI? I'm just trying to understand what it is, because I -- I don't know that term.**

A. Sure. It's -- it's a performance metric. A KPI is we need to generate X number of leads at X cost. So the KPI is how those actually performed. So 10,000 leads at $10 a lead; right; is, what, a hundred thousand dollars in spend. So those are all KP -- all those numbers that I just described are KPI's. Those are the performance metrics.

**Q. Who's evaluating the performance metrics?**

A. Me.

**Q. So you're evaluating yourself, essentially?**

A. Yeah. I mean, I have -- I have annual meetings with our -- with our CEO and CFO where we have conversations, but I'm left to self-evaluation, yes.

**Q. When you became managing director, did you get more people on your team?**

A. Yes.
**Q. Who would those people be?**
A. At the time, it would have been Ashley Fabia and Blake Gallimore.
**Q. And what were their titles?**
A. Marketing associates.
**Q. And are they still at the company?**
A. Blake Gallimore is.
**Q. What is his current role?**
A. Her current role is --
**Q. Oh, her. Apologies.**
A. No. Director of -- I actually can't speak confidently what -- exactly what her title is now, but she's a director.
**Q. Is she still in the marketing bubble? Does she still -- sorry. Is she still in the marketing prong of the company?**
A. Yeah, I'm not her direct report anymore, but, yes, more -- more on the other side.
**Q. Okay. And other person, I think you said Ashley, why did she leave?**
A. She took a job at Visit Orlando just as opportunity for her, so --
**Q. Okay. About how long were you in this role, if you had to estimate?**

A. Again, probably two to three years.

**Q. Okay. And your next promotion was -- I'm forgetting the title. Please remind me.**

A. Vice president of marketing.

**Q. Vice president. How did your role and responsibility change as vice president?**

A. Again, grew -- the expectations grew, which -- which changes the importance of the role as our budget increased. Outside of that, team stayed -- we stayed the same size. And that's really it. The -- the -- the -- the title changes mostly came with seniority.

**Q. Okay. And the only thing that was changing was the expectation that you generate more profit with your leads; correct?**

A. That's correct.

**Q. And about how long were you in this role?**

A. Again, two to three years. I -- I -- I can't speak to my exact, like, time in each role, but roughly two to three years is accurate.

**Q. Were you in this role in November of 2023, or were you already chief marketing officer then?**

A. I was vice president of marketing at that time.

**Q. Okay. So at some point after 2023, you**

**were promoted again to chief marketing officer; correct?**

A. Correct.

**Q. And what are your current responsibilities as chief marketing officer?**

A. Still the same. Drive growth. Now there's more companies under the umbrella and we're a public company, so it's -- it's driving growth at an even larger scale across more business lines.

**Q. And who else is on your team now?**

A. Two directors, three associates.

**Q. And what are their names?**

A. Gary Burns, Logan Brown, Andrew Brown, Hannah Bishop, and Leigha, who, I apologize, I don't recall her last name right this second.

**Q. Okay. You mentioned now we're a public company. When -- when did you -- when did Abacus become public?**

A. I believe it was July of 2022. I could be a little off on that number, but I believe it was July of 2022.

**Q. What does a typical day look like for you?**

A. Typical day, we do a standup every morning with the marketing team, make sure everybody's aligned on what they're working on.



e2b6859b-b218-480f-b9dc-547a8e116de3

**Q. What is a standup?**

A. A standup is just a meeting every morning to quickly check if anybody needs an assist or if anybody's moving the way they need to move on their projects.

**Q. Is anyone outside of marketing in those meetings, or is it just internal?**

A. No, it's a marketing standup. Just internal.

**Q. Okay. All right. So after that, then what -- what else would happen in your day?**

A. After that, I check all of our spend, make sure nothing out of the ordinary is occurring; right? Any -- any major news changes that might lift spend in some specific area. That's my primary duty. So I roll through all of our spend. By that time, it's lunch; right? So I eat lunch. After that --

**Q. Best part of the day.**

A. Yeah, exactly. After -- after that, my primary duty currently is maintaining, really, everything that's running; right? I -- I usually have calls with media buyers, because we're running national TV and radio. I manage my team. I work with them. And I also am on the -- the tech and

development end of our business, so I might be working on some dev projects or -- or operational and, kind of, technology projects, so --

**Q. How involved is your current job with the compliance aspect of being a publicly-traded company?**

MS. MESSINGER: Objection.

THE WITNESS: Limited. It's -- it's not a marketing job, so --

BY MS. JUNGER:

**Q. How involved is your role in the preparation for board meetings?**

MS. MESSINGER: Objection.

THE WITNESS: I have no role outside of -- really, nothing.

BY MS. JUNGER:

**Q. How involved is your role in the preparation of the decks that get presented at board meetings?**

MS. MESSINGER: Objection.

THE WITNESS: Again, I -- I -- I don't have a major role in that.

BY MS. JUNGER:

**Q. Okay. Tell me about Abacus' business.**

A. Sure. So at our core, we're an asset

manager. We are, initially, a life settlement company. We purchase life insurance policies as assets. We manage those assets. And, I mean, that's -- that's -- that's the core of the life settlement business, to be honest with you. There's not really much more to it.

**Q. Are there other assets managed, or is it just life settlements?**

A. Well, it's just life insurance policies. Those are -- those are the only assets we manage from a life-solutions perspective.

**Q. Are there other assets outside of the life insurance prong?**

MS. MESSINGER: Objection.

THE WITNESS: It's -- it's not something -- I'm not an asset manager, of course; right? We do have other companies in our business that -- there's a lot of information available online, so I can't -- I can't necessarily speak to this conclusively, but outside of that, we have an ETF manager.

BY MS. JUNGER:

**Q. So when you're marketing, are you only marketing for the life insurance side of the business, or are you marketing for the entire**

**business?**

A. The entire business.

**Q. So can you speak to what the other types of investment -- or type of assets you would be marketing for?**

A. Sure. So we have an ETF manager as a business line, we have a life insurance company, we have a life settlement company, and we have a technology company.

**Q. And if you know, how many employees work for Abacus in total?**

A. This is -- I -- I can give you a very rough number.

**Q. That's fine.**

A. Between 220 to 260 right now.

**Q. Do you know when Abacus was founded?**

A. I believe 2004.

**Q. Okay. And you joined around 2016.**

A. That's correct.

**Q. How has it grown in the time that you've been there?**

A. Substantially. When I started, we had about 15 employees.

**Q. 15, you said?**

A. Roughly. Approximately.

**Q. And now you said approximately 150, did I hear you say?**

A. No. 220 to 260.

**Q. Wow, that is --**

A. 200-plus, is probably a safer way to say that.

**Q. Okay. 200-plus. Thank you.**

**Does Abacus have any subsidiaries or affiliates?**

A. I can't answer that confidently. I wouldn't know that answer.

**Q. Okay. Does Abacus have a board of directors?**

A. Yes.

**Q. Who sits on the board?**

A. I can't answer that confidently either. It's outside of my purview.

**Q. Do you know any of the names of who sits on the board?**

A. Adam Gusky is probably -- yeah. I mean, that's the only one I can recall.

**Q. Who is Adam Gusky?**

A. Adam Gusky is -- he -- he works for Terry Pegula. I don't know the work he does or anything else. So this is -- these are, like, passing

introductions for me.

THE COURT REPORTER: Past what? I'm sorry.

THE WITNESS: These are passing introductions for me. They're not personal relationships.

BY MS. JUNGER:

**Q. You said he works for Terry --**

A. Pegula.

**Q. And what's that?**

A. One of our larger investors is the Pegula family.

**Q. Okay. Do you know if Jay Jackson also sits on the board?**

A. As far as I know, I would assume yes. But, again, I -- I'm not privy to -- to that type of information, so --

**Q. As chief marketing officer, are you considered part of the executive team at Abacus?**

A. I am -- I mean, yes, I'm an executive.

**Q. Who else is on the executive team?**

A. Almost anybody with an executive title at our company. Jay Jackson, Bill McCauley, me, our --

**Q. So --**



e2b6859b-b218-480f-b9dc-547a8e116de3

A. -- chief compliance officer. Go ahead.
**Q. Sorry. Let's just go through it one at a time. So Jay Jackson is the CEO; correct?**
A. Correct.
**Q. And what's Bill McCauley's role?**
A. He is -- actually, his title just changed. I can't confidently tell you what that title is right now.
**Q. What is the title that you last remember?**
A. CFO.
**Q. Okay. And who else?**
A. Elena Plesco.
**Q. And what's her title?**
A. I can't tell you that confidently either. I actually have no idea on that one.
**Q. Do you know what she does?**
A. She, as far as I understand, does -- does things related to capital, but I don't know what.
**Q. Okay. So something on the finance side, if you had to guess?**
A. I -- I don't want to guess anything. I -- I don't know, to be honest.
**Q. Okay. Who else is on the executive side?**
A. Chief compliance officer, Ralph Milne.
**Q. And who else?**



e2b6859b-b218-480f-b9dc-547a8e116de3

A. Our -- and who else. Alexei -- I don't remember Alexei's last name. He is moving into that -- that CFO role.

**Q. Is Bill McCauley moving out of that CFO role?**

A. So Bill's title recently changed, like I mentioned. Again, I can't confidently say what his title is right now. There's a (inaudible) --

**Q. Okay. But he's --**

A. -- if you'd like to check.

**Q. -- remaining at the company.**

A. Yes.

**Q. Okay. Is there anyone else on the executive team?**

A. I'm sure there is. None -- none are at the top of my mind right now, though.

**Q. Okay. So it's a pretty small group that hold such high titles; correct?**

A. Yes.

**Q. And does the executive team often meet to discuss things going on at Abacus?**

MS. MESSINGER: Objection.

THE WITNESS: We meet periodically.

BY MS. JUNGER:

**Q. Do you have regular meetings, or just when**

**they're needed?**

A. As needed, for the most part. There's whole company check-ins, but those aren't the same thing.

**Q. Correct. Whole company check-ins would be different. I'm asking, specifically, does the executive committee meet regularly.**

MS. MESSINGER: Objection.

THE WITNESS: Not -- not really. Not -- not in the sense that we have an executive meeting. We have a biweekly meeting with managers which has a lot of people in it that aren't executives as well.

BY MS. JUNGER:

**Q. And what's discussed at those biweekly meetings?**

MS. MESSINGER: Objection.

THE WITNESS: Typically, just what's occurring at the company. Could be any number of things. You know, new accounts, big sales, et cetera.

BY MS. JUNGER:

**Q. Has this lawsuit been brought up at the biweekly meetings?**

MS. MESSINGER: Objection, and I'll,

again, caution the witness not to divulge privileged information.

MS. JUNGER: I can't hear you.

MS. MESSINGER: Objection, and caution the witness not to divulge privileged information.

BY MS. JUNGER:

**Q. Correct, I'm not asking for privileged information. If your lawyers on this call or if your inhouse lawyers spoke to you, I'm not at any point in this deposition asking you to tell me that. But if any of the business people brought up the lawsuit or if it was discussed in any way with the business people, I'm asking about that.**

A. No.

**Q. What -- how are -- how are major decisions made at Abacus?**

MS. MESSINGER: Objection.

THE WITNESS: Depends on the decision.

BY MS. JUNGER:

**Q. So, for example, if Abacus is considering acquiring a company, how would that decision need to be approved?**

MS. MESSINGER: Objection.

THE WITNESS: I can't speak to that. It's completely outside of my purview.

BY MS. JUNGER:

**Q. Is that something that the executive (inaudible) about?**

MS. MESSINGER: Objection.

THE COURT REPORTER: I'm sorry. Your question cut out. Your question cut out for me, Ms. Junger.

BY MS. JUNGER:

**Q. Is that something that the executive committee would be asked about?**

MS. MESSINGER: Objection.

THE WITNESS: Again, that's -- that is outside of my purview. Not a conversation I've had, no.

BY MS. JUNGER:

**Q. Okay. So, no. Because if it was, you'd be asked, since you're on the executive committee; correct?**

MS. MESSINGER: Objection.

THE WITNESS: Again, this is outside of my purview, so --

BY MS. JUNGER:

**Q. Do you know if major decisions are presented to the board?**

MS. MESSINGER: Objection.



e2b6859b-b218-480f-b9dc-547a8e116de3

THE WITNESS: I can't speak to that.
BY MS. JUNGER:
**Q. When -- or -- or how often does Abacus have board meetings?**
A. I also can't speak to that confidently.
**Q. Do you know when they do have board meetings if there's always a board deck presented to the board?**
MS. MESSINGER: Objection.
THE WITNESS: I can't speak to that confidently.
BY MS. JUNGER:
**Q. When there is a board deck presented, who is responsible for preparing it?**
A. Also outside of my purview.
**Q. So I'm just trying to figure out, like, from a -- a protocol standpoint. We know that there was a board deck prepared in November of 2023, and I'm trying to figure out is that something that was routine? Like, we're having a board meeting, so we're preparing a board deck? Or was that just in that one, specific instance?**
MS. MESSINGER: Objection.
THE WITNESS: I can't speak to that. Yeah.

BY MS. JUNGER:

**Q. Okay. Do you know who would be responsible for preparing board decks?**

A. No. Again, outside of my purview.

**Q. What is IRC?**

A. I don't know who IRC is.

MS. JUNGER: Let's just go off the record for one second.

THE VIDEOGRAPHER: We're off the record at 11:01.

(Off the record.)

THE VIDEOGRAPHER: We're back on the record at 11:02.

BY MS. JUNGER:

**Q. Okay. Apologies. I meant ICR. Who is -- who or what is ICR?**

A. ICR was the group we were engaged with for IR.

**Q. What is IR?**

A. Investor relations.

THE COURT REPORTER: Investor relations, did you say?

THE WITNESS: I'm sorry. I can't -- I couldn't hear you.

THE COURT REPORTER: I couldn't hear the

end of your answer. Investor --

THE WITNESS: Investor relations.

THE COURT REPORTER: Thank you.

BY MS. JUNGER:

**Q. And are they a separate company?**

A. Yes.

**Q. What is their role?**

MS. MESSINGER: Objection.

THE WITNESS: I can't speak to that. I'm not in charge of that.

BY MS. JUNGER:

**Q. Do you work with them as part of your role?**

A. No.

**Q. Who does?**

A. I can't speak to that.

**Q. So as you sit here today, you're saying you do not work with them at all.**

A. Today, no.

**Q. In 2023?**

A. Yes.

**Q. Can you tell me about your working relationship with them in 2023?**

A. They managed the Abacus IR website and ultimately were the ones that posted things like

decks.

**Q. Okay. Do you know why that wasn't managed internally?**

MS. MESSINGER: Objection.

THE WITNESS: I can't speak to that. Wasn't my decision.

BY MS. JUNGER:

**Q. When you started at Abacus, were you already working with -- was Abacus already working with ICR?**

A. No.

**Q. When did Abacus start working with ICR?**

A. I -- I don't know.

**Q. Which position -- of -- of the positions that you mentioned, which positions required you to work alongside ICR?**

MS. MESSINGER: Objection.

THE WITNESS: I don't recall my title at that time. I --

BY MS. JUNGER:

**Q. Well, I believe you testified earlier that that was the title right before chief marketing officer.**

A. So VP of marketing.

**Q. VP of marketing. So when you were VP of**

**marketing, your job required you to work with ICR; correct?**

MS. MESSINGER: Objection.

THE WITNESS: In a very limited capacity.

BY MS. JUNGER:

**Q. And what was that limited capacity?**

A. Sending a board deck.

**Q. So the extent of your working relationship with ICR was sending them board decks; correct?**

MS. MESSINGER: Objection.

THE WITNESS: I don't recall the full extent, but, yes.

BY MS. JUNGER:

**Q. Okay. And we know that one was sent in this case. How many other approximate examples do you have of sending board decks to ICR?**

MS. MESSINGER: Objection.

THE WITNESS: None that I recall.

BY MS. JUNGER:

**Q. So this is the only board deck that you recall having been prepared for a board meeting; correct?**

MS. MESSINGER: Objection.

THE WITNESS: Again, outside of my purview.

BY MS. JUNGER:

**Q. Well, I'm asking what you recall, so that's not outside of your purview.**

MS. MESSINGER: Objection.

THE WITNESS: I -- I genuinely don't know how many board decks were created, nor do I recall exactly how many that I've -- was around for at that time.

BY MS. JUNGER:

**Q. Okay. So as you sit here and testify today, you're telling me that a limited part of your role when you were VP of marketing was sending board decks to ICR; correct?**

MS. MESSINGER: Objection.

THE WITNESS: I can't say that was a -- a bullet-point job role of mine, but it is something that I did at that time.

BY MS. JUNGER:

**Q. So it's something that you did at that time. And as part of being something you did at that time, you sent the board deck that we are referring to as the November 2023 board deck; correct?**

A. That's correct.

**Q. And you do not recall any other examples**

**of board decks that you sent to ICR.**

A. No.

**Q. So was November 2023 the first time that you ever spoke to these people at ICR?**

A. No.

**Q. What other context would you have to speak with them?**

A. They've gone to events; right? They've -- they've been in our office. I've met them in passing.

**Q. Aside from meeting them in passing and seeing them at events, was November 2023 the first time that you e-mailed with them regarding board decks?**

MS. MESSINGER: Objection.

THE WITNESS: I can't recall. I -- I can't speak to that confidently.

BY MS. JUNGER:

**Q. Is ICR's only role to manage the investor website?**

A. I didn't manage that account.

**Q. I don't understand your answer.**

A. I didn't manage ICR, so I can't answer that confidently.

**Q. Why is there a different website for**

**investors and for the public?**

MS. MESSINGER: Objection.

THE WITNESS: I also can't answer that confidently.

BY MS. JUNGER:

**Q. Why do you think?**

MS. MESSINGER: Objection.

THE WITNESS: Not a decision I made. I can't speculate.

BY MS. JUNGER:

**Q. Does Abacus have a contract with ICR, to your knowledge?**

A. Again, not a relationship I manage.

**Q. Who does manage that relationship?**

A. I -- I don't know.

**Q. So you're an executive of the company and you have no idea who manages ICR.**

A. No.

**Q. In November 2023, who told you to communicate with ICR regarding the board deck?**

MS. MESSINGER: Objection.

THE WITNESS: I don't recall, but, likely, nobody.

BY MS. JUNGER:

**Q. So you just, on your own, figured let me**



e2b6859b-b218-480f-b9dc-547a8e116de3

**just e-mail this company that I've never spoken to before in a work setting and just send them the board deck.**

A. I don't recall my exact thoughts. And it was three years ago, so --

**Q. Understood, but I'm trying to understand how this relationship came about. And you're testifying that you had never worked with them before, so what -- what prompted you to send that board deck?**

MS. MESSINGER: Objection.

THE WITNESS: They manage the IR website. As mentioned prior, they post board decks.

BY MS. JUNGER:

**Q. Who are your contacts at ICR?**

A. I don't have any contacts at ICR.

**Q. So how did you know who to e-mail?**

A. Marissa is one of the individuals at ICR. I don't have a contact there. I don't have anybody's phone number.

**Q. I'm not asking about phone numbers. I'm asking who you would reach out to at ICR if you needed something.**

A. Marissa.

**Q. Who currently sends board decks to ICR?**



e2b6859b-b218-480f-b9dc-547a8e116de3

A. I can't speak to that.

**Q. Okay. I'm going to show you what I've marked as Tab 4.**

A. Uh-hum.

**Q. This is the Confidentiality Agreement in the case. Or not in the case. Between Abacus and RiverRock. Have you ever seen this document?**

A. No.

**Q. Are you aware that this document exists?**

A. No.

**Q. Can you read me the paragraph that starts with, "In consideration of the discussions..."? It's the second paragraph on the first page.**

[redacted]

**Q. Were you aware, in November of 2023, that there was a potential transaction between Abacus and RiverRock?**

A. No.
**Q. At what point did you become aware?**
MS. MESSINGER: Objection.
THE WITNESS: Never.
BY MS. JUNGER:
**Q. So you never knew that there was a potential transaction.**
A. No. That's not information I was privy to.
**Q. Well, you know now; right?**
A. Correct.
**Q. So at what point did you learn?**
MS. MESSINGER: Objection.
THE WITNESS: When this engagement began.
BY MS. JUNGER:
**Q. What does, "this engagement began," mean?**
A. The conversation we're having right now.
**Q. So until this morning, you did not know that there was a potential business transaction --**
A. No.
**Q. -- between RiverRock and Abacus.**
A. The engagement this conversation is a part of. This legal process.
**Q. Can you be more specific?**
A. I don't know the exact name you guys have

given this case, but, again, this -- this exchange of information from a legal perspective.

**Q. I don't understand what you're saying. What does, "this exchange of information from a legal perspective," mean?**

MS. MESSINGER: Objection.

THE WITNESS: You'd have to define that.

BY MS. JUNGER:

**Q. Well, you said it, so I can't define what you said. I'm trying to understand what you said.**

A. This case.

**Q. So you learned when this case was filed.**

MS. MESSINGER: Objection.

THE WITNESS: Correct.

BY MS. JUNGER:

**Q. Okay.**

A. I should specify, I don't know when this case was filed, so I can't speak to that confidently, but --

**Q. So how can you say you learned when this case was filed if you don't know when this case was filed?**

A. Which is the correction I just gave. I've learned from this case. I have no idea when this case began or was filed.



e2b6859b-b218-480f-b9dc-547a8e116de3

**Q. Okay. But your testimony is you did not know about a potential transaction until this case.**
MS. MESSINGER: Objection.
THE WITNESS: Correct.
BY MS. JUNGER:
**Q. Okay. And your testimony is that you've never seen this agreement; correct?**
A. Correct.
**Q. And you had no idea that there was a Confidentiality Agreement between RiverRock and Abacus; correct?**
A. Correct.
**Q. Okay. In looking at this agreement, when it says, "In consideration of," what do you think that means?**
MS. MESSINGER: Objection.
THE WITNESS: I can't speak to that. I -- I don't know.
BY MS. JUNGER:
[redacted]

**In reading that, do you believe that the terms in this agreement would be confidential?**

MS. MESSINGER: Objection.

THE WITNESS: I can't speak to that.

BY MS. JUNGER:

**Q. Well, what do you think? What does that sentence --**

A. I don't -- I don't know.

MS. MESSINGER: Objection. Let me -- give me some time to object.

BY MS. JUNGER:

**Q. Okay. So just reading the words on the paper, you don't know what it means.**

A. No.

**Q. Scrolling to the bottom, looking at the signature blocks, who signed this agreement?**

A. Looks like Jay Jackson.

**Q. And is it your understanding that when an agreement is signed by a company executive, that that binds the company?**

MS. MESSINGER: Objection.

THE WITNESS: I can't speak to that.

BY MS. JUNGER:

**Q. What does a signature on a document mean to you?**



e2b6859b-b218-480f-b9dc-547a8e116de3

MS. MESSINGER: Objection.
THE WITNESS: Can't speak to that.
BY MS. JUNGER:
**Q. You don't know what a signature on a document means. That's what you're testifying. This is your personal -- personal capacity. I'm asking you, Mr. Jeff Smith, what does it mean to you when someone signs a document?**
A. It means they've put a signature on a document. Outside of that, I can't -- I can't assume.
**Q. Okay.**
MS. JUNGER: I'd like to mark that as Exhibit 3.
(Thereupon a document was marked Plaintiff's Exhibit 3 in the proceeding.)
BY MS. JUNGER:
**Q. Who told you that there was a potential transaction with RiverRock?**
MS. MESSINGER: Objection.
THE WITNESS: I can't recall that.
MS. JUNGER: What's your objection there?
MS. MESSINGER: The witness already testified that he learned about it from this case. So "who told you" is vague and

ambiguous.

MS. JUNGER: What is vague and ambiguous about "who told you" about a potential transaction?

MS. MESSINGER: There's no speaking objections in the Middle District of Florida, so I'm simply making an objection for the record. You can ask your question.

MS. JUNGER: I understand, but I'm trying to figure out what your objection is, because you're objecting to every question, and I think who made you aware is a non-objectionable question, so I'm asking you to tell me what your objection is based on.

MS. MESSINGER: Vague and ambiguous, lacks foundation, assumes facts not in evidence.

BY MS. JUNGER:

**Q. You can answer. Who told you about the potential transaction?**

MS. MESSINGER: Objection.

THE WITNESS: Again, I don't know.

BY MS. JUNGER:

**Q. Okay. Were you at any point involved in any negotiations with RiverRock?**

A. No.

**Q. Did you at any point speak to anyone at RiverRock?**
A. No.
**Q. Were you aware that Jay Jackson, in the fall of 2023, was communicating with RiverRock's CEO about a potential transaction --**
A. No.
**Q. -- for Abacus to acquire RiverRock?**
A. No.
**Q. Were you aware that Mr. Annino created a data room for Mr. Jackson to review?**
A. No.
**Q. Mr. -- do you know who Mr. Annino is?**
A. No.
**Q. Just so there's no confusion, Mr. Annino is -- was RiverRock's former CEO. So I -- I will refer to him as "Mr. Annino," or sometimes "RiverRock's CEO." Will you understand who I'm talking about?**
A. I will now.
**Q. Did you ever see the data room or view its contents?**
MS. MESSINGER: Objection.
THE WITNESS: Wouldn't even know one existed, so, no.

BY MS. JUNGER:
**Q. Were you aware that Mr. Annino e-mailed Mr. Jackson a valuation of RiverRock?**
A. No.
**Q. When did you first become aware that the potential transaction with RiverRock would be presented to the board?**
MS. MESSINGER: Objection.
THE WITNESS: Never.
BY MS. JUNGER:
**Q. Are you aware that -- well, let me just show you an exhibit.**
A. Uh-hum.
**Q. I'm going to show you what I've premarked as Tab 5, which is the board deck in question in this case.**
A. Uh-hum.
**Q. Have you ever seen this document?**
A. Yes.
**Q. Did you have any role in the preparation of this document?**
A. On mark -- one to two marketing tabs. That's it.
**Q. Do you know who else had involvement in the preparation of this document?**



e2b6859b-b218-480f-b9dc-547a8e116de3

A. No.
**Q. So I'm going to scroll through this, and when you get to the one or two pages of marketing that you were involved in, please stop me so that we can discuss them. Okay?**
A. Okay.
**Q. Let me know if I'm going too fast or too slow. (Scrolling.)**
A. You can stop here.
**Q. Okay. So this is one of the pages that you had a role in preparing; correct?**
A. Correct.
MS. JUNGER: For the record, this is beginning at what's Bates marked as Abacus 0000284. For some reason, it is also stamped as Abacus 0000258. I'm not sure why there are two Bates numbers there, but there are.
BY MS. JUNGER:
**Q. So how did you come to prepare this slide?**
A. I gathered these KPI's, or these reporting numbers, put them together and sent them along.
**Q. Who told you to do that?**
A. Jay Jackson.
**Q. And is that something that you commonly did for board meetings?**

A. I wouldn't say, "commonly." We have marketing slides for most presentations. I'm asked for numbers periodically.

**Q. Okay. As I scroll to the next slide. Okay. First line down. So was it just this slide, or do you want me to continue scrolling?**

A. I can't recall. I send numbers over for a lot of things. We can continue scrolling.

**Q. Okay. I'll continue going through it. (Scrolling.)**

A. I would stop here.

**Q. Okay.**

A. I can't --

MS. JUNGER: For the record, this is Abacus 0000286.

THE WITNESS: Uh-hum.

MS. JUNGER: Also 000258.

BY MS. JUNGER:

**Q. What -- what were you responsible for here?**

A. Can't speak confidently that these numbers were used, but I typically provide policies originated and originated face value for various presentations.

[redacted]

[redacted]

**Q. Okay. I'm going to continue scrolling. Let me know if anything else is something you would have been a part of. (Scrolling.)**

**Okay. That's it. So is it your testimony that those two pages are the only two pages that you may have had involvement working on in this slide deck? Board deck?**

A. I can't say that with total confidence. I provide numbers, again, for a number of things. Those are -- those are the ones that stand out to me right now, though.

**Q. Okay. So this is a -- you know, I didn't count the pages, but it's a fairly large board deck with a lot of different company endeavors involved; correct?**

MS. MESSINGER: Objection.

THE WITNESS: I can't speak to that. Only my part.

BY MS. JUNGER:

**Q. What can't you speak to? You don't think**



e2b6859b-b218-480f-b9dc-547a8e116de3

**there's multiple endeavors involved in this board deck?**

MS. MESSINGER: Objection.

THE WITNESS: Again, not my purview.

BY MS. JUNGER:

**Q. Who compiles all of these slides to put them into one?**

A. Also outside of my wheelhouse.

**Q. As an executive of the company, you don't know who is responsible for preparing the board deck?**

A. No.

**Q. So would you ever -- strike that.**

**So you only know that you add things per Jay Jackson's request; is that correct?**

A. I didn't -- I didn't hear what you just said. I'm sorry.

**Q. Your testimony is that you only added things to the board deck by Jay Jackson's request; correct?**

A. That's correct. I mean, as far as I recall.

**Q. Would anyone else tell you to add things, or would it only be coming from him?**

A. No. Realistically, only from him.

**Q. Okay. I'm going to scroll up to the page that's Bates marked as Abacus_0000277. Do you know who prepared this page?**

A. No.

**Q. I'm going to scroll down to Abacus_000278. Do you know who prepared this page?**

A. No.

**Q. Okay.**

MS. JUNGER: Let's go off the record for five minutes.

(Recording stopped at 11:29 a.m.)

(Thereupon a brief recess was taken, after which the following proceedings were had:)

THE VIDEOGRAPHER: We're back on the record at 11:43.

BY MS. JUNGER:

**Q. When did you first see the board deck? And when -- sorry. When I refer to the board deck, I'm referring to the board deck I just showed you which we entered as Exhibit 4, I think.**

THE COURT REPORTER: It hasn't been entered yet, but now it's 4.

MS. JUNGER: Okay. Now it's 4.



e2b6859b-b218-480f-b9dc-547a8e116de3

(Thereupon a document was marked
Plaintiff's Exhibit 4 in the proceeding.)
BY MS. JUNGER:
**Q. If I refer to the board deck, will you understand that that's what I'm talking about?**
A. Yes.
**Q. Apologies. One very quick second.**
**When did you first see the board deck?**
A. I can't speak to an exact date. And can you define "see"?
**Q. When did you first receive it?**
A. I didn't receive it. I had access to it.
THE COURT REPORTER: I'm sorry. "I didn't receive it. I --" what?
THE WITNESS: Sorry. I didn't receive it. I had access to it.
BY MS. JUNGER:
**Q. When did you get access to it?**
A. I -- I can't speak to a date on that. The -- the first time I interacted with it was when sending it over.
**Q. Did you ever review the board deck?**
A. No.
**Q. So you never looked at the context of it.**
A. Define "context" here.

**Q. Like, you never flipped through the pages, saw what was inside --**

A. No.

**Q. -- when you were --**

**Just the pages that you specifically worked on.**

A. That's correct.

**Q. Okay. Do you know who would be responsible for editing the board deck?**

A. No.

**Q. Were you told that there was any confidential information within the board deck?**

MS. MESSINGER: Objection.

THE WITNESS: Not that I recall.

BY MS. JUNGER:

**Q. So we haven't -- we -- we haven't received in discovery any documents that show, you know, how this board deck came to be, like how the pages were put together and prepared into one document, and as I'm sitting here today asking you questions, it -- it doesn't seem like you know that information. Is that a correct assessment?**

A. That's a correct assessment.

**Q. Were you asked to search your inbox? Because you keep mentioning it's been three years,**

**so understand the passage of time. Were you asked to search through your inbox to see if you could find information like that?**

A. No. Not that I -- no, not that I recall.

**Q. Do you know if your e-mail box was searched by your lawyers?**

MS. MESSINGER: Objection.

THE WITNESS: I -- I don't know.

BY MS. JUNGER:

**Q. Do you have a work phone or a personal phone or both?**

A. Just personal.

**Q. Were you asked to search your cellphone for any text messages that might be involved in this case?**

A. I'm sorry. You froze there. Can you repeat the question?

**Q. Were you asked to search your cellphone for text messages that might relevant in this case?**

A. No.

**Q. Were you involved at all in the collection and searching of documents in this case?**

A. Define "involved."

**Q. Did you know whose inboxes were being searched? Did you know that searches were being**

**run?**

A. No.

**Q. No to both of those?**

A. That's correct.

**Q. Okay. I'm going to show you what is going to be the next exhibit, so that's going to be Exhibit 5. This is RiverRock's first RFP. Sorry. One second.**

**(Thereupon a document was marked Plaintiff's Exhibit 5 in the proceeding.)**

BY MS. JUNGER:

**Q. Have you ever seen this document?**

A. No.

**Q. Do you know what a Request for Production is?**

A. Is that what "RFP" stands for?

**Q. Yes.**

A. Yes.

**Q. So you understand that a Request for Production is a request from one party to another party asking for documents; correct?**

A. Yes.

**Q. Okay. All right. One moment.**

A. Uh-hum.

**Q. Okay. In looking at Instruction 15, do**

**you see where I've highlighted the word, "text messages"?**

A. Yes.

**Q. Do you see where this says, "All of the requests in this Request for Production seek the production of electronic data, sometimes referred to as 'electronically stored information' or 'ESI.' Electronic Data as used herein shall mean the original or identical duplicate when the original is not available, and any nonidentical copies --" and then it goes on to a list of things that it's looking for.**

**Do you see that text messages --**

A. Yes.

**Q. -- and e-mails are on that list?**

A. Uh-hum.

**Q. And it's your testimony you don't believe you were asked to search your phone for text messages?**

A. As far as I recall, yes.

**Q. And you don't believe that your inbox was searched.**

MS. MESSINGER: Objection.

THE WITNESS: I -- I can't speak to whether or not it was. I did not.



e2b6859b-b218-480f-b9dc-547a8e116de3

BY MS. JUNGER:

**Q. Okay. If after this deposition you uncover that there were e-mails that said -- that there were e-mails that would demonstrate how this board deck was put together, will you produce those documents?**

MS. MESSINGER: Objection.

THE WITNESS: Whatever my attorney's advice is, I'll follow.

BY MS. JUNGER:

**Q. Have you been asked to preserve data on your phone and your e-mail?**

A. Not that I recall. I'm not in charge of data preservation.

**Q. Well, I wasn't asking if you were in charge, but I'm asking if you've been asked.**

A. That would be handled at an enterprise level. It's -- it's outside of my purview.

**Q. Well, what about your personal phone? Were you asked to preserve data on your personal phone?**

A. Not that I recall.

**Q. Do you use your personal phone to communicate with other employees and colleagues?**

A. Rarely.



e2b6859b-b218-480f-b9dc-547a8e116de3

**Q. But you have before, texted with colleagues and employees?**

A. Yes.

**Q. Do you use text messages or WhatsApp or iMessage? What -- what platform do you use to communicate?**

A. Whatever the default messenger app is on my phone.

**Q. What is that?**

A. A -- just a Samsung Galaxy.

**Q. Okay. So not iMessage. Just a text message.**

A. Correct.

**Q. Okay. Were you aware that two pages of the board deck related to RiverRock and the potential transaction?**

A. No.

**Q. When did you become aware?**

MS. MESSINGER: Objection.

THE WITNESS: As mentioned earlier, in relation to this proceeding.

BY MS. JUNGER:

**Q. And I believe I asked you this earlier, but I -- I may not have, so I'm going to ask you again. Have you ever had your deposition taken**



e2b6859b-b218-480f-b9dc-547a8e116de3

**before?**

A. No.

**Q. Sorry. One very quick call.**

**You said, no, you've never had your deposition taken?**

A. I have not.

**Q. And you are aware that your testimony is under oath.**

A. Yes.

**Q. So everything that you're saying must be truthful because it's under oath.**

A. Yes.

**Q. Okay. When -- when something like a board deck is being prepared at Abacus -- and I'm not necessarily speaking about this board deck, just in general --**

A. Uh-hum.

**Q. -- sensitive information is being passed around from person to person within Abacus, because someone has to prepare the board deck; right? So someone is getting that information and then sending it to someone else to prepare the deck; is that correct?**

MS. MESSINGER: Objection.

THE WITNESS: I -- I can't speak to the



e2b6859b-b218-480f-b9dc-547a8e116de3

exchange of information in the office.

BY MS. JUNGER:

**Q. Do you know what safeguards Abacus has in place to make sure that confidential documents are protected?**

MS. MESSINGER: Objection.

THE WITNESS: No. Outside of my scope.

BY MS. JUNGER:

**Q. Do you know if Abacus sends sensitive e-mails with password protection?**

A. Also outside of my scope.

**Q. Well, I'm asking if you know, so it's a yes or a no.**

MS. MESSINGER: Objection.

THE WITNESS: Personal exposure, no.

BY MS. JUNGER:

**Q. Do you know if -- so -- so, for example, you -- you claimed -- you testified earlier that you had access to the board deck. Where would that access be? Was it in a hard file? Computer file? E-mail? Where was it?**

A. Boardvantage.

**Q. What is that?**

A. That is Nasdaq's, essentially, storage and management platform.

**Q. Is that internal to Abacus, or is it Nasdaq's?**

A. Nasdaq's.

**Q. And how did the board deck come to be on the Nasdaq website?**

A. I don't know.

MS. MESSINGER: Objection.

BY MS. JUNGER:

**Q. So I'm just trying to understand. The Nasdaq website had the Abacus board deck that I just showed you that was marked as Exhibit 4. Is that what your testimony is?**

A. No, not the Nasdaq website. Boardvantage, which is a SAS solution that Nasdaq offers.

**Q. Okay. But you would only have access to Abacus-related documents on that platform; correct?**

A. Yes.

**Q. And who controls that?**

A. I -- I don't know. Not me.

**Q. I guess I'm asking a little bit more broadly. You said it's a service Nasdaq offers. So does Nasdaq maintain the website or does Abacus maintain the website?**

MS. MESSINGER: Objection.

BY MS. JUNGER:



e2b6859b-b218-480f-b9dc-547a8e116de3

**Q. And, sorry. By "website," I mean platform.**

A. Yeah. I can't speak to that. I -- I didn't set it up.

**Q. Is it password protected?**

A. I have to enter a password to go in.

**Q. Who has access to it other than you?**

A. I don't -- I don't know the other users.

**Q. Does anyone else on your team?**

A. No.

**Q. How did you get access?**

A. I was given an e-mail with access when we were listed publicly on Nasdaq.

**Q. Who -- who sent you that e-mail?**

A. The e-mail came from Nasdaq.

**Q. Why were you selected as someone that should have access to that?**

A. I can't speak to that. I -- I don't know.

**Q. So you just kind of woke up and there was an e-mail saying you have access to this platform and you're not really sure why you got access?**

A. Correct.

**Q. Did you ask anyone, "Why am I getting this?"**

A. No.



e2b6859b-b218-480f-b9dc-547a8e116de3

**Q. Did you talk to anyone about why you, specifically, might have access?**
A. No.
**Q. Aside from this one instance in which you accessed the board deck that we're referring to in this case, did you utilize that website or platform for anything else?**
A. No.
**Q. So is it your testimony that that's the only time you've ever accessed that platform?**
A. Logged in when I created my user account and, yeah. I mean, as far as I recall, this is the only other time I've logged into it.
**Q. Okay. So it wasn't something that you typically did as part of your job to pull board decks from that platform?**
A. Correct.
**Q. When you pulled -- sorry. Strike that.**
**You mentioned that Abacus went public in 2022 and these events took place in 2023. So would I be correct in understanding that you made your password in 2022 when Abacus went public?**
A. No. As I mentioned, I'm fuzzy on exact dates we went public. We likely went public in 2023. If I misspoke that, I apologize.

**Q. Okay. I'm still -- the question still remains, though. Did you make your password when Abacus went public? You said shortly thereafter you got an e-mail from Nasdaq. Did you set up your account and password then?**

A. I don't recall the exact dates I set up an account, but it would have been shortly after going public.

**Q. Okay. And then you didn't use the platform at all until November of 2023; correct?**

A. Correct.

**Q. So did you have to reset your password when you logged in?**

A. Not that I recall. Yeah.

**Q. And as you sit here today, you don't know who posted that deck to that platform. You don't know who posted the board deck to that platform.**

A. No.

**Q. Okay. Okay. I'm going to show you the next exhibit.**

A. Uh-hum.

MS. JUNGER: Ms. Bronis, will this be 6?

THE COURT REPORTER: Yes.

MS. JUNGER: This will be Exhibit 6.

(Thereupon a document was marked Plaintiff's Exhibit 6 in the proceeding.)

BY MS. JUNGER:

**Q. This is an e-mail from Tom MacDonald to Jay Jackson. You are copied on this e-mail. Do you see your e-mail listed as jeff@abacuslife.com?**

A. I do.

**Q. Is that your correct e-mail address?**

A. Not current, but at the time, yes.

**Q. Okay. And this e-mail was sent on November 6th, 2023. Do you see that?**

A. Uh-hum.

**Q. And do you see that it attaches Board Deck 3rd Quarter Updated 11.5 Draft, Version 2, Tom's Slide? Do you see that?**

A. I do.

**Q. Who's Tom MacDonald?**

A. He's a financial analyst here.

**Q. Did you say, "financial analyst here"?**

A. Yes. At Abacus.

**Q. Why does he not have an Abacus e-mail address?**

A. Lmagrp is -- is Longevity Market Assets. It's a -- it's -- it's a part of our -- it's an owned company. It's a part of Abacus Global

Management.
**Q. Okay. So he is employed by Abacus.**
A. That's correct.
**Q. Okay. And when it references, "Tom's Slide," does that refresh your recollection at all as to who else may have worked on this board deck?**
A. No. It's not my responsibility, so it's -- it's not something I would recall.
**Q. Why were you copied on this e-mail?**
MS. MESSINGER: Objection.
THE WITNESS: I can't speak to that. I don't know.
BY MS. JUNGER:
**Q. Okay. So Tom's a financial analyst. Jay Jackson is the CEO. Who is Armando Cabrera?**
A. He is a VP of engineering and Abacus intel.
**Q. Okay. You're next. We know who you are. Is Blake Gallimore the person on your team that you mentioned earlier?**
A. That's correct.
**Q. Okay. So it looks like in this e-mail there are two people from marketing that were sent this e-mail. Did you ask, "Hey, Tom, why are you sending me this?"**



e2b6859b-b218-480f-b9dc-547a8e116de3

A. No.

**Q. Was it common for you to get e-mails with slides for the board deck?**

A. I can't speak to how common it is. I get a lot of e-mails every day. I don't recall this one, specifically.

**Q. Did you have any action items from this e-mail?**

A. According to the text here, no.

**Q. Let's scroll down. So it starts with Jay Jackson on November 5th, and he e-mails Tom MacDonald, Armando Cabrera, you, and Blake. And then he says, "Please see attached board deck for Quarter 3. Can you please create a ABL Tech Mortality Tracker slide? Slide 25 is the current holder for that slide. I need this by tomorrow afternoon. Sorry for the late request."**

**Then he goes, "Jeff, I need you to --" "I need you to do update the marketing summary slide (slide #27) and the 3Q KPIs on slide 29. Let me know if you have any questions on the data pretty straightforward. I need yours by tomorrow afternoon as well."**

**Does that refresh your recollection as to why you were receiving this e-mail?**

A. Yeah, it makes sense.

**Q. Okay. And is this the only involvement that you had with this slide deck?**

A. As far as I recall, yes.

**Q. Okay. He also attaches the draft. When you received the e-mail, did you go through the board deck in order to address his directions to you?**

A. I can't -- I can't recall exactly how I would have interacted with it, but I updated my slides, as requested.

**Q. Okay. So he's asking you for slide 27 and 29; correct?**

A. That's correct.

**Q. Okay. So let's just go through the board deck that's attached to this e-mail. It looks like, thus far, up until slide 11, it looks like everything's in pretty final form. Would you agree?**

A. I can't speak to that.

**Q. Okay. Well, when we get here to slide 11, this clearly -- or does this appear to be a draft to you?**

A. It would appear that way.

**Q. Okay. And then slide 12, similarly,**

**appears to be a draft?**

A. Okay.

**Q. Well, yes or no? What do you -- what do you think?**

A. It's -- it's not my slide, so I can't speak to that.

**Q. Okay. And getting to your slide, we're at slide 13 now, you were told to update 27 and 29. So did you scroll through all of these slides in order to get to your slide?**

A. That's not how I navigate PDF's, so probably not. But, again, I can't speak to that. It was three years ago.

**Q. How would you navigate this PDF to get to your slide?**

A. Type the page number and -- and navigate directly to it.

**Q. Well, I don't believe that these have page numbers, so --**

A. It's --

**Q. -- how would you have done that?**

A. It's -- it's a PDF. There's -- there's page numbers.

**Q. So, here. Let me pull this up outside of -- one second, because --**



e2b6859b-b218-480f-b9dc-547a8e116de3

**Okay. So what would you have done? He told you to look at slide 27. How would you navigate this?**

A. Well, this is an e-mail. If -- if -- if he told me update slide 27, first of all, it wouldn't come in PDF format. That would be -- that would be a PowerPoint.

**Q. So this is the attachment right here. How would you have gotten to it?**

A. Type the page in and navigate to it.

**Q. Okay. So putting aside that the first three pages of this are an e-mail, if he's telling you to get to Page 27, would you have put in Page 27? But ignoring those three pages, that would be 30?**

A. Sorry. Can I clarify? Can you go up to the attachment, please?

Yeah, he sent us a PowerPoint, not a PDF.

**Q. Would that change the pages?**

A. Yes. He gave me slide numbers, so I would navigate to the slide numbers.

**Q. So getting to slide 27. Is this the page that you worked on?**

A. It would appear that way.

**Q. What did you add here?**

A. Numbers to be current, as asked by Jay.

**Q. I couldn't hear you. Sorry. Can you repeat that?**

A. I would have updated the numbers to be current, as asked by Jay.

[redacted]

**Q. Did you review these numbers as well?**

A. Well, the two I'd be responsible for, as mentioned earlier, would be originated face value and number of policies originated.

[redacted]

**Q. So it's your testimony that you only went directly to the slides that you were asked to look at and you didn't see anything else that was in the board deck.**

A. That's correct. That's what I was instructed to do.

**Q. Okay.**



e2b6859b-b218-480f-b9dc-547a8e116de3

MS. JUNGER: And that was Exhibit 6?

THE COURT REPORTER: Yes.

MS. JUNGER: Okay. Thank you.

BY MS. JUNGER:

**Q. If you recall, was that your -- was that e-mail that was sent on November 5th, was that your first time seeing any draft of the board deck?**

A. I can't speak to the -- to -- to that exactly, but I would assume so, because that's what I'm being asked for numbers.

**Q. When you were sent that draft, were you notified that the board deck may contain information that's confidential?**

MS. MESSINGER: Objection.

THE WITNESS: I can't recall.

BY MS. JUNGER:

**Q. So do you recall attending the November 9th, 2023, board meeting?**

A. Yes.

**Q. Who led the meeting?**

A. I don't -- I don't know. I don't remember the meeting exactly.

**Q. Do you recall who was in attendance?**

A. No.

**Q. Okay. I'm going to show you the board**

**meeting minutes. This is going to be Exhibit 7.**

A. Uh-hum.

(Thereupon a document was marked Plaintiff's Exhibit 7 in the proceeding.)

BY MS. JUNGER:

**Q. Do you see where it says, "Abacus Life, Inc., Meeting of the Board of Directors, November 9, 2023"?**

A. I do.

**Q. Is that consistent with your recollection of when the board meeting was held?**

A. I don't know exactly what day it was held, but that -- this seems correct, yes.

**Q. Okay. And the members of the board participating in this meeting were -- and it gives a list. I'm going to walk through each one, and if you could tell me what you know about those people, we'll just do it one at a time.**

**So Jay Jackson is the chairman, but he's also the CEO; correct?**

A. That's correct.

**Q. What does "Chairman" mean?**

A. I don't know.

**Q. Okay. Who's Thomas W. Corbett, Jr.?**

A. One of our board members.



e2b6859b-b218-480f-b9dc-547a8e116de3

**Q. What does he do?**

A. I don't know what he does in his personal time. I actually think he's retired.

**Q. Who's Adam Gusky?**

A. As we spoke about earlier, Adam Gusky works for the Pegula family. I don't know exactly what he does for them.

**Q. I apologize in advance. I'm not going to pronounce this correctly. But who is Cornelis Michiel van Katwijk?**

A. Another one of our board members. I don't know what he does in his personal time, but I know he's on the board.

**Q. Do you know how he came to be on the board?**

A. No.

**Q. What about Sean McNealy?**

A. He is one of -- was one of the partners at our company. Still works here.

**Q. You said, "was one of the partners"? Is he not a partner anymore?**

A. I updated his title on the website. I don't know. I really don't know when. And I believe it's co-president now.

**Q. Okay. And who is Karla Radka?**

A. Again, a board member. I have no idea what she does, though.

**Q. And Mary Beth Schulte?**

A. Same answer. It's a board member. Don't know what she does.

**Q. Okay. Mr. Jackson and Mr. McNealy are the only board members that work at Abacus; correct?**

A. Yes.

**Q. Okay. Right underneath that, it says, "Present by invitation of the Board were Chris Romaine, Bill McCauley, Dani Theobald, Frank Walden, Armando Cabrera, Jeff Smith, Blake Gallimore, and Seth Miller of the Company."**

**Who invited you to the board meeting?**

A. I can't recall that.

**Q. Who's Chris Romaine?**

A. He was our -- he -- he worked in legal. I don't know his exact title, so I can't speak to that.

**Q. Okay. Bill McCauley, CFO at that time.**

A. Uh-hum.

**Q. Now you don't remember his current role, but that's -- that's Bill McCauley; correct?**

A. That's correct.

**Q. Who's Dani Theobald?**

A. Also works in legal at our company. I don't know their exact title.

**Q. Does Chris Romaine still work in legal? I thought -- I think you said, "was," so I just want to --**

A. Correct. Chris doesn't work here anymore.

**Q. Okay. But Dani does.**

A. Yes.

**Q. Who is Frank Walden?**

A. Frank works in finance. Unsure of exact title.

**Q. Armando, I'm pretty sure we just discussed, but please remind me again what Armando does.**

A. VP of engineering.

**Q. Okay. You are you. We know Blake. And who's Seth Miller?**

A. Seth Miller was one of our executives at the time.

**Q. Doing what?**

A. I don't remember his exact title.

**Q. Was this the first board meeting that you ever attended?**

A. I honestly can't recall that. We've had a lot of board meetings and I don't know which one



e2b6859b-b218-480f-b9dc-547a8e116de3

was my first.

**Q. How often do you attend board meetings?**

A. Periodically.

**Q. Would you say once a year?**

A. I -- I can't say, truly. When there's a marketing opinion needed, and I have no say over when that is.

**Q. What was the marketing opinion needed here?**

A. The slides that we already reviewed.

**Q. So I know your input was needed in preparing the slides. Would you have been expected to speak about the slides at the board deck? Or not -- sorry. The board meeting?**

A. Yeah. Not typically, no.

**Q. Okay. So were you invited in case there were questions about the slides you worked on?**

A. I -- I can't -- I can't say exactly what was in anybody's head when I got invited, but that's probably it, yes.

**Q. And you didn't ask? You didn't say, like, "Why do you guys want me here?" You didn't say, "Is there anything I should prepare? What do you need from me at this meeting?"**

A. No.



e2b6859b-b218-480f-b9dc-547a8e116de3

**Q. Kind of just showed up?**

A. Yes.

**Q. Can you -- I know we discussed this at the beginning, but I want to circle back, because I'm not sure I understand it. Explain to me like I am in kindergarten. What is KPI?**

A. Sure. It's a performance metric.

**Q. Okay. So --**

A. It's --

**Q. Hold on. I'm just going to stop you. I don't mean to interrupt, but I just -- before -- before I lose track, I want to make sure I'm understanding everything.**

**A performance metric. Is it on a platform?**

A. No.

**Q. So what is it?**

A. It's -- it's hard for me to explain much more simply than performance metric, but it is -- it is a measure of how successful anything is, for the most part, but, specifically, an advertising campaign.

[redacted]

[redacted]

**Q. So, like, when you type something into Google, making sure that you're, like, the first one that comes up?**

A. Yes, to put it simply.

[redacted]

**Q. Did you do social media advertising?**

A. No.

**Q. Radio advertising?**

A. Yes.

**Q. So just as an example for my understanding, if there was a radio advertisement, the KPI would assess how successful that specific ad was?**

A. A KPI would, again, just be a metric. Assessing success is -- I mean, that's a part of my job; right? Like, a KPI, in this case, if a radio ad runs, if we spend X amount of money, it produces X amount of leads and X amount of people see it, those are KPI's. Me saying that combination of



e2b6859b-b218-480f-b9dc-547a8e116de3

things is a success is part of my job.

**Q. Okay. So just in using this example, you run an ad, and the KPI is how many people see the ad and how many people respond to the ad, and then part of your job is to evaluate the success. Like, we got X amount of business from that.**

A. Correct.

**Q. Okay. Is that -- is there any -- you also mentioned that you updated the website to reflect someone's job change title. So would that be another responsibility beyond assessing KPI metrics?**

MS. MESSINGER: Objection.

THE WITNESS: I don't personally maintain our websites at this point, but something like updating a title would fall into the marketing purview.

BY MS. JUNGER:

**Q. What else beyond assessing the metrics of KPI's do you consider to be part of your job responsibility?**

A. Again, my -- my core responsibility is driving revenue to the company.

**Q. Is there anything else that you are responsible for?**



e2b6859b-b218-480f-b9dc-547a8e116de3

A. That's, honestly, impossible to answer. I'm responsible for driving revenue. There's a number of things that fall underneath that umbrella.

**Q. Like what?**

A. Again, managing spend, managing creative, managing our websites. Any -- anything that would be attributed to advertising in a very standard form.

**Q. When you say managing your websites, are you referring to the investor website as well?**

A. No.

**Q. That's just ICR?**

A. That's correct.

**Q. Okay. And in 2023 when you were VP of marketing, were there any other responsibilities that you did not just mention?**

A. I -- I don't know that I can provide an exhaustive list of all my responsibilities in 2023, but, yes, I think I've captured them all.

**Q. Okay. Let's go back to this document. So you attended the board meeting. Do you recall about how long it was?**

A. No.

**Q. Did you stay the entire time?**



e2b6859b-b218-480f-b9dc-547a8e116de3

A. As far as I recall, yeah.

**Q. Was the board deck presented at the board meeting?**

A. Yes. I mean, a deck was presented.

**Q. Okay. I'm going to scroll down. Okay. I'm looking at Bates Number Abacus 0001194.**

A. Uh-hum.

[redacted]

**Q. Okay. Thank you. So you were at this meeting; correct?**

A. I was.

**Q. And Mr. Jackson discussed the potential acquisition of RiverRock; correct?**

A. It would appear he did, according to this.

**Q. So you knew that RiverRock was in a potential -- in discussions for a potential acquisition with Abacus as early as the board meeting; correct?**

A. I don't recall that discussion at the board meeting, no.

**Q. Even though you sat through the presentation?**

A. Yeah. As you mentioned earlier, it's a very long board deck. I don't recall that aspect of the conversation.

**Q. So you just zoned out during that period? You have no recollection at all of those slides being discussed?**

A. It would appear that way.

**Q. It would strike me that, you know, board members would be interested in a potential acquisition that would cost the company millions of dollars, so they most likely would ask questions. Do you have any recollection of board members asking questions about this topic?**

A. No.

**Q. And you have no recollection of the company RiverRock being brought up at all during this board meeting.**

A. No.

**Q. Okay. Did you ever see -- sorry. I should have asked this at the beginning, but did you ever see the board meeting minutes after they were prepared?**

A. No.

**Q. Who prepares the board meeting minutes?**

A. I don't know.

**Q. I'll just screen share one more time.**

A. Uh-hum.

**Q. It looks like it was submitted by Christopher Romaine. Does that refresh your recollection at all as to who would have submitted the -- the minutes?**

A. No. I have no knowledge of it, so there's not -- nothing to refresh.

**Q. Do you know where board meeting minutes are stored after they're prepared?**

A. No.

**Q. Do you know who has access to seeing them?**

A. No.

**Q. Do you know why board meeting minutes are**

**prepared?**

A. No.

**Q. Do you know if they get sent to anyone?**

A. No.

**Q. So was there a vote at this meeting on any potential issues? Or does the board -- just from a procedure standpoint, when -- when issues are -- strike -- strike that.**

**From a procedure standpoint, when issues are presented to the board at a board meeting, in your experience from being there, did they decide in realtime, or did they just learn about it and then decide their vote on a later date?**

MS. MESSINGER: Objection.

THE WITNESS: Yeah, that's way outside of my wheelhouse.

BY MS. JUNGER:

**Q. Well, I mean, you've attended board meetings. So do you see votes happening at board meetings?**

A. Yes, votes occur.

**Q. Do you know if they voted on the acquisition of RiverRock at that board meeting?**

A. No.

**Q. Okay. So after the meeting ends, what**

**happens to the board deck?**

MS. MESSINGER: Objection.

THE WITNESS: I don't know.

BY MS. JUNGER:

**Q. Are copies printed out for the board meeting?**

A. Unsure.

**Q. Do you have any recollection of you sitting at that board meeting? Were you looking at a screen where it was presented, or did you have a hard copy that you were flipping through?**

A. I don't recall.

**Q. Okay. You testified that you pulled the board deck from that Nasdaq website. Remind me the name of that platform.**

A. Boardvantage.

**Q. Boardvantage. Okay. Do you recall anything in between the board meeting ending and you going to Vantage to pull that deck?**

A. No.

**Q. Who told you to pull the deck?**

A. Nobody.

**Q. So you just went to Vantage to pull the deck on your own.**

A. That's correct.



e2b6859b-b218-480f-b9dc-547a8e116de3

**Q. Why?**
A. Initiative.
**Q. Initiative for what?**
A. Getting the deck up.
**Q. So was it protocol or policy to get a deck up on the investor website after a board meeting?**
A. I can't speak to protocol or policy.
**Q. So what gave you that initiative to do it?**
A. Myself.
**Q. Why? What was the purpose of going to get that board deck?**
A. Just getting it up on the IR website so it could be up. I mean, I typically try to get ahead of things.
**Q. But why? Why -- why would it go up on the investor website?**
A. Because decks go on our IR website. There's a deck there prior.
**Q. Okay. So it is protocol for decks to go up on the IR website; correct?**
A. In a form.
**Q. What does "in a form" mean?**
A. There's a difference between a board deck and a public deck.
**Q. Understood. And we're going to get to**

**that shortly. But I'm trying to understand from a public deck standpoint, is it Abacus' protocol after a board meeting for the public deck to go on the investor website?**

A. I can't speak to our current protocol.

**Q. I believe you just testified that there is a board -- there is a deck on the website, and that you were using initiative because you knew that, after meetings, decks go on the investor website. Is that not what you testified?**

A. Yes. I'd like to clarify. You asked is that our protocol. I can't speak to our current protocol.

**Q. Was that your protocol then?**

A. Our protocol at the time was, as far as I know, not one we had. I don't -- I don't know of a protocol at the time.

**Q. Okay. So you just, on your own, went to the Nasdaq platform, pulled the deck. And what did you do next?**

A. Sent it to Marissa at ICR and asked her to post it.

**Q. And why did you do that?**

A. Again, taking initiative to get it up on the website.

**Q. And why did you want it up on the website?**

MS. MESSINGER: Objection.

THE WITNESS: Yeah, I -- I can't recall my exact mindset at that time.

BY MS. JUNGER:

**Q. What would be the difference between a public deck and a board deck?**

A. I would assume the content. I'm not responsible for those.

**Q. Who is?**

A. I don't know.

**Q. So as chief marketing officer, you don't know who prepares the public deck that goes on the website that investors see.**

A. That's correct.

**Q. Wouldn't that have to do with marketing?**

MS. MESSINGER: Objection.

BY MS. JUNGER:

**Q. It's what the world sees.**

MS. MESSINGER: Objection.

THE WITNESS: One, I don't know; right? That's not my definition, so --

MS. JUNGER: I show it's 12:34. I can keep going, but if we want to take a break at 12:30, we can do so now.



e2b6859b-b218-480f-b9dc-547a8e116de3

MS. MESSINGER: Yeah, we've --
THE WITNESS: Yep, we're gonna eat lunch.
MS. JUNGER: Okay. What time do you want to be back?
THE WITNESS: What time is it?
MS. MESSINGER: 45.
THE WITNESS: Yeah, 12:45 is fine.
MS. MESSINGER: No, no, no.
THE WITNESS: Oh, sorry. 45 minutes. I apologize. So --
MS. MESSINGER: I was, like, that's, like, ten minutes.
THE WITNESS: 45 minutes. I apologize.
MS. JUNGER: So, like, 1:15?
THE WITNESS: That works.
MS. JUNGER: Okay. All right. See you at 1:15.
THE WITNESS: Thank you.
THE VIDEOGRAPHER: We're off the record at 12:35.
(Thereupon a lunch recess was taken, after which the following proceedings were had:)
THE VIDEOGRAPHER: We're back on the record at 1:25.
BY MS. JUNGER:



e2b6859b-b218-480f-b9dc-547a8e116de3

**Q. Okay. Before we jump into questions, I hope you had a nice lunch. And I just want to ask: Did you speak to anyone, including your lawyers, about this deposition during the break?**

A. No.

**Q. Okay. So we left -- last left off discussing kind of what happened after the board meeting and the differences between the public deck and the board deck, so I'm going to pick up right where we left off.**

**You had mentioned that you pulled the deck from the Nasdaq platform, but the board deck was also saved on the Abacus internal website; correct?**

A. If you -- can you clarify that question?

**Q. Sorry. Sorry. I didn't mean website. Sorry. Strike that.**

**The board deck was also saved on the Abacus internal system; correct?**

A. It -- it would have had to be on my desktop to download it from the website, yes.

**Q. Okay. So you had it on your desktop.**

A. I don't recall, but, yes, most likely.

**Q. And were you made aware at any point that the board deck had confidential information in it?**

MS. MESSINGER: Objection.

THE WITNESS: Not that I remember, no.
BY MS. JUNGER:
**Q. Okay. And why -- why would there be a public deck and a board deck? What's the purpose of having two different decks?**
A. As I've learned since then, there's -- there's differences in the information that's presented.
**Q. Like what?**
A. I can't speak to that. I don't prepare them.
**Q. Is it your testimony that as of November 2023, you did not know there was a difference between a public deck and a board deck?**
A. That's correct.
**Q. Okay. Do you know -- do you know what type of information would be taken out of the public board deck?**
MS. MESSINGER: Objection.
THE WITNESS: No. Not in my wheelhouse.
BY MS. JUNGER:
**Q. Do you know what steps Abacus takes to ensure that the board deck is not disseminated beyond the board meeting?**
A. No.

**Q. Do you know what purpose the public deck serves?**

A. No.

**Q. Do you know if the -- do you know if the rules affiliated with being a publicly-traded company require Abacus to post a public deck?**

MS. MESSINGER: Objection.

THE WITNESS: I do not know that.

BY MS. JUNGER:

**Q. When the public deck gets posted to the investor website, how long does it stay up?**

A. I don't know that answer either.

**Q. Do you know if it's, like, until the next one? Like, it stays up until you have another public deck to put up?**

A. It's -- it's not my job, so, no.

**Q. Is there only ever one deck at a time, or can you kind of toggle around and see, like, last year, this was the deck posted? Last quarter, this was the deck that was posted?**

A. I'm not aware.

**Q. Okay. So, ultimately, we know that at some point between November 9th and November 14th the board deck -- which, again, I think that was Exhibit 5?**



e2b6859b-b218-480f-b9dc-547a8e116de3

MS. JUNGER: Jan, can you correct me if I'm wrong on that?

THE COURT REPORTER: No, the board deck was Number 4.

MS. JUNGER: Exhibit 4. Okay.

BY MS. JUNGER:

**Q. So at some point between November 9th and November 14th, the board deck, which we introduced as Exhibit 4, was posted to Abacus' investor website.**

MS. MESSINGER: Objection.

MS. JUNGER: What's the objection? I haven't even finished my question.

MS. MESSINGER: Well, if you're asking him in his personal capacity versus his 30(b)(6), the 30(b)(6), it's a defined term.

BY MS. JUNGER:

**Q. Okay. I'm asking in your personal capacity. Do you know that at some point between November 9th and November 14th, 2023, the board deck was posted to Abacus' investor website?**

A. I can't recall the exact date.

**Q. Okay. As corporate rep, do you know that at some point between November 9th and November 14th, the board deck was posted to Abacus'**



e2b6859b-b218-480f-b9dc-547a8e116de3

**investor website?**
A. I still cannot recall the exact date, but, yes.
**Q. Okay. I'm not asking for the exact date. I'm just saying, at some point in that time period.**
A. Yes.
**Q. Okay. What happened there? How did that get posted?**
A. I downloaded it from Boardvantage, I sent it to Marissa at ICR, and she posted it.
**Q. Okay. I'm going to show you the next exhibit, which I believe is 7, but for some reason, I keep messing up these numbers.**
THE COURT REPORTER: No, it's 8.
MS. JUNGER: It's 8? Okay. Sorry.
THE COURT REPORTER: 7 was the board meeting minutes.
MS. JUNGER: Okay. Thank you. 8. I will remember now, I promise.
(Thereupon a document was marked Plaintiff's Exhibit 8 in the proceeding.)
BY MS. JUNGER:
**Q. Okay. I'm showing you now Defendant's Responses and Objections to Plaintiff's First Set of Interrogatories. Have you ever seen this**



e2b6859b-b218-480f-b9dc-547a8e116de3

**document?**

A. No.

**Q. Do you know what an interrogatory is?**

A. No.

**Q. Okay. I'm going to show you a question and the response.**

**Okay. At Interrogatory Number 6, RiverRock asks Abacus, "Describe in detail the circumstances under which the Board Deck containing RiverRock's confidential information was published to Abacus' website, including the date and time of posting, who authorized or caused the posting, and the reasons for doing so."**

**Abacus answers. There are some objections there. For the record, I'm saying they're there, but I'm going to skip past them and answer -- or and read the answer.**

**"Defendant states that the Board Deck which included two pages referencing Plaintiff out of a total of 38 pages, was inadvertently posted on Defendant's investor website at https://ir.abacusgm.com under the Presentations subtab during the period from November 14, 2023 at 10:26 AM Eastern Standard time to November 15, 2023 at 3:30 PM Eastern Standard Time. Defendant**

**further states that the Board Deck was inadvertently sent by Jeff Smith to ICR, Inc., who then sent the Board Deck to Notified to be posted on Defendant's investor website."**

**Does that answer -- or is that answer consistent with your recollection of what happened?**

A. Yes.

**Q. Who is Notified?**

A. I can't speak to exactly who Notified is.

**Q. Have you ever heard of the name Notified? It's capitalized, so it appears to be a name of an entity.**

A. I have heard the name Notified, yes.

**Q. What do you know about it?**

A. Nothing, to be honest with you. I've heard the name in passing.

**Q. Okay. So you are here today as corporate rep on this specific topic of how the board deck came to be posted.**

A. Uh-hum.

**Q. Were you prepared on who -- on how it got posted?**

MS. MESSINGER: Objection.

THE WITNESS: No. I mean, what -- can you define "prepared"? I'm sorry. I want to make

sure I answer this properly.
BY MS. JUNGER:
**Q. Did you prepare for the deposition today on how the board deck got posted to the investor website?**
A. No.
**Q. Did you review this document in your preparation?**
A. No.
**Q. Did you -- did any of your preparation involve refreshing your memory on who Notified is or what Notified did or what their role was in posting the board deck?**
A. No.
**Q. As you sit here today, you can't tell me who Notified is?**
A. I don't recall who Notified is. We've had a lot of vendor contracts, so --
**Q. Do you know if Notified is a part of ICR or if they're a different entity?**
A. I don't know.
**Q. Okay.**
MS. JUNGER: I'd like to enter this as Exhibit 8.

And for the record, I don't believe that Mr. Smith is adequately prepared on this topic, because Notified is a part of how the board deck was posted, and he does not have any recollection of who they or what their role is. So we will continue, but we reserve the right to reopen this deposition and reserve all remedies related thereto.

MS. MESSINGER: And we'll make an appropriate objection at the appropriate time.

MS. JUNGER: When would the appropriate time be? I believe it's now.

MS. MESSINGER: If you want to -- I'm not going to engage on the record, but you're reserving your rights and we're objecting and we'll make an objection at the appropriate time if you want to reopen.

MS. JUNGER: What is your objection to our record --

MS. MESSINGER: Outside the scope.

THE COURT REPORTER: I'm sorry?

MS. JUNGER: I can't hear you.

MS. MESSINGER: Outside the scope.

MS. JUNGER: So, for the record, I am pulling up what I believe was marked as

Exhibit 2, which is the re-notice. The topic is: The uploading of the slide deck to Abacus' investor website in November 2023. How is that outside the scope?

MS. MESSINGER: You can ask him questions. We're reserving our right to object if you choose to reopen it.

BY MS. JUNGER:

**Q. Mr. Smith, if Notified played a role in uploading the board deck to the website --**

A. Uh-hum.

**Q. -- wouldn't that be a part of the topic that you were designated to speak on?**

MS. MESSINGER: Objection.

THE WITNESS: Yeah, I -- I can't speak to what the topic is.

BY MS. JUNGER:

**Q. So you're here to testify on a topic that you can't speak to the scope of the topic.**

MS. MESSINGER: Objection. Mischaracterizes the witness's testimony and also what's written.

MS. JUNGER: That's a speaking objection, so please stop coaching the witness.

THE WITNESS: No, I can't speak to the

topic you presented and define it for you. That's all.

BY MS. JUNGER:

**Q. So you can't speak to the topic that you are here to present on. That's your testimony.**

MS. MESSINGER: Objection.

THE WITNESS: I can absolutely speak to exactly what happened in Topic 11. I cannot speak to your representation of it or your perception of it.

BY MS. JUNGER:

**Q. Well, I'm reading directly from an interrogatory that is signed and sworn by Abacus that stated, Notified, capital N, played a role in how the slide deck was uploaded to the website. And you're telling me you cannot tell me who Notified is or what their role is; correct?**

MS. MESSINGER: Objection.

THE WITNESS: I -- can you -- can you return to the previous doc that you're referencing?

BY MS. JUNGER:

**Q. Yes. Back to Exhibit 8.**

A. Uh-hum. So ICR sent the board deck to Notified, according to this documentation. I did

not.

**Q. Did you take any steps to call ICR to learn who Notified is?**

A. No.

**Q. Did you ask anyone at Abacus why ICR would have sent the board deck to Notified?**

A. No.

**Q. Did you ask anyone why a third entity would have been involved in the posting of this deck?**

A. No.

**Q. Did you do anything to learn who Notified might be?**

A. No.

**Q. Do you have any indication of what the relationship between ICR and Notified is?**

**Hello?**

THE VIDEOGRAPHER: I think he froze.

MS. JUNGER: I think he's frozen too.

THE VIDEOGRAPHER: Do you want to go off the record?

MS. JUNGER: Yeah.

THE VIDEOGRAPHER: We're off the record at 1:41.

(Off the record.)

THE VIDEOGRAPHER: We're back on the record at 1:43.

MS. JUNGER: Okay. So we froze before. I had a question outstanding, so I'm going to have the court reporter read it back so that you can answer it.

THE WITNESS: Okay.

THE COURT REPORTER: The question was: Do you have any indication of what the relationship between ICR and Notified is?

THE WITNESS: No.

BY MS. JUNGER:

**Q. Did you know that someone other than ICR was responsible for posting to the investor website?**

A. No.

**Q. Do you know what ICR's role is if it's really someone else that posts to the website?**

A. They're an investor relations company. That's all I know about their role.

**Q. I believe you testified earlier that they were responsible for managing the investor website. Is that not what you testified?**

A. Yes, as a part of their duties as an investor relations company; that's correct.



e2b6859b-b218-480f-b9dc-547a8e116de3

**Q. Okay. So in preparing for today's deposition, I just want the record to be really clear, you did nothing to prepare yourself on learning about who exactly posted the board deck to the investor website.**

MS. MESSINGER: Objection.

THE WITNESS: From my perspective, that's ICR.

BY MS. JUNGER:

**Q. What do you mean, from your perspective?**

A. As specifically noted in the documentation in front of me, I sent the board deck to ICR. That's where my participation in this ended.

**Q. Correct, but you're here as the corporate representative. You're not here as yourself. On this topic, you speak for the company. So while you may have sent it to ICR, the company's sworn interrogatories say that ICR sent the board deck to Notified. So are you telling me that the interrogatories are incorrect, or are you telling me that you're not prepared on this topic?**

MS. MESSINGER: Objection.

THE WITNESS: I can't speak to either of those.

BY MS. JUNGER:



e2b6859b-b218-480f-b9dc-547a8e116de3

**Q. Do you know, as you sit here today, whether ICR posted the deck or whether Notified posted the deck?**
A. I know what I see in front of me.
**Q. That's not answering my question.**
**Do you know, as you sit here today, whether ICR posted the deck or whether Notified posted the deck?**
A. From my understanding, ICR posted the deck.
**Q. So is it your understanding that these sworn interrogatories are wrong?**
MS. MESSINGER: Objection.
THE WITNESS: Again, I cannot speak to that.
BY MS. JUNGER:
**Q. How did you prepare yourself to be confident that ICR is who posted the board deck?**
A. Marissa from ICR is one that replied to me and said the board deck is posted.
**Q. Did you ever ask Marissa who posted it?**
A. No.
**Q. Did you ever ask anyone who posted it?**
A. No.
**Q. Were you consulted at all in the**



e2b6859b-b218-480f-b9dc-547a8e116de3

**preparation of these interrogatories?**

MS. MESSINGER: Objection.

THE WITNESS: No. Not that I recall.

BY MS. JUNGER:

**Q. Did you ask -- I'll move on. That's okay.**

**These interrogatories were signed by Jay Jackson. Did you ask Mr. Jackson if he knew who posted the board deck?**

A. No.

**Q. Did you have any conversations with Mr. Jackson about who posted the board deck?**

A. Not that I recall.

**Q. How did you come to send ICR the wrong board deck?**

MS. MESSINGER: Objection.

THE WITNESS: Can you define that?

BY MS. JUNGER:

**Q. Well, we discussed that there's a public deck which is supposed to go on the investor website, and there's a board deck, which we've shown you as Exhibit 4. And throughout this deposition, when we refer to the board deck, we've been referring to what we've shown as Exhibit 4. I can show you that again if you'd like.**

**When I'm saying, "the wrong board deck," I'm**

**referring to the board deck that was not meant for public viewing, as opposed to the public deck that is meant for public viewing.**

**How did you come to send ICR the board deck instead of the public deck?**

A. I downloaded it from Boardvantage, as mentioned prior, and attached it to an e-mail and sent it to them.

**Q. Did you ask anyone how the wrong document was posted to the Nasdaq platform?**

MS. MESSINGER: Objection.

THE WITNESS: I can't speak to the correctness of the document, nor how it was posted.

BY MS. JUNGER:

**Q. Well, you acknowledge that the board deck -- again, Exhibit 4 -- was not supposed to be on the investor website; correct?**

MS. MESSINGER: Objection.

THE WITNESS: I can't speak to that.

BY MS. JUNGER:

**Q. What systems does Abacus have in place to make sure that the correct documentation is uploaded to the investor website?**

A. I don't know.

**Q. What systems are in place between Abacus and ICR to ensure that, when ICR receives documentation, it is the correct documentation before it's posted to the website?**

MS. MESSINGER: Objection.

THE WITNESS: I don't know.

BY MS. JUNGER:

**Q. Okay. I'm going to show you what I'm going to enter as Exhibit 9.**

**(Thereupon a document was marked Plaintiff's Exhibit 9 in the proceeding.)**

BY MS. JUNGER:

**Q. This is an e-mail from you, jeff@abacuslife.com, to Marissa Young, marissa.young@icrinc.com. Is that, or was that at the time, your correct e-mail address?**

A. Correct.

**Q. Do you recognize this document as having been sent by you?**

A. Yes.

**Q. What's the date on this document?**

A. Tuesday, 14th November 2023.

MS. JUNGER: And for the record, we're looking at the document that's Bates-labeled as Abacus 0001110.

BY MS. JUNGER:

**Q. Can you read the e-mail?**

A. "Hey Marissa,

"Here is the Q3 board deck for the ir website.

"Thanks!"

**Q. And you testified earlier that you didn't really interact with ICR very often; is that correct?**

A. That's correct.

**Q. So when you say, "Hey Marissa," was this the first time you had ever e-mailed her?**

A. Not likely, but I don't recall.

**Q. You don't give any explanation as to, you know, who you are or what the purpose of the e-mail is; right?**

A. No. That's my e-mail signature's primary role.

**Q. Well, typically, when you're speaking with someone for the first time, you might introduce yourself in an e-mail; right?**

MS. MESSINGER: Objection.

THE WITNESS: I can't speak to that. That's just personality.

BY MS. JUNGER:

**Q. Well, what would you do if you've never**



e2b6859b-b218-480f-b9dc-547a8e116de3

**spoken to someone?**
A. I would say, "Hey," and then I have an e-mail signature.
**Q. Okay. So I'm trying to get a clear answer from you. Was this the first time that you had spoken with Marissa Young, or did you previously e-mail with her?**
A. Sure. Again, I don't recall; right? I e-mail a lot of people every day. I'm sure me and Marissa have been on e-mails together at some point. This is three years --
**Q. Was this the first time you ever sent her a board deck?**
A. Yes.
**Q. When you sent the board deck, did you review it?**
A. No.
**Q. So you pulled the deck and you sent it, but you didn't take the time to open it up and look and see what was in there?**
A. That's correct.
**Q. Okay. And can you read me what the title of the attachment is?**
A. Board Deck 3Q Final 11-9-23.
**Q. So there's no reference to it being a**

**public deck in the attachment; right?**

A. Doesn't appear that way.

**Q. And that didn't trigger to you that perhaps this wasn't the version you should be sending?**

MS. MESSINGER: Objection.

THE WITNESS: No.

BY MS. JUNGER:

**Q. When you pulled the deck, did you see the first page where it said third quarter board presentation?**

A. Again, as previously stated, I did not review the deck.

**Q. So you didn't see anything in it. You just kind of dragged and dropped it into the e-mail?**

A. Yes, again, I did not review the deck.

**Q. Okay. I'm asking, you did not review the deck, so you pulled it from the Nasdaq website and just put it in an e-mail. That's all you did with it.**

MS. MESSINGER: Objection.

THE WITNESS: I can't recall the exact motions my mouse took.

BY MS. JUNGER:

**Q. I'm not asking for the exact motions your mouse took. I'm just saying, all you did with it was put it in an e-mail.**
A. Yes. As far as I remember, yes.
**Q. Okay.**
MS. JUNGER: I'll enter that as Exhibit 9.
BY MS. JUNGER:
**Q. One more question on this. Would you -- strike that.**
**You were at the November 9th board meeting, as you testified earlier; right?**
A. As far as I remember, yes.
**Q. And you saw the board deck at that meeting; right?**
MS. MESSINGER: Objection.
THE WITNESS: I can't speak to what was presented at that meeting.
BY MS. JUNGER:
**Q. You were there, but you have no recollection whatsoever of what was presented at the meeting?**
A. There was certainly a presentation. I couldn't tell you exactly what it was.
**Q. Okay. Perhaps now that's your testimony, but if you were at the board meeting on**

**November 9th, 2023, and you sent this e-mail on November 14th, 2023, that was only a few days later, is it your testimony that even then you didn't remember what was presented at the board meeting?**

A. I can't recall what I -- exactly what I remembered on that date from the board meeting.

**Q. Okay. But you were at the meeting. Yes?**

A. That's correct.

**Q. Presumptively, since you were at the meeting, you were present when the board deck was shown.**

MS. MESSINGER: Objection.

THE WITNESS: Again, I cannot tell you what was shown at that meeting. It's outside of my limits.

BY MS. JUNGER:

**Q. I don't -- you keep saying it's outside of your limits, but you're a person testifying as to your own personal knowledge at what happened at the board meeting. You were at the board meeting.**

A. That's correct.

**Q. So is it your -- is it your testimony that you, you know, spaced out the whole meeting and have no recollection of what happened? You just**

**don't remember? I -- outside of your limits is not -- if you don't remember, you don't remember, but saying it's outside of your limits isn't really addressing the questions.**

A. I should be clear. You asked what was presented there. I didn't prepare the presentation. I can't tell you that --

**Q. But you were there. You were sitting --**

A. Correct.

**Q. -- at the board meeting. So --**

A. And there was --

**Q. -- what was presented?**

A. There was a PowerPoint presentation.

**Q. And when you sent this e-mail to Marissa, it didn't trigger in your mind, hey, this is the exact same presentation that I saw sitting at that board deck -- sitting at that board meeting.**

A. Again, I did not review the document that I sent to Marissa.

**Q. But you saw the title.**

MS. MESSINGER: Objection.

THE WITNESS: I don't know that I saw the title.

BY MS. JUNGER:

**Q. When you attached the e-mail, you didn't**

**see what the document was saved as? Right here where it says -- right there where it says, Board Deck Q3 Final 11/9/2023? You didn't see that when you sent the e-mail?**

A. Safe to say that's likely a deck.

**Q. And that deck has the same date of the meeting you attended just a few days prior; right?**

A. I don't recall the date, nor do I know, again, that this was the exact same thing. I can't speak to that.

**Q. I'm going to show you what I'm going to enter as Exhibit 10.**

**(Thereupon a document was marked Plaintiff's Exhibit 10 in the proceeding.)**

BY MS. JUNGER:

**Q. This is from Marissa Young to you on November 14th. This appears to just be -- be followup of the e-mail we just looked at.**

**You write to her, saying, "Here is the Q3 board deck for the ir website."**

**And she says, "Thank you! I will add it to the site."**

**Do you recall sending and receiving this e-mail?**

A. I don't remember sending and receiving

this exact e-mail. I've seen it since.

**Q. Did you take any action after she told you that she would add it to the site?**

A. Not until a followup e-mail asking her to take it down from the site.

**Q. Did you call her and have any discussions about -- sorry.**

**Prior to you asking her to take it down, did you call her and have any discussions about what would be uploaded to the site, the investor site?**

A. No.

**Q. Did you let her know, you know, please review to make sure that this is the public deck?**

A. No.

**Q. Did you ask her to, you know, double-check that this was the correct document to be posted?**

MS. MESSINGER: Objection.

THE WITNESS: No. And I don't know what the correct document to be posted is, to be clear.

BY MS. JUNGER:

**Q. So as you sit here today, is it your testimony that you don't believe there was an error in posting the board deck to the investor website?**

MS. MESSINGER: Objection.

THE WITNESS: It's completely outside of my scope.

BY MS. JUNGER:

**Q. In your individual capacity, do you believe that there was an error in posting the board deck to the investor site?**

MS. MESSINGER: Objection.

THE WITNESS: I don't have an opinion.

BY MS. JUNGER:

**Q. Okay. So you don't have an opinion, but you do eventually ask Marissa to take it down; right?**

A. That's correct.

**Q. Who told you to do that?**

A. Jay Jackson.

**Q. How?**

A. Phone call.

**Q. What did he say?**

A. Pull down this deck, or have ICR take down this deck.

**Q. Did you have -- did anyone else tell you?**

A. No.

**Q. I'm going to show you what I'm going to enter as Exhibit 11.**

MS. JUNGER: Right, Jan?

THE COURT REPORTER: Yes.

MS. JUNGER: Okay. Thank you. And that is Bates Stamp 0001629.

(Thereupon a document was marked Plaintiff's Exhibit 11 in the proceeding.)

BY MS. JUNGER:

**Q. Okay. This is a chain from Marissa Young to you on November 15th, 2023. Is that your e-mail address at the time?**

A. That is.

**Q. Okay. I'm going to scroll to the bottom of the chain so that we can read it from the beginning.**

**You write, on November 15th, 2023, "Hey 911 here. Let's get that 3Q board deck pulled ASAP. Sorry about that it's not ready to go up yet, Replace it with the 2Q deck we already had up."**

**Do you recall sending this e-mail?**

A. Yes.

**Q. What does "911" here mean?**

A. Urgency.

**Q. So you testified a moment ago that you're still not sure that there was an error made in posting the board deck to the investor website, but here you're saying, "911 here," which means**



e2b6859b-b218-480f-b9dc-547a8e116de3

**urgency. So how do you reconcile those?**

MS. MESSINGER: Objection.

THE WITNESS: Anything that my CEO asked me to do I consider urgent. Doesn't matter what it is.

BY MS. JUNGER:

**Q. So -- so when Mr. Jackson told you to take it down, did you ask why?**

A. No.

**Q. Did you ask any questions?**

A. No. It's not my place.

**Q. So the call just went, hey, pull down the board deck, and you said, okay, and then you hung up? That was it?**

A. "Yes, sir."

**Q. Nothing else was said or discussed about the deck.**

A. No.

**Q. Okay. And when you say, "911 here," you're -- you're testifying that there was an urgent request to take it down.**

A. Again, anything my CEO asked me to do is urgent. It takes top priority, I'm going to do it immediately, and I'm going to convey that upon anybody else.



e2b6859b-b218-480f-b9dc-547a8e116de3

**Q. So how regularly do you get calls from your CEO?**

A. Outside of work hours, very rarely.

**Q. What time did he call you?**

A. I don't know.

**Q. Was it outside of work hours?**

A. Again, I don't know.

**Q. Well, you testified, "outside of work hours, very rarely," so I'm trying to figure out if the call was outside of work hours since you -- you raised that.**

A. Yeah, I would assume no, because this e-mail was at 3:22 p.m.

**Q. Okay. Was it typical for you to get unplanned phone calls from your CEO?**

A. No.

**Q. Okay. So you get this unplanned phone call from your CEO telling you to take the board deck down, and you understand that there's a sense of urgency there, but you didn't ask any questions as to why it should be pulled down?**

A. Yeah, let me reiterate. I'm -- I'm not going to question something that comes from my CEO. I just do it.

**Q. I'm not asking if you were questioning**



e2b6859b-b218-480f-b9dc-547a8e116de3

**him. I'm asking if you, for yourself, wanted to learn more information about what was wrong with the board deck?**

MS. MESSINGER: Objection.

THE WITNESS: You're asking if I questioned him, which I did not, no.

BY MS. JUNGER:

**Q. I'm not asking if you questioned him. I'm asking if you had any further discussions with him about why he pulled -- why it should be pulled down.**

A. No, I did not ask him anything, did not have any further discussions. I pulled it down. Or Marissa did.

**Q. Okay. So you say, "Hey 911 here." You're testifying that that means there's urgency, but you don't really know why.**

A. Again, the urgency is implied through him making a request of me. That's it.

**Q. You're not answering my question. I'm saying --**

A. Yes, it is.

**Q. -- you don't know why he wanted you to pull it down. You don't know why there was --**

A. To be clear, you're asking me two

questions. You're asking me to establish what the urgency was, which is him asking me to do something, and then you're asking me to establish if I understand what the urgency was for. The answer to one is the urgency is him asking. The answer to two is, no, I'm not going to question why he asked me to do something.

**Q. Did you call Marissa to make sure she received this e-mail?**

A. No.

**Q. So you have this sense of urgency, and you're just going to send the e-mail out and hope she gets it quickly?**

A. No.

**Q. No, you're not going to hope she gets it quickly? I don't understand your answer there.**

A. The answer is, am I going to send it out and hope she gets it quickly? No, that's not the intent behind sending an e-mail.

**Q. Well, you're saying that there's urgency, "911 here," so I'm asking if you followed that up with a call to make sure she saw your e-mail.**

A. No.

**Q. Okay. So she responds -- or, no. Sorry. You respond to that. Let's see. This is at 3:26**

**and this is at 3:22. So four minutes later, you respond, "If possible can we see if anyone clicked or downloaded the deck?"**

**What prompted that followup e-mail four minutes later?**

A. Being --

MS. MESSINGER: Objection.

THE WITNESS: Being proactive.

BY MS. JUNGER:

**Q. Did Mr. Jackson ask you to find that out?**

A. I can't recall.

**Q. Why did you want to know who clicked or downloaded the deck?**

A. I can't make assumptions around that.

**Q. Well, you sent the e-mail. So why did you want to know if someone clicked or downloaded the deck?**

A. Again, I can't assume why that question was asked at that time. This was three years ago.

**Q. So you can't tell me why you sent this specific e-mail.**

A. Not without making assumptions, which I won't do.

**Q. I'm just trying to understand your answer here.**

A. Uh-hum.

**Q. This is your own action, and you're telling me you'd need to assume about something that you did. Is that -- you don't remember why you sent this e-mail?**

A. I can't tell you my exact head space three years ago, no. I can tell you why I would send that e-mail today, but, again, that's not the question and I won't answer that.

**Q. And you don't recall if you were told by anyone to ask this question.**

A. No.

**Q. But you were obviously troubled enough that you sent an e-mail four minutes later with a followup question; right?**

MS. MESSINGER: Objection.

THE WITNESS: I don't -- I don't see where I conveyed trouble here, but, no, I just sent another e-mail.

BY MS. JUNGER:

**Q. Marissa responds at 8:30, so that's several hours later, saying, "Presentation is removed."**

**Did you talk to her at all between the hours of 3:26 and 8:30?**

A. Not that I recall.

**Q. She says, waiting to see if they can view who has clicked on it. Who is "they"?**

A. I don't know.

**Q. Did you ask?**

A. No.

**Q. Did you receive any reprimands or punishment for sending that board deck to Marissa?**

MS. MESSINGER: Objection.

THE WITNESS: Not that I recall, no.

BY MS. JUNGER:

**Q. Did you have any further conversations with Mr. Jackson about the posting of the board deck?**

A. Not that I recall.

**Q. Were any e-mails sent between you and Mr. Jackson about the posting or the -- the -- strike that.**

**Were any e-mails sent between you and Mr. Jackson regarding your sending of the board deck to Marissa at ICR?**

A. Not that I recall.

**Q. Do you have performance reviews?**

A. Yes.

**Q. Was there any discussion in your**

**performance review about your sending of the board deck to Marissa at ICR?**

A. Again, three years ago, not that I recall.

**Q. Did you have any discussions with anyone else at Abacus about your sending the board deck to Marissa at ICR?**

A. Not that I recall.

**Q. At any point from November 2023 through now have you had any discussions with anyone at Abacus regarding your sending of the board deck to Marissa at ICR?**

A. Not that I recall. No, not that I can immediately recall.

**Q. So is it your testimony that upon your telling her to take the board deck down and her confirming that the board deck was taken down, that that was it? That was a closed book, never to be discussed again?**

A. No. I said, not that I recall. It is not my testimony that nothing ever occurred after that. I -- I don't recall anything, though.

**Q. Is it your testimony that after you e-mailed Marissa and she told you she took it down, that you do not recall having any other discussions with anyone at Abacus or ICR about your sending the**



e2b6859b-b218-480f-b9dc-547a8e116de3

**board deck to Marissa to post on the investor website?**
A. No. To clarify, you asked anybody from Abacus earlier. Marissa presumably responded to that e-mail that I sent her when she said she's --
**Q. Well, we're -- we're looking at the e-mail. We're --**
A. Correct.
**Q. Okay. So after that, after that, where she said, "Presentation is removed," and the presentation gets removed --**
A. Uh-hum.
**Q. -- is it your testimony that you have no recollection of any further conversations with anyone at Abacus or at ICR about your sending of the board deck to Marissa?**
A. Correct.
**Q. Did you discuss it with anyone else?**
A. No.
**Q. So it was just call from Jay Jackson, e-mails back and forth with Marissa, no further discussion with anyone else.**
MS. MESSINGER: Objection.
THE WITNESS: Out of my scope after that, is really the answer.

BY MS. JUNGER:

**Q. That's not an answer. I'm asking your recollection.**

A. Yes. After that, it's out of my scope. It's --

**Q. What does out of your scope mean? You either remember something or you don't, it either happened or it didn't, but out of your scope is not an answer to my question. You might say, "I was not involved in other conversations," but "out of my scope" does not answer the question.**

**So I'm asking you, as you sit here today --**

A. Uh-hum.

**Q. -- aside from that call with Jay Jackson where he tells you, take down the board deck, you e-mail Marissa, she e-mails back, the board deck's taken down, you did not discuss the sending of this board deck to Marissa with anyone else at any time until, presumptively, yesterday when you prepared with your counsel.**

A. Not that I recall, no.

**Q. You had asked Marissa to see who downloaded the deck. Were you ever able to confirm with her who downloaded the deck?**

A. Not that I recall.



e2b6859b-b218-480f-b9dc-547a8e116de3

**Q. Did you follow up?**

A. Not that I recall. There's no way I'd remember an e-mail chain from three years ago like that.

**Q. I'm going to show you what I'm going to introduce as --**

MS. JUNGER: Why do I not remember these? I think it's 13. Right?

THE COURT REPORTER: No. 12. 12 will be the next.

MS. JUNGER: I'm so sorry.

THE COURT REPORTER: It's okay.

MS. JUNGER: I'm going to show you what I'm going to introduce as Exhibit 12.

(Thereupon a document was marked Plaintiff's Exhibit 12 in the proceeding.)

BY MS. JUNGER:

**Q. This is continued of that chain with Marissa. It's titled -- or Bates-stamped Abacus 0001634. We -- the last document we looked at is here where it says, Marissa -- from Marissa to Jeff Smith. "Presentation is removed." And she asks, "Do you want to add the August presentation back on the site? Or just leave it blank for now?"**

**You respond, "Let's leave it blank for now."**

**Why did you want to leave it blank for now?**

A. Because it's the default state. It was already blank.

**Q. Did anyone tell you that, or did you decide that on your own?**

A. On my own.

**Q. Okay. And then she responds, "There's no way of knowing who clicked on it but it received 32 clicks."**

**Do you recall getting that answer?**

A. Yes.

**Q. And did you ask any followup questions about why she was unable to determine who clicked on it?**

A. No.

**Q. Did you --**

A. Not that I recall.

**Q. Did you report that answer back to anyone at Abacus?**

A. Not that I recall.

**Q. Did anyone at Abacus ever specifically ask you to find out who clicked on it?**

A. Not that I recall.

**Q. Did you share this information with anyone?**



e2b6859b-b218-480f-b9dc-547a8e116de3

A. Not that I recall.

**Q. Did you do any independent research on any ways that you could figure out who clicked on a link?**

A. Not that I recall.

**Q. Did you ask your own IT people if there's a way to uncover the IP addresses of who clicked on a link?**

A. Not that I recall.

**Q. Did you ask Marissa who she spoke to to get that answer?**

A. Not that I recall.

**Q. I'm now going to show -- oh, let's enter that as Exhibit 12.**

**I'm now going to show you what we're going to enter as Exhibit 13.**

**(Thereupon a document was marked Plaintiff's Exhibit 13 in the proceeding.)**

BY MS. JUNGER:

**Q. This is what I'm going to enter as Exhibit 13. This is still the same -- still the same chain. It just looks like things were sent kind of in piecemeal, so that's why we're looking at the same chain multiple times.**

**The top of this chain is from Marissa to you,**



e2b6859b-b218-480f-b9dc-547a8e116de3

**sent on November 15th at 8:26. Subject is, "Board Deck." And this is Bates-labeled as Abacus 0001496.**

**So, again, we've already discussed this. "If possible can we see if anyone clicked or downloaded the deck?"**

**And Marissa replies, saying, "I can ask Notified if they have access to that."**

**Do you recall receiving this e-mail?**

A. I don't recall this e-mail chain in general. I'm sure it occurred, though.

**Q. Did you follow up to say, "Who is Notified?"**

A. No.

**Q. Did you ask, "Can I speak to Notified so that I can find out if they have access to it?"**

A. Not that I recall, no.

**Q. Did you ask anyone at Abacus, "Who is Notified?"**

A. Not that I recall.

**Q. Did you understand what she meant when she said, "I can ask Notified if they have access to that"?**

A. I can't speak to my head space three years ago, but I would -- no.

**Q. Did you take any steps to understand who Notified is?**

A. Not that I recall.

**Q. Did you ultimately ever find out if Notified would be able to access who downloaded the deck?**

A. Not that I recall.

**Q. Okay. I'm going to show you --**

MS. JUNGER: Oh, let's enter that as Exhibit -- that's 14; right?

THE COURT REPORTER: No, that was 13.

MS. JUNGER: 13. My God. I'm very sorry. 13.

Okay. Now I'm going to show you what I'm going to enter as Exhibit 14. This is Bates-labeled as Abacus 0001472.

(Thereupon a document was marked Plaintiff's Exhibit 14 in the proceeding.)

BY MS. JUNGER:

**Q. Okay. So on November 17th, two days after all the e-mails that we just looked at, you again looked at -- you again e-mail Marissa. This time, you copy Jay Jackson.**

A. Uh-hum.

**Q. And you say, "Public deck for IR site. I**

**promise it's the right one this time."**

**Do you recall sending this e-mail?**

A. Not that I recall, no. I see it in front of me, though.

**Q. Do you have any reason to believe you didn't send this e-mail?**

A. No. No.

**Q. Okay. And just in general, all the e-mails that -- that we've looked at when you say you don't recall sending it, but you do acknowledge that that's your e-mail address, you have no reason to believe you didn't send those e-mails; right?**

A. No.

**Q. Okay. Why did you copy Jay Jackson here?**

A. It was previously mentioned, he's the one that asked me to take it down.

**Q. Okay. So you were just trying to keep him in the loop as to what was happening?**

A. That's correct.

**Q. Did he ask to be kept in the loop?**

A. Not that I recall.

**Q. Okay. You write, "I promise it's the right one this time."**

**Earlier, you testified that you still weren't sure if you ever sent the wrong one. So what did**



e2b6859b-b218-480f-b9dc-547a8e116de3

**you mean, "I promise it's the right one this time"?**

A. It's different than the one he asked me to pull down.

**Q. And the one that he asked you to pull down was the wrong one?**

A. I can't speak to that.

**Q. But the one you're sending is the right one?**

A. Yeah, you're implying two different contexts, but, yes.

**Q. Well, what -- okay. This time, on November 17th, you're saying, "I promise it's the right one." Correct?**

A. That's correct. I did say that right there.

**Q. Okay. And Jay Jackson replies, "Wait not yet!!!!" With four exclamation points. "I will send." Why is he --**

A. That's --

**Q. -- telling -- why is he saying, don't upload it yet?**

MS. MESSINGER: Objection.

THE WITNESS: I'm not Jay.

BY MS. JUNGER:

**Q. Did you ask?**



e2b6859b-b218-480f-b9dc-547a8e116de3

A. No.
**Q. Marissa replies, "No worries, Waiting!"**
**Did you ever come to learn why he asked to not send the one that you said was right this time?**
A. Not that I recall.
MS. JUNGER: Let's enter that as Exhibit 14.
Now I'm going to show you what I'm going to enter as Exhibit 15.
(Thereupon a document was marked Plaintiff's Exhibit 15 in the proceeding.)
BY MS. JUNGER:
**Q. So this is the same -- similar chain, but slightly different. This is Abacus 0000100. And Jay Jackson writes to Marissa and copies Garrett Edson, Chris Romaine, Bill McCauley, and cc's you.**
**Who is Garrett Edson?**
A. Looks like an ICR employee.
**Q. Did you know who he was at the time?**
A. Again, like most ICR employees, I'm sure I've met him, but I can't speak to a personal relationship.
**Q. Okay. And he sends it to Chris Romaine, who was on Abacus' legal team; correct?**
A. That's correct.



e2b6859b-b218-480f-b9dc-547a8e116de3

**Q. Did you know why Mr. Jackson was including legal at this point?**

A. Again, I'm not Jay.

**Q. Did you ever ask?**

A. No, not that I recall.

**Q. So you get an unexpected call from your CEO saying, take down the board deck; right?**

MS. MESSINGER: Objection.

THE WITNESS: Can you reframe that? I apologize.

BY MS. JUNGER:

**Q. I'm -- I'm backtracking a little bit, but back to, you know, November 15th, you get an unexpected call from your CEO asking you to remove the board deck from the IR website; right?**

MS. MESSINGER: Objection.

THE WITNESS: I received a call from Jay.

BY MS. JUNGER:

**Q. Okay. Earlier, you testified that it was an unplanned call. Is that no longer the case?**

A. Can you play that back for me where I said that?

**Q. Are you speaking to the court reporter?**

A. Whoever is fine. I'd just like to see the quote where I said it was an unplanned call.



e2b6859b-b218-480f-b9dc-547a8e116de3

THE COURT REPORTER: Did you want me to try to search for that, Ms. Junger?

MS. JUNGER: If the witness requested it, please do.

THE COURT REPORTER: I don't know if I can find it right now, but let's see.

I'm just searching the word "unplanned" before this and I'm not finding it, but that doesn't mean it's not there. It's just not coming up as a full word at this point.

MS. JUNGER: Can you try "unscheduled"?

THE COURT REPORTER: Sure.

MS. JUNGER: Or "scheduled"?

THE COURT REPORTER: No "unscheduled." No "scheduled."

MS. JUNGER: Could we go off the record for a second?

THE VIDEOGRAPHER: We're off the record at 2:25.

(Off the record.)

THE VIDEOGRAPHER: We're back on the record at 2:26.

BY MS. JUNGER:

**Q. I think I asked, were you expecting this call.**

THE COURT REPORTER: Do you want me to read you the question before he asked to play it back?

MS. JUNGER: Did you find what he's looking for?

THE COURT REPORTER: No, no, no. The question that you had asked was: "Earlier, you testified that it was an unplanned call. Is that no longer the case?"

And before that: November 15th, you received an unexpected call from your CEO asking you to remove the board deck from the IR website; right?

That was the question before all of that started.

MS. JUNGER: Yes. And what was his answer?

THE COURT REPORTER: He said, "I received a call from Jay."

MS. JUNGER: And what?

THE COURT REPORTER: And then you said, "Okay. Earlier, you testified that it was an unplanned call. Is that no longer the case?"

Answer. "Can you play that back for me where I said that?"



e2b6859b-b218-480f-b9dc-547a8e116de3

MS. JUNGER: No, you're -- you're reading the current questions. I'm asking you to go back. But this is unimportant, so let's just move on.

BY MS. JUNGER:

**Q. Was the call from Jay an expected call?**

A. It was a call. I can't speak to expected, unexpected.

**Q. Okay. Was it planned? Was it on your calendar?**

A. I don't know what my calendar looked like at that time.

**Q. So you got a call from Mr. Jackson telling you to take down the deck; correct?**

A. That is correct.

**Q. And you send Marissa an e-mail saying, 911, take the deck down; correct?**

A. That would appear to be correct, yes.

**Q. And then two days later, Mr. Jackson is putting you on an e-mail with Chris Romaine of legal counsel; correct?**

A. That's what the document in front of me says, yes.

**Q. And at that point, you didn't think, why is legal counsel involved in this?**

A. Like anything else, I can't tell you what my head space was three years ago. That would just be assumptions.

**Q. Did you ask?**

A. Not that I recall.

**Q. Okay. Mr. Jackson says, "Wait until Monday to upload."**

**And Marissa says, "Will do. Thank you!"**

**Do you know why he was asking to wait until Monday to upload?**

MS. MESSINGER: Objection.

THE WITNESS: Not that I recall.

BY MS. JUNGER:

**Q. Did you ask?**

A. Not that I recall.

MS. JUNGER: I'll enter that as Exhibit --

THE COURT REPORTER: 15.

MS. JUNGER: -- 15.

BY MS. JUNGER:

**Q. As you sit here today, do you know anything that was contained -- strike that.**

**Do you know -- strike that also.**

**I just want to be clear. It's your testimony today that you never looked at the board deck; right?**

A. I can't speak to if I never looked at it. I put slides in it, as you know.

**Q. But you've never reviewed the complete board deck.**

A. That's correct.

**Q. Were you ever told that there was confidential information within the board deck?**

MS. MESSINGER: Objection.

THE WITNESS: Not that I recall.

BY MS. JUNGER:

**Q. And as you sit here today under oath, you've testified that you didn't know there was a potential acquisition between Abacus and RiverRock; correct?**

A. That is correct.

**Q. Okay. I'm going to show you what I'm going to enter as Exhibit 16.**

**(Thereupon a document was marked Plaintiff's Exhibit 16 in the proceeding.)**

BY MS. JUNGER:

**Q. This is an e-mail from Jay Jackson sent to a bunch of people, including yourself.**

**And he writes: Somehow Coventry knows we are working on a deal with RiverRock and Reid is flying out to see RiverRock Friday. Super frustrating. I**



e2b6859b-b218-480f-b9dc-547a8e116de3

**am hopeful that no one said anything to anyone even by accident. This is non public information and will impact our potential deal. Always remember, anything we say or materials used in the board meeting or in the hallways is non public and we cannot tell anyone including our family.**
**Did you receive this e-mail?**
A. It would appear I did, yes.
**Q. And you've previously testified that, you know, when your CEO tells you to do something, you do it; right?**
A. Correct.
**Q. So, presumptively, when your CEO sends you an e-mail, you read it; right?**
A. That's correct.
**Q. Is it still your testimony that you did not know there was a potential acquisition between RiverRock and Abacus?**
A. Yeah, can you point to me where it says "RiverRock" in this e-mail?
**Q. "Somehow Coventry knows we are working on a deal with RR." Does "RR" mean RiverRock to you?**
A. "RR" doesn't mean anything to me. It's two letters.
**Q. So you get this e-mail from your CEO where**

**he says, "Super frustrating," someone is talking about a deal with RR, and you don't think, let me ask someone what "RR" is to make sure I'm not the one doing it?**

A. No. Again, I don't ask questions. That's not my job.

**Q. That's not what I was asking. Your CEO's concerned here. He's super frustrated. Those are his words.**

A. Uh-hum.

**Q. And you're not trying to figure out what he's talking about so that you can make sure you're not doing anything wrong.**

A. He didn't ask for any input in this e-mail, so I didn't give any input, nor ask any questions.

**Q. That's not what I asked. I'm saying, you receive an e-mail from your CEO where he is super frustrated, and you don't take any action to learn what he's talking about.**

A. Yeah, the safe assumption is, if I don't know what he's talking about, I'm not talking about it.

**Q. But you were at that board meeting; right?**

A. That's correct.

**Q. And you didn't understand that "RR" meant RiverRock, which was presented at the board meeting?**

MS. MESSINGER: Objection.

THE WITNESS: I don't recall.

BY MS. JUNGER:

**Q. What does "non public" mean to you?**

A. "Non public" means the opposite of "public."

**Q. Did you talk to anyone about this e-mail?**

A. Not that I recall.

**Q. When you saw the subject, "Coventry knows about RR deal," did you ask anyone what "RR deal" was?**

A. Not that I recall.

**Q. This was less than a week after the board meeting; right?**

A. It would appear that way by the date, yes.

**Q. And it didn't strike you that the "RR deal" was the same RiverRock deal discussed at the board meeting?**

MS. MESSINGER: Objection.

THE WITNESS: I don't recall the board meeting or how I felt about this e-mail.

BY MS. JUNGER:



e2b6859b-b218-480f-b9dc-547a8e116de3

**Q. When Mr. Jackson says: Always remember, anything we say or materials used in the board meeting is non public, what did you take that to mean?**

A. I don't recall. Again, three years ago.

**Q. What do you take that to mean right now?**

A. What do I take that statement --

**Q. What do you -- what do you understand that sentence to mean?**

A. It means materials that are used in board meetings or hallways are the opposite of public.

**Q. And if --**

A. I take it to mean exactly what it says.

**Q. And if materials that were discussed in board meetings became public, is that something that would be a problem?**

MS. MESSINGER: Objection.

THE WITNESS: I can't speak to that.

BY MS. JUNGER:

**Q. Well, if your CEO is telling you anything used in a board meeting is non public, I'm asking, if something used in a board meeting was made public, do you think that would be a problem for Abacus?**

MS. MESSINGER: Objection.

THE WITNESS: I can't speak to that. I'm not Jay.

BY MS. JUNGER:

**Q. I'm not asking you to speak for Jay. I'm asking what your interpretation would be.**

MS. MESSINGER: Objection.

THE WITNESS: I can't speak to that.

BY MS. JUNGER:

**Q. I don't understand what you're saying, "I can't speak to that." What can't you speak on? I'm asking for your interpretation of something. You don't have an interpretation?**

A. My interpretation is exactly as this is written, and I can't speak to what Jay's intent is at all times.

**Q. I'm not asking for Jay's intent. I'm asking how you received e-mail.**

**You're telling me that anything said in a board meeting is non public. So if something in a board meeting becomes public, do you think that would be an issue?**

MS. MESSINGER: Objection.

THE WITNESS: We should be clear, it does not say anything said in a board meeting is non public. It says anything we say or

materials used in the board meeting or in the hallway is -- is non public. Just as a point of clarity.

BY MS. JUNGER:

**Q. That doesn't -- that doesn't change my question.**

**If, "anything we say or materials used in the board meeting or in the hallways is non public," does that mean it should not go to the public?**

A. Yes, that is the opposite of "public." Or the opposite of "non public." I apologize.

**Q. But we do know that the information discussed at the board meeting did eventually become public; correct?**

MS. MESSINGER: Objection.

THE WITNESS: I don't know that, no.

BY MS. JUNGER:

**Q. What do you mean, you don't know that?**

A. I know that I'm talking to you about it right now, but prior to this case, I did not know that, no.

**Q. Well, you -- we just looked at an e-mail that said 32 clicks were on the deck. So is it your testimony that you did not understand that at least 32 people clicked on the board deck?**

A. That's what Marissa said, yes.
**Q. So you did know that eventually the information discussed at the board meeting and contained in the board deck became public.**
MS. MESSINGER: Objection.
THE WITNESS: No, I can't assume any of those clicks actually read anything, no.
BY MS. JUNGER:
**Q. Do you consider information being posted on a website to be private?**
A. It's not really my place to say.
**Q. I'm not asking if it's your place to say. I'm asking for your own thoughts and interpretation.**
**Do you believe if information is posted on a website that people outside of Abacus can access, that that means the information still retains its non-public status?**
MS. MESSINGER: Objection.
THE WITNESS: Again, I can't speak to public or non-public status. That's not a -- that's not something I assign.
BY MS. JUNGER:
**Q. So as you sit here today, you will not tell me one way or the other whether you believe**

**information posted on a website that the public can access is public or not public. I'm not asking if you're right.**

A. I can't speak to -- okay. I can't speak to if the information posted is public or non public. Is the information on the website, yes. That's all I can say.

**Q. Well, you just told me a moment ago that that e-mail from Jay Jackson said, anything discussed in our board meetings or materials used or discussed in the hallway is non public. Do you disagree with what your CEO said?**

A. I don't have an opinion.

**Q. Do you think your CEO is wrong?**

A. Again, I don't have an opinion there.

**Q. I'm asking you a question. Do you think your CEO is wrong? Yes or no?**

MS. MESSINGER: Objection.

THE WITNESS: Yes, and my answer is, I don't have an opinion.

BY MS. JUNGER:

**Q. That's not an answer.**

A. It is.

**Q. It's a "yes" or a "no" question. It's not, "I don't have an opinion."**

**Do you think your CEO is wrong?**

MS. MESSINGER: Objection.

THE WITNESS: Again, I don't have an opinion. There is no yes or no.

BY MS. JUNGER:

**Q. Let's read this again. "Always remember, anything we say or materials used in the board meeting or in the hallways is non public."**

**Is that what your CEO wrote to this group on November 16th, 2023?**

A. It would appear that way, yes.

**Q. Okay. And he says, anything we say or materials used in the board meeting is non public. What does "anything" mean to you?**

A. I can't speculate on what he meant when he said the word "anything."

**Q. I'm asking what "anything" means to you.**

A. "Anything" means anything. It's a pretty self-defined term.

**Q. Okay. So now you're testifying that you don't know if everything presented at the board meeting was non public, even though we just testified that Jay Jackson told you, specifically, anything used in the board meeting is non public; correct?**

MS. MESSINGER: Objection. Objection.
THE WITNESS: To be clear, this also says, anything mentioned in the hallways; right? People talk about the World Cup in the hallways; right? Like, this -- I can't, again, assume everything that he tried to convey in this e-mail. I am not him.
BY MS. JUNGER:
**Q. I'm asking your interpretation.**
A. My interpretation of this is that non-public information is non public.
**Q. And, eventually, we know that the entire board deck, which was discussed at the meeting, a material used at the meeting, was posted to your investor website; right?**
MS. MESSINGER: Objection.
THE WITNESS: Eventually, we know a deck went on the investor website. Everything else you said, I can't speak to.
BY MS. JUNGER:
**Q. And the investor website was accessible by anyone that invests in Abacus; correct?**
A. The investor website was accessible to anyone that ICR made it accessible to. I did not manage that website.

**Q. And we know that at least 32 people clicked the board deck; correct?**

A. That is what Marissa stated, yes.

**Q. Okay.**

MS. MESSINGER: We've been going since 1:25. Is now a good time to take a break?

MS. JUNGER: How long do you want to take?

MS. MESSINGER: Maybe five.

MS. JUNGER: Sure. So be back at, I don't know, 2:50?

THE WITNESS: That works.

THE VIDEOGRAPHER: We're off the record at 2:44.

(Thereupon a brief recess was taken, after which the following proceedings were had:)

THE VIDEOGRAPHER: We're back on the record at 2:55.

BY MS. JUNGER:

**Q. Okay. So -- okay. So looking at this document again, and understanding that you claim you don't know what River -- what "RR" meant, do you agree that, based on this e-mail, your CEO, Jay Jackson, was writing to you and Sean McNealy, Scott Kirby, Matt Ganovsky, Samantha Butcher, yourself, Bill McCauley, Seth Miller, and Chris Romaine**

**discussing that a deal with RR -- even if you don't know who "RR" is, but that a deal with RR was non public?**

MS. MESSINGER: Objection.

THE WITNESS: I can't -- I -- it would -- it would appear that way.

BY MS. JUNGER:

**Q. Who is Scott Kirby?**

A. One of the original partners and founders of Abacus.

**Q. Who is Matt Ganovsky?**

A. The second of those partners.

**Q. Who is Samantha Butcher?**

A. She's currently the president of Abacus Life Solutions.

**Q. Who is Seth Miller?**

A. Seth Miller's title at the time eludes me, but he was one of our executives.

**Q. Okay. So this is sent to all executives, executives and founders. So it's a -- you know, would you say that this is a handful of the most senior people at the company?**

A. I can't say that, no. I -- the -- I -- I don't know exactly what our staff was at the time or that this is exhaustive of all executives, no.



e2b6859b-b218-480f-b9dc-547a8e116de3

**Q. I didn't ask if it was exhaustive of all executives. I said, would you say that these people are amongst the most senior executives at the company?**

A. Yeah, as a point of clarity, you did say, "all executives." But, no, these are -- these are amongst the executives at the company, yes.

**Q. Why would you have been receiving this e-mail?**

MS. MESSINGER: Objection.

THE WITNESS: I can't assume why Jay would send me an e-mail.

BY MS. JUNGER:

**Q. Was there any followup to this e-mail?**

A. Not that I recall.

**Q. Do you know who Coventry is?**

A. I do.

**Q. Did you know at the time?**

A. Yes.

**Q. Were you involved at all in any discussions about Abacus acquiring other entities?**

A. Not that I recall.

**Q. Is it your testimony that you were not aware there was a potential deal around this time period that was being discussed?**

A. Yes. I was not aware of a potential deal being discussed at this time period.

**Q. Even after having received this e-mail?**

A. Again, I don't know who "RR" is.

**Q. Do you see where it says, "This is non public information and will impact our potential deal"?**

A. I can see that, yes.

**Q. Did you take that to mean there was a potential deal?**

A. I would assume from that that there is an existence of a deal, but I don't know what that deal is or anything about it.

**Q. Even though you sat through the whole board presentation.**

A. That's correct.

**Q. Do you recall if there was any sort of emergency or meeting that pulled you out of the board meeting?**

A. No, I don't recall that.

**Q. Are you aware that Abacus filed a Form 8-K in response to the posting of the board deck on the investor website?**

A. Not that I recall. It's outside of my scope.

**Q. Were you involved in the preparation of the Form 8-K?**

A. No. As just mentioned, it's outside of my scope.

**Q. Do you know who would be involved in the preparation of the Form 8-K?**

A. No.

**Q. Do you know the meaning of a Form 8-K?**

A. No.

**Q. Do you know the compliance laws surrounding a public company, that they have to file a Form 8-K within four days of an unscheduled event?**

MS. MESSINGER: Objection.

THE WITNESS: No, I -- I can't speak to compliance laws.

BY MS. JUNGER:

**Q. I'm going to show you what I am going to enter as Exhibit 16.**

**THE COURT REPORTER: 17.**

MS. JUNGER: 17. Man. Okay. Exhibit 17.

(Thereupon a document was marked Plaintiff's Exhibit 17 in the proceeding.)

BY MS. JUNGER:

**Q. Have you ever seen this document?**



e2b6859b-b218-480f-b9dc-547a8e116de3

A. Not that I recall.

**Q. I'm just scrolling through to see if that refreshes your recollection. (Scrolling.)**

**Does that change your testimony? Have you ever seen this document?**

A. No.

**Q. You testified earlier that you're not sure if the information from the board deck ever became public. Can you please explain what that means?**

A. By "not sure," I mean I -- my -- my involvement ended with sending it to Marissa and then requesting her to take it down. I can't speak on anything that happened in between those two things.

**Q. So I understand that you're here as the corporate representative only on the topic of how the board deck got posted, but you are also here in your individual capacity, as an individual witness, and I'm asking you from your personal recollection if you have any indication of whether or not the information posted to the investor website is public.**

A. Not that I recall.

**Q. I'm going to show you what I'm going to enter as Exhibit 18.**



e2b6859b-b218-480f-b9dc-547a8e116de3

**(Thereupon a document was marked Plaintiff's Exhibit 18 in the proceeding.)**

BY MS. JUNGER:

**Q. This is an article titled, "Abacus Accidentally Posts Document on Potential RiverRock Deal." It is an article written by a reporter named Donna Horowitz and posted on December 5th, 2023.**

**Have you ever seen this article?**

A. I'm subscribed to their newsletter, so I'm sure it's hit my inbox at some point, but I don't recall reading this article.

**Q. Have you ever discussed this article with anyone at RiverRock?**

A. No.

**Q. So it's your testimony that you've never spoken with Jay Jackson about this article.**

A. Jay Jackson doesn't work at RiverRock.

**Q. Sorry. Have you ever spoken with anyone at Abacus about this article?**

A. Not that I recall.

**Q. You've never spoken with Jay Jackson about this article.**

A. Not that I recall. Again, this was three years ago.



e2b6859b-b218-480f-b9dc-547a8e116de3

**Q. Have you ever had any conversations with anyone about this article?**

A. Not that I recall.

**Q. Okay. Can you read right here where it says, "The firm..."?**

A. "The firm removes a document that detailed a potential acquisition and subsequently files a disclaimer and CEO Jay Jackson says it only --" "-- says it only was a financial model."

**Q. Okay. And you mentioned earlier that you subscribe to The Deal, so that you probably received it. Do you believe that a news article is public information?**

A. I can't speak to whether Donna made this public or not.

**Q. Well, you see right here at the bottom, it says, "https://pipeline.thedeal.com/article"?**

A. I do.

**Q. So do you believe that a published article is public information?**

A. I don't know. The Deal has a subscription service, so I can't really, again, speak to the definition of "public" versus "non public" here.

**Q. If The Deal publishes an article, anyone that subscribes to The Deal will receive that**

**article; correct?**
MS. MESSINGER: Objection.
THE WITNESS: You would have to ask The Deal that.
BY MS. JUNGER:
**Q. Okay. I'm going to read where it says, "Abacus said in its updated filing that the 'disclaimed document' entered the public domain about Nov 14."**
**Do you believe that this is incorrect, when it says, "entered the public domain"?**
A. I absolutely can't speak to that. Again, this is Donna's opinion article.
**Q. The article says, "One industry source said it was up for about a day and a half before being removed."**
**Is that consistent with your recollection of how long the board deck was posted on the investor website?**
A. I can't -- I can't -- I can't lend credence to a random industry source from an article opinion piece. I'm sorry. That's just outside of my scope completely.
**Q. Do you have any personal recollection of how long the board deck was posted on the investor**

**website?**

A. I can't recall the exact time frame.

**Q. And as you sit here today, you will not agree that an article published in a publication is public information?**

MS. MESSINGER: Objection.

THE WITNESS: Again, I am not The Deal. I can't speak to anything that they apply into their data as -- as it is non public or public.

BY MS. JUNGER:

**Q. I'm not asking whether you are not -- are or are not The Deal. I'm asking, as an individual, living and existing in the world, if something is published in a published news publication, is that accessible to the public?**

MS. MESSINGER: Objection.

THE WITNESS: I don't have an opinion on that.

BY MS. JUNGER:

**Q. So you don't believe that an article disseminated to everyone that subscribes to The Deal is public -- becomes put in the public sphere.**

A. Yeah, again, you're asking my opinion. I don't have one.



e2b6859b-b218-480f-b9dc-547a8e116de3

**Q. If something is confidential and it is posted in a public news article, do you believe that information then becomes put in the public sector?**

MS. MESSINGER: Objection.

THE WITNESS: The lack of opinion is unchanged.

BY MS. JUNGER:

**Q. So at a minimum, you know 32 people clicked the link from the investor website; right?**

A. I know that Marissa sent an e-mail that said that. That's it.

**Q. But you can't possibly know how many additional people learned about the potential RiverRock acquisition after it was published in The Deal; correct?**

MS. MESSINGER: Objection.

THE WITNESS: Yeah, that's completely outside of my scope.

BY MS. JUNGER:

**Q. If you had to guess, how many people do you think subscribe to The Deal?**

A. I'm not -- I'm not guessing.

**Q. Do you think it's hundreds?**

A. I'm just going to continue saying I'm not



e2b6859b-b218-480f-b9dc-547a8e116de3

guessing, so --

**Q. Okay.**

MS. JUNGER: Let's take a five-minute break.

THE WITNESS: Okay.

THE VIDEOGRAPHER: We're off the record at 3:10.

(Thereupon a brief recess was taken, after which the following proceedings were had:)

THE VIDEOGRAPHER: We're back on the record at 3:23.

BY MS. JUNGER:

**Q. So I want to circle back to that Nasdaq platform. Can you remind me again what the name of it is?**

A. Boardvantage.

**Q. Boardvantage. And with Boardvantage, is that an Abacus-specific page, or is that something that all publicly-traded companies would be able to access?**

A. No, it's private.

**Q. Okay. So do you know the URL of how you get to it?**

A. I have not gone to Boardvantage in over three years, so, no.

**Q. Okay. But you do know that only Abacus people can access it.**
A. Yeah, it's -- it's a SAS solution; right? Like, when you log into your Facebook, everybody can't access your Facebook. It's -- it's no different than that. You have a login and it goes into a specific environment.
**Q. Okay. Understood. And do you know how many people at Abacus had access to that?**
A. No.
**Q. Do you know who would know that information?**
A. I can't assume that, no. I don't know.
**Q. Do you know what else was posted on that?**
A. Not that I -- not what I can recall, no.
**Q. I know it's been a couple years, but if you could kind of explain to me, when you log in, what does the platform look like?**
A. Like a website. I mean, it's -- it's nothing groundbreaking; right? White background. There's menus. You know --
**Q. What would be on the menu?**
A. I -- I cannot recall that. Yeah. File navigation and a home page, probably.
**Q. How did you find the board deck on that**

**platform?**

A. I -- like -- like earlier, I couldn't tell you the exact motions I took. If you put me on any website, I could figure out how to use it, though, so --

**Q. Okay. And you had to download the board deck from that website in order to send it to ICR; correct?**

A. That's correct.

**Q. Okay. I'm going to just share what we previously marked as Exhibit 4. No, that's not right. This is right.**

**Okay. I'm showing you now what we previously marked as Exhibit 4. This is the 3Q board presentation from November 9th, 2023; correct?**

A. That's what's on the screen, yes.

**Q. And it's your testimony that you pulled this from the internal Abacus Nasdaq platform; correct?**

A. I didn't review the file that I downloaded, so I don't know what the first tab looked like, but I did download a file and send it to Marissa.

**Q. And this is the file that you sent to Marissa.**



e2b6859b-b218-480f-b9dc-547a8e116de3

A. Again, I didn't -- I didn't -- I didn't open it. I didn't see the first tab. I don't know that for sure. I -- since you're showing it to me, most likely; right?

**Q. Okay. So let's go -- let's move through this. If you're not sure, let's go through this.**

**I would like you to -- I think you have the hard copy documents, so can your counsel show you -- actually, strike that.**

**Let's just go to what we previously marked as, I believe, Exhibit 9.**

MS. JUNGER: Jan, can you tell me if Exhibit 9 is Abacus 0001110?

THE COURT REPORTER: It is.

MS. JUNGER: The e-mail from -- e-mail from Jeff Smith to Marissa which attaches the board deck?

THE COURT REPORTER: Sorry. I was on mute. I only have the Bates number written. And what you said is correct, 0001110.

MS. JUNGER: And that's Exhibit 9.

THE COURT REPORTER: Yes.

BY MS. JUNGER:

**Q. Okay. So I'm going to show you what we marked as Exhibit 9. Sorry. Okay.**



e2b6859b-b218-480f-b9dc-547a8e116de3

**Okay. So understanding that you didn't review the board deck, but it's your testimony that this deck attached to your e-mail, Board Deck 3Q Final 11/9/2023, and this is the board deck, starting at Abacus 0001111, this board deck is what you pulled from the internal Abacus Nasdaq platform and sent to Marissa.**

A. Yeah, that's -- that's what's in front of us, yes.

**Q. Okay. And it's your testimony that you did this without ever having reviewed it.**

A. That's correct.

**Q. And it's your testimony that you did this without being instructed to do so.**

A. That's correct.

**Q. And it's your testimony that, since doing this, you've been promoted to chief marketing officer.**

A. That's correct.

MS. JUNGER: I have no further questions.

MS. MESSINGER: Before going off the record, I would just -- can we designate this as confidential, the transcript?

MS. JUNGER: I think I missed the first part of what you said. All I heard was, can

we designate the transcript as confidential.
What did you say before that?
MS. MESSINGER: That before we go off the record, I just wanted to make sure that we designated this as confidential.
MS. JUNGER: What about the deposition is confidential?
MS. MESSINGER: We're entitled under the Confidentiality Agreement to designate things we deem to be confidential, so I'm asking that we designate it confidential.
MS. JUNGER: I'm asking if -- if you're asking for the whole thing to be confidential, or if there are certain portions that you'd like to be confidential.
MS. MESSINGER: The whole thing, pending review.
MS. JUNGER: Pending review, yes. You know, obviously, you have the right to review it. I'm not conceding that we agree the entire deposition is confidential, but I think we can address that once -- once the transcript comes out. You'll -- you'll send me an e-mail saying whether you, you know, believe the whole thing is or only whether



e2b6859b-b218-480f-b9dc-547a8e116de3

certain portions are and then we can discuss it.

MS. MESSINGER: Okay. In the interim, this should be designated as confidential.

MS. JUNGER: Sure, in the interim, yes. I mean, we don't -- we don't have a transcript yet, but, yes, in the interim, designate it as confidential.

MS. MESSINGER: Nothing further.

THE COURT REPORTER: Read or waive? Do you want him to read or waive?

THE WITNESS: She said, read or waive. Read or waive?

MS. MESSINGER: I'm sorry?

THE WITNESS: Can you clarify, Jan? I'm sorry.

MS. JUNGER: She's asking if you want to read the transcript or waive your right to read the transcript.

MS. MESSINGER: Read.

THE COURT REPORTER: Are you ordering, Ms. Junger?

MS. JUNGER: Yes.

THE COURT REPORTER: And do you need a copy, Ms. Messinger?



e2b6859b-b218-480f-b9dc-547a8e116de3

MS. MESSINGER: Yes, please.

THE COURT REPORTER: Okay.

MS. JUNGER: Thank you.

THE VIDEOGRAPHER: We're off the record at -- we're off the record at 3:32 p.m.

(Thereupon the taking of the videotaped remote deposition was concluded.)

JEFF SMITH

Sworn to and subscribed before me this

day of 2026.

CERTIFICATE OF OATH

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

I, the undersigned authority, certify that JEFF SMITH was duly sworn.

WITNESS my hand and official seal this day of July 7, 2026.

JAN L. BRONIS
Notary Public - State of Florida
My Commission expires: 5-16-2027
Commission No. HH 350118

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA
COUNTY OF MIAMI-DADE

I, JAN L. BRONIS, Registered Professional Reporter, certify that I was authorized to and did stenographically report the videotaped remote deposition of JEFF SMITH; that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DATED this day of July 7, 2026.

JAN L. BRONIS, R.P.R.

CORRECTION SHEET

Re: Renegade Capital GP, LLC
vs. Abacus Life, Inc.
Deponent: JEFF SMITH
June 24, 2026

PAGE NO. LINE NO. CORRECTION OR CHANGE

_________ __________ ____________________________________

_________ __________ ____________________________________

_________ __________ ____________________________________

_________ __________ ____________________________________

_________ __________ ____________________________________

_________ __________ ____________________________________

_________ __________ ____________________________________

_________ __________ ____________________________________

_________ __________ ____________________________________

_________ __________ ____________________________________

_________ __________ ____________________________________

_________ __________ ____________________________________

_________ __________ ____________________________________

_________ __________ ____________________________________

_________ __________ ____________________________________

_________ __________ ____________________________________

_________ __________ ____________________________________

_________ __________ ____________________________________

_________ __________ ____________________________________

_________ __________ ____________________________________

_________ __________ ____________________________________

____________________________________
JEFF SMITH

Sworn to and subscribed to before me this _______day of _____________, 2026 by _____________________________ who produced______________________________ as Identification.

____________________________________
Notary Public-State of Florida
My Commission No.
Expires:



e2b6859b-b218-480f-b9dc-547a8e116de3

CHOICE-UNITED REPORTING SERVICE, INC.
REGISTERED PROFESSIONAL REPORTERS / VIDEOTAPE
DEPOSITIONS COMPUTER TRANSCRIPTION / LITIGATION
VIDEO TELECONFERENCING

Jan L. Bronis Registered Professional Reporter
Ft. Lauderdale (954) 525-2221

July 7, 2026

RE: Renegade Capital GP, LLC,
vs. Abacus Life, Inc.

Quinn Emanuel
Attn: Kathleen S. Messinger McCarty, Esq.
E-Mail: Kathleenmessinger@quinnemanuel.com

Dear Ms. Messinger,

With reference to the videotaped remote deposition of JEFF SMITH taken on June 24, 2026, in connection with the above-captioned case, please be advised that the transcript of the deposition has been completed and is awaiting signature.

Please provide a copy of the transcript to the deponent, or arrange to have the deponent stop by our office at 622 South Andrews Avenue, Suite 202, Fort Lauderdale, Florida, for the purpose of reading and signing the transcript of the deposition. Office hours are from 9:30 a.m. until 4:30 p.m., Monday through Friday.

PLEASE TELEPHONE IN ADVANCE

If this has not been taken care of, however, within the next 20 days or by the time of trial, whichever comes first, we shall conclude that the reading and subscribing of the deposition have been waived without further notice.

Sincerely,

BY: ______________________________
Jan L. Bronis, RPR



e2b6859b-b218-480f-b9dc-547a8e116de3

**A**
**a.m** 1:17 5:2 13:18 57:11 181:18
**Abacus** 1:11,11 5:11 5:16 6:14 7:25 8:23 9:2 11:4 12:25 15:23 16:10,13,15 17:7,16,17 23:17 27:11,16 28:8,12 29:19 31:21 33:16 33:20 35:3 37:24 38:8,9,12 42:11 44:6,24 45:21 47:11 51:8 53:14,16 54:15 65:14,19 66:3,9 67:1,10,22 69:19,22 70:3 71:20,21,25 72:2,16 77:14 79:6 81:7 88:6 89:6 97:13,17 98:22 99:6 102:8,14 107:13 108:5 113:22 114:1 114:25 132:5,10,25 133:4,15 135:19 136:19,21 138:2,18 139:16 142:14 148:13 149:18 152:24 155:16 158:22 160:10,14 161:21 162:21 165:4,20 167:7 171:1,9 172:18 173:13 174:5,6 180:3 181:8
**Abacus'** 12:5 25:24 94:2 100:9,21,25 102:10 106:3 142:24
**Abacus-related** 67:16
**Abacus-specific** 170:18
**Abacus_0000277** 57:2
**Abacus_000278** 57:5
**ability** 14:23
**ABL** 73:14 88:12,13
**able** 14:19 134:23 139:5 170:19
**above-captioned** 181:14
**absolutely** 17:15 107:7 167:12
**access** 58:12,16,18 66:19,20 67:15 68:7 68:11,12,17,20,21 69:2 90:23 138:8,16 138:22 139:5 155:16 156:2 170:20 171:2,5,9
**accessed** 69:5,10
**accessible** 158:21,23 158:24 168:16
**accident** 149:2
**Accidentally** 165:5
**account** 41:21 69:11 70:5,7
**accounts** 32:20
**accurate** 22:20
**acknowledge** 113:16 140:10
**acquire** 51:8
**acquiring** 33:21 161:21
**acquisition** 88:14 89:2,6,21 91:23 148:13 149:17 166:7 169:15
**action** 5:9 73:7 122:2 130:2 150:19 179:18,19
**actual** 16:13
**ad** 18:12,13 85:19,23 86:3,4,4
**Adam** 28:20,22,23 80:4,5
**add** 56:14,23 76:25 121:21 122:3 135:23
**added** 56:18
**addition** 10:16
**additional** 88:20 169:14
**address** 6:15 15:3,4 71:8,22 74:7 114:16 124:9 140:11 175:22
**addresses** 137:7
**addressing** 120:4
**adequately** 105:2
**ADL** 88:15
**advance** 9:8 80:8 181:19
**advertisement** 85:17
**advertising** 84:20,22 85:9,10,12,14 87:8
**advice** 63:9
**advised** 9:13 181:15
**Advisors** 88:13
**AdWords** 84:25 85:1 85:3,4
**affiliated** 99:5
**affiliates** 28:9 44:17 44:21 47:23
**afternoon** 73:17,23
**aging** 88:17
**ago** 16:25 17:10 43:5 55:3 75:13 124:22 129:19 130:7 132:3 135:3 138:25 147:2 152:5 156:8 165:25
**agree** 44:22 74:19 159:22 168:4 175:20
**agreement** 3:12 44:5 47:7,10,13,21,22,25 48:2,16,19 175:9
**ahead** 7:15 30:1 93:13
**Alan** 6:12
**Alex** 2:9 5:17 14:17
**Alexei** 31:1
**Alexei's** 31:2
**aligned** 23:25
**allowed** 18:19
**alongside** 38:16
**ambiguous** 50:1,2,15
**amount** 85:23,24,24 86:6
**analyst** 71:18,19 72:14
**Andrew** 23:13
**Andrews** 181:17
**Angeles** 2:8
**Annino** 51:10,13,15 51:17 52:2
**annual** 20:20
**answer** 6:23 7:8,14 7:15 13:3 28:10,11 28:16 37:1 41:22,23 42:3 50:18 81:4 87:1 99:12 102:16 102:17 103:5,5 104:1 109:6 116:4 128:5,6,16,17 129:24 130:9 133:25 134:2,9,11 136:10,18 137:11 145:17,24 156:19 156:22
**answering** 13:3 111:5 127:20
**answers** 102:14
**anybody** 24:3 29:22 125:25 133:3
**anybody's** 24:4 43:20 83:19
**anymore** 21:18 80:21 82:6
**anyway** 9:14
**Apologies** 21:11 36:15 58:7
**apologize** 23:14 69:25 80:8 96:10,13 143:10 154:11
**app** 64:7
**appear** 74:22,24 76:24 89:3,18 117:2 146:18 149:8 151:18 157:11 160:6
**APPEARANCES** 2:1
**appears** 75:1 103:11 121:17
**apply** 168:8
**appropriate** 105:10 105:10,11,16
**approved** 33:22
**approximate** 39:15
**approximately** 17:6 27:25 28:1
**Approximation** 17:1
**area** 24:15
**Armando** 72:15 73:12 81:12 82:12 82:13
**arrange** 181:16
**article** 4:22 165:4,6,9 165:12,13,17,20,23 166:2,12,19,24 167:1,13,14,22 168:4,21 169:2
**ASAP** 124:15
**Ashley** 21:3,21
**aside** 41:11 69:4 76:11 134:14
**asked** 34:10,17 54:2 59:24 60:1,13,18 62:18 63:11,16,20 64:23 77:1,5,20 78:10 90:6 94:11,21 120:5 125:3,22 128:7 129:19 133:3 134:22 140:16 141:2,4 142:3 144:24 145:2,7 150:17
**asking** 6:23 32:6 33:7 33:10,13 40:2 43:21 43:22 49:7 50:13 59:20 61:21 63:15 63:16 66:12 67:20 74:12 89:24 100:14 100:18 101:4 117:18 118:1 122:4 122:8 126:25 127:1 127:5,8,9,25 128:1 128:2,3,5,21 134:2 134:12 143:14 145:12 146:2 147:9 150:7 152:21 153:4 153:5,11,16,17 155:12,13 156:2,16 157:17 158:9 164:19 168:12,13 168:24 175:10,12 175:13 176:17
**asks** 102:8 135:22
**aspect** 8:17 25:5 89:13
**assess** 85:18
**assessing** 85:21 86:11 86:19
**assessment** 59:22,23
**asset** 25:25 26:16
**assets** 26:3,3,7,10,12 27:4 71:23
**assign** 155:22
**assist** 24:3
**associate's** 15:15
**associates** 21:6 23:11
**assume** 29:15 49:11 78:9 95:8 126:12 129:18 130:3 155:6 158:6 161:11 162:11 171:13
**assumes** 50:16
**assumption** 150:21
**assumptions** 129:14 129:22 147:3
**attached** 73:13 74:16

113:7 120:25 174:3
**attaches** 71:13 74:5 173:16
**attachment** 76:8,17 116:23 117:1
**attend** 15:8 83:2
**attendance** 8:18 78:23
**attended** 82:23 87:22 91:18 121:7
**attending** 78:17
**Attn** 181:10
**attorney** 14:14 179:15,17
**attorney's** 63:8
**attributed** 87:8
**August** 135:23
**authority** 178:6
**authorized** 102:12 179:7
**available** 26:18 62:10
**Avenue** 2:3 181:17
**awaiting** 181:15
**aware** 10:1,6,16 13:2 44:9,23 45:2 50:12 51:4,10 52:2,5,11 64:14,18 65:7 97:23 99:21 161:24 162:1 162:21
**Aww** 15:8

**B**

**B** 3:7
**back** 13:21 36:12 57:14 84:4 87:21 96:4,23 107:23 109:1,5 133:21 134:16 135:23 136:18 143:13,21 144:21 145:3,24 146:3 159:9,16 170:10,13
**background** 15:1 171:20
**backtrack** 16:19
**backtracking** 143:12
**based** 50:14 159:22
**Basically** 16:11
**Bates** 53:14,17 57:2 88:6 124:3 173:19
**Bates-labeled** 114:24 138:2 139:16
**Bates-stamped** 135:19
**began** 45:14,16 46:25
**beginning** 53:14 84:4 90:6 124:13
**behalf** 2:4,9 5:11,16
**believe** 23:19,20 27:17 38:21 48:1 62:17,21 64:23 75:18 80:24 94:6 101:12 105:1,12,25 109:21 122:23 123:5 140:5,12 155:15,25 166:12 166:19 167:10 168:21 169:2 173:11 175:25
**Best** 24:19
**Beth** 81:3
**beyond** 85:10 86:11 86:19 98:24
**big** 32:20
**Bill** 29:23 30:5 31:4 81:11,20,23 142:16 159:25
**Bill's** 31:6
**binds** 48:20
**Bishop** 23:14
**bit** 16:1 67:20 143:12
**biweekly** 32:11,15,24
**Blake** 21:4,8 72:19 73:12 81:12 82:16
**blank** 135:24,25 136:1,3
**Blockchain** 88:17
**blocks** 48:16
**board** 3:13,17 11:4,4 25:12,19 28:12,15 28:19 29:14 34:24 35:4,6,7,8,13,18,21 35:21 36:3 39:7,9 39:16,20,21 40:6,13 40:21,22 41:1,13 42:20 43:3,10,13,25 52:7,15 53:25 55:12 55:18 56:1,10,19 57:17,18,19 58:4,8 58:22 59:9,12,18 63:5 64:15 65:13,15 65:20 66:19 67:4,10 69:5,15 70:17 71:13 72:6 73:3,13 74:7 74:15 77:22 78:7,12 78:18,25 79:7,11,14 79:25 80:11,13,15 81:1,4,7,10,14 82:22,25 83:2,13,14 87:22 88:2,2 89:6,9 89:13,19,23 90:3,7 90:10,20,25 91:6,10 91:10,18,19,23 92:1 92:5,9,14,18 93:6 93:11,23 94:3,7 95:7 97:7,9,12,17 97:24 98:4,14,18,23 98:24 99:24 100:3,8 100:20,25 101:16 102:9,18 103:1,3,18 104:4,13 105:4 106:10 107:24 108:6 110:4,12,18 111:18,20 112:8,11 112:14,20,22,25 113:1,4,16 115:4 116:13,15,24 117:10 118:10,13 118:25 119:4,7,11 119:21,21 120:10 120:17,17 121:2,20 122:24 123:6 124:15,24 125:13 126:18 127:3 131:8 131:13,20 132:1,5 132:10,15,16 133:1 133:16 134:15,16 134:18 138:1 143:7 143:15 145:12 147:24 148:4,7 149:4 150:24 151:2 151:16,21,23 152:2 152:10,15,21,22 153:19,20,24 154:1 154:8,13,25 155:3,4 156:10 157:7,13,21 157:24 158:13 159:2 162:15,19,22 164:8,17 167:18,25 171:25 172:6,14 173:17 174:2,3,4,5
**Boardvantage** 66:22 67:13 92:16,17 101:9 113:6 170:16 170:17,17,24
**book** 132:17
**bottom** 12:3 48:15 124:11 166:16
**box** 60:5
**break** 7:6,9 15:25 95:24 97:4 159:6 170:4
**Brickyard** 15:4
**brief** 13:19 57:12 159:14 170:8
**Bringing** 18:7
**broadly** 67:21
**Bronis** 1:22 7:3 70:22 178:16 179:6,24 181:4,25
**brought** 32:23 33:11 90:2
**Brown** 23:13,13
**bubble** 21:15
**budget** 19:16 22:9
**Building** 18:12
**bullet-point** 40:16
**bunch** 148:22
**Burns** 23:13
**business** 16:10 18:7,9 23:9 25:1,24 26:5 26:17,25 27:1,2,7 33:11,13 44:15 45:19 86:6
**Butcher** 159:24 160:13
**buyback** 88:22
**buyers** 24:23

**C**

**Cabrera** 72:15 73:12 81:12
**calendar** 146:10,11
**California** 2:8
**call** 33:8 65:3 108:2 122:6,9 123:17 125:12 126:4,10,18 128:8,22 133:20 134:14 143:6,14,17 143:20,25 144:25 145:8,11,19,23 146:6,6,7,13
**called** 6:6 15:18
**calls** 24:23 126:1,15
**camera** 2:9
**campaign** 84:21,23
**campaigns** 18:12
**capacity** 10:8,17 12:9 39:4,6 49:6 100:15 100:19 123:4 164:18
**capital** 1:6 30:18 77:16 107:14 180:3 181:7
**capitalized** 103:11
**captured** 87:20
**care** 181:20
**career** 15:24 16:13
**carriers** 88:21
**case** 1:3 8:12,13,15 9:1 13:25 14:2,3,7 14:10 39:15 44:6,6 46:1,11,12,18,21,21 46:24,25 47:2 49:25 52:16 60:15,19,22 69:6 83:16 85:22 143:20 145:9,23 154:20 181:14
**cause** 1:25
**caused** 102:12
**caution** 13:10 33:1,4
**cc's** 142:16
**cellphone** 60:13,18
**Central** 15:11
**CEO** 20:21 30:3 51:6 51:16,18 72:15 79:20 125:3,22 126:2,15,18,23 143:7,14 145:11 149:10,13,25 150:18 152:20 156:12,14,17 157:1 157:9 159:22 166:8
**CEO's** 150:7
**certain** 175:14 176:1
**certainly** 118:22
**CERTIFICATE** 178:1 179:1
**certify** 178:6 179:7 179:14
**cetera** 32:21
**CFO** 20:21 30:10 31:3,4 81:20
**chain** 124:7,12 135:3 135:18 137:22,24 137:25 138:10 142:13
**chairman** 79:19,22
**change** 19:15 22:6 76:19 86:10 154:5

164:4 180:5
**changed** 30:6 31:6
**changes** 22:8,11 24:14
**changing** 22:14
**charge** 37:10 63:13 63:16
**check** 24:3,12 31:10
**check-ins** 32:3,5
**chief** 17:22 19:5,10 22:22 23:1,5 29:18 30:1,24 38:22 95:12 174:17
**child** 15:7
**CHOICE-UNITED** 181:1
**choose** 106:7
**Chris** 81:10,16 82:3,6 142:16,23 146:20 159:25
**Christopher** 90:15
**circle** 84:4 170:13
**circumstances** 102:8
**claim** 159:20
**claimed** 66:18
**clarification** 11:20
**clarify** 76:16 94:11 97:14 133:3 176:15
**clarity** 154:3 161:5
**clear** 110:3 116:4 120:5 122:20 127:25 147:23 153:23 158:2
**clearly** 74:22
**clicked** 129:2,12,16 131:3 136:8,13,22 137:3,7 138:5 154:25 159:2 169:10
**clicks** 136:9 154:23 155:7
**closed** 15:21 132:17
**co-president** 80:24
**coaching** 106:24
**colleague** 5:17
**colleagues** 63:24 64:2
**collection** 60:21
**collectively** 47:24
**college** 15:9,10 16:20
**combination** 85:25
**come** 18:17,19 53:19 55:2 67:4 76:6 112:13 113:4 142:3
**comes** 85:7 126:23 175:23 181:21
**coming** 7:1 56:24 144:10
**Commission** 178:18 178:19 180:22
**committee** 32:7 34:10 34:17
**common** 73:2,4
**commonly** 53:24 54:1 55:5
**communicate** 42:20 63:24 64:6
**communicating** 51:5
**companies** 23:7 26:17 170:19
**company** 1:8 7:24 13:4 15:18,21 18:1 18:7 19:17,19,21 21:7,17 23:8,17 25:6 26:2 27:7,8,9 29:23 31:11 32:3,5 32:19 33:21 37:5 42:16 43:1 48:19,20 55:19 56:9 71:25 80:19 81:13 82:1 86:23 88:16 89:21 90:2 99:6 109:19,25 110:16 160:22 161:4,7 163:11
**company's** 88:19 110:17
**compiles** 56:6
**complete** 148:3 179:11
**completed** 181:15
**completely** 33:25 123:1 167:23 169:18
**compliance** 25:5 30:1 30:24 163:10,16
**Computer** 66:20 181:2
**conceding** 175:20
**concerned** 150:8
**conclude** 181:21
**concluded** 177:7
**conclusively** 26:20
**confidence** 55:13
**confident** 111:18
**confidential** 44:19 47:22 48:2 59:12 66:4 78:13 97:24 102:10 148:7 169:1 174:23 175:1,5,7,10 175:11,13,15,21 176:4,8
**Confidentiality** 3:12 44:5 47:10 175:9
**confidently** 21:13 28:10,16 30:7,14 31:7 35:5,11 41:17 41:24 42:4 46:19 54:21
**confirm** 134:23
**confirming** 132:16
**confusion** 51:15
**connected** 179:17
**connection** 181:14
**consider** 86:20 125:4 155:9
**consideration** 44:12 44:14 47:14
**considered** 29:19
**considering** 33:20
**consistent** 79:10 103:6 167:17
**consulted** 111:25
**contact** 43:19
**contacts** 43:15,16
**contain** 78:12
**contained** 147:21 155:4
**containing** 102:9
**content** 95:8
**contents** 47:25 51:22
**context** 8:25 20:5 41:6 58:24,25
**contexts** 141:10
**continue** 3:25 19:21 19:22 54:6,8,9 55:6 105:6 169:25
**continued** 4:4 135:18
**contract** 16:11 42:11
**contracts** 104:18
**controls** 67:18
**conversation** 14:6 34:13 45:17,22 89:14
**conversations** 20:22 88:20 112:10 131:12 133:14 134:10 166:1
**convey** 125:24 158:7
**conveyed** 130:18
**copied** 71:5 72:9
**copies** 62:10 92:5 142:15
**copy** 9:14 92:11 139:23 140:14 173:8 176:25 181:16
**Copywriter** 16:7
**copywriting** 16:12
**Corbett** 79:24
**core** 25:25 26:4 86:22
**Cornelis** 80:9
**corporate** 10:18 12:9 12:18 100:23 103:17 110:14 164:16
**Corporation** 1:12
**correct** 10:4,9,10,19 10:20 11:6,17 13:4 13:5 15:20 17:6 18:5 19:13 22:15,16 23:2,3 27:19 30:3,4 31:18 32:5 33:7 34:18 39:2,9,22 40:13,23,24 45:11 46:14 47:4,7,8,11 47:12 53:11,12 55:3 55:20 56:15,20,21 59:7,22,23 61:4,21 64:13 65:23 67:16 68:22 69:17,21 70:10,11 71:8 72:3 72:21 74:13,14 77:23 79:13,20,21 81:7,23,24 82:6 86:7 87:14 88:24 89:2,7 92:25 93:20 95:15 97:13,18 98:15 100:1 107:17 109:25 110:14 113:18,23 114:3,16 114:17 115:8,9 116:21 119:9,22 120:9 122:16,19 123:13 133:8,17 140:19 141:13,14 142:24,25 146:14 146:15,17,18,21 148:5,14,15 149:12 149:15 150:25 154:14 157:25 158:22 159:2 162:16 167:1 169:16 172:8,9,15 172:19 173:20 174:12,15,19
**correction** 46:23 180:1,5
**correctly** 80:9
**correctness** 113:13
**cost** 20:11 89:21
**counsel** 5:4 134:20 146:21,25 173:8 179:15,17
**count** 55:18
**COUNTY** 178:4 179:4
**couple** 171:16
**course** 26:16
**court** 1:1 5:5,13,19 6:2 7:4 10:23 11:1 29:2 34:5 36:21,25 37:3 57:21 58:13 70:23 78:2 100:3 101:14,16 105:21 109:5,8 124:1 135:9 135:12 139:11 143:23 144:1,5,12 144:14 145:1,6,18 145:21 147:17 163:20 173:14,18 173:22 176:10,21 176:24 177:2
**Coventry** 148:23 149:21 151:12 161:16
**create** 17:12 73:14
**created** 40:6 51:10 69:11
**creating** 18:2,4
**creation** 88:16
**creative** 87:6
**credence** 167:21
**Cup** 158:4
**current** 15:3,4 17:21 21:9,10 23:4 25:4 71:9 73:15 77:1,5 81:22 94:5,12 146:2
**currently** 6:19 11:11 14:11 24:21 43:25 160:14
**cut** 34:6,6

**cute** 15:8

**D**

**D** 3:1
**d/b/a** 1:7
**Dani** 81:11,25 82:7
**data** 51:11,21 62:6,8 63:11,14,20 73:21 168:9
**date** 58:9,19 91:13 100:22 101:2,4 102:11 114:21 119:7 121:6,8 151:18
**dated** 4:17 179:20
**dates** 16:24 17:9,14 69:24 70:6
**day** 23:22,23 24:11 24:19 73:5 79:12 116:9 167:15 177:16 178:10 179:20 180:19
**day-to-day** 18:10
**days** 119:2 121:7 139:20 146:19 163:12 181:20
**deal** 4:22 148:24 149:3,22 150:2 151:13,13,20,20 160:1,2 161:24 162:1,7,10,12,13 165:6 166:11,21,24 166:25 167:4 168:7 168:13,23 169:16 169:22
**Dear** 181:13
**decade** 17:10
**December** 165:7
**decide** 91:11,13 136:5
**decision** 33:18,21 38:6 42:8
**decisions** 33:15 34:23
**deck** 3:13 10:22,25 11:1,3,4 12:5 35:7 35:13,18,21 39:7,20 40:21,22 42:20 43:3 43:10 52:15 55:12 55:12,18 56:2,11,19 57:17,18,19 58:4,8 58:22 59:9,12,18 63:5 64:15 65:14,15 65:20,22 66:19 67:4 67:10 69:5 70:16,17 71:13 72:6 73:3,13 74:3,7,16 77:22 78:7,12 83:13 88:2 88:4 89:13 92:1,14 92:19,21,24 93:4,5 93:11,18,23,24 94:2 94:3,7,19 95:7,7,13 97:8,9,11,12,17,24 98:4,4,14,14,18,23 99:1,6,10,15,17,19 99:20,24 100:3,8,21 100:25 102:9,18 103:1,3,18 104:4,13 105:4 106:2,10 107:15,24 108:6,10 110:4,12,18 111:2,3 111:7,8,10,18,20 112:8,11,14,19,20 112:22,25 113:1,2,4 113:5,17 115:4 116:13,15,18,24 117:1,9,13,17,19 118:13 119:11 120:17 121:3,5,6,20 122:13,24 123:6,19 123:20 124:15,17 124:24 125:13,17 126:19 127:3 129:3 129:13,17 131:8,14 131:20 132:2,5,10 132:15,16 133:1,16 134:15,18,23,24 138:2,6 139:6,25 143:7,15 145:12 146:14,17 147:24 148:4,7 154:23,25 155:4 158:13,17 159:2 162:22 164:8 164:17 167:18,25 171:25 172:7 173:17 174:2,3,3,4 174:5
**deck's** 134:16
**decks** 25:18 36:3 38:1 39:9,16 40:6,13 41:1,14 43:13,25 69:16 93:17,19 94:9 98:5
**deem** 175:10
**default** 64:7 136:2
**Defendant** 1:13 2:9 102:18,25
**Defendant's** 3:19 101:23 102:21 103:4
**define** 46:7,9 58:10 58:25 60:23 103:25 107:1 112:16
**defined** 100:16
**definition** 12:21 95:22 166:23
**degree** 15:13,14
**Delaware** 1:7,12
**demonstrate** 63:4
**department** 18:20
**Depends** 33:18
**deployed** 77:16
**deponent** 180:4 181:16,16
**deposition** 1:19,25 3:9,11 7:13,18 8:4 8:22 9:1,8,12 10:2,6 11:9 33:10 63:2 64:25 65:4 97:4 104:3 105:7 110:2 112:22 175:6,21 177:7 179:1,9 181:14,15,18,21
**DEPOSITIONS** 181:2
**Describe** 102:8
**described** 20:14
**designate** 174:22 175:1,9,11 176:7
**designated** 106:13 175:5 176:4
**desktop** 97:20,21
**detail** 102:8
**detailed** 166:6
**determine** 136:13
**dev** 25:2
**development** 25:1
**dictionary** 12:21
**difference** 93:23 95:6 98:14
**differences** 97:8 98:7
**different** 18:19 32:6 41:25 55:19 98:5 104:20 141:2,9 142:14 171:6
**direct** 3:5 6:8 21:18
**directions** 74:7
**directly** 18:17 75:17 77:20 107:12
**director** 16:7 17:18 17:23 18:3,24 19:2 19:4,5,7,9,15,15 20:24 21:12,14
**directors** 23:11 28:13 79:7
**disagree** 156:12
**disclaimed** 167:8
**disclaimer** 166:8
**Disclosing** 47:24
**disclosure** 44:18
**discovery** 59:17
**discuss** 31:21 53:5 133:18 134:17 176:1
**discussed** 13:6 32:15 33:12 82:13 84:3 88:9,10,13 89:1,17 112:18 125:16 132:18 138:4 151:20 152:14 154:13 155:3 156:10,11 158:13 161:25 162:2 165:13
**discussing** 97:7 160:1
**discussion** 89:8 131:25 133:22
**discussions** 44:12,14 89:5 122:6,9 127:9 127:13 132:4,9,24 161:21
**disseminated** 98:23 168:22
**District** 1:1,1 50:6
**DIVISION** 1:2
**divulge** 13:10 33:1,5
**doc** 107:20
**document** 9:15,21,25 10:13 11:10,15,19 12:14 44:7,9 48:24 49:5,8,10,15 52:18 52:21,25 58:1 59:19 61:9,12 71:1 79:3 87:21 101:20 102:1 104:7 113:9,13 114:10,18,21,24 120:18 121:1,13 122:16,19 124:4 135:15,20 137:17 139:17 142:10 146:22 148:18 159:20 163:22,25 164:5 165:1,5 166:6
**document'** 167:8
**documentation** 107:25 110:11 113:23 114:3,3
**documents** 8:11,14 9:4 59:17 60:22 61:21 63:6 66:4 67:16 173:8
**doing** 82:20 102:13 150:4,13 174:16
**dollars** 20:13 89:22
**domain** 167:8,11
**Donna** 165:7 166:14
**Donna's** 167:13
**double-check** 122:15
**download** 97:20 172:6,22
**downloaded** 101:9 113:6 129:3,13,16 134:23,24 138:5 139:5 172:21
**draft** 71:14 74:5,22 75:1 78:7,11
**dragged** 117:15
**Drive** 23:6
**driving** 23:8 86:23 87:2
**dropped** 117:15
**duly** 6:7 178:7
**duplicate** 62:9
**duties** 109:24
**duty** 24:16,21

**E**

**E** 3:1,7
**e-mail** 2:5,10 3:16,21 3:22 4:7,9,11,13,15 4:17 43:1,17 60:5 63:12 66:21 68:12 68:14,15,20 70:4 71:4,5,6,8,10,21 72:9,22,24 73:8,25 74:6,16 76:4,12 78:6 113:7 114:13 114:16 115:2,14,16 115:20 116:3,7,9 117:16,20 118:3 119:1 120:14,25

121:4,18,24 122:1,4 124:8,18 126:13 128:9,12,19,22 129:4,15,21 130:5,8 130:14,19 133:5,7 134:16 135:3 138:9 138:10 139:22 140:2,6,11 146:16 146:20 148:21 149:7,14,20,25 150:15,18 151:10 151:24 153:17 154:22 156:9 158:7 159:22 161:9,12,14 162:3 169:11 173:15,15 174:3 175:24 181:10
**e-mailed** 4:24 41:13 52:2 115:11 132:23
**e-mails** 62:15 63:3,4 66:10 73:2,5,11 116:10 131:16,19 133:21 134:16 139:21 140:9,12
**earlier** 13:6 38:21 64:20,23 66:18 72:20 77:12 80:5 89:12 109:21 115:6 118:11 133:4 140:24 143:19 145:7,22 164:7 166:10 172:2
**early** 89:6
**Eastern** 102:24,25
**eat** 24:17 96:2
**editing** 59:9
**Edson** 142:16,17
**either** 28:16 30:14 99:12 110:23 134:7 134:7
**electronic** 62:6,8
**electronically** 62:7
**Elena** 30:12
**eludes** 160:17
**Emanuel** 2:7 5:11 181:9
**emergency** 162:18
**employed** 72:2
**employee** 142:18 179:15,16
**employees** 27:10,23 63:24 64:2 142:20
**endeavors** 55:19 56:1
**ended** 88:19 110:13 164:11
**ends** 91:25
**engage** 105:14
**engaged** 36:17
**engagement** 45:14,16 45:22
**engineering** 72:16 82:15
**English** 15:15
**ensure** 98:23 114:2
**enter** 68:6 104:23 114:9 118:6 121:12 123:24 137:13,16 137:20 139:9,15 142:6,9 147:16 148:17 163:19 164:25
**entered** 57:20,22 167:8,11
**enterprise** 63:17
**entire** 26:25 27:2 87:25 158:12 175:21
**entities** 161:21
**entitled** 175:8
**entity** 103:12 104:20 108:8
**environment** 171:7
**error** 122:23 123:5 124:23
**ESI.'** 62:7
**Esq** 2:4,8,9 181:10
**essentially** 18:14 20:19 66:24
**establish** 128:1,3
**estimate** 21:25
**et** 32:21
**ETF** 26:21 27:6
**evaluate** 86:5
**evaluating** 20:16,18
**event** 163:13
**events** 10:9 41:8,12 69:20
**eventually** 15:21 123:11 154:13 155:2 158:12,17
**everybody** 171:4
**everybody's** 23:24
**everything's** 74:18
**evidence** 50:16
**exact** 16:4,24 17:9 22:19 43:4 45:25 58:9 69:23 70:6 81:18 82:2,10,21 95:4 100:22 101:2,4 117:23 118:1 120:16 121:9 122:1 130:6 168:2 172:3
**exactly** 20:6 21:13 24:20 40:7 74:9 77:9 78:9,22 79:12 80:6 83:18 103:9 107:8 110:4 118:23 119:6 152:13 153:13 160:24
**EXAMINATION** 3:5 6:8
**Examinations** 3:2
**example** 33:20 66:17 85:2,16 86:2
**examples** 39:15 40:25
**exchange** 44:18 46:1 46:4 66:1
**exclamation** 141:17
**Excuse** 13:13
**executive** 29:19,20,21 29:22 30:23 31:14 31:20 32:7,10 34:2 34:9,17 42:16 48:19 56:9
**executives** 32:13 82:18 160:18,19,20 160:25 161:2,3,6,7
**exhaustive** 87:19 160:25 161:1
**exhibit** 3:9,10,12,13 3:14,16,17,19,21,22 4:7,9,11,13,15,17 4:20,22 10:12,14 12:13,15 49:14,16 52:12 57:20 58:2 61:6,7,10 67:11 70:20,24 71:2 78:1 79:1,4 99:25 100:5 100:9 101:12,21 104:24 106:1 107:23 112:21,23 113:17 114:9,11 118:6 121:12,14 123:24 124:5 135:14,16 137:14 137:16,18,20
139:10,15,18 142:7 142:9,11 147:16 148:17,19 163:19 163:21,23 164:25 165:2 172:11,14 173:11,13,21,25
**exhibits** 3:25 4:4,24
**existed** 51:25
**existence** 162:12
**existing** 168:14
**exists** 44:9
**expanded** 88:20
**expectation** 22:14
**expectations** 19:16 19:18 22:7
**expected** 83:12 146:6 146:7
**expecting** 144:24
**experience** 91:11
**expires** 178:18 180:22
**explain** 17:25 20:6 84:5,17 164:9 171:17
**explanation** 115:13
**exposure** 66:15
**extent** 9:12 39:8,12

**F**

**Fabia** 21:4
**face** 54:23 55:1 77:12
**Facebook** 171:4,5
**facts** 50:16
**fairly** 55:18
**fall** 51:5 86:16 87:3
**family** 29:12 80:6 149:6
**far** 29:15 30:17 56:21 62:20 69:12 74:4,17 88:1 94:15 118:4,12
**fast** 53:7
**feel** 7:6
**felt** 151:24
**Figueroa** 2:7
**figure** 35:16,19 50:10 126:9 137:3 150:11 172:4
**figured** 42:25
**file** 66:20,20 163:12 171:23 172:20,22 172:24
**filed** 1:25 14:11 46:12 46:18,21,22,25 162:21
**files** 166:7
**filing** 167:7
**final** 74:18 116:24 121:3 174:3
**finance** 30:19 82:10
**financial** 71:18,19 72:14 166:9
**financially** 179:18
**find** 11:24,25 60:3 129:10 136:22 138:16 139:4 144:6 145:4 171:25
**finding** 144:8
**fine** 27:14 96:7 143:24
**finish** 6:24 7:2
**finished** 100:13
**firm** 166:5,6
**first** 3:14,20 6:7 11:16 15:17 41:3,12 44:13 52:5 54:5 57:17 58:8,11,20 61:7 76:5,11 78:7 82:22 83:1 85:6 101:24 115:11,19 116:5,12 117:10 172:21 173:2 174:24 181:21
**five** 57:10 159:8
**five-minute** 170:3
**flipped** 59:1
**flipping** 92:11
**Floor** 2:7
**Florida** 1:1,24 2:3 6:17 15:2,5,12 50:6 178:3,17 179:3 180:21 181:17
**flow** 18:8
**flying** 148:24
**focus** 13:7
**follow** 63:9 135:1 138:12
**followed** 128:21
**following** 13:20 57:13 96:22 159:15 170:9
**follows** 6:7 44:22
**followup** 121:18 122:4 129:4 130:15 136:12 161:14
**forgetting** 22:3

**form** 4:20 74:18 87:9 93:21,22 162:21 163:2,6,8,12
**format** 76:6
**former** 51:16
**Fort** 181:17
**forth** 133:21
**foundation** 50:16
**founded** 27:16
**founders** 160:9,20
**four** 8:9 16:5 17:5 129:1,4 130:14 141:17 163:12
**Fourth** 88:11
**frame** 16:4 168:2
**Frank** 81:11 82:9,10
**free** 7:6
**Friday** 148:25 181:19
**front** 11:11,18 110:12 111:4 140:3 146:22 174:8
**froze** 60:16 108:18 109:3
**frozen** 108:19
**frustrated** 150:8,19
**frustrating** 148:25 150:1
**Ft** 181:4
**full** 6:11 39:11 144:10
**fully** 16:17
**Fund** 88:12
**Funds** 1:7 88:14
**further** 103:1 127:9 127:13 131:12 133:14,21 174:20 176:9 179:14 181:22
**future** 88:10
**fuzzy** 69:23

**G**

**Galaxy** 64:10
**Gallimore** 21:4,8 72:19 81:13
**Ganovsky** 159:24 160:11
**Garland** 6:16
**Garrett** 142:15,17
**Gary** 23:13
**gathered** 53:20
**general** 13:25 14:2 65:16 138:11 140:8
**generate** 18:15 19:20 20:10 22:14
**generating** 18:1 19:23
**genuinely** 40:5
**getting** 65:21 68:23 75:7 76:22 93:4,12 136:10
**give** 5:23 6:22 27:12 48:9 115:13 150:15
**given** 46:1 68:12
**gives** 79:15
**Global** 1:11 5:11,16 6:14 71:25
**go** 7:14 13:13,14 30:1 30:2 36:7 57:9 68:6 74:6,15 76:16 87:21 93:15,17,19 94:3,9 108:20 112:19 124:16 144:16 146:2 154:9 173:5,6 173:10 175:3
**God** 5:25 139:12
**goes** 62:11 73:18 95:13 171:6
**going** 6:22,25 7:11 9:10 11:7,22 12:12 13:9 14:25 15:25 31:21 44:2 52:14 53:2,7 54:9 55:6 57:1,5 61:5,5,6 64:24 70:7,19 78:25 79:1,16 80:8 84:10 88:5 92:19 93:10,25 95:24 97:9 101:11 102:5,16 105:14 109:4 114:8,9 121:11,11 123:23 123:23 124:11 125:23,24 126:23 128:6,12,15,17 135:5,5,13,14 137:13,15,15,20 139:8,14,15 142:8,8 148:16,17 159:5 163:18,18 164:24 164:24 167:6 169:25 172:10 173:24 174:21
**gonna** 96:2
**good** 5:7 6:10 159:6
**Google** 85:4,6,10
**gotten** 76:9
**GP** 1:6 180:3 181:7
**graduate** 16:20,22
**graduating** 17:3
**graduation** 15:16
**GREENBERG** 2:2
**grew** 19:17,19 22:7,7
**ground** 6:22
**groundbreaking** 171:20
**group** 31:17 36:17 157:9
**grow** 15:1
**growing** 19:22
**grown** 27:20
**growth** 19:21 23:6,8 88:12,12
**guess** 30:20,21 67:20 169:21
**guessing** 169:23 170:1
**Gusky** 28:20,22,23 80:4,5
**guys** 45:25 83:22

**H**

**H** 3:7
**half** 167:15
**hallway** 154:2 156:11
**hallways** 149:5 152:11 154:8 157:8 158:3,5
**hand** 5:20 6:3 178:10
**handful** 160:21
**handled** 63:17
**Hannah** 23:14
**happen** 24:11
**happened** 97:7 101:7 103:6 107:8 119:20 119:25 134:8 164:13
**happening** 91:19 140:18
**happens** 92:1
**hard** 19:20 66:20 84:17 92:11 173:8
**head** 12:22 83:19 130:6 138:24 147:2
**hear** 5:14 11:13 13:12 28:2 33:3 36:24,25 56:16 77:2 105:22
**heard** 103:10,13,16 174:25
**held** 79:11,12
**Hello** 108:17
**help** 5:25
**helpful** 9:13
**helping** 7:25 18:8
**hey** 72:24 115:3,10 116:2 120:15 124:14 125:12 127:15
**HH** 178:19
**high** 31:18
**highlighted** 62:1
**highlighting** 88:19
**hit** 165:11
**hold** 31:18 84:10
**holder** 73:16
**home** 171:24
**honest** 20:4 26:5 30:22 103:15
**honestly** 82:24 87:1
**hope** 97:2 128:12,15 128:18
**hopeful** 149:1
**Horowitz** 165:7
**hours** 8:9 126:3,6,9 126:10 130:22,24 181:18
**https://ir.abacusgm...** 102:22
**https://pipeline.the...** 166:17
**hundred** 20:13
**hundreds** 169:24
**hung** 125:13

**I**

**ICR** 36:15,16,17 38:10,12,16 39:1,9 39:16 40:13 41:1,4 41:23 42:11,17,20 43:15,16,18,22,25 87:13 94:21 101:10 103:2 104:19 107:24 108:2,5,16 109:10,13 110:8,12 110:17,18 111:2,7,9 111:18,19 112:13 113:4 114:2,2 115:7 123:19 131:21 132:2,6,11,25 133:15 142:18,20 158:24 172:7
**ICR's** 41:19 109:17
**idea** 30:15 42:17 46:24 47:9 81:1
**identical** 62:9
**Identification** 180:20
**ignoring** 76:14
**iMessage** 64:5,11
**immediate** 16:10
**immediately** 125:24 132:13
**impact** 14:22 149:3 162:6
**implied** 127:18
**implying** 141:9
**importance** 22:8
**impossible** 87:1
**inadvertently** 102:20 103:2
**inaudible** 31:8 34:3
**inbox** 59:24 60:2 62:21 165:11
**inboxes** 60:24
**include** 88:11
**included** 102:19
**including** 97:3 102:11 143:1 148:22 149:6
**Income** 88:12
**incorrect** 110:20 167:10
**increased** 22:9
**independent** 137:2
**Indian** 15:10
**indication** 108:15 109:9 164:20
**individual** 123:4 164:18,18 168:13
**individually** 7:23
**individuals** 43:18
**industry** 167:14,21
**information** 13:11 26:18 29:17 33:2,5 33:8 44:19 45:8 46:2,4 59:12,21 60:3 65:18,21 66:1 78:13 97:24 98:7,17 102:10 127:2 136:24 148:7 149:2 154:12 155:3,9,15 155:17 156:1,5,6 158:11 162:6 164:8

164:21 166:13,20
168:5 169:3 171:12
**information'** 47:22
62:7
**inhouse** 33:9
**initial** 17:17
**initially** 26:1
**initiative** 93:2,3,8
94:8,24
**input** 83:11 150:14
150:15
**inside** 59:2
**instance** 35:22 69:4
**instructed** 7:14 77:24
174:14
**Instruction** 61:25
**insurance** 26:2,9,13
26:24 27:7 88:21
**Integration** 88:17
**intel** 72:17
**intent** 128:19 153:14
153:16
**interact** 115:7
**interacted** 58:20
74:10
**interested** 89:20
179:18
**interim** 176:3,5,7
**internal** 24:7,9 67:1
97:13,18 172:18
174:6
**internally** 8:22 38:3
**interpretation** 153:5
153:11,12,13
155:14 158:9,10
**interrogatories** 3:20
101:25 110:18,20
111:12 112:1,6
**interrogatory** 102:3
102:7 107:13
**interrupt** 84:11
**introduce** 5:4 115:19
135:6,14
**introduced** 100:8
**introductions** 29:1,5
**investment** 27:4
**investor** 12:5 36:20
36:21 37:1,2 41:19
87:11 93:6,16 94:4
94:9 99:11 100:9,21
101:1 102:21 103:4
104:4 106:3 109:14
109:19,22,25 110:5
112:19 113:18,24
122:10,24 123:6
124:24 133:1
158:15,18,21,23
162:23 164:21
167:18,25 169:10
**investors** 29:11 42:1
95:14
**invests** 158:22
**invitation** 81:10
**invited** 81:14 83:16
83:19
**involve** 104:11
**involved** 7:25 25:4,11
25:17 50:23 53:4
55:19 56:1 60:14,21
60:23 108:9 134:10
146:25 161:20
163:1,5
**involvement** 52:24
55:11 74:2 164:11
**IP** 137:7
**IQ** 88:17
**ir** 36:18,19 37:24
43:12 93:12,17,20
115:4 121:20
139:25 143:15
145:13
**IRC** 36:5,6
**ISR** 9:7
**issue** 153:21
**issues** 91:6,7,9
**items** 73:7

**J**

**Jackson** 3:16 29:13
29:23 30:3 48:17
51:4,11 52:3 53:23
71:5 72:15 73:11
79:19 81:6 88:9,10
88:15,19 89:1 112:7
112:7,11 123:15
125:7 129:10
131:13,17,20
133:20 134:14
139:23 140:14
141:16 142:15
143:1 146:13,19
147:6 148:21 152:1
156:9 157:23
159:23 165:17,18
165:22 166:8
**Jackson's** 56:15,19
**Jan** 1:22 100:1
123:25 173:12
176:15 178:16
179:6,24 181:4,25
**Jay** 29:13,23 30:3
48:17 51:4 53:23
56:14,19 71:5 72:14
73:10 77:1,5 79:19
112:6 123:15
133:20 134:14
139:23 140:14
141:16,23 142:15
143:3,17 145:19
146:6 148:21 153:2
153:4 156:9 157:23
159:22 161:11
165:17,18,22 166:8
**Jay's** 153:14,16
**Jeff** 1:19 3:4 6:5 7:23
49:7 73:18 81:12
103:2 135:21
173:16 177:11
178:7 179:9 180:4
180:18 181:14
**jeff@abacuslife.com**
71:6 114:14
**Jeffrey** 6:12
**Jennifer** 2:4 5:8
**job** 15:17,24 16:10
19:14 21:22 25:4,9
39:1 40:16 69:15
85:22 86:1,5,10,20
99:16 150:6
**Johnson** 2:23
**joined** 5:17 27:18
**Jr** 79:24
**July** 23:19,21 178:11
179:20 181:6
**jump** 97:1
**June** 1:16 5:3 180:4
181:14
**Junger** 2:4 3:5 5:7,8
6:9 10:12,15 11:2
12:12,16 13:12,16
13:23 14:12 25:10
25:16,23 26:22 29:7
31:24 32:14,22 33:3
33:6,19 34:1,7,8,15
34:22 35:2,12 36:1
36:7,14 37:4,11
38:7,20 39:5,13,19
40:1,9,18 41:18
42:5,10,24 43:14
45:5,15 46:8,15
47:5,19 48:5,11,23
49:3,13,17,22 50:2
50:9,17,22 52:1,10
53:13,18 54:14,17
54:18 55:24 56:5
57:9,16,23 58:3,17
59:15 60:9 61:11
63:1,10 64:22 66:2
66:8,16 67:8,25
70:22,24 71:3 72:13
78:1,3,4,16 79:5
86:18 91:17 92:4
95:5,18,23 96:3,14
96:16,25 98:2,21
99:9 100:1,5,6,12
100:17 101:15,18
101:22 104:2,23
105:11,18,22,24
106:8,17,23 107:3
107:11,22 108:19
108:22 109:3,12
110:9,25 111:16
112:4,17 113:15,21
114:7,12,23 115:1
115:24 117:8,25
118:6,7,18 119:17
120:24 121:15
122:21 123:3,9,25
124:2,6 125:6 127:7
129:9 130:20
131:11 134:1 135:7
135:11,13,17
137:19 139:9,12,19
141:24 142:6,12
143:11,18 144:2,3
144:11,13,16,23
145:4,16,20 146:1,5
147:13,16,18,19
148:10,20 151:6,25
152:19 153:3,8
154:4,17 155:8,23
156:21 157:5 158:8
158:20 159:7,9,18
160:7 161:13
163:17,21,24 165:3
167:5 168:11,20
169:8,20 170:3,12
173:12,15,21,23
174:20,24 175:6,12
175:18 176:5,17,22
176:23 177:3
**Jungerj@gtlaw.com**
2:5

**K**

**Karla** 80:25
**Kat** 14:14
**Kathleen** 2:8 181:10
**Kathleenmessinger...**
2:10 181:10
**Kathy** 5:10,15
**Katwijk** 80:10
**keep** 59:25 95:24
101:13 119:18
140:17
**kept** 140:20
**kind** 25:3 68:19 84:1
97:7 99:18 117:15
137:22 171:17
**kindergarten** 84:6
**Kirby** 159:24 160:8
**knew** 45:6 89:4 94:8
112:7
**know** 6:25 7:1 12:17
17:11 20:1,4,8
27:10,16 28:11,18
28:24 29:13,15
30:16,18,22 32:20
34:23 35:6,17 36:2
36:6 38:2,13 39:14
40:5 42:15 43:17
45:10,18,25 46:17
46:21 47:2,18 48:8
48:13 49:4 50:21
51:13,24 52:24 53:7
55:7,17 56:10,14
57:2,6 59:8,17,21
60:5,8,24,25 61:14
66:3,9,12,17 67:6
67:19 68:8,18 70:15
70:17 72:12,18
73:21 78:21 79:12
79:17,23 80:2,6,12
80:12,14,23,23 81:5
81:18 82:2,16,25
83:11 84:3 87:18
89:19 90:11,20,23
90:25 91:3,22 92:3
94:16,16 95:11,13
95:21 98:13,16,16

98:22 99:1,4,4,8,12
99:13,22 100:19,23
102:3 103:14
104:19,21 109:13
109:17,20 111:1,4,6
113:25 114:6
115:14 119:24
120:22 121:8
122:12,12,15,18
126:5,7 127:17,23
127:24 129:12,16
131:4 142:19 143:1
143:13 144:5
146:11 147:9,20,22
148:2,12 149:10,17
150:22 154:12,16
154:18,19,20 155:2
157:21 158:12,17
159:1,10,21 160:2
160:20,24 161:16
161:18 162:4,12
163:5,8,10 166:21
169:9,11,13 170:22
171:1,8,11,11,13,14
171:16,21 172:21
173:2 175:19,24
**knowing** 136:8
**knowledge** 42:12 90:18 119:20
**knows** 148:23 149:21 151:12
**KP** 20:14
**KPI** 19:24,25 20:2,7 20:10,11 84:6 85:18 85:20,22 86:3,11
**KPI's** 19:20 20:15 53:20 85:25 86:20
**KPIs** 73:20

**L**

**L** 1:22 178:16 179:6 179:24 181:4,25
**lack** 169:6
**lacks** 50:15
**Lane** 15:5
**large** 1:24 55:18
**largely** 10:7
**larger** 23:9 29:11
**late** 73:17
**Lauderdale** 181:4,17
**laws** 163:10,16
**lawsuit** 7:21 32:23 33:12
**lawsuits** 8:1
**lawyer** 7:11 12:22
**lawyers** 33:8,9 60:6 97:3
**lead** 20:1,2,12
**leads** 18:16,17,19 19:22 20:10,12 22:15 85:24
**learn** 45:12 91:12 108:3,12 127:2 142:3 150:19
**learned** 46:12,20,24 49:24 98:6 169:14
**learning** 110:4
**leave** 21:21 135:24,25 136:1
**led** 78:20
**left** 20:22 97:6,6,10
**legal** 8:5,7 45:23 46:2 46:5 81:17 82:1,3 142:24 143:2 146:21,25
**Leigha** 23:14
**lend** 167:20
**let's** 17:4 19:21 30:2 36:7 57:9 73:10 74:15 87:21 124:15 128:25 135:25 137:13 139:9 142:6 144:6 146:3 157:6 170:3 173:5,5,6,10
**letters** 149:24
**level** 13:1 63:18
**liability** 1:7
**life** 1:11 26:1,2,4,8,9 26:12,24 27:7,8 79:6 88:18,20 160:15 180:3 181:8
**life-solutions** 26:11
**lift** 24:15
**limited** 1:7 25:8 39:4 39:6 40:11
**limits** 119:16,19 120:1,3
**line** 27:7 54:5 180:5
**lines** 23:9
**link** 137:4,8 169:10
**list** 62:11,15 79:16 87:19
**listed** 68:13 71:6
**literally** 11:18
**LITIGATION** 181:2
**little** 16:1 17:14 23:20 67:20 143:12
**live** 15:6 88:18
**living** 168:14
**LLC** 1:6,7 180:3 181:7
**LLP** 2:7
**Lmagrp** 71:23
**log** 171:4,17
**Logan** 23:13
**logged** 69:11,13 70:13
**login** 171:6
**long** 8:7 16:3 18:24 21:24 22:17 87:23 89:13 99:11 159:7 167:18,25
**longer** 143:20 145:9 145:23
**Longevity** 71:23 88:12
**look** 23:22 47:20 76:2 77:20 116:19 171:18
**looked** 58:24 121:18 135:20 139:21,22 140:9 146:11 147:24 148:1 154:22 172:22
**looking** 9:21 47:13 48:15 61:25 62:12 88:6 92:9 114:24 133:6 137:23 145:5 159:19
**looks** 48:17 72:22 74:16,17 90:14 137:22 142:18
**loop** 140:18,20
**Los** 2:8
**lose** 84:12
**lot** 26:18 32:12 54:8 55:19 73:5 82:25 104:18 116:9
**lunch** 24:17,17 96:2 96:21 97:2

**M**

**MacDonald** 71:4,17 73:12
**maintain** 67:22,23 86:14
**maintaining** 24:21
**maintenance** 88:16
**major** 24:14 25:22 33:15 34:23
**making** 9:18 50:7 85:6 127:19 129:22
**Mallory** 2:23
**Man** 163:21
**manage** 18:8 24:24 26:3,10 41:19,21,23 42:13,14 43:12 158:25
**managed** 26:7 37:24 38:2
**management** 1:11 5:11,16 6:14 66:25 72:1
**manager** 26:1,16,21 27:6
**managers** 32:12
**manages** 42:17
**managing** 19:2,4,9,15 20:24 87:6,6,7,10 109:22
**Marissa** 43:18,24 94:21 101:10 111:19,21 114:14 115:3,10 116:6,10 120:14,19 121:16 123:11 124:7 127:14 128:8 130:21 131:8,21 132:2,6,11,23 133:1 133:4,16,21 134:16 134:18,22 135:19 135:21,21 137:10 137:25 138:7 139:22 142:2,15 146:16 147:8 155:1 159:3 164:11 169:11 172:23,25 173:16 174:7
**marissa.young@icr...** 114:15
**mark** 10:12 12:12 49:13 52:22
**marked** 9:11 10:13 12:14 44:3 49:15 53:14 57:2 58:1 61:9 67:11 71:1 79:3 101:20 105:25 114:10 121:13 124:4 135:15 137:17 139:17 142:10 148:18 163:22 165:1 172:11,14 173:10 173:25
**Market** 71:23
**marketing** 16:8 17:18 17:22,24 18:3,14,25 19:7 21:6,15,17 22:4,22,23 23:1,5 23:24 24:6,8 25:9 26:23,24,25 27:5 29:18 38:22,24,25 39:1 40:12 52:22 53:3 54:2 72:23 73:19 83:6,8 85:4 86:16 87:16 95:12 95:16 174:17
**Marketplace** 88:17
**Mary** 81:3
**material** 158:14
**materials** 149:4 152:2,10,14 154:1,7 156:10 157:7,13
**Matt** 159:24 160:11
**matter** 12:25 125:4
**matters** 15:15
**McCARTY** 2:8 181:10
**McCauley** 29:23 31:4 81:11,20,23 142:16 159:25
**McCauley's** 30:5
**McDonald** 3:16
**McNealy** 80:17 81:6 159:23
**mean** 8:14 11:3 14:1 17:7 19:12 20:20 26:3 28:20 29:20 45:16 46:5 48:24 49:7 56:21 62:8 68:1 69:12 79:22 84:11 85:21 88:4 91:18 93:13,22 97:15 103:24 110:10 124:20 134:6 141:1 144:9 149:22,23 151:7 152:4,6,9,13 154:9 154:18 157:14 162:9 164:10

171:19 176:6
**meaning** 163:8
**means** 12:17,20 13:2 14:8 47:15,22 48:13 49:5,9 124:25 127:16 151:8 152:10 155:17 157:17,18 164:9
**meant** 36:15 113:1,3 138:21 151:1 157:15 159:21
**measure** 84:19
**media** 24:23 85:12
**medications** 14:22
**meet** 31:20,23 32:7
**meeting** 3:17 8:19 13:7 24:2 32:11,11 35:21 39:21 41:11 78:18,20,22 79:1,7 79:11,15 81:14 82:22 83:14,24 87:22 88:3,24 89:7 89:9 90:3,7,10,20 90:25 91:5,10,23,25 92:6,9,18 93:6 94:3 97:8 98:24 101:17 118:10,14,17,21,25 119:5,7,8,11,15,21 119:21,24 120:10 120:17 121:7 149:5 150:24 151:3,17,21 151:24 152:3,21,22 153:19,20,24 154:1 154:8,13 155:3 157:8,13,22,24 158:13,14 162:18 162:19
**meetings** 20:21 24:7 25:12,19 31:25 32:16,24 35:4,7 53:25 82:25 83:2 91:19,20 94:9 152:11,15 156:10
**member** 81:1,4
**members** 79:14,25 80:11 81:7 89:20,23
**memory** 14:23 104:11
**mention** 87:17
**mentioned** 23:16 31:7 38:15 43:13 64:20 69:19,23 72:20 77:12 86:9 89:12 97:11 113:7 140:15 158:3 163:3 166:10
**mentioning** 59:25
**menu** 171:22
**menus** 171:21
**message** 64:12
**messages** 60:14,19 62:2,13,19 64:4
**messenger** 64:7
**messing** 101:13
**Messinger** 2:8 5:10 5:10,15,15 13:9 14:9,15 25:7,13,20 26:14 31:22 32:8,17 32:25 33:4,17,23 34:4,11,19,25 35:9 35:23 37:8 38:4,17 39:3,10,17,23 40:4 40:14 41:15 42:2,7 42:21 43:11 45:3,13 46:6,13 47:3,16 48:3,9,21 49:1,20 49:23 50:5,15,20 51:23 52:8 55:21 56:3 59:13 60:7 62:23 63:7 64:19 65:24 66:6,14 67:7 67:24 72:10 78:14 86:13 91:14 92:2 95:2,17,20 96:1,6,8 96:11 97:25 98:19 99:7 100:11,14 103:23 105:9,13,20 105:23 106:5,14,20 107:6,18 110:6,22 111:13 112:2,15 113:11,19 114:5 115:21 117:6,22 118:15 119:13 120:21 122:17,25 123:7 125:2 127:4 129:7 130:16 131:9 133:23 141:22 143:8,16 147:11 148:8 151:4,22 152:17,25 153:6,22 154:15 155:5,19 156:18 157:2 158:1 158:16 159:5,8 160:4 161:10 163:14 167:2 168:6 168:17 169:5,17 174:21 175:3,8,16 176:3,9,14,20,25 177:1 181:10,13
**met** 14:14 41:9 142:21
**metric** 20:9 84:7,14 84:18 85:20
**metrics** 20:15,16 86:12,19
**Miami** 2:3
**MIAMI-DADE** 178:4 179:4
**Michiel** 80:10
**Middle** 1:1 50:6
**Miller** 81:13 82:17,18 159:25 160:16
**Miller's** 160:17
**million** 54:25 77:6,6 77:15
**millions** 89:21
**Milne** 30:24
**mind** 31:16 120:15
**mindset** 95:4
**mine** 40:16
**minimum** 169:9
**minutes** 3:18 57:10 79:1 90:7,10,17,20 90:25 96:9,12,13 101:17 129:1,5 130:14
**Mischaracterizes** 106:21
**missed** 174:24
**misspoke** 69:25
**model** 166:9
**moment** 61:23 124:22 156:8
**Monday** 147:7,10 181:19
**money** 18:15 85:23
**months** 16:18 17:2
**morning** 5:7 6:10 23:23 24:2 45:18
**Mortality** 73:15 88:18
**motions** 117:24 118:1 172:3
**mouse** 117:24 118:2
**move** 24:4 112:5 146:4 173:5
**moved** 6:16
**moving** 24:4 31:2,4
**multiple** 56:1 137:24
**mute** 173:19

**N**

**N** 3:1 107:14
**n/k/a** 1:11
**name** 5:8 6:11 23:15 31:2 45:25 92:15 103:10,11,13,16 170:14
**named** 165:7
**names** 23:12 28:18
**Nasdaq** 67:5,10,13 67:14,21,22 68:13 68:15 70:4 92:14 94:19 97:12 113:10 117:19 170:13 172:18 174:6
**Nasdaq's** 66:24 67:2 67:3
**national** 24:24
**navigate** 75:11,14,16 76:2,10,21
**navigation** 171:24
**necessarily** 26:19 65:15
**need** 7:6 11:25 19:20 19:21 20:10 24:4 33:21 73:16,18,19 73:22 83:24 130:3 176:24
**needed** 32:1,2 43:23 83:6,8,11
**needs** 24:3
**negotiations** 50:24
**never** 7:24 9:25 43:1 43:8 45:4,6 47:7 52:9 58:24 59:1 65:4 115:25 132:17 147:24 148:1,3 165:16,22
**new** 32:20
**news** 24:14 166:12 168:15 169:2
**newsletter** 165:10
**nice** 15:13 97:2
**non** 149:2,5 151:7,8 152:3,21 153:19,25 154:2,8,11 156:5,11 157:8,13,22,24 158:11 160:2 162:5 166:23 168:9
**non-objectionable** 50:13
**non-public** 155:18,21 158:11
**nonidentical** 62:10
**Notary** 1:23 178:17 180:21
**noted** 110:11
**notes** 179:12
**notice** 1:24 181:22
**noticed** 10:1
**notified** 78:12 103:3 103:8,9,10,13 104:11,12,16,17,19 105:3 106:9 107:14 107:17,25 108:3,6 108:12,16 109:10 110:19 111:2,7 138:8,13,15,19,22 139:2,5
**Nov** 167:9
**November** 11:5 12:6 22:21 35:18 40:22 41:3,12 42:19 44:23 70:10 71:11 73:11 78:6,18 79:8 98:13 99:23,23 100:7,8,20 100:20,24,25 102:23,24 106:3 114:22 118:10 119:1,2 121:17 124:8,14 132:8 138:1 139:20 141:12 143:13 145:10 157:10 172:15
**number** 19:22,25 20:10 23:20 27:13 32:19 43:20 55:1,14 75:16 77:13,17 87:3 88:6 100:4 102:7 173:19
**numbers** 20:14 43:21 53:17,21 54:3,7,21 55:2,14 75:19,23 76:20,21 77:1,4,9 77:10 78:10 101:13

**O**

**oath** 65:8,11 148:11 178:1

**object** 7:12 48:10 106:6
**objecting** 50:11 105:15
**objection** 13:9 14:9 25:7,13,20 26:14 31:22 32:8,17,25 33:4,17,23 34:4,11 34:19,25 35:9,23 37:8 38:4,17 39:3 39:10,17,23 40:4,14 41:15 42:2,7,21 43:11 45:3,13 46:6 46:13 47:3,16 48:3 48:9,21 49:1,20,22 50:7,10,14,20 51:23 52:8 55:21 56:3 59:13 60:7 62:23 63:7 64:19 65:24 66:6,14 67:7,24 72:10 78:14 86:13 91:14 92:2 95:2,17 95:20 97:25 98:19 99:7 100:11,12 103:23 105:10,16 105:18 106:14,20 106:23 107:6,18 110:6,22 111:13 112:2,15 113:11,19 114:5 115:21 117:6 117:22 118:15 119:13 120:21 122:17,25 123:7 125:2 127:4 129:7 130:16 131:9 133:23 141:22 143:8,16 147:11 148:8 151:4,22 152:17,25 153:6,22 154:15 155:5,19 156:18 157:2 158:1 158:1,16 160:4 161:10 163:14 167:2 168:6,17 169:5,17
**objections** 3:19 50:6 101:24 102:14
**obviously** 130:13 175:19
**occur** 91:21
**occurred** 132:20 138:11
**occurring** 24:13 32:19
**offers** 67:14,21
**office** 41:9 66:1 181:17,18
**officer** 17:22 22:22 23:1,5 29:18 30:1 30:24 38:23 95:12 174:18
**official** 178:10
**oh** 21:11 96:9 137:13 139:9
**okay** 5:15 7:18 8:3 9:10,15,19,24,25 10:11 11:7,20 12:2 12:3,11 13:6,24 14:18,25 15:3,25 16:2,6,9,19,22 17:4 17:16,23 19:4,8,11 20:5 21:20,24 22:2 22:13,25 23:16 24:10 25:24 27:18 28:7,12 29:13 30:11 30:19,23 31:9,13,17 34:16 36:2,15 38:2 39:14 40:10 44:2 46:16 47:1,6,13,20 48:12 49:12 50:23 53:5,6,10 54:4,5,9 54:12,25 55:6,9,17 57:1,8,23 59:8 61:5 61:23,25 63:2 64:11 64:14 65:13 67:15 69:14 70:1,9,19,19 71:10 72:2,4,14,18 72:22 74:2,5,12,15 74:21,25 75:2,7 76:1,11 77:25 78:3 78:25 79:14,24 80:25 81:6,9,20 82:7,16 83:16 84:8 85:9 86:2,8 87:15 87:21 88:5,5,23 90:5 91:25 92:13,17 93:19 94:18 96:3,16 97:1,6,21 98:3,16 99:22 100:5,18,23 101:4,7,11,15,18,23 102:5,7 103:17 104:22 109:3,7 110:1 112:5 114:8 116:4,22 117:18 118:5,24 119:8 123:10 124:2,7,11 125:13,19 126:14 126:17 127:15 128:24 133:9 135:12 136:7 139:8 139:14,20 140:8,14 140:17,22 141:11 141:16 142:23 143:19 145:22 146:9 147:6 148:16 156:4 157:12,20 159:4,19,19 160:19 163:21 166:4,10 167:6 170:2,5,22 171:1,8 172:6,10,13 173:5,24,25 174:1 174:10 176:3 177:2
**Okeechobee** 15:2,10
**once** 7:5 83:4 175:22 175:22
**ones** 8:16 37:25 55:15
**online** 26:19
**open** 116:19 173:2
**operational** 18:8 25:2
**opinion** 83:6,8 123:8 123:10 156:13,15 156:20,25 157:4 167:13,22 168:18 168:24 169:6
**opportunity** 21:23
**opposed** 113:2
**opposite** 151:8 152:11 154:10,11
**order** 74:7 75:10 172:7
**ordering** 176:21
**ordinary** 24:13
**original** 62:9,9 160:9
**originated** 54:23,23 55:1,2 77:12,13
**Orlando** 1:2 6:17 15:5,12 21:22
**outside** 8:25 18:13 22:9 24:6 25:14 26:12,20 28:17 33:25 34:13,20 35:15 36:4 39:24 40:3 49:10 56:8 63:18 66:7,11 75:24 91:15 105:20,23 106:4 119:15,18 120:1,3 123:1 126:3 126:6,8,10 155:16 162:24 163:3 167:23 169:19
**outstanding** 109:4
**overview** 88:15
**owned** 71:25

**P**

**P.A** 2:2
**p.m** 1:17 126:13 177:5 181:19
**page** 3:2,8,25 12:3 44:13 57:1,3,6 75:16,18,23 76:10 76:13,14,22 77:9 117:10 170:18 171:24 180:5
**pages** 53:3,10 55:10 55:10,18 59:1,5,18 64:14 76:12,14,19 102:19,20
**paper** 48:13
**paragraph** 44:11,13 88:8
**part** 7:21,24 10:7 24:19 29:19 32:2 37:12 40:11,20 45:22 55:8,23 69:15 71:24,25 84:20 85:21 86:1,5,20 104:19 105:3 106:12 109:24 174:25
**participating** 79:15
**participation** 110:13
**parties** 44:15,16,20 44:21 179:16
**parties'** 179:17
**partner** 80:21
**partners** 80:18,20 160:9,12
**party** 47:23 61:20,21
**Party'** 47:24
**pass** 9:24
**passage** 60:1
**passed** 65:18
**passing** 28:25 29:4 41:10,11 103:16
**password** 66:10 68:5 68:6 69:22 70:2,5 70:12
**patience** 12:2
**PDF** 75:14,22 76:6,18
**PDF's** 75:11
**Pegula** 28:24 29:9,11 80:6
**pending** 7:8 175:16 175:18
**people** 18:22 20:25 21:2 32:12 33:11,13 41:4 72:23 79:17 85:24 86:3,4 116:9 137:6 148:22 154:25 155:16 158:4 159:1 160:22 161:3 169:9,14,21 171:2,9
**perception** 107:10
**performance** 19:25 20:9,15,16 84:7,14 84:18 131:23 132:1
**performed** 20:11
**period** 19:6 89:15 101:5 102:23 161:25 162:2
**periodically** 31:23 54:3 83:3
**person** 21:20 65:19 65:19 72:19 119:19
**personal** 10:7,17 13:1 29:5 49:6,6 60:10 60:12 63:19,20,23 66:15 80:2,12 100:15,18 119:20 142:21 164:19 167:24
**personality** 115:23
**personally** 86:14
**perspective** 26:11 46:2,5 110:7,10
**phone** 43:20,21 60:10 60:11 62:18 63:12 63:19,21,23 64:8 123:17 126:15,17
**pick** 97:9
**piece** 167:22
**piecemeal** 137:23
**place** 66:4 69:20 113:22 114:1 125:11 155:11,12
**Plaintiff** 1:9 2:4 5:9 6:6 102:19
**Plaintiff's** 3:9,10,12

3:13,14,16,17,19,19 3:21,22 4:7,9,11,13 4:15,17,20,22 10:14 12:15 49:16 58:2 61:10 71:2 79:4 101:21,24 114:11 121:14 124:5 135:16 137:18 139:18 142:11 148:19 163:23 165:2
**planned** 146:9
**plans** 88:11
**platform** 64:5 66:25 67:16 68:2,20 69:6 69:10,16 70:10,16 70:17 84:14 92:15 94:19 97:12 113:10 170:14 171:18 172:1,18 174:6
**platforms** 18:13
**play** 143:21 145:2,24
**played** 106:9 107:14
**please** 5:4,21 6:10,24 7:2,10 22:3 53:4 73:13,14 76:17 82:13 106:24 122:12 144:4 164:9 177:1 181:14,16,19
**Plesco** 30:12
**PM** 102:25
**point** 22:25 33:10 45:2,12 50:23 51:1 86:15 97:23 99:23 100:7,19,24 101:5 116:11 132:8 143:2 144:10 146:24 149:19 154:2 161:5 165:11
**points** 141:17
**policies** 26:2,9 54:22 55:1 77:13,17
**policy** 88:21 93:5,7
**Pond** 15:4
**portions** 175:14 176:1
**position** 15:23 16:6 17:17,19,21 38:14
**positions** 38:14,15
**possible** 129:2 138:5
**possibly** 169:13
**post** 43:13 94:22 99:6 133:1
**posted** 37:25 70:16 70:17 99:10,19,20 100:9,21,25 101:8 101:10 102:20 103:3,19,22 104:4 105:4 110:4 111:2,3 111:7,7,9,18,20,21 111:23 112:8,11 113:10,14 114:4 122:16,19 155:9,15 156:1,5 158:14 164:17,21 165:7 167:18,25 169:2 171:14
**posting** 102:11,12 104:13 108:9 109:14 122:24 123:5 124:24 131:13,17 162:22
**posts** 109:18 165:5
**potential** 44:15,17,24 45:7,19 47:2 49:18 50:3,19 51:6 52:6 64:16 88:14 89:1,5 89:5,20 91:6 148:13 149:3,17 161:24 162:1,6,10 165:5 166:7 169:14
**potentially** 77:16
**PowerPoint** 76:7,18 120:13
**predicting** 7:1
**premarked** 11:8 52:14
**preparation** 13:7,8 25:12,18 52:20,25 104:8,10 112:1 163:1,6
**prepare** 8:3 13:24 53:19 65:20,22 83:23 98:10 104:3 110:3 111:17 120:6
**prepared** 12:8 14:13 35:18 39:21 57:3,6 59:19 65:14 90:8,21 91:1 103:21,25 105:2 110:21 134:19
**prepares** 90:10 95:13
**preparing** 35:14,21 36:3 53:11 56:10 83:12 110:1
**present** 2:20 14:16,17 81:10 107:5 119:11
**presentation** 89:11 117:11 118:22 120:7,13,16 130:22 133:10,11 135:22 135:23 162:15 172:15
**presentations** 54:2,24 102:22
**presented** 11:4 25:18 34:24 35:7,13 52:7 88:2,4,15 91:10 92:10 98:8 107:1 118:17,20 119:4 120:6,12 151:2 157:21
**preservation** 63:14
**preserve** 63:11,20
**president** 19:9 22:4,5 22:6,23 160:14
**presumably** 133:4
**presumptively** 119:10 134:19 149:13
**pretty** 31:17 73:21 74:18 82:12 157:18
**previous** 107:20
**previously** 116:6 117:12 140:15 149:9 172:11,13 173:10
**primary** 24:16,21 115:16
**printed** 9:14 92:5
**prior** 43:13 93:18 113:7 121:7 122:8 154:20
**priority** 125:23
**private** 155:10 170:21
**privileged** 13:11 33:2 33:5,7
**privy** 15:22 29:16 45:8
**proactive** 129:8
**probably** 7:11 22:1 28:5,20 75:12 83:20 166:11 171:24
**problem** 12:1 152:16 152:23
**procedure** 91:7,9
**proceeding** 10:14 12:15 49:16 58:2 61:10 64:21 71:2 79:4 101:21 114:11 121:14 124:5 135:16 137:18 139:18 142:11 148:19 163:23 165:2
**proceedings** 13:20 57:13 96:22 159:15 170:9
**process** 45:23
**processes** 18:18
**produce** 63:5
**produced** 8:14 180:20
**produces** 85:23
**production** 61:14,20 62:5,6
**Professional** 1:23 179:6 181:1,4
**profit** 22:15
**program** 88:22
**projects** 24:5 25:2,3
**promise** 101:19 140:1 140:22 141:1,12
**promoted** 18:25 19:2 19:6 23:1 174:17
**promotion** 22:2
**promotions** 19:11
**prompted** 43:9 129:4
**prong** 21:17 26:13
**pronounce** 80:9
**properly** 104:1
**proprietary** 44:19
**protected** 66:5 68:5
**protection** 66:10
**protocol** 35:17 93:5,7 93:19 94:2,5,12,13 94:14,15,17
**provide** 54:22 55:14 87:18 181:16
**public** 1:23 23:8,16 23:18 42:1 69:19,22 69:24,24 70:3,8 93:24 94:2,3 95:7 95:13 97:8 98:4,14 98:18 99:1,6,10,15 112:18 113:2,2,3,5 117:1 122:13 139:25 149:2,5 151:7,8,9 152:3,11 152:15,21,23 153:19,20,25 154:2 154:8,9,10,11,14 155:4,21 156:1,2,2 156:5,6,11 157:8,13 157:22,24 158:11 160:3 162:6 163:11 164:9,22 166:13,15 166:20,23,23 167:8 167:11 168:5,9,10 168:16,23,23 169:2 169:3 178:17
**Public-State** 180:21
**publication** 168:4,15
**publicly** 68:13
**publicly-traded** 25:5 99:5 170:19
**published** 102:10 166:19 168:4,15,15 169:15
**publishes** 166:24
**pull** 9:10 69:15 75:24 92:19,21,23 123:19 125:12 127:24 141:3,4
**pulled** 69:18 92:13 94:19 97:11 116:18 117:9,19 124:15 126:21 127:10,10 127:13 162:18 172:17 174:5
**pulling** 105:25
**punishment** 131:8
**purchase** 26:2
**purpose** 93:10 98:4 99:1 115:14 181:17
**purposes** 47:21
**pursuant** 1:24
**purview** 18:14 28:17 33:25 34:13,21 35:15 36:4 39:25 40:3 56:4 63:18 86:17
**put** 6:3 49:9 53:21 56:6 59:19 63:5 76:13 85:8 99:15 117:20 118:3 148:2 168:23 169:3 172:3
**puts** 17:6
**putting** 76:11 146:20

**Q**

**Q3** 115:4 121:3,19
**qualified** 20:1
**quarter** 71:14 73:14 88:11 99:19 117:10
**question** 6:24 7:2,3,8 7:9,10,14 34:6,6 50:8,11,13 52:15 60:17 70:1 97:14 100:13 102:5 109:4 109:8 111:5 118:8 126:23 127:20 128:6 129:18 130:9 130:11,15 134:9,11 145:2,7,14 154:6 156:16,24
**questioned** 127:6,8
**questioning** 126:25
**questions** 6:21,23 7:12 59:20 73:21 83:17 89:22,24 97:1 106:5 120:4 125:10 126:20 128:1 136:12 146:2 150:5 150:16 174:20
**quick** 11:24 13:14 58:7 65:3
**quickly** 24:3 128:13 128:16,18
**Quinn** 2:7 5:10 181:9
**quote** 143:25

**R**

**R.P.R** 179:24
**radio** 24:24 85:14,17 85:22
**Radka** 80:25
**raise** 5:20
**raised** 126:11
**Ralph** 30:24
**random** 167:21
**rarely** 63:25 126:3,9
**re-notice** 3:9,10 9:11 11:8 106:1
**reach** 43:22
**read** 44:11 88:8 102:17 109:5 115:2 116:22 124:12 145:2 149:14 155:7 157:6 166:4 167:6 176:10,11,12,13,18 176:19,20
**reading** 48:1,12 107:12 146:1 165:12 181:18,21
**ready** 124:16
**Realistically** 56:25
**really** 5:14 13:12,14 15:15,22 19:1 22:11 24:21 25:15 26:6 32:9 68:21 80:23 109:18 110:2 115:7 120:3 127:17 133:25 155:11 166:22
**realtime** 91:12
**reason** 14:18 53:15 101:12 140:5,11
**reasons** 102:13
**recall** 9:4,20 10:21 16:4,17,24 17:9 19:1 23:15 28:21 38:18 39:11,18,21 40:2,7,25 41:16 42:22 43:4 49:21 54:7 56:22 59:14 60:4 62:20 63:13,22 69:12 70:6,14 72:8 73:5 74:4,9 77:8 78:5,15,17,23 81:15 82:24 87:22 88:1 89:8,13 92:12,17 95:3 97:22 100:22 101:2 104:17 112:3 112:12 115:12 116:8 117:23 119:6 121:8,23 124:18 129:11 130:10 131:1,10,15,22 132:3,7,12,13,19,21 132:24 134:21,25 135:2 136:10,17,20 136:23 137:1,5,9,12 138:9,10,17,20 139:3,7 140:2,3,10 140:21 142:5 143:5 147:5,12,15 148:9 151:5,11,15,23 152:5 161:15,22 162:17,20,24 164:1 164:23 165:12,21 165:24 166:3 168:2 171:15,23
**receive** 15:13 58:11 58:12,14,15 131:7 149:7 150:18 166:25
**received** 9:23 59:16 74:6 128:9 136:8 143:17 145:11,18 153:17 162:3 166:12
**receives** 114:2
**receiving** 73:25 121:23,25 138:9 161:8
**recess** 13:19 57:12 96:21 159:14 170:8
**recognize** 114:18
**recollection** 19:12 72:5 73:24 79:10 89:16,23 90:1,16 92:8 103:6 105:5 118:20 119:25 133:14 134:3 164:3 164:19 167:17,24
**reconcile** 125:1
**record** 5:2,5 6:11 13:14,17,22 36:7,9 36:11,13 50:8 53:13 54:14 57:9,15 96:19 96:24 102:15 105:1 105:14,19,24 108:21,23,25 109:2 110:2 114:23 144:16,18,20,22 159:12,17 170:6,11 174:22 175:4 177:4 177:5 179:11
**Recording** 57:11
**refer** 51:17 57:18 58:4 112:22
**reference** 116:25 181:13
**references** 72:4
**referencing** 102:19 107:21
**referred** 62:6
**referring** 40:22 57:19 69:5 87:11 112:23 113:1
**reflect** 86:9
**reframe** 143:9
**refresh** 72:5 73:24 90:15,19
**refreshes** 164:3
**refreshing** 104:11
**regarding** 41:13 42:20 44:15 131:20 132:10
**Registered** 1:22 179:6 181:1,4
**regular** 31:25
**regularly** 32:7 126:1
**Reid** 148:24
**reinsurer** 88:21
**reiterate** 126:22
**related** 30:18 44:21 64:15 105:8
**relation** 64:21
**relations** 36:20,21 37:2 109:19,25
**relationship** 37:23 39:8 42:13,14 43:7 108:16 109:10 142:22
**relationships** 29:6
**relative** 179:15,16
**relevant** 8:16 60:19
**remained** 17:19
**remaining** 31:11
**remains** 70:2
**remedies** 105:8
**remember** 30:9 31:2 78:21 81:22 82:21 98:1 101:19 118:4 118:12 119:4 120:1 120:2,2 121:25 130:4 134:7 135:3,7 149:3 152:1 157:6
**remembered** 119:7
**remembers** 10:8
**remind** 22:3 82:13 92:14 170:14
**remote** 1:19 177:7 179:8 181:13
**remove** 143:14 145:12
**removed** 130:23 133:10,11 135:22 167:16
**removes** 166:6
**Renegade** 1:6 180:3 181:7
**reopen** 105:7,17 106:7
**rep** 100:23 103:18
**repeat** 7:11 60:17 77:3
**Replace** 124:17
**replied** 111:19
**replies** 138:7 141:16 142:2
**report** 21:18 136:18 179:8
**reporter** 1:23 5:5,13 5:19 6:2 7:4 10:23 11:1 29:2 34:5 36:21,25 37:3 57:21 58:13 70:23 78:2 100:3 101:14,16 105:21 109:5,8 124:1 135:9,12 139:11 143:23 144:1,5,12,14 145:1 145:6,18,21 147:17 163:20 165:6 173:14,18,22 176:10,21,24 177:2 179:7 181:4
**REPORTER'S** 179:1
**REPORTERS** 181:1
**reporting** 53:20 181:1
**represent** 5:8
**representation** 107:9
**representative** 10:18 12:18,25 110:15 164:16
**reprimands** 131:7
**request** 56:15,19 61:14,19,20 62:5 73:17 125:21 127:19
**requested** 74:11 144:3 179:10
**requesting** 164:12
**requests** 62:5
**require** 99:6
**required** 38:15 39:1
**research** 137:2
**reserve** 105:6,8
**reserving** 105:15 106:6
**reset** 70:12
**respect** 47:23
**respective** 44:17,20
**respond** 86:4 128:25 129:2 135:25
**responded** 133:4

**responds** 128:24 130:21 136:7
**response** 7:4 102:6 162:22
**Responses** 3:19 101:24
**responsibilities** 18:11 19:14 23:4 87:16,19
**responsibility** 22:6 72:7 86:11,21,22
**responsible** 18:4 35:14 36:3 54:19 56:10 59:9 77:11 86:25 87:2 95:9 109:14,22
**rest** 77:8
**retains** 155:17
**retired** 80:3
**return** 107:20
**revenue** 18:2,4 86:23 87:2
**review** 51:11 58:22 77:10 104:7 116:16 117:13,17,18 120:18 122:13 132:1 172:20 174:1 175:17,18,19 179:9
**reviewed** 8:6,10,12 8:13,14 9:5 83:10 148:3 174:11
**Reviewing** 13:25
**reviews** 131:23
**RFP** 3:15 61:7,16
**right** 5:20 6:19 9:22 11:18,19 18:15 19:25 20:2,12 23:15 24:10,14,17,22 26:16 27:15 30:8 31:8,16 38:22 41:8 45:10,17 55:16 61:23 65:20 76:8 81:9 85:22 95:21 96:16 97:9 105:7 106:6 115:15,20 116:8 117:1 118:11 118:14 121:1,2,7 123:12,25 130:15 135:8 139:10 140:1 140:12,23 141:1,7 141:13,14 142:4 143:7,15 144:6 145:13 147:25 149:11,14 150:24 151:17 152:6 154:20 156:3 158:3 158:5,15 166:4,16 169:10 171:3,20 172:12,12 173:4 175:19 176:18
**rights** 105:15
**River** 15:11 159:21
**RiverRock** 1:7 5:9 44:7,25 45:21 47:10 49:19 50:24 51:2,8 52:3,6 64:15 88:14 89:2,4 90:2 91:23 102:7 148:13,24,25 149:18,20,22 151:2 151:20 165:5,14,18 169:15
**RiverRock's** 3:14 51:5,16,18 61:7 102:9
**Rock** 15:18,19,20 16:3,9,15,23
**role** 17:24,25 21:9,10 21:25 22:5,8,17,19 22:21 25:11,14,17 25:22 30:5 31:3,5 37:7,13 40:12,16 41:19 52:20 53:11 81:22 88:15 104:12 105:6 106:9 107:14 107:17 109:17,20 115:17
**roll** 24:16
**Romaine** 81:11,16 82:3 90:15 142:16 142:23 146:20 159:25
**room** 51:11,21
**rough** 27:13
**roughly** 22:20 27:25
**routine** 35:20
**RPR** 181:25
**RR** 149:22,22,23 150:2,3 151:1,13,13 151:19 159:21 160:1,2,2 162:4
**rules** 6:22 7:16 99:5
**run** 61:1 86:3
**running** 18:12 24:22 24:23
**runs** 85:23

**S**

**S** 2:7,8 3:7 181:10
**safe** 121:5 150:21
**safeguards** 66:3
**safer** 28:5
**sales** 32:20
**Samantha** 159:24 160:13
**Samsung** 64:10
**SAS** 67:14 171:3
**sat** 89:10 162:14
**saved** 97:13,17 121:1
**saw** 9:24,24 59:2 118:13 120:16,20 120:22 128:22 151:12
**saying** 37:17 46:3 65:10 68:20 85:25 101:5 102:15 112:25 118:2 119:18 120:3 121:19 124:25 127:21 128:20 130:22 138:7 141:12,20 143:7 146:16 150:17 153:9 169:25 175:24
**says** 12:4 47:14,21 54:25 62:4 73:13 77:6 79:6 81:9 121:2,2,21 131:2 135:21 146:23 147:6,8 149:19 150:1 152:1,13 153:25 157:12 158:2 162:5 166:5,8 166:9,17 167:6,11 167:14
**scale** 23:9
**scheduled** 144:13,15
**Schulte** 81:3
**scope** 66:7,11 105:20 105:23 106:4,19 123:2 133:24 134:4 134:6,8,11 162:25 163:4 167:23 169:19
**Scott** 159:23 160:8
**screen** 9:12,22 90:12 92:10 172:16
**scroll** 11:22 53:2 54:4 57:1,5 73:10 75:9 88:5 124:11
**scrolling** 48:15 53:8 54:6,8,10 55:6,8 164:2,3
**seal** 178:10
**Sean** 80:17 159:23
**search** 59:24 60:2,13 60:18 62:18 85:4 144:2
**searched** 60:6,25 62:22
**searches** 60:25
**searching** 60:22 144:7
**second** 11:23,24 15:24 23:15 36:8 44:13 58:7 61:8 75:25 144:17 160:12
**section** 47:20
**sector** 169:4
**see** 12:4 51:21 57:17 58:8,10 60:2 62:1,4 62:13 71:6,11,13,15 73:13 77:21 79:6 85:24 86:3 90:5,7 91:19 95:14 96:16 99:18 111:4 116:20 117:9,14 121:1,3 128:25 129:2 130:17 131:2 134:22 138:5 140:3 143:24 144:6 148:25 162:5,8 164:2 166:16 173:2
**seeing** 41:12 78:7 90:23
**seek** 62:5
**seen** 9:15,25 11:10,15 11:18 44:7 47:7 52:18 61:12 101:25 122:1 163:25 164:5 165:9
**sees** 95:19
**selected** 68:16
**self-defined** 157:19
**self-evaluation** 20:23
**send** 43:2,9 54:7 112:13 113:4 128:12,17 130:7 140:6,12 141:18 142:4 146:16 161:12 172:7,22 175:23
**sending** 39:7,9,16 40:12 58:21 65:22 72:25 117:5 121:23 121:25 124:18 128:19 131:8,20 132:1,5,10,25 133:15 134:17 140:2,10 141:7 164:11
**sends** 43:25 66:9 142:23 149:13
**senior** 160:22 161:3
**seniority** 22:12
**sense** 7:16 32:10 74:1 126:19 128:11
**sensitive** 65:18 66:9
**sent** 39:14 40:21 41:1 53:21 55:4 68:14 71:10 72:23 76:18 78:6,11 91:3 94:21 101:9 103:2,3 107:24 108:6 110:12,17,18 113:8 114:19 116:12,15 116:18 119:1 120:14,19 121:4 129:15,20 130:5,14 130:18 131:16,19 133:5 137:22 138:1 140:25 148:21 160:19 169:11 172:24 174:6
**sentence** 48:7 152:9
**separate** 37:5
**serves** 99:2
**service** 67:21 166:22 181:1
**set** 3:20 18:18 68:4 70:4,6 101:24
**Seth** 81:13 82:17,18 159:25 160:16,17
**setting** 43:2
**settlement** 26:1,5 27:8
**settlements** 26:8
**share** 9:12,14 90:12 136:24 172:10
**sharing** 11:24
**SHEET** 180:1

**shortly** 70:3,7 94:1
**show** 11:7 44:2 52:12 52:14 59:17 61:5 70:19 78:25 95:23 101:11 102:5 112:24 114:8 121:11 123:23 135:5,13 137:13,15 139:8,14 142:8 148:16 163:18 164:24 173:8,24
**showed** 57:19 67:11 84:1
**showing** 9:22 101:23 172:13 173:3
**shown** 112:21,23 119:12,15
**side** 21:19 26:24 30:19,23
**signature** 48:16,24 49:4,9 116:3 181:15
**signature's** 115:16
**signed** 48:16,19 107:13 112:6
**signing** 181:18
**signs** 49:8
**similar** 142:13
**similarly** 74:25
**simply** 50:7 84:18 85:8
**Sincerely** 181:23
**sir** 5:21 125:15
**sit** 14:18 37:17 40:10 70:15 104:15 111:1 111:6 122:22 134:12 147:20 148:11 155:24 168:3
**site** 121:22 122:3,5 122:10,10 123:6 135:24 139:25
**sits** 28:15,18 29:14
**sitting** 59:20 92:9 120:8,16,17
**size** 22:10
**skip** 102:16
**slide** 12:5 53:19 54:4 54:5 55:12 71:15 72:5 73:15,15,16,19 73:20,20 74:3,12,17 74:21,25 75:5,7,8 75:10,15 76:2,5,20 76:21,22 77:14 106:2 107:15
**slides** 54:2 56:6 73:3 74:11 75:9 77:20 83:10,12,13,17 89:16 148:2
**slightly** 142:14
**slow** 53:8
**small** 31:17
**Smith** 1:19 3:4,22 5:7 5:19 6:5,10,12 7:23 10:8 49:7 81:12 103:2 105:2 106:9 135:22 173:16 177:11 178:7 179:9 180:4,18 181:14
**social** 85:12
**Soft** 15:18,19,20 16:3 16:9,14,23
**solemnly** 5:22
**solution** 67:14 171:3
**Solutions** 160:15
**someone's** 86:10
**soon** 16:22
**sorry** 5:13,14 9:17 10:23 11:13,23,23 21:16 29:3 30:2 34:5 36:23 56:17 57:18 58:13,15 60:16 61:7 65:3 68:1 69:18 73:17 76:16 77:2 83:14 90:5 96:9 97:15,15 97:16 101:15 103:25 105:21 122:7 124:16 128:24 135:11 139:12 165:19 167:22 173:18,25 176:14,16
**sort** 162:17
**sounds** 19:13
**source** 167:14,21
**South** 181:17
**Southeast** 2:3
**space** 130:6 138:24 147:2
**spaced** 119:24
**speak** 8:7 9:7 21:12 22:19 26:20 27:3 33:24 35:1,5,10,24 37:9,16 38:5 41:6 41:17 44:1 46:18 47:17 48:4,22 49:2 51:1 54:21 55:22,25 58:9,19 62:24 65:25 68:3,18 72:11 73:4 74:20 75:6,12 78:8 81:18 83:13 93:7 94:5,12 97:3 98:10 103:9 106:13,15,19 106:25 107:4,7,9 110:16,23 111:14 113:12,20 115:22 118:16 121:10 138:15,24 141:6 142:21 146:7 148:1 152:18 153:1,4,7,10 153:10,14 155:20 156:4,4 158:19 163:15 164:12 166:14,22 167:12 168:8
**speaking** 50:5 65:15 106:23 115:18 143:23
**speaks** 13:3
**specific** 10:19 24:15 35:22 45:24 85:18 103:18 129:21 171:7
**specifically** 7:13 8:16 9:4 32:6 59:5 69:2 73:6 84:20 110:11 136:21 157:23
**specifics** 14:3,7,10
**specify** 46:17
**speculate** 42:9 157:15
**spend** 18:15 20:13 24:12,15,16 85:23 87:6
**spending** 18:15
**sphere** 168:23
**spoke** 8:5 33:9 41:4 80:5 137:10
**spoken** 8:25 43:1 116:1,6 165:17,19 165:22
**staff** 160:24
**Stamp** 124:3
**stamped** 53:15
**stand** 20:3 55:15
**standard** 18:14 87:8 102:24,25
**standpoint** 35:17 91:7,9 94:2
**stands** 61:16
**standup** 23:23 24:1,2 24:8
**start** 14:25 16:23 38:12
**started** 15:17 17:7,16 18:23 27:22 38:8 145:15
**starting** 174:4
**starts** 44:11 73:10 88:9
**state** 1:24 6:11 136:2 178:3,17 179:3
**stated** 107:14 117:12 159:3
**statement** 152:7
**states** 1:1 102:18 103:1
**status** 155:18,21
**stay** 87:25 99:11
**stayed** 22:10,10
**stays** 99:14
**stenographic** 179:11
**stenographically** 179:8
**steps** 98:22 108:2 139:1
**stop** 11:24 53:4,9 54:11 84:10 106:24 181:16
**stopped** 57:11
**storage** 66:24
**stored** 62:7 90:21
**straightforward** 73:22
**Street** 2:7
**strike** 56:13 69:18 89:19 91:8,8 97:16 118:9 131:17 147:21,22 151:19 173:9
**subject** 138:1 151:12
**submitted** 90:14,16
**subscribe** 166:11 169:22
**subscribed** 165:10 177:14 180:19
**subscribes** 166:25 168:22
**subscribing** 181:21
**subscription** 166:21
**subsequently** 166:7
**subsidiaries** 28:8
**Substantially** 27:22
**subtab** 102:23
**success** 85:21 86:1,5
**successful** 84:19 85:18
**Suite** 2:3 181:17
**SULLIVAN** 2:7
**summary** 73:19
**super** 148:25 150:1,8 150:18
**supposed** 112:19 113:17
**sure** 6:24 7:2 9:18 13:16 20:9 23:24 24:13 25:25 27:6 31:15 53:16 66:4 68:21 82:12 84:5,7 84:12 85:6 88:10 104:1 113:23 116:8 116:9 122:13 124:23 128:8,22 138:11 140:25 142:20 144:12 150:3,12 159:9 164:7,10 165:11 173:3,6 175:4 176:5
**surrounding** 163:11
**swear** 5:6,22
**sworn** 5:20 6:7 107:13 110:17 111:12 177:14 178:7 180:19
**system** 97:18
**systems** 113:22 114:1

**T**

**T** 3:7
**tab** 9:11 11:8 44:3 52:15 172:21 173:2
**Tables** 88:18
**tabs** 52:22
**take** 7:4 95:24 108:2 116:19 122:2,5,8 123:11,19 125:7,21 126:18 132:15 134:15 139:1 140:16 143:7 146:14,17 150:19 152:3,6,7,13 159:6

159:7 162:9 164:12 170:3
**taken** 1:22 7:18 10:2 10:7 13:19 57:12 64:25 65:5 96:21 98:17 132:16 134:17 159:14 170:8 181:14,20
**takes** 98:22 125:23
**talk** 8:21 69:1 130:24 151:10 158:4
**talking** 14:4 51:19 58:5 150:1,12,20,22 150:22 154:19
**team** 8:5,8 18:22 20:25 22:9 23:10,24 24:24 29:19,21 31:14,20 68:9 72:19 142:24
**tech** 24:25 73:14
**Tech's** 88:15
**technical** 15:14
**technology** 25:3 27:9
**Tele** 2:5,10
**TELECONFEREN...** 181:2
**TELEPHONE** 181:19
**tell** 12:20 14:8 25:24 30:7,14 33:10 37:22 50:14 56:23 79:17 104:15 107:16 118:23 119:14 120:7 123:21 129:20 130:6,7 136:4 147:1 149:6 155:25 172:2 173:12
**telling** 40:11 76:12 107:16 110:19,20 126:18 130:3 132:15 141:20 146:13 152:20 153:18
**tells** 134:15 149:10
**ten** 16:16 96:12
**ten-month-old** 15:7
**term** 12:22 20:8 100:16 157:19
**terms** 47:24 48:1
**Terry** 28:23 29:8
**testified** 6:7 38:21
49:24 66:18 92:13 94:6,10 109:21,23 115:6 118:11 124:22 126:8 140:24 143:19 145:8,22 148:12 149:9 157:23 164:7
**testify** 12:9 14:19,23 40:10 106:18
**testifying** 10:17,18 43:8 49:5 119:19 125:20 127:16 157:20
**testimony** 5:22 47:1,6 55:9 56:18 62:17 65:7 67:12 69:9 77:19 98:12 106:21 107:5 118:24 119:3 119:23 122:23 132:14,20,22 133:13 147:23 149:16 154:24 161:23 164:4 165:16 172:17 174:2,10,13,16
**text** 60:14,19 62:1,13 62:18 64:4,11 73:9
**texted** 64:1
**Thank** 6:2 11:20 12:2 28:7 37:3 78:3 88:23 96:18 101:18 121:21 124:2 147:8 177:3
**Thanks** 115:5
**Theobald** 81:11,25
**theory** 14:5
**thereto** 44:21 105:8
**Thereupon--** 6:4
**thing** 7:7 22:13 32:4 121:9 175:13,16,25
**things** 16:12 30:18 31:21 32:20 37:25 54:8 55:14 56:14,19 56:23 62:11 86:1 87:3 93:14 137:22 164:14 175:9
**think** 6:25 19:2 21:20 42:6 47:14 48:6 50:12 55:25 57:20 75:4 80:3 82:4 87:20 99:24 108:18 108:19 135:8
144:24 146:24 150:2 152:23 153:20 156:14,16 157:1 169:22,24 173:7 174:24 175:21
**third** 108:8 117:10
**Thomas** 79:24
**thought** 82:4
**thoughts** 43:4 155:13
**thousand** 20:13
**three** 8:9 16:5 17:5 19:11 22:1,18,20 23:11 43:5 55:3 59:25 75:13 76:12 76:14 116:11 129:19 130:6 132:3 135:3 138:24 147:2 152:5 165:24 170:25
**time** 5:2 16:4,14 19:6 21:3 22:19,24 24:17 27:20 30:3 38:19 40:8,17,20,21 41:3 41:13 48:10 58:20 60:1 69:10,13 71:9 78:7 79:18 80:3,12 81:20 82:19 87:25 90:12 94:15,17 95:4 96:3,5 99:17 101:5 102:11,24,25 105:10,12,17 114:16 115:11,19 116:5,12,19 124:9 126:4 129:19 134:18 139:22 140:1,23 141:1,11 142:4,19 146:12 159:6 160:17,24 161:18,24 162:2 168:2 181:20
**timeline** 17:12
**times** 137:24 153:15
**title** 21:13 22:3,11 29:22 30:6,7,9,13 31:6,8 38:18,22 80:22 81:18 82:2,11 82:21 86:10,16 116:22 120:20,23 160:17
**titled** 135:19 165:4
**titles** 21:5 31:18
**today** 5:3 6:22 8:4,22 10:2 14:4,19 37:17 37:19 40:11 59:20 70:15 103:17 104:3 104:15 111:1,6 122:22 130:8 134:12 147:20,24 148:11 155:24 168:3
**today's** 110:1
**toggle** 99:18
**told** 42:19 49:18,25 50:3,18 53:22 59:11 75:8 76:1,5 92:21 122:2 123:14 125:7 130:10 132:23 148:6 156:8 157:23
**Tom** 71:4,17 72:24 73:11
**Tom's** 71:14 72:4,14
**tomorrow** 73:16,22
**top** 31:16 125:23 137:25
**topic** 10:19,21 12:4 13:8,24 14:13 89:24 103:18 105:3 106:1 106:12,16,18,19 107:1,4,8 110:16,21 164:16
**total** 27:11 55:13 102:20
**track** 84:12
**tracked** 77:17
**Tracker** 73:15
**Tracking** 88:18
**transaction** 44:16,24 45:7,19 47:2 49:19 50:4,19 51:6 52:6 64:16
**Transaction'** 44:18
**transcript** 4:25 174:23 175:1,23 176:6,18,19 179:10 179:10 181:15,16 181:18
**TRANSCRIPTION** 181:2
**TRAURIG** 2:2
**trial** 181:20
**tried** 158:6
**trigger** 117:3 120:15
**trouble** 130:18
**troubled** 130:13
**true** 179:11
**truly** 83:5
**truth** 5:23,24,24
**truthful** 65:11
**truthfully** 14:20
**try** 93:13 144:2,11
**trying** 17:12 20:7 35:16,19 43:6 46:10 50:9 67:9 94:1 116:4 126:9 129:24 140:17 150:11
**Tuesday** 114:22
**TV** 24:24
**twice** 19:6
**two** 15:10,11 17:8 19:2 22:1,18,20 23:11 52:22 53:3,17 55:10,10 64:14 72:23 77:11 88:20 98:5 102:19 127:25 128:6 139:20 141:9 146:19 149:24 164:13
**type** 15:22 27:4 29:16 75:16 76:10 85:5 98:17
**types** 27:3
**typical** 23:22,23 126:14
**typically** 32:18 54:22 69:15 83:15 93:13 115:18

**U**

**Uh-hum** 17:13 44:4 52:13,17 54:16 61:24 62:16 65:17 70:21 71:12 79:2 81:21 88:7 90:13 103:20 106:11 107:24 130:1 133:12 134:13 139:24 150:10
**ultimately** 37:25 99:22 139:4
**umbrella** 23:7 87:4
**unable** 136:13
**unchanged** 169:7
**uncover** 63:3 137:7
**underneath** 81:9 87:3
**undersigned** 178:6

**understand** 7:10 17:1 20:7 30:17 41:22 43:6 46:3,10 50:9 51:18 58:5 60:1 61:19 67:9 84:5 94:1 126:19 128:4 128:16 129:24 138:21 139:1 151:1 152:8 153:9 154:24 164:15
**understanding** 12:23 12:24 48:18 69:21 84:13 85:17 111:9 111:11 159:20 174:1
**understood** 17:11 43:6 93:25 171:8
**unexpected** 143:6,14 145:11 146:8
**unimportant** 146:3
**UNITED** 1:1
**University** 15:11
**unplanned** 126:15,17 143:20,25 144:7 145:8,23
**unscheduled** 144:11 144:14 163:12
**Unsure** 82:10 92:7
**update** 73:19 75:8 76:5
**updated** 71:14 74:10 77:4,9,14 80:22 86:9 167:7
**updating** 86:16
**upload** 141:21 147:7 147:10
**uploaded** 107:15 113:24 122:10
**uploading** 10:22,24 12:4 106:2,10
**urgency** 124:21 125:1 126:20 127:16,18 128:2,4,5,11,20
**urgent** 125:4,21,23
**URL** 170:22
**URQUHART** 2:7
**use** 63:23 64:4,5 70:9 172:4
**user** 69:11
**users** 68:8
**usually** 24:22
**utilize** 69:6

**V**

**v** 1:10
**vague** 49:25 50:2,15
**valuation** 52:3
**value** 18:1 54:23 55:1 77:12
**van** 80:10
**Vantage** 92:19,23
**various** 18:13 54:23
**vendor** 104:18
**version** 71:14 117:4
**versus** 100:15 166:23
**vice** 19:9 22:4,5,6,23
**VIDEO** 181:2
**videographer** 2:23 5:1 13:13,15,17,21 36:9,12 57:14 96:19 96:23 108:18,20,23 109:1 144:18,21 159:12,16 170:6,10 177:4
**VIDEOTAPE** 181:1
**videotaped** 1:19 5:2 177:6 179:8 181:13
**view** 51:21 131:2
**viewing** 113:2,3
**Visit** 21:22
**volume** 19:17
**vote** 91:5,13
**voted** 91:22
**votes** 91:19,21
**VP** 38:24,25,25 40:12 72:16 82:15 87:15
**vs** 180:3 181:8

**W**

**W** 79:24
**wait** 141:16 147:6,9
**waiting** 131:2 142:2
**waive** 176:10,11,12 176:13,18
**waived** 181:22
**Walden** 81:12 82:9
**walk** 79:16
**want** 6:22 30:21 54:6 82:4 83:22 84:4,12 95:1,24 96:3 97:2 103:25 105:13,17 108:20 110:2 129:12,16 135:23 136:1 144:1 145:1 147:23 159:7 170:13 176:11,17
**wanted** 127:1,23 175:4
**wasn't** 15:22 38:2,6 63:15 69:14 117:4
**way** 12:3 13:3 24:4 28:5 33:12 74:24 76:24 89:18 91:15 117:2 135:2 136:8 137:7 151:18 155:25 157:11 160:6
**ways** 137:3
**we'll** 79:18 105:9,16
**we're** 5:1 13:17,21 14:25 17:11 19:22 23:7,16 24:23 25:25 35:20,21 36:9,12 45:17 57:14 69:5 75:7 93:25 96:2,19 96:23 105:15 106:6 108:23 109:1 114:23 133:6,6,7 137:15,23 144:18 144:21 159:12,16 170:6,10 175:8 177:4,5
**we've** 82:24 96:1 104:17 112:20,22 112:23 138:4 140:9 159:5
**Wealth** 88:13
**website** 12:5 37:24 41:20,25 43:12 67:5 67:10,13,22,23 68:1 69:6 80:22 86:9 87:11 92:14 93:6,12 93:16,17,20 94:4,7 94:9,25 95:1,14 97:13,15,20 99:11 100:10,21 101:1 102:11,21 103:4 104:5 106:3,10 107:15 109:15,18 109:22 110:5 112:20 113:18,24 114:4 115:4 117:19 121:20 122:24 124:24 133:2 143:15 145:13 155:10,16 156:1,6 158:15,18,21,23,25 162:23 164:21 167:19 168:1 169:10 171:19 172:4,7
**websites** 18:12 86:15 87:7,10
**Wednesday** 5:3
**week** 151:16
**went** 14:3 16:9 69:19 69:22,24,24 70:3 77:19 92:23 94:18 125:12 158:18
**weren't** 140:24
**WhatsApp** 64:4
**whatsoever** 118:20
**wheelhouse** 56:8 91:16 98:20
**whichever** 181:21
**White** 171:20
**wife** 15:7
**witness** 5:6 6:1,6 10:25 13:10 14:10 25:8,14,21 26:15 29:4 31:23 32:9,18 33:1,5,18,24 34:12 34:20 35:1,10,24 36:23 37:2,9 38:5 38:18 39:4,11,18,24 40:5,15 41:16 42:3 42:8,22 43:12 45:4 45:14 46:7,14 47:4 47:17 48:4,22 49:2 49:21,23 50:21 51:24 52:9 54:16 55:22 56:4 58:15 59:14 60:8 62:24 63:8 64:20 65:25 66:7,15 72:11 78:15 86:14 91:15 92:3 95:3,21 96:2,5,7,9 96:13,15,18 98:1,20 99:8 103:24 106:15 106:24,25 107:7,19 109:7,11 110:7,23 111:14 112:3,16 113:12,20 114:6 115:22 117:7,23 118:16 119:14 120:22 122:18 123:1,8 125:3 127:5 129:8 130:17 131:10 133:24 141:23 143:9,17 144:3 147:12 148:9 151:5,23 152:18 153:1,7,23 154:16 155:6,20 156:19 157:3 158:2,17 159:11 160:5 161:11 163:15 164:18 167:3 168:7 168:18 169:6,18 170:5 176:12,15 178:10
**witness's** 106:21
**woke** 68:19
**word** 62:1 144:7,10 157:16
**words** 48:12 150:9
**work** 6:13 16:12 24:24 27:10 28:24 37:12,18 38:16 39:1 43:2 60:10 81:7 82:3,6 126:3,6,8,10 165:18
**worked** 15:20 43:8 59:5 72:6 76:23 81:17 83:17
**working** 15:17 23:25 25:2 37:22 38:9,9 38:12 39:8 55:11 148:24 149:21
**workplace** 6:15
**works** 28:23 29:8 80:6,19 82:1,10 96:15 159:11
**world** 95:19 158:4 168:14
**worries** 142:2
**wouldn't** 28:11 51:24 54:1 76:6 95:16 106:12
**Wow** 28:4
**write** 121:19 124:14 140:22
**writes** 142:15 148:23
**writing** 15:14 159:23
**written** 106:22 153:14 165:6 173:19
**wrong** 100:2 111:12 112:13,25 113:9 127:2 140:25 141:5 150:13 156:14,17

157:1
**wrote** 157:9

**X**

**x** 1:14 3:1,7 19:20 20:10,10 85:23,24 85:24 86:6

**Y**

**yeah** 9:24 17:7,11 20:20 21:18 24:20 28:20 35:25 68:3 69:12 70:14 74:1 76:18 77:16 83:15 85:2 88:1 89:12 91:15 95:3 96:1,7 106:15 108:22 126:12,22 141:9 149:19 150:21 161:5 168:24 169:18 171:3,23 174:8
**year** 83:4 99:19
**years** 15:10,11 16:5 16:16,25 17:5,8 19:3 22:1,18,20 43:5 55:3 59:25 75:13 116:11 129:19 130:7 132:3 135:3 138:24 147:2 152:5 165:25 170:25 171:16
**Yep** 96:2
**yesterday** 8:5,8 13:7 134:19
**Young** 3:22 114:14 116:6 121:16 124:7

**Z**

**zoned** 89:15
**Zoom** 1:16 2:1,20 5:17 14:17
**Zuckerman** 2:9 5:18 14:17

**0**

**0000100** 4:15 142:14
**0000258** 53:16
**0000284** 53:15
**0000286** 54:15
**0000707** 77:15
**0001110** 3:21 114:25 173:13,20
**0001111** 174:5
**0001194** 88:6
**0001472** 4:13 139:16
**0001496** 4:11 138:3
**0001629** 4:7 124:3
**0001634** 4:9 135:20
**000258** 54:17

**1**

**1** 3:9 9:11 10:12,14
**1:15** 96:14,17
**1:25** 96:24 159:6
**1:41** 108:24
**1:43** 109:2
**10** 3:9,22 20:12 121:12,14
**10,000** 20:12
**10:20** 1:17 5:2
**10:26** 102:24
**10:30** 13:18
**10:35** 13:22
**101** 3:19
**10th** 2:7
**10X** 77:7
**11** 4:7 12:4 13:8,24 14:13 74:17,21 107:8 123:24 124:5
**11-9-23** 116:24
**11.5** 71:14
**11/14/23** 3:22
**11/16/23** 4:18
**11/9/2023** 121:3 174:4
**11:01** 36:10
**11:02** 36:13
**11:29** 57:11
**11:43** 57:15
**114** 3:21
**11526** 15:4
**11th** 11:5
**12** 3:10 4:9 16:25 74:25 135:9,9,14,16 137:14
**12:30** 95:25
**12:34** 95:23
**12:35** 96:20
**12:45** 96:7
**121** 3:22
**124** 4:7
**13** 4:11 75:8 135:8 137:16,18,21 139:11,12,13
**135** 4:9
**137** 4:11
**139** 4:13
**14** 4:13 102:23 139:10,15,18 142:7 167:9
**141** 77:15
**142** 4:15
**148** 4:17
**14th** 99:23 100:8,20 100:25 114:22 119:2 121:17
**15** 4:15 27:23,24 61:25 102:24 142:9 142:11 147:17,18
**150** 28:1
**15th** 124:8,14 138:1 143:13 145:10
**16** 4:17 148:17,19 163:19
**163** 4:20
**165** 4:22
**16th** 157:10
**17** 4:20 163:20,21,21 163:23
**17th** 139:20 141:12
**18** 4:22 164:25 165:2
**181** 55:1

**2**

**2** 3:10 11:8 12:13,15 71:14 106:1
**2:25** 144:19
**2:26** 144:22
**2:44** 159:13
**2:50** 159:10
**2:55** 159:17
**20** 181:20
**200-plus** 28:5,7
**2004** 27:17
**2014** 16:21,22 17:4
**2016** 17:7,16 19:11 27:18
**2017** 17:6
**2018** 17:6
**202** 181:17
**2022** 23:19,21 69:19 69:22
**2023** 11:5 12:6 22:21 22:25 35:19 37:20 37:23 40:22 41:3,12 42:19 44:23 51:5 69:20,25 70:10 71:11 78:18 79:8 87:15,19 98:13 100:20 102:23,24 106:3 114:22 119:1 119:2 124:8,14 132:8 157:10 165:8 172:15
**2026** 1:16 5:3 177:16 178:11 179:20 180:4,19 181:6,14
**213** 2:10
**220** 27:15 28:3
**24** 1:16 180:4 181:14
**24th** 5:3
**25** 73:15
**260** 27:15 28:3
**266** 77:15
**27** 73:20 74:12 75:8 76:2,5,13,14,22
**29** 73:20 74:13 75:8
**2nd** 2:3
**2Q** 124:17

**3**

**3** 3:12 49:14,16 73:14
**3:10** 170:7
**3:22** 126:13 129:1
**3:23** 170:11
**3:26** 128:25 130:25
**3:30** 102:25
**3:32** 1:17 177:5
**30** 76:15
**30(b)(6)** 3:11 11:9 100:15,16
**305** 2:5
**32** 136:8 154:23,25 159:1 169:9
**33131** 2:3
**333** 2:3 6:16
**341** 54:25
**35** 20:1
**350118** 178:19
**38** 102:20
**3Q** 73:20 116:24 124:15 172:14 174:3
**3rd** 71:14

**4**

**4** 3:13,25 44:3 57:20 57:22,23 58:2 67:11 100:4,5,9 112:21,23 113:17 172:11,14
**4:30** 181:19
**4400** 2:3
**443-3000** 2:10
**45** 96:6,9,13
**49** 3:12

**5**

**5** 3:14 12:3 52:15 61:7,10 99:25
**5-16-2027** 178:18
**50** 77:6
**525-2221** 181:4
**550** 77:6
**579-0535** 2:5
**58** 3:13
**5th** 73:11 78:6 165:7

**6**

**6** 3:4,5,16 70:22,24 71:2 78:1 102:7
**6:25-cv-00424** 1:3
**61** 3:14
**622** 181:17
**6th** 71:11

**7**

**7** 3:17 79:1,4 101:12 101:16 178:11 179:20 181:6
**71** 3:16
**79** 3:17

**8**

**8** 3:19 101:14,15,18 101:21 104:24 107:23
**8-K** 4:20 162:21 163:2,6,8,12
**8:26** 138:1
**8:30** 130:21,25
**865** 2:7

**9**

**9** 3:21 79:8 114:9,11 118:6 173:11,13,21 173:25
**9:30** 181:18
**90017** 2:8
**911** 124:14,20,25 125:19 127:15 128:21 146:17
**954** 181:4

**9th** 78:18 99:23 100:7
100:20,24 118:10
119:1 172:15

Plf. Exhibit 1 | Date: 6/24/2026
Witness: Jeff Smith

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

RENEGADE CAPITAL GP, LLC d/b/a RIVERROCK FUNDS LLC, a Delaware limited liability company,

CASE NO.: 6:25-cv-00424

Plaintiff,

v.

ABACUS LIFE, INC. n/k/a ABACUS GLOBAL MANAGEMENT, INC., a Delaware Corporation,

Defendant,

_________________________________ /

**PLAINTIFF'S RE-NOTICE[1] OF VIDEOTAPED DEPOSITION OF JEFF SMITH**

PLEASE TAKE NOTICE that Plaintiff will take the videotaped deposition via Zoom video conference of:

| WITNESS | DATE/TIME | LOCATION |
|---|---|---|
| Jeff Smith of ABACUS LIFE, INC. n/k/a ABACUS GLOBAL MANAGEMENT, INC., a Delaware Corporation | Wednesday, June 24th, 2026 at 10:00 A.M. | Zoom Meeting<br>**LINK TO Join Zoom Meeting will be provided to Abacus' counsel in advance of the deposition** |

[1] This deposition is being re-noticed solely to change the deposition date at the request of Abacus' counsel; all other terms and details of the original notice remain unchanged.

Said deposition shall be recorded stenographically and videotaped upon oral examination before United Court Reporting (Main Office: 633 South Andrews Avenue, Suite 202, Fort Lauderdale, FL 33301, Phone: 954-525-2221), or any other officer or Notary Public authorized by law to take depositions. The videotaped deposition will continue from day to day until completed. The videotaped deposition is being taken for the purpose of discovery, for use at trial, or both of the foregoing, or for such purposes as are permitted under the applicable and governing rules.

Dated: May 28, 2026.

Respectfully submitted,

**GREENBERG TRAURIG, P.A.**
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0535

By: */s/ A. Sheila Oretsky*
A. Sheila Oretsky, Esq.
*Lead Counsel*
Florida Bar No. 31365
sheila.oretsky@gtlaw.com
raquel.acuna@gtlaw.com
Jennifer Junger, Esq.
Florida Bar No. 125853
jungerj@gtlaw.com
fernandezfe@gtlaw.com
MiaLitDock@gtlaw.com
*Attorneys for Plaintiff Renegade Capital GP, LLC d/b/a RiverRock Funds, LLC*

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on this May 28, 2026, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

By: */s/ A. Sheila Oretsky*
A. Sheila Oretsky, Esq.

Plf. Exhibit 2 | Date: 6/24/2026
Witness: Jeff Smith

**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

RENEGADE CAPITAL GP, LLC d/b/a RIVERROCK FUNDS LLC, a Delaware limited liability company,

CASE NO.: 6:25-cv-00424

Plaintiff,

v.

ABACUS LIFE, INC. n/k/a ABACUS GLOBAL MANAGEMENT, INC., a Delaware Corporation,

Defendant,

_________________________________ /

**PLAINTIFF'S RE-NOTICE[1] OF ZOOM DEPOSITION OF DEFENDANT'S CORPORATE REPRESENTATIVE UNDER FED. R. CIV. P. 30(b)(6)**

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Plaintiff will take the deposition via Zoom video conference of:

| WITNESS | DATE/TIME | LOCATION |
|---|---|---|
| Defendant Abacus Life, Inc. n/k/a Abacus Global Management, Inc., through one or more officers, directors, agents or other representatives who should be designated to testify on Abacus's behalf regarding all information known or | Wednesday, June 24th, 2026 at 10:00 A.M. | Zoom Meeting<br><br>**LINK TO Join Zoom Meeting** – on a computer or mobile phone:<br><br>**https://us02web.zoom.us/j/9545250012?pwd=QVJYWHhOblNJbFYwM1JCQlIvdS81QT09&omn=87169577593** |

[1] Upon Abacus' representation that Jeff Smith will be designated on 30(b)(6) topic Number 11, the 30(b)(6) Deposition Notice is re-noticed to reflect topic 11 on the same date and time as the deposition of Jeff Smith.

| | | |
|---|---|---|
| reasonably available to Abacus with respect to the subject matters identified in **Exhibit A** | | **Meeting ID: 954 525 0012**<br>**Passcode: 9545252221** |

Said deposition shall be recorded stenographically and videotaped upon oral examination before United Court Reporting (Main Office: 633 South Andrews Avenue, Suite 202, Fort Lauderdale, FL 33301, Phone: 954-525-2221), or any other officer or Notary Public authorized by law to take depositions. The videotaped deposition will continue from day to day until completed. The videotaped deposition is being taken for the purpose of discovery, for use at trial, or both of the foregoing, or for such purposes as are permitted under the applicable and governing rules.

Dated: June 12, 2026.

Respectfully submitted,

**GREENBERG TRAURIG, P.A.**
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0535

By: */s/ A. Sheila Oretsky*
A. Sheila Oretsky, Esq.
*Lead Counsel*
Florida Bar No. 31365
sheila.oretsky@gtlaw.com
raquel.acuna@gtlaw.com
JENNIFER JUNGER
Florida Bar No. 125853
jungerj@gtlaw.com
fernandezfe@gtlaw.com
MIAlitdock@gtlaw.com
*Attorneys for Plaintiff Renegade Capital GP, LLC d/b/a RiverRock Funds, LLC*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on this June 12, 2026, I electronically filed the foregoing document with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

By: */s/ A. Sheila Oretsky*
A. Sheila Oretsky, Esq.

## EXHIBIT "A"

In accordance with the Federal Rules of Civil procedure 30(b)(6), Plaintiff designates the matters identified below for examination. In construing these topics, the following definitions shall apply.

## DEFINITIONS

1. "Abacus," "Defendant," "You," or "Your" means Defendant Abacus Life, Inc. n/k/a Abacus Global Management, Inc., and any other individual or entity affiliated with Defendant, employed by Defendant, or acting or purporting to act on its behalf, including but not limited to directors, officers, employees, attorneys, agents, consultants, and parent, subsidiary, predecessor, successors, affiliated or related corporations or business units of such entities.

2. "Answer" means Abacus's operative responsive pleading to the Complaint.

3. "Complaint" means the operative Complaint in the Lawsuit.

4. "Confidentiality Agreement" means the Confidentiality Agreement entered between RiverRock and Abacus on September 5, 2023, which is attached to the Complaint as **Exhibit A**.[2]

5. "Confidential Information" has the same meaning as defined in the Confidentiality Agreement.

---

[2] Any capitalized terms not defined here have the same meaning as defined within the Confidentiality Agreement.

6. “Data Room” means the data room created shortly after the execution of the Confidentiality Agreement, on or about September 13, 2023 to share the Confidential Information between RiverRock and Abacus.

7. “Lawsuit” means the instant action.

8. “Plaintiff” or “RiverRock” means Plaintiff Renegade Capital GP, LLC d/b/a RiverRock Funds LLC and any other individual or entity affiliated with Plaintiff, employed by Plaintiff, or acting or purporting to act on its behalf, including but not limited to directors, officers, employees, attorneys, agents, consultants, and parent, subsidiary, predecessor, successors, affiliated or related corporations or business units of such entities.

9. “PowerPoint Presentation” or “Board Deck” means the presentation presented at the Abacus board of directors meeting occurring on or around November 9, 2023, which included information regarding the potential RiverRock Acquisition.

10. “RiverRock Acquisition” means the potential acquisition between RiverRock and Abacus.

11. “Slide Deck” means the slide deck that RiverRock posted on its website on or around November 14, 2023 and referred to in the Complaint.

**SUBJECT MATTERS DEPONENT SHALL BE PREPARED TO ADDRESS**

Topic 11: The uploading of the Slide Deck to Abacus’s investor website in November 2023.

**CONFIDENTIAL**

**Plf. Exhibit 3 |** Date: 6/24/2026
Witness: Jeff Smith

CONFIDENTIAL

**Plf. Exhibit 4 |** Date: 6/24/2026
Witness: Jeff Smith

Plf. Exhibit 5 | Date: 6/24/2026
Witness: Jeff Smith

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

RENEGADE CAPITAL GP, LLC d/b/a RIVERROCK FUNDS LLC, a Delaware limited liability company,

Plaintiffs,

v. Case No. 6:25-cv-00424-CEM-UAM

ABACUS LIFE, INC. n/k/a ABACUS GLOBAL MANAGEMENT, INC., a Delaware Corporation,

Defendants.

---

**PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION TO DEFENDANT**

Plaintiff Renegade Capital GP, LLC d/b/a RiverRock Funds LLC ("RiverRock" or "Plaintiff"), pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, hereby requests that Defendant Abacus Life, Inc. n/k/a Abacus Global Management, Inc. ("Defendant") produce the following within thirty (30) days of service and in the manner provided by the Federal Rules of Civil Procedure.

**DEFINITIONS[1]**

A. "Abacus," "Defendant," "You," or "Your" refers to Defendant Abacus Life, Inc. n/k/a Abacus Global Management, Inc., and any other individual or entity

[1] When the defined terms are used within requests, they have the meaning defined herein whether the term is capitalized or not.

affiliated with Defendant, employed by Defendant, or acting or purporting to act on its behalf, including but not limited to directors, officers, employees, attorneys, agents, consultants, and parent, subsidiary, predecessor, successors, affiliated or related corporations or business units of such entities.

B. "All" includes and encompasses "any" and "each."

C. "And" and "or" shall be read in the conjunctive or disjunctive in a manner to provide the broadest scope of an interrogatory.

D. "Anthony Annino" or "Annino" refers to the individual who was Chief Executive Officer of RiverRock.

E. "Business Records" refers to any and all of the documents that RiverRock shared with Abacus in contemplation of the potential RiverRock Acquisition.

F. "Communication" shall mean and include any written, oral, telephonic, electronic or other inquiry, representation, discussion, conversation, negotiation, agreement, understanding, meeting, letter, note, text message, whatsapp message, imessage, messaging through any app platform, telegraph, telex, fax, computer transmission, e-mail, blog post, tweet, instant message, voicemail, social media post, chat, video, advertisement or interview and any document relating to such communication.

G. "Complaint" refers to the operative Complaint in the Lawsuit.

H. "Confidentiality Agreement" refers to the Confidentiality Agreement entered between RiverRock and Abacus on September 5, 2023, which is attached to the Complaint as **Exhibit A**.[2]

I. "Document" and "Documents" shall be defined to the broadest extent permitted by Federal Rule of Civil Procedure 34(a)(1) and mean, without limitation, originals, drafts, or exact duplicates of any written, or graphic matter, however produced or reproduced, of any thought, expression, kind or description, and all tangible things from which information can be transcribed, including without limitation all written, graphic, or otherwise recorded material, however produced or stored, including, microfilms or other film records or impressions, electronically stored information regardless of the form of storage medium, tape recordings or computer cards, floppy disks or printouts, any and all papers, photographs, films, recordings, memoranda, books, records, accounts, communications, letters, telegrams, correspondence, drafts, notes of meetings, notes of conversations, notes of telephone calls, inter-office memoranda or written communications of any nature, recordings of conversations either in writings or upon any mechanical or electrical recording devices, including email, notes, papers, reports, analyses, invoices, canceled checks or check stubs, receipts, minutes of meetings, time sheets, diaries, desk calendars, ledgers, schedules, licenses, financial statements, telephone bills, logs, and any differing versions of any of the foregoing, whether so denominated, formal, informal or

[2] Any capitalized terms not defined here have the same meaning as defined within the Confidentiality Agreement.

otherwise, as well as copies of the foregoing which differ in any way, including by the addition of handwritten notations or other written or printed matter of any nature, from the original. The term specifically includes information stored in a computer database and capable of being generated in documentary form, such as report, spreadsheet, or electronic mail. The term encompasses the term Communication to the extent the transmission was recorded in any way. "Document" also includes all Electronically Stored Information ("ESI") as defined herein.

J. "Electronically Stored Information" or "ESI," as used herein, shall mean the original (or identical duplicate when the original is not available), and any non-identical copies (whether non-identical because of notes made on copies or attached comments, annotations, marks, transmission notations or highlighting of any kind) of writings of every kind and description whether inscribed by mechanical, facsimile, electronic, magnetic, digital, or other means. Electronically Stored Information includes, by way of example only, computer programs (whether private, commercial or work-in-progress), programming notes or instructions, activity listing of electronic mail receipts and/or transmittals, output resulting from the use of any software program, including word processing documents, spreadsheets, database files, charts, graphs and outlines, electronic mail, operating systems, source code of all types, peripheral drivers, PDF files, batch files, ASCII files, and any and all miscellaneous files and/or file fragments, regardless of the media on which they reside and regardless of whether said electronic information consists in an active file, deleted file or file fragment. Electronically Stored Information includes any and all items stored on

computer memories, hard disks, floppy disks, CD-ROMs, removable media such as Bernoulli Boxes and their equivalent, magnetic tapes of all types, microfiche, punched cards, punched tape, computer chips, including, but not limited to EPROM, PROM, RAM and ROM, on or in any other vehicle for digital information storage and/or transmittal. Electronically Stored Information also includes the file, folder tabs and/or containers and labels appended to, or associated with, any physical storage device associated with each original and/or copy.

K. "Include" and "Including" means including without limitation.

L. "Jay Jackson" or "Jackson" refers to the Chief Executive Officer of Abacus.

M. "Lawsuit" refers to the instant action.

N. "Plaintiff" or "RiverRock" refers to Plaintiff Renegade Capital GP, LLC d/b/a RiverRock Funds LLC and any other individual or entity affiliated with Plaintiff, employed by Plaintiff, or acting or purporting to act on its behalf, including but not limited to directors, officers, employees, attorneys, agents, consultants, and parent, subsidiary, predecessor, successors, affiliated or related corporations or business units of such entities.

O. "PowerPoint Presentation" or "Board Deck" refers to the presentation presented at the Abacus board of directors meeting occurring on or around November 9, 2023, which included information regarding the potential RiverRock Acquisition.

P. "Reflecting" means constituting or in any way concerning, representing or referring to.

Q. "Relating to" and "Relate to" mean reflecting, referring to, concerning, mentioning, pertaining to, evidencing, involving, describing, discussing, commenting on, embodying, responding to, supporting, contradicting, or constituting (in whole or in part), as the context makes appropriate.

R. "RiverRock Acquisition" means the potential acquisition between RiverRock and Abacus.

S. "Supporting" means evidencing, exhibiting, proving, substantiating, showing, or demonstrating.

## INSTRUCTIONS

1. Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, these Requests are continuing, and to the extent that the responses may be enlarged, diminished or otherwise modified by information required or discovered by you after service of your responses, you are requested to promptly serve supplemental responses immediately upon acquiring or discovering such information. Such supplemental responses shall include the dates and manner in which the additional information became known to you.

2. These Requests are directed to documents and things in your possession, custody or control as provided in Rule 34 of the Federal Rules of Civil Procedure. If any of the requested documents or things are not in your possession, custody or control, but you know or believe them to be in the possession, custody or control of another person, business organization or entity, identify that person, business organization or entity.

3. All documents produced pursuant to these Requests are to be produced as they are kept in the usual course of business or shall be organized and labeled (without permanently marking the original item produced) to correspond with the categories of each numbered request to which they are responsive.

4. In answering these Requests, all language should be given its plain meaning and kept in context, and the singular shall be read as including the plural and the plural shall be read as including the singular where appropriate.

5. To the extent that you consider any of the following Requests objectionable, respond to so much of each, and each part thereof, which is not objectionable in your view, and separately state that part of each which is objectionable and the ground for each objection.

6. No part of a Request shall be left unanswered merely because an objection has been interposed to another part of the request.

7. Where objections are made to a Request or any part thereof, the objection shall state with specificity all grounds in sufficient detail to allow the Court to rule on the objection.

8. Any document(s) withheld as privileged must be identified on a privilege log compliant with Federal Rule of Civil Procedure 26 and the Local Rules of the Middle District of Florida. In order that the Court and the parties may determine the validity of the claim of privilege, you are to provide sufficient information to determine the identity of the document or oral communication so claimed to be privileged, and, as well, state the basis for any asserted claim of privilege.

9. Any reference in the singular shall include the plural and vice versa to bring within the scope of the request all document(s) which might otherwise be construed to be outside its scope.

10. If, for any reason, you are unable to produce in full any document requested:

(a) Produce each document to the fullest extent possible;

(b) Specify the reasons for your inability to produce the remainder; and

(c) State in detail whatever information, knowledge, or belief you have concerning the whereabouts and substance of each document not produced in full.

11. If any document requested was at one time in existence, but is no longer in existence, please state for each document as to which that is the case:

(a) The type of document;

(b) The types of information contained therein;

(c) The date upon which it ceased to exist;

(d) The circumstances under which it ceased to exist;

(e) The identity of all persons having knowledge of the circumstances under which it ceased to exist; and

(f) The identity of all persons having knowledge or who had knowledge of the contents thereof.

12. Words of gender shall be construed as including all genders, without limitation.

13. Words in the singular shall be construed to mean the plural and vice versa as appropriate.

14. As used herein, the present tense shall include the past tense and vice versa.

15. All of the requests in this Request for Production seek the production of electronic data ("Electronic Data"), sometimes referred to as "electronically stored information" or "ESI." Electronic Data as used herein shall mean the original or identical duplicate when the original is not available, and any non-identical copies (whether non-identical because of notes made on copies or attached comments, annotations, marks, transmission notations or highlighting of any kind) of writings of every kind and description whether inscribed by mechanical, facsimile, electronic, magnetic, digital, or other means. Electronic Data includes, by way of example only, electronic ledgers, electronic mail, e-mail, text messages, messages on social media platforms (such as Facebook, Instagram, and WhatsApp), computer programs (whether private, commercial or work-in-progress), programming notes or instructions, activity listing of electronic mail receipts and/or transmittals, output resulting from the use of any software program, including word processing documents, spreadsheets, database files, charts, graphs and outlines, operating systems, source code of all types, peripheral drivers, PIF files, batch files, ASCII files, and any and all miscellaneous files and/or file fragments, regardless of the media on which they reside and regardless of whether said electronic data exists in an active file, deleted file, or file fragment. Electronic Data includes any and all items stored, in native and non-

native format, on computers, servers, cloud databases, or online (for example, QuickBooks); on computer memories; hard disks; floppy disks; CD-ROMs; removable media such as portable drives, Bernoulli Boxes, and their equivalent; magnetic tapes of all types; microfiche; punched cards; punched tape; computer chips including, but not limited to, EPROM, PROM, RAM and ROM; or on or in any other vehicle for digital data storage and/or transmittal. Electronic Data also includes the file, folder tabs and/or containers and labels appended to, or associated with, any physical storage device associated with each original and/or copy.

16. These Requests shall be deemed to seek responses from January 1, 2023 to the date hereof (unless otherwise noted), and to the full extent permitted under the Federal Rules of Civil Procedure.

## REQUESTS FOR PRODUCTION

1. All documents and/or communications relating to Your potential business acquisition of RiverRock, including but not limited to all correspondence internal to Abacus, between Abacus and RiverRock, or between Abacus and any third-party regarding Abacus' intention to acquire RiverRock, its negotiations with RiverRock, its due diligence of the potential RiverRock Acquisition, and its decision not to acquire RiverRock.

2. All documents and/or communications relating to the entry of the Confidentiality Agreement, including but not limited to all correspondence internal to Abacus, between Abacus and RiverRock, or between Abacus and any third-party regarding the negotiation, terms, entry and breach of the Confidentiality Agreement.

3. All documents and/or communications relating to the Business Records and/or Confidential Information from RiverRock in the virtual data room in furtherance of the potential RiverRock Acquisition.

4. All documents and/or communications relating to the draft letter of intent titled "Project Water."

5. All documents You received from RiverRock relating to the RiverRock Acquisition, including all documents shared with You through any online data room, from January 1, 2023, through January 1, 2024.

6. All communications relating to the documents Abacus received from RiverRock through any online data room from January 1, 2023, through January 1, 2024.

7. The PowerPoint Presentation shared with Your board of directors at a meeting on or around November 9, 2023, which included information regarding the potential RiverRock Acquisition.

8. All versions and drafts of the Board Deck or any investor presentation referencing or including RiverRock's Confidential Information, including the RiverRock Acquisition.

9. All documents and/or communications between Abacus and any of its board members regarding the potential RiverRock Acquisition.

10. All documents and/or communications relating to or referring to the potential RiverRock Acquisition being discussed at the meeting on or around November 9, 2023.

11. The Board Deck and/or information contained within the Board Deck that was uploaded to Your website at abacuslife.com on or around November 14, 2023.

12. All documents and communications concerning the posting of the Board Deck and/or information contained within the Board Deck to Abacus' website, including internal communications, decision-making processes, and metadata or logs reflecting when the document was uploaded and removed.

13. All documents and/or communications evidencing that the Board Deck and/or information contained within the Board Deck was uploaded to Your website, including but not limited to, documents reflecting how long it remained on Your website, when it was posted and removed, how it was determined that it had been posted, how many individuals viewed it, and who accessed it.

14. All documents identifying the individuals, IP addresses, or other tracking data for persons who accessed or downloaded the Board Deck from the Abacus website.

15. All documents and/or communications evidencing who uploaded the PowerPoint Presentation to Your website and how the PowerPoint Presentation was uploaded to Your website.

16. All documents and/or communications relating to Your posting of the PowerPoint Presentation to Your website.

17. All documents and/or communications regarding the Form 8-K filed by Abacus noting the disclosure of information regarding the RiverRock Acquisition.

18. All documents and/or communications with any reporter regarding the PowerPoint Presentation on Your website.

19. All communications referencing or relating to the article published by Donna Horowitz for The Deal titled "Abacus Accidentally Posts Document on Potential RiverRock Deal" from December 1, 2023.

20. All documents and/or communications relating to Your decision to not move forward with the RiverRock Acquisition, including board minutes, internal memoranda, and communications with advisors.

21. All documents and/or communications demonstrating, evidencing or reflecting Your calculation of RiverRock's value between January 1, 2023 and November 9, 2023.

22. All documents and/or communications demonstrating, evidencing or reflecting Your determination of a purchase price for the RiverRock Acquisition between January 1, 2023 and November 9, 2023.

23. All documents reflecting valuations of RiverRock conducted or considered by Abacus.

24. Any and all documents demonstrating that intervening and superseding events caused RiverRock's damages or that RiverRock's damages were not caused by Abacus.

25. Any and all documents supporting Your claim that RiverRock failed to perform under the Confidentiality Agreement.

26. All insurance policies that may provide coverage for claims arising from this litigation, including errors and omissions, directors and officers, and cyber liability coverage.

Dated: June 2, 2025.

**GREENBERG TRAURIG, P.A.**
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0535

By: */s/ A. Sheila Oretsky*
**A. Sheila Oretsky, Esq.**
*Lead Counsel*
Florida Bar No. 31365
sheila.oretsky@gtlaw.com
raquel.acuna@gtlaw.com
**Jennifer Junger, Esq.**
Florida Bar No. 125853
jungerj@gtlaw.com
fernandezfe@gtlaw.com
**James J. Diamond, Esq.**
Florida Bar No. 0117678
diamondj@gtlaw.com
**Maria R. Santangelo, Esq.**
Florida Bar No. 1049930
maria.santangelo@gtlaw.com
MiaLitDock@gtlaw.com

*Attorneys for Plaintiff Renegade Capital GP, LLC d/b/a RiverRock Funds, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 2, 2025, I electronically served the foregoing on all counsel of record identified on the below Service List by Registered E-mail.

*/s/ A. Sheila Oretsky*
A. Sheila Oretsky, Esq.

Lauren Z. Alexander
Lash Goldberg Fineberg LLP
2500 Weston Rd, Suite 220
Weston, FL 33331
305-347-4040
Email: lalexander@lashgoldberg.com

Martin B. Goldberg
Lash & Goldberg, LLP
100 SE 2nd St Ste 1200
Miami, FL 33131-2158
305/347-4040
Fax: 305/347-4050
Email: mgoldberg@lashgoldberg.com

Andrea Picco
Lash Goldberg Fineberg LLP
2500 Weston Road, Suite 220
Fort Lauderdale, FL 33331
954-384-2500
Fax: 954-384-2510
Email: apicco@lashgoldberg.com

# CONFIDENTIAL

**Plf. Exhibit 6 |** Date: 6/24/2026
Witness: Jeff Smith

**CONFIDENTIAL**

**Plf. Exhibit 7 |** Date: 6/24/2026
Witness: Jeff Smith

**Plf. Exhibit 8 |** Date: 6/24/2026
Witness: Jeff Smith

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

RENEGADE CAPITAL GP, LLC
d/b/a RIVERROCK FUNDS LLC, a
Delaware Limited Liability company,

Plaintiff,

Case No. 6:25-cv-00424-CEM-UAM

v.

ABACUS LIFE, INC. n/k/a ABACUS
GLOBAL MANAGEMENT, INC.,
a Delaware Corporation,

Defendant.

---

**DEFENDANT'S RESPONSES AND OBJECTIONS TO**
**PLAINTIFF'S FIRST SET OF INTERROGATORIES**

Defendant Abacus Life, Inc. n/k/a Abacus Global Management, Inc. ("Abacus" or "Defendant"), by and through its undersigned counsel, submits the foregoing Responses and Objections to Plaintiff Renegade Capital GP, LLC d/b/a RiverRock Funds LLC's ("RiverRock" or "Plaintiff") First Set of Interrogatories, pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, and states as follows:

**PRELIMINARY STATEMENT**

These Responses are made solely for the purpose of this action. By responding to these Interrogatories, Defendant does not concede that the information provided is relevant to or reasonably calculated to lead to the discovery of admissible evidence in this or any other action. Defendant instead expressly reserves all objections pertaining to the relevance, competency, materiality, and admissibility of the documents as evidence and

information provided, as well as the right to object to further discovery relating to the subject matter of any information provided.

Defendant's investigation and development of the facts and circumstances related to this action are ongoing. Defendant's objections and responses are made without prejudice to, and are not a waiver of, its right to reply and object to other facts, documents, and requests during the pendency of this case. These Responses are provided based on the information reasonably known to Defendant at the time. Defendant reserves the right to supplement, revise, and/or amend these Responses, and to assert additional objections or privileges.

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1. Defendant objects to each Instruction and Definition to the extent they purport to impose any requirement or discovery obligation greater or different from the Federal Rules of Civil Procedure, applicable rules of the Court, or case law.

2. Defendant objects to the definition "Business Records" on the grounds that it assumes facts not established in the record, specifically, the existence of a "potential RiverRock Acquisition."

3. Defendant objects to the definitions of "PowerPoint Presentation" or "Board Deck" on the grounds that it assumes facts not established in the record, specifically, the existence of a "potential RiverRock Acquisition."

4. Defendant objects to the definition of "RiverRock Acquisition" as it assumes facts not established in the record, specifically, the existence of a potential acquisition between RiverRock and Abacus.

## GENERAL OBJECTIONS

1. Defendant objects to each Instruction and Definition to the extent it purports to impose any requirement or discovery obligation greater or different from the Federal Rules of Civil Procedure, applicable rules of the Court, or case law.

2. Defendant objects to each instruction, definition, and interrogatory to the extent that it seeks documents protected from disclosure by the attorney-client privilege, attorney work product doctrine, or any other applicable privilege. Should any disclosure by Defendant occur, it is inadvertent and shall not constitute a waiver of any privilege.

3. Defendant's discovery and investigation of the facts relevant to this case are ongoing and its responses to the Interrogatories are made to the best of its present knowledge, information, and belief. Defendant reserves the right to amend and/or supplement its responses, which are subject to such additional or different information as discovery or further investigation may disclose.

4. In making these objections, Defendant does not in any way waive or intend to waive, but rather preserves and intends to preserve:

a. all rights to object on any ground to the competency, relevancy, materiality, and admissibility of any information or document that may be provided in response to the Interrogatories or the subject matter thereof;

b. all rights to object on any ground to the use of any information or document that may be provided in response to the Requests or the subject matter thereof, in any subsequent proceeding, including the trial of the this or any other action; and

c. all rights to object on any ground to any request for further responses to these or any other discovery requests.

5. Defendant objects to the Interrogatories to the extent that they seek to define terms or characterize the evidence or pleadings in this matter. To the extent that Defendant reference theses terms in their Responses, such adoption is for ease of reference only and is not intended to imply acceptance of any such characterizations.

6. Defendant reserves the right to supplement, modify, amend, or correct all of any of the response and objections asserted below as necessary, including based on any court order that may be entered in this case.

**SPECIFIC RESPONSES AND OBJECTIONS**

1. Identify all individuals who have knowledge, or who Defendant believes have knowledge regarding the preparation of the Board Deck and describe what knowledge that individual(s) possesses.

**RESPONSE:** Defendant objects to this Interrogatory as overbroad and unduly burdensome, insofar as it requests identification of "all individuals" with knowledge regarding the preparation of the entire Board Deck which contained 38 slides of information, 36 of which did not concern or relate to Plaintiff. Subject to and without waiver of the foregoing objection, Defendant states that the following individuals have knowledge regarding the preparation of the two slides pertaining to Plaintiff in the Board Deck:

a. Jay Jackson
Chairman and Chief Executive Officer, Abacus
c/o LashGoldberg

He is likely to have information regarding the contents and preparation of the Board Deck.

b. Jonathan Osbourne
c/o Greenberg Traurig, P.A.
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
(305) 579-0535

He is likely to have knowledge regarding the information provided to Defendant pertaining to RiverRock that was included in the Board Deck.

c. Gabriel Siegel
c/o Greenberg Traurig, P.A.
333 E. 2nd Avenue, Suite 4400
Miami, Florida 33131
(305) 579-0535

He is likely to have knowledge regarding the information provided to Defendant pertaining to RiverRock which was included in the Board Deck.

d. Lucas Siegel
c/o Greenberg Traurig, P.A.
333 E. 2nd Avenue, Suite 4400
Miami, Florida 33131
(305) 579-0535

He is likely to have knowledge regarding the information provided to Defendant pertaining to RiverRock that was included in the Board Deck.

e. Anthony J. Annino
Former CEO, RiverRock
Anthony.annino@gmail.com

He is likely to have knowledge regarding the information provided to Defendant pertaining to RiverRock which was included in the Board Deck.

Defendant further states that its factual investigation is ongoing, and Defendant will supplement this interrogatory response as necessary as additional facts and information become available.

2. Identify all individuals who have knowledge, or who Defendant believes have knowledge regarding the presentation of the Board Deck to the board at the meeting on or around November 9, 2023, and describe what knowledge that individual(s) possesses.

**RESPONSE:** Defendant objects to this Interrogatory as overbroad and unduly burdensome, insofar as it requests identification of "all individuals" with knowledge regarding the presentation of the Board Deck which contained 38 slides of information, 36 of which did not concern or relate to Plaintiff. Subject to and without waiver of the foregoing objection, Defendant states that the following individuals have knowledge regarding the presentation of the two slides pertaining to the Plaintiff in the Board Deck:

a. Jay Jackson
Chairman and Chief Executive Officer, Abacus
c/o LashGoldberg

He is likely to have knowledge regarding the presentation of the Board Deck on or about November 9, 2023.

b. Bill McCauley
Chief Financial Officer, Abacus
c/o LashGoldberg

He is likely to have knowledge regarding the presentation of the Board Deck on or about November 9, 2023.

c. Chris Romaine
Chief Counsel, Abacus
c/o LashGoldberg

He is likely to have knowledge regarding the presentation of the Board Deck on or about November 9, 2023.

d. Adam Gusky
Chief Investment Officer, East Asset Management
Director, Abacus Board of Directors
c/o LashGoldberg

He is likely to have knowledge regarding the presentation of the Board Deck on or about November 9, 2023.

e. Gov. Thomas W. Corbett Jr.
Director, Abacus Board of Directors

He is likely to have knowledge regarding the presentation of the Board Deck on or about November 9, 2023.

f. Michiel van Katwijk
Director, Abacus Board of Directors

He is likely to have knowledge regarding the presentation of the Board Deck on or about November 9, 2023.

g. Beth Schulte, CPA, MBA
Director, Abacus Board of Directors

She is likely to have knowledge regarding the presentation of the Board Deck on or about November 9, 2023.

h. Karla Radka
Director, Abacus Board of Directors

She is likely to have knowledge regarding the presentation of the Board Deck on or about November 9, 2023.

Defendant further states that its factual investigation is ongoing, and Defendant will supplement this Interrogatory response as necessary as additional facts and information become available.

3. Identify all individuals who have knowledge, or who Defendant believes have knowledge regarding negotiations and communication relating to the potential RiverRock Acquisition and describe what knowledge that individual(s) possesses.

**RESPONSE:** Defendant objects to this Interrogatory as overbroad and unduly burdensome, insofar as it requests identification of "all individuals" with knowledge regarding a "potential RiverRock Acquisition," the existence of which is not established in the record. Subject to and without waiver of the foregoing objections, Defendant states that the following individuals have knowledge regarding the communications between Defendant and Plaintiff relating to RiverRock:

a. Jay Jackson
Chairman and Chief Executive Officer, Abacus
c/o LashGoldberg

He is likely to have knowledge regarding communications between Defendant and Plaintiff related to RiverRock.

b. Bill McCauley
Chief Financial Officer, Abacus
c/o LashGoldberg

He is likely to have knowledge regarding communications between Defendant and Plaintiff related to RiverRock.

c. Chris Romaine
Chief Counsel, Abacus
c/o LashGoldberg

He is likely to have knowledge regarding communications between Defendant and Plaintiff related to RiverRock.

Defendant further states that its factual investigation is ongoing, and Defendant will supplement this Interrogatory response as necessary as additional facts and information become available.

4. Identify all individuals who have knowledge, or who Defendant believes have knowledge regarding the upload of the Board Deck onto Abacus's public facing website and describe what knowledge that individual(s) possesses.

**RESPONSE:** Defendant objects to this Interrogatory as overbroad and unduly burdensome, insofar as it requests identification of "all individuals" with knowledge regarding the inadvertent upload of the Board Deck onto Defendant's website. Subject to and without waiver of the foregoing objection, Defendant states that the following individuals have knowledge regarding the inadvertent upload of the Board Deck to Defendant's website:

a. Jay Jackson
Chairman and Chief Executive Officer, Abacus
c/o LashGoldberg

He is likely to have knowledge regarding the inadvertent upload of the Board Deck to Defendant's website.

b. Jeff Smith
Director of Marketing, Abacus
c/o LashGoldberg

He is likely to have knowledge regarding the inadvertent upload of the Board Deck to Defendant's website.

c. Blake Gallimore
Director of Corporate Marketing & Communications, Abacus

c/o LashGoldberg

She is likely to have knowledge regarding the inadvertent upload of the Board Deck to Defendant's website.

d. Marissa Young
Senior Associate, ICR Inc.

She is likely to have knowledge regarding the inadvertent upload of the Board Deck to Defendant's website.

Defendant further states that its factual investigation is ongoing, and Defendant will supplement this Interrogatory response as necessary as additional facts and information become available.

5. Identify all individuals who have knowledge, or who Defendant believes have knowledge regarding the decision to not move forward with the RiverRock Acquisition and describe what knowledge that individual(s) possesses.

**RESPONSE:** Defendant objects to this Interrogatory as overbroad and unduly burdensome, insofar as it requests identification of "all individuals" with knowledge regarding the uploading of the Board Deck onto Defendant's website. Defendant further objects to this Request to the extent it seeks information regarding the "RiverRock Acquisition," on the ground that such Interrogatory presumes facts not established in the record. Subject to and without waiver of the foregoing objections, Defendant states that the following individuals have knowledge regarding discussions between RiverRock and Defendant and Defendant's decision-making process with respect to RiverRock:

a. Jay Jackson
Chairman and Chief Executive Officer, Abacus

c/o LashGoldberg

He is likely to have knowledge regarding discussions between Defendant and Plaintiff and Abacus's decision-making process with respect to RiverRock.

b. Chris Romaine
Chief Counsel, Abacus
c/o LashGoldberg

He is likely to have knowledge regarding discussions between Defendant and Plaintiff and Abacus's decision-making process with respect to RiverRock.

Defendant further states that its factual investigation is ongoing, and Defendant will supplement this Interrogatory response as necessary as additional facts and information become available.

6. Describe in detail the circumstances under which the Board Deck containing RiverRock's Confidential Information was published to Abacus' public website, including the date and time of posting, who authorized or caused the posting, and the reasons for doing so.

**RESPONSE:** Defendant objects to this Interrogatory to the extent is assumes facts not in evidence, including the characterization of any information as "Confidential." Defendant also objects to this Interrogatory to the extent that it seeks identification or a summary of documents that Defendant agrees to produce in discovery, on the grounds that such a request is unduly burdensome and seeks information equally available to Plaintiff. Subject to and without waiver of the foregoing objections, Defendant states that the Board Deck which included two pages referencing Plaintiff out of a total of 38 pages, was inadvertently posted on

Defendant's investor website at https://ir.abacusgm.com under the Presentations subtab during the period from November 14, 2023 at 10:26AM EST to November 15, 2023 at 3:30PM EST. Defendant further states that the Board Deck was inadvertently sent by Jeff Smith to ICR, Inc., who then sent the Board Deck to Notified to be posted on Defendant's investor website.

Defendant further states that its factual investigation is ongoing, and Defendant will supplement this Interrogatory response as necessary as additional facts and information become available.

7. State the exact date and time when the Board Deck was removed from Abacus' website, and identify all individuals involved in or responsible for the removal.

**RESPONSE:** Defendant objects to this Interrogatory as overbroad and unduly burdensome, insofar as it requests identification of "all individuals" involved in or responsible for the removal of the Board Deck from Defendant's website. Subject to and without waiver of the foregoing, Defendant states that the Board Deck which included two pages referencing Plaintiff out of a total of 38 pages, was inadvertently posted on Defendant's investor website at https://ir.abacusgm.com under the Presentations subtab during the period from November 14, 2023 at 10:26AM EST to November 15, 2023 at 3:30PM EST. Jay Jackson immediately directed Jeff Smith who directed ICR, Inc. to remove the Board Deck from Defendant's investor website after the inadvertent posting was discovered.

Defendant further states that its factual investigation is ongoing, and Defendant will supplement this Interrogatory response as necessary as additional facts and information become available.

8. Identify all persons or entities who accessed, viewed, downloaded, or otherwise obtained the Board Deck containing RiverRock's Confidential Information while it was publicly posted to Abacus' website, including all IP addresses, email domains, or identifying information captured.

**RESPONSE:** Defendant objects to this Interrogatory to the extent is assumes facts not in evidence, including the characterization of any information as "Confidential." Defendant also objects to this Interrogatory to the extent that it seeks identification or a summary of documents, if any exist, that Defendant agreed to produce in response to Plaintiff's Request for Production No. 14, on the grounds that such a request is unduly burdensome and seeks information equally available to Plaintiff. Subject to and without waiver of the foregoing, Defendant states that the link to the Board Deck presentation that was inadvertently posted on Defendant's investor website during the period from November 14, 2023 at 10:26AM EST to November 15, 2023 at 3:30PM EST received thirty-two (32) clicks. Defendant is without further knowledge or information to enable it to identify the persons or entities who clicked on the link to the Board Deck. Defendant further states that its factual investigation is ongoing, and Defendant will supplement this Interrogatory response as necessary as additional facts and information become available.

9. Identify all documents and communications relating to Abacus' decision not to proceed with the RiverRock Acquisition, including who made the decision, when it was made, and the reasons given.

**RESPONSE:** Defendant objects to this Interrogatory to the extent that it seeks information regarding a potential "RiverRock Acquisition," on the grounds that it presumes facts not established in the record. Defendant also objects to this Interrogatory to the extent that it seeks identification or a summary of documents that Defendant agreed to produce in discovery, on the grounds that such a request is unduly burdensome and seeks information equally available to Plaintiff. Defendant states that the responsive and non-privileged documents and communications requested in this Interrogatory, if any, will be produced in response to Plaintiff's First Set of Requests for Production to Defendants.

Dated: July 14, 2025

**LASHGOLDBERG**
Lash Goldberg Fineberg LLP
2500 Weston Road, Suite 220
Weston, Florida 33331
Tel: 954-384-2500
Fax: 954-384-2510

By: */s/ Lauren Z. Alexander*
**MARTIN B. GOLDBERG**
Florida Bar No. 827029
mgoldberg@lashgoldberg.com
**LAUREN Z. ALEXANDER**
Florida Bar No. 58044
lalexander@lashgoldberg.com
**ANDREA PICCO**
Florida Bar No. 1011573
apicco@lashgoldberg.com

*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of July, 2025, a true and correct copy of the foregoing has been served on all counsel of record.

*/s/ Lauren Z. Alexander*
**LAUREN Z. ALEXANDER**

STATE OF FLORIDA )
) SS.
COUNTY OF Orange )

BEFORE ME, the undersigned authority, personally appeared, Jay Jackson, who, after being first duly sworn, deposes and says that the foregoing answers are true and accurate.

SWORN TO AND SUBSCRIBED before me this 14 day of July, 2025.

Signature

TRACEY SMID FORD
Notary Public - State of Florida
Commission # HH 307374
My Comm. Expires Aug 31, 2026
Bonded through National Notary Assn.

Tracey Smid Ford
Print Name
NOTARY PUBLIC
State of Florida at Large

My Commission Expires:
8/31/2026

X Personally known to me

______ Produced identification

**CONFIDENTIAL**

**Plf. Exhibit 9 |** Date: 6/24/2026
Witness: Jeff Smith

Pltf. Exhibit 10 | Date: 6/24/2026
Witness: Jeff Smith

**From:** Marissa Young <Marissa.Young@icrinc.com>
**To:** Jeff Smith <jeff@abacuslife.com>
**Subject:** RE: Board Deck for IR Site
**Date:** Tue, 14 Nov 2023 15:25:37 +0000
**Inline-Images:** image002.png

---

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe, any questions please forward to IT. Thank You!

Thank you! I will add it to the site.

---

**From:** Jeff Smith <jeff@abacuslife.com>
**Sent:** Tuesday, November 14, 2023 9:33 AM
**To:** Marissa Young <marissa.young@icrinc.com>
**Subject:** Board Deck for IR Site

Hey Marissa,

Here is the Q3 board deck for the ir website.

Thanks!

Jeff Smith
**Vice President of Marketing**

407.988.1088| jeff@abacuslife.com | abacuslifesettlements.com | 2101 Park Center Drive, Orlando, FL 32835

ABACUS LIFE
OPTIONS FOR YOUR LIFE INSURANCE
NASDAQ | ABL

The information contained in this electronic mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be a client communication and/or work product which may contain proprietary information and as such is privileged and confidential. If the reader of this message is not the intended recipient(s) or an agent responsible for delivering it to the intended recipient(s), you are hereby notified that you have received this message and any attachments hereto in error and that any review, dissemination, distribution, or copying of this message whole or in part is strictly prohibited and may subject you to civil and/or criminal penalties under state or federal law. If you have received this message in error, please notify the sender immediately by email, and delete the original message.

**External Email. Exercise Caution when clicking links or opening attachments.**

ICR STRATEGIC COMMUNICATIONS & ADVISORY

**Marissa Young**, Senior Associate


ABACUS_0001108

**D 332-242-4361** C +1 646-618-5267
New York NY 10017
www.icrinc.com

Investor Relations | Public Relations | Capital Markets Advisory | ESG Solutions
Crisis Communications | Transactions | Special Situations | Branding + Creative

**Confidentiality Notice** The contents of this email, including any attachments, are confidential and/or privileged and, in all cases, provided for the sole use of the intended recipient. If you are not the intended recipient of this email you may not copy, forward, disclose or otherwise use it or any part of it in any form whatsoever. If you have received this message in error, please notify us immediately by replying to the message and deleting it from your computer. Messages sent to and from ICR may be monitored for various purposes including security management and compliance.

**CONFIDENTIAL**

**Plf. Exhibit 11 |** Date: 6/24/2026
Witness: Jeff Smith

**CONFIDENTIAL**

**Plf. Exhibit 12 |** Date: 6/24/2026
Witness: Jeff Smith

CONFIDENTIAL

**Plf. Exhibit 13 |** Date: 6/24/2026
Witness: Jeff Smith

**CONFIDENTIAL**

**Plf. Exhibit 14 |** Date: 6/24/2026
Witness: Jeff Smith

Plf. Exhibit 15 | Date: 6/24/2026
Witness: Jeff Smith

**From:** Marissa Young <Marissa.Young@icrinc.com>
**To:** Jay Jackson <jay@abacuslife.com>, Garrett Edson <garrett.edson@icrinc.com>, Chris Romaine <chris@lmagrp.com>, Bill McCauley <bill@abacuslife.com>
**CC:** Jeff Smith <jeff@abacuslife.com>
**Subject:** Re: Final Approved Public Deck
**Date:** Fri, 17 Nov 2023 22:01:01 +0000
**Inline-Images:** image001.png

---

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe, any questions please forward to IT. Thank You!

Will do. Thank you!

---

**From:** Jay Jackson <jay@abacuslife.com>
**Sent:** Friday, November 17, 2023 4:52:30 PM
**To:** Marissa Young <marissa.young@icrinc.com>; Garrett Edson <garrett.edson@icrinc.com>; Chris Romaine <chris@lmagrp.com>; Bill McCauley <bill@abacuslife.com>
**Cc:** Jeff Smith <jeff@abacuslife.com>
**Subject:** Final Approved Public Deck

Wait until Monday to upload.

Jay Jackson
President & CEO

800.561.4148 | jay@abacuslife.com | abacuslife.com | 2101 Park Center Drive, Orlando, FL 32835

ABACUS LIFE
KNOW THE VALUE OF YOUR LIFE
NASDAQ | ABL

The information contained in this electronic mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be a client communication and/or work product which may contain proprietary information and as such is privileged and confidential. If the reader of this message is not the intended recipient(s) or an agent responsible for delivering it to the intended recipient(s), you are hereby notified that you have received this message and any attachments hereto in error and that any review, dissemination, distribution, or copying of this message whole or in part is strictly prohibited and may subject you to civil and/or criminal penalties under state or federal law. If you have received this message in error, please notify the sender immediately by email, and delete the original message.

**External Email. Exercise Caution when clicking links or opening attachments.**

ICR STRATEGIC COMMUNICATIONS & ADVISORY

**Marissa Young**, Senior Associate

**D 332-242-4361** C +1 646-618-5267
New York NY 10017


ABACUS_0000100

www.icrinc.com

Investor Relations
Crisis Communications
Public Relations
Transactions
Capital Markets Advisory
Special Situations
ESG Solutions
Branding + Creative

**Confidentiality Notice** The contents of this email, including any attachments, are confidential and/or privileged and, in all cases, provided for the sole use of the intended recipient. If you are not the intended recipient of this email you may not copy, forward, disclose or otherwise use it or any part of it in any form whatsoever. If you have received this message in error, please notify us immediately by replying to the message and deleting it from your computer. Messages sent to and from ICR may be monitored for various purposes including security management and compliance.

Plf. Exhibit 16 | Date: 6/24/2026
Witness: Jeff Smith

**From:** Jay Jackson <jay@abacuslife.com>
**To:** Sean McNealy <sean@abacuslife.com>, Scott Kirby <scott@abacuslife.com>, Matt Ganovsky <matt@abacuslife.com>, Samantha Butcher <sbutcher@abacuslife.com>
**CC:** Jeff Smith <jeff@abacuslife.com>, Bill McCauley <bill@abacuslife.com>, Seth Miller <seth@lmagrp.com>, Chris Romaine <chris@lmagrp.com>
**Subject:** Coventry knows about RR deal
**Date:** Thu, 16 Nov 2023 15:26:39 +0000
**Inline-Images:** image001.png

---

Somehow Coventry knows we are working on a deal with RR and Reid is flying out to see RR Friday. Super frustrating. I am hopeful that no one said anything to anyone even by accident. This is non public information and will impact our potential deal. Always remember, anything we say or materials used in the board meeting or in the hallways is non public and we cannot tell anyone including our family.

Jay Jackson
President & CEO

800.561.4148 | jay@abacuslife.com | abacuslife.com | 2101 Park Center Drive, Orlando, FL 32835

ABACUS LIFE
KNOW THE VALUE OF YOUR LIFE
NASDAQ | ABL

The information contained in this electronic mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be a client communication and/or work product which may contain proprietary information and as such is privileged and confidential. If the reader of this message is not the intended recipient(s) or an agent responsible for delivering it to the intended recipient(s), you are hereby notified that you have received this message and any attachments hereto in error and that any review, dissemination, distribution, or copying of this message whole or in part is strictly prohibited and may subject you to civil and/or criminal penalties under state or federal law. If you have received this message in error, please notify the sender immediately by email, and delete the original message.


ABACUS_0000456

CONFIDENTIAL

**Plf. Exhibit 17 |** Date: 6/24/2026
Witness: Jeff Smith

# Abacus Accidentally Posts Document on Potential RiverRock Deal




**The firm removes a document that detailed a potential acquisition and subsequently files a disclaimer and CEO Jay Jackson says it only was a financial model.**



**By Donna Horowitz**

December 05, 2023 09:05 AM

Abacus Life Inc. (ABL) published a document on its website about the acquisition of RiverRock Funds LLC, pulled it down and filed a disclaimer with the Securities and Exchange Commission.

The Orlando, Fla.-based life settlement provider posted a third-quarter board presentation dated Nov. 9 giving details about the acquisition of a competitor.

"It just was a financial model and not actual data," Abacus CEO Jay Jackson said, referring to the two pages of information in the middle of the document under the heading: "ABL Wealth Advisors — Acquisition of RiverRock Funds".

Jackson forwarded a link to a Form 8-K filed with the SEC on Nov. 20 that said the company had posted an updated investor deck on its website.

The "important notice to investors" by the company said the "disclaimed document" contained certain information that might be "inaccurate and preliminary."

Abacus didn't say in the filing that it was referring to the RiverRock information, which was obtained by The Life Settlements Report.

Abacus said in its updated filing that the "disclaimed document" entered the public domain about Nov. 14.

It didn't say when it removed the document or discovered its mistake. One industry source said it was up for about a day and a half before being removed.

The investors' note on the updated filing said it advises investors not to rely upon the disclaimed document or any information contained in it when making investment decisions to transact Abacus securities.

"The company notes that the disclaimed document and certain of the information contained therein, may be inaccurate and preliminary, was not intended to be publicly disclosed, and was not reviewed by the Company's auditors," Abacus said. "The company is providing this note to investors and third quarter 2023 investor presentation, which the company believes includes any material information from the disclaimed document, in order to better inform investors about the company."

The proposal about the RiverRock acquisition listed five bullet points describing advantages of such a purchase: $160 million in assets under management via two funds — seven-year closed-end fund structure; $5 million-plus acquisition price — $1.8 million 2023 gross revenue — $4.6 million 2023 gross costs; reduce gross costs to $755,000 in 2024 due to labor and infrastructure redundancies; 2024 estimated net revenue of $1.5 million (including transfer of servicing to Abacus) $1 million without transfer; and access to 100-plus new investors for Abacus funds.

Other costs in the "uses" category that includes payroll and rent totaled $4.7 million this year and dropped to $755,000 next year.

Under the valuation scenario, the net loss was about $2.9 million this year, which became net income of $967,177 in 2024 and ranged from $1 million to $1.8 million in succeeding years through 2031.

It isn't known if Abacus ever made an offer to purchase RiverRock, as Jackson declined comment. Jackson worked as a director of RiverRock from April 2009 to August 2015, according to his LinkedIn profile.

RiverRock chairman and owner Gabe Siegel, CEO Anthony Annino and COO Valerie Coffey didn't respond to calls and emails.

In addition to Siegel and the top two executives, RiverRock has 12 staff members, according to its web page.

RiverRock, which was founded in 2007, focuses on small-face policies ranging from $100,000 to $1 million in face value. The firm said it managed more than $220 million in assets four years ago when it put out a statement about its hiring of Annino. An October 2020 Form D notice for RRIF VII LP, the firm's seventh fund, said it had raised $44.7 million from 33 investors.

TAGS LIFE SETTLEMENTS INSURANCE FLORIDA TEXAS TRANSACTION EXCLUSIVE

COMPANIES MENTIONED

Abacus Life Inc.

PEOPLE MENTIONED

Jay Jackson